# Exhibit F



World politics    Business & finance    Economics    Science & technology    Culture    Blogs    Debate & discuss    Multimedia    Print edition

## Argentina's debt default
# Gauchos and gadflies

**Creditors' decade-long battle with Argentina shows just how tangled sovereign defaults can be**

Oct 22nd 2011 | NEW YORK | from the print edition



AS GREECE flirts with disaster and several other European countries buckle under heavy debts, creditors' experience with Argentina should serve as a sobering reminder about the mess that can follow a sovereign default. A decade after the Latin American country welshed on $81 billion, disgruntled creditors are still chasing their money. The litigation, and Argentina's defiance in the face of judgments against it, complicate its plans to return to international capital markets.

Argentina's default, after a severe economic crisis, sparked social unrest and runs on banks. It subsequently presented creditors with a take-it-or-leave-it offer of 35 cents on the dollar. They considered this derisory: previously, delinquent countries had typically paid 50-60 cents. But the government stood firm and roughly three-quarters of the bondholders took part in a debt exchange in 2005. More joined in 2010, bringing the total to 93%.

But the rest, holding $6 billion-worth of debt (excluding accrued interest), continue to insist on a higher payout, pointing to Argentina's strong commodity-led recovery. They were able to hold out because Argentina's bonds had no "collective-action clause" forcing everyone to participate if it reached a threshold of takers. Such clauses have since become commoner in emerging markets, and are due to become standard in Europe as part of the European Stability Mechanism, a planned replacement for the euro zone's current bail-out fund.

The holdouts are a motley crew. The noisiest are two "vulture" funds that bought many of their bonds in the secondary market: EM and NML Capital, an affiliate of Elliott Management, a hedge-fund group with a long history of butting heads with countries in default. The other main constituency is a group of 60,000 individuals from Italy, where Argentine bonds had been a popular retail investment.

Because the bonds were mostly issued under New York, not Argentine, law—a move designed to give comfort to investors and reduce the interest rates they demanded—the creditors could sue in America. Argentina played for time, at one point unsuccessfully arguing that only the agent through which the bonds were issued, not the beneficial holders, could sue. But over the years courts have handed down hundreds of judgments against Argentina, including $3 billion-worth for NML and EM.



Getting the country to cough up is another matter. Unlike companies, countries cannot officially go bust so their creditors don't have the benefit of a clear insolvency framework. It comes down to what assets they can persuade a judge to "attach", or deem subject to seizure. National sovereign-immunity laws protect many state-owned assets abroad, such as embassies. In America, however, stuff that is used for commercial purposes is fair game.

Judge Thomas Griesa, who has presided over much of the litigation, has branded Argentina's manoeuvres "immoral", turning the writ of American courts into a "dead letter". But he acknowledges that it is not a normal commercial party. He likes to remind the plaintiffs that they have rights but may not have remedies.

The upshot is a game of cat and mouse as creditors resort to novel tactics to get their money. This is bread-and-butter stuff for Elliott, which has stretched the legal envelope several times before in pursuit of sovereign deadbeats. The firm is going after assets belonging to Argentina's central bank (known at home as the BCRA), invoking the "alter ego" theory. This states that the BCRA is a fair target because it lacks separateness from the government, which has used it to finance pet projects and to pay favoured creditors. Judge Griesa has upheld this theory. Lawyers disagree about whether an appeals-court ruling in New York in July undermined it.

One target is BCRA funds held at other central banks. EM and NML came close to seizing $105m parked with the Federal Reserve Bank of New York, but an appeals court ruled that the money was not for "commercial" use and was thus immune. This case could end up in the Supreme Court. The creditors have sent subpoenas to banks that work with Argentina, asking for details of its commercial activities worldwide. Earlier this year Britain's top court ruled that they could pursue claims in British courts.

Creditors have scored some modest successes. Some $90m was seized from the New York trustee with which shares of a privatised Argentine bank had been deposited. And a few million dollars were grabbed from a science-ministry account, used to buy telescopes, at an American branch of another bank. Among the assets that the holdouts have tried and so far failed to get are shipments of natural gas and satellites. Lawyers spent many hours arguing over whether the satellites, part of a multi-governmental project, should be considered Argentine and commercial.

### Biscreants?

The vulture funds' boldest move has been to target the Bank for International Settlements (BIS), the bank for central bankers based in Basel. (Elliott's lawyers reportedly served Jaime Caruana, the bank's general manager, with a subpoena at a public event, just as he was about to speak.) The funds allege that the BIS has abused the immunities it enjoys as a multilateral institution by allowing the BCRA to park 80-90% of its $48 billion in foreign reserves in Basel,

out of creditors' reach, when other central banks typically keep only 3-5% of their reserves there. Although the BIS says 80-90% is "grossly overstated" (it won't disclose the actual number), nobody denies that the BCRA has a lot more of its money there than its peers do.



