UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

NML CAPITAL, LTD.,                                      08 Civ. 6978 (TPG)
                                                       09 Civ. 1707 (TPG)
                       Plaintiff,                      09 Civ. 1708 (TPG)

        v.

THE REPUBLIC OF ARGENTINA,

                       Defendant.
--------------------------------------------------------x

--------------------------------------------------------x
AURELIUS CAPITAL MASTER, LTD. and                       09 Civ. 8757 (TPG)
ACP MASTER, LTD.,                                        09 Civ. 10620 (TPG)

                       Plaintiffs,

        v.

THE REPUBLIC OF ARGENTINA,

                       Defendant.
--------------------------------------------------------x *(captions continue on following pages)*


## BRIEF OF PLAINTIFFS IN RESPONSE TO THE REMAND FROM THE COURT OF APPEALS

-------------------------------------------------------x

| | |
|---|---|
| AURELIUS OPPORTUNITIES FUND II, LLC and AURELIUS CAPITAL MASTER, LTD., | 10 Civ. 1602 (TPG) 10 Civ. 3507 (TPG) |

                        Plaintiffs,

      v.

THE REPUBLIC OF ARGENTINA,

                        Defendant.
-------------------------------------------------------x

-------------------------------------------------------x

| | |
|---|---|
| AURELIUS CAPITAL MASTER, LTD. and AURELIUS OPPORTUNITIES FUND II, LLC, | 10 Civ. 3970 (TPG) 10 Civ. 8339 (TPG) |

                        Plaintiffs,

      v.

THE REPUBLIC OF ARGENTINA,

                        Defendant.
-------------------------------------------------------x

-------------------------------------------------------x

| | |
|---|---|
| BLUE ANGEL CAPITAL I LLC, | 10 Civ. 4101 (TPG) 10 Civ. 4782 (TPG) |

                        Plaintiff,

      v.

THE REPUBLIC OF ARGENTINA,

                        Defendant.
-------------------------------------------------------x   *(captions continue on following page)*

```
--------------------------------------------------------x
```

PABLO ALBERTO VARELA, et al.,                    10 Civ. 5338 (TPG)

        Plaintiffs,

   v.

THE REPUBLIC OF ARGENTINA,

        Defendant.

```
--------------------------------------------------------x
```

```
--------------------------------------------------------x
```

OLIFANT FUND, LTD.,                              10 Civ. 9587 (TPG)

        Plaintiff,

   v.

THE REPUBLIC OF ARGENTINA,

        Defendant.

```
--------------------------------------------------------x
```

**GIBSON, DUNN & CRUTCHER LLP**     **DECHERT LLP**
Theodore B. Olson                      Robert A. Cohen
Matthew D. McGill                   Eric C. Kirsch
Jason J. Mendro                     1095 Avenue of the Americas
Misha Tseytlin                      New York, N.Y.  10036-6796
1050 Connecticut Avenue, N.W.    (212) 698-3500
Washington, D.C.  20036
(202) 955-8500

        *Attorneys for Plaintiff NML Capital, Ltd.*


**SIMON LESSER, P.C.**
Leonard F. Lesser
420 Lexington Avenue
New York, New York  10170
(212) 599-5455

        *Attorneys for Plaintiff Olifant Fund, Ltd.*

**FRIEDMAN KAPLAN SEILER & ADELMAN LLP**
Daniel B. Rapport
Edward A. Friedman
7 Times Square
New York, N.Y. 10036
(212) 833-1100

*Attorneys for Plaintiffs Aurelius Capital Master, Ltd., Aurelius Opportunity Fund II, LLC, ACP Master, Ltd., Blue Angel Capital I LLC*

**MILBERG LLP**
Michael C. Spencer
One Pennsylvania Plaza
New York, N.Y. 10119
(212) 594-5300

*Attorney for Plaintiffs Pablo Alberto Varela, et al.*

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................ 1

II.   BACKGROUND ............................................................................................. 5

　　A.    This Court Squarely Held That Argentina Breached The Equal Treatment Provision And That Argentina Is Required To Specifically Perform Its Obligations Under That Provision ........................................................ 5

　　B.    The Second Circuit Affirmed This Court's Orders And Remanded For Clarification On Two Issues ............................................................................ 6

　　C.    Argentina Has Declared That It Will Violate This Court's Orders And Disregard The Second Circuit's Opinion And Has Begun Planning To Restructure Its Payment Mechanisms ............................................................ 7

　　D.    Argentina Relies Upon Payment Systems Of The United States And Entities Located In New York To Make Payments On The Exchange Bonds .......................................................................................................... 10

III.  ARGUMENT .................................................................................................. 12

　　A.    The Two Limited Issues Remanded By The Second Circuit Should Be Resolved As Set Forth In The Plaintiffs' Proposed Orders ............................... 12

　　　　1.    This Court Correctly Determined The Operation Of The Ratable Payment Formula In The February 23 Orders .......................................... 12

　　　　2.    The Court Should Enter The Proposed Orders, Making Clear That The February 23 Orders Bind Agents Of Argentina, And Parties That Act In Concert With Argentina, Pursuant To Rule 65(d)(2) .......... 15

　　B.    The Court Should Decline To Extend The Stay Of The February 23 Orders...... 20

　　　　1.    Argentina Has No Substantial Possibility Of Success On The Merits .................................................................................................... 21

　　　　2.    A Stay Would Substantially Injure The Plaintiffs ................................... 21

　　　　3.    Argentina Will Not Be Irreparably Injured By Refusal Of Its Request To Continue The Stay, Especially Because It Can Post A Bond To Protect Its Rights On Appeal .................................................... 23

　　　　4.    The Public Interest Weighs Strongly Against A Stay ............................. 24

　　C.    The Belated Interjections Of Purported Holders Of Exchange Bonds Should Not Be Permitted To Delay Resolution Of The Second Circuit's Remand .......................................................................................................... 24

IV.   CONCLUSION ................................................................................................ 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Eli Lily & Co. v. Gottstein*,
    617 F.3d 186 (2d Cir. 2010) ..................................................................... 16

*Elliott Assocs. L.P. v. Banco de la Nacion*,
    194 F.3d 363 (2d Cir. 1999) ..................................................................... 8

*Fed. Ins. Co. v. County of Westchester*,
    921 F. Supp. 1136 (S.D.N.Y. 1996) ....................................................... 21

*Fin. One Pub. Co., v. Lehman Bros. Special Fin., Inc.*,
    414 F.3d 325 (2d Cir. 2005) ..................................................................... 15

*Goya Foods, Inc. v. Wallack Mgmt. Co.*,
    290 F.3d 63 (1st Cir. 2002) ....................................................................... 17

*Grain Traders, Inc. v. Citibank, N.A.*,
    160 F.3d 97 (2d Cir. 1998) ....................................................................... 19

*Hilton v. Braunskill*,
    481 U.S. 770 (1987) ................................................................................... 21

*Mohammed v. Reno*,
    309 F.3d 95 (2d Cir. 2002) ....................................................................... 21

*Regal Knitwear Co. v. NLRB*,
    324 U.S. 9 (1945) ................................................................................... 16, 18

*Reliance Ins. Co. v. Mast Constr. Co.*,
    84 F.3d 372 (10th Cir. 1996) ......................................................... 16, 17, 18

*U.S. Postal Serv. v. Brennan*,
    579 F.2d 188 (2d Cir. 1978) ..................................................................... 25

