# EXHIBIT H

# 12-105-cv(L)

**12-109-cv(CON), 12-111-cv(CON), 12-157-cv(CON), 12-158-cv(CON),
12-163-cv(CON), 12-164-cv(CON), 12-170-cv(CON), 12-176-cv(CON),
12-185-cv(CON), 12-189-cv(CON), 12-214-cv(CON), 12-909-cv(CON),
12-914-cv(CON), 12-916-cv(CON), 12-919-cv(CON), 12-920-cv(CON),
12-923-cv(CON), 12-924-cv(CON), 12-926-cv(CON), 12-939-cv(CON),
12-943-cv(CON), 12-951-cv(CON), 12-968-cv(CON), 12-971-cv(CON)**

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

NML CAPITAL, LTD., AURELIUS CAPITAL MASTER, LTD., ACP MASTER, LTD.,
BLUE ANGEL CAPITAL I LLC, AURELIUS OPPORTUNITIES FUND II, LLC, PABLO
ALBERTO VARELA, LILA INES BURGUENO, MIRTA SUSANA DIEGUEZ, MARIA
EVANGELINA CARBALLO, LEANDRO DANIEL POMILIO, SUSANA AQUERRETA,
MARIA ELENA CORRAL, TERESA MUNOZ DE CORRAL, NORMA ELSA LAVORATO,
CARMEN IRMA LAVORATO, CESAR RUBEN VAZQUEZ, NORMA HAYDEE GINES,
MARTA AZUCENA VAZQUEZ, OLIFANT FUND, LTD.,

*Plaintiffs-Appellees,*

—against—

THE REPUBLIC OF ARGENTINA,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF FOR *AMICI CURIAE*
PROFESSOR RONALD MANN AND EM LTD. IN SUPPORT
OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

*Attorneys for Amicus Curiae
   EM Ltd.*

PROFESSOR RONALD MANN
435 West 116th Street
New York, New York 10027
(212) 854-1570

*Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, undersigned counsel state that *amicus curiae* EM Ltd. is not publicly traded and has no corporate parent, and that no publicly held corporation owns 10% or more of its stock.

## TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ................................................................1

SUMMARY OF ARGUMENT ...............................................................3

ARGUMENT .......................................................................................5

I.    THE INJUNCTION DOES NOT CONFLICT WITH ARTICLE 4A
      OF THE UCC BECAUSE IT DOES NOT PURPORT TO REACH
      INTERMEDIARY BANKS. ...........................................................5

      A.    ARTICLE 4A PERMITS CREDITORS TO REACH ASSETS
            IN THE HANDS OF ORIGINATORS, BENEFICIARIES,
            AND THEIR BANKS, BUT FORBIDS COLLECTION
            ACTIVITY DIRECTED AT INTERMEDIARY BANKS..................6

      B.    THE INJUNCTION DOES NOT PURPORT TO REACH
            INTERMEDIARY BANKS. ...............................................12

II.   THE DECISION BELOW IS CONSISTENT WITH *JALDHI*. ...................17

CONCLUSION ...................................................................................20

# TABLE OF AUTHORITIES

## CASES

*Aqua Stoli Shipping Ltd. v. Gardner Smith PTY Ltd.*,
  460 F.3d 434 (2d Cir. 2006) ........................................................................3, 18

*Consub Delaware LLC v. Schahin Engenharia Limitada*,
  543 F.3d 104 (2d Cir. 2008) ..................................................................... 17-18

*Grain Traders, Inc. v. Citibank, N.A.*,
  160 F.3d 97 (2d Cir. 1998) .................................................. 7, 8, 13, 18-19

*Winter Storm Shipping, Ltd. v. TPI*,
  310 F.3d 263 (2d Cir. 2002) ................................................... 3, 5, 17-19

*The Shipping Corp. of India v. Jaldhi Overseas PTE Ltd.*,
  585 F.3d 58 (2d Cir. 2009) ...................................................... 5, 17-19

## STATUTES

UCC Article 4A ...........................................................................passim

UCC § 4A-102 comment. ..........................................................................6

UCC § 4A-103 ....................................................................................6, 7

UCC § 4A-104 ....................................................................................6, 7

UCC § 4A-104 comment ....................................................................6, 7

UCC § 4A-406 ..........................................................................................6

UCC § 4A-502 (February 1989 Draft) ..................................................11

UCC § 4A-502 ................................................................................ 9, 10-13

UCC § 4A-502 comment 4 ........................................... 9, 10, 12, 13, 18, 19

UCC § 4A-503 ............................................................................ 9-13, 14, 20

UCC § 4A-503 comment ........................................................................10

**OTHER AUTHORITIES**

12 C.F.R. § 210.25(b)(1)..................................................................5

Federal Rule of Appellate Procedure 29(b) ...............................................1

2 Cir. R. 29.1 ..........................................................................1

James J. White & Robert S. Summers,
    Uniform Commercial Code 951-56 (6th ed. 2010) ...............................................7

Benjamin Geva, The Law of Electronic Funds Transfers 2.24-.28 (2012) ..............7

With the Court's leave, Professor Ronald Mann and EM Ltd. ("EM") submit this brief as *amici curiae* supporting affirmance of the February 12, 2012 Order of the U.S. District Court for the Southern District of New York entered by the Honorable Thomas P. Griesa (the "District Court") enjoining Argentina from violating the "Equal Treatment Provision" contained in Paragraph 1(c) of the Fiscal Agency Agreement ("FAA") that governs the debt instruments held by Plaintiffs-Appellees, and requiring Argentina to honor its payment obligations to Plaintiffs-Appellees to the same extent it honors its payment obligations to creditors that participated in Argentina's restructurings (the "Injunction").[1]

## INTEREST OF *AMICI CURIAE*

Ronald Mann is the Albert E. Cinelli Enterprise Professor in Law and the Co-Director of the Charles E. Gerber Program in Transactional Studies at Columbia Law School. He has written and taught extensively about wire transfers for decades. In addition to his scholarship and teaching in the area, he is a member of the American Law Institute and served as the Reporter for the most recently appointed Drafting Committee with responsibility for Article 4A of the Uniform

---

[1] This brief is filed contemporaneously with a motion seeking leave to file pursuant to Federal Rule of Appellate Procedure 29(b), because counsel for the Defendants-Appellants refused consent. Pursuant to Local Rule 29.1, no party's counsel authored this brief in whole or in part; and no person, other than *amici* or their counsel, contributed money that was intended to fund preparing or submitting this brief.

