UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                                                   :
NML CAPITAL, LTD.,                                                 :
                                                                   :   08 Civ. 6978 (TPG)
                              Plaintiff,                           :   09 Civ. 1707 (TPG)
                                                                   :   09 Civ. 1708 (TPG)
                      - against -                                  :
                                                                   :
THE REPUBLIC OF ARGENTINA,                                        :
                                                                   :
                              Defendant.                           :
                                                                   :
------------------------------------------------------------------X
AURELIUS CAPITAL MASTER, LTD. and                                 :
ACP MASTER, LTD.,                                                 :
                                                                   :   09 Civ. 8757 (TPG)
                              Plaintiffs,                          :   09 Civ. 10620 (TPG)
                                                                   :
                      - against -                                  :
                                                                   :
THE REPUBLIC OF ARGENTINA,                                        :
                                                                   :
                              Defendant.                           :
------------------------------------------------------------------ X
AURELIUS OPPORTUNITIES FUND II, LLC                               :
and AURELIUS CAPITAL MASTER, LTD.,                                :   10 Civ. 1602 (TPG)
                                                                   :   10 Civ. 3507 (TPG)
                              Plaintiffs,                          :   10 Civ. 3970 (TPG)
                                                                   :   10 Civ. 8339 (TPG)
                      - against -                                  :
                                                                   :
THE REPUBLIC OF ARGENTINA,                                        :
                                                                   :
                              Defendant.                           :
------------------------------------------------------------------X *(captions continue on following pages)*


**MEMORANDUM OF LAW OF THE REPUBLIC OF ARGENTINA IN RESPONSE TO
PLAINTIFFS' BRIEF ON REMAND**

```
-----------------------------------------------------------------X
BLUE ANGEL CAPITAL I LLC,                      :
                                               :
                                               :
                           Plaintiff,          :      10 Civ. 4101 (TPG)
                                               :      10 Civ. 4782 (TPG)
              - against -                       :
                                               :
THE REPUBLIC OF ARGENTINA,                     :
                                               :
                           Defendant.          :
                                               :
-----------------------------------------------------------------X
OLIFANT FUND, LTD.,                            :
                                               :
                                               :
                           Plaintiff,          :      10 Civ. 9587 (TPG)
                                               :
              - against -                       :
                                               :
THE REPUBLIC OF ARGENTINA,                     :
                                               :
                           Defendant.          :
                                               :
-----------------------------------------------------------------X
PABLO ALBERTO VARELA, et al.,                  :
                                               :
                                               :
                           Plaintiffs,         :      10 Civ. 5338 (TPG)
                                               :
              - against -                       :
                                               :
THE REPUBLIC OF ARGENTINA,                     :
                                               :
                           Defendant.          :
                                               :
-----------------------------------------------------------------X
```

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ............................................................................................................. 4

    A.   The October 26 Decision of the Court of Appeals ........................................ 4

    B.   The November 9 Court Conference ................................................................ 5

    C.   Plaintiffs' Proposed Amended Injunctions .................................................... 7

    D.   The Status of Proceedings On Appeal and the
          Court's Stay of the Injunctions ...................................................................... 8

ARGUMENT .................................................................................................................. 9

I.     WHILE THE MANDATE REMAINS WITH THE
      SECOND CIRCUIT THIS COURT LACKS JURISDICTION
      TO FINALLY DECIDE THE REMANDED ISSUES ......................................... 9

II.    THE COURT SHOULD REJECT PLAINTIFFS' DEMAND THAT
      EXCHANGE BONDHOLDERS NOT RECEIVE A SINGLE SCHEDULED
      INTEREST PAYMENT, UNLESS PLAINTIFFS ARE PAID THE FULL FACE
      VALUE OF THEIR DEFAULTED DEBT, PLUS INTEREST ........................... 11

III.   THE PROPOSED AMENDED INJUNCTIONS WOULD IMPROPERLY
      BIND THIRD PARTIES ...................................................................................... 16

IV.   THE ORDER STAYING THE EFFECT OF THE INJUNCTIONS SHOULD
      REMAIN IN PLACE ............................................................................................ 24

CONCLUSION ............................................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alemite Mfg. Corp. v. Staff,*
42 F.2d 832 (2d Cir. 1930)........................................................................................... 23

*Brown v. J.P. Morgan & Co.,*
40 N.Y.S.2d 229 (1st Dep't 1943), *aff'd*, 295 N.Y. 867 (1946) ...................................... 18

*Capital Ventures Int'l v. Republic of Argentina,*
282 F. App'x 41 (2d Cir. 2008) ..................................................................................... 22

*Dague v. City of Burlington,*
976 F.2d 801 (2d Cir. 1992)...................................................................................... 9, 10

*Deutsche Bank AG v. JPMorgan Chase Bank,*
No. 04 Civ. 7192 (SHS), 2007 WL 2823129 (S.D.N.Y. Sept. 27, 2007).......................... 15

*Doe v. Gonzales,*
449 F.3d 415 (2d Cir. 2006)........................................................................................... 10

*Eli Lilly & Co. v. Gottstein,*
617 F.3d 186 (2d Cir. 2010)..................................................................................... 23, 24

*EM Ltd. v. Republic of Argentina,*
131 F. App'x 745 (2d Cir. 2005) ................................................................................... 13

*EM Ltd. v. Republic of Argentina,*
473 F.3d 463 (2d Cir. 2007)...................................................................................... 15, 16

*EM Ltd. v. Republic of Argentina,*
No. 03 Civ. 2507 (TPG), 2012 WL 1028109 (S.D.N.Y. Mar. 28, 2012) ...................... 18, 21

*Goya Foods, Inc. v. Wallack Mgmt. Co.,*
290 F.3d 63 (1st Cir. 2002)........................................................................................... 24

*Grain Traders, Inc. v. Citibank, N.A.,*
160 F.3d 97 (2d Cir. 1998)............................................................................................. 20

*Int'l Bhd. of Teamsters v. United States,*
431 U.S. 324 (1977) ..................................................................................................... 11

*Kusay v. United States,*
62 F.3d 192 (7th Cir. 1995) ........................................................................................... 10

*Lamberti v. Angiolillo,*
905 N.Y.S.2d 560 (1st Dep't 2010) ............................................................................... 11

*Latino Officers Ass'n of New York v. City of New York*,
558 F.3d 159 (2d Cir. 2009).................................................................... 27

*Lau v. Meddaugh*,
229 F.3d 121 (2d Cir. 2000)................................................................... 25-26

*Lightwater Corp. v. Republic of Argentina*,
No. 02 Civ. 3804 (TPG), 2003 WL 1878420 (S.D.N.Y. Apr. 14, 2003)........................... 13

*Mohammed v. Reno*,
309 F.3d 95 (2d Cir. 2002)..................................................................... 25

*NML Capital, Ltd. v. Banco Central de la República Argentina*,
652 F.3d 172 (2d Cir. 2011), *cert. denied sub nom. EM Ltd. v. Republic of Argentina*,
No. 11-604, 2012 WL 2368718 (June 25, 2012) ................................................ 15, 25

*Reliance Ins. Co. v. Mast Constr. Co.*,
84 F.3d 372 (10th Cir. 1996) ................................................................. 23-24

*Stanfield Offshore Leveraged Assets, Ltd. v. Metro. Life Ins. Co.*,
883 N.Y.S.2d 486 (1st Dep't 2009) ........................................................... 23

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*,
402 U.S. 1 (1971)............................................................................. 12

*Thapa v. Gonzales*,
460 F.3d 323 (2d Cir. 2006)................................................................... 25

*Time Warner City Cable v. Adelphi Univ.*,
813 N.Y.S.2d 114 (2d Dep't 2006) ............................................................ 22

*United States v. Rivera*,
844 F.2d 916 (2d Cir. 1988)................................................................... 9, 10

