UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NML CAPITAL, LTD.,
                            Plaintiff,

            - against -

THE REPUBLIC OF ARGENTINA,
                            Defendant.

No. 08 Civ. 6978 (TPG)
No. 09 Civ. 1707 (TPG)
No. 09 Civ. 1708 (TPG)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AURELIUS CAPITAL MASTER, LTD. and
ACP MASTER, LTD.,
                            Plaintiffs,

            - against -

THE REPUBLIC OF ARGENTINA,
                            Defendant.

No. 09 Civ. 8757 (TPG)
No. 09 Civ. 10620 (TPG)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AURELIUS OPPORTUNITIES FUND II, LLC
and AURELIUS CAPITAL MASTER, LTD.,
                            Plaintiffs,

            - against -

THE REPUBLIC OF ARGENTINA,
                            Defendant.

No. 10 Civ. 1602 (TPG)
No. 10 Civ. 3507 (TPG)
No. 10 Civ. 3970 (TPG)
No. 10 Civ. 8339 (TPG)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BLUE ANGEL CAPITAL I LLC,
                            Plaintiff,

            - against -

THE REPUBLIC OF ARGENTINA,
                            Defendant.

No. 10 Civ. 4101 (TPG)
No. 10 Civ. 4782 (TPG)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x   *(captions continue on following page)*

# MEMORANDUM OF LAW OF CITIBANK, N.A.
# IN SUPPORT OF ITS MOTION FOR CLARIFICATION

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                :
OLIFANT FUND, LTD.,                                             :
                    Plaintiff,                                  :
                                                                :
        - against -                                            :   No. 10 Civ. 9587 (TPG)
                                                                :
THE REPUBLIC OF ARGENTINA,                                     :
                    Defendant.                                  :
                                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                :
PABLO ALBERTO VARELA, et al.,                                  :
                    Plaintiffs,                                 :
                                                                :
        - against -                                            :   No. 10 Civ. 5338 (TPG)
                                                                :
THE REPUBLIC OF ARGENTINA,                                     :
                    Defendant.                                  :
                                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

SUMMARY OF ARGUMENT ...............................................................................1

BACKGROUND ....................................................................................................2

    A.    Citibank Argentina.......................................................................2

    B.    The Exchange Bonds and the Argentine Law Bonds .............................3

    C.    The Flow of Payments on the Argentine Law Bonds .............................3

    D.    The November 21 Orders................................................................5

    E.    Applying the November 21 Orders to Citibank Argentina Would Cause It to Breach its Contractual Obligations and Subject It to Grave Sanctions ..............6

ARGUMENT ..........................................................................................................7

I.    THE NOVEMBER 21 ORDERS DO NOT RESTRAIN PAYMENTS TO BE MADE BY CITIBANK ARGENTINA WHOLLY IN ARGENTINA FOR ITS CUSTODY ACCOUNT CUSTOMERS ...............................................................7

    A.    Assets Held in Custody for Customers Are Not Assets of the Republic ...............8

    B.    The Payments at Issue Cannot Be Viewed as Having a *Situs* in the United States ...............................................................................9

        1.    The *Situs* of Argentine Law Bonds and Payments on Such Bonds Are in Argentina .............................................................9

        2.    The Separate Entity Doctrine Remains Vital to Protect Branches of International Banks from Conflicting Obligations ...............................11

        3.    The Separate Entity Rule Has Also Been Codified to Protect Foreign Branches from Conflicting Obligations.........................................14

II.    THE PRINCIPLES OF COMITY THAT SUPPORT THE ACT OF STATE DOCTRINE PRECLUDE APPLICATION OF THE NOVEMBER 21 ORDERS TO PAYMENTS MADE WITHIN ARGENTINA ...............................................16

III.    THE NOVEMBER 21 ORDERS MAY NOT IMPOSE EXTREME AND INEQUITABLE BURDENS UPON A NON-PARTY ...................................................19

    A.    A U.S. Court May Not Expose a Non-Party to Civil, Regulatory and Criminal Risk through the Exercise of Its Equitable Powers ...............................19

i

B.    Applying the November 21 Orders to Citibank Argentina
            Would Be Inequitable ............................................................................................22

CONCLUSION........................................................................................................................24

# TABLE OF AUTHORITIES

### CASES

PAGE

*Af-Cap, Inc. v. Republic of Congo,*
  462 F.3d 417 (5th Cir. 2006) ..................................................17

*Alemite Mfg. Corp. v. Staff,*
  42 F.2d 832 (2d Cir. 1930).................................................2, 20

*Allied Bank Int'l v. Banco Credito Agricola de Cartago,*
  566 F. Supp. 1440 (S.D.N.Y. 1983), *aff'd* 733 F.2d 23 (2d Cir. 1984),
  *rev'd on rehearing en banc*, 757 F.2d 516 (2d Cir. 1985).......................17

*Allied Bank Int'l v. Banco Credito Agricola de Cartago,*
  757 F.2d 516 (2d Cir. 1985)...............................................2, 17

*Aurelius Capital Partners, LP v. Republic of Argentina,*
  No. 07 Civ. 2715, 2010 WL 768874 (S.D.N.Y. Mar. 5, 2010) ...................9, 10, 12

*Aurelius Capital Partners, LP v. Republic of Argentina,*
  No. 10-837-cv (L), slip op. (2d Cir. Mar. 24, 2010)........................11

*Ayyash v. Koleilat,*
  957 N.Y.S.2d 574 (Sup. Ct. N.Y. Cnty. 2012) .............................13, 19

*Brown v. J.P. Morgan & Co.,*
  265 A.D. 631, 40 N.Y.S.2d 229 (1st Dep't 1943), *aff'd*, 295 N.Y. 867 (1946) ...................8, 9

*Cook Inc. v. Boston Sci. Corp.,*
  333 F.3d 737 (7th Cir. 2003) ..................................................23

*Cronan v. Schilling,*
  100 N.Y.S.2d 474 (Sup. Ct. N.Y. Cnty. 1950),
  *aff'd*, 282 A.D. 940 (1st Dep't 1953)................................................12

*Det Bergenske Dampskibsselskab v. Sabre Shipping Corp.,*
  341 F.2d 50 (2d Cir. 1965)................................................12

*EEOC v. Local 638,*
  81 F.3d 1162 (2d Cir. 1996).................................................21

*EM Ltd. v. Republic of Argentina,*
  865 F. Supp. 2d 415 (S.D.N.Y. 2012)................................................4, 8, 9

*Fidelity Partners, Inc. v. First Trust Co.*,
    58 F. Supp. 2d 52 (S.D.N.Y. 1997)......................................................................................13

*Fidelity Partners, Inc. v. First Trust Co.*,
    142 F.3d 560 (2d Cir. 1998)............................................................................................13

*Fidelity Partners, Inc. v. First Trust Co.*, 58 F. Supp. 2d 55 (S.D.N.Y. 1999), *aff'd*, 216 F.3d 1072 (2d Cir. 2000)............................13

