UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- x

| | | |
|---|---|---|
| NML CAPITAL, LTD., | : | 03 Civ. 8845 (TPG) |
| | : | 05 Civ. 2434 (TPG) |
| | : | 06 Civ. 6466 (TPG) |
| Plaintiff, | : | 07 Civ. 1910 (TPG) |
| | : | 07 Civ. 2690 (TPG) |
| v. | : | 07 Civ. 6563 (TPG) |
| | : | 08 Civ. 2541 (TPG) |
| THE REPUBLIC OF ARGENTINA, | : | 08 Civ. 3302 (TPG) |
| | : | 08 Civ. 6978 (TPG) |
| Defendant. | : | 09 Civ. 1707 (TPG) |
| | : | 09 Civ. 1708 (TPG) |

-------------------------------------------------- x

## PLAINTIFF'S OPPOSITION TO MOTION TO QUASH SUBPOENAS

HOFFNER PLLC
David S. Hoffner
(hoffner@hoffnerpllc.com)
325 Broadway, Suite 505
New York, NY 10007
Tel.: (917) 881-1039
Fax: (646) 810-4031

*Attorneys for Plaintiff NML Capital, Ltd.*
*with respect to subpoenas served on*
*BNP Paribas & BNP Paribas Fortis*

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Kevin S. Reed
(kevinreed@quinnemanuel.com)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel.: (212) 849-7000
Fax: (212) 849-7100

*Attorneys for Plaintiff NML Capital, Ltd.*
*with respect to all subpoenas except*
*those served on BNP Paribas & BNP*
*Paribas Fortis*

June 26, 2013

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF FACTS ............................................................................. 3

I.     The Second Circuit Has Held That Banks Must Obey Subpoenas Seeking Information About The Same Types Of Argentine Assets. ................................... 3

        A.     NML's 2010 Subpoenas To Bank of America And BNA    3

        B.     Motion To Quash The 2010 Subpoenas Was Denied.    4

II.     NML's Current Subpoenas To The Banks .......................................... 6

ARGUMENT .......................................................................................... 6

I.     The Subpoenas Are Within The Broad Scope Of Permissible Post-Judgment Discovery. 6

        A.     The Subpoenas Are Reasonably Calculated To Find Attachable Property.   7

        B.     Argentina's Objections To The Subpoenas' Scope Lack Merit And Have Already Been Rejected.    9

II.     Argentina's Immunity Objections Are Meritless. .................................. 12

        A.     Immunity Is Irrelevant To Post-Judgment Asset Discovery. 12

        B.     Property Held In The Name Of Defense And Foreign Affairs Ministries Is Not Categorically Immune From Execution Or Discovery.    14

CONCLUSION ...................................................................................... 16

# TABLE OF AUTHORITIES

CASES

*767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to United Nations*,
   988 F.2d 295 (2d Cir. 1993)................................................................................15

*Aurelius Capital Partners, LP v. Republic of Argentina*,
   2009 WL 755231 (S.D.N.Y. Mar. 12, 2009) .........................................................12

*Aurelius Capital Partners v. Republic of Argentina*,
   2013 WL 857730 (S.D.N.Y. Mar. 7, 2013) ...........................................................10

*Avelar v. J. Cotoia Const., Inc.*,
   2011 WL 5245206 (E.D.N.Y. Nov. 2, 2011).........................................................15

*Colella v. Republic of Argentina*,
   2007 WL 1545204 (N.D. Cal. May 29, 2007) .......................................................14

*EM Ltd. v. Republic of Argentina*,
   389 Fed. App'x 38 (2d Cir. 2010)..........................................................................8

*EM Ltd. v. Republic of Argentina*,
   695 F.3d 201 (2d Cir. 2012)........................................................................ passim

*EM Ltd. v. Republic of Argentina*,
   720 F. Supp. 2d 273 (S.D.N.Y. 2009)...................................................................12

*First City, Texas-Houston, N.A. v. Rafidain Bank*
   ("*Rafidain II*"), 281 F.3d 48 (2d Cir. 2002)....................................................6, 13

*Jones v. Coughlin*,
   45 F. 3d 677 (2d Cir. 1995)....................................................................................5

*Liberian E. Timber Corp. v. Gov't of Republic of Liberia*,
   659 F.Supp. 606 ...................................................................................................15

*Minpeco, S.A. v. Hunt*,
   No. 81 Civ. 7619, 1989 WL 57704 (S.D.N.Y. May 24, 1989)................................6

*NML Capital, Ltd. v. Banco Central de la Republica Argentina*,
   652 F.3d 172 (2d Cir. 2011)..................................................................................12

*NML Capital, Ltd. v. Republic of Argentina*,
   680 F.3d 254 (2d Cir. 2012)....................................................................................7

*Vulcan Iron Works, Inc. v. Polish Am. Mach. Corp.*,
   472 F. Supp. 77 (S.D.N.Y. 1979) .........................................................................15

**STATUTES AND RULES**

28 U.S.C. § 1611(b)(2)(B) ................................................................................................14

C.P.L.R. § 5223 ...................................................................................................................7

Fed. R. Civ. P. 69 ...........................................................................................................6, 7

**OTHER AUTHORITIES**

David D. Siegel, New York Practice § 509 (5th ed. 2011) ....................................................7

Plaintiff NML Capital, Ltd. ("NML"), through its attorneys, Quinn Emanuel Urquhart & Sullivan LLP and Hoffner PLLC, respectfully submits this memorandum of law in opposition to the motion of defendant the Republic of Argentina ("Argentina") to quash the subpoenas, dated April 15, 2013, and May 1, 2013, that were served on BNP Paribas, BNP Paribas Fortis, Citibank, N.A., Deutsche Bank AG, HSBC Holdings PLC, HSBC Bank USA, N.A., JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., Standard Chartered PLC, Standard Chartered Bank, UBS AG, Wells Fargo & Co., and Wells Fargo Bank, N.A. (collectively, the "Banks").

## PRELIMINARY STATEMENT

Through this motion to quash, Argentina seeks to re-litigate questions about the scope of post-judgment discovery that have been conclusively resolved against Argentina, in this case, by the Second Circuit and this Court.

In 2010, NML served subpoenas on Bank of America and Banco de la Nación Argentina ("BNA") seeking information regarding Argentina's accounts and wire transfer activity, among other things.  The purpose of those subpoenas was to learn how Argentina moves its assets through New York and around the world, and accurately to identify the places and times when those assets might be subject to attachment and execution in the United States or abroad. Because Argentina conducts commercial transactions through its constituent entities and holds assets in the names of such entities—as NML's judgment enforcement efforts have repeatedly demonstrated—NML sought information regarding a list of such entities, rather than only seeking assets held in the name of the "Republic of Argentina."  Argentina sought to quash the subpoenas based on its purported sovereign immunity, on the purportedly improper list of entities in the subpoenas, and on the purportedly overbroad scope of the subpoenas.  This Court rejected all of Argentina's arguments, and the Second Circuit affirmed.

The subpoenas at issue in this motion—like those served by NML in 2010—also seek information from non-party banks regarding Argentina's accounts and wire transfer activity, and Argentina has returned to this Court with the same objections.  NML's new subpoenas are indistinguishable, however, from the ones that were upheld by this Court and the Second Circuit, and therefore Argentina's present motion to quash must fail for the same reasons as its motion to quash the earlier subpoenas.

*First*, NML's new subpoenas are within the broad scope of permissible post-judgment discovery.  NML is entitled to seek any information that might lead to the discovery of Argentina's assets, wherever in the world those assets may be located.  NML's subpoenas seek such information both by asking the Banks to disclose any Argentine assets in their custody and by seeking wire transfer information that is likely to lead NML to property belonging to Argentina in the custody of third-parties.  NML's subpoenas are tailored to the way that Argentina typically holds its assets and conducts transactions: in the name of its constituent entities, rather in the name of the Republic.

*Second*, questions of immunity are irrelevant as a matter of law to the scope of post-judgment discovery.  Post-judgment asset discovery—particularly discovery directed to non-parties, such as NML's subpoenas—does not implicate immunity in any way.  Argentina's invocation of immunity for diplomatic and military property is a blatant attempt to re-litigate this settled issue.  Moreover, because neither diplomatic nor military immunity is triggered simply because property is held in the name of a foreign affairs or defense ministry, there is no merit to Argentina's argument that NML is seeking information on property that necessarily is immune from execution.

## STATEMENT OF FACTS

I.     **The Second Circuit Has Held That Banks Must Obey Subpoenas Seeking Information About The Same Types Of Argentine Assets.**

   A.     **NML's 2010 Subpoenas To Bank of America And BNA**

On March 10, 2010, NML served a subpoena on Bank of America seeking information about, among other things, (i) "accounts maintained … in the name of Argentina, beneficially held in whole or in part by Argentina, or for which Argentina is a signatory", and (ii) electronic fund transfers that were sent through the Society for Worldwide Interbank Financial Telecommunication ("SWIFT") system.[1]  Declaration of Kevin S. Reed, dated June 26, 2013 (the "Reed Decl."), Ex. A at 10-11.  On June 14, 2010, NML served a subpoena on BNA seeking similar information.  Reed Decl. Ex. B.

Because Argentina acts through numerous ministries, sub-ministries, and other entities that are part of the Republic itself, and because one of Argentina's tactics for evading judgment enforcement efforts is holding assets and conducting transactions in the name of such entities, NML's subpoena to Bank of America defined "Argentina" to include Argentina's "agencies, ministries, instrumentalities, political subdivisions, employees, attorneys, representatives, affiliates, subsidiaries, predecessors, alter-egos, and assigns, and all other Persons acting or purporting to act for or on Argentina's behalf."  Reed Decl. Ex. A at 4.  NML's subpoena to BNA contained a similar definition.  Reed Decl. Ex. B at Attachment A.  During the meet-and-confer process, in response to an objection that BNA was not in a position to determine which Argentine entities met this definition, NML agreed to provide a list of entities falling within the definition of "Argentina."  Reed Decl. Ex. C.

---

[1]     Banks use the SWIFT system to send and receive international electronic fund transfers, and transfers involving U.S. dollars are often routed through intermediary banks in New York.

### B.   Motion To Quash The 2010 Subpoenas Was Denied.

On May 17, 2010, Argentina moved to quash the subpoena directed to Bank of America, arguing that it impermissibly sought "breathtakingly expansive" categories of information, that the definition of "Argentina" was overly broad because it included ministries and purportedly separate entities, that "there is no carve-out in the Subpoena excluding diplomatic accounts" or "exclud[ing] military property," and that NML had failed to show that an exception to immunity applied to the assets about which NML sought discovery.  Reed Decl. Ex. D at 4, 7-11.  This Court rejected each of these arguments.

At a hearing on August 30, 2011, the Court held:

> We are not really talking about a fishing expedition or a lot of unknowns.  There is now a focus.  And I think that at least what the Court realizes now is that the Republic, through various entities, can very well be engaged in commercial activities in various places or activity which might involve attachable assets on some other theory in a foreign country.
>
> So please don't talk about fishing expeditions.  What do you expect these people to do?  They have to engage in these maneuvers because of your client's behavior.  And these plaintiffs now have come forward with a very credible theory illustrated by the Honeywell situation that the Republic may be purchasing abroad, may be investing abroad, may be doing a lot of things outside of Argentina which could be the subject of attachments.  That's their theory.  It is not fishing.

Reed Decl Ex. E at 42:6-20.  On September 2, 2011, the Court entered an order compelling compliance with the subpoenas (subject to modifications that would reduce the burden on the banks) for the reasons stated on the record at the August 30 hearing (the "2011 Discovery Order").  Reed Decl. Ex. F.

Argentina appealed the 2011 Discovery Order, and on August 20, 2012, the Second Circuit affirmed.  *EM Ltd. v. Republic of Argentina*, 695 F.3d 201 (2d Cir. 2012).  The Second Circuit reaffirmed that "broad post-judgment discovery in aid of execution is the norm in federal

and New York state courts," that "[i]t is not uncommon to seek asset discovery from third parties, including banks, that possess information pertaining to the judgment debtor's assets," and that "[it is not] unusual for the judgment creditor to seek disclosure related to assets held outside the jurisdiction of the court where the discovery request is made." *Id.* at 207-08.  Thus, the Second Circuit had "no doubt" that in an ordinary judgment enforcement case, this Court "would have been within its discretion to order the discovery from third-party banks about the judgment debtor's assets located outside the United States." *Id.* at 208.

The Second Circuit then rejected Argentina's argument that sovereign cases should be treated differently from "run-of-the-mill" execution proceedings, holding that "[o]nce the district court had subject matter and personal jurisdiction over Argentina, it could exercise its judicial power over Argentina as over any other party, including ordering third party compliance with the disclosure requirements of the Federal Rules." *Id.* at 208-09.  Moreover, the Second Circuit rejected Argentina's argument that discovery must be tied to an immunity determination:

> Whether a particular sovereign asset is immune from attachment must be determined separately under the FSIA, but this determination does not affect discovery. Whatever hurdles NML will face before ultimately attaching Argentina's property abroad (and we have no doubt there will be some), it need not satisfy the stringent requirements for attachment in order to simply receive information about Argentina's assets.

*Id*. at 209.  Merely obtaining discovery about an asset "does not implicate Argentina's immunity from attachment under the FSIA." *Id.* at 208.

On October 10, 2012, the Second Circuit denied Argentina's motion for rehearing, and it issued its mandate on October 17, 2012.  The Second Circuit's ruling thus is final and binding on Argentina, regardless of Argentina's pending petition for a writ of certiorari.  *See Jones v. Coughlin*, 45 F. 3d 677, 679 (2d Cir. 1995) (a pending petition for certiorari is irrelevant because

a "decision of a panel of this Court is binding unless and until it is overruled by the Court *en banc* or by the Supreme Court.").

## II.   NML's Current Subpoenas To The Banks

In accordance with the Second Circuit's decision, NML served subpoenas, dated April 15, 2013 and May 1, 2013, on each of the Banks (the "Subpoenas").  *See*, *e.g.*, Reed Decl. Ex. G (subpoena directed to Citibank N.A.).  The Subpoenas contained two narrow requests: one for information about "property, assets, or accounts … for which Argentina is, in whole or in part, the owner, beneficiary, or a signatory," and one for information about transfers of "any monies or financial instruments to, from, or through accounts owned or controlled by Argentina."  *See*, *e.g.*, *id.* at 9.  Standard Chartered and HSBC did not object to the Subpoenas as being burdensome, and they have produced responsive information.  NML is negotiating with other banks to resolve any objections that they may have with respect to issues of burden.

On May 28, 2013, Argentina filed its motion to quash the Subpoenas, making substantially the same arguments that it previously asserted in connection with the Bank of America and BNA subpoenas.

## <u>ARGUMENT</u>

## I.   The Subpoenas Are Within The Broad Scope Of Permissible Post-Judgment Discovery.

"[B]road postjudgment discovery in aid of execution is the norm in federal and New York state courts."  *EM Ltd.*, 695 F.3d at 207.  The Federal Rules expressly authorize judgment creditors to obtain discovery from "any person" in aid of execution.  Fed. R. Civ. P. 69(a)(2).  Such discovery is routinely permitted where a non-party may have information leading to the discovery of a judgment debtor's assets, "wherever located."  *First City, Texas-Houston, N.A. v. Rafidain Bank* ("*Rafidain II*"), 281 F.3d 48, 54 (2d Cir. 2002) (quoting *Minpeco, S.A. v. Hunt*,

No. 81 Civ. 7619, 1989 WL 57704, at *1 (S.D.N.Y. May 24, 1989)).  Under the Federal Rules, discovery need only be "reasonably calculated to lead to attachable property."  *EM Ltd.*, 695 F.3d at 205.

The same broad post-judgment discovery is available in New York judgment enforcement proceedings, which are available to judgment creditors through Rule 69.  *See* Fed. R. Civ. P. 69(b) ("In aid of the judgment or execution, the judgment creditor or a successor in interest whose interest appears of record may obtain discovery from any person—including the judgment debtor—as provided in these rules or by the procedure of the state where the court is located.").  New York judgment creditors are entitled to "***all matter*** relevant to the satisfaction of the judgment."  N.Y. C.P.L.R. § 5223 (emphasis added).  This is "a broad criterion authorizing investigation through any person shown to have any light to shed on the subject of the judgment debtor's assets or their whereabouts".   David D. Siegel, New York Practice § 509 (5th ed. 2011).

### A.       The Subpoenas Are Reasonably Calculated To Find Attachable Property.

The Subpoenas request two types of information that this Court has already held NML is entitled to seek from non-party banks: information regarding assets and accounts of Argentina held at those banks, and information regarding wire transfers reflecting Argentina's movements of money.  Both types of information are reasonably calculated to locate property that is subject to attachment and execution.

The propriety of NML's subpoenas is confirmed by the nature of the assets on which NML has successfully executed.  One such asset was a bank account in New York, which was held in the name of the *Secretaria de Programación Economica – Programa de Modernizacion Tecnologia* (the "ANPCT Account").  *See NML Capital, Ltd. v. Republic of Argentina*, 680 F.3d 254 (2d Cir. 2012) (affirming order of attachment).  NML also successfully executed on assets held in the name of the *Fideicomiso de Asistencia al Fondo Fiduciario Federal de*

*Infraestructura Regional*, a trust maintained at U.S. Bank Trust, N.A. of which BNA is the trustee (the "Banco Hipotecario Trust Account"). *EM Ltd. v. Republic of Argentina*, 389 Fed. App'x 38 (2d Cir. 2010) (affirming order of attachment). Both accounts should have been disclosed by Argentina in response to asset discovery conducted early in creditors' litigation efforts, but were not. *See* Reed Decl. Ex. H at 3. The ANPCT Account came to light only when BNA responded to a 2008 attachment order, which forced BNA to disclose the existence of the account.

In the Subpoena, NML requested information regarding property held by New York banks in the name of Argentine ministries, sub-ministries, and entities. The ANPCT Account and the Banco Hipotecario Trust Account demonstrate—as this Court held in the 2011 Discovery Order—that such a request is not a mere "fishing expedition," but rather a request that has a substantial chance of locating assets subject to attachment and execution.

NML's other request in the Subpoenas seeks wire transfer information, which can directly lead to attachable property in the United States and abroad by revealing both the location of Argentine bank accounts and the identities of parties with which Argentina transacts business.[2] When Argentina purchases goods in other jurisdictions, NML can execute upon the funds Argentina intends to use to pay for those goods, or it can execute upon the goods themselves when Argentina acquires title. In connection with the 2011 Discovery Order, NML demonstrated that numerous foreign jurisdictions will apply Argentina's broad waiver of immunity and allow NML to execute upon Argentina's assets—thus demonstrating that

---

[2]     Here too the ANPCT Account provides a useful example: Had NML obtained discovery of wire transfers into the ANPCT Account, NML could have immediately attached and executed upon the ANPCT Account, instead of happening upon it during other attachment proceedings.

discovery of wire transfer information has a substantial chance of locating assets subject to attachment and execution.  *See* Reed Decl. Ex. I.

      **B.**      <u>**Argentina's Objections To The Subpoenas' Scope Lack Merit And Have Already Been Rejected.**</u>

Argentina's objections to the scope of the Subpoenas are the same objections that were rejected in connection with the 2011 Discovery Order, and they should be rejected again here. The Subpoenas served on the Banks are, in fact, ***more*** focused than the subpoenas the Court enforced in the 2011 Discovery Order because they seek fewer categories of information from a more complete list of entities.

First, NML's 2010 subpoena to Bank of America contained twelve requests for information, and its 2010 subpoena to BNA contained three requests.  The Subpoenas served on the Banks contained only two requests for information—a subset of what the Court approved in the 2011 Discovery Order.  NML currently is requesting "[d]ocuments sufficient to identify all property, assets, or accounts" of Argentina, which is identical to what it requested from BNA, *see* Reed Decl. Ex. B at 6, and narrower than what NML sought from Bank of America, from which NML sought an array of information about "all accounts," such as transaction histories, plus "[e]ach asset or property of any kind" of Argentina.  Reed Decl. Ex. A at 10-11.  Similarly, NML sought from BNA in 2010 documents sufficient to identify all transfers of property "into our out of accounts at BNA anywhere in the name of Argentina or for Argentina's benefit," Reed Decl. Ex. B at 6, and it sought from Bank of America "[d]ocuments relating to all SWIFT messages," Reed Decl. Ex. A at 10-11— both requests that are substantively identical to NML's current request for "documents concerning any transfer … of any monies or financial instruments to, from, or through accounts owned or controlled by Argentina."  See Reed Decl. Ex. G at 9.

Argentina's arguments that these two limited requests constitute "all-encompassing discovery this Court previously denied" and a "scattershot" approach thus are patently false. Reed Decl. Ex. E (8/30/11 Tr.) at 42:6-8 ("We are not really talking about a fishing expedition or a lot of unknowns.  There is now a focus.").[3]  This is particularly true given that NML limited its requests to information that can easily be retrieved from the banks' compliance computer systems, rather than seeking information that requires a search for physical documents.[4]

Second, the Subpoenas do not target property located entirely within Argentina.  NML served subpoenas on banks in New York regarding property in the custody of those banks and wire transfers processed by those banks, in accordance with this Court's repeated holdings that NML can seek discovery regarding Argentine assets anywhere in the world.  *See*, *e.g.*, January 15, 2004 Tr., Reed Decl. Ex. J, at 33-34 ("[W]here you've got … judgments issued in the Court, and the possibility of enforcing those judgments in a foreign country, I would think that there should be discovery here. … So, it would be my ruling that they are entitled, in principle, to reasonable discovery about assets in foreign countries."); May 13, 2004 Tr., Reed Decl. Ex. K, at 13-14 ("I have expanded the discovery to include foreign countries."); *EM Ltd.*, 695 F.3d at 208 ("Nor is it unusual for the judgment creditor to seek disclosure related to assets held outside the jurisdiction of the court where the discovery request is made.").  To the extent that the Banks

---

[3]     Argentina's reliance on *Aurelius Capital Partners v. Republic of Argentina*, 2013 WL 857730 (S.D.N.Y. Mar. 7, 2013), is misplaced.  There the Court **denied** Argentina's motion to quash and noted that the Aurelius subpoenas—which then contained 45 requests for information—might need to be narrowed.  It is beyond dispute that NML's Subpoenas, which contain only two requests for information, are already narrower than the 45 requests the Court addressed in *Aurelius*.

[4]     As NML established in connection with the 2011 Discovery Order, banks have software and specialized personnel who can quickly and easily respond to requests for account and wire transfer information with a handful of computer searches—as Standard Chartered and HSBC already demonstrated in connection with the Subpoenas.  Reed Decl. Ex. N.

have information regarding property entirely within Argentina or regarding wire transfers occurring entirely within Argentina, NML will stipulate (as it did in connection with the 2011 Discovery Order) that the Banks need not produce such information.

Finally, the definition of "Argentina" in the Subpoenas is not overbroad. Because Argentina holds assets and conducts transactions through its ministries, sub-ministries, and purportedly separate entities, a search for assets held in the name of such entities or for transactions conducted in the name of such entities or high-ranking government officials is both proper and necessary for the Subpoenas to be effective. Although Argentina criticizes the number of entities named in the Subpoenas, the length of the list is caused by the complex structure of the Argentine government, which could conduct transactions or hold assets in the name of any of its numerous constituent entities. And by limiting the Subpoenas to information that can easily be searched through the Banks' compliance computer systems, NML has ensured that the Banks' burden in responding to the Subpoenas will be minimal, even with the more complete list of entities included in NML's current subpoenas.

Nor is there any merit to Argentina's objections to discovery regarding purportedly separate entities or transactions conducted in the name of the president—objections that also were rejected in the 2011 Discovery Order. *Compare* Reed Decl. Ex. D (Argentina's brief) at 7-11 *with* Reed Decl. Ex. E (8/30/11 Tr.) at 42:6-20. As NML established in connection with the 2011 Discovery Order, and as NML's judgment enforcement history shows, Argentina holds assets and conducts business through entities that it holds out as being separate. For example, according to BNA's website, its "principal objective is to act as financial agent for [Argentina]. In this capacity, it accepts official deposits and makes payments for account and by

order of [Argentina]."  Reed Decl. Ex. L.  BNA was the trustee of the Banco Hipotecario Trust

Account, and it held the ANPCT Account for Argentine.  Discovery with respect to purportedly

separate entities such as BNA thus is essential to finding assets that belong to Argentina, which

are being held by those entities.  *See also Aurelius Capital Partners, LP v. Republic of*

*Argentina*, 2009 WL 755231 (S.D.N.Y. Mar. 12, 2009) (holding *Administración Nacional de la*

*Seguridad Social* liable under *Garb v. Republic of Poland*, 440 F.3d 579 (2d Cir.2006)); *EM Ltd.*

*v. Republic of Argentina*, 720 F. Supp. 2d 273 (S.D.N.Y. 2009) (holding that Banco Central de la

Republic Argentina ("BCRA") is an alter ego of Argentina).[5]

## II.     Argentina's Immunity Objections Are Meritless.

### A.     Immunity Is Irrelevant To Post-Judgment Asset Discovery.

Both the Second Circuit and this Court have already held that post-judgment asset

discovery does not implicate any immunity from attachment and execution.  Argentina cannot

avoid this binding precedent by framing its objections in terms of military and diplomatic

property.[6]  To the contrary, each of the reasons why the Second Circuit affirmed the 2011

Discovery Order demonstrates why Argentina's immunity arguments are devoid of merit.

First, the Second Circuit held that asset discovery is permissible, regardless of whether an

asset might be immune from execution.  "[T]he district court's power to order discovery to

---

[5]     Although Argentina seeks to mischaracterize the Second Circuit as having held that
        BCRA's property cannot be attached, in fact the Second Circuit did not disturb this
        Court's alter ego ruling, and it held that NML could overcome BCRA's immunity in the
        future by "demonstrating with specificity that the funds are not being used for central
        banking functions as such functions are normally understood, irrespective of their
        'commercial' nature."  *NML Capital, Ltd. v. Banco Central de la Republica Argentina*,
        652 F.3d 172, 194 (2d Cir. 2011).

[6]     Argentina also attempts to "preserve" the arguments in its unsuccessful Second Circuit
        brief by repeating them in Section II(C).  Argentina acknowledges—as it must—that
        these arguments have already been rejected (*see* Def. Memo at 18), and thus Section II(C)
        is immaterial to the resolution of this motion.

enforce its judgment does not derive from its ultimate ability to attach the property in question but from its power to conduct supplementary proceedings, involving persons indisputably within its jurisdiction, to enforce valid judgments." *EM Ltd.*, 695 F.3d at 208.  This principle is confirmed by the fact that post-judgment asset discovery is worldwide in nature—and thus necessarily may reveal assets that cannot be executed upon in domestic judgment enforcement proceedings.  *See id.* at 207-08 ("[I]n a run-of-the-mill execution proceeding, we have no doubt that the district court would have been within its discretion to order the discovery from third-party banks about the judgment debtor's assets located outside the United States."); *Rafidain II*, 281 F.3d at 54 (holding that judgment creditors are entitled to discovery regarding assets "wherever located" (internal citations omitted)).

Second, Argentina has unambiguously and broadly waived its sovereign immunity.  In the bonds underlying NML's judgments, Argentina pledged that:

> To the extent the Republic or any of its revenues, assets or properties shall be entitled . . . to any immunity from suit . . . from attachment prior to judgment . . . from execution of a judgment or from any other legal or judicial process or remedy . . . the Republic has irrevocably agreed not to claim and has irrevocably waived such immunity to the fullest extent permitted by the laws of such jurisdiction (and consents generally for the purposes of the Foreign Sovereign Immunities Act to the giving of any relief or the issue of any process in connection with any Related Proceeding or Related Judgment).

Reed Decl. Ex. M (Fiscal Agency Agreement) at 52.  This waiver subjects Argentina to discovery like any other party.  *EM Ltd.*, 695 F.3d at 210.  It is for each jurisdiction in which Argentine assets are located—not this Court at the discovery stage—to determine whether to enforce Argentina's broad waiver of immunity with respect to those assets.  *Id.* at 209 ("Whether a particular sovereign asset is immune from attachment must be determined separately under the FSIA, but this determination does not affect discovery."); Reed Decl. Ex. E (8/30/11 Tr.) at 42:7-

12 ("And I think that at least what the Court realizes now is that the Republic, through various entities, can very well be engaged in commercial activities in various places or activity which might involve attachable assets on some other theory in a foreign country.").

Finally, immunity is not implicated at all when discovery is sought from a non-party, rather than from the sovereign itself, because such discovery places no burden on a sovereign. *EM Ltd.*, 695 F.3d at 210.  Like the 2010 bank subpoenas, NML's current Subpoenas are directed to non-party banks in New York, not to Argentina itself.

> **B.**    **Property Held In The Name Of Defense And Foreign Affairs Ministries Is Not Categorically Immune From Execution Or Discovery.**

Even if issues of immunity were relevant considerations on a motion to quash a non-party subpoena—and as the Second Circuit has held, they are not—the Subpoenas are proper because property held in the name of defense and foreign affairs ministries is not categorically immune from attachment and execution.  Moreover, blocking discovery into property held by foreign affairs and defense ministries will only encourage judgment-evading foreign states like Argentina to try to shield their commercial transactions abroad by conducting their business through such ministries.

Property held by military agencies is not immune from attachment and execution unless it is of a military character or used for a military purpose.  *See*, *e.g.*, 28 U.S.C. § 1611(b)(2)(B) (immunizing property only if it is both "under the control of a military authority or defense agency" and "used in connection with a military activity").  The authorities cited by Argentina focus on the nature and use of property upon which execution is sought, not on the mere fact that the property is held in the name of a defense ministry.  *See*, *e.g.*, *Colella v. Republic of Argentina*, 2007 WL 1545204, at *7 (N.D. Cal. May 29, 2007) (holding that plane was immune because "[t]he transportation of military officials qualifies property as being 'of military

character'"). This is precisely the type of asset-specific immunity inquiry that the Second Circuit held is irrelevant to questions of discovery. *EM Ltd.*, 695 F.3d at 209 ("Whether a particular sovereign asset is immune from attachment must be determined separately under the FSIA, but this determination does not affect discovery.").

Nor is there any authority suggesting that property held by a foreign affairs ministry is absolutely immune from execution, let alone discovery. Argentina's cases relating to the Vienna Convention restrict process directed to embassies and missions—not discovery relating to assets held in the name of a foreign affairs ministry. *See, e.g., 767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to United Nations*, 988 F.2d 295 (2d Cir. 1993) (blocking eviction of mission); *Avelar v. J. Cotoia Const., Inc.*, 2011 WL 5245206, at *4 (E.D.N.Y. Nov. 2, 2011) (vacating execution on mission assets). Moreover, these restrictions are limited to discovery sought directly from an embassy's personnel or archives. *See, e.g., Liberian E. Timber Corp. v. Gov't of Republic of Liberia*, 659 F.Supp. 606, 610 n.5 (D.D.C. 1987 (noting that a mission's archives and personnel are not subject to discovery); *Vulcan Iron Works, Inc. v. Polish Am. Mach. Corp.*, 472 F. Supp. 77, 79-80 (S.D.N.Y. 1979) (same). Argentina's cases are inapposite here because the Subpoenas do not identify a single embassy or mission as an entity whose records should be searched, let alone seek discovery directly from an embassy or mission.[7]

The principle that Argentina seeks to establish—that a court should quash an asset discovery subpoena if it is theoretically possible that some responsive documents might relate to immune military or diplomatic property—is directly contrary to the principle established by the

---

[7]     There remains an open question in many jurisdictions as to whether Argentina has waived any immunity that its missions and embassies may enjoy. For example, NML and Argentina are currently litigating the issue in Belgium, where an appellate court is considering whether to allow NML to execute upon bank accounts purportedly used for diplomatic purposes.

Second Circuit that issues of immunity are irrelevant to discovery.  If the Court were to adopt

Argentina's theory, it would provide Argentina with a roadmap for continuing to evade NML's

judgment enforcement efforts: Argentina could simply conduct commercial transactions abroad

in the name of its defense and foreign affairs ministries, and then seek to block discovery into

such transactions using the arguments it has asserted in this motion.  Argentina would transform

its foreign affairs and defense ministries into a black box through which it could channel and

hide asserts.  There is no basis in law or equity for such a result, and this Court should instead

follow the Second Circuit's binding ruling that immunity is not a relevant consideration with

respect to post-judgment discovery.

## CONCLUSION

For the foregoing reasons, NML respectfully requests that Argentina's motion to quash

be denied.

Dated: New York, NY
      June 26, 2013

| | |
|---|---|
| HOFFNER PLLC | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
| By:  /s/ *David S. Hoffner*<br>David S. Hoffner<br>(hoffner@hoffnerpllc.com)<br>325 Broadway, Suite 505<br>New York, NY 10007<br>Tel.: (917) 881-1039<br>Fax: (646) 810-4031 | By:  /s/ *Kevin S. Reed*<br>Kevin S. Reed<br>(kevinreed@quinnemanuel.com)<br>51 Madison Avenue, 22nd Floor<br>New York, New York 10010<br>Tel.: (212) 849-7000<br>Fax: (212) 849-7100 |
| *Attorneys for Plaintiff NML Capital, Ltd. with respect to subpoenas served on BNP Paribas & BNP Paribas Fortis* | *Attorneys for Plaintiff NML Capital, Ltd. with respect to all subpoenas except those served on BNP Paribas & BNP Paribas Fortis* |