UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                                  :

NML CAPITAL, LTD.,                     :   08 Civ. 6978 (TPG)
                                  :   09 Civ. 1707 (TPG)
       Plaintiff,          :   09 Civ. 1708 (TPG)
                                  :

v.                                 :

THE REPUBLIC OF ARGENTINA,    :
                                  :

       Defendant.       :

------------------------------------------------------- x

## DECLARATION OF ROBERT A. COHEN

Pursuant to 28 U.S.C. Section 1746, Robert A. Cohen declares as follows:

1.      I am an attorney duly admitted to practice before this Court. My firm, Dechert LLP, is counsel to plaintiff NML Capital, Ltd. ("**NML**").

2.      I respectfully submit this declaration in support of NML's Motion to Hold the Republic of Argentina ("Argentina") in Contempt and its Motion for Expedited Discovery from the Republic of Argentina, as well as to place before the Court certain documents.

3.      Attached hereto as Exhibit A is a true and correct copy of the Court's Amended February 23, 2012 Order dated November 21, 2012 granting NML's motion for equitable relief as a remedy for violations of the 1994 Fiscal Agency Agreement.

4.      Attached hereto as Exhibit B is a true and correct copy of the transcript of a speech given on June 25, 2014 by Argentina's Economy Minister Axel Kiciloff before the United Nations.

1

5.      Attached hereto as Exhibit C is a true and correct copy of and a certified translation of an official communiqué from the Argentina government dated June 26, 2014.

6.      Attached hereto as Exhibit D is a true and correct copy of a Spanish language document entitled "*Tenedores De Deuda Argentina*" available at *http://www.presidencia.gov.ar/* along with a summary of the document from Bloomberg News.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, New York on June 27, 2014.

Robert A. Cohen

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x
                            :

NML CAPITAL, LTD.,
                            :

                 Plaintiff,      :

          – against –         :

REPUBLIC OF ARGENTINA,
                            :

                Defendants.   :

------------------------------------------------x

**ORDER**

08 Civ. 6978 (TPG)
09 Civ. 1707 (TPG)
09 Civ. 1708 (TPG)

## AMENDED FEBRUARY 23, 2012 ORDER

WHEREAS, in an Order dated December 7, 2011, this Court found that, under Paragraph 1(c) of the 1994 Fiscal Agency Agreement ("FAA"), the Republic is "required . . . at all times to rank its payment obligations pursuant to NML's Bonds at least equally with all the Republic's other present and future unsecured and unsubordinated External Indebtedness."

WHEREAS, in its December 7, 2011 Order, this Court granted partial summary judgment to NML on its claim that the Republic repeatedly has breached, and continues to breach, its obligations under Paragraph 1(c) of the FAA by, among other things, "ma[king] payments currently due under the Exchange Bonds, while persisting in its refusal to satisfy its payment obligations currently due under NML's Bonds."

1

And WHEREAS NML Capital, Ltd. ("NML") has filed a renewed motion for equitable relief as a remedy for such violations pursuant to Rule 65(d) of the Federal Rules of Civil Procedure and the Court's inherent equitable powers.

Upon consideration of NML's renewed motion, the response of the Republic of Argentina (the "Republic") thereto, NML's reply, and all other arguments submitted to the Court in the parties' papers and at oral argument, it is HEREBY ORDERED that:

1.    It is DECLARED, ADJUDGED, and DECREED that NML is irreparably harmed by and has no adequate remedy at law for the Republic's ongoing violations of Paragraph 1(c) of the FAA, and that the equities and public interest strongly support issuance of equitable relief to prevent the Republic from further violating Paragraph 1(c) of the FAA, in that:

    a.  Absent equitable relief, NML would suffer irreparable harm because the Republic's payment obligations to NML would remain debased of their contractually-guaranteed status, and NML would never be restored to the position it was promised that it would hold relative to other creditors in the event of default.

    b.  There is no adequate remedy at law for the Republic's ongoing violations of Paragraph 1(c) of the FAA because the Republic has made clear – indeed, it has codified in Law 26,017 and Law

26,547 – its intention to defy any money judgment issued by
this Court.

c.  The balance of the equities strongly supports this Order in light
of the clear text of Paragraph 1(c) of the FAA and the Republic's
repeated failures to make required payments to NML.  In the
absence of the equitable relief provided by this Order, the
Republic will continue to violate Paragraph 1(c) with impunity,
thus subjecting NML to harm.  On the other hand, the Order
requires of the Republic only that which it promised NML and
similarly situated creditors to induce those creditors to
purchase the Republic's bonds.  Because the Republic has the
financial wherewithal to meet its commitment of providing equal
treatment to both NML (and similarly situated creditors) and
those owed under the terms of the Exchange Bonds, it is
equitable to require it to do so.  Indeed, equitable relief is
particularly appropriate here, given that the Republic has
engaged in an unprecedented, systematic scheme of making
payments on other external indebtedness, after repudiating its
payment obligations to NML, in direct violation of its
contractual commitment set forth in Paragraph 1(c) of the FAA.

d.  The public interest of enforcing contracts and upholding the
rule of law will be served by the issuance of this Order,
particularly here, where creditors of the Republic have no

3

recourse to bankruptcy regimes to protect their interests and must rely upon courts to enforce contractual promises.  No less than any other entity entering into a commercial transaction, there is a strong public interest in holding the Republic to its contractual obligations.

2.     The Republic accordingly is permanently ORDERED to specifically perform its obligations to NML under Paragraph 1(c) of the FAA as follows:

    a.  Whenever the Republic pays any amount due under terms of the bonds or other obligations issued pursuant to the Republic's 2005 or 2010 Exchange Offers, or any subsequent exchange of or substitution for the 2005 and 2010 Exchange Offers that may occur in the future (collectively, the "Exchange Bonds"), the Republic shall concurrently or in advance make a "Ratable Payment" to NML (as defined below and as further defined in the Court's Opinion of November 21, 2012).

    b.  Such "Ratable Payment" that the Republic is ORDERED to make to NML shall be an amount equal to the "Payment Percentage" (as defined below) multiplied by the total amount currently due to NML in respect of the bonds at issue in these cases (08 Civ. 6978, 09 Civ. 1707, and 09 Civ. 1708), including pre-judgment interest (the "NML Bonds").

    c.  Such "Payment Percentage" shall be the fraction calculated by dividing the amount actually paid or which the Republic

4

intends to pay under the terms of the Exchange Bonds by the total amount then due under the terms of the Exchange Bonds.

d.   The Republic is ENJOINED from violating Paragraph 1(c) of the FAA, including by making any payment under the terms of the Exchange Bonds without complying with its obligation pursuant to Paragraph 1(c) of the FAA by concurrently or in advance making a Ratable Payment to NML.

e.   Within three (3) days of the issuance of this ORDER, the Republic shall provide copies of this ORDER to all participants in the payment process of the Exchange Bonds ("Participants"). Such Participants shall be bound by the terms of this ORDER as provided by Rule 65(d)(2) and prohibited from aiding and abetting any violation of this ORDER, including any further violation by the Republic of its obligations under Paragraph 1(c) of the FAA, such as any effort to make payments under the terms of the Exchange Bonds without also concurrently or in advance making a Ratable Payment to NML.

f.   "Participants" refer to those persons and entities who act in active concert or participation with the Republic, to assist the Republic in fulfilling its payment obligations under the Exchange Bonds, including:  (1) the indenture trustees and/or registrars under the Exchange Bonds (including but not limited to The Bank of New York Mellon f/k/a/ The Bank of New York);

(2) the registered owners of the Exchange Bonds and nominees of the depositaries for the Exchange Bonds (including but not limited to Cede & Co. and The Bank of New York Depositary (Nominees) Limited) and any institutions which act as nominees;  (3) the clearing corporations and systems, depositaries, operators of clearing systems, and settlement agents for the Exchange Bonds (including but not limited to the Depository Trust Company, Clearstream Banking S.A., Euroclear Bank S.A./N.V. and the Euroclear System);  (4) trustee paying agents and transfer agents for the Exchange Bonds (including but not limited to The Bank of New York (Luxembourg) S.A. and The Bank of New York Mellon (including but not limited to the Bank of New York Mellon (London));  and (5) attorneys and other agents engaged by any of the foregoing or the Republic in connection with their obligations under the Exchange Bonds.

g.  Nothing in this ORDER shall be construed to extend to the conduct or actions of a third party acting solely in its capacity as an "intermediary bank," under Article 4A of the U.C.C. and N.Y.C.L.S. U.C.C. § 4-A-104, implementing a funds transfer in connection with the Exchange Bonds.

h.  Any non-party that has received proper notice of this ORDER, pursuant to Rule 65(d)(2), and that requires clarification as to

6

its duties, if any, under this ORDR may make an application to this Court, with notice to the Republic and NML.  Such clarification will be promptly provided.

    i.  Concurrently or in advance of making a payment on the Exchange Bonds, the Republic shall certify to the Court and give notice of this certification to its Participants, and to counsel for NML, that the Republic has satisfied its obligations under this ORDER to make a Ratable Payment to NML.

3.    NML shall be entitled to discovery to confirm the timing and amounts of the Republic's payments under the terms of the Exchange Bonds; the amounts the Republic owes on these and other obligations; and such other information as appropriate to confirm compliance with this ORDER;

4.    The Republic is permanently PROHIBITED from taking action to evade the directives of this ORDER, render it ineffective, or to take any steps to diminish the Court's ability to supervise compliance with the ORDER, including, but not limited to, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without obtaining prior approval by the Court;

5.    This Court shall retain jurisdiction to monitor and enforce this ORDER, and to modify and amend it as justice requires to achieve its equitable purposes and to account for changing circumstances.

Dated:  New York, New York
        November, 21 2012

*[signature: Thomas P. Griesa]*

                    Thomas P. Griesa
                    U.S. District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
#:
DATE FILED: 11/21/12

8

# EXHIBIT B

**STENOGRAPHERS**
Office of the Nation's President

1

<u>06/25/2014</u>

<u>PRESS CONFERENCE BY ARGENTINE CHANCELLOR HÉCTOR TIMERMAN AND
MINISTER OF THE ECONOMY AXEL KICILLOF FROM THE UN HEADQUARTERS
IN NEW YORK, UNITED STATES</u>

TIMERMAN: Good afternoon everyone, today — at the invitation of the G-77 plus China
— we have participated in an important meeting, attended by over 90 countries, in
which we set forth the recent developments regarding the restructured and non-
restructured debt held by Argentina, and the G-77 has decided by consensus to submit
a letter to Judge Griesa and the Supreme Court expressing concern about recent
decisions and also requesting that the opportunity for fair and balanced negotiations be
granted to both parties.

So we take it as a huge gesture of solidarity from over 134 countries who make up the
G-77 plus China, and as one more reason to keep working on finding a just solution to
this issue, which we believe is an extremely serious issue not only for Argentina, but
also for the entire international financial system.

KICILLOF: Thank you. We have in fact made quite a comprehensive presentation
regarding the issue of Argentina's sovereign debt and its restructuring, and we truly and
greatly appreciate the opportunity the G-77 has given us — through his presidency — in
inviting us to make this presentation before a group which, as the Chancellor has
recently said, represents the 193 countries of the United Nations; the G-77 plus China
Group represents 134. We are extremely pleased and gratified to see that our country's
position has been understood; the urgency of the present moment has also been
understood and this has then been accompanied by a note that will in fact be sent to the
judge hearing the case, to the US Justice system, as well as to the US government,
indicating that what is at stake does not only concern Argentina, this is a position of the
G-77, it has worldwide and systemic implications.

You will understand that the claim that Judge Griesa considered represents
approximately one percent of creditors holding Argentina private debt, which fell into
default in 2001. Of this debt, 92.4% was successfully and voluntarily restructured. In
other words, of the 81 billion dollars in default in 2001, 92.4 percent voluntarily accepted
Argentina's restructuring. Since then, Argentina has paid every last cent of its
restructured commitments. We are now in a position to say that the claims of the Paris
Club member countries have also been resolved, and that compensation for the
recovery of 51 percent of the Argentine oil company YPF from Repsol has also been
resolved completely amicably. International lending institutions have also been paid in

full without any breach and the full payment has been made, and Argentina now owes no debt to the International Monetary Fund. This has all been done using a very complex, difficult path and I would say, from a financial standpoint, with great sacrifice, since it was done without access to financial markets. Since 2003, when President Néstor Kirchner assumed the presidency and now under President Cristina Fernandez de Kirchner, all steps necessary to complete the restructuring have been taken after one of the largest defaults in history. This path is obviously complex and has taken a lot of work, and it troubles us deeply to see how a tiny group of creditors, who did not accept the restructuring and did not do so because they assumed the debt after the restructuring in order to litigate, [now] claim one hundred percent of the debts.

What this ruling by Judge Griesa says, and which is final, is that all of these claims simply have to be paid, at the next maturity date, which occurs on the 30th, which is Monday. We are ready — and this has to be crystal clear — to negotiate in good faith but we have asked the court to grant a suspension, a stay, so that in three days we do not have to resolve what would amount to payments of 1.5 billion dollars, according to the judgment, but which could soon result in a payment of 15 billion dollars on claims by holders of similar bonds, with proceedings pending, and thereafter on claims of approximately 120 billion dollars more under the Rufo clause. This obviously puts the country's economy at the risk of foreclosure and that is why we have requested that negotiating conditions be fair and balanced and account for the interests of one hundred percent of bondholders instead of a small portion. We have had no response to this request to date, and we are therefore awaiting that answer because otherwise the negotiations are being carried out under very difficult conditions.

JOURNALIST: I have three questions. Is Argentina negotiating with all the holdouts or only those mentioned in this judgment? What proposal has Argentina made to Pollack today and you are planning to [handle] all holdouts in the same way you paid Repsol, with bonds?

KICILLOF: Thank you for the question. I repeat categorically that Argentina made a request to the judge to create a legal umbrella that would allow for negotiations. Otherwise it would obviously not be possible to take all factors into account, all the risks involved in any decision made by the Republic of Argentina, in such a short time. All we have heard for now is Judge Griesa's silence; we are also aware of the vulture funds' public declaration that they do not agree to a stay of the judgment's implementation and we have nothing to add in that regard.

JOURNALIST: Thank you. I wanted to ask about one of the things that has been talked about a lot, which is for all of these payments and any payment structure implemented to take place under Argentine law. So far, the vulture funds are trying to have it be under United States law. How is this going to be handled? We know that an agreement could be reached and the judge might be considering that there may be a possibility for

**STENOGRAPHERS**
Office of the Nation's President

3

some kind of hybrid in which there could be the possibility for Argentina to make these payments under the laws of its own country?

KICILLOF: I can't respond to hypotheticals, but I can say that we have heard today, but also from all those who were on Argentina's side during the litigation, who gave considered opinions, for example today Mr. Wolfe in the *Financial Times*, and also numerous newspapers, including from the US, and countries like France, Mexico, and Brazil; today this has become a truly overwhelming number of countries because 133 countries plus China are going to express their concern regarding the consequences of this ruling.

Just to give you an idea, let me just read part of the brief submitted by the U.S. government itself to the Second Circuit Court of Appeals which says, "sovereign debt restructuring will become substantially more difficult, if not impossible (this was before the ruling was made), if those who do not participate in them are allowed novel interpretations of standard clauses in bond contracts in order to interfere with the implementation of a restructuring plan accepted by the majority of creditors, and this drastically decreases the incentives for consensual and negotiated restructuring in the first place."

That is why we are asking for a stay, so that these decisions can be made in consideration of the positions of other countries who would be affected by what Argentina decides. We have been very clear on this point: if Argentina pays the entirety of or any amount above what was agreed to in the restructuring, the Rufo clause, which is in force, probably comes into play. This tells bondholders who have signed contracts with us — I'm thinking of the Republic of Argentina's exchange bonds — it tells them clearly that Argentina cannot make offers higher than what has already been agreed. The difficulty of this would be that those who accepted the restructuring request the same treatment as those who have gone through the courts.

And I would like to mention two issues: those who lent to Argentina, not the holdouts and vultures, did so at interest rates that are 600 or 700 basis points above what was customary in US debt; many analysts have noted that if they took on debt at a much deeper discount, at a much higher premium, much higher interest rates, they did so knowing there was a risk of default. That risk unfortunately became real, but what would happen if all those who held debts under these conditions did not have to go through restructuring, but could instead go to court and claim the entire debt? Would you be able to charge the difference in interest on a US sovereign bond if the probability of recovery eventually reached one hundred percent? Because we all know that risk is directly linked to yield on a financial asset, but what if there is no risk? And by the same token, could we say that if 92.4 percent of bondholders accept certain conditions, can

the rest reject them and still get paid on the total debt, putting all efforts made by the country in a complex situation? I want to make this clear: the Argentine government — which I am a member — is not the one that took on the debt. There is of course legal continuity within the State, but we were not the ones who took on the debt. Instead, when this debt was taken on, which it turned out could not be repaid, there was support from a great many international lending organizations saying there would be no problem. This government is also not the one that defaulted, but it is the government that restructured all these liabilities with 93 percent approval and absolutely met all its commitments in amounts in excess of 190 billion dollars. And now we find that there is the risk if we pay such bondholders and vulture funds as stated in Griesa's ruling, and I call them vulture funds because the securities have been purchased at low prices for a 1,600 percent profit, and have never been open to negotiation. Otherwise, they would have participated in the restructuring and in all of the rounds of consultation that occurred prior to the restructuring. This was successful because of the preceding negotiations. Argentina *does* negotiate, and does so in good faith, and pays and intends to pay, but is not allowed to do so; this is the situation we are in today.

JOURNALIST: (...) the holdout creditors have investments in other G-77. Could these follow the same trend? Do you think it is necessary to have an IMF-type reform regarding bankruptcies and corporations who take advantage of this?

KICILLOF: We know of public documents that reference not the future problems, but the past experiences of these funds, or neighboring funds that have been attacked. Recently this was clearly stated by the representative of Peru, in the case of that country, but there are many cases that have reported this kind of activity, in a way that without a doubt—and even more so with a favorable ruling, as in fact has been obtained, and which was the concern of everyone who, before knowing the ruling, spoke of the systemic risks involved, but as the U.S. government itself said at the time, as did the IMF in April 2013, "the rulings that go against Argentina, if confirmed, are likely to grant great relative power to the holdouts that will make the restructuring processes more difficult." This relatively greater power already exists and is affecting, unfavorably at this time, the Republic of Argentina.

In addition, the question is accurate and it is strange because we are wondering whether the sovereign nations and peoples we represent may not have at least the same rights as private companies. If 66 percent of the creditors agree to the restructuring, the rest are obligated to accept it. They cannot continue to litigate forever to get the total amount of the debt and that is an issue that is obviously scary and that I am posing as a question.

JOURNALIST: There were rumors about your visit today and the possibility of a meeting between the representatives of the Argentine government, the Cleare [sic] lawyers, and the representatives of the holdouts. I would like to know if these meetings occurred and

if they did, what is the upshot? The second question is about the joint statement by the G-77, which was discussed today. Many of its members who spoke had tough words regarding the holdouts—"international looting," blackmail and extortion were mentioned. I was present at the hearing with Judge Griesa last Wednesday, with both parties, where President Cristina Fernández' speech was analyzed in great detail, and even one of your speeches too, where it was ultimately counterproductive. Do you fear that the terms that were used today may affect the negotiations in terms of the request made by the Argentine government for a stay, meaning that Judge Greisa may take up these words, these adjectives that were used here today, and that we might have a situation similar to last week? This stampede of which you speak, by which perhaps other holdouts might also claim money, and per the Rufo clause, that other bondholders may also do this, is this a fact or is it speculation, and what could be done if it were to happen?

KICILLOF: First, yes I had a meeting with our lawyers. As we said earlier, we have not met either with representatives of the Court or with the claimants. So ... But that meeting with the lawyers was really nothing special, they are lawyers of the Republic of Argentina. Yesterday I had three phone conversations with them in Argentina and I imagine that when I return I will communicate with them again. Some representatives of our government are also communicating with them permanently because they are our advisors. Therefore, I have nothing to disclose other than what is a regular relationship with our lawyers. Second, what I can say regarding the presentation that both Chancellor Timerman and I have made here: it was public and I believe it was also televised in Argentina; we have referred to this problem in the same terms that we have using consistently and we have referred mainly to what we are asking the Judge—which we have also made public. But we have made it public by publishing a letter on the Court's website requesting he issue a stay of the ruling so that at the very least we are able to negotiate under less stressful conditions than having a maturity date on Monday. Today as well, as I have done on other occasions and as our President has said, we pointed out the alternatives, all of which we have already evaluated and presented to the Judge publicly through a request that has been published in media around the world in order to show the situation that Argentina has been placed in. And today we have stressed this because we emphasized that it is not Argentina's problem, and what I think is key, these are not the expressions and the mood of one judge. At least to me, that is not the concern. Because it would be difficult to see Argentina placed at risk of default, as we have said, and to say that was due to the mood of one person. I think that should not be the case. Of course harsh language has been used, which is the province of the other countries, and the reaction of the court to that language is the province of the Judge; I cannot anticipate, I ignore it, and I do not think it is the determining factor in a matter of such magnitude as this. Not because the Argentine Republic intends to play the victim or exaggerate. Today we heard representatives from many countries express

themselves, talking about the global implications, the consequences for them, the consequences for the international financial system, and they do so today in the specialized press, and countries, organizations, experts do so before the courts as friends of Argentina. So, I think that an approach that has as its central axis [someone's] mood, I think that to be off-base, because it doesn't go to the crux of the matter. Because in addition, not only did Judge Griesa rule, and this is a central issue, the G-77 must also address its letter to the Government of the United States because, it was Judge Griesa, confirmed by the Second Circuit, then it was rejected by the Supreme Court. So, we're talking about another dimension of the ruling. And finally, the question of the stampede of the holdouts, as it was recently called by a journalist: they would be in the same condition as NML and the other funds, but also as the bondholders who accepted the restructuring. I've heard opinions about whether this falls within or outside the Rufo clause, I have found that this is new, since it is a legal question this issue is subject to interpretation. What I clearly remember is that when what was at issue was this novel interpretation of *pari passu*, the US government said it used novel interpretations of standard clauses such as *pari passu*, all experts opined that the judge and then the Second Circuit and finally the [Supreme] Court would not apply this unfavorable and complicated novel interpretation, not only for the Argentine Republic exclusively, because the emphasis there is on the entire global financial system. I repeat this so that everyone understands it: 93 percent agreed, 92.4. The remainder are claiming, and that is what this ruling says, that we must pay the total they are claiming on the next date payment is made on the maturities of those who agreed to [the swap]. It's a novel interpretation at the very least. So what can we also expect from the interpretation of the Rufo clause? Thus, again, it is a matter of case law ... and also of American case law because it must remain clear that Argentina has commitments to its own judicial system and to that which it has signed, which are contracts with the bondholders who joined the restructuring.

TIMERMAN: Regarding the speeches that were heard today in the G-77, it is important to recognize that they represent the voice of the majority of countries in the world and the solidarity that they have expressed, and the concern expressed by all the countries [they] have spoken on behalf of the G-77. It shows the need for Justice to act, Justice here in New York, multilateral agencies, listen to the voice of the majority of the world. And that is why I believe it is important for Argentina to have come before the G-77 to put forward the case of our debt and hear from our peers their opinion that, as you said, has been very, very direct in its support for the Argentine Republic, because it is a fact that what is happening in the Argentine Republic has affected other countries, and if there is no change, if the system in which we are immersed does not change, it will surely affect the development of nations and security in the future.

JOURNALIST: I wonder if you have met today with any of the holdouts or with the legal group that is representing the holdouts. But do you plan on meeting with them before returning to Argentina? Second, are you still trying to achieve a plan to exchange the US and New York bonds for Argentine bonds?

**STENOGRAPHERS**
Office of the Nation's President

7

KICILLOF: First question, no, I have no plan to have meetings before leaving. And this is due to many factors: the first is that we have legal representation here in New York that is in communication with the court and the lawyers for the other party if necessary. Second, because I was invited to a very timely meeting of the G-77, which turned out to be even more timely if you listen, as the Chancellor said, and most of the world is in solidarity with Argentina and is asking the judge and the US Government to facilitate fair and equitable negotiating conditions. So the meeting has borne fruit, but in a few minutes I'm going back to Buenos Aires. And with respect to hypotheses about what will happen, I'll go back to that point because Argentina has made a presentation that was public, that has also been accompanied by a request published in the major US and international newspapers, asking the judge to grant conditions for Argentina to engage in negotiations. I repeat: three working days are left for us to implement a judgment that places Argentina in the risky situation I have described. Thus, in three days, with the importance that has for Argentina, and I now add the fact that I understand that this negotiation cannot overlook third parties either. Because today we heard the voices of the countries who have told us, and who are our counterparts, that we must not jeopardize the system, do not jeopardize the system, and Argentina has heard those voices. As for whatever may happen, I can say that we will evaluate it according to our legal obligations. Argentina will evaluate any event—and there have been many—in keeping with our legal obligations.

JOURNALIST: Minister, there is a very fine line between what you ask for as a fair and reasonable negotiation and what the vulture funds have, [which is] a judgment by which Griesa granted them 100 percent. Where along that line is there room for negotiation? What do you think? Because it seems the two positions are clear. That's the first question. And the second is: what do you think of the appointment of a mediator, is that a positive step? Have you had positive feedback from the Cleary attorneys on that?

KICILLOF: I think everyone can agree by simply applying common sense. First, one percent, or for that matter, 0.1 percent, cannot demolish what one country has built together with virtually 93 percent of its creditors, this is common sense—or even jeopardize it. Second, in the context of fair and balanced, and taking into account 100 percent of the bondholders, we add one factor—and we have mentioned in the letter to Griesa—and that is time. When I read the letter from representatives of NML or Elliott, saying they did not want us to be granted a stay. Because we have requested a stay that would give a reasonable amount of time in which all the complexity noted earlier can find its proper course. A course that, as in all negotiations, is not coercive, but rather is best for both parties, because otherwise it is not a negotiation, otherwise it is

not a dialogue, but instead an imposition. Therefore, the first factor, which is common sense, is time. Without time, we would find it odd that we could resolve any part of this complexity that affects, at least, the 134 countries with which we spoke today. They all seemed very moved, very touched, and above and beyond their concern and the way they related to the situation, they talked about the material implications this has and about its systemic implications. So it is difficult to imagine how this can be resolved in three days. And the judge needs to understand this, and he obviously needs to understand this, because it helps us, I believe—I'm no expert on US law, but at least we have common sense on our side, the reasonableness of our position. I have no assessment of it. I think Argentina has requested certain conditions, the President has said so, she has instructed me to submit a letter, we have submitted a letter to request adequate conditions. Then we'll see how those talks go forward. That's why I said there will be new developments, and Argentina, which has not yet seen them—I cannot give answers today based on speculation—but we are indeed ready to assess any alternative. However, we will do so in light of our legal obligations. Everything within the law, everything; outside of it, well ...

JOURNALIST: First, if you can confirm, today Mr. Pollack announced that there was a meeting between the parties, if you can confirm that meeting. And if we can find out something about the meeting, whether there was any progress considering that time is very short.

KICILLOF: Yes, I understand Mr. Pollack spoke of confidentiality, not about the content. I will not refute Mr. Pollack, I did not participate in any meeting. The judge did indeed give a public order that the parties must be subject to the pace that Pollack wants to set, and we are not about to refuse to cooperate, because Argentina negotiates in good faith. But we obviously need equitable conditions for everyone, fair, legal [conditions], time in order to undertake something so complex ... Therefore, because perhaps, using a narrow view of whether we pay or fail to pay this or that amount in this or that way, you look at and observe that narrow financial test tube where it might seem that we have to negotiate as if we were merely two private parties in conflict over a simple contract. But this, as we have seen, affects what we are discussing here, it also affects the other bondholders who are in the same condition as all the others, and today we discovered what we already knew, but saw it confirmed by the countries themselves, [it affects] all other countries, the international financial system. So all this complexity cannot be overlooked, cannot be ignored because we are going to make a mistake, all parties will make a mistake. We have responsibilities and have asked the judge to let us fulfill them. Thank you.

# EXHIBIT C

**OFFICIAL PRESS RELEASE FROM THE ARGENTINE GOVERNMENT**

**ARGENTINA IS PAYING**

The Argentine Republic, in compliance with the Prospectus and with the contract in force with the bondholders who voluntarily entered into the debt swap during the 2005-2010 period, has proceeded to pay the service on the principal and interest of its bonds governed by foreign law, for the equivalent of 832 million dollars, of which 539 million dollars are deposited in Bank of New York Mellon (BONY) accounts number 15098 and 15002 at the *Banco Central* [Central Bank] of the Argentina Republic. Adding in the maturities in [Argentine] pesos, the payment made today exceeds one billion dollars.

On Monday, June 23, taking into account the imminence of the payment date on the maturities, Judge Griesa was asked to issue a stay of his ruling in order to allow a good-faith dialogue under equitable, just and legal conditions. The request was reiterated on this date. Today, June 26, following the indications contained in the contracts, is the final deadline for making the payment, since Friday is a holiday for the public sector and the payment must be made on the last business day prior to the maturity date. Failure to pay despite being in possession of the resources, and thereby forcing a voluntary default, is something that is not contemplated under Argentine law – it would be contrary to Argentine law and a clear violation of the Debt Prospectus.

This payment is being made by virtue of the sovereign decision of the Argentine Republic, which by this act confirms its steadfast and unrestricted willingness to comply, in order to honor its debts and to rule out any tendentious interpretation implied by the introduction of the euphemism "technical default" to attempt to characterize the capricious blocking of a payment by means of a court order without consideration of the debtor's willingness to meet its obligations.

In the view of the Argentine Republic, and that of any sovereign nation, payment means: depositing the funds in compliance with the obligations established in the Prospectus associated with the issuance of the bonds, and therefore represents the exercise of a right in a voluntary manner, without thereby intending to clash with other decisions emanating from a judicial authority that alter the contractual basis undersigned by a sovereign nation.

As international institutions and organizations will attest, together with analysts and specialists who have in fact even been critical of the country in specialized newspapers and journals at an international level, we are fully convinced that we will see through the successful process of voluntary debt restructuring with the participation of 92.4% of the bondholders. This conviction involves appealing to common sense and to regular and rational participation in debt resolution processes in which the rights of a clear and authentic majority cannot be undercut by the 1% of bondholders who, from a minority position, are skewering the collective efforts of the nation and of the Argentine people to honor their commitments, not to mention harming the interests and rights of the majority bondholders.

This sovereign decision by the Argentine Republic implies a warning to the United States regarding the consequences of its acts, given the international responsibility it bears for the decisions taken by its judicial branch; to the fiduciary agent, to the financial entities involved, to the litigators, and to Judge Thomas Griesa himself, with regard to future court actions that may allow us to legitimately enforce our rights as members of the international community, the Organization of American States (Article 61), the United Nations (Article 2 paragraphs 1 and 4), the Articles of Agreement of the International Monetary Fund (Article 4), before the International Court of Justice of The Hague as subjects of international law, and before courts of general jurisdiction in the Argentine Republic.

The execution of the payment in the time frame and manner necessary to meet, in a normal fashion, the obligations that derive from the Prospectus and its associated contracts, implies a warning that anyone disposing of the funds deposited in the fiduciary account would be undermining the rights of their true owners, who are none other than the bondholders who voluntarily joined the swap, and would profoundly alter the conditions set by the Prospectus; that would imply anything from misappropriation of third-party funds to the violation of agreed-upon rights to a breach of contract, as well as other legal figures that may derive.

The fact that the Prospectus has established an extension of jurisdiction in favor of United States law does not imply any acceptance of jurisdictional acts that are impossible to carry out, especially when considering that the ruling violates the principle of sovereign immunity that prevails in that nation as a rule of superior institutional hierarchy, and it furthermore interprets the principle of *pari passu* in a capricious and absurd manner. Compliance with a ruling cannot require a breach of assumed obligations.

Any conduct that seeks to hinder this payment to our creditors will constitute a violation of the provision of international public law that, by virtue of sovereign equality, forbids coercing other States. This provision is also in force in the United States.

It was equally absurd and illegitimate to have the *Fragata Libertad* vessel seized, as were the 900 legal actions filed in different venues and countries that furthered the unusual, perverse and extortive harassment by a minuscule group of creditors against a sovereign nation.

There is no doubt whatsoever about the Judge's bias in favor of the vulture funds, nor about his true intention: to try to push the Argentine Republic into a default in order to overturn the 2005-2010 restructuring that achieved consensus among 92.4% after long negotiations. The holdouts never wanted to participate in these negotiations, an attitude that

was reconfirmed even this last week in their unwavering opposition to the Argentine Republic's request for a stay in order to begin talks under just, equitable and legal conditions among 100% of our creditors.

But he cannot achieve his objective for one short and simple reason: the Argentine Republic will meet its obligations, it will pay its debt, it will honor its commitments as it has been doing, in order to put an end to the ploy of considering an absurd court ruling, with systemic effects at the international level, to be a "technical default." That is merely a sophisticated way of trying to force us to kneel down before world-class usurers.

The international support enjoyed by the Argentine Republic includes countries such as France, Mexico, Brazil as *amici curiae*; [this support] spans multilateral lending agencies to political organizations such as the G-77 plus China, which is made up of 133 countries; MERCOSUR and UNASUR; it includes over one hundred British Members of Parliament, whose country has been in conflict with our nation over matters of sovereignty; there are even international publications such as *Foreign Affairs* of the Council on Foreign Relations, analysts for specialized newspapers and journals, and academics of the most diverse schools of thought.

It is clear that this support signifies recognition of the logical and just nature of our claims and of and the negative systemic effects of these wrong-headed and unjust decisions by the United States judicial system.

Finally, the Argentine Republic reiterates its commitment to honor its debts to 100% of its creditors in a just, equitable and legal manner.

**COMUNICADO OFICIAL DEL GOBIERNO ARGENTINO**

**ARGENTINA PAGA**

LA REPÚBLICA ARGENTINA EN CUMPLIMIENTO DEL PROSPECTO Y DEL CONTRATO VIGENTE CON LOS TENEDORES QUE ADHIRIERON VOLUNTARIAMENTE AL CANJE DE DEUDA EN EL PERÍODO 2005-2010 HA PROCEDIDO AL PAGO DE LOS SERVICIOS DE CAPITAL E INTERESES DE SUS BONOS BAJO LEY EXTRANJERA POR EL EQUIVALENTE A 832 MILLONES DE DÓLARES DE LOS CUALES 539 M DE DÓLARES DEPOSITADO EN LAS CUENTAS NÚMEROS 15.098 Y 15.002 DEL BANCO NEW YORK MELLON (BONY) EN EL BANCO CENTRAL DE LA REPÚBLICA ARGENTINA SUMANDO LOS VENCIMIENTOS EN PESOS, EL PAGO REALIZADO HOY SUPERA LOS MIL MILLONES DE DÓLARES.

EL DÍA LUNES 23 DE JUNIO, HABIDA CUENTA DE LA PROXIMIDAD DEL DÍA DE PAGO DE LOS VENCIMIENTOS, SE SOLICITÓ AL JUEZ GRIESA UN PEDIDO DE SUSPENSIÓN (*STAY*) DE SU FALLO QUE POSIBILITARA UN DIÁLOGO DE BUENA FE EN CONDICIONES EQUITATIVAS, JUSTAS Y LEGALES. LA SOLICITUD FUE REITERADA EN EL DÍA DE LA FECHA. HOY, 26 DE JUNIO, SIGUIENDO LAS INDICACIONES DE LOS CONTRATOS, SE VENCE EL ÚLTIMO PLAZO PARA REALIZAR EL PAGO, YA QUE EL DÍA VIERNES ES FERIADO DE LA ADMINISTRACIÓN PÚBLICA Y EL PAGO DEBE REALIZARSE EL ÚLTIMO DÍA HÁBIL ANTES DEL VENCIMIENTO. NO PAGAR TENIENDO LOS RECURSOS Y FORZANDO UN DEFAULT VOLUNTARIO ES ALGO QUE NO ESTÁ CONTEMPLADO EN LA LEY ARGENTINA, SERÍA CONTRARIO AL ORDEN PÚBLICO ARGENTINO Y UNA CLARA VIOLACIÓN A LOS PROSPECTOS DE DEUDA.

ESTE PAGO SE REALIZA EN VIRTUD DE LA DECISIÓN SOBERANA DE LA REPÚBLICA ARGENTINA, QUE RATIFICA EN ESTE ACTO SU FIRME E IRRESTRICTA VOLUNTAD DE CUMPLIMIENTO, PARA HONRAR SUS DEUDAS Y PARA DESCARTAR CUALQUIER INTERPRETACIÓN CAPCIOSA QUE IMPLIQUE INTRODUCIR EL EUFEMISMO DE "DEFAULT TÉCNICO", CON EL CUAL SE PRETENDE ASOCIAR EL IMPEDIMENTO ANTOJADIZO DE UN PAGO POR ORDEN JUDICIAL SIN CONSIDERAR LA VOLUNTAD DEL DEUDOR DE CUMPLIR CON SUS OBLIGACIONES.

PARA LA REPÚBLICA ARGENTINA Y PARA CUALQUIER PAÍS SOBERANO, PAGAR ES: DEPOSITAR LOS FONDOS CUMPLIENDO CON LAS OBLIGACIONES ESTABLECIDAS EN EL PROSPECTO DE EMISIÓN DE LOS TÍTULOS DE DEUDA Y POR LO TANTO, ES EJERCER UN DERECHO EN FORMA VOLUNTARIA SIN PRETENDER CON ELLO COLISIONAR CON OTRAS DECISIONES EMERGENTES DE AUTORIDAD JUDICIAL QUE ALTERAN LAS BASES CONTRACTUALES SUSCRIPTAS POR UN PAÍS SOBERANO.

NUESTRA CONVICCIÓN PLENA, COMO LO ATESTIGUAN INSTITUCIONES Y ORGANISMOS INTERNACIONALES, COMO ASÍ TAMBIÉN ANALISTAS Y ESPECIALISTAS QUE HAN SIDO INCLUSIVE CRÍTICOS CON EL PAÍS EN DIARIOS Y REVISTAS ESPECIALIZADAS DE NIVEL INTERNACIONAL, ES CUMPLIR CON EL PROCESO EXITOSO DE REESTRUCTURACIÓN VOLUNTARIA DE DEUDA CON LA

ADHESIÓN DEL 92,4 % DE LOS BONISTAS. ESTA CONVICCIÓN ES APELAR AL SENTIDO COMÚN Y AL EJERCICIO HABITUAL Y RACIONAL EN LOS PROCESOS CONCURSALES EN DONDE LOS DERECHOS REPRESENTADOS POR UNA MAYORÍA CLARA E INDUBITABLE NO PUEDE SER VULNERADA POR EL 1 % DE LOS BONISTAS, FULMINANDO CON ELLO, DESDE UNA POSICIÓN MINORITARIA EL ESFUERZO COLECTIVO DE LA NACIÓN Y DEL PUEBLO ARGENTINO PARA HONRAR SUS COMPROMISOS, ADEMÁS DE AFECTAR LOS INTERESES Y LOS DERECHOS DE LA MAYORÍA DE LOS BONISTAS.

ESTA DECISIÓN SOBERANA DE LA REPÚBLICA ARGENTINA IMPLICA ADVERTIR RESPECTO DE LAS CONSECUENCIAS DE SUS ACTOS A LOS ESTADOS UNIDOS POR LA RESPONSABILIDAD INTERNACIONAL QUE LE CABE POR LAS DECISIONES DE SU PODER JUDICIAL, AL AGENTE FIDUCIARIO, A LAS ENTIDADES FINANCIERAS INVOLUCRADAS, A LOS LITIGANTES Y AL MISMO JUEZ THOMAS GRIESA RESPECTO A EVENTUALES ACCIONES JUDICIALES QUE NOS PERMITAN HACER VALER LEGÍTIMAMENTE NUESTROS DERECHOS COMO MIEMBRO DE LA COMUNIDAD INTERNACIONAL, LA ORGANIZACIÓN DE LOS ESTADOS AMERICANOS (ARTÍCULO 61), LA ORGANIZACIÓN DE LAS NACIONES UNIDAS (ARTÍCULOS 2ª INCISO 1 Y 4), CONVENIO CONSTITUTIVO DEL FONDO MONETARIO INTERNACIONAL (ARTÍCULO 4º), ANTE EL TRIBUNAL INTERNACIONAL DE LA HAYA COMO SUJETOS DE DERECHO INTERNACIONAL Y ANTE TRIBUNALES ORDINARIOS DE LA REPÚBLICA ARGENTINA.

LA EJECUCIÓN DEL PAGO EN TIEMPO Y FORMA PARA CUMPLIR REGULARMENTE NUESTRAS OBLIGACIONES EMERGENTES DEL PROSPECTO Y SUS CONTRATOS RESPECTIVOS, IMPLICA ADVERTIR QUE SI ALGUIEN DISPUSIERA DE LOS FONDOS DEPOSITADOS EN LA CUENTA DEL FIDUCIARIO AFECTARÍA LOS DERECHOS DE SUS VERDADEROS DUEÑOS, QUE NO SON OTROS QUE LOS TENEDORES ADHERIDOS VOLUNTARIAMENTE AL CANJE Y CONSTITUIRÍA UNA GRAVE ALTERACIÓN A LAS CONDICIONES FIJADAS EN EL PROSPECTO, IMPLICANDO DESDE UNA APROPIACIÓN INDEBIDA DE FONDOS DE TERCEROS, DESBARATAMIENTO DE DERECHOS ACORDADOS, INCUMPLIMIENTO DE SU RESPONSABILIDAD CONTRACTUAL Y OTRAS TIPOLOGÍAS QUE PODRÍAN CONFIGURARSE.

EL HECHO QUE EL PROSPECTO HAYA ESTABLECIDO UNA PRÓRROGA DE JURISDICCIÓN EN FAVOR DE LA LEGISLACIÓN NORTEAMERICANA NO IMPLICAR LA ACEPTACIÓN DE ACTOS JURISDICCIONALES DE CUMPLIMIENTO IMPOSIBLE. MÁXIME TENIENDO EN CUENTA QUE EL FALLO VULNERA EL PRINCIPIO DE INMUNIDAD SOBERANA VIGENTE EN ESE PAÍS COMO NORMA DE JERARQUÍA INSTITUCIONAL SUPERIOR E INTERPRETA ADEMÁS EN FORMA ANTOJADIZA Y ABSURDA EL PRINCIPIO DE "PARI PASSU". ACATAR UNA SENTENCIA NO PUEDE EXIGIR EL INCUMPLIMIENTO DE LAS OBLIGACIONES ASUMIDAS.

CUALQUIER CONDUCTA, QUE PRETENDA OBSTACULIZAR ESTE PAGO A NUESTROS ACREEDORES CONSTITUYE UNA ACCIÓN VIOLATORIA DEL ORDENAMIENTO JURÍDICO DEL DERECHO PÚBLICO INTERNACIONAL QUE PROHÍBE LA COERCIÓN A OTROS ESTADOS EN VIRTUD DE LA IGUALDAD SOBERANA, CLÁUSULA QUE TAMBIÉN RIGE EN ESTADOS UNIDOS.

COMO TAMBIÉN FUE ABSURDA E ILEGÍTIMA LA EJECUCIÓN DEL EMBARGO A LA "FRAGATA LIBERTAD" O LAS 900 ACCIONES PROMOVIDAS EN DIFERENTES INSTANCIAS Y PAÍSES PROMOVIENDO UN HOSTIGAMIENTO INUSUAL, PERVERSO Y EXTORSIVO DE UN GRUPO MINÚSCULO DE ACREEDORES HACIA UN PAÍS SOBERANO.

NO CABE LA MENOR DUDA DE LA PARCIALIDAD DEL JUEZ EN FAVOR DE LOS FONDOS BUITRES NI DE SU VERDADERA INTENCIÓN: LA DE PRETENDER LLEVAR A LA REPÚBLICA ARGENTINA AL DEFAULT PARA DERRIBAR LA REESTRUCTURACIÓN 2005-2010 QUE ALCANZÓ LUEGO DE LARGAS NEGOCIACIONES UN CONSENSO DEL 92,4%. NEGOCIACIONES ÉSTAS, DE LAS QUE JAMÁS QUISIERON PARTICIPAR LOS HOLDOUTS, ACTITUD QUE SE CONFIRMÓ INCLUSIVE EN LA ÚLTIMA SEMANA ANTE LA CERRADA NEGATIVA A LA SOLICITUD DE STAY DE LA REPÚBLICA ARGENTINA PARA LOGRAR UN DIÁLOGO EN CONDICIONES JUSTAS, EQUITATIVAS Y LEGALES DEL 100 % DE LOS ACREEDORES.

PERO NO PODRÁ LOGRAR SU OBJETIVO POR UNA SENCILLA Y SIMPLE RAZÓN: LA REPÚBLICA ARGENTINA CUMPLIRÁ SUS OBLIGACIONES, PAGARÁ SU DEUDA, HONRARÁ SUS COMPROMISOS COMO LO VIENE HACIENDO PARA TERMINAR CON EL ARTILUGIO DE CONSIDERAR UNA DECISIÓN JUDICIAL ABSURDA CON EFECTOS SISTÉMICOS A NIVEL INTERNACIONAL, COMO UN "DEFAULT TÉCNICO", QUE CONSTITUYE SOLO UN MODO SOFISTICADO DE INTENTAR PONERNOS DE RODILLAS ANTES USUREROS DE CARÁCTER GLOBAL.

EL RESPALDO INTERNACIONAL QUE HA TENIDO LA REPÚBLICA ARGENTINA INCLUYE A PAÍSES COMO FRANCIA, MÉXICO, BRASIL COMO AMICUS CURIAE Y ABARCA DESDE ORGANISMOS MULTILATERALES DE CRÉDITO HASTA ORGANISMOS POLÍTICOS COMO G77 MÁS CHINA INTEGRADO POR 133 PAÍSES, MERCOSUR, UNASUR, PASANDO POR MÁS DE UN CENTENAR DE PARLAMENTARIOS BRITÁNICOS CON CUYO PAÍS DE ORIGEN, NUESTRA NACIÓN MANTIENE UN CONFLICTO POR DISPUTAS DE SOBERANÍA, HASTA PUBLICACIONES INTERNACIONALES COMO FOREIGN AFFAIRS DEL COUNCIL ON FOREIGN RELATIONS Y ANALISTAS DE DIARIOS Y REVISTAS ESPECIALIZADAS COMO ASÍ TAMBIÉN ACADÉMICOS DE LAS MÁS DIVERSAS CORRIENTES DE PENSAMIENTO.

RESULTA CLARO QUE ESTE RESPALDO SIGNIFICA RECONOCER LA LÓGICA Y LA JUSTICIA DE NUESTROS RECLAMOS Y LOS NEGATIVOS EFECTOS SISTÉMICOS DE ESTAS EQUIVOCADAS E INJUSTAS DECISIONES DEL SISTEMA JUDICIAL ESTADOUNIDENSE.

POR ÚLTIMO, LA REPÚBLICA ARGENTINA REAFIRMA SU COMPROMISO DE HONRAR SUS DEUDAS CON EL 100 % DE LOS ACREEDORES DE MANERA JUSTA, EQUITATIVA Y LEGAL.



June 27, 2014

I hereby certify that I am a professional translator, that I abide by the Code of Ethics and Professional Practice of the *American Translators Association*, that I am fluent in Spanish and English, that I have employed a team of professional translators, and that we have translated, to the best of our knowledge, the attached document entitled

**Press Release Transcript**

From Spanish into English

Signed,

Cathleen Waters

Founder, New World Medium

Translator of French, Spanish, Italian, Portuguese and English

American Translator's Association Membership no. 257918

# EXHIBIT D

(BFW) Argentina Says It's Fulfilled Obligations on Restructured Debt

+----------------------------------------------------------------------------+

BN 06/27 11:25 *ARGENTINA SAYS IT HAS NO MORE OBLIGATIONS FOR
RESTRUCTURED DEBT   BN 06/27 11:23 *ARGENTINA SAYS IT FULFILLED DUTY TO
HOLDERS OF 2005, 2010 BONDS   BN 06/27 11:19 *ARGENTINA SENDS LEGAL NOTICE
TO HOLDERS OF RESTRUCTURED DEBT

+----------------------------------------------------------------------------+

Argentina Says It's Fulfilled Obligations on Restructured Debt

2014-06-27 11:40:49.366 GMT

By Pablo Gonzalez

    June 27 (Bloomberg) -- Argentina has fulfilled its duty to holders of 2005 and 2010
restructured bonds and has no more obligations to these creditors, according to legal notice sent
to bondholders and posted on govt website.

  * Argentina says that, according to bond prospectus, deposited

    funds already belong to bondholders

  * Argentina says it's trustee BNY Mellon's duty to deliver

    funds to bondholders

  * NOTE: Argentina yday deposited $1b for restructured bond

    payments, including $539m to trustee BNY Mellon for intl

    bonds

  * Link to legal notice: {NSN N7TQWHAIH8N6 <GO>}

  * Argentina Tests U.S. Court Order by Posting Interest Payment

    {NSN N7T2MS6VDKI7 <GO>

AVISO LEGAL

# TENEDORES DE DEUDA ARGENTINA CANJES 2005 – 2010

Por la presente, la República Argentina hace saber a los Tenedores de Deuda Argentina adherentes a los Canjes de Deuda Soberana que la República Argentina, en cumplimiento de las obligaciones asumidas en el Trust Indenture de fecha 2 de junio de 2005 modificado el 30 de abril de 2010, frente a los Tenedores y al Agente Fiduciario (Bank of New York Mellon- BoNY) ha procedido al depósito de las sumas correspondientes a los próximos vencimientos de intereses a ocurrir el 30 de junio de 2014, que ascienden al equivalente a USD 539 MILLONES DE DÓLARES ESTADOUNIDENSES, los cuales deberán ser distribuidos por el Agente Fiduciario a todos y cada uno de los Tenedores, conforme al Trust Indenture mencionado.

Los importes así depositados y a disposición del Agente Fiduciario son propiedad fiduciaria de los Tenedores, siendo obligación del Agente Fiduciario mantenerlos en beneficio de los Tenedores, hasta su liquidación y pago, no existiendo ningún interés de la República Argentina sobre tales importes una vez depositados.

El presente aviso se publica con el objeto de comunicar a los Tenedores adherentes a los Canjes de Deuda Soberana Argentina de 2005 y 2010, el efectivo cumplimiento de la República Argentina respecto a sus obligaciones frente a aquéllos, los Prospectos respectivos, en el marco de la legislación argentina y extranjera aplicables, deslindándose cualquier responsabilidad y/o incumplimiento que pretenda imputársele a la República

[1]Sección 3.1. Pago del Capital y los Intereses. La República pacta y acuerda que pagará o dispondrá que se pague debida y puntualmente el capital y los intereses (incluidos los Montos Adicionales) sobre cada uno de los Títulos de Deuda así como cualquier otro pago que deba efectuar la República al Fiduciario en virtud de los Títulos de Deuda y el presente Convenio de Fideicomiso, en el lugar o los lugares, en las respectivas oportunidades y de la manera dispuesta en los Títulos de Deuda y en este Convenio de Fideicomiso. Todas las sumas pagadas al Fiduciario en virtud de los Títulos de Deuda y este Convenio de Fideicomiso serán mantenidas por él en fiducia para los Tenedores de los Títulos de Deuda y serán aplicadas por el Fiduciario a los pagos adeudados en virtud de los Títulos de Deuda y este Convenio de Fideicomiso en las oportunidades y de la manera dispuesta en los Títulos de Deuda y en este Convenio de Fideicomiso.

Sección 3.5. Pagos. (a) Con el propósito de disponer el pago del capital y los intereses (incluidos los Montos Adicionales) sobre los Títulos de Deuda de cualquier Serie a medida que dicho capital e intereses venzan y resulten pagaderos, la República acuerda que en el presente pagar o disponer que se pague a una cuenta del Fiduciario en la Oficina de Fiducia Societaria o la otra oficina del Fiduciario que sea convenida entre el Fiduciario y la República (o, en el caso de los pagos denominados en una moneda distinta del dólar estadounidense, en el otro lugar que se especifique en la Autorización), a más tardar a la 1:00 P.M. hora local en ese lugar de pago a más tardar el Día Hábil anterior a cada fecha de pago de intereses o de pago del capital (cada una, una "Fecha de Pago") de esos Títulos de Deuda, en fondos inmediatamente disponibles en dólares estadounidenses (o en la otra moneda que se especifique en las Condiciones de los Títulos de Deuda de la Serie respecto de la cual deba efectuarse el pago), un monto que (junto con los fondos en ese momento mantenidos por el Fiduciario y disponibles para ese fin) sea suficiente para pagar el monto total de los intereses (incluidos los Montos Adicionales) o el capital o ambos, según corresponda, que resulte vencido respecto de esos Títulos de Deuda en esa Fecha de Pago. El Fiduciario aplicará dicho monto al pago vencido en esa Fecha de Pago y, hasta dicha aplicación, esos montos serán mantenidos en fiducia por el Fiduciario en beneficio de los Tenedores con derecho a los mismos, y la República no tendrá interés alguno en dichos montos.

El Fiduciario también podrá designar, asumiendo los gastos la República, uno o más agentes de pago (cada uno, un "agente de pago fiduciario") a los efectos de facilitar el pago por la República de los montos vencidos respecto de los Títulos de Deuda de cualquier Serie en beneficio de los Tenedores de esos Títulos de Deuda. La República puede proporcionar directamente a ese agente o agentes de pago fiduciarios los fondos para el pago del capital y la prima y los intereses, al hubiera, sobre los Títulos de Deuda en el marco de acuerdos con respecto a dichos fondos que contengan sustancialmente los mismos términos y condiciones estipulados en esta Sección, y el Fiduciario no tendrá responsabilidad alguna con respecto a los fondos proporcionados de ese modo por la República a tal agente de pago fiduciario. Con sujeción a lo mencionado anteriormente, la República tendrá derecho, en cualquier momento, a impartir instrucciones al Fiduciario para terminar la designación de cualquier agente de pago fiduciario y para designar a otros agentes de pago en cualquier lugar que la República considere adecuado a los efectos de efectuar pagos en beneficio de los Tenedores. Independientemente de lo precitado, cualquier agente de pago fiduciario designado en virtud del presente Convenio de Fideicomiso será exclusivamente agente del Fiduciario, y la República no tendrá ninguna autoridad o relación directa con ese agente o agentes de pago fiduciarios.

Sección 4.5. Destino de los Fondos. Toda suma de dinero cobrada por el Fiduciario de conformidad con este Artículo será aplicada en el siguiente orden en la fecha o fechas fijadas por el Fiduciario y, si tales sumas fueran distribuidas en concepto de capital o intereses (incluidos los Montos Adicionales), contra presentación de los Títulos de Deuda de la Serie respecto de la cual se cobraron las sumas de dinero y la indicación del pago mediante sellado (u otra forma de anotación) sobre los mismos, o mediante la emisión de Títulos de Deuda por montos menores de capital en canje por los Títulos de Deuda presentados si sólo fueran pagados parcialmente, o contra entrega de los mismos si fueran pagados en su totalidad:

PRIMERO: Al pago de todas las sumas adeudadas al Fiduciario en virtud de la Sección 5.7;

SEGUNDO: Si el capital de los Títulos de Deuda de esa Serie no hubiera vencido y fuese en ese momento exigible y pagadero, al pago de los intereses en mora (incluidos los Montos Adicionales) sobre esa Serie de Títulos de Deuda en mora en el orden de vencimiento de las cuotas de tales intereses (incluidos los Montos Adicionales), con más intereses (en la medida en que el Fiduciario haya cobrado tales intereses) sobre las cuotas vencidas de intereses (incluidos los Montos Adicionales) a la misma tasa de interés que la especificada en esos Títulos de Deuda, y tales pagos serán efectuados proporcionalmente a las Personas con derecho a los mismos, sin discriminación ni preferencia alguna;

TERCERO: Si el capital de los Títulos de Deuda de esa Serie hubiera vencido y fuese en ese momento exigible y pagadero, al pago del monto total en ese momento adeudado e impago sobre todos los Títulos de Deuda de esa Serie en concepto de capital e intereses (incluidos los Montos Adicionales) a la tasa de interés especificada en dichos Títulos de Deuda, y si tales sumas de dinero resultaran insuficientes para pagar por su totalidad el monto total así adeudado e impago respecto de los Títulos de Deuda de esa Serie, en ese caso, al pago del capital e intereses (incluidos los Montos Adicionales), sin preferencia ni prioridad del capital sobre los intereses o de los intereses sobre el capital, o de cualquier cuota de intereses sobre cualquier otra cuota de intereses, o de cualquier Título de Deuda de esa Serie sobre cualquier otro Título de Deuda de la misma Serie, en forma proporcional al total de tal capital e intereses devengados e impagos.

Sección 4.9. Derecho Incondicional de los Tenedores a Recibir el Capital y los Intereses. Independientemente de las disposiciones de la Sección 4.8, cada Tenedor de Títulos de Deuda tendrá el derecho, absoluto e incondicional, a percibir el pago del capital y los intereses (incluidos los Montos Adicionales) respecto de su Título de Deuda en la fecha de vencimiento especificada para ese pago en dicho Título de Deuda (como ese Título de Deuda pueda enmendarse o modificarse en virtud del Artículo Siete), y a iniciar juicio con miras a la ejecución de dicho pago, y ese derecho no será menoscabado sin el consentimiento de ese Tenedor