A Swiss court sided with the hedge funds, which had sued under a debt-collection law, but was overruled by an appeals court on a technicality. The Swiss supreme court then swooped in to confirm the BIS's immunity to seizure or prosecution. It typically takes several months to reach a decision, but this one came in a fortnight—a sign of the cut-and-dried nature of the case or indirect political pressure, depending on whom you ask.

The BIS declined to comment for this article but it has said publicly that taking central-bank deposits allows it to fulfil its function as a global settlements hub, that its immunities help it to operate in the public interest and that central banks are "generally entitled" to immunity protection. It rejects claims that it is above the law, pointing out that trading counterparties can take complaints to arbitration (none has).

The difference in this case, it might argue, is that the creditors' beef is with a client, not the BIS itself. "They don't want to become a centre of recovery for creditors of developing countries," says someone familiar with the bank's thinking. At the very least the BIS is caught uncomfortably between the legal logic of the holdouts and the political logic of sovereign countries.

EM and NML are still hopeful of exploiting this tension. They have brought a case against Switzerland at the European Court of Human Rights, under Article 6 of the human-rights convention, which guarantees the right to a fair hearing. Eager to kick up as big a stink as possible, they have even filed a criminal money-laundering complaint against unknown individuals at the BIS. But the odds are stacked against them.

The 60,000 Italians, who hold $1.3 billion in claims, are attacking from another angle. This summer the World Bank's International Centre for the Settlement of Investment Disputes (ICSID) agreed to hear their case against Argentina, the first time ICSID has allowed a group action of this type. The bad news for them is that Argentina, alone among G20 countries, has a habit of cocking a snook at ICSID rulings. Azurix, an American water company, has been unable to collect $165m awarded in 2006 because Argentina insisted it refile its claim in its courts, making a mockery of the idea that the arbitration process transcends national legal systems.

Unimpressed, America is applying pressure. In September it voted against a $230m loan to Argentina from the Inter-American Development Bank, one of the three multilateral agencies the country has been able to tap for funds since terminating its IMF programme in 2005. It has vowed to do the same at the World Bank. ICSID is not America's only peeve. It is also frustrated that Argentina has been dragging its feet over paying its $6.7 billion debt to the Paris Club of sovereign creditors, and that its anti-money-laundering framework is full of

cracks.

It is hard to see how the deadlock with holdout creditors can be broken. With Cristina Fernández set to be re-elected as Argentina's president on October 23rd, no big political shift is on the horizon. Nor does a sudden meeting of lawyers' minds look likely. At the latest New York court hearing on September 28th, decade-old arguments were revived, including over "pari passu" covenants, which state that no group of creditors should get a better deal than any other. The holdouts want these interpreted in a way that secures them a 100% payout when Argentina next services its restructured debt. That would jeopardise all of the restructuring done to date, counter the government's weary lawyers. Some cases, such as the ICSID one, look set to rumble on for at least another five years.

### Still circling

The vulture funds are unlikely to let up. Persistent harassment and provocative tactics are their stock-in-trade, and these occasionally pay off handsomely. In 2000 Elliott wrung a settlement from Peru worth five times what it had paid for a chunk of the country's defaulted debt in 1996. Victory came after it obtained a restraining order from a Belgian judge blocking the country's financial agent and clearing house from paying interest on Peru's Brady Bonds. The firm will continue to lobby lawmakers to pass laws penalising countries that defy American court judgments. One state law did almost pass, but banks that underwrite emerging-market sovereign-debt issues managed to block it.

It is unclear whether Argentina could really return to global markets without disruption from the holdouts, as officials claim. International bond proceeds would surely be a target for seizure. Foreigners can buy debt issued domestically, but artificially low yields and the risk of another default make that unappealing. With external finance in short supply, the government included a provision in its latest budget to use BCRA reserves to pay off maturing bonds. Not every sovereign default is as convoluted as Argentina's. But it still gives warning of how messy things can get when countries don't pay up.

from the print edition | Finance and economics

About The Economist online   About The Economist   Media directory   Staff books   Career opportunities   Contact us   Subscribe     [+] Site Feedback

Copyright © The Economist Newspaper Limited 2011. All rights reserved.   Advertising info   Legal disclaimer   Accessibility   Privacy policy   Terms of use     Help