*U.S. SEC v. Citigroup Global Mkts., Inc.*,
    673 F.3d 158 (2d Cir. 2012) (per curiam) ............................................... 21

*Vuitton et Fils S.A. v. Carousel Handbags*,
    592 F.2d 126 (2d Cir. 1979) ............................................................... 16, 18

**TABLE OF AUTHORITIES (continued)**

<u>**Page(s)**</u>

**Statutes**

N.Y. U.C.C. Law § 4-A-103 ......................................................................................... 19

N.Y. U.C.C. Law § 4-A-104 ......................................................................................... 19

N.Y. U.C.C. Law § 4-A-503 ......................................................................................... 19

**Rules**

Fed. R. Civ. P. 24 ......................................................................................................... 25

Fed. R. Civ. P. 65 .................................................................................................. passim

The Court of Appeals for the Second Circuit has unequivocally and unanimously affirmed this Court's decision that the Republic of Argentina ("Argentina" or "the Republic") has breached the Equal Treatment Provision of the Fiscal Agency Agreement ("FAA"), and this Court's determination that specific performance of Argentina's promise is the appropriate remedy for this breach.  The plaintiffs, accordingly, respectfully request that this Court promptly enter the clarification that the Second Circuit requested, as described herein, and decline to extend the stay of the February 23 Orders.[1]

## I.      INTRODUCTION

On October 26, 2012, the United States Court of Appeals for the Second Circuit affirmed this Court's finding that Argentina breached the Equal Treatment Provision and its determination that specific performance of Argentina's promise is the appropriate remedy for the breach.  It remanded the case for clarification only as to how two aspects of this Court's injunctions are to be implemented.

Immediately following the decision of the Second Circuit, Argentina's Minister of Economy proclaimed on his Twitter page that "Argentina's capacity and willingness to pay has been demonstrated, again and again," but that "*[w]e are never going to pay the 'vulture funds.'*" Declaration of Robert A. Cohen, Ex. DD ("Cohen Decl.") (emphasis added).  "***That's not going***

---

[1]  The "February 23 Orders" refer to this Court's orders granting the plaintiffs' motions for specific performance of the Equal Treatment Provision, though all citations to the Orders' text refer to the Order in *NML Capital Ltd. v. Republic of Argentina*.  *See* Order, *NML Capital, Ltd. v. Republic of Argentina*, Nos. 08 Civ. 6978 (TPG), 09 Civ. 1707 (TPG), 09 Civ. 1708 (TPG) (S.D.N.Y. Feb. 23, 2012), Cohen Decl., Ex. L; Order, *Aurelius Capital Master, Ltd. v. Republic of Argentina*, Nos. 09 Civ. 8757 (TPG), 09 Civ. 10620 (TPG), 10 Civ. 1602 (TPG), 10 Civ. 3507 (TPG), 10 Civ. 3970 (TPG), 10 Civ. 4101 (TPG), 10 Civ. 4782 (TPG), 10 Civ. 8339 (TPG) (S.D.N.Y. Feb. 23, 2012), Cohen Decl., Ex. M; Order, *Pablo Alberto Varela v. Republic of Argentina*, No. 10 Civ. 5338 (TPG) (S.D.N.Y. Feb. 23, 2012), Cohen Decl., Ex. N; Order, *Olifant Fund, Ltd. v. Republic of Argentina*, 10 Civ. 9587 (TPG) (S.D.N.Y. Feb. 23, 2012), Cohen Decl., Ex. O.

*to change because of rulings*," Lorenzino continued.  *Id.*  (emphasis added).  "Those who think otherwise have not understood anything."  *Id.*  Minister Lorenzino thereafter promised to the press that Argentina "isn't going to change its position of not paying vulture funds," even *"despite any ruling that could come out of any jurisdiction, in this case New York."*  Cohen Decl., Ex. JJ at 2 (emphasis added).  Argentine President Cristina Kirchner took the same position, declaring to the media that "we are going to pay [the Exchange Bonds], in dollars, because we have them," but "not one dollar to the 'vulture funds,'" adding that the Second Circuit "*does not know enough about its own legislation*."  *See* Cohen Decl., Ex. CC at 1; Cohen Decl., Ex. II at 1-2 (emphasis added).  And just yesterday, Monday, November 12—three days after the stern warning provided by this Court—President Kirchner repeated her threat, vowing in a widely reported speech that Argentina "will not give in [to] vulture funds" and "will not pay them in any way."  *See* Cohen Decl., Ex. PP; Cohen Decl., Ex. SS.

Argentina's leaders having stated plainly their determination to defy this Court's injunctions, Argentina's lawyers have turned to delaying enforcement of those injunctions beyond the critical month of December—a month in which Argentina is scheduled to pay close to $3.3 billion under the Exchange Bonds.  Cohen Decl., Ex. EE at 1 (Argentine newspaper reporting that Argentina "has bet until now on delaying the timing [of the effective date of the February 23 Orders].  In particular because it has to pay out on bond expirations on the first of December and, the biggest one, on December 15 (GDP Warrant).").  Argentina has no legitimate excuse for any further delay.  The litigation surrounding the Equal Treatment Provision has been going on for over two years.  Both this Court and the Court of Appeals have held that complying with this Court's February 23 Orders will not damage Argentina.  It is a simple matter of paying the plain-

tiffs in this case what this Court has already determined Argentina owes, less than one month's payments on the Exchange Bonds.

Once past December, however, Argentina will not face another payment for more than three months, until March 2013, which could allow the time it needs to devise a new payment arrangement, in violation of this Court's order, that could take place outside of this Court's jurisdiction. In other words, delay past December will increase the likelihood that Argentina could make good on President Kirchner's and Minister Lorenzino's threats to flout the judgment of this Court and the Court of Appeals.

This Court can and should resolve the narrow issues remanded by the Second Circuit in advance of the December payment dates. The Second Circuit's remand concerning the "ratable payment formula" is limited to clarification as to "how [this Court] intends this injunction to operate," not reconsideration of that subject. There can be no serious dispute as to what the Court intended. At the February 23 hearing, after observing that the plaintiffs' proposed order defined a "Ratable Payment" as the total amount due to the plaintiffs multiplied by a "Payment Percentage," the Court reviewed the definition of "Payment Percentage" and offered the following example: "if $1 million in interest is due and they are going to pay the $1 million, then the percentage is 100." Hr'g Tr. 25:1-12 (Feb. 23, 2012) ("Feb. 23 Tr."), Cohen Decl., Ex. Q. Argentina also repeatedly articulated its own understanding of this ruling and explicitly recognized that under this Court's orders, if it makes an interest payment due under any of the Exchange Bonds and pays 100% of what is due at that time, that it must pay the plaintiffs 100% of what they are owed at that time. *See* Argentina 2d Cir. Br. 19, Cohen Decl., Ex. G; Feb. 23 Tr. 34:8-11. This is consistent with the fact that the Equal Treatment Provision promises equal ranking of ***payment obligations***.

3

The Second Circuit's remand concerning how its injunctions could apply to third parties is also easily resolved.  Federal Rule of Civil Procedure 65(d)(2) clearly requires that the parties, their agents, and those acting in concert or participating with the parties or their agents are bound by an injunction of which they have actual notice.  Here, documents relating to the Exchange Offers provide considerable information as to the entities involved in the payment process under the Exchange Bonds.  There can be no dispute that these entities are acting in concert and participating with Argentina in the Exchange Bond transactions.  To eliminate any conceivable misunderstanding about the reach of the February 23 Orders, the plaintiffs propose that the Court specifically identify those entities, by reference to their roles in the transactions, as persons bound under Rule 65(d)(2).  And to address the Second Circuit's concern regarding intermediary banks, the plaintiffs propose specifically to exclude from the injunctions' reach any entity to the extent that it is acting as an intermediary bank as that term is defined by Article 4 of the U.C.C.  Finally, the plaintiffs propose that the Court state explicitly in the injunctions that any third party with any remaining doubts as to its obligations under the Court's orders may apply to the Court for clarification.

Once these narrow issues are resolved, there is no legal justification or good cause to continue the stay pending appeal.  Having lost on the merits of its appeal, the Republic no longer can be said to have a possibility of success on the merits, much less a "likelihood," which is a legally minimum prerequisite for a stay pending appeal.  But even if Argentina could establish such a likelihood, a stay could not be justified because the equities tip strongly in favor of the plaintiffs.  Argentina's President and Minister of Economy have boldly asserted that they will defy the injunctions, and the press, informed analysts, and other market participants are widely reporting that Argentina already is developing means to evade them.  Continuing the stay facilitates and

enables that course of action, which would unquestionably prejudice the plaintiffs and upend the rule of law.  Not extending the stay, on the other hand, will not prejudice Argentina at all because it is legally bound to honor these obligations, and as an alternative the plaintiffs have committed to forbear enforcement if Argentina posts a sufficient bond.

## II.    BACKGROUND

**A.    This Court Squarely Held That Argentina Breached The Equal Treatment Provision And That Argentina Is Required To Specifically Perform Its Obligations Under That Provision**

The plaintiffs moved for an injunction requiring Argentina to live up to its promise to "rank" its "payment obligations" under the FAA Bonds "at least equally" with its payment obligations under "future unsecured and unsubordinated External Indebtedness."  On December 7 and 13, 2011, this Court granted partial summary judgment to the plaintiffs, holding that Argentina violated the Equal Treatment Provision by timely honoring its payment obligations under the Exchange Bonds, while repudiating its obligations under the plaintiffs' bonds.  Cohen Decl., Exs. I, J, K.

On February 23, 2012, this Court ordered Argentina to specifically perform its obligations under the Equal Treatment Provision, providing that "[w]henever the Republic pays any amount due under terms of the [exchange] bonds," it shall make a "Ratable Payment" to the plaintiffs.  Feb. 23 Orders ¶ 2(a).  Such a "Ratable Payment" is equal to a "Payment Percentage," multiplied by the total amount currently due to the plaintiffs on the bonds in these cases.  *Id.* ¶ 2(b).  The "Payment Percentage" is calculated by dividing the amount Argentina pays to Exchange Bondholders by the total amount of Argentina's immediate payment obligations to them—e.g., principal, interest and/or other payments ***currently due*** to them.  *Id.* ¶ 2(c)  The February 23 Orders also included language that reflected the requirements of Federal Rule of Civil Procedure 65(d)(2), clarifying that the Orders bound "all parties involved, directly or indirectly,

in advising upon, preparing, processing, or facilitating any payments on the Exchange Bonds." Feb. 23 Orders ¶ 2(e).[2]

On March 5, 2012, after Argentina appealed this Court's orders to the Second Circuit, this Court issued an order providing that "the effect of the February 23, 2012 Orders is stayed until the U.S. Court of Appeals for the Second Circuit has issued its mandate disposing of the Republic's appeal of the February 23, 2012 Orders." Cohen Decl., Ex. P ¶ 1 ("March 5 Order"). This Order also included a preliminary injunction, mandating that Argentina not "take any action to evade the directives of the February 23 Orders," "render them ineffective," or "diminish the Court's ability to supervise compliance with" them. *Id.* ¶ 2. The March 5 Order specifically prohibits Argentina from taking any steps to "alter[] or amend[] the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without prior approval of the Court." *Id.*

**B.    The Second Circuit Affirmed This Court's Orders And Remanded For Clarification On Two Issues**

On October 26, 2012, the Second Circuit affirmed this Court's decisions: "(1) granting summary judgment to plaintiffs on their claims for breach of the Equal Treatment Provision and (2) ordering Argentina to make 'Ratable Payments' to the plaintiffs concurrent with or in advance of its payments to the holders of 2005 and 2010 restructured debt." Cohen Decl., Ex. F at 28 ("Op."). The Second Circuit had "little difficulty" concluding that Argentina had breached the Equal Treatment Provision, "even under Argentina's interpretation" of that Provision. *Id.* at

---

[2]  The February 23 Orders also prohibited Argentina from "taking action to evade the directives of this ORDER, render it ineffective, or to take any steps to diminish the Court's ability to supervise compliance with the ORDER, including, but not limited to, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without obtaining prior approval of the Court." Feb. 23 Orders ¶ 4.

20.  The Second Circuit also held that the equitable relief that this Court ordered in the February 23 Orders was permitted by law and amply justified by the equities.  The Court explained that Argentina's "disregard of its legal obligations exceeds any affront to its sovereign powers resulting from the" February 23 Orders, and upheld this Court's conclusion that "the Republic had sufficient funds, including $40 billion in foreign currency reserves, to pay plaintiffs the judgments they are due." *Id.* at 26.

Having affirmed the substantive provisions of this Court's orders in whole, the Second Circuit remanded for this Court to clarify "how the injunctions are to function" in two respects. *Id.* at 1.  First, it requested clarification only as to "precisely how [the Ratable Payment] formula is intended to operate." *Id.* at 11.  Second, it expressed "concerns about the [February 23 Orders'] application to banks acting as pure intermediaries" and "confusion as to how the challenged order will apply to third parties generally," and thus requested that the Court "more precisely determine the third parties to which the Injunctions will apply." *Id.* at 27-28.  The Second Circuit instructed that "[o]nce the district court has conducted such proceedings the mandate should automatically return to this Court and to our panel." *Id.* at 29.

**C.    Argentina Has Declared That It Will Violate This Court's Orders And Disregard The Second Circuit's Opinion And Has Begun Planning To Restructure Its Payment Mechanisms**

Since the Second Circuit issued its opinion affirming the February 23 Orders, Argentina's highest officials, including its President and its Minister of Economy, have proclaimed that Argentina will not comply.  *See supra* 1-2.  At the November 9 hearing, Argentina's counsel attempted to explain these statements as mere references to its intent to "appeal the [Second Circuit's] ruling."  Hr'g Tr. 11:21 (Nov. 9, 2012) ("Nov. 9 Tr."), Cohen Decl., Ex. R.  Yet Argentina's Economy Minister Hernan Gaspar Lorenzino promised that Argentina "isn't going to change its position of not paying vulture funds," "despite any ruling that could come out of any

jurisdiction, in this case New York." Cohen Decl., Ex. JJ at 2.[3]  For an official to say it will con-

tinue a policy "despite any ruling that could come out of any jurisdiction" is, as the Court recog-

nized, nothing less than "simply saying [that Argentina] will not comply."  Nov. 9 Tr. 12:5-6.

It is, therefore, not surprising that notwithstanding the March 5 preliminary injunction

prohibiting Argentina from taking any steps to change its processes for making payments under

its Exchange Bonds, the financial press, various analysts and market participants have widely

reported that Argentina is, indeed, making plans to change its payment processes and discussing

these changes with beneficial holders under the Exchange Bonds.  As early as July 13, 2012, an

Argentine newspaper reported that Argentine officials were looking to "pay out the bonds at the

Caja de Valores in Buenos Aires" to avoid compliance with the orders.   *See* Cohen Decl., Ex. FF

at 2.  Reports of Argentina's planned evasion multiplied following the Second Circuit's ruling.

Those reports explain that Argentina's "technical staff" spent "all weekend" after the Second

Circuit's decision "on various scenarios that will be opening up from here on out to confront the

vulture funds."  Cohen Decl., Ex. HH at 1.  And that Argentina is "now preparing alternative

payment schemes . . . so that they can make [the Exchange Bond payments] abroad."  Cohen

Decl., Ex. GG at 3.

Indeed, just today—Tuesday, November 13—press reports are rife with Argentina's

plans to evade the February 23 Orders.  One article published by a prominent Argentine newspa-

per reported that Argentina is considering two alternatives: ignoring the February 23 Orders and

continuing to pay **only** the Exchange Bonds in New York, or ignoring the Orders and paying **on-**

---

[3]  This Court has rejected the use of the term "vulture funds, or anything like that" (Nov. 9 Tr. 14:12), and the Second Circuit has noted that purchasers of sovereign debt on the secondary market—like some of the plaintiffs—are necessary to provide "incentives for primary lenders to continue to lend to high risk countries."  *Elliott Assocs. L.P. v. Banco de la Nacion*, 194 F.3d 363, 380 (2d Cir. 1999).

*ly* on the Exchange Bonds outside of New York.  Cohen Decl., Ex. OO.  The alternative of "negotiat[ing] with the 'holdouts,'" let alone paying them, "does not appear to be an option for the government the Government's menu of options, since it has already refused—via the Economy Minister, Hernan Lorenzino— this possibility."  *Id.*  Bloomberg News is also reporting that, according to Argentine news sources, certain beneficial interest holders under the Exchange Bonds are "considering collecting interest payments in France or Switzerland, beyond the reach of U.S. District Judge Thomas Griesa."  Cohen Decl., Ex. QQ.  And, as noted above, President Kirchner repeated her threat that Argentina "will not give in [to the] vulture funds" and "will not pay them in any way."  *See* Cohen Decl., Ex. PP; Cohen Decl., Ex. SS.

Thus, on the morning of the November 9 hearing, one analyst known for his contacts with Argentine officials advised his clients, "once the appeals process is over, our view is that Argentina would seek to reroute payments away from the US, rather than pay holders of defaulted debt."  Cohen Decl., Ex. KK at 1.  The analyst elaborated:  "[O]ur view is that [President Kirchner] would likely prefer to argue that her government has both willingness and capacity to pay its debts in the US, but cannot do it given the actions of 'vulture funds' and US courts, but that it is willing to pay in dollars in a different jurisdiction (potentially Argentina)."  *Id.* at 2.  Setting the stage for such a strategy, Argentina's ambassador to the United States, Jose Arguello, published on November 8, 2012 an "OPEN LETTER TO PAUL SINGER OF THE VULTURE FUND NML," in which he portrayed the judgments of this Court—judgments to which Argentina agreed irrevocably to be bound—as a "bet on usury" and "legal cruelty to satisfy . . . illegitimate interests."  Cohen Decl., Ex. NN at 1.[4]

---

[4]  Ambassador Arguello further opined: "Mr. Singer and friends: we Argentines have been dealing with you for a while, especially this year, and will continue to do so. The whole world is watching, with growing interest, how this confrontation between a country and government that

[Footnote continued on next page]

Argentina must make payments on the Exchange Bonds totaling more than **$3.3 billion** in December 2012.[5]  Argentina has made clear that it is relying upon an extension of the stay to make these substantial scheduled payments on the Exchange Bonds, without paying anything to the plaintiffs.  Argentina has publicly declared that it expects the Court's stay to remain in effect, thus permitting it to make these payments without honoring its Equal Treatment obligations, notwithstanding the Second Circuit's ruling.  *See* Cohen Decl., Ex. LL at 1 (Argentine Finance Secretary Adrian Cosentino indicating that the Second Circuit decision "had no immediate impact on debt payments").  The Argentine press has reported that Argentina "has bet until now on delaying the timing [of the effective date of the February 23 Orders].  In particular because it has to pay out on bond expirations on the first of December and, the biggest one, on December 15 (GDP Warrant)."  Cohen Decl., Ex. EE at 1.  Argentina's counsel made this point clear at the November 9 hearing, stressing that Argentina wanted this Court to continue its stay so that Argentina could honor its payment obligations under the Exchange Bonds in December 2012, without paying even a dollar to the plaintiffs.  Nov. 9 Tr. 24:3-13.

**D.     Argentina Relies Upon Payment Systems Of The United States And Entities Located In New York To Make Payments On The Exchange Bonds**

When making its payments on the Exchange Bonds, Argentina does not transfer funds directly to the beneficial interest holders under the Exchange Bonds.  Rather, on the day prior to the due date of any periodic payment, Argentina transfers funds to the Bank of New York

---

[Footnote continued from previous page]
adhere to the law, honor their debts, and duly pay them, and a group of speculators who insist on flapping their wings like vultures.  But things are changing, as they no longer flying over a dying Argentine economy . . . ."  Cohen Decl., Ex. NN.

[5]   At the November 9 hearing, Argentina's counsel represented that Argentina's payment obligations under the Exchange Bonds due on December 31, 2012 are "100 million to 200 million."  Nov. 9 Tr. 6:15-18.  The actual figure is approximately $500 million.  Cohen Decl., Ex. RR.

Mellon ("BNY"), which agreed to serve as indenture trustee in a Trust Indenture, dated as of June 2005, between BNY and Argentina (the "Indenture"), pursuant to which the Exchange Bonds were issued (Cohen Decl., Ex. X).[6] BNY then forwards those funds to the "registered owner" of the Exchange Bonds, which for several series of the dollar-denominated 2005 Exchange Bonds is Cede & Co. ("Cede") (Cohen Decl., Ex. Y at R-1-2), and for other series of the 2005 Exchange Bonds and the 2010 Exchange Bonds is The Bank of New York Depositary (Nominees) Limited ("BNY Depositary") (Cohen Decl., Ex. Z at R-1-2; Cohen Decl. Ex. AA at R-1-2).[7] As registered owners, Cede and BNY Depositary own the unified "Global Security" for each series of Exchange Bonds and are designated as "nominees" of the entities who have agreed to hold each of the physical Global Securities, referred to as depositaries.  Cohen Decl., Ex. Y at 1; Cohen Decl., Ex. AA at 1.[8] Cede and BNY Depositary transfer the funds to a clearing corporation or system affiliated with the depositary (such as the Depository Trust Company or "DTC"), which then distributes funds to the other financial institutions who are members of the

---

[6] Although Argentina's counsel represented to the Court at the November 9 hearing that this payment takes place in Argentina (Nov. 9 Tr. 7:6-7), documents produced by BNY to certain of the plaintiffs demonstrate otherwise.  These documents include letters from BNY to Argentina's payment agent, Banco Central de la República Argentina ("BCRA"), instructing BCRA to pay Federal Funds (i.e., funds on deposit with a U.S. Federal Reserve Bank) to "Bank of New York Mellon, *New York, NY*."  Cohen Decl., Exs. S, T, U, V, W (emphasis added).

[7] Argentina also has the option of sending funds to a "trustee paying agent" that forwards funds to the registered owner.  The Bank of New York (Luxembourg) S.A., and The Bank of New York Mellon (London) are designated as trustee paying agents in several series of the 2005 Exchange Bonds and the 2010 Exchange Bonds, while several series of the 2005 Exchange Bonds require the trustee paying agent to have an office in the City of New York.  Cohen Decl., Ex. Y at R-1-2; Cohen Decl., Ex. Z at R-1-2; Cohen Decl. Ex. AA at R-1-2.

[8] The Depository Trust Company serves as depositary for several series of the 2005 Exchange Bonds and Clearstream Banking S.A. and Euroclear Bank S.A./N.V. share a common depositary for several series of the 2005 Exchange Bonds and for the 2010 Exchange Bonds.

clearing system.  Cohen Decl., Ex. BB at S-72-73.[9]  These financial institutions then transfer the

funds to their customers, who are the beneficial interest holders.  *Id*.  Below is a diagram of the

payment flows for the 2005 Exchange Bonds passing through Cede and the DTC.



## III.   **ARGUMENT**

**A.   The Two Limited Issues Remanded By The Second Circuit Should Be Resolved As Set Forth In The Plaintiffs' Proposed Orders**

**1.   This Court Correctly Determined The Operation Of The Ratable Payment Formula In The February 23 Orders**

The Second Circuit affirmed the instruction in this Court's February 23 Orders that Ar-

gentina must "make 'Ratable Payments' to plaintiffs concurrent with or in advance of its pay-

ments to holders of the 2005 and 2010 restructured debt."  Op. 28.  That Court, however, re-

---

[9] A clearing system is an institution that enables financial institutions trading through the clear-
ing system to pay for securities and receive all payments on their securities from a single source,
the clearing system.  The Depository Trust & Clearing Corporation, an affiliate of the DTC,
serves as the clearing system for several series of the 2005 Exchange Bonds, and Clearstream
Banking S.A. and Euroclear Bank S.A./N.V., as operator of the Euroclear system, serve as the
clearing systems for several series of the 2005 Exchange Bonds and for the 2010 Exchange
Bonds.

quested clarification as to how the ratable payment formula "is intended to operate." *Id.* at 11. The Court added that the Ratable Payment formula "could be read to mean that if, for example, Argentina owed the holders of restructured debt $100,000 in interest and paid 100% of that amount then it would be required to pay the plaintiffs 100% of the accelerated principal and all accrued interest. Or it could be read to mean that, if such a $100,000 payment to the exchange bondholders represented 1% of the principal and interest outstanding on the restructured debt, then Argentina must pay plaintiffs 1% of the amount owed to them." *Id.* The Second Circuit was not requesting that this Court conduct a new inquiry into how the "Ratable Payment" formula is to work, but instead was merely asking for clarification of the operation of the formula already included in the February 23 Orders.

The operation of that formula was clear to the parties and the Court at the February 23 hearing. If Argentina pays any installment currently due under the Exchange Bonds in full, it must pay in full the amount it currently owes to the plaintiffs. *See, e.g.*, Feb. 23 Tr. 34:6-11. Accordingly, the Plaintiffs' Proposed Amending Orders add a new paragraph to the February 23 Orders further explaining the Ratable Payment formula and then, as an illustration, noting that if Argentina makes the full approximately $3 billion payment that it must make under the Exchange Bonds on December 15, 2012, it must then pay everything that it then owes to the plaintiffs—or roughly $1.43 billion. As the Second Circuit hypothesizes, this means that if "Argentina owed the holders of restructured debt $100,000 in interest and paid 100% of that amount then it would be required to pay the plaintiffs 100% of the accelerated principal and all accrued interest." Op. 11.

There can be no dispute that the Court intended—and the parties clearly understood—that the payment required by the Ratable Payment formula ordered by this Court is the total amount

13

Argentina currently is obligated to pay under the plaintiffs' bonds in these cases (*i.e.*, roughly $1.43 billion), multiplied by the proportion (in percentage terms) that Argentina pays under the Exchange Bonds of the amount it is currently obligated to pay on those bonds at that time (*i.e.*, the next payment due). That this Court "intended [this formula] to operate" (Op. 11) in this way is clear from the Court's dialogue with the plaintiffs' counsel at the February 23 hearing. At that hearing, this Court recognized that the plaintiffs' proposed February 23 Orders' definition of "Ratable Payment" was the total amount due to the plaintiffs multiplied by a "Payment Percentage," reviewed the definition of "Payment Percentage," and then explained that "if $1 million in interest is due and they are going to pay the $1 million, then the percentage is 100." Feb 23 Tr. 25:10-12. Argentina shared this understanding, complaining at the same hearing that the February 23 Orders' Ratable Payment formula requires that "when everybody else is getting deeply discounted bonds and just payments of interest over time, that [the plaintiffs] get 100 percent of full principal and interest." *Id.* 34:8-10. And Argentina repeated this position before the Second Circuit, describing the February 23 Orders as "enjoining the Republic from making payments on the discounted debt issued pursuant to its 2005 and 2010 Exchange Offers, unless the Republic simultaneously pays in full all past due principal and interest owed to plaintiffs." *See* Argentina 2d Cir. Br. 8.

The Ratable Payment formula that this Court adopted in the February 23 Orders is consistent with Equal Treatment Provision's promise that Argentina will rank its "***payment obligations***" under the FAA Bonds "at least equally" with "payment obligations" on subsequently issued debt. As the Second Circuit noted, "payment obligations" are those obligations that are currently due and owing to a creditor. *See* Op. 18-19 & n.10. Under the plaintiffs' bonds, the amount currently due and owing is roughly $1.43 billion. Under the Exchange Bonds, the

amount due and owing on December 2, 15 and 31 will be more than $3.3 billion in total.  The

bonds clearly contemplate that the just and proper remedy for Argentina failing to rank the plain-

tiffs' payment obligations "at least equally" with the obligations under the Exchange Bonds for

more than six years would be to require that, if Argentina pays in full what it is obligated to pay

to under any of the Exchange Bonds at any point in December 2012, it must also pay the full

amount that is currently due under the plaintiffs' bonds.

This Ratable Payment formula is also wholly consistent with the equities.  It cannot be

inequitable for Argentina to pay roughly $1.43 billion that it currently owes to plaintiffs at the

same time that Argentina pays the more than $3.3 billion in total that it will owe under the Ex-

change Bonds in December 2012.  And as this Court and the Second Circuit found, Argentina

has sufficient funds to honor all of these payment obligations in full, meaning that all of the due

and owing obligations can (and should) be honored without prejudice to each other.  The fact

that the beneficial interest holders under the Exchange Bonds will not receive an immediate ad-

vance of the full amounts they will be owed (and presumably paid) until the maturity of their

bonds is of no moment.  Those amounts are not now due and are not current "payment obliga-

tions."  *See Fin. One Pub. Co., v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 344 (2d Cir.

2005) ("LBSF is receiving merely what it is entitled to under the bills, and if other creditors do

not receive the same thing that is because LBSF is differently situated from other creditors.").

**2.    The Court Should Enter The Proposed Orders, Making Clear That
The February 23 Orders Bind Agents Of Argentina, And Parties That
Act In Concert With Argentina, Pursuant To Rule 65(d)(2)**

The Second Circuit requested clarification concerning the February 23 Orders' applica-

tions to banks acting as "pure intermediaries" and requested that this Court "more precisely de-

termine the third parties to which the [February 23 Orders] will apply."  Op. 27-28.  To address

these concerns, the plaintiffs' Proposed Amending Orders: (1) provide a new definition of the

term "Agents and Participants" that identifies with specificity the particular institutional roles identified in Argentina's 2005 and 2010 Exchange Bond offerings and names the entities currently aiding Argentina in those capacities; (2) further clarify that the injunctions shall not prohibit activities of a third party functioning solely in its capacity as an "intermediary bank" as that term is defined by Article 4A of the U.C.C.; and (3) explicitly allow any third party in need of clarification as to its obligations under the February 23 Orders to apply to the Court for such clarification.  The institutions that the Proposed Amending Orders identify as "Agents or Participants" are either agents of Argentina, who receive monetary payment for their role under the Exchange Bonds under contracts with Argentina, or those who are in active concert with Argentina under the Exchange Bonds.  These parties are already bound by the terms of the Orders by operation of Rule 65(d)(2) and their express listing is provided in response to the Second Circuit's request for clarification.

Under Rule 65(d)(2), an injunction binds not only the party against whom it is entered, but also the parties' "officers, *agents*, servants, employees, and *attorneys*," as well as "other persons who are *in active concert or participation with*" with these "officers, agents, servants, employees, and attorneys," as long as those third parties receive "actual notice" of the injunction. Fed. R. Civ. P. 65(d)(2) (emphases added).   The Supreme Court has explained that this rule ensures that "defendants may not nullify a decree by carrying out prohibited acts through *aiders and abettors*, although they were not parties to the original proceeding." *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945) (emphasis added); *accord Eli Lily & Co. v. Gottstein*, 617 F.3d 186 (2d Cir. 2010); *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 129-30 (2d Cir. 1979).  Following this rule, the Tenth Circuit in *Reliance Insurance Co. v. Mast Construction Co.*, 84 F.3d 372 (10th Cir. 1996), held that Rule 65(d)(2) prohibits a bank from carrying out

its contractual obligation to its depositors by helping those depositors withdraw funds from their

accounts, in violation of the injunctive order directed at those depositors.  *Id.* at 377; *accord*

*Goya Foods, Inc. v. Wallack Mgmt. Co.*, 290 F.3d 63, 76 (1st Cir. 2002) (holding that nonparties

were subject to civil contempt pursuant to an injunctive order where they "played an essential

role in consummating the forbidden transaction" and knew about the injunction).

Consistent with the operation of Rule 65(d)(2) and the instructions of the Second Circuit,

the Proposed Amending Orders identify categories of financial institutions that are either Argen-

tina's agents because of their contractual relationships with Argentina related to the Exchange

Bonds, or would act in "active concert" with Argentina and its agents if they help Argentina vio-

late the February 23 Orders:

> "Agents and Participants" refer to those persons and entities who act as the Re-
> public's agents, or act in active concert or participation with the Republic or its
> agents, to assist the Republic in fulfilling its payment obligations under the Ex-
> change Bonds, including: (1) the indenture trustees and/or registrars under the Ex-
> change Bonds (including but not limited to The Bank of New York Mellon f/k/a
> The Bank of New York); (2) the registered owners of the Exchange Bonds and
> nominees of the depositaries for the Exchange Bonds (including but not limited to
> Cede & Co. and The Bank of New York Depositary (Nominees) Limited) and any
> institutions which act as nominees; (3) the clearing corporations and systems, de-
> positaries, operators of clearing systems, and settlement agents for the Exchange
> Bonds (including but not limited to the Depository Trust Company, Clearstream
> Banking S.A., Euroclear Bank S.A./N.V. and the Euroclear System); (4) trustee
> paying agents and transfer agents for the Exchange Bonds (including but not lim-
> ited to The Bank of New York (Luxembourg) S.A., and The Bank of New York
> Mellon (including but not limited to The Bank of New York Mellon (London)));
> and (5) attorneys and other agents engaged by any of the foregoing or the Repub-
> lic in connection with their obligations under the Exchange Bonds.

Amended Order ¶ 2(g), Cohen Decl., Ex. A.  For example, BNY signed a contract with Argenti-

na to act as trustee and registrar under the Exchange Bonds, and pursuant to this agreement,

BNY accepts payments from Argentina, forwards those payments to depositary, and records the

name of the owner of the Global Security.  The trustee paying agents are explicitly designated in

the bond documents as BNY's agents, who facilitate these same processes.  Cede & Co. and The Bank of New York Depositary (Nominees) Limited are the registered owners under the Exchange Bonds, who own the Global Security for each series, and also have a contract with Argentina.  The Depository Trust Company, Clearstream Banking S.A., Euroclear Bank S.A./N.V. and the Euroclear System act as clearing corporations and systems, depositaries, and operators of clearing systems for the Exchange Bonds, thus serving the vital function of distributing the money provided by BNY to their participant financial institutions.

These parties are bound by the February 23 Orders under the plain terms of Rule 65(d)(2), even without the Proposed Amending Orders' specific enumeration.  *See Regal*, 324 U.S. at 14; *Vuitton*, 592 F.2d at 129-30.  The Orders' express listing of those parties is thus merely meant to respond to the Second Circuit's concern for more specificity.  And the real-world application of the February 23 Orders to these parties is straightforward—if Argentina certifies that it has made a ratable payment to the plaintiffs, these parties can simply carry out their responsibilities under the Exchange Bonds, as they have for years.  Amended Order ¶ 2(j).  If, on the other hand, Argentina does not provide the certification, they may not perform these duties, just like the bank in *Reliance* could not permit the enjoined depositors from withdrawing their money.  *See Reliance*, 84 F.3d at 377.  If any complications arise, the Proposed Amending Orders provide for an orderly mechanism by which these parties can seek clarification of their duties from this Court.  Amended Order ¶ 2(i).

There is no doubt that the "Agents and Participants" under the Proposed Amending Orders are ***not*** restrained by those Orders insofar as they are acting only in the capacity of "intermediary banks" as contemplated by Article 4A of the U.C.C.  That Article governs "funds transfers," the series of transactions that occurs when an entity gives an instruction to its bank to pay,

or to cause another bank to pay, another party a fixed or determinable amount of money.   The initial party giving the instruction to make payment is the "originator" and the final party to be paid is the "beneficiary."   *See* N.Y. U.C.C. §§ 4-A-103, 104.   A court may enjoin the originator from issuing a payment order, the originator's bank from executing the payment order of the originator, the beneficiary's bank from releasing funds and the beneficiary from withdrawing the funds.   *Id.* § 4-A-503.   A court may not, however, enjoin an intermediary bank, which merely processes the fund transfer between the originator (or its bank) and the beneficiary (or its bank) (*id.* § 4-A-503 cmt.) because this would "impede the use of rapid electronic funds transfers in commerce."   *Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 102 (2d Cir. 1998).

The "Agents and Participants" under the Proposed Amending Orders are not "intermediary banks" under the U.C.C., but are either originators (or their banks), beneficiaries (or their banks), or both, or are serving in some other capacity.   The Exchange Bonds' governing documents set forth at least three distinct fund transfers from originators to beneficiaries, in which unnamed banks may act as intermediary banks: (1) from Argentina (as originator) to BNY (as beneficiary) on the day before a scheduled payment; (2) from BNY (as originator) to the registered owner such as Cede & Co. (as beneficiary) on the payment date; and (3) from the registered owner (as originator) into one of the clearing corporations or systems such as The Depository Trust Company (as beneficiary) also on the payment date.   BNY, the registered owners, and the clearing corporations act as beneficiaries and originators during these three distinct transactions and are not "intermediary banks."   Thus, all of these parties can plainly be bound consistent with the terms of U.C.C. Article 4A.   As a final backstop, if one of the entities listed in the Proposed Amending Orders does end up acting as an intermediary bank for a fund transfer under the Exchange Bonds for some reason, those Orders specifically provide that nothing in those orders

"shall be construed to extend to the conduct" of "intermediary banks" "implementing a funds transfer in connection with the Exchange Bonds."  Amended Order ¶ 2(h).

## B.    The Court Should Decline To Extend The Stay Of The February 23 Orders

On March 5, 2012, this Court stayed the enforcement of the February 23 Orders until the Second Circuit issued its mandate, but retained jurisdiction to prevent Argentina from "tak[ing] any action to evade the directives of the February 23, 2012 Orders."  Mar. 5 Order ¶¶ 1–2.  At the November 9 hearing, the Court stated that it would "keep the stay in effect until" it ruled on the issues on remand, and would "consider continuing the stay while the Court of Appeals does further work."  Nov. 9 Tr. 30:11-17.  The plaintiffs respectfully submit that the Court should not extend the stay beyond the issuance of the clarifying orders described herein, given that Argentina has no likelihood of success on the merits and is able to protect any interests it has in further litigation by simply posting a bond.  And continuing the stay is particularly inappropriate in the present circumstances, given that this would ensure that the plaintiffs will once again receive nothing in December 2012, while Argentina makes exceptional payments of more than $3.3 billion on the Exchange Bonds.  Finally, continuing the stay would profoundly undermine this Court's ability to ensure compliance with the February 23 Orders, as reports by the press, informed analysts and market participants reveal that Argentina plans to use the time afforded by the stay to contrive a scheme to evade the February 23 Orders in perpetuity.  *See* Nov. 9 Tr. 13:18-19 ("I have a long experience in this case and press reports have been amazingly accurate.").

Federal Rule of Appellate Procedure 62(c) allows a party to seek a stay pending appeal of an injunction.  In determining whether to issue a stay pursuant to Rule 62(c), the Court considers the following factors:  "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3)

whether issuance of the stay will substantially injure the other parties interested in the proceed-ing; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). This same four-factor analysis applies to questions of whether already issued stays should be contin-ued. *See Fed. Ins. Co. v. County of Westchester*, 921 F. Supp. 1136, 1139-40 (S.D.N.Y. 1996). Here, ***all four factors*** weigh decisively against continuance of the stay:

### 1. Argentina Has No Substantial Possibility Of Success On The Merits

To obtain a stay pending an appeal, Argentina must make "a strong showing" that it is likely to succeed on that appeal. *U.S. SEC v. Citigroup Global Mkts., Inc.*, 673 F.3d 158, 162 (2d. Cir. 2012) (per curiam). The Second Circuit already "affirm[ed] the underlying judgments of the district court" (Op. 1), and the only open questions after this remand relate to clarification of two points, neither of which implicates the merits of this case. Unless Argentina can show that it has a substantial possibility of prevailing on appeal, as a matter of law it cannot be entitled to a stay in support of that appeal. *See Mohammed v. Reno*, 309 F.3d 95, 101-02 (2d Cir. 2002) (even where the balance of hardships tips decidedly in favor of the stay, "a stay pending appeal is not warranted" where applicant "does not have a substantial possibility of prevailing"). Argenti-na's failure to satisfy this requirement is not even a debatable point in light of the Second Cir-cuit's decision, making continuation of the stay plainly impermissible.

### 2. A Stay Would Substantially Injure The Plaintiffs

Continuing the stay through December 2012, the period during which Argentina must make payments of more than $3.3 billion on the Exchange Bonds, would irreparably harm the plaintiffs. As this Court explained at the November 9 hearing, the plaintiffs have been deprived of their rightful payments from Argentina for years and they should not have to "be put off until March" to get payments to which they have "a legal right." Nov. 9 Tr. 29:4-8, 30:7. Yet, it is clear that is exactly what Argentina intends to do if this Court extends the stay, as its high minis-

ters have openly declared that the Second Circuit decision "had no immediate impact on debt payments" (Cohen Decl., Ex. LL at 1), and the Argentine press has reported that Argentina has "bet" on the extension of the stay so that it can make its December 2012 Exchange Bond payments without making any payments to the plaintiffs (Cohen Decl., Ex. EE at 1).

Continuing the stay also would irreparably harm the plaintiffs because it would permit Argentina to use its U.S.-based agents to make the substantial payments it owes under the Exchange Bonds in December 2012, without paying anything to the plaintiffs, while it unlawfully seeks to implement a new payment structure that does not use those agents for later payments. After completing its payments in December 2012, Argentina will have until March 31, 2013 to devise a plan to evade the February 23 Orders by attempting to relocate its payment mechanisms outside of this Court's supervisory jurisdiction. Such efforts and planning are strictly prohibited by the plain terms of the March 5 Order currently in place, but Argentina has—according to its own press—already been actively plotting to design a series of "alternative payment schemes . . . so that they can make [the Exchange Bond payments] abroad." Cohen Decl., Ex. GG. It is not possible to know at this time whether Argentina has already created such an unlawful scheme, or whether such a scheme is even possible without the assistance of parties such as BNY. Allowing Argentina an additional three months to plot and conspire can only increase its chances of achieving such evasion.[10]

---

[10] At the November 9 hearing, counsel for Argentina assured the Court that Argentina "has complied with" the March 5 Order's prohibition against "tak[ing] any action to evade the directives of the [February 23 Orders]." Nov. 9 Tr. 23:23-24. This assertion cannot be reconciled with the numerous articles in the press reporting that Argentina and its agents are researching and trying to develop means to evade the effect of the Court's February 23 Orders. Such conduct is plainly an "action to evade [those Orders'] directives," and a violation of the March 5 Order.

**3.     Argentina Will Not Be Irreparably Injured By Refusal Of Its Request To Continue The Stay, Especially Because It Can Post A Bond To Protect Its Rights On Appeal**

This Court's February 23 Orders "require[] of the Republic only that which it promised NML and similarly situated creditors to induce those creditors to purchase the Republic's bonds."  Feb. 23 Order ¶ 1(c).  Mandating that Argentina finally honor its promise to the plaintiffs, after breaking that promise for years, is not a cognizable injury to Argentina, let alone an irreparable harm.  This is especially the case because the record is clear that Argentina has "sufficient funds, including over $40 billion in foreign currency reserves, to pay plaintiffs the judgments they are due."  Op. 26.  And President Kirchner recently confirmed that the Republic has sufficient "dollars" to pay all of its obligations, but that it simply will refuse to pay the plaintiffs because she finds it politically expedient to disparage them as "vulture[s]."  Cohen Decl., Ex. CC at 1; Cohen Decl., Ex. II at 1.

There is no merit to the argument urged by Argentina's counsel at the November 9 hearing that failure to continue the stay in the weeks (or even days) before the December 2 scheduled payment on the Exchange Bonds would "cause great disruption in the market."  Nov. 9 Tr. 26:2-3.  *Any disruption to the market would be entirely Argentina's own doing*, and the consequence solely of its own contumacious threats.  As Bloomberg News reported just yesterday, Monday, November 12, it is "[s]peculation that Argentina will opt to default instead of settling with [the plaintiffs that] has caused the nation's bonds to tumble."  Cohen Decl., Ex. MM at 1.  These concerns, the article noted, stemmed from President Kirchner's threat never to pay the plaintiffs.  *Id.*  Argentina can calm any market turmoil by simply retracting these ill-advised public statements and declaring that it will honor ***all*** of its payment obligations in December 2012, including to the plaintiffs, something it can manifestly afford to do.  Nov. 9 Tr. 28:10-11 ("Now if you want to get the exchange people paid, talk to the Republic.").  Counsel for "one of the exchange bond-

holders that did [the 2010 Exchange]" stated at the November 9 hearing that his clients are being "held hostage" (*id.* 27:9-12)—but if any beneficial owners of the Exchange Bonds are being held hostage, Argentina is the hostage taker, and the ransom is permission to continue violating its contractual promise to the plaintiffs in perpetuity, even after the terms of that promise have been definitively determined against Argentina by this Court and the Second Circuit.

In any event, Argentina has the option of posting a bond of $1.45 billion pending further appeal,[11] which would address all the concerns it has raised.  Such a bond would fully protect Argentina in the unlikely contingency that it prevails before an *en banc* panel of the Second Circuit or the Supreme Court, while also providing full comfort to the market that Argentina will make all of its December payments under the Exchange Bonds.

### 4.    The Public Interest Weighs Strongly Against A Stay

The Second Circuit has already affirmed this Court's finding and legal conclusion that "the public interest" weighed in favor of enforcing the February 23 Orders.  Op. 26.  Permitting Argentina to make more than $3.3 billion in payments under the Exchange Bonds in December 2012, while at the same time not paying a single dollar to the plaintiffs—just two months after the Second Circuit concluded that such a course of conduct is unlawful—would poorly serve the public interest by undermining the rule of law and potentially frustrating this Court's jurisdiction.

### C.    The Belated Interjections Of Purported Holders Of Exchange Bonds Should Not Be Permitted To Delay Resolution Of The Second Circuit's Remand

At the November 9 hearing, counsel representing "one of the exchange bondholders that did [the 2010 Exchange]" asserted that his clients should have "a seat at the table" (Nov. 9 Tr.

---

[11] This would cover the roughly $1.43 billion that Argentina currently owes the plaintiffs and build a small margin for interest that could accrue during the pendency of the appeal.  The plaintiffs reserve all rights with respect to the amount of the bond to account for further delays by the Republic.

5:2, 27:9-11) as this Court addresses the Second Circuit's remand instructions.  But the holders of the beneficial interest in the Exchange Bonds have nothing to say as to either how the Court intends the Ratable Payment formula to operate, or the February 23 Orders' binding of third parties under Rule 65(d)(2).  They might now have views about the Equal Treatment Provision in the plaintiffs' bonds, or remedies for that Provision's breach, but they would be seeking to interject those views a full year after this Court considered briefing and argument on the meaning of the Provision and the proper remedy for Argentina's breach, and after this Court's determination has been affirmed in all respects by the Second Circuit.  That Argentina is required to make a Ratable Payment to the plaintiffs whenever it makes a payment on the Exchange Bonds is not subject to reconsideration on remand.  As this Court put it at the November 9 hearing, that the Exchange Bonds cannot be paid unless and until the plaintiffs are also paid is the "inevitable result[] of a Court of Appeals ruling." *Id.* 28:4-5.  The holders of the Exchange Bonds thus have no basis to intervene in these limited remand proceedings.

These parties' actual purpose for interjecting themselves into the proceedings at this late date would appear to be simply to delay enforcement of this Court's orders and the Second Circuit's ruling and thereby ensure that they will continue to be paid by Argentina.  That, of course, is not a legitimate basis for intervention. Fed. R. Civ. P. 24(b)(3); *see U.S. Postal Serv. v. Brennan*, 579 F.2d 188, 191 (2d Cir. 1978) (delay or prejudice is the "principal consideration").  And it would be ample grounds for denying a motion for leave to file an *amicus curiae* brief.

Even still, the plaintiffs understand the desire of the beneficial holders of the Exchange Bonds to be paid pursuant to the terms of their contract with Argentina, as they have been paid for years.  The plaintiffs have a similar desire and legal right to be paid, a right that Argentina has breached over and over again.  As this Court found and the Second Circuit affirmed, Argen-

tina has more than sufficient resources to honor its payment obligations to all of its bondholders and creditors, and it is expected under law to make good on these contractual commitments.  As the Court explained at the November 9 hearing, "the Court of Appeals emphasized the Republic doesn't have to stop paying the exchange.  They don't have to stop for a minute as long as they make a payment, an appropriate payment to the plaintiffs.  *Now if you want to get the exchange people paid, talk to the Republic.  They can pay you*."  Nov. 9 Tr. 28:6-11 (emphasis added).  And, of course, Argentina has not threatened to default on the Exchange Bonds.  To the contrary, its President recently declared that Argentina is "going to pay [the Exchange Bonds], in dollars, because we have them."  *See* Cohen Decl., Ex. CC at 1.  If the beneficial holders of the Exchange Bonds believe that the Argentine President's oft-repeated commitment to paying them timely and in full is less secure than her vow never to pay the plaintiffs, they can "talk to the Republic" about that.

## IV.  CONCLUSION

For the reasons stated above, the Court should enter the attached Proposed Orders, including dissolving the stay on the February 23 Orders.

Respectfully submitted,

November 13, 2012
Theodore B. Olson
(tolson@gibsondunn.com)
Matthew D. McGill
(mmcgill@gibsondunn.com)
Jason J. Mendro
(jmendro@gibsondunn.com)
Misha Tseytlin
(mtseytlin@gibsondunn.com)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
(202) 955-8500

By:   /s/  Robert A. Cohen___
Robert A. Cohen
(robert.cohen@dechert.com)
Eric C. Kirsch
(eric.kirsch@dechert.com)
DECHERT LLP
1095 Avenue of the Americas
New York, NY  10036-6796
(212) 698-3500

*Attorneys for Plaintiff NML Capital, Ltd.*

Leonard F. Lesser
(llesser@simonlesser.com)
SIMON LESSER, P.C.
420 Lexington Avenue
New York, New York  10170
(212) 599-5455

*Attorneys for Plaintiff Olifant Fund, Ltd.*


Daniel B. Rapport
(drapport@fklaw.com)
Edward A. Friedman
(efriedman@fklaw.com)
FRIEDMAN KAPLAN SEILER & ADELMAN LLP
7 Times Square
New York, N.Y. 10036
(212) 833-1100

*Attorneys for Plaintiffs Aurelius Capital Master, Ltd., Aurelius Opportunity Fund II, LLC, ACP Master, Ltd., Blue Angel Capital I LLC*


Michael C. Spencer
MILBERG LLP
(MSpencer@milberg.com)
One Pennsylvania Plaza
New York, N.Y. 10119
(212) 594-5300

*Attorney for Plaintiffs Pablo Alberto Varela, et al.*