1

Commercial Code ("UCC").  His interest in appropriate explication of the laws related to wire transfer systems is longstanding.  The exaggerated assertions in The Clearing House Association L.L.C. ("The Clearing House" or "CH") *amicus* brief that the Injunction will unhinge the routine administration of wire transfer systems give Professor Mann a particularly strong interest in providing this Court with a more balanced perspective on the UCC issues raised by this case.

EM has invested in the secondary sovereign debt market in New York and obtained in the District Court a judgment against the Republic of Argentina ("Argentina").  *See EM Ltd. v. Republic of Argentina*, No. 03 Civ. 2507 (TPG). The debt instruments underlying EM's judgment were issued pursuant to the same FAA at issue in this appeal, which involves application in the pre-judgment context of the Equal Treatment Provision.  Since the District Court has not yet been asked to address whether the Equal Treatment Provision can be used to enforce an existing judgment, EM is not a party to this appeal and currently has no direct financial interest in its outcome.  EM has an interest in all of the issues presented by this appeal, because EM believes that the Equal Treatment Provision applies with identical force in the post-judgment context, and because those issues are of exceptional importance to sovereign debt enforcement litigation.[2]

---

[2]   Professor Mann expresses no opinion about any aspect of this appeal except as set forth in this brief.  EM joins by reference the additional arguments made by Plaintiffs-Appellees supporting affirmance.

## SUMMARY OF ARGUMENT

This Court bears a critical responsibility:  to support New York's position as a global financial center.  A misstep that destabilizes the financial system imposes incalculable costs on the community.  It is thus no surprise that the Federal Reserve Bank of New York has appeared as an *amicus curiae* to caution the Court on those occasions (such as *Winter Storm* and *Aqua Stoli*) when panel decisions have threatened to transgress inappropriately into the largely insulated interior of funds transfer systems.  But this is not one of those occasions.[3]

More generally, the stability and enforceability of the rule of law is a foundational institution for New York's continuing success in that realm.  It is no less important for this Court to facilitate the enforcement of commercial obligations than it is for the Court to limit the burdens of enforcement to parties with appropriate ties to the underlying obligations.  The Injunction steers far clear

---

[3]   Argentina implies (Argentina Br. 56) that an *amicus* brief regarding the Equal Treatment Provision submitted by the Federal Reserve to the District Court eight years ago implies its support for Argentina in this appeal.  Putting to one side the obvious point that the Federal Reserve easily could have filed a brief before this Court had it chosen to do so, it is plain that the brief in question has no relevance here.  The Federal Reserve's prior brief criticized injunctions issued by Belgic courts solely because they extended to intermediary banks in direct contravention of UCC § 4A-503.  *See* Memorandum of Law of *Amicus Curiae* Federal Reserve Bank of New York, at pp. 9-11 (A-1799-1801), *Macrotecnic International Corp. v. The Republic of Argentina*, No. 02 CV 5932 (TPG) (January 12, 2004).  As we explain, the Injunction on appeal does not extend to intermediary banks.

of the properly sheltered internal working of the wire transfer system. The Clearing House's contrary arguments in Part II of its *amicus* brief offer no basis for reversal or vacation.

The Clearing House assumes that Argentina will choose to violate the Injunction by attempting to make the payment that it owes under the "Exchange Bonds" without first or simultaneously making a "Ratable Payment" to Plaintiffs-Appellees. SPA-34. Under that assumption, The Clearing House argues that the Injunction "threatens the orderly functioning of the payment systems and credit markets" and is "inconsistent with New York Law and this Court's precedents" (capitalization regularized) (CH Br. at 17-18). We write solely to respond to those assertions, providing a more careful assessment of the relation between the Injunction and the legal framework for wire transfers. We offer two brief points.

*First*, we explain the consistency between the Injunction and UCC Article 4A. Article 4A does not ban *all* creditor process that interferes with wire transfers. To the contrary, it adopts a comprehensive framework that explicitly describes both the collection strategies that are consistent with the statute and those that violate the statute. Generally, it permits processes, like the Injunction, directed to the "real-world" parties that are sending and receiving funds, as well as their banks. By contrast, it rejects processes (unlike the Injunction) directed at wholly

"intermediary" banks, whose activity in the "backbone" of the wire transfer system involves no direct contact with the real-world parties sending and receiving funds.

*Second*, to allay any concerns that the Injunction might pose a *Winter Storm* problem, we analyze the logical flaws in the decision of the *Winter Storm* panel that led to its rejection seven years later in *Jaldhi*.[4]   In general, the conceptual flaw of *Winter Storm* was its holding that an intermediary bank held property belonging to the parties to the funds transfer.   *Jaldhi's* rejection of that error underscores the impropriety of an injunction directed at intermediary banks, but it is irrelevant in a case like this one, which limits enforcement to the parties sending and receiving bond payments.

## ARGUMENT

## I.   THE INJUNCTION DOES NOT CONFLICT WITH ARTICLE 4A OF THE UCC BECAUSE IT DOES NOT PURPORT TO REACH INTERMEDIARY BANKS.

We start by situating the Injunction against the applicable law of the relevant payment system (UCC Article 4A).[5]   To that end, we first summarize the carefully

---

[4]   We refer to *Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d 263 (2d Cir. 2002), *overruled by The Shipping Corp. of India v. Jaldhi Overseas PTE Ltd*., 585 F.3d 58, 61-68 (2d Cir. 2009).

[5]   New York has adopted Article 4A of the Uniform Commercial Code as Article 4-A of New York's Uniform Commercial Code.   Similarly, the Board of Governors of the Federal Reserve System has incorporated Article 4A into the Federal Reserve's Regulation J to govern transfers through the Fedwire system. 12 C.F.R. § 210.25(b)(1).   Because the relevant provisions in the different

crafted provisions of Article 4A that specify when creditors properly can proceed against parties to transfers governed by that statute.  We then examine the terms of the Injunction to illustrate their consistency with the principles of Article 4A.

> **A.  ARTICLE 4A PERMITS CREDITORS TO REACH ASSETS IN THE HANDS OF ORIGINATORS, BENEFICIARIES, AND THEIR BANKS, BUT FORBIDS COLLECTION ACTIVITY DIRECTED AT INTERMEDIARY BANKS.**

Because the drafters of Article 4A had the luxury of "writ[ing] on a clean slate," they were able to craft a "unique" and novel framework for governing wire transfers.  UCC § 4A-102 comment.  The framework depends on two major concepts:  the funds transfer and the payment order.  A funds transfer is the "real-world" transaction that calls upon the wire transfer system.  In the language of Article 4A, it is sent from an originator (the party making the payment) to a beneficiary (the party receiving payment).[6]  Completion of the funds transfer discharges the obligation of the originator to the beneficiary.[7]

---

versions are the same, this brief refers for convenience to the official version of the Uniform Commercial Code promulgated by the American Law Institute and the Uniform Law Commission (formerly known as the National Conference of Commissioners on Uniform State Laws).

[6]  *See* UCC §§ 4A-103(a)(2), 4A-104(a), 4A-104(c); 4A-104 comment 1.

[7]  *See* UCC § 4A-406.

Each funds transfer consists of a number of "payment orders," each of which is sent from a "sender" to a "receiving bank."[8]  When the originator is not a bank, the first payment order is sent from the originator to the originator's bank.[9]  If the originator's bank is not also the beneficiary's bank, the transfer will involve one or more additional payment orders until a final payment order reaches the beneficiary's bank.  Commonly, and especially in cross-border transfers, a funds transfer will include payment orders sent to one or more banks between the originator's bank and the beneficiary's bank, "intermediary banks" in the language of Article 4A.[10]

That framework creates a distinction between the parties that play a role in the overarching funds transfer (the originator, the beneficiary, and their respective banks) and those whose role is limited to processing of payment orders internal to the wire-transfer system (the intermediary banks).  The payment-order regime functions by creating specific responsibilities at the payment-order level.  Thus, an

---

[8]   *See* UCC §§ 4A-103(a)(1), (4), (5), 4A-104(a).

[9]   *See* UCC § 4A-104(c), (d).

[10]   *See* UCC § 4A-104(b).  *See generally* 4A-104 comment 1 ("[A] payment under Article 4A involves an overall transaction, the funds transfer, in which the originator * * * is making payment to the beneficiary * * *, but the funds transfer may encompass a series of payment orders that are issued in order to effect the payment initiated by the originator's payment order."); *Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 100 (2d Cir. 1998); James J. White & Robert S. Summers, Uniform Commercial Code 951-56 (6th ed. 2010); Benjamin Geva, The Law of Electronic Funds Transfers 2.24-.28 (2012).

intermediary bank's liability is ordinarily limited to its responsibility as a receiving bank on a payment order from one bank and as a sender on a payment order to another bank.  The originator, beneficiary, and their banks, by contrast, have rights and duties related to the obligation for which the funds transfer is sent.

This distinction undergirds the holding in this Court's justly celebrated decision in *Grain Traders*, that intermediary banks ordinarily have no responsibility to any party with whom they have not directly dealt.  *Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 101-02 (2d Cir. 1998).  As the Court explained there:

> [T]here are sound policy reasons for limiting [rights of recourse against a receiving bank] to the sender who directly paid the receiving bank.  * * *  To allow a party to, in effect, skip over the bank with which it dealt directly, and go to the next bank in the chain * * * would require intermediary banks to investigate the financial circumstances and various legal relations of the other parties to the transfer.  These are matters as to which an intermediary bank ordinarily should not have to be concerned.

160 F.3d at 102.

Notwithstanding the protections for intermediary banks, nobody has ever supposed that the presence of a funds transfer or a payment order in a transaction insulated the participants from their general obligation to comply with judicial decrees.  To the contrary, the drafters recognized the likelihood that creditors would want to reach funds flowing through the system.  Thus, the statute explicitly describes, and confines, the proper bounds of those efforts.

For example, Section 4A-502(d) describes the appropriate process for the creditor of a beneficiary and suggests that the correct action is to look to the assets in the hands of the beneficiary's bank.  The Official Comment to that provision offers a more expansive tripartite summary:  (1) creditors of the originator should look to the originator's bank, which is the only bank with assets of the originator, (2) creditors of the beneficiary should look to the beneficiary's bank, the only bank obligated to the beneficiary,[11] and (3) neither group of creditors should look to the intermediary banks, because those banks are obligated to neither the originator nor the beneficiary.  UCC § 4A-502 comment 4.

Similarly, UCC § 4A-503 considers the possibility that creditors will not move affirmatively to acquire funds from parties involved in the payments process, but will seek instead to enjoin the process.  Again, like Section 4A-502, the provision explicitly defines categories of permitted and prohibited collection activity:

---

[11] At first glance, it might seem odd that a creditor of a beneficiary cannot use a writ of garnishment to attach assets at the bank of an originator, when the originator is indebted to the beneficiary.  But that creditor's writ of garnishment should reach only those indebted to the beneficiary (such as the originator).  The point of Section 4A-502(d)'s restrictions on the strategies of a beneficiary's creditor is that the funds in the originator's account represent a debt that the originator's bank owes to the originator (not to the beneficiary). Even when the originator has sent a payment order to the originator's bank initiating a funds transfer to the beneficiary, the funds are not yet owed to the beneficiary, and thus are not yet subject to garnishment (or other process) of the beneficiary's creditor.

> For proper cause and in compliance with applicable law, a court may restrain (i) a person from issuing a payment order to initiate a funds transfer, (ii) an originator's bank from executing the payment order of the originator, or (iii) the beneficiary's bank from releasing funds to the beneficiary or the beneficiary from withdrawing the funds.  A court may not otherwise restrain a person from issuing a payment order, paying or receiving payment of a payment order, or otherwise acting with respect to a funds transfer.

UCC § 4A-503.  As with Section 4A-502, the only categorical prohibitions relate to intermediary banks.  *See* UCC § 4A-503 comment ("In particular, intermediary banks are protected.").

The boundaries that those provisions draw are not arbitrary happenstance. Rather, they flow naturally from the conceptual framework described above. Because the person initiating a funds transfer might have obligations to third parties with regard to the funds being used for the payment, it makes sense that a creditor of the originator could reach those funds (UCC § 4A-502 comment 4 sentence 4) or that a court could restrain the dissipation of those funds (UCC § 4A-503(i), (ii)).  Similarly, because a third party might have a claim to the funds sent to the beneficiary, a court just as naturally could allow a creditor to reach those funds when they appear at the beneficiary's bank (UCC § 4A-502(d)[12]) or restrain the release of those funds from that bank (UCC § 4A-503(iii)).  Because intermediary banks have no obligations directly to the parties to the funds transfer,

---

[12] *See also* UCC § 4A-502(c) (procedure for beneficiary's banks responding to garnishment of beneficiary).

they can have no obligations to the creditors of those parties.  Hence, it makes no

sense for courts to interfere with them at all (UCC §§ 4A-502(d) (last sentence),

4A-503 (last sentence)).

The drafting history of Article 4A underscores this point.[13]  The earliest draft

to consider the interface between creditors and the funds transfer system included a

broad provision protecting all banks except the beneficiary's bank, with no

suggestion (even in the comment) of other possibilities.   UCC § 4A-502(4)

(February 1989 Draft) ("The proper party to receive creditor process with respect

to a payment by the originator to the beneficiary pursuant to a funds transfer is the

beneficiary's bank.  Any other party to a funds transfer served with such creditor

process is not obliged to act with respect to the process.").  But the drafters quickly

recognized the overbreadth of that provision, which had failed to consider the

possibility that creditors of an originator might seek relief against parties involved

in funds transfers.  Thus, the very next draft added two sentences to the proposed

comment, quite similar to the language in existing law, emphasizing the proper

scope of relief for creditors of the originator.   This newly added language

explained:  "A creditor of the originator can levy on the account of the originator in

---

[13]   The materials discussed in this paragraph are available in the NCCUSL Archives in the Special Collections Department at the Biddle Law Library at the University of Pennsylvania Law School.  For the convenience of the Court, we reproduce the relevant materials in an Appendix to this brief.

the originator's bank, but that levy is subject to the limitations stated in [the predecessor to UCC § 4A-502(b)]. Except for the account that is debited, no property of the originator is involved in the funds transfer." UCC § 4A-502 comment 4 (April 1989 Draft).

The history, like the text, contemplates a coherent two-step framework for managing creditor process: (1) relief is readily available against the assets of originators and beneficiaries, at the banks with which they deal; (2) relief is not available against wholly intermediary banks, because they hold assets of neither the originators nor the beneficiaries.

### B. THE INJUNCTION DOES NOT PURPORT TO REACH INTERMEDIARY BANKS.

Read against that backdrop, the Injunction should not be controversial. It does not mention intermediary banks, either explicitly or by implication. Rather, the operative provision (Section 2(e)) extends only to "parties involved, directly or indirectly, in advising upon, preparing, processing, or facilitating any payment on the Exchange Bonds." SPA-34. The UCC provisions of relevance here target parties involved in "processing" and "facilitating" payments.

The Injunction applies directly to Argentina and its agents, as originators of a funds transfer, but clause (i) of Section 4A-503 expressly contemplates that. It also would apply to any bank that acts on behalf of Argentina and its agents to enter such a transfer into a funds transfer system, but clause (ii) of Section 4A-503

validates that application; *see also* UCC § 4A-502 comment 4 sentence 4 ("A creditor of the originator can levy on the account of the originator in the originator's bank before the funds transfer is initiated * * * ."). Finally, the Injunction would apply to any beneficiary's bank or beneficiary with regard to the final payment, as contemplated by clause (iii) of Section 4A-503; see UCC § 4A-502(d) ("Creditor process with respect to a payment by the originator to the beneficiary * * * may be served only on the beneficiary's bank * * * .").

There is no reason to suppose that the Injunction has any application to the intermediary banks, because they have no role in "processing, or facilitating any payment" for the originator or beneficiary. Their sole role under Article 4A is to execute payment orders they might receive, and their sole obligations are to the parties to those payment orders. *See Grain Traders*, 160 F.3d at 102 (explaining that intermediary banks "ordinarily" are not "concerned" about "the financial circumstances and various legal relations of the other parties to the transfer"). If the District Court had intended its Injunction to reach those parties, it should have fashioned its order much more expansively and explicitly. To read the Injunction as reaching those parties is to rake up trouble that needs not exist.

The Clearing House and Argentina offer different understandings of the underlying facts, but under either scenario the Injunction is consistent with Article 4A. The Clearing House contends (CH Br. at 20) that Bank of New York (acting

as Trustee) would be the originator, and challenges application of the Injunction in that scenario.  But clause (i) of UCC § 4A-503 explicitly authorizes injunctive relief against an originator.  Conversely, Argentina contends (Argentina Br. at 55) that Argentina itself is the originator, such that all subsequent parties in the trans-action should be immune from judicial process.  But in that scenario, Argentina's bank – presumably, but not necessarily, Bank of New York – would be the originator's bank.  Application of the Injunction under that scenario falls directly within clause (ii) of UCC § 4A-503.

Yet another possibility is that there are two distinct funds transfers, one from Argentina to the Trustee, and one from the Trustee to the individual bondholders. Again, nothing in Article 4A would prevent application of the Injunction to any of those parties or their banks.  For example, clause (iii) of UCC § 4A-503 would permit application of the Injunction to prevent the Trustee as beneficiary of the first transfer from taking any steps to withdraw or transfer funds from the first transfer.  Similarly, clauses (i) and (ii) of UCC § 4A-503 would permit application of the Injunction to bar the Trustee from initiating a payment order to send those funds onward.  Finally, it would permit application of the Injunction at the level of

the beneficiaries' banks to prevent the beneficiaries from gaining access to funds distributed by the Trustee through the wire transfer system.[14]

While Argentina wholly ignores the distinction between the originator's banks and intermediary banks, seeking blanket protection for all involved (Argentina Br. at 55-56), The Clearing House at least implicitly recognizes that Article 4A protections apply only to the intermediary banks. Thus, The Clearing House asserts that the terms of the Injunction are "defined * * * to include intermediary banks," CH Brief at 18 & n.22, but it does not even try to explain how intermediary banks can be "processing" payments of which they are most unlikely to have any knowledge. The tendentiousness of The Clearing House's position is underscored by its acknowledgment (CH Brief at 18 n.22) that Plaintiffs-Appellees have suggested no interest in extending the Injunction to intermediary banks.[15] Essentially, The Clearing House has offered an implausibly

---

[14]   This assumes, of course, that the parties in question are subject to the injunctive authority of the district court, a question as to which Article 4A does not speak.

[15]   The Clearing House does challenge (CH Brief at 18 n.22, 19-20) application of the Injunction to the Bank of New York acting as Trustee. But the basis of that challenge (CH Br. at 22) appears to be the volume of the challenged payments rather than any aspect of the structure of Article 4A. In context, the unusually large number of affected payments says less about the Injunction's interference with the funds transfer system than it does about the difficulties that face a financial institution handling the affairs of an entity the size of Argentina that is committed to routine contravention of the judgment of a federal court.

broad reading of the Injunction because of the flimsiness of the arguments it could present against the actual, narrower, scope of the Injunction.   Because The Clearing House offers no reason why Article 4A might bar application of the Injunction to parties with roles beyond that of an intermediary bank, and because the Injunction does not depend on or even contemplate application to intermediary banks, The Clearing House's concerns are unwarranted.

Having said that, we recognize the seriousness of the concerns that would arise if the Injunction extended to intermediary banks.   If this Court, notwithstanding the discussion above, concludes that the Injunction might chill the activities of intermediary banks, we believe that the appropriate course of action is not to vacate and remand the Injunction, but for this Court instead to clarify the Injunction as simply as possible without altering the valid scope of its reach.   For example, one possible revision that would eviscerate any legitimate concern of The Clearing House regarding Article 4A would add the following sentence at the conclusion of Section 2(e) of the Injunction:   "Nothing in this paragraph shall be construed to extend this ORDER to institutions the sole role of which with regard to any payment on the Exchange Bonds is as an intermediary bank implementing a payment order that is a part of the relevant funds transfer."

## II.    THE DECISION BELOW IS CONSISTENT WITH *JALDHI*.

The Clearing House's brief explicitly compares the Injunction at issue to the pervasive disruption of the payments system that ensued upon the decision in *Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d 263 (2d Cir. 2002).  *See* CH Brief at 23-24.  But in fact the Injunction is much more consistent with the understandings of the *Jaldhi* Court (*Shipping Corp. of India v. Jaldhi Overseas PTE Ltd.*, 585 F.3d 58, 61-68 (2d Cir. 2009) (overruling *Winter Storm*)) than it is with the ill-fated *Winter Storm* decision.

The central flaw of *Winter Storm* was its failure to recognize the hermetic separation between the rights of parties in the outside "real" world – the originators and beneficiaries of funds transfers – from the obligations of intermediary banks within the black box of the funds transfer system.   By treating funds at intermediary banks as subject to attachment based on the conduct of originators and beneficiaries – with whom the intermediary banks had never dealt – the *Winter Storm* panel undermined the basic framework of Article 4A.  Specifically, and with all due respect, the *Winter Storm* panel erred in treating funds in the hands of the intermediary bank as property of the defendant, *Winter Storm*, 310 F.3d at 276-78; *see Consub Delaware LLC v. Schahin Engenharia Limitada*, 543 F.3d 104, 108-13 (2d Cir. 2008) (repeating that error).

Neither *Winter Storm* nor *Consub Delaware* can sensibly be reconciled with the recognition in *Grain Traders* (summarized above) that the intermediary bank is responsible only to its sender and receiving bank.  *See Grain Traders*, 160 F.3d at 101-02; *see also Aqua Stoli Shipping Ltd. v. Gardner Smith PTY Ltd*., 460 F.3d 434, 445 n.6 (2d Cir. 2006) (criticizing *Winter Storm* on that basis).

The *Jaldhi* Court's retreat from *Winter Storm* reflected a renewed understanding and embrace of the Article 4A framework.  Specifically, the *Jaldhi* Court returned to the emphasis, first articulated clearly in *Grain Traders*, on the step-by-step structure of Article 4A obligations:  the internal parties to a transfer give and receive obligations only to and from their counterparties on their respective payment orders.  Explaining that the specific error of the *Winter Storm* panel was its assumption that intermediary banks hold property of the originator or beneficiary, the *Jaldhi* Court overruled Winter Storm based on the structure of UCC Article 4A, which makes it clear intermediary banks hold no such thing. *Jaldhi*, 585 F.3d at 68-71 ("'[U]ntil the funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary, the beneficiary has no property interest in the funds transfer * * * .'") (quoting UCC § 4A-502 comment 4); *see* Permanent Editorial Board for the Uniform Commercial Code, PEB Commentary No. 16, at 2 (July 1, 2009) ("[C]redits in an intermediary bank * * * are not property of either the originator or the beneficiary.").

To put it colloquially, *Winter Storm* erred in treating the wire transfer system as a pipe, in which funds flow directly from the originator to the beneficiary, capable of interception at any point. *Jaldhi* rests on an understanding of the wire transfer system as more like a transporter (of *Star Trek* vintage), in which the originator's funds leave the beginning point (the originator's bank) and appear at the destination (the beneficiary's bank), without traversing the space between. *See* UCC § 4A-502 comment 4 ("A creditor of the originator * * * cannot reach [funds that are no longer at the originator's bank] because no property of the originator is being transferred.").

Thus, *Jaldhi* did not overrule *Winter Storm* because of a free-floating need to insulate wire transfers from lawful process. It reversed the specific conclusion of Winter Storm that creditor process can extend all the way to the backbone institutions transmitting the payments behind the scenes. *Jaldhi* documents the importance of understanding the precise obligations of the parties to funds transfers and payment orders, and ensuring that creditor process is limited to assets and obligations of the responsible parties.

Viewed through the *Jaldhi/Grain Traders* lens, the Injunction is not in the least objectionable. In relevant part, it addresses only the parties that are processing payments on Argentina's bonds. If Argentina or the Trustee wishes to distribute those funds by wire transfer (*see* CH Br. at 19), the Injunction's

19

prohibition of that activity is a pedestrian application of UCC § 4A-503.  If the Injunction were extended to intermediary banks, which ordinarily would have no reason to realize they are processing or facilitating payments sent by the Trustee (CH Br. at 19-20), it would contravene Article 4A.  But of course that extension exists only in the wolf-crying rhetoric of The Clearing House's brief.

## CONCLUSION

We submit, respectfully, that with regard to the issues addressed in this brief, the decision below should be affirmed.

Dated:   New York, New York
         April 24, 2012

                                        Respectfully submitted,


                                        /s/ Ronald Mann
                                        Professor Ronald Mann
                                        435 West 116th Street
                                        New York NY 10027
                                        (212) 854-1570
                                        *Amicus Curiae*


                                        /s/ David W. Rivkin
                                        David W. Rivkin
                                        Suzanne M. Grosso
                                        DEBEVOISE & PLIMPTON LLP
                                        919 Third Avenue
                                        New York, New York 10022
                                        (212) 909-6000
                                        *Attorneys for* Amicus Curiae *EM Ltd.*

CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND
TYPE STYLE REQUIREMENTS


1.     This brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(d) and 32(a)(7)(B)(i) because this brief contains 4878 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14-point Times New Roman font.


/s/ David W. Rivkin
David W. Rivkin
Suzanne M. Grosso
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000
*Attorneys for* Amicus Curiae *EM Ltd.*

APPENDIX:  February 1989 Draft

## § 4A-502.   CREDITOR PROCESS SERVED ON RECEIVING BANK; SETOFF BY BENEFICIARY'S BANK

(1)     As used in this section, "creditor process" means levy, attachment, garnishment, notice of lien, sequestration, or similar process issued by or on behalf of a creditor or other claimant with respect to an account.

(2)     If a receiving bank accepts a payment order and debits the account of the sender, the resulting reduction in the account balance is effective not-withstanding service of creditor process with respect to the account, unless the creditor process is served at a time and in a manner affording the receiver a reasonable opportunity to act on it before the bank accepts the payment order.

(3)     This subsection applies if a beneficiary's bank has received a payment order and has credited the beneficiary's account with respect to the order.

    (a)     Until the payment order is accepted, the amount credited to the beneficiary's account (i) may not be set off against an obligation owed by the beneficiary to the bank, and (ii) may not be applied to satisfy creditor process served on the bank with respect to the account.

    (b)     The bank may allow withdrawal of the amount credited to the account unless creditor process with respect to the account is served at a time and in a manner affording the bank a reasonable opportunity to act to prevent withdrawal.

    (c)     If creditor process with respect to the account is served on the bank before the payment order is accepted, the bank may not reject the order except for a reason unrelated to the service of process.

(4)     The proper party to receive creditor process with respect to a payment by the originator to the beneficiary pursuant to a funds transfer is the beneficiary's bank.  Any other party to a funds transfer served with such creditor process is not obliged to act with respect to the process.

<u>COMMENT</u>

1.     Under subsection (2) if a receiving bank accepts a payment order and debits the sender's account, the debit takes precedence over a garnishment of the sender's account if the garnishment was not served in a time and manner to allow

APPENDIX:  February 1989 Draft (cont'd)

the bank to act on it before accepting the order.  The ration-ale is obvious.  In accepting the payment order the bank may have relied on a credit balance in the sender's account.  Under subsection (2) time must be allowed for notice of the service of creditor process to be received by personnel of the bank responsible for the acceptance.

2.    Subsection (3) deals with payment orders issued to the beneficiary's bank.  The bank may credit the beneficiary's account when the order is received, but under Section 4A-405(1) the bank incurs no obligation to pay the beneficiary until the order is accepted pursuant to Section 4A-207(2).  Thus, before acceptance, the credit to the beneficiary's account is provisional.  Subsection (3)(a) states that until acceptance occurs, the credit can't be set off against an obligation owed to the bank.  This follows because until acceptance the credit does not represent an obligation owed by the bank.  If the payment order was accepted when received, as in the case of a Fedwire, the bank could set off immediately.  But if the beneficiary's bank receives a payment order from an intermediary bank which had not yet paid the order when it was received, the bank can wait until acceptance occurs by receipt of payment (Section 4A-207(2)(b)) and then set off.  As an alternative the bank could set off after accepting the order by notifying the beneficiary under Section 4A-207(2)(a).

The same principle applies to creditor process.  Subsection (3)(a) also states that the credit to the beneficiary's account cannot be applied to the creditor process until acceptance.  In some states a garnishment applies only to the amounts owed by the bank to the debtor at the time of garnishment.  Under that kind of statute, garnishment before the payment order was accepted would not apply to the amount represented by the order even though a provisional credit to the beneficiary's account had been made, because until acceptance nothing is owed to the beneficiary.  And, the garnishment would not apply to the credit if the payment order is accepted later.  In other states, the law provides that the garnishment applies to debts of the bank to the debtor arising after service is made.  In those states, the levy or garnishment will reach the amount represented by the payment order if it is accepted after service is made.  Both subsection (3)(a) and (b) apply to this type of statute.  Although the creditor process does not apply to the amount credited to the beneficiary's account until the order is accepted, acceptance normally will occur in ordinary course, unless the bank rejects the order.  Normally there is no reason for a beneficiary's bank to reject a payment order, but if the beneficiary's account is garnished, the bank may be faced with a difficult choice.  If it rejects the order, the garnishing creditor's potential recovery of funds of the beneficiary is frustrated.  It may be faced with a claim by the creditor that the

APPENDIX:  February 1989 Draft (cont'd)

rejection was a wrong to the creditor.  If the bank accepts the order, the effect is to allow the creditor to seize funds of its customer, the beneficiary.  Subsection (3)(c) gives the bank no choice in this case.  It provides that it may not favor its customer over the creditor by rejecting the order.  The beneficiary's bank may rightfully reject only if there is an independent basis for rejection.

3.   Subsection (3)(b) is similar to subsection (2).   Normally the beneficiary's bank will release funds to the beneficiary shortly after acceptance or it will accept by releasing funds.  Since the bank is bound by a garnishment order served before funds are released to the beneficiary, the bank might suffer a loss if funds were released without knowledge that a particular garnishment order had been served.  Subsection (3)(b) protects the bank if it did not have adequate notice of the garnishment when the funds were released.

4.   A creditor may want to intercept a funds transfer.  The creditor may try to do so by serving process on the originator's bank, an intermediary bank or the beneficiary's bank.  The purpose of subsection (4) is to guide the creditor and the court as to the proper method of reaching the funds.  Since a funds transfer is simply a process for causing the beneficiary's bank to incur an obligation to the beneficiary, the funds can be reached by the creditor only by serving creditor process on the beneficiary's bank.

5.   "Creditor process" is defined in subsection (1) to cover a variety of devices by which a creditor of the holder of a bank account or a claimant to a bank account can seize the account.  Procedure and nomenclature varies widely from state to state.  The term used in Section 4A-502 is a generic term.

APPENDIX:  April 1989 Draft

## § 4A-502.    CREDITOR PROCESS SERVED ON RECEIVING BANK; SETOFF BY BENEFICIARY'S BANK

(1)    As used in this section, "creditor process" means levy, attachment, garnishment, notice of lien, sequestration, or similar process issued by or on behalf of a creditor or other claimant with respect to an account.

(2)    If a receiving bank accepts a payment order and debits the account of the sender, the resulting reduction in the account balance is effective not-withstanding service of creditor process with respect to the account, unless the creditor process is served at a time and in a manner affording the receiver a reasonable opportunity to act on it before the bank accepts the payment order.

(3)    This subsection applies if a beneficiary's bank has received a payment order for payment to the beneficiary's account in the bank.

(a)    The bank may credit the beneficiary's account and the amount credited may be set off against an obligation owed by the beneficiary to the bank or may be applied to satisfy creditor process served on the bank with respect to the account.

(b)    The bank may credit the beneficiary's account and may al-low withdrawal of the amount credited to the account unless creditor process with respect to the account is served at a time and in a manner affording the bank a reasonable opportunity to act to prevent withdrawal.

(c)    If creditor process with respect to the account is served, the bank may not reject the payment order except for a reason unrelated to the service of process.

(4)    The proper party to receive creditor process with respect to a payment by the originator to the beneficiary pursuant to a funds transfer is the beneficiary's bank.  Any other bank served with such creditor process is not obliged to act with respect to the process.

<u>COMMENT</u>

1.    Under subsection (2) if a receiving bank accepts a payment order and debits the sender's account, the debit takes precedence over a garnishment of the sender's account if the garnishment was not served in a time and manner to allow the bank to act on it before accepting the order.  The ration-ale is obvious.  In

APPENDIX:  April 1989 Draft (cont'd)

accepting the payment order the bank may have relied on a credit balance in the sender's account.  Under subsection (2) time must be allowed for notice of the service of creditor process to be received by personnel of the bank responsible for the acceptance.

2.      Subsection (3) deals with payment orders issued to the beneficiary's bank.  The bank may credit the beneficiary's account when the order is received, but under Section 4A-404(1) the bank incurs no obligation to pay the beneficiary until the order is accepted pursuant to Section 4A-207(2).  Thus, before acceptance, the credit to the beneficiary's account is provisional.  But under Section 4A-207(2) acceptance occurs if the beneficiary's bank pays the beneficiary pursuant to Section 4A-405(1).  Under that provision, payment occurs if the credit to the beneficiary's account is applied to a debt of the beneficiary.  Subsection (3)(a) allows the bank to credit the beneficiary's account with respect to a payment order and to accept the order by setting off the credit against an obligation owed to the bank or applying the credit to creditor process with respect to the account.

In some states a garnishment applies only to the amounts owed by the bank to the debtor at the time of garnishment.  Under that kind of statute, garnishment before the payment order was accepted would not apply to the amount represented by the order even though a provisional credit to the beneficiary's account had been made, because until acceptance nothing is owed to the beneficiary.  And, the garnishment would not apply to the credit if the payment order is accepted later.  In other states, the law provides that the garnishment applies to debts of the bank to the debtor arising after ser-vice is made.  In those states, the levy or garnishment will reach the amount represented by the payment order if it is accepted after service is made.  Al-though the creditor process does not apply to the amount credited to the beneficiary's account until the order is accepted, acceptance normally will occur in ordinary course, unless the bank rejects the order.  Normally there is no reason for a beneficiary's bank to reject a payment order, but if the beneficiary's account is garnished, the bank may be faced with a difficult choice.  If it rejects the order, the garnishing creditor's potential recovery of funds of the beneficiary is frustrated.  It may be faced with a claim by the creditor that the rejection was a wrong to the creditor.  If the bank accepts the order, the effect is to allow the creditor to seize funds of its customer, the beneficiary.  Subsection (3)(c) gives the bank no choice in this case.  It provides that it may not favor its customer over the creditor by rejecting the order.  The beneficiary's bank may rightfully reject only if there is an independent basis for rejection.

APPENDIX:  April 1989 Draft (cont'd)

3.     Subsection (3)(b) is similar to subsection (2).   Normally the beneficiary's bank will release funds to the beneficiary shortly after acceptance or it will accept by releasing funds.  Since the bank is bound by a garnishment order served before funds are released to the beneficiary, the bank might suffer a loss if funds were released without knowledge that a particular garnishment order had been served.  Subsection (3)(b) protects the bank if it did not have adequate notice of the garnishment when the funds were released.

4.     A creditor may want to intercept a funds transfer.  The creditor may try to do so by serving process on the originator's bank, an intermediary bank or the beneficiary's bank.  The purpose of subsection (4) is to guide the creditor and the court as to the proper method of reaching the funds.  Since a funds transfer is simply a process for causing the beneficiary's bank to incur an obligation to the beneficiary, the funds transfer cannot be intercepted by creditor process.  A creditor of the originator can levy on the account of the originator in the originator's bank, but that levy is subject to the limitations stated in subsection (2). Except for the account that is debited, no property of the originator is involved in the funds transfer.  The beneficiary has no property interest in the funds transfer until the funds transfer is completed, i.e.  when the beneficiary's bank incurs an obligation to the beneficiary by accepting a payment order for the benefit of the beneficiary.   A creditor of the beneficiary that wants to reach the funds to be received by the beneficiary must serve creditor process on the beneficiary's bank to reach the obligation of the beneficiary's bank to pay the beneficiary which arises upon acceptance by the beneficiary's bank under Section 4A-404(1).

5.     "Creditor process" is defined in subsection (1) to cover a variety of devices by which a creditor of the holder of a bank account or a claimant to a bank account can seize the account.  Procedure and nomenclature varies widely from state to state.  The term used in Section 4A-502 is a generic term.

# CERTIFICATE OF SERVICE & CM/ECF FILING

12-105-cv(L)          NML Capital, Ltd. v. The Republic of Argentina

       I hereby certify that I caused the foregoing Motion for Leave to File *Amicus Curiae* Brief to be served on all counsel via Electronic Mail generated by the Court's electronic filing system (CM/ECF) with a Notice of Docket Activity pursuant to Local Appellate Rule 25.1:

Carmine D. Boccuzzi, Jr.
Christopher P. Moore
Cleary Gottlieb Steen & Hamilton LLP
1 Liberty Plaza
New York, NY 10006
212-225-2000

Jonathan I. Blackman
Cleary Gottlieb Steen & Hamilton LLP
City Place House
55 Basinghall Street
London, EC2V 5EH
England
+442076142200

*Attorneys for Defendant-Appellant*
*The Republic of Argentina*

Theodore B. Olson
Matthew McGill
Jason J. Mendro
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
202-887-3680

Robert A. Cohen
Dechert LLP
1095 Avenue of the Americas
New York, New York 10036
212-698-3501

*Attorneys for Plaintiff-Appellee*
*NML Capital, Ltd.*

Barry Robert Ostrager
Kimberly A. Hamm
Tyler B. Robinson
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
212-455-2000

Melissa Kelly Driscoll
Menz Bonner & Komar LLP
444 Madison Avenue, 39th Floor
New York, NY 10022
212-223-2100

Edward A. Friedman
Andrew W. Goldwater
Jessica Murzyn
Daniel B. Rapport
Emily A. Stubbs
Friedman Kaplan Seiler & Adelman LLP
7 Times Square
New York, NY 10036
212-833-1100

Jeffrey A. Lamken
MoloLamken LLP
600 New Hampshire Avenue
Washington, DC 20037
202-556-2010

Walter Rieman
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3260

*Attorneys for Plaintiffs-Appellees*
*Aurelius Capital Master , Ltd., ACP Master ,*
*Ltd., Blue Angel Capital I LLC, Aurelius*
*Opportunities Fund II, LLC*

Jeannette Anne Vargas
Assistant U.S. Attorney
United States Attorney's Office
 for the Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
212-637-2678

*Attorneys for Amicus Curiae*
*United States of America*

Sergio J. Galvis
Joseph E. Neuhaus
Michael J. Ushkow
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004
212- 558-4000

*Attorneys for Amicus Curiae*
*The Clearing House Association L.L.C*

Andrew W. Amend
Walter Rieman
Paul, Weiss, Rifkind, Wharton
 & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3000

*Attorneys for Movants*
*Montreaux Partners L.P. and Wilton Capital*

Richard Abbott Samp
Washington Legal Foundation
2009 Massachusetts Avenue
202-588-0302

*Movant*

Gary Steven Snitow
Michael Champlin Spencer
Milberg LLP
1 Pennsylvania Plaza, 48th Floor
New York, NY 10119
212-594-5300

*Attorneys for Plaintiffs-Appellees*
*Pablo Alberto Varela, Lila Ines Burgueno,*
*Mirta Susana Dieguez, Maria Evangelina*
*Carballo, Leandro Daniel Pomilio, Susana*
*Aquerreta, Maria Elena Corral, Teresa Munoz*
*De Corral, Norma Elsa Lavorato, Carmen Irma*
*Lavorato, Cesar Ruben Vazquez, Norma*
*Haydee Gines, Marta Azucena Vazquez*

Stephen D. Poss
Robert D. Carroll
Goodwin Procter LLP
53 State Street
Boston, MA 02109
617-570-1000

*Attorneys for Plaintiff-Appellee*
 *Olifant Fund, Ltd.*

Kevin S. Reed
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
212-849-7000

*Attorneys for Movant*
*Kenneth W. Dam*

Joel M. Miller
Miller & Wrubel P.C.
570 Lexington Avenue, 25th Floor
New York, NY 10022
212-336-3501

*Attorneys for Movants*
*Luis A. Erize, Martin E. Paolantoni and*
 *Estela B. Sacristan,*

2

I certify that an electronic copy was uploaded to the Court's electronic filing system. Three hard copies of the foregoing Motion for Leave to File *Amicus Curiae* Brief were sent to the Clerk's Office By Hand Delivery to:

Clerk of Court
United States Court of Appeals, Second Circuit
United States Courthouse
500 Pearl Street, 3rd floor
New York, New York 10007
(212) 857-8576

on this 24th day of April 2012.

Notary Public:

/s/ Ramiro A. Honeywell                              /s/ Samantha Collins

**Sworn to me this**                                 SAMANTHA COLLINS
                                                     Record Press, Inc.
April 24, 2012                                       229 West 36th Street, 8th Floor
                                                     New York, New York 10018
RAMIRO A. HONEYWELL                                  (212) 619-4949
Notary Public, State of New York
No. 01HO6118731
Qualified in Kings County
Commission Expires November 15, 2012