*United States v. Rodgers*,
101 F.3d 247 (2d Cir. 1996)................................................................... 9, 10

*United States v. Timewell*,
387 F. App'x 23 (2d Cir. 2010) .............................................................. 10

**Rules and Statutes**

22 U.S.C. § 5322(1) ......................................................................... 13

N.Y. C.P.L.R. § 5222(b) ..................................................................... 18

Fed. R. App. P. 41(d)(1) .................................................................... 8, 10

Fed. R. Civ. P. 62.1 ........................................................................ 11

N.Y. U.C.C. § 4-A-502 cmt. 4 ............................................................................ 19

**Other Authorities**

16AA Charles Alan Wright, Arthur R. Miller & Edward H. Cooper,
*Federal Practice and Procedure: Jurisdiction 3d* § 3987 (4th ed. 2008) ......................... 10

Joshua Aizenman & Reuvan Glick, *Sterilization, Monetary Policy,
and Global Financial Integration*, Rev. Int'l Econ. ........................................................ 16

Kit Dawnay, *A History of Sterling*, The Telegraph, Oct. 8, 2001 ...................................... 16

Restatement (Third) of Agency § 1.01 (2006) .................................................................. 22

Ross P. Buckley, *The Bankruptcy of Nations: An Idea Whose Time Has Come*, 43 Int'l
Law. 1189 (2009) ............................................................................................................ 1

Defendant the Republic of Argentina (the "Republic") submits this memorandum to address the issues identified by the Court of Appeals for further review in its October 26, 2012 decision (the "Decision") affirming in part this Court's February 23, 2012 Orders.[1]

## PRELIMINARY STATEMENT

In its October 26 Decision, the Court of Appeals directed this Court to conduct proceedings on two issues regarding the February 23, 2012 injunctions, which enjoin the Republic from paying holders of its restructured debt unless it makes "Ratable Payments" to plaintiffs.  The issues identified by the Court of Appeals directly affect the interests of numerous third parties, including a host of financial institutions as well as the holders of approximately $24 billion in restructured debt who participated in the 2005 and 2010 debt Exchange Offers that were essential to the re-building of the Republic's economy in the wake of its historic and tragic economic collapse.

*First*, the Court of Appeals remanded for proceedings to clarify how the "Ratable Payment" formula under the injunctions is intended to operate.  Decision at 11, 28-29.  That formula, as an equitable remedy, cannot put plaintiffs in a better position than their contractual entitlements warrant and must not harm innocent third parties.  Plaintiffs' proposed definition of "Ratable Payment" fails both of these tests.  Payment to plaintiffs of *100%* of the full face value of their defaulted debt, plus interest, as a precondition to the Republic's making a *single* scheduled interest payment to holders of its discounted restructured debt, is not a remedy for the purported breach of plaintiffs' right to "equal treatment," because it treats plaintiffs far better

---

[1]   Unless otherwise noted, exhibits are attached to the Declaration of Carmine D. Boccuzzi, dated November 16, 2012.  The Brief of Plaintiffs in Response to the Remand from the Court of Appeals and the Declaration of Robert A. Cohen dated November 13, 2012 are cited as "Pls. Br." and "Cohen Decl.," respectively.  The points made in this memorandum are of course without prejudice to the Republic's pending petition for panel rehearing and rehearing *en banc* of the Decision, and any further review by way of a petition for certiorari that may be available.

than any exchange bondholder.  The Court itself recognized that the exchange bondholders are not getting paid anywhere near 100% of their principal and interest.  *See* Sept. 28, 2011 Hr'g Tr. at 12:7-13 (Ex. S).  That is undeniably true, whether that periodic interest payment on exchange debt is measured against the current amount of outstanding principal and interest owed by the Republic to its bondholders, or, as it should more logically be, the entire amount of originally defaulted principal and interest.  Plaintiffs have now twice rejected the Republic's offers to resolve their claims, thereby refusing equal treatment with the exchange bondholders.  They cannot now use that refusal as a basis for obtaining, in the name of "equal treatment," far better treatment than the exchange bondholders.

Plaintiffs' proposed remedy must also be rejected by the Court because it would harm third parties, including the exchange bondholders.  Plaintiffs' unprecedented demand for over one billion dollars from the fiscal reserves of a foreign state, with further demands to follow as more "me too" plaintiffs pile in, had the immediate, intended effect on the market of sending it into disarray.  *See, e.g.*, Credit Suisse, *Argentina: Unfavorable US appeals court ruling*, Oct. 28, 2012 (observing that the Court's orders are "a very negative development that increases the risk of technical default") (Ex. H).  Faced with losses already, third party bondholders have asked the Court to protect their interests, and as the Court of Appeals specifically noted, these interests must be considered by this Court in crafting any injunctive remedy.

*Second*, the Court of Appeals expressed serious concerns about the effect of the injunctions on third parties, and further directed the Court to "determine the third parties to which the Injunctions will apply" so that the reasonableness of such application can be assessed. Decision at 28.  It would be entirely unreasonable to impose the injunctions on the panoply of third parties proposed by plaintiffs – including the performing exchange bondholders' Trustee

(Bank of New York Mellon ("BNYM")), the financial institutions connected to payments on the performing bonds, the registered bondholders, and the "agents" of all these actors.  The Court of Appeals itself expressed skepticism at the very notion "that courts enter injunctions primarily for the purpose of taking action against such third parties."  July 23, 2012 Court of Appeals Hr'g Tr. at 56:13-14 (Ex. K).  Nothing in plaintiffs' submissions allays that concern.

Plaintiffs try to justify their unwarranted, overbroad injunctions on the grounds that the Trustee and all other financial institutions with any connection to the payment of the performing debt are somehow the "agents" of the Republic.  But there is not a scintilla of evidence in this record, nor could there be, that any of these entities are agents of the Republic.  To the contrary, BNYM, the Trustee for the bondholders, is the agent of the *bondholders*, and acts as their fiduciary, a role that plaintiffs seek to disrupt.  When in receipt of funds from the Republic for the exchange bondholders, BNYM *cannot* act on behalf of the Republic, but rather must adhere to its fiduciary duties to the exchange bondholders for whom it holds funds in trust.  Nor do plaintiffs improve their arguments with the blanket assertion that the vast network of commercial entities connected to payments on the Republic's restructured debt are "aiders and abettors" of the Republic – a theory this Court unsurprisingly rejected the last time it was presented by plaintiffs.  *See* Feb. 23, 2012 Hr'g Tr. at 7:22-24 (Ex. Q).

These are all serious problems, and plaintiffs are wrong in seeking to have this Court treat them as if they are a formality.  Many issues central to the injunctions are still before the Court of Appeals – the subject of the Republic's pending petition for panel rehearing and rehearing *en banc* – and as a result the mandate remains with the Court of Appeals.  Accordingly, the Court presently lacks jurisdiction to rule definitively on any of these issues, further counseling for a process that appropriately takes into account the interests and concerns of the Republic, the

3

exchange bondholders, BNYM, and the financial institutions who stand to be gravely injured by

an erroneous ruling.  It also counsels for the continuation of the March 5, 2012 stay Order (the

"Stay") currently in effect in light of the parties' intent to maintain the Stay during the appeal

process and in light of the interests of third parties affected by any Court ruling.

## BACKGROUND

**A.      The October 26 Decision of the Court of Appeals**

The Court of Appeals affirmed in part and remanded in part this Court's February 23,

2012 Orders granting NML and various "me too" plaintiffs[2] permanent injunctive relief pursuant

to the pari passu clause.  Decision at 28-29; 1994 Fiscal Agency Agreement ¶ 1(c) (Ex. Z).  The

Court of Appeals ordered "further consideration of the merits of the remedy" and directed this

Court to conduct proceedings concerning how the injunctions might function.  *See* Decision at 4,

29.

*First*, the Court of Appeals directed this Court to "clarify precisely how it intends this

[payment formula] to operate."  *Id.* at 11.  As this Court has acknowledged on multiple

occasions, plaintiffs' formula for calculating a "Ratable Payment" – namely, that plaintiffs

should immediately be paid 100 cents on the dollar of principal plus all overdue interest in a one-

time payment when the exchange bondholders get a *single* interest payment that is a fraction of

their discounted debt (and a smaller fraction of their original debt) – is problematic and illogical.

*See* Sept. 28, 2011 Hr'g Tr. at 12:7-13 (THE COURT: "[W]hat would need to be done to apply

the pari passu clause is to . . . give the plaintiffs the same percentage of the face amount of the

bonds that the exchanges received, *because [the holders of the exchange bonds are] not*

---

[2]      The "me too" plaintiffs are Aurelius Capital Master, Ltd., ACP Master, Ltd., Blue Angel Capital I LLC,
Aurelius Opportunities Fund II, LLC, Pablo Alberto Varela, Lila Ines Burgueno, Mirta Susana Dieguez, Maria
Evangelina Carballo, Leandro Daniel Pomilio, Susana Aquerreta, Maria Elena Corral, Teresa Munoz De Corral,
Norma Elsa Lavorato, Carmen Irma Lavorato, Cesar Ruben Vazquez, Norma Haydee Gines, Marta Azucena
Vazquez, and Olifant Fund, Ltd.

*receiving 100 percent.*") (emphasis added) (Ex. S); *see also* Jan. 15, 2004 Hr'g Tr. at 14:10-11

(THE COURT: NML's demand for payment in full is "a very odd interpretation of the pari passu

clause") (Ex. X).

*Second*, the Court of Appeals directed this Court to "more precisely determine the third

parties to which the Injunctions will apply before [it] can decide whether the Injunctions'

application to them is *reasonable*." Decision at 28 (emphasis added). The Court of Appeals thus

questioned whether the injunctions' sweeping applicability to third parties is appropriate *at all*, a

concern also raised by the panel during the July 23, 2012 oral argument. *See* July 23, 2012 Court

of Appeals Hr'g Tr. at 56:12-14 (THE COURT: [Interposing] "You know, I'm not sure that

courts enter injunctions primarily for the purpose of taking action against such third parties.")

(Ex. K).

The Court of Appeals stated that its concerns about third parties included the application

of the injunctions to banks acting as intermediaries under Article 4-A of the Uniform

Commercial Code ("U.C.C."), because any system that forces such intermediaries to "stop

payments by a particular entity for a particular purpose imposes significant costs on intermediary

banks and risks delays in [unrelated] payments." *See* Decision at 28; *see also* Brief for *Amicus

Curiae* the Clearing House Association L.L.C. ("CH Br.") at 18, dated Apr. 4, 2012 (Ex. N).

The Court of Appeals expressly added that "[o]ur concerns about the Injunctions' application to

third parties *do not end here*," Decision at 28 (emphasis added), and questioned "how the

challenged order will apply to third parties generally." *Id.*

## B.   The November 9 Court Conference

Following the Court of Appeals Decision, plaintiffs submitted to this Court their

proposed orders amending the injunctions while simultaneously requesting that this Court

dissolve the Stay of the injunctions – notwithstanding that open issues remain as to how the injunctions should operate.  *See* Decision at 28-29; *see also* Letter of C. Boccuzzi to J. Griesa, dated Nov. 5, 2012 (identifying open issues) (Ex. F); Letter of C. Boccuzzi to J. Griesa, dated Nov. 8, 2012 (Ex. D).  Recognizing that this Court "must comply with the Court of Appeals direction" to conduct further proceedings on the issues identified by the Court of Appeals, *see* Nov. 9, 2012 Hr'g Tr. at 3:5-13 (Cohen Decl. Ex. R), the Court declined to dissolve the Stay or enter the plaintiffs' proposed amended injunctions.  *See id.* at 30:11-12; *see also id.* at 3:14-17 (THE COURT: "The plaintiffs have submitted a letter and . . . a proposed order, but really, I can't act on that letter.  This is a matter that has to have some briefing and hearing and so forth."); *id.* at 5:7-10.

Numerous third parties attended the November 9 conference to address the Court of Appeals' concerns, including BNYM, the Trustee for holders of approximately $24 billion of foreign-currency external debt that the injunctions purport to reach.  *See* Trust Indenture governing the Exchange Bonds ("Indenture"), dated June 2, 2005 (Ex. U); Letter of E. Schaeffer to J. Griesa, dated Nov. 7, 2012 (Ex. E).  BNYM's concern is not simply that it is the Trustee for the exchange bondholders, whose property BNYM holds in trust, but that its ability to perform its fiduciary duties would be stopped by the injunctions.[3]

Other third parties whose interests are affected by the injunctions include significant holders of restructured Republic debt that the Republic has been servicing since 2005, such as Gramercy Funds Management LLC ("Gramercy") and Fintech Advisory, Inc. ("Fintech").  *See* Letter of S. O'Shea to J. Griesa, dated Nov. 8, 2012 (Ex. B); Letter of W. Dahill to J. Griesa,

---

[3]   Payments on the performing restructured debt held by the exchange bondholders are next scheduled in December, and will continue in March and September, or in June and December, depending on the bond, with maturities extending out into 2017, 2033 or 2038.  *See* Prospectus Supplement, dated Jan. 10, 2005 (excerpts) (Ex. W); Argentine Ministry of Economy and Public Finance, Public Debt Chart at A.1.11, dated June 30, 2012 (listing, *inter alia*, bonds issued under the 2005 and 2010 exchange offers) (Ex. M).

dated Nov. 8, 2012 (Ex. C).  During the November 9 conference these bondholders put front and center the injury to them and the other holders of restructured debt that would result from plaintiffs' proposed orders.  *See* Nov. 9, 2012 Hr'g Tr. at 27:24-28:1 (Cohen Decl. Ex. R) (counsel for Gramercy noting "the collateral consequences to those people who are absolutely innocent here," including "[p]ension funds and endowments that are [Gramercy's] clients.").

## C.    Plaintiffs' Proposed Amended Injunctions

Notwithstanding the Second Circuit's expressly stated concerns, plaintiffs urge the Court to adopt proposed amended injunctions that use the *same* Ratable Payment remedy theory that the Court of Appeals asked this Court to reassess.  *See* NML Proposed Amended Order at 3-5 (Cohen Decl. Ex. A); Decision at 11 (discussing possible interpretations of "Ratable Payment"). And plaintiffs' proposed amendments do nothing to resolve the Court of Appeals' concerns about the injunctions' application to third parties.  Indeed, plaintiffs now ignore that they are required to prove that third parties are properly bound by the injunctions, and instead list expansive, sweepingly broad categories of affected third parties that they purport to bind, including:

- "the indenture trustees and/or registrars under the Exchange Bonds (including but not limited to The Bank of New York Mellon f/k/a The Bank of New York);"

- "the registered owners of the Exchange Bonds;"

- "nominees of the depositaries for the Exchange Bonds (including but not limited to Cede & Co. and The Bank of New York Depositary (Nominees) Limited) and any institutions which act as nominees;"

- "the clearing corporations and systems, depositaries, operators of clearing systems, and settlement agents for the Exchange Bonds (including but not limited to the Depository Trust Company, Clearstream Banking S.A., Euroclear Bank S.A./N.V. and the Euroclear System);"

- "trustee paying agents and transfer agents for the Exchange Bonds (including but not limited to The Bank of New York (Luxembourg) S.A., and The Bank of New

> York Mellon (including but not limited to The Bank of New York Mellon
> (London)));" and
>
> - "attorneys and other agents engaged by any of the foregoing or the Republic in
>   connection with their obligations under the Exchange Bonds."

*See* NML Proposed Amended Order at 6-7 (Cohen Decl. Ex. A).  There are now, in some cases,
names of specific entities (who as of yet have not even been before the Court) as well as
sweeping categories, but the overall scope remains breathtakingly broad.

**D.      The Status of Proceedings On Appeal and the Court's Stay of the Injunctions**

As this Court acknowledged on November 9, the Court of Appeals has not yet issued its
mandate in connection with the Decision.  *See* Docket, No. 12-105-cv (2d Cir. 2012);
Nov. 9, 2012 Hr'g Tr. at 19:20-21 (THE COURT: "[the Court of Appeals] has issued an opinion
but it hasn't issued its mandate") (Cohen Decl. Ex. R).  The Republic has filed a petition for
panel rehearing and rehearing *en banc* in the Court of Appeals.  *See* Petition for Panel Rehearing
and Rehearing *En Banc* of Defendant-Appellant the Republic of Argentina (the "Rehearing
Petition"), dated Nov. 13, 2012 (Ex. A).  The mandate remains stayed pending resolution of the
Republic's petition for rehearing.  *See* Fed. R. App. P. 41(d)(1).

At the November 9 conference, the Court noted that its March 5 Stay of the injunctions
remains in place.  *See* Nov. 9, 2012 Hr'g Tr. at 19:12-14 (THE COURT: "I don't think there is
really any question about the fact that *the stay has to stay in effect*.  The matter is just not
finished.") (emphasis added) (Cohen Decl. Ex. R).[4]

By its own terms, the Stay continues to be in effect until the Court of Appeals issues its
mandate "disposing of the Republic's appeal."  *See* Stay at 2 (Ex. P).  Apart from the fact that no

---

[4]     The Court also directed the Republic to submit a declaration confirming that it is in compliance with the terms
of the Stay, *see id.* at 23:8-10, which the Republic is filing with this memorandum.  *See* Decl. of Francisco
Guillermo Eggers ("Eggers Decl."), dated Nov. 16, 2012.

mandate has issued yet following the Court of Appeals' Decision, that mandate will not dispose

of the appeal, because the Court of Appeals has indicated that it will automatically resume

jurisdiction following this Court's adjudication of the two issues identified as requiring further

review.  *See* Decision at 29 ("Once the district court has conducted such proceedings *the*

*mandate should automatically return to this Court* and to our panel for further consideration of

the merits of the remedy without need for a new notice of appeal.") (emphasis added).

### ARGUMENT

**I.    WHILE THE MANDATE REMAINS WITH THE SECOND CIRCUIT THIS COURT LACKS JURISDICTION TO FINALLY DECIDE THE REMANDED ISSUES**

It is a fundamental principle that "jurisdiction follows the mandate."  *United States v.*

*Rivera*, 844 F.2d 916, 921 (2d Cir. 1988); *United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir.

1996).  Accordingly, where an appeal is being pursued, and the mandate has not been issued by

the Court of Appeals, the district court lacks jurisdiction to issue rulings on matters still "before"

the appeals court, and any such ruling would be void.  *See, e.g.*, *Dague v. City of Burlington*, 976

F.2d 801, 805 (2d Cir. 1992) (holding that an order issued by the district court before the Court

of Appeals issued its mandate was a "nullity"); *United States v. Timewell*, 387 F. App'x 23, 25,

28 (2d Cir. 2010) (summary order) (vacating order that was entered before the mandate issued

because "[b]y ruling before the mandate issued . . . and, thus, before it regained jurisdiction . . .

the district court erred"); *Doe v. Gonzales*, 449 F.3d 415, 420 (2d Cir. 2006) (holding that the

district court "cannot entertain a motion . . . before [the Second Circuit] issues its mandate."); *see*

*also Kusay v. United States*, 62 F.3d 192, 194 (7th Cir. 1995) ("Until the mandate issues, the

case is 'in' the court of appeals, and *any action by the district court is a nullity*.") (emphasis

added) (citing *United States v. Wells*, 766 F.2d 12, 19 (1st Cir. 1985)).

As the Court correctly recognized at the November 9, 2012 conference, the Court of Appeals has not yet issued its mandate.  *See* Nov. 9, 2012 Hr'g Tr. at 19:20-21 (THE COURT: "[the Court of Appeals] has issued an opinion but it hasn't issued its mandate") (Cohen Decl. Ex. R); *Rivera*, 844 F.2d at 921 (stating that the mandate does not issue "merely upon the filing of an opinion or summary order . . . [because] it is the clerk, not the judges, who 'issues' it").  Moreover, the Republic's Rehearing Petition, timely filed this past Tuesday, November 13, has the legal effect of staying the issuance of the mandate.  *See* Fed. R. App. P. 41(d)(1) ("[t]he timely filing of a petition for panel rehearing, [or] petition for rehearing en banc . . . stays the mandate until disposition of the petition"); Rehearing Petition (Ex. A).  Therefore, the Court lacks jurisdiction to enter any ruling on the substantive questions identified by the Court of Appeals' Decision until the mandate has issued.  *See Dague*, 976 F.2d at 804; *Timewell*, 387 F. App'x at 25; *see generally* 16AA Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction 3d* § 3987 (4th ed. 2008) ("Until the mandate issues . . . *the district court lacks power to proceed further with respect to the matters involved with the appeal*.") (emphasis added).

This does not mean that the Court may not issue an indicative ruling on these matters under Fed. R. Civ. P. 62.1, which is expressly designed for the situation where a party seeks relief during the pendency of appeal.  But it does mean that, as a matter of law, any definitive ruling must await the issuance of the Court of Appeals' mandate, unless the Court of Appeals directs otherwise.[5]

---

[5]   Federal Rule 62.1(c) provides that "[t]he district court may decide the motion if the court of appeals remands for that purpose," but this provision does not address the present case, where the Court of Appeals has provided for a remand, but in an opinion on which the mandate has not issued.

II.    **THE COURT SHOULD REJECT PLAINTIFFS' DEMAND THAT EXCHANGE BONDHOLDERS NOT RECEIVE A SINGLE SCHEDULED INTEREST PAYMENT, UNLESS PLAINTIFFS ARE PAID THE FULL FACE VALUE OF THEIR DEFAULTED DEBT, PLUS INTEREST**

When granting an equitable contract remedy a court may not grant plaintiffs any greater rights than they would have enjoyed had the breach not occurred, and must avoid harming third parties or imposing relief that is contrary to the public interest.  *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 375 (1977) ("Especially when immediate implementation of an equitable remedy threatens to impinge upon the expectations of innocent [third] parties, the courts must look to the practical realities and necessities inescapably involved in reconciling competing interests, in order to determine the special blend of what is necessary, what is fair, and what is workable.") (internal quotation marks omitted); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16 (1971) ("[In] any equity case, the nature of the violation determines the scope of the remedy."); *Lamberti v. Angiolillo*, 905 N.Y.S.2d 560, 561 (1st Dep't 2010) (courts may "grant[] no party superior rights than would have been enjoyed had there been proper performance").

The Court of Appeals remanded to this Court the question of the operation of the "Ratable Payment" formula – which is an equitable remedy (as opposed to  actual contractual performance, which is required by the clause itself) and thus subject to the above principles.  *See* Decision at 11; *see also id.* at 19 n.10 (noting that plaintiffs acknowledge that "Ratable Payments" are not required by the pari passu clause itself, but are instead a proposed equitable "*remedy* for Argentina's breach" of the provision) (emphasis in original).  Plaintiffs' proposed definition of "Ratable Payment," which would require the Republic to pay plaintiffs the full face value of their defaulted debt, plus interest, as a precondition to the Republic's making a single scheduled interest payment to holders of its restructured debt, goes well beyond any plausible

theory of equity and clearly impinges on the "expectation of innocent third parties" – here, holders of performing debt – and is not "fair," "necessary," or "workable."

As plaintiffs concede, their proposed Ratable Payment formula, where it and other plaintiffs receive 100% of principal and interest as a precondition to the Republic making a payment of interest on discounted debt to the exchange bondholders, *see* Pls. Br. at 13, was squarely presented to the Court of Appeals, which did not affirm that portion of the injunctions. *See* Decision at 28-29.  Plaintiffs are wrong that given the record and this procedural posture the Court of Appeals is simply looking for the Court to "rubber stamp" via a "clarification" the precise methodology that was before the Court of Appeals and that the Court of Appeals questioned.  *See id.*

*First*, plaintiffs' demand for "100 cents on the dollar" makes no sense in the context of payments of interest to bondholders whom plaintiffs agree are receiving far less than that – in NML's words, the debt held by participants in the Exchange Offers is worth approximately "30 cents on the dollar" compared to their defaulted debt.  *See* Brief for Plaintiff-Appellant at 17, dated Apr. 7, 2005 (Ex. V); *see also id.* at 8 (The restructured bonds are "worth only about 34% of [the defaulted debt].  Participating debtholders. . . [took] an approximately 66% haircut.").  As plaintiffs know, these litigations spring from the economic and financial crisis suffered by the Republic between 1998 and 2002, which was "the worst . . . in its history," *Lightwater Corp. v. Republic of Argentina*, No. 02 Civ. 3804 (TPG), 2003 WL 1878420, at *2 (S.D.N.Y. Apr. 14, 2003),[6] and the Republic, consistent with U.S. policy, and with the encouragement of this Court

---

[6]   *See also* Ross P. Buckley, *The Bankruptcy of Nations: An Idea Whose Time Has Come*, 43 Int'l Law. 1189, 1196 (2009) (describing Argentina's economic crisis:  "The living standards of over one-half of the Argentine people fell below the poverty line, and over a third could not afford basic food.  Children were fainting in class from hunger, regularly.  Adults were rioting and breaking into supermarkets, regularly, in search of food.  UNICEF Argentina was concerned that stunted growth and reduced mental capacities would be the long-term consequence of this economic crisis for millions of the nation's children.").

and the Court of Appeals, engaged in the long and difficult process of restructuring its

unsustainable debt. *See* Brief for the United States of America as *Amicus Curiae* in Support of

Reversal at 7, No. 12-105-cv(L) (2d Cir. Apr. 4, 2012) ("In those rare cases where a sovereign

cannot meet its external obligations, however, the policy of the United States is that the orderly

and consensual restructuring of sovereign debt, in conjunction with needed macroeconomic

adjustments, is the most appropriate response.") (Ex. O); 22 U.S.C. § 5322(1) (specific

Congressional finding that the international debt problem "threatens the safety and soundness of

the international financial system, the stability of the international trading system, and the

economic development of the debtor countries."). As the Court of Appeals observed when it

affirmed this Court's rejection of plaintiffs' attempt to disrupt the 2005 Exchange Offer, the

Republic's "[debt] restructuring is obviously of critical importance to the economic health of a

nation." *EM Ltd. v. Republic of Argentina*, 131 F. App'x 745, 747 (2d Cir. 2005) (summary

order); Opinion, *H.W. Urban GmbH v. Republic of Argentina*, No. 02 Civ. 5699 (TPG)

(S.D.N.Y. Apr. 26, 2010) (rejecting attempt to enjoin the Republic's 2010 exchange offer; "[a]ll

recipients of the exchange offer are treated the same, and that is the way it should be.") (Ex. T).

This Court has already rejected the notion that payments to the restructured debt holders

on their *discounted* debt can be equated via a theory of "equal treatment" to plaintiffs for the *full*

face amount of their defaulted debt. *See* Sept. 28, 2011 Hr'g Tr. at 12:8-13 (THE COURT:

"[W]hat would need to be done to apply the pari passu clause is to do something, which of

course the plaintiffs would not want at all, but it would be to give the plaintiffs the same

percentage of the face amount of the bonds that the exchanges received, *because they're not*

*receiving 100 percent*.") (emphasis added) (Ex. S). As the Court put it, "the exchange people are

13

not getting 100 percent of their bonds, of course, they are getting something less."  Feb. 23, 2012 Hr'g Tr. at 23:1-3 (Ex. Q).

*Second*, the inequity of plaintiffs' "Ratable Payment" demand is further demonstrated by the fact that the periodic interest payments to holders of restructured debt – which under plaintiffs' definition cannot be paid unless plaintiffs receive all outstanding principal and interest – represent only a small percentage of the entire amount of principal and interest owed to the restructured debt holders, which they will receive in increments over a period of many years. Payment to plaintiffs of full principal and interest is not "equal treatment" to those receiving payments in small percentage installments that represent a fraction of what they were entitled to under the terms of the defaulted debt.  The Court of Appeals itself proffered the alternative functioning of the "Ratable Payment" formula as requiring consideration of the percentage – as a percentage of the full amount of principal and interest owed by the Republic – represented by a payment of interest on the performing debt.  *See* Decision at 11.[7]  Even this proposal, however, treats plaintiffs far better than holders of exchange debt, as it fails to take into account the significant haircut taken by the exchange bondholders.

*Third*, plaintiffs' Ratable Payment formula would grant them greater rights than they are entitled under the pari passu clause – *better* treatment than other creditors.  Pari passu means "at an equal pace" or "side by side."  *Deutsche Bank AG v. JPMorgan Chase Bank*, No. 04 Civ. 7192 (SHS), 2007 WL 2823129, at *14 (S.D.N.Y. Sept. 27, 2007).  Putting plaintiffs "ahead of" other debt holders turns the clause on its head.  Indeed, the Court has previously noted the

---

[7]  Recognizing that the inequity of their "Ratable Payment" demand is patent from traditional viewpoints of proportionality, plaintiffs abandon the "ratable" concept and instead ask this Court to compare the aggregate amount that the restructured debt holders will purportedly receive in December 2012 – $3.3 billion – with the aggregate amount plaintiffs are purportedly owed on their defaulted debt – $1.43 billion, according to plaintiffs. But, of course, that $3.3 billion dollars will be distributed amongst thousands of holders who held tens of billions of dollars of defaulted debt.  On a "pro rata" basis those holders will be receiving far less than plaintiffs would under their "equal treatment" remedy.

inequity of such a remedy in the context of restructured debt, stating when NML first presented this theory to the Court that it was "very odd."  *See* Jan. 15, 2004 Hr'g Tr. at 14:10 (Ex. X).  The Court's observation was consistent with the long-held position of the United States that a party may not "read into [a] contract a term restricting the rights of another creditor," because "[p]ermitting a plaintiff to do so would be contrary to the efforts the United States has expended since 1982 to resolve [] debt cris[es] through cooperative negotiations."  Statement of Interest of the United States of America ("US CIBC Br.") at 8, *CIBC Bank & Trust Co. v. Banco Central do Brasil*, No. 94 Civ. 4733 (LAP) (S.D.N.Y. Sept. 8, 1994) (Ex. CC).

*Finally*, plaintiffs' invocation of the currency reserves of the BCRA, *see* Pls. Br. at 15, demonstrates further the inequity of their "Ratable Payment" formula.  As an initial matter, the Court of Appeals has twice held BCRA reserves located in the United Sates to be immune from restraint and execution, *see NML Capital, Ltd. v. Banco Central de la República Argentina*, 652 F.3d 172 (2d Cir. 2011); *EM Ltd. v. Republic of Argentina*, 473 F.3d 463 (2d Cir. 2007), rulings that *a fortiori* protect reserves located outside the United States.  Nor are foreign currency reserves a magic pot of money to be tapped by plaintiffs – they are subject to Argentine law in Argentina, and so plaintiffs are wrong in trying to convert this Court into a super-legislature overriding the Argentine legal processes necessary for the use of reserves.  *Cf. EM Ltd.*, 473 F.3d at 473-80 (rejecting NML's invocation of Argentine Decrees 1599 and 1601 as basis for subjecting BCRA reserves to restraint and execution).  In any event, reserves serve essential Central Bank stabilizing functions.   Reserves support the currency, provide self-insurance against sudden shifts in capital flows, such as those provoked by shocks to exchange rates and export prices, and allow the Central Bank to carry out its role as a lender of last resort in the event of crisis.  *See* Joshua Aizenman & Reuvan Glick, *Sterilization, Monetary Policy, and*

*Global Financial Integration*, Rev. Int'l Econ. 5; Kit Dawnay, *A History of Sterling*, Daily Telegraph, June 10, 2003 (detailing attack on the British pound in 1992 when British monetary authorities lacked sufficient reserves to compete with speculators).  A formula based on the premise that up to one-third of such reserves should be made available to a nation's creditors (adoption of plaintiffs' theory means that holders of approximately $15 billion in principal and interest of unrestructured debt may make similar (albeit also meritless) claims for payment) is unfair on its face and in breach of established law on sovereign immunity and the comity owed among nations.  Plaintiffs are wrong to urge this Court to dictate BCRA's use of its own reserves or override the Republic's tri-partite system of government.  No court can substitute for the political will and self-determination that includes the use of a country's reserves.

## III.   THE PROPOSED AMENDED INJUNCTIONS WOULD IMPROPERLY BIND THIRD PARTIES

After expressing numerous concerns about the injunctions' effect on intermediary banks and "third parties generally," the Court of Appeals asked this Court to "determine the third parties to which the injunctions will apply" so that upon the mandate's automatic return to the Court of Appeals the court can assess "whether the Injunctions' application to them is *reasonable*."  Decision at 28 (emphasis added).  The concerns expressed by the Court of Appeals about the reasonableness of the injunctions' applicability to absent third parties are well-founded.

*Bank of New York Mellon*.  BNYM serves as the Trustee for – and therefore owes fiduciary duties to – the holders of the Republic's restructured debt.  BNYM acts pursuant to the terms of the Indenture that is on file with the SEC and was part of the Republic's 2005 Exchange Offer that was filed with the SEC and securities regulators throughout the world.  Under the terms of the governing Indenture, the Republic pays the holders of that debt in Argentina when it pays the Trustee, which receives, holds, and transfers the funds in trust for the beneficial owners

16

of the restructured debt.  *See* Indenture § 3.1 ("All monies . . . paid to the Trustee under the [restructured debt] and this Indenture shall be held by it in trust for itself and the [restructured debt holders] in accordance with their respective interests to be applied by the Trustee to payments due under the [restructured debt].") (Ex. U).[8]  Once that transfer takes place, the Republic has no right to the funds, and they are no longer the property of the Republic.  *See id.* § 3.5(a) ("[T]he Trustee shall apply [the amount due on the bonds] to the payment due on such Payment Date.  Pending such application, such amounts shall be held in trust by the Trustee for the exclusive benefit of the Trustee and the [restructured debt holders] . . . in accordance with their respective interests and the Republic shall have no interest whatsoever in such amounts.").  The Indenture and the structure it creates for payment by the issuer to the Trustee for the benefit of bondholders is a standard part of the capital markets.  Plaintiffs' proposed injunctions would thus undermine an essential part of the capital market's framework overseen by the SEC and other regulators.

Were plaintiffs to try to attach or restrain the funds when they are in the hands of the Trustee, or at any point thereafter, their efforts would plainly fail under black letter New York law.  *See Brown v. J.P. Morgan & Co.*, 40 N.Y.S.2d 229, 233 (1st Dep't 1943) (bondholder cannot attach money in the hands of trustee for other bondholders because the money "belongs to the [other] bondholders"), *aff'd*, 295 N.Y. 867 (1946); *EM Ltd. v. Republic of Argentina*, No. 03 Civ. 2507 (TPG), 2012 WL 1028109 (S.D.N.Y. Mar. 28, 2012) (vacating attachments and restraining orders directed at funds purportedly held at FRBNY because the Republic had no

---

[8]  Despite plaintiffs' assertion to the contrary, *see* Pls. Br. at 11 n.6, this transfer takes place outside the United States.  *See* Decision at 8 ("Argentina makes principal and interest payments to a trustee *in Argentina*") (emphasis added); Decl. of Matias Isasa ¶ 4, dated Feb. 1, 2012 ("The Trustee receives payment in trust for the account of the holders and once it receives such payment, the moneys belong to the bondholders, not to the Republic.  *Argentina has paid all monies to the Trustee outside of the United States.  When the Trustee pays a U.S. registered holder, the moneys already belong to such holders, not the Republic.*") (emphasis added) (Ex. R).

control over, nor retained interest in, the funds); N.Y. C.P.L.R. § 5222(b) (restraining notice effective only if at time of service third party owes debt to judgment debtor).  Indeed, plaintiffs conceded as much in the Court of Appeals.  *See* July 23, 2012 Court of Appeals Hr'g Tr. at 54:5-9 (THE COURT: "What would you try and do, attach those [funds at] Bank of New York.  NML COUNSEL: Well no, we're not attaching.  We can't attach anything with respect to – we're not saying that.") (Ex. K); Decision at 25 n.14 ("Nothing in the Injunctions suggests that plaintiffs would 'execute upon' any funds, much less those held in trust for the exchange bondholders."). In light of the fact that neither the Republic nor plaintiffs has any interest whatsoever in the funds at issue when they reach BNYM, and BNYM serves as the Trustee for the restructured debt holders, it would be manifestly *unreasonable* to apply the injunctions to the Trustee.  There is no basis for placing a non-party in the position of choosing between potentially facing contempt for violating a court order on the one hand, and failing to fulfill its fiduciary duties on the other.  Plaintiffs cite no case, and we are aware of none, for the proposition that a plaintiff can indefinitely restrain the property of a third party in which it asserts no right based upon the actions of a separate obligor.

*Financial Institutions*.  The various financial institutions that will be caught up by the broad categories in the proposed injunctions – including, *inter alia*, "clearing corporations and systems, depositaries, operators of clearing systems, and settlement agents for the Exchange Bonds," NML Proposed Amended Order at 6 (Cohen Decl. Ex. A) – transfer payments en route from the Trustee to the restructured debt holders, which payments *at all times remain in trust for the restructured debt holders*.[9]  In addition to the prohibition against restraining trust property in

---

[9]    Plaintiffs' proposed injunctions purport to bind foreign financial institutions – like Euroclear SA/NV and Clearstream Banking S.A. – that the Court has already held were not subject to injunction here.  *See* Hr'g Tr. at 52:7-9, *Seijas v. Republic of Argentina*, No. 04 Civ. 400 (TPG) (S.D.N.Y. April 30, 2008). ("I have a document on its face which has requests for injunctive relief about trust bonds in Belgium and Germany.  I can't do

the hands of the Trustee, these institutions are further protected by Article 4-A of the U.C.C., which determines the rights, duties and liabilities of entities involved in the funds transfer process in New York and the rest of the United States.  Under Article 4-A-503 – *which expressly bars injunctions* – a court may only restrain (i) an originator from issuing a payment order; (ii) an originator's bank from executing the payment order; or (iii) a beneficiary's bank from releasing the funds to the beneficiary or the beneficiary from withdrawing the funds.  Although plaintiffs suggest this rule permits them to go after any beneficiary or originator, *see* Pls. Br. at 18-20, the U.C.C. commands that creditor process be directed only *to the bank of the party that owes the creditor the debt.  See, e.g.*, N.Y. U.C.C. § 4-A-502 cmt. 4 ("A creditor of the originator can levy on the account of the originator in the originator's bank before the funds transfer is initiated . . . [but] cannot reach any other funds because no property of the originator is being transferred.").  Thus, because the financial institutions are not the "Republic's banks," the U.C.C. bars the injunctions from binding them.  *See* Decision at 28-29.

Equally, an injunction can only be directed to a beneficiary of a funds transfer if the beneficiary is the party that owes the plaintiffs money, which is obviously not the case here – the registered and beneficial holders of restructured debt owe *nothing* to plaintiffs.  This framework restricting creditor process directed at funds transfers serves "[o]ne of Article 4-A's primary goals [of] promot[ing] certainty and finality so that the various parties to funds transfers [will] be able to predict risk with certainty, to insure against risk, to adjust operational and security procedures, and to price funds transfer services appropriately."  *Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 102 (2d Cir. 1998) (internal quotation marks omitted).  As the New York Clearing House explained to the Court of Appeals, which clearly took heed of the Clearing

that.").  Indeed, following an NML-affiliate's previous invocation of the pari passu clause to stop payments by Peru on its restructured debt, Belgium passed legislation preventing creditors from similarly enjoining Euroclear's processing of such debt payments.

House's concerns, binding banks with these injunctions "will have a deleterious long-term

impact on New York's financial institutions and its preeminence as a financial center" because

they "would inhibit the free flow of funds among financial institutions, create uncertainty as to

rights and liabilities, and place intermediary banks in the middle of civil disputes."  CH Br. at 26

(Ex. N); *see also* FRBNY Br. at 5-6, dated Jan. 12, 2004 (observing that similar injunctions

"would allow holdout creditors to disrupt the efficient operation of payment and settlement

systems, create legal uncertainty for those systems, and ultimately cause adverse economic

implications far beyond the sovereign bond dispute.") (Ex. Y).

Although plaintiffs now propose a carve-out for intermediary banks, *see* NML Proposed

Amended Order at 7 (Cohen Decl. Ex. A), that does not resolve the uncertainty, risk, confusion,

and ultimately cost, injected into the market by binding the other financial institutions in a

manner contrary to U.C.C. Article 4-A.  For example, when the *Aurelius* plaintiffs served

process on the FRBNY purporting to restrain bondholder funds passing through the Central Bank

of Argentina's account at the FRBNY, the FRBNY "shut down" the account entirely in an

attempt to avoid noncompliance, and in doing so "jeopardized the functioning of [the Central

Bank]." *EM Ltd.*, 2012 WL 1028109, at *2.  That is the precise result that would flow from the

application of the injunctions to these financial institutions, but on a much larger scale.  Because

binding these financial institutions runs exactly counter to the strong protections afforded

financial institutions under the U.C.C. and the policies underlying those protections, application

of the injunctions to these entities would be wholly unreasonable.

*Clearing Systems and Nominees*.  Book-entry depository systems, such as the Depository

Trust Company ("DTC") and its nominee Cede & Co., indisputably have no obligations to

plaintiffs whatsoever, and are not agents or intermediaries of the Republic.  Application of the

injunctions to DTC and other depositories is thus unreasonable on its face.  Plaintiffs have no

claim against these entities, no interest in the amounts that depositories transfer to their

Participants, and no basis whatsoever to bind them to the injunctions.  DTC acts as the U.S.

principal securities depository facilitating numerous and massive daily book-entry operations for

its Participants.  Plaintiffs mischaracterize DTC and its relationship to the Republic.  The

Republic is not a Participant of DTC and has no account at DTC.  DTC receives instructions for

transfer of securities and cash by Participant entities, but is in no position to evaluate the status of

those entities, let alone the relationship between their Participants and other parties.  Once the

Republic pays BNYM in trust for the bondholders in Argentina, the subsequent transfers,

including to entities such as DTC, are under the control of BNYM as Trustee and its Trustee

paying agents, if applicable, as set out in the Indenture.  As the Court noted at the February 23

hearing, the exchange bondholders "can be legally paid," and "the exchange offers were lawful."

*See* Feb. 23, 2012 Hr'g Tr. at 11:2-3 (Ex. Q).  In these very cases, the Court of Appeals directed

this Court to "take care to craft [] orders so as to avoid interrupting Argentina's regular payments

to bondholders."  *Capital Ventures Int'l v. Republic of Argentina*, 282 F. App'x 41, 42 (2d Cir.

2008) (summary order).  It would be utterly contrary to that instruction to issue an order that

could interfere with BNYM's transfers on behalf of bondholders to DTC and other depositories

involved in the distribution of payments.  *See* US CIBC Br. at 8 (rejecting plaintiffs' attempt

restrict the rights of other creditors as contrary to U.S. policy) (Ex. CC).

Recognizing that they have no right to block the distribution of payments to holders of

the Republic's restructured debt under traditional means of attachment and execution, plaintiffs

instead ask this Court to interfere with these valid transfers under Rule 65(d), based on the novel

theory that the entities named in plaintiffs' injunctions – over which the court otherwise lacks

jurisdiction – are agents of the Republic.  Pls. Br. at 16.  Plaintiffs' characterization of the entities named in the proposed injunctions as "agents" of the Republic is wrong.  Agency "is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's *control*."  Restatement (Third) of Agency § 1.01 (2006) (emphasis added); *Time Warner City Cable v. Adelphi Univ.*, 813 N.Y.S.2d 114, 116 (2d Dep't 2006) (agency relationship established when one party subject to another's control).  Plaintiffs have not pointed to a single contract with a targeted entity that creates an agency relationship with the Republic.  To the contrary, as stated above, once the Republic pays the Trustee, it relinquishes all *control* over the funds and cannot direct any of the entities to which the Trustee transfers moneys to take any action whatsoever with respect to these funds.  *See* Indenture §§ 3.1, 3.5(a) (Ex. U).

Plaintiffs otherwise seek to lump together the Trustee, the Trustee paying agents, the financial institutions acting on behalf of the depositories, and the registered bondholders as "aiders and abettors" in any potential violation of the injunctions by the Republic.  *See* Pls. Br. at 16-18; *see also* July 23, 2012 Hr'g Tr. at 56:1-9 (NML counsel explaining that plaintiffs will seek to impose "aider and abettor" liability on the financial institutions) (Ex. K).  It would be unprecedented – and unwarranted – to hold liable as aiders and abettors participants in the financial markets doing no more than carrying out their normal business functions and fulfilling their *own* obligations to third parties.  *See Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 833 (2d Cir. 1930) ("[T]he only occasion when a person not a party may be punished, is when he has helped to bring about, not merely what the decree has forbidden . . . but what it has power to forbid, an act of a party.").  The Court was right to express skepticism of this theory when plaintiffs last

presented it, noting that "[t]he banks wouldn't be aiding and abetting.  The banks only pay the

exchange offer people.  That's what they do."  Feb. 23, 2012 Hr'g Tr. at 7:22-24 (Ex. Q).

Significantly, none of these entities has any role, "causal" or otherwise, in the Republic

not paying plaintiffs.  *See Stanfield Offshore Leveraged Assets, Ltd. v. Metro. Life Ins. Co.*, 883

N.Y.S.2d 486, 489 (1st Dep't 2009) ("aiding and abetting" requires, *inter alia*, that the actions of

the aider/abettor proximately cause the harm).  In each of the contempt cases relied on by

plaintiffs, the party held liable as an aider and abettor in actuality substantially assisted the

violation of the court order at issue.  *See Eli Lilly & Co. v. Gottstein*, 617 F.3d 186 (2d Cir. 2010)

(aider and abettor attorney intervened in a litigation for purposes of issuing sham subpoena

designed to elicit disclosure of documents in violation of confidentiality order); *Reliance Ins. Co.*

*v. Mast Constr. Co.*, 84 F.3d 372, 377 (10th Cir. 1996) (non-party bank aided and assisted

defendant in "completing a fairly complicated series of fund withdrawals and transfers" in

violation of restraining notice served on bank); *Goya Foods, Inc. v. Wallack Mgmt. Co.*, 290 F.3d

63 (1st Cir. 2002) (couple in contempt for knowingly buying liened apartment in secret

transaction).  Here, of course, there are no such "sham" or otherwise illicit relationships – the

Trustee, financial institutions, and registered bondholders who receive funds in connection with

the performing debt play no role in "aiding" the Republic's non-payment of plaintiffs.  *Cf. Eli*

*Lilly*, 617 F.3d at 191.  In connection with the performing debt, they act no differently than they

have for the past seven years, *i.e.*, since the settlement of the Republic's Exchange Offers in

2005 (or 2010) – transactions which the Court of Appeals noted did not violate the pari passu

clause.  *See* Decision at 19 n.10.

23

**IV.    THE ORDER STAYING THE EFFECT OF THE INJUNCTIONS SHOULD REMAIN IN PLACE**

The Court should continue the March 5, 2012 Stay of the effect of the unprecedented injunctions while the Republic appeals the Court's Orders.  This is precisely what the parties intended by designing the Stay to dissolve only after the Court of Appeals had issued its mandate "disposing of the Republic's appeal," *see* Stay ¶ 1 (Ex. P) – which it has not done, and will not do until *after* it considers the merits of whatever ruling the Court enters on remand.  Nor is there any indication in the Decision that the Court of Appeals believed that the injunctions, about which it expressed numerous "concerns," would go into effect before it had the ability to further review the issues before the Court; in fact the court's statements suggest the exact opposite.  *See* Decision at 29 ("Once the district court has conducted such proceedings the mandate should *automatically return* to this Court and to our panel for further consideration of the merits of the remedy without need for a new notice of appeal.") (emphasis added).

Continuing the Stay during the Republic's appeal would be consistent with this Court's past practice in this litigation.  The Court has granted such stays to plaintiffs and the Republic on a regular basis, including during NML's ultimately unsuccessful attempt to attach the reserves of the Central Bank of Argentina.  *See* Order, *EM Ltd. v. Republic of Argentina*, No. 03 Civ. 2507 (TPG) (S.D.N.Y. Jan. 24, 2006) (staying vacatur of attachments and restraining notices issued against BCRA pending appeal) (Ex. BB); *NML Capital, Ltd.*, 652 F.3d at 172.  This consistent practice is all the more appropriately followed here, given the third party interests at stake – interests that the Court of Appeals itself said must be considered as part of the remand process and subsequent appeals.  *See* Decision at 28.

In addition to being consistent with the parties' intentions and the practice of the Court in this litigation, the Stay should be continued because the standards for a stay, which were of

course present when the Court granted the Stay, remain satisfied and are all the more relevant where the harm posed to third parties if the Stay is lifted is so substantial.  *See Mohammed v. Reno*, 309 F.3d 95, 100 (2d Cir. 2002) (stay warranted where (i) movant is likely to succeed on the merits, (ii) there is risk of irreparable injury absent a stay, (iii) there is no risk of substantial injury to the party opposing a stay if one is issued, and (iv) a stay is in the public interest); *Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006) (balancing of factors is flexible; the magnitude of one factor may offset the absence of another).

*First*, the public interest will be significantly harmed if the Stay is lifted, as numerous financial institutions, including those involved in payment systems, as well as holders of the Republic's restructured debt, stand to be harmed by the injunctions.  *See supra*, Point III.  That harm will likely result in ancillary litigation, which could clog the Court's docket.   Moreover, the uncertainty about *who* the injunctions apply to and *what* conduct is enjoined, *see* Decision at 28, has already caused and will continue to cause unfounded speculation in the marketplace.  *See Lau v. Meddaugh*, 229 F.3d 121, 123 (2d Cir. 2000) ("Since an injunctive order prohibits conduct under threat of judicial punishment, fairness requires that the litigants receive explicit notice of precisely what conduct is outlawed."); Robin Wigglesworth & Joseph Cotterill, *Creditors weigh up Argentina debt Ruling*, Fin. Times, Nov. 4, 2012 (discussing the "far-reaching implications" of the injunctions) (Ex. G); Bob Van Voris, *Argentina Loses U.S. Appeal of Ruling on Defaulted Bonds*, Bloomberg, Oct. 26, 2012 (discussing decline in the Republic's bond values after the Decision) (Ex. I).

*Second*, given the novel and unprecedented nature of the relief that plaintiffs request, as well as the Court of Appeals' unwillingness to affirm the injunctions in their entirety, the Republic has established a likelihood of success on the merits.  The Court of Appeals expressed

multiple "concerns" about the injunctions' application to third parties generally and in particular to intermediary banks, even after plaintiffs had fully briefed the issues and argued in favor of the injunctions in this Court and the Court of Appeals.  The Court of Appeals nevertheless specifically declined to affirm central aspects of the Court's injunctions.

*Third*, the real risk of irreparable harm to the Republic if the Stay is dissolved further warrants continuance of the Stay.  By demanding the immediate lifting of the Stay the plaintiffs seek to bind the Republic, without the Republic and third parties being allowed their full appellate rights, to orders preventing the Republic from using immune assets to service legitimate debts unless and until the Republic turns over more than one billion in immune assets to pay plaintiffs.  Such an unprecedented infringement on the sovereignty of a friendly foreign state unquestionably constitutes irreparable harm, even if the Court were to ignore – as it cannot and it should not – the irreparable harm facing third parties in the event the Stay is lifted.

*Finally*, there is no substantial risk of injury to plaintiffs.  The Republic has now confirmed on multiple occasions – including in a declaration being submitted today – that it is complying with the terms of the Stay.  *See* Eggers Decl. ¶ 4; Letter of Carmine Boccuzzi to Robert Cohen, dated July 16, 2012 (Ex. L); Letter of Carmine Boccuzzi to J. Griesa, dated July 26, 2012 (Ex. J).[10]  Maintaining the Stay provides this Court and the Court of Appeals with the time necessary to determine the scope of plaintiffs' rights, as the Court of Appeals directed this Court to do.  *See* Nov. 9 Hr'g Tr. at 1:5-11 (". . . I would like to start with the obvious, and that is, *this court must comply with the Court of Appeals direction* . . . [O]bviously the Court of Appeals . . . asked the district court *to have further proceedings* to deal with the question of the amount to be paid to plaintiffs . . .".) (emphases added) (Cohen Decl. Ex. R).  The Court of

---

[10]   Plaintiffs' reliance on newspaper gossip to suggest otherwise is unfounded.  Courts require clear and convincing evidence of violation of an injunction, not newspaper hearsay.  *See Latino Officers Ass'n of New York v. City of New York*, 558 F.3d 159, 164 (2d Cir. 2009).

Appeals itself contemplated that it will further review this Court's conclusions following remand.  Plaintiffs' other claim that they will suffer prejudice if the Stay remains in place, because the Republic will go forward with its scheduled December payments to exchange bondholders, *see* Pls. Br. at 21, ignores that the exchange bondholders have been paid for years (while plaintiffs were perfectly content to let those payments occur) and that regular payments on exchange debt are scheduled for many years to come.  *See, e.g.*, Form of U.S. Dollar-Denominated 8.75% Global Bonds due 2017 at 1 (Cohen Decl. Ex. AA ).  The Court should not accept the false urgency plaintiffs are trying to create and allow the Republic and all potentially affected third parties to prosecute their appeal rights before any orders go into effect.

## CONCLUSION

For the foregoing reasons, the Court should reject plaintiffs' Proposed Orders, and appropriately limit the application of any injunctions.

Dated: New York, New York
      November 16, 2012

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: __/s/ Carmine Boccuzzi_____
    Jonathan I. Blackman (jblackman@cgsh.com)
    Carmine D. Boccuzzi (cboccuzzi@cgsh.com)

One Liberty Plaza
New York, New York 10006
(212) 225-2000
Attorneys for the Republic of Argentina