*Fidelity Partners, Inc. v. Philippine Export and Foreign Loan Guarantee Corp.*,
    921 F. Supp. 1113 (S.D.N.Y. 1996)...................................................................11, 12, 13

*First Nat'l City Bank v. Banco Nacional de Cuba*,
    406 U.S. 759 (1972).................................................................................................. 16-17

*Gen. Bldg. Contractors Ass'n v. Penn.*,
    458 U.S. 375 (1982)................................................................................................2, 20, 21

*Great-West Life & Annuity Ins. Co. v. Knudson*,
    534 U.S. 204 (2002)............................................................................................................22

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
    527 U.S. 308 (1999)......................................................................................................22, 23

*Heyman v. Kline*,
    444 F.2d 65 (2d Cir. 1971)..............................................................................................21

*Interamerican Ref. Corp. v. Texaco Maracaibo, Inc.*,
    307 F. Supp. 1291 (D. Del. 1970)..................................................................................18

*Int'l Legal Consulting Ltd. v. Malabu Oil & Gas Ltd.*,
    No. 651773/2011, 2012 WL 1032907 (Sup. Ct. N.Y. Cnty. Mar. 15, 2012) ...........................14

*Jaffee v. United States*,
    592 F.2d 712 (3d Cir. 1979)...........................................................................................22

*John Wiley & Sons, Inc. v. Kirtsaeng*,
    No. 08 Civ. 7834, 2009 WL 3003242 (S.D.N.Y. Sept. 15, 2009)...........................................12

*Lightwater Corp. v. Republic of Argentina*,
    No. 02 Civ. 3804 (TPG), 2003 WL 1878420 (S.D.N.Y. Apr. 14, 2003)........................... 17-18

*Motorola Credit Corp. v. Uzan*,
    288 F. Supp. 2d 558 (S.D.N.Y. 2003)............................................................................11

*Nat'l Union Fire Ins. Co. v. Advanced Emp't Concepts, Inc.*,
    269 A.D.2d 101, 703 N.Y.S.2d 3 (1st Dep't 2000) ........................................................ 13-14

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*,
    992 F.2d 430 (2d Cir. 1993).................................................................................................23

*NML Capital, Ltd. v. Republic of Argentina*,
    No. 08 Civ. 6978 (TPG), 2012 WL 5895786 (S.D.N.Y. Nov. 21, 2012) ...............................5

*Penn. Coal Co. v. Mahon*,
    260 U.S. 393 (1922)...............................................................................................................21

*Regal Knitwear Co. v. NLRB*,
    324 U.S. 9 (1945) ...................................................................................................................20

*Sabolyk v. Morgan Guaranty Trust Co. of N.Y.*,
    No. 84 Civ. 3179, 1984 WL 1275 (S.D.N.Y. Nov. 27, 1984) ................................................14

*Schooner Exchange v. McFadden*,
    11 U.S. 116 (1812)..................................................................................................................16

*Shaheen Sports, Inc. v. Asia Ins. Co.*,
    No. 98 Civ. 5951, 2012 WL 919664 (S.D.N.Y. Mar. 14, 2012) ................................12, 13, 15

*Shakhnes v. Berlin*,
    689 F.3d 244 (2d Cir. 2012), *cert. denied*, 185 L. Ed. 2d 812 (2013) ...................................20

*Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*,
    585 F.3d 58 (2d Cir. 2009)......................................................................................................15

*Trugman-Nash, Inc. v. New Zealand Dairy Bd., Milk Products Holdings (N. Am.) Inc.*,
    954 F. Supp. 733 (S.D.N.Y. 1997)................................................................................... 18-19

*Underhill v. Hernandez*,
    168 U.S. 250 (1897).................................................................................................................16

*United States v. Alexander*,
    736 F. Supp. 1236 (N.D.N.Y. 1989), *aff'd*, 901 F.2d 272 (2d Cir. 1990) ..............................23

*United States v. First Nat'l City Bank*,
    379 U.S. 378 (1965).................................................................................................................20

*United States v. Watchmakers of Switzerland Info. Ctr., Inc.*,
    1963 Trade Cases (CCH) ¶ 70,600 (S.D.N.Y. 1962),
    *order modified*, 1965 Trade Cases ¶ 70,352 (S.D.N.Y. 1965).................................................18

*United States v. Zang*,
    703 F.2d 1186 (10th Cir. 1982) ......................................................................................23

*Vacco v. Operation Rescue Nat'l*,
    80 F.3d 64 (2d Cir. 1996) ................................................................................................21

*In re Vitamin C Antitrust Litig.*,
    584 F. Supp. 2d 546 (E.D.N.Y. 2008) ............................................................................18

*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*,
    493 U.S. 400 (1990) ........................................................................................................17

*Younger v. Harris*,
    401 U.S. 37 (1971).........................................................................................................22


STATUTES & RULES

12 U.S.C. § 633 ........................................................................................................................15

28 U.S.C. § 1610(a) ..............................................................................................................9, 10

28 U.S.C. § 1610(d) ................................................................................................................10

CPLR § 5225 ............................................................................................................................13

CPLR § 5227.............................................................................................................................13

CPLR art. 62 ............................................................................................................................14

Fed. R. Civ. P. 65 ....................................................................................................................20

Fed. R. Civ. P. 65(d) ...............................................................................................................21

N.Y. Banking Law § 138(1) ...................................................................................................14

N.Y. Banking Law § 204-a .....................................................................................................14

NYUCC art. 4-A ......................................................................................................................15

NYUCC § 5-116(b)..................................................................................................................15

NYUCC § 8-110(e)......................................................................................................15

NYUCC § 8-112(b)......................................................................................................15

### OTHER AUTHORITIES

Hague Securities Convention, art. 4, *available at*
    http://www.hcch.net/index_en.php?act=conventions.text&cid=72........................15

Restatement (Second) of Contracts § 364(1)(b) ..........................................................23

Restatement (Third) of the Foreign Relations Law of the United States § 441(1) (1987) ...........18

Citibank, N.A. ("Citibank"), an interested non-party, respectfully submits this memorandum of law in support of its motion for clarification of certain orders entered in this matter on November 21, 2012 (the "November 21 Orders").

## PRELIMINARY STATEMENT

Citibank's Argentine branch ("Citibank Argentina") acts as local custodian for certain holders of Peso- and U.S. Dollar-denominated bonds governed by Argentine law and payable in Argentina that were issued by the Republic of Argentina in 2005 and 2010 (the "Argentine Law Bonds"). The Argentine Law Bonds were not the subject of the litigation leading to the November 21 Orders, and Citibank was not a party to that litigation.

This Court has previously ruled that securities held in custody at Citibank Argentina, and payments on such securities in Argentina, are beyond the reach of any restraining order issued by this Court. If the November 21 Orders were to be held applicable to payments on the Argentine Law Bonds, they would direct Citibank Argentina to restrain payments held in custody in Argentina for customers in Argentina in exactly the manner that this Court has previously ruled is impermissible. Therefore, Citibank seeks confirmation that the November 21 Orders do not extend to payments by Citibank Argentina on the Argentine Law Bonds.

## SUMMARY OF ARGUMENT

Were the November 21 Orders interpreted to restrain payments in Argentina on the Argentine Law Bonds, the November 21 Orders would be inconsistent with this Court's previous rulings that restraints may not be imposed on payments of funds, not owned by the Republic of Argentina (the "Republic"), that are to be made entirely in Argentina. Further, because the *situs* of these payments is Argentina for act of state purposes, any such interpretation of the November 21 Orders would also contravene the act of state doctrine, as authoritatively construed by the

1

Second Circuit *en banc* in *Allied Bank International v. Banco Credito Agricola de Cartago*, 757 F.2d 516 (2d Cir. 1985).  Finally, by exposing Citibank Argentina to grave regulatory, civil and possible criminal risk for obeying a court order not recognized as valid in Argentina, a construction of the injunctions that would prevent legally mandated payments with an Argentine *situs* would impose an extreme and inequitable burden upon Citibank Argentina well beyond the "minor and ancillary" relief permitted in equity jurisprudence against a non-party.  *Gen. Bldg. Contractors Ass'n v. Penn*, 458 U.S. 375, 399-402 (1982); *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832-33 (2d Cir. 1930).

## BACKGROUND

### A.    Citibank Argentina

Citibank Argentina is a branch of Citibank, N.A. located in Buenos Aires, Argentina, licensed by the Central Bank of Argentina (the "BCRA") to conduct a banking business in Argentina.  Citibank Argentina must abide by the laws of Argentina and the rules and regulations of the BCRA, which supervises the banking activities of financial institutions within Argentina, including those measures relating to the provision of custodial services.  *See* Declaration of Maximiliano D'Auro, dated May 21, 2013 ("D'Auro Decl.") ¶¶ 13-15.

Citibank Argentina maintains custody accounts for customers in Argentina.  The custody agreements pursuant to which the accounts are established require Citibank Argentina to act solely for the account of its Custody Account Customers.  *See* Declaration of Federico Elewaut, dated May 22, 2013 ("Elewaut Decl.") ¶ 4; *see also* D'Auro Decl. ¶ 12.  The Republic is not a party to the accounts, and has no interest in the securities held in the accounts.  *See* Elewaut Decl. ¶ 4.

2

**B.     The Exchange Bonds and the Argentine Law Bonds**

In 2001, the Republic defaulted on its public debt.  In 2005 and 2010, the Republic

offered holders of its defaulted debt the option to exchange their bonds for new bonds (the

"Exchange Bonds").  The Exchange Bonds include U.S. Dollar-denominated and Euro-

denominated bonds, governed by New York or English law, and issued under a trust indenture

governed by New York law executed between the Republic and The Bank of New York Mellon

("BNY Mellon"), as U.S.-European trustee (the "Indenture").[1]  The Argentine Law Bonds,

which are also Exchange Bonds, were not issued under the Indenture.  Instead, they were issued

under two Argentine government decrees, one dated December 9, 2004 and the second dated

April 26, 2010.  *See* D'Auro Decl. Exs. A-D (decrees in Spanish and in English).  Payments on

the Argentine Law Bonds are not made through BNY Mellon, but instead are made entirely in

Argentina as further detailed below.

**C.     The Flow of Payments on the Argentine Law Bonds**

To effect a principal or interest payment upon the Argentine Law Bonds, the Republic

first transfers funds to the account of the Central de Registro y Liquidación de Instrumentos de

Endeudamiento Publico (the "CRYL") with the BCRA.  The CRYL, which has no branches or

employees in New York, is a registry for the registration, clearance and settlement of

transactions involving debt securities issued by the Republic.  The CRYL holds Argentine

securities for its participants in the form of global notes held in custody by the BCRA, and

---

[1] *See* Prospectus Supplement, filed Jan. 10, 2005, *available at* http://www.sec.gov/
Archives/edgar/data/914021/000095012305000302/y04567e424b5.htm#109; Prospectus Supplement, filed Apr. 28,
2010, *available at* http://www.sec.gov/Archives/edgar/data/ 914021/000090342310000252/roa-
424b5_0428.htm#descripsecure.

facilitates the clearance and settlement of transactions through electronic book-entry changes to its participants' accounts.  Elewaut Decl. ¶ 6; D'Auro Decl. ¶ 6.

Immediately upon receiving a payment from the Republic, the CRYL transfers an equal sum to the Caja de Valores S.A. (the "Caja").  The Caja acts as a securities depository, registrar, and paying agent for both government and corporate securities, and holds "collective deposits" in the names of participating institutions and their customers.  Elewaut Decl. ¶ 7; D'Auro Decl. ¶ 7; *see also EM Ltd. v. Republic of Argentina*, 865 F. Supp. 2d 415, 419 (S.D.N.Y. 2012) (Caja is the "counterpart of the Depository Trust Company in the United States").

The Caja in turn debits its account with the BCRA in an amount equal to the sum due to the holders of the Argentine Law Bonds holding such Bonds through local custody accounts, in this case accounts maintained with Citibank Argentina, and simultaneously credits that amount to the respective accounts of Citibank Argentina and other custodians for the Argentine Law Bonds with the BCRA.  Elewaut Decl. ¶ 8; D'Auro Decl. ¶ 8.

Once the Caja receives from the CRYL a payment on the Argentine Law Bonds, and deposits the payment in the account of Citibank Argentina at the BCRA, the payment to the customers of Citibank Argentina that hold Argentine Law Bonds is considered complete pursuant to the terms of the Argentine Law Bonds and Argentine law.  D'Auro Decl. ¶ 10.  Consequently, when Citibank Argentina receives such payments on behalf of its Custody Account Customers, Citibank Argentina acts only for its Custody Account Customers.  *Id*.

Citibank Argentina, as a participating financial institution in the Caja, has entered into a collective deposit agreement with the Caja pursuant to which Citibank Argentina is deemed to have delivered to the Caja a specific amount of securities for the account of its customers that the Caja holds in a "collective deposit," with a commitment by the Caja to return the same number

4

and type of securities to Citibank Argentina and its customers.  The deposit of securities with the Caja is made in the name of both the participating financial institution (e.g., a bank like Citibank Argentina) and such institution's custody account customer or customers.  Elewaut Decl. ¶ 9; D'Auro Decl. ¶ 9.

Immediately upon the receipt of the payment on the Argentine Law Bonds in its account with the BCRA, Citibank Argentina credits the custody account of each of its customers in Buenos Aires, who are then legally entitled immediately to withdraw those amounts.  Elewaut Decl. ¶ 10; *see also* D'Auro Decl. ¶ 11.  Citibank Argentina's obligation to its Custody Account Customers is complete when the cash accounts of those Customers have been credited with the amount each such Customer is entitled to receive on that date, and when any instructions in respect of such accounts have been carried out.  Elewaut Decl. ¶ 12; *see also* D'Auro Decl. ¶ 12.

### D.    The November 21 Orders

No participant in the litigation leading to the issuance of the November 21 Orders addressed the Argentine Law Bonds, and there is nothing in the Court's opinion or the terms of the November 21 Orders to suggest that the Argentine Law Bonds were within the contemplation of the parties or the Court.  The Orders are addressed to transfers by BNY Mellon on the Exchange Bonds issued under the Indenture, and do not by their terms restrain payments that are not made pursuant to the Indenture, exclusively in Argentina.  *See NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (TPG), 2012 WL 5895786, at *5 (S.D.N.Y. Nov. 21, 2012). Indeed, while the unprecedented interpretation given by this Court and the Second Circuit to the *pari passu* provision in the defaulted bonds has been a matter of dispute, there is no dispute that the second clause of the provision excludes on its face the Peso-denominated Argentine Law Bonds from its reach: "The payment obligation of the Republic under the Securities shall at all

times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness."  The Peso-denominated Bonds do not constitute "External Indebtedness" within the meaning of this clause.[2]  Whether denominated in U.S. Dollars or Pesos, the Argentine Law Bonds were both issued pursuant to Argentine decrees, not the Indenture, and both are subject to Argentine law and payable in Argentina.[3]

### E.   Applying the November 21 Orders to Citibank Argentina Would Cause It to Breach its Contractual Obligations and Subject It to Grave Sanctions

This Court has previously recognized that if a financial institution subject to Argentine law, such as Citibank Argentina, were directed to restrain payments in Argentina, the institution would be placed at grave regulatory, civil and criminal risk, and for that reason has declined to issue restraints of that nature.

As a general principle, the Argentine legal system does not recognize as enforceable the acts of foreign courts.  D'Auro Decl. ¶ 16.  Therefore, were Citibank Argentina to act in violation of Argentine law, the November 21 Orders would provide no shield.  Instead, the BCRA could conclude that Citibank Argentina had violated the Financial Institutions Act, and could impose serious administrative sanctions.  *See id.* ¶ 21.  Further, the unilateral withholding or disposal of the funds contrary to instructions of Citibank Argentina's Custody Account Customers might be deemed to be either "unjustified retention" or "fraudulent administration" of

---

[2] The Fiscal Agency Agreement defines "External Indebtedness" as "obligations (other than the Securities) for borrowed money or evidenced by securities, debentures, notes or other similar instruments denominated or payable, or which at the option of the holder thereof may be payable, in a currency other than the lawful currency of the Republic provided that no Domestic Foreign Currency Indebtedness . . . shall constitute External Indebtedness."

[3] Citibank Argentina also acts as custodian for Argentine Exchange Bonds that are payable in Yen. Payments on the Yen-denominated bonds are received by Citibank Argentina from JPMorgan Chase Japan into the correspondent account maintained by Citibank Argentina with Citibank Japan for credit to the accounts of its Custody Account Customers.  Elewaut Decl. ¶ 13.  These Bonds as well were not considered in the litigation leading to the November 21 Orders.

a third party's assets, a criminal offense under Argentine law that could expose participating bank officials to imprisonment.  Declaration of Manuel Beccar Varela, dated May 21, 2013 ¶ 4.

As a civil matter, the unilateral withholding of any funds received by Citibank Argentina for Argentine Law Bondholders could expose Citibank Argentina to claims of breach of contract by its Custody Account Customers.  D'Auro Decl. ¶ 20.  A customer fearing that Citibank Argentina would not make the payments due on Argentine Law Bonds held by that customer would likely transfer such bonds held in custody by Citibank Argentina to an account with another institution, as every custody customer has the unconditional right to do, or might obtain an urgent precautionary order from an Argentine court directing Citibank Argentina to make the requisite payments when due.  *Id.* ¶ 23.  Citibank Argentina would then be placed in the untenable position of being in contempt of the orders of either this Court or the Argentine court, again potentially subjecting the bank or its officials to criminal liability or imprisonment.  *See id.*

Because exactly these considerations have in the past caused this Court to decline to issue orders restraining payments by the Republic within its borders, Citibank Argentina understands that the November 21 Orders were not intended, and cannot be construed, to apply to payments in Argentina on the Argentine Law Bonds.

## ARGUMENT

## I.    THE NOVEMBER 21 ORDERS DO NOT RESTRAIN PAYMENTS TO BE MADE BY CITIBANK ARGENTINA WHOLLY IN ARGENTINA FOR ITS CUSTODY ACCOUNT CUSTOMERS

This Court has previously ruled that payments being made in Argentina by Citibank Argentina for the account of its Custody Account Customers are not properly subject to restraint, attachment or execution.  The Court has likewise ruled that property of the Republic held by Citibank Argentina in custody in Argentina is not properly subject to restraint, attachment or

7

execution.  Because Citibank Argentina could comply with the November 21 Orders only by restraining funds received by it in Argentina in custody for its customers in violation of its contractual obligations and Argentine law, Citibank seeks an order confirming that the November 21 Orders do not restrain the transfer by Citibank Argentina of payments made to its Custody Account Customers on the Argentine Law Bonds.

## A. Assets Held in Custody for Customers Are Not Assets of the Republic

In the first of its two relevant precedents, *EM Ltd. v. Republic of Argentina* ("*EM Ltd.*"), 865 F. Supp. 2d 415 (S.D.N.Y. 2012), this Court ruled that payments made in Argentina and received for the account of Citibank Argentina's Custody Account Customers were not subject to restraint as property of the Republic.  In *EM Ltd.*, the Court had initially granted plaintiffs' *ex parte* application for an order restraining payments in respect of the "BODEN 12" bonds issued by the Republic.  865 F. Supp. 2d at 416-17.  Citibank moved to vacate the restraints to the extent they prevented Citibank Argentina from making payments of interest to its Custody Account Customers holding the BODEN 12 bonds.  *Id.* at 417.

In its opinion vacating the *ex parte* restraint, the Court described in detail the funds flow for payments on the bonds, which was the same as it is for the Argentine Law Bonds.  There, as here, the Republic transferred funds in Argentina to the CRYL, the CRYL then transferred the funds to the Caja, and the Caja in turn credited accounts of Citibank Argentina as custodian for its bondholder customers.  *Id.* at 419.  There, as here, "[t]he Republic lost control over the funds when it made payment to CRYL," *id.* at 423, and "had no further interest in the funds designated to pay the BODEN 12 bonds once it transferred those funds to CRYL."  *Id.* at 424.

Relying in part upon *Brown v. J.P. Morgan & Co.*, 265 A.D. 631, 635, 40 N.Y.S.2d 229, 233 (1st Dep't 1943), *aff'd*, 295 N.Y. 867 (1946), in which the Appellate Division had vacated

the attachment of funds held by a New York bank for the account of bondholders where the issuing company "lost all control over this fund" when it transferred funds to the bank for distribution to the bondholders, this Court vacated the restraining orders preventing Citibank Argentina from making the payments in question.  *EM Ltd.*, 865 F. Supp. 2d at 423 (quoting *Brown*, 265 A.D. at 635).

### B.  The Payments at Issue Cannot Be Viewed as Having a *Situs* in the United States

In its second relevant precedent, *Aurelius Capital Partners, LP v. Republic of Argentina* ("*ANSES*"), No. 07 Civ. 2715, 2010 WL 768874 (S.D.N.Y. Mar. 5, 2010), this Court recognized that it could not restrain property the *situs* of which was in Argentina, and further recognized that the separate entity rule was instructive in determining that property held by the Argentine branch of a U.S. bank could not be deemed to have a U.S. *situs*.

### 1.  The *Situs* of Argentine Law Bonds and Payments on Such Bonds Are in Argentina

In the litigation leading to the *ANSES* decision, this Court initially signed restraining orders and orders of execution directed to securities custody accounts held at Citibank Argentina by ANSES, the Argentine agency responsible for making payments to Argentine pensioners. 2010 WL 768874, at *1.  Citibank moved to vacate the restraints, this time on the grounds that they could not reach customer assets in custody accounts located in Argentina, even if the securities held in the accounts represented property of the Republic.

The Court recognized that, under the Foreign Sovereign Immunities Act (the "FSIA"), sovereign assets could be subject to attachment or execution only where they constituted "'property in the United States of a foreign state . . . used for a commercial activity in the United States.'"  *Id.* at *2 (quoting 28 U.S.C. § 1610(a)).  After rejecting plaintiffs' argument that "the

9

garnishee is, of course, Citibank, and to plaintiffs there is one Citibank, the company headquartered in the United States, not multiple Citibanks," and its corollary that "the situs of the intangible property in question is the United States," the Court concluded that the ANSES assets were unquestionably in Argentina, not in the United States.  *Id.* at *2, *4.

Thus, while Citibank "is, through its branches, located in many countries," *id.* at *2, this Court ruled that it was not the case that "intangible property, resulting from deposit transactions between ANSES and the Buenos Aires branch of Citibank, can be considered as 'property in the United States' and 'property . . . used for a commercial activity in the United States.'"  *Id.* at *4 (quoting 28 U.S.C. §§ 1610(a) and (d)).  Because the *situs* of the intangible property in question was in Argentina, it could not be subjected to restraint, attachment, or execution under the FSIA:

> All the dealings of ANSES in setting up the accounts, depositing securities into the accounts (whether electronically or by paper), giving instructions to Citibank regarding the accounts, receiving advice regarding the accounts, directing the sale and purchase of securities—all were made between ANSES and the Citibank branch in Argentina.  Although the property is properly regarded as intangible property, there were and still are actual live transactions regarding that property, all of which have taken place, and are taking place, in Argentina.  As far as the use of the assets for whatever activity they are used for, this would surely involve dealings in Argentina by ANSES, and between ANSES and the Citibank branch there.
>
> Thus, the court concludes that the property in question is not located in the United States.  The court further concludes that, even if the property is being used for commercial activity, this use is not occurring in the United States.  Thus the assets in the custodial accounts are immune from attachment, restraint and execution.

*Id.*

Although the Court acknowledged that the *ex parte* orders it had issued were of "doubtful . . . validity," Hr'g Tr. at 26:17-18, *Aurelius Capital Partners, LP v. Republic of Argentina*, No. 07 Civ. 2715 (TPG) (S.D.N.Y. Mar. 1, 2010), the *ex parte* restraints were continued pending appeal, and Citibank Argentina and its officers were exposed to imminent civil, regulatory and

10

criminal risk in Argentina.  Citibank filed an expedited appeal from the stay and an emergency motion to vacate the stay on the grounds, among others, that the Court's restraining orders would not be recognized in Argentina as authorizing a freeze of the custody accounts in violation of Argentine law and the terms of the custody agreements.  After an expedited process, the Second Circuit vacated the stay pending appeal and ruled that "the district court did not find, nor will the record support, a likelihood that the plaintiffs will succeed on the merits of a claim that the custodial accounts at issue are being used for a commercial activity in the United States." *Aurelius Capital Partners, LP v. Republic of Argentina*, No. 10-837-cv (L), slip op. at 2 (2d Cir. Mar. 24, 2010).

The Argentine *situs* of the payments here is similarly clear, and the exposure of Citibank to the consequences of conflicting obligations, and to the risk of civil, regulatory, and even criminal penalties in Argentina would be similarly stark.  The result should be no different.

### 2.    The Separate Entity Doctrine Remains Vital to Protect Branches of International Banks from Conflicting Obligations

The *ANSES* decision also found that the separate entity rule, a principle developed to protect an international bank like Citibank from potentially conflicting obligations such as those it would face if the November 21 Orders were to be applied to payments received by Citibank Argentina on the Argentine Law Bonds from the Caja, was instructive in guiding the factual analysis of the transactions relevant to the payments on the Argentine Law Bonds and the dealings between Citibank Argentina and its Custody Account Customers:

> There are two cases decided in this district, which do indeed deal with international banks.  *Fidelity Partners, Inc. v. Philippine Export and Foreign Loan Guarantee Corp.*, 921 F. Supp. 1113 (S.D.N.Y. 1996); *Motorola Credit Corp. v. Uzan*, 288 F. Supp. 2d 558 ([S.D.N.Y.] 2003).  *Fidelity Partners* was under the FSIA.  *Motorola* was under New York law.  Both cases applied a doctrine known as the "separate entity rule."  Under this rule each branch of a

11

> bank is a separate entity-that is, separate from the head office and separate from other branches.

*ANSES*, 2010 WL 768874, at *3.

The separate entity doctrine is a "rule . . . unique to international banks," that reflects "policy considerations [that] contemplate, among other issues, the intolerable burden that would otherwise be placed on banking and commerce if mere service of a writ to a New York branch could subject foreign bank branches to competing claims." *Shaheen Sports, Inc. v. Asia Ins. Co.*, No. 98 Civ. 5951, 2012 WL 919664, at *3, *5 (S.D.N.Y. Mar. 14, 2012) (internal quotation marks omitted).

To protect branches of international banks that are subject to local law, the separate entity doctrine places deposits held in a foreign branch of a U.S. bank beyond the reach of a New York execution order. "[E]ach branch of a bank is treated as a separate entity, in no way concerned with accounts maintained by depositors in other branches or at a home office." *Cronan v. Schilling*, 100 N.Y.S.2d 474, 476 (Sup. Ct. N.Y. Cnty. 1950), *aff'd*, 282 A.D. 940 (1st Dep't 1953); *see also Det Bergenske Dampskibsselskab v. Sabre Shipping Corp.*, 341 F.2d 50, 53 (2d Cir. 1965); *John Wiley & Sons, Inc. v. Kirtsaeng*, No. 08 Civ. 7834, 2009 WL 3003242, at *3 (S.D.N.Y. Sept. 15, 2009).

In *Fidelity Partners, Inc. v. Philippine Export and Foreign Loan Guarantee Corp.*, cited by this Court in the *ANSES* case, Fidelity moved for an order of attachment and execution against funds transferred to an account in Manila belonging to the judgment debtor, a Philippine government agency. 921 F. Supp. at 1115-16. The court concluded that Fidelity could not attempt to execute against assets held in a Manila office by moving against the bank's New York branch because "the New York branch and the Manila office should be viewed as separate

entities for the purposes of attachment and execution." *Id*. at 1119.  The court held that Fidelity could not reach funds by serving a U.S. entity when the funds themselves were "on the opposite end of the globe and in another sovereign nation."  *Id*. at 1120.

Similarly, in *Fidelity Partners, Inc. v. First Trust Co.*, 58 F. Supp. 2d 52 (S.D.N.Y. 1997), a sovereign judgment debtor maintained a securities account on the books of the Manila branch of an international bank.  The district court held that the property was not subject to turnover pursuant to CPLR § 5225 or § 5227 based on the court's jurisdiction over the New York branch that operated the clearing system through which the securities were held.  *See* 58 F. Supp. 2d at 54-55.  The Second Circuit remanded for a limited consideration of mootness.  *See* 142 F.3d 560, 566 (2d Cir. 1998).  On remand, the district court adhered to its prior decision, *see* 58 F. Supp. 2d 55, 61-62 (S.D.N.Y. 1999), but also found that the case was, in fact, moot.  *See id.* at 59-60, *aff'd*, 216 F.3d 1072 (2d Cir. 2000) (Table).

The separate entity doctrine remains vital.  For example, in *Shaheen Sports*, the district court refused to permit execution upon deposits held at a Pakistani branch based upon service effected in New York.  *See* 2012 WL 919664, at *3.  Similarly, in *Ayyash v. Koleilat*, 957 N.Y.S.2d 574 (Sup. Ct. N.Y. Cnty. 2012), a state court refused to permit judgment creditors to subpoena information from foreign banks by serving their New York branches, observing that "[t]he importance of the separate entity rule is underlined by the existence of laws in the foreign jurisdictions in which the institutions are headquartered or in which other of their branches are located, laws providing for serious civil and criminal sanctions in the event of their breach."  957 N.Y.S.2d at 581.  "[A]ny future exception to the separate entity rule would require 'a pronouncement from the Court of Appeals or an act of the Legislature.'"  *Id.* (quoting *Nat'l Union Fire Ins. Co. v. Advanced Emp't Concepts, Inc.*, 269 A.D.2d 101, 102, 703 N.Y.S.2d 3

(1st Dep't 2000)); *see also Int'l Legal Consulting Ltd. v. Malabu Oil & Gas Ltd.*, No. 651773/2011, 2012 WL 1032907, at *8 (Sup. Ct. N.Y. Cnty. Mar. 15, 2012) ("This court likewise holds that the separate entity rule is still good law, particularly with respect to pre-judgment attachment of a bank account under CPLR Article 62[.]").

### 3.     The Separate Entity Rule Has Also Been Codified to Protect Foreign Branches from Conflicting Obligations

The separate entity doctrine has also been codified in a manner consistent with the act of state doctrine to protect a bank with branches in multiple jurisdictions from conflicting obligations.  For example, Section 138(1) of the New York Banking Law provides that:

> [A]ny bank . . . located in this state which . . . shall have opened . . . a branch office . . . in any foreign country shall be liable for contracts to be performed at such branch office . . . and for deposits to be repaid at such branch office . . . to no greater extent than a bank . . . organized and existing under the laws of such foreign country would be liable under its laws.

The intent of the statute is to place a foreign branch like Citibank Argentina on an equal footing with an entirely local Argentine bank, and to recognize that a foreign branch, like an entirely local bank, will be subject to the civil, regulatory and criminal laws of the sovereign jurisdiction in which it is located.[4]  *See also Sabolyk v. Morgan Guaranty Trust Co. of N.Y.*, No. 84 Civ. 3179, 1984 WL 1275, at *4-5 (S.D.N.Y. Nov. 27, 1984) (Swiss attachment order prohibiting payment on letter of credit excused head office from obligation); N.Y. Banking Law § 204-a (parallel legislation for foreign banks that have opened branch offices in New York).

A federal analog to Section 138 provides with respect to foreign branch deposits that:

---

[4] Section 138(1) expressly provides that "[t]he laws of such foreign country shall be deemed to include all acts, decrees, regulations and orders promulgated or enforced by a dominant authority asserting governmental, military or police power of any kind at the place where any such branch is located . . . ."

A member bank shall not be required to repay any deposit made at a foreign branch of the bank if the branch cannot repay the deposit due to - (1) an act of war, insurrection, or civil strife; or (2) an action by a foreign government or instrumentality (whether de jure or de facto) in the country in which the branch is located; unless the member bank has expressly agreed in writing to repay the deposit under those circumstances.

12 U.S.C. § 633.

Other rules recognize the differing cross-border rights and obligations in various commercial contexts of branch offices located in different jurisdictions.  For example, Article 5 of New York's Uniform Commercial Code ("NYUCC") provides that "[f]or the purpose of jurisdiction, choice of law, and recognition of interbranch letters of credit, but not enforcement of a judgment, all branches of a bank are considered separate juridical entities."  NYUCC § 5-116(b).  Article 4-A of the NYUCC in turn provides with respect to wire transfers that "[a] branch or separate office of a bank is a separate bank for purposes of this Article."  *See Shaheen Sports*, 2012 WL 919664, at *3.  Similarly, Article 8 of the NYUCC provides that a creditor may reach a debtor's interest in a security entitlement "only by legal process upon the securities intermediary with whom the debtor's securities account is maintained," NYUCC § 8-112(b), which, under NYUCC § 8-110(e), in this case is Citibank Argentina.[5]

When the facts relating to the payments being made to Citibank Argentina and its administration of the Custody Accounts are considered in the light of the separate entity rule, it is

---

[5] The Hague Convention on the Law Applicable to Certain Rights in Respect of Securities Held With an Intermediary (the "Hague Securities Convention") similarly provides that the law applicable to a securities account is that agreed in the account agreement provided the "relevant intermediary" has an office in the jurisdiction.  Hague Securities Convention, Article 4, *available at* http://www.hcch.net/index_en.php?act=conventions.text&cid=72.  The United States signed the Hague Securities Convention on July 5, 2006.  Although it has not yet entered into force, the Convention imposes no change in federal or New York law and is squarely aligned with the objective of increasing certainty and predictability in complex cross-border transactions in securities held in indirect holding systems.  *Cf. Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 62 (2d Cir. 2009) (overruling a prior decision that "introduced uncertainty into the international funds transfer process . . . [and] undermined the efficiency of New York's international funds transfer business" (internal citation and quotation marks omitted)).

clear that Citibank's presence in New York is irrelevant and that Citibank Argentina must be treated as an Argentine juridical entity separate from Citibank, N.A. for purposes of the November 21 Orders. Those Orders must therefore be construed as inapplicable to payments being made by Citibank Argentina for the account of its Custody Account Customers in Argentina.

## II.   THE PRINCIPLES OF COMITY THAT SUPPORT THE ACT OF STATE DOCTRINE PRECLUDE APPLICATION OF THE NOVEMBER 21 ORDERS TO PAYMENTS MADE WITHIN ARGENTINA

Payments under the Argentine Law Bonds are made by the Republic wholly in Argentina. Therefore, the act of state doctrine, as expounded by the Supreme Court, and the related defense of "foreign sovereign compulsion," also preclude the application of the November 21 Orders to payments of funds held in custody for customers in Argentina.

The act of state doctrine has its origins in principles of comity and respect for other states. *See Schooner Exchange v. McFadden*, 11 U.S. 116, 136 (1812) ("The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself . . . . All exceptions, therefore, to the full and complete power of a nation within its own territories, must be traced up to the consent of the nation itself."). As formulated by the Supreme Court:

> Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

*Underhill v. Hernandez*, 168 U.S. 250, 252 (1897).

The doctrine thus "has its roots, not in the Constitution, but in the notion of comity between independent sovereigns." *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S.

16

759, 765 (1972).  The act of state doctrine "requires that, in the process of deciding [cases and controversies], the acts of foreign sovereigns taken within their own jurisdiction shall be deemed valid."  *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 409 (1990).  "[T]he potential for affront may be particularly acute . . . where the district court issues an injunctive order . . . that purports to control the foreign state's conduct within its own borders."  Brief for the United States as Amicus Curiae at 12-13, *Af-Cap, Inc. v. Republic of Congo*, 462 F.3d 417 (5th Cir. 2006) (No. 05-51168) (invalidating a turnover order entered by the district court against the Congo on the grounds that it was barred by the FSIA).

In *Allied Bank International v. Banco Credito Agricola de Cartago*, 566 F. Supp. 1440 (S.D.N.Y. 1983), *aff'd* 733 F.2d 23 (2d Cir. 1984), *rev'd on rehearing en banc*, 757 F.2d 516 (2d Cir. 1985), this Court held that because a Costa Rican suspension of U.S. Dollar debt payments was "public in nature, rather than commercial" and "in response to a serious national economic crisis," 566 F. Supp. at 1443, the act of state doctrine required that this Court give effect in New York to the Costa Rican moratorium.  The Court of Appeals initially affirmed, but then overruled the panel's decision *en banc* and held that, because the *situs* of the debt—its place of payment— was New York for act of state purposes, the Costa Rican decree would not be given effect outside Costa Rica to prevent payment.  757 F.2d at 521.  The *en banc* decision in *Allied Bank* plainly supports the converse proposition—where a sovereign act such as the payment of its debt occurs solely within the sovereign's borders, the act of state doctrine will bar the review or enjoinder of the act by courts of the United States.[6]

---

[6] At the outset of litigation over the Republic's restructured debt, this Court applied *Allied Bank* to hold that the Republic could *not* raise a valid act of state defense with regard to payments to be made *outside* of Argentina. *Lightwater Corp. v. Republic of Argentina*, No. 02 Civ. 3804 (TPG), 2003 WL 1878420, at *5 (S.D.N.Y. Apr. 14,

As relevant to Citibank Argentina, courts have also recognized a related defense of "foreign sovereign compulsion":

> The defense of foreign sovereign compulsion . . . focuses on the plight of a defendant who is subject to conflicting legal obligations under two sovereign states. Rather than being concerned with the diplomatic implications of condemning another country's official acts, the foreign sovereign compulsion doctrine recognizes that a defendant trying to do business under conflicting legal regimes may be caught between the proverbial rock and a hard place where compliance with one country's laws results in violation of another's.

*In re Vitamin C Antitrust Litig.*, 584 F. Supp. 2d 546, 551 (E.D.N.Y. 2008).

The logic underlying this defense is that "[c]ommerce may exist at the will of the government, and to impose liability for obedience to that will would eliminate for many companies the ability to transact business in foreign lands." *Interamerican Ref. Corp. v. Texaco Maracaibo, Inc.*, 307 F. Supp. 1291, 1298 (D. Del. 1970).  As described in the Restatement (Third) of the Foreign Relations Law of the United States § 441 (1987):

> In general, a state may not require a person (a) to do an act in another state that is prohibited by the law of that state or by the law of the state of which he is a national; or (b) to refrain from doing an act in another state that is required by the law of that state or by the law of the state of which he is a national.

*Id.* § 441(1); *see also United States v. Watchmakers of Switzerland Info. Ctr., Inc.*, 1963 Trade Cases (CCH) ¶ 70,600, at ¶ 77,456 (S.D.N.Y. 1962), *order modified*, 1965 Trade Cases ¶ 70,352 (S.D.N.Y. 1965) ("If, of course, the defendants' activities had been required by Swiss law, this court could indeed do nothing.  An American court would have under such circumstances no right to condemn the governmental activity of another sovereign nation."); *Trugman-Nash, Inc. v. New Zealand Dairy Bd., Milk Products Holdings (N. Am.) Inc.*, 954 F. Supp. 733, 736

---

2003).  Here, however, the payments are made entirely *inside* Argentina.  Under *Allied Bank*, it is plain that restraining payments on the Argentine Law Bonds taking place in Argentina would violate the act of state doctrine.

(S.D.N.Y. 1997) (where "there is an actual and material conflict between American antitrust law and New Zealand law in respect of the marketing of dairy export produce[, t]hat conflict is sufficient to entitle defendants to invoke the doctrines of act of state, foreign sovereign compulsion, and international comity").

These principles have led New York courts to refrain from issuing orders that require an entity in a foreign jurisdiction to breach the laws of that jurisdiction:

> Under principles of international comity, a New York court should not encroach upon another nation's sovereignty by requiring citizens to take actions within their home country that would contravene their home country's laws. The non-party banks have shown that were this Court to require that they comply with plaintiff's demands, they, their officers and/or employees could be subject to civil or criminal penalties merely for such compliance. Such intrusion into legal frameworks of foreign countries in [sic] unjustified by the record *sub judice*.

*Ayyash,* 957 N.Y.S.2d at 582-83 (internal citations omitted).

Here, all payments on the Argentine Law Bonds are made in Argentina. From the perspective of Citibank Argentina, therefore, even though this Court has jurisdiction to issue an injunction against the Republic, and may be disinclined to respect the Republic's sovereignty in this regard, the act of state doctrine and the defense of foreign sovereign compulsion must still apply to protect Citibank Argentina from risk where Citibank Argentina, which is subject to the jurisdiction of Argentina, makes payments in Argentina to holders of the Argentine Law Bonds.

## III. THE NOVEMBER 21 ORDERS MAY NOT IMPOSE EXTREME AND INEQUITABLE BURDENS UPON A NON-PARTY

### A. A U.S. Court May Not Expose a Non-Party to Civil, Regulatory and Criminal Risk through the Exercise of Its Equitable Powers

No claim has been stated, let alone adjudicated, against Citibank in this case. Yet if the November 21 Orders were interpreted to require that Citibank Argentina restrain funds held by it in custody for customers, which would place Citibank Argentina at risk under Argentine civil,

regulatory and criminal law, the burden placed upon Citibank would far exceed the limits of equity jurisprudence.  *See, e.g.*, *United States v. First Nat'l City Bank*, 379 U.S. 378, 384 (1965) (noting that a U.S. court should refrain from entering an order or judgment which "would violate foreign law . . . or place respondent under any risk of double liability").

The Supreme Court has recognized "fundamental limitations on the remedial powers of the federal courts," which permit their exercise "only on the basis of a violation of the law." *Gen. Bldg. Contractors*, 458 U.S. at 399.  A non-party's lawful conduct that is "independent" of a party's wrongful conduct falls outside the scope of a federal court's injunctive power.  *See Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 13 (1945) (injunctive power is not "so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law"); *Shakhnes v. Berlin*, 689 F.3d 244, 257 (2d Cir. 2012) ("[a]n injunction is overbroad when it restrains . . . legal conduct"), *cert. denied*, 185 L. Ed. 2d 812 (2013).  As Judge Learned Hand stated over eighty years ago:

> [N]o court can make a decree which will bind anyone but a party; a court of equity is as much so limited as a court of law; it cannot lawfully enjoin the world at large, no matter how broadly it words its decree.  If it assumes to do so, the decree is *pro tanto brutum fulmen,* and the persons enjoined are free to ignore it.

*Alemite Mfg.*, 42 F.2d at 832.

In *General Building Contractors*, the Supreme Court held that Federal Rule of Civil Procedure 65 does not allow a court to lawfully enjoin the world at large.  There, certain defendants were found liable for racial discrimination and were enjoined from taking further discriminatory actions.  458 U.S. at 378.  Other defendants, not found liable, were also enjoined. The Supreme Court held that the imposition of a remedial injunction in the absence of liability was impermissible.  *Id.* at 399-402.

20

The Court first recognized "fundamental limitations on the remedial powers of the federal courts," and concluded that there was "no support for the imposition of injunctive relief against a party found not to have violated any substantive right of respondents." *Id*. at 399. Non-liable parties might be subjected only to "minor and ancillary relief" that is "not the same, and cannot be the same, as that awarded against a party found to have infringed the statutory rights of persons in the position of respondents." *Id*.

A remedy that treated "petitioners as if they had been properly found liable . . . is beyond the traditional equitable limitations upon the authority of a federal court to formulate such decrees." *Id*. at 400-01. "[W]e hold that such obligations can be imposed neither under traditional equitable authority of the District Court nor under the All Writs Act." *Id*. at 402; *see also EEOC v. Local 638*, 81 F.3d 1162, 1180 (2d Cir. 1996) ("If the plaintiffs wish to have sanctions imposed on the Contractors or to fashion remedies as to them that are more than minor and ancillary, they may do so only upon establishing the Contractors' liability after adhering to the appropriate rules of civil procedure."); *Vacco v. Operation Rescue Nat'l*, 80 F.3d 64, 70 (2d Cir. 1996) ("Rule 65(d) codifies the well-established principle that, in exercising its equitable powers, a court cannot lawfully enjoin the world at large." (internal quotation marks omitted)); *Heyman v. Kline*, 444 F.2d 65, 65-66 (2d Cir. 1971) ("Rule 65(d) does not grant a court power so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law." (internal quotation marks omitted)); *cf. Penn. Coal Co. v. Mahon*, 260 U.S. 393, 416 (1922) (Holmes, J.) ("In general it is not plain that a man's misfortunes or necessities will justify his shifting the damages to his neighbor's shoulders.").

21

The November 21 Orders should not be read to expose Citibank Argentina, against whom no judgment has issued, to burdens that are far from "minor and ancillary" simply to give effect to the injunctions against the Republic.

### B. Applying the November 21 Orders to Citibank Argentina Would Be Inequitable

The November 21 Orders mandate the payment, or non-payment, of money. But a "court of equity should not act . . . when the moving party has an adequate remedy at law." *Younger v. Harris*, 401 U.S. 37, 43 (1971); *see also Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002) ("Almost invariably . . . suits seeking . . . to compel the defendant to pay a sum of money to the plaintiff are suits for money damages . . . ." (internal quotation marks omitted)); *Jaffee v. United States*, 592 F.2d 712, 715 (3d Cir. 1979) ("A plaintiff cannot transform a claim for damages into an equitable action by asking for an injunction that orders the payment of money.").

The limits of equitable jurisdiction were set out in *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999). There, holders of defaulted bonds obtained a provisional injunction, also based on a *pari passu* clause, restraining a defendant at risk of insolvency from dissipating its assets. The Supreme Court rejected the argument that "the grand aims of equity" created a general power to grant relief whenever legal remedies are not "practical and efficient." *Id*. at 321 (quoting *id.* at 342 (Ginsburg, J., dissenting)). As regards a pre-judgment restraining order, the Court observed that such relief would violate fundamental debtor-creditor protections by marginalizing state law prejudgment remedies:

> Why go through the trouble of complying with local attachment and garnishment statutes when this all-purpose prejudgment injunction is available? More importantly, by adding, through judicial fiat, a new and powerful weapon to the creditor's arsenal, the new rule could radically alter the balance between debtor's and creditor's rights which has been developed over centuries through many laws—including those relating to bankruptcy, fraudulent conveyances, and preferences.

*Id*. at 330-31; *see also Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 436 (2d Cir. 1993) (citing Restatement (Second) of Contracts § 364(1)(b) ("Specific performance or an injunction will be refused if such relief would be unfair because . . . (b) the relief would cause unreasonable hardship or loss to . . . third persons.")); *United States v. Alexander*, 736 F. Supp. 1236, 1242 (N.D.N.Y. 1989), *aff'd*, 901 F.2d 272 (2d Cir. 1990) ("specific performance may not and will not be ordered if under all the circumstances it would be inequitable to do so"); *Cook Inc. v. Boston Sci. Corp.*, 333 F.3d 737, 743-44 (7th Cir. 2003) (modifying injunction in contract case because it "violate[d] the principle that in determining the appropriate scope of an injunction the judge must give due weight to the injunction's possible effect on third parties"); *United States v. Zang*, 703 F.2d 1186, 1195 (10th Cir. 1982) ("[T]he interests of innocent third parties should be protected.").

Whatever the merits of expanding the usual boundaries of equitable relief as against the Republic, the November 21 Orders should not be expanded in the same manner against Citibank Argentina.

**CONCLUSION**

For the reasons set forth, the November 21 Orders should not be construed to govern payments by Citibank Argentina on Argentine Law Bonds to customers for whom it acts as custodian.

Dated:   New York, New York
       May 22, 2013

                DAVIS POLK & WARDWELL LLP

           By:   /s/ Karen E. Wagner
                Karen E. Wagner
                James L. Kerr
                Lindsey T. Knapp

                450 Lexington Avenue
                New York, New York  10017
                Telephone:   (212) 450-4000
                Facsimile:   (212) 701-5800

                *Attorneys for Non-Party Citibank, N.A.*

24