UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NML CAPITAL, LTD.

                             Plaintiff,

    -against-

THE REPUBLIC OF ARGENTINA,

                             Defendant.

08 Civ. 6978 (TPG)
09 Civ. 1707 (TPG)
09 Civ. 1708 (TPG)

---

AURELIUS CAPITAL MASTER, LTD. And
ACP MASTER, LTD.,

                             Plaintiffs,

    -against-

THE REPUBLIC OF ARGENTINA,

                             Defendant.

09 Civ. 8757 (TPG)
09 Civ. 10620 (TPG)

---

AURELIUS OPPORTUNITIES FUND II, LLC
and AURELIUS CAPITAL MASTER, LTD.,

                             Plaintiffs,

    -against-

THE REPUBLIC OF ARGENTINA,

                             Defendant.

10 Civ. 1602 (TPG)
10 Civ. 3507 (TPG)
10 Civ. 3970 (TPG)
10 Civ. 8339 (TPG)

*(captions continue on following page)*

---

**CORRECTED MEMORANDUM OF LAW IN SUPPORT OF NON-PARTIES
EURO BONDHOLDERS' EMERGENCY MOTION FOR CLARIFICATION**

BLUE ANGEL CAPITAL I LLC,

                              Plaintiff,

    -against-                                    10 Civ. 4101 (TPG)
                                                 10 Civ. 4782 (TPG)
THE REPUBLIC OF ARGENTINA,

                              Defendant.

---

OLIFANT FUND, LTD.,

                              Plaintiff,

    -against-                                    10 Civ. 9587 (TPG)

THE REPUBLIC OF ARGENTINA,

                              Defendant.

---

PABLO ALBERTO VARELA, et al.,
                              Plaintiff,

    -against-                                    10 Civ. 5338 (TPG)

THE REPUBLIC OF ARGENTINA,

                              Defendant.

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................2

BACKGROUND ........................................................................................................7

I.  THE FOREIGN THIRD PARTIES THAT PROCESS PAYMENTS ON THE
    EURO BONDS ARE BEYOND THE JURISDICTION OF U.S. COURTS....................10

II.  THE FOREIGN THIRD PARTIES THAT PROCESS PAYMENTS ON THE
     EURO BONDS CANNOT COMPLY WITH THE INJUNCTIONS UNDER
     FOREIGN LAW ..............................................................................................14

III.  THE DEPOSITORIES AND CLEARING SYSTEMS INVOLVED IN
      PAYMENTS ON THE EXCHANGE BONDS SHOULD BE PERMITTED TO
      SHARE INFORMATION WITH ARGENTINA.............................................................18

CONCLUSION...................................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Canterbury Belts, Ltd. v. Lane Walker Rudkin, Ltd.*,
   869 F.2d 34 (2d Cir. 1989) ........................................................... 13

*Daimler AG v. Bauman*,
   134 S. Ct. 746 (2014) ......................................... 3, 4, 10, 11, 17

*Dow Jones & Co., Inc. v. Harrods*,
   237 F. Supp. 2d at 413 ................................................................ 15

*Dunlop Tires Operations, S. A. v. Brown*,
   131 S. Ct. 2846 (2011) ................................................................... 3

*Hilao v. Estate of Marcos (In re: Estate of Marcos Human Rights Litig.)*,
   94 F.3d 539 (9th Cir. 1996) ........................................................ 13

*In re Sealed Case*,
   825 F.2d 494 (D.C. Cir. 1987) .................................................... 14

*Laker Airways, Ltd. v. Sabena, Belgian World Airlines*,
   731 F.2d 909 (D.C. Cir. 1984) .................................................... 13

*Metro. Life Ins. Co. v. Robertson–Ceco Corp.*,
   84 F.3d 560 (2d Cir. 1996) ......................................................... 13

*Motorola Credit Corp. v. Uzan*,
   388 F.3d 39 (2d Cir. 2004) ......................................................... 14

*Nguyen Thang Loi v. Dow Chem. Co. (In re Agent Orange Prod. Liab. Litig.)*,
   373 F. Supp. 2d 7 (E.D.N.Y. 2005) ............................................ 15

*NML Capital Ltd. v. Republic of Argentina*,
   699 F.3d 246 (2d Cir. 2012) .......................................................... 8

*NML Capital Ltd. v. Republic of Argentina*,
   727 F.3d 230 (2d Cir. 2013) .......................................... 2, 3, 9, 12

*Perkins v. Benguet Consol. Mining Co.*,
   342 U. S. 437 (1952) ................................................................... 10

*Reebok Int'l v. McLaughlin*,
   49 F.3d 1387 (9th Cir. 1995) .......................................... 14, 15, 16

*Seijas v. Republic of Argentina*,
    No. 04 Civ. 400 (TPG) (S.D.N.Y. Apr. 30, 2008) ..................................................... 9

*Sonera Holding B.V. v. Cukurova Holding A.S*,
    2014 U.S. App. LEXIS 7809 (2d Cir. Apr. 25, 2014)......................................... 11, 17

*United States v. Davis*,
    767 F.2d 1025 (2d Cir. 1985) .................................................................................... 12

*Vanity Fair Mills, Inc. v. T. Eaton Co.*,
    234 F.2d 633 (2d Cir. 1956) ....................................................................................... 14

## OTHER AUTHORITIES

11A C. Wright & A. Miller, Federal Practice and Procedure § 2960.......................... 13

## RULES

Fed. R. Civ. P. 65..................................................................................................... 1

Fed. R. Civ. P. 65(d) ............................................................................................... 13

Fed. R. Civ. P. 65(d)(2)........................................................................... 2, 12, 14, 17

The Euro Bondholders,[1] interested non-parties, respectfully submit this corrected memorandum of law in support of their emergency motion for clarification regarding the application of this Court's November 21, 2012 injunctions ("Injunctions") to the Euro Bonds (as defined below).[2]  In those Orders, this Court stated that any non-party that requires clarification regarding the scope of the Injunctions may make an application and "[s]uch clarification will be promptly provided."  Injunctions at 6-7 [Dkt. No. 425].  Similarly, the Second Circuit instructed that "when questions arise as to who is bound by an injunction though operation of Rule 65, district courts will not 'withhold a clarification in the light of a concrete situation' . . . [and] [t]he

---

[1] The Euro Bondholders are Knighthead Capital Management, LLC, Redwood Capital Management, LLC, Perry Capital LLC, VR Global Partners, LP, Monarch Master Funding 2 (Luxembourg) S.à r.l., QVT Fund IV LP, QVT Fund V LP, and Quintessence Fund LP (each on behalf of itself or one or more investment funds or accounts managed or advised by it).

[2] The Euro Bondholders submit this corrected memorandum based on information that came to light in filings by the Bank of New York Mellon ("BNYM") on July 10, 2014, subsequent to the filing of the Euro Bondholders' motion for clarification.  Specifically, BNYM submitted a Declaration of Kevin F. Binnie, dated June 17, 2014 ("Second Binnie Declaration"), stating that the Bank of New York (Luxembourg) presently does not have a role in the payment process for the Euro Bonds and does not own the Banco Central account into which Argentina makes payments on the Euro Bonds, as the Euro Bondholders stated in their motion.  *See* Second Binnie Decl. at ¶¶ 9-11, attached as Exhibit C to the Declaration of Evan K. Farber ("Farber Decl.") [Dkt. 579].  The Euro Bondholders asked BNYM to provide bank statements or similar documents indicating the Bank of New York entity that owns the account at Banco Central.  Counsel for BNYM provided us with documents indicating the number, but not the owner, of the account, and stated that BNYM does not receive statements for the account.  This corrected memorandum is based on BNYM's assertion that BNYM owns the account at issue, but the Euro Bondholders reserve the right to further amend this memorandum if new facts bearing on the ownership of the account are revealed.

According to BNYM, the Second Binnie Declaration was filed in a case in Belgium. Neither the Euro Bondholders nor their U.S. counsel, however, received a copy of the Second Binnie Declaration, or were informed of its contents, until it was filed in this Court on July 10. U.S. counsel for the Euro Bondholders does not represent the Euro Bondholders in Belgium, and understands that court filings in Belgium are not publicly available.  Indeed, counsel for plaintiffs in this case repeatedly have asked the Euro Bondholders' U.S. counsel for copies of the filings in the Belgian litigation, and U.S. counsel has referred them to the Euro Bondholders' Belgian counsel.  Further, BNYM's U.S. counsel did not provide a courtesy copy of the Second Binnie Declaration to the Euro Bondholders or their U.S. counsel, prior to filing it in this case.

doors of the district court obviously remain open for such applications."  *NML Capital Ltd. v. Republic of Argentina*, 727 F.3d 230, 243 (2d Cir. 2013) ("*NML II*").[3]

## PRELIMINARY STATEMENT

The Euro Bondholders are a group of investors that hold euro-denominated bonds ("Euro Bonds") issued by the Republic of Argentina (the "Republic") pursuant to a June 2, 2005 Indenture, as supplemented on April 30, 2010 ("Indenture").  The Euro Bonds are governed by the laws of England and Wales and paid in euro.  At no point in the Euro Bonds' payment chain do funds comprise U.S. dollars or enter the U.S.

This Court specifically named in the Injunctions certain foreign third parties that process payments on the Euro Bonds, even though the payments on the Euro Bonds never flow through the U.S.  Since the Court issued the Injunctions, however, clarifications to the factual record and intervening decisions of the U.S. Supreme Court and the U.S. Court of Appeals for the Second Circuit, make clear that the foreign third parties that process payments on the Euro Bonds cannot be bound either by the Injunctions themselves or pursuant to Rule 65(d)(2).

When issuing the Injunctions, this Court concluded that "[t]he process … involved in making payments on the Exchange Bonds" involved steps that "without question take[] place in the United States."  November 21, 2012 Order at 10 & n.2 [Dkt. No. 425].  Whether or not that is accurate with respect to the U.S. dollar-denominated bonds governed by New York law ("USD Bonds"), the payments on the English law-governed Euro Bonds do not touch the U.S. during the payment process.  As the Second Circuit itself recognized, if "the payment process for [the Euro

---

[3] At a hearing on June 27, 2014, counsel for the Euro Bondholders briefly addressed certain of the issues raised by this motion.  Although the Court reiterated that Argentina is bound by the Injunctions, it noted that "there may be a need for a sort of special language in any order" regarding the foreign third parties that process payments on Euro Bonds.  June 27, 2014 Hr. Transcript at 31.  The Euro Bondholders respectfully request such modification of the Injunctions through this motion.

Bonds] takes place entirely outside the United States, then the district court *misstated that . . . the Exchange Bond payment 'process, without question takes place in the United States.*'"  *NML II*, 727 F.3d at  244 (emphasis added).  That misstatement led this Court to specifically list parties outside its jurisdiction within the scope of its Injunctions.

Intervening decisions of the Supreme Court and Second Circuit have established that this Court lacks jurisdiction over the foreign parties listed in the Injunctions.  On January 14, 2014, the Supreme Court expressly made clear (i) that foreign subsidiaries of a United States parent corporation are not amenable to suit in state court on claims unrelated to any activity of the *subsidiaries* in the forum State, and (ii) foreign parents are not subject to suit in state court on the basis of the actions of their subsidiaries in that forum state.  *See generally Daimler AG v. Bauman*, 134 S. Ct. 746 (2014); *see id.* at 757 (discussing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846 (2011)).  Rather, the Supreme Court held that U.S. courts have general jurisdiction over foreign corporations almost exclusively *only* where those corporations are incorporated or have their principal place of business.  *Id.* at 761, n.19.   Under the Supreme Court's standard in *Daimler,* it is now clear that various foreign parties named in the Injunctions, along with others involved in the Euro Bond payment process, are beyond the jurisdiction of U.S. courts.  The Second Circuit's own recent application of the *Daimler* standard reinforces that jurisdiction over the foreign parties was inappropriate here.

The Injunctions also directly conflict with the obligations of certain foreign parties under the law of their home forums, making the Injunctions unenforceable against them.  For example, the Injunctions are unenforceable against Euroclear and Clearstream under Belgian and Luxembourgian laws, respectively, that were specifically enacted to protect Euroclear, Clearstream, and other financial institutions from foreign court orders attempting to enjoin

payment transfers.  *Daimler* explicitly criticized courts for failing to pay "heed to the risks to international comity" that follow from attempts to enjoin foreign parties.  This Court should follow suit and clarify that the foreign third parties subject to those laws are exempt from the Injunctions.  That result is particularly warranted because it will not diminish the force and effect of this Court's equitable remedy, in light of the substantial amount of dollar-denominated exchange bonds for which the payment process does pass through the United States.

Finally, this Court should clarify that the Injunctions do not prohibit the depositories and clearing systems involved in payments on the Exchange Bonds, including specifically the Depository Trust Company ("DTC"), Euroclear, and Clearstream, from sharing information regarding the identity of the beneficial owners of the Exchange Bonds, as such information may be necessary to facilitate a settlement of this matter.[4]  The Exchange Bonds contain a Rights Upon Future Offers ("RUFO") provision that gives the Exchange Bondholders the right to exchange their bonds for the same consideration or terms of any future exchange of non-performing securities, such as those held by plaintiffs.  As noted by many analysts and commentators, a settlement here may implicate the RUFO provision, which could greatly increase the cost of a settlement for Argentina.  It may be necessary for Argentina to undertake a consent solicitation seeking a waiver of the RUFO provision by the Exchange Bondholders, in advance of a potential settlement.  In order to undertake such a solicitation, however, Argentina will need to obtain information regarding the identity of the Exchange Bondholders from various depositories and clearing systems, but those entities may refuse to provide that information to

---

[4] On June 23, 2014, this Court appointed a Special Master "to conduct and preside over settlement negotiations between and among the parties to this litigation."  [Dkt. 530].  The Euro Bondholders welcome the appointment of the Special Master, and believe that a negotiated solution will be beneficial for all the parties. We do note however that any such negotiated solution may take time to implement and thus believe it important to clarify the parties to whom the injunction applies.

Argentina on the ground that it may be considered a violation of the Injunctions to do so. This Court, which has strongly encouraged a settlement, should clarify that the Injunctions do not prohibit the depositories and clearing systems from sharing information about the Exchange Bondholders with Argentina, as such information may be necessary to prevent the RUFO provision from being an obstacle to settlement

*          *          *

On June 27, 2014, this Court held a hearing during which it was disclosed that, on June 26, 2014, Argentina made an interest payment on the Euro Bonds to a Bank of New York Mellon ("BNYM") account at Banco Central de la Republica de Argentina ("Banco Central") in Argentina. At the hearing, counsel for BNYM did not specify the precise Bank of New York entity that owns that account, but BNYM has now stated that the account is "owned and operated by The Bank of New York Mellon, a bank chartered and headquartered in New York." (Second Binnie Declaration at ¶ 9, attached as Exhibit C to the Farber Decl. [Dkt. 579].) The Euro Bondholders accept BNYM's assertion that the funds are in an account owned by BNYM, and not by Bank of New York (Luxembourg), S.A. ("BNY Luxembourg"), as the Euro Bondholders stated in their motion for clarification.[5]

Regardless of which Bank of New York entity currently holds the funds, however, this Court should not prevent BNYM from transferring the Euro Bond payment to the beneficial holders. As noted by BNYM in its motion for clarification, an order directing BNYM to return the Euro Bond payment—which is the Euro Bondholders' property—raises significant due process concerns. *See* BNYM Motion for Clarification at 8-10 [Dkt. 578].

---

[5] According to BNYM, BNY Luxembourg would have a role in processing payments on the Euro Bonds under certain circumstances. *See* BNYM Response to Euro Bondholders' Emergency Motion for Clarification at 3, n.3 [Dkt. 581]. Therefore, for the reasons explained below, this Court should still clarify that BNY Luxembourg is not subject to the Injunctions.

The payment that was made on the Euro Bonds to the Banco Central account was made pursuant to a Trust Indenture governed by the laws of England and Wales.  The Trust Indenture states that "[a]ll monies . . . paid to the Trustee under the Debt Securities and this Indenture *shall be held by it in trust* for itself and the Holders of Debt Securities in accordance with their respective interests."  (Indenture, Section 3.1 (emphasis added).)  In regard to the Euro Bonds, the "Indenture and such Debt Securities shall be governed by and construed in accordance with the laws of England & Wales," not U.S. law. (*Id.* at Section 12.7).  Accordingly, this Court should not be deciding an issue of English law by issuing orders preventing the transfer of the Euro Bond payment, held in trust by BNYM, to the beneficial holders.  No party has presented issues of English law to this Court, and no party has claimed that payments made on the Euro Bonds are not the property of the Euro Bondholders under English law.  Barring an order from an English court stating otherwise, the Euro Bond payment should be transferred to the beneficial holders in accordance with the Indenture and the terms of the debt securities.[6]

If this Court does not clarify that the Injunctions do not apply to the foreign parties who process payment on the Euro Bonds, the substantial holdings of the Euro Bondholders will be at risk and the foreign third parties that process Euro Bond payments may be subject to significant liability overseas.  Although counsel for the Euro Bondholders raised these issues during the June 27 hearing, this Court held only that the Injunctions bound Argentina and did not clarify whether the Injunctions bind parties *other than Argentina*.  Because foreign entities named in the

---

[6] As noted by BNYM in its motion for clarification, the Euro Bondholders are considering an action against BNYM in England, the proper forum to adjudicate the Euro Bondholders' rights to their trust property, if BNYM does not transfer the Euro Bond payment to the beneficial holders. .

Injunctions may come into possession of payments made on the Euro Bonds, this Court's

immediate guidance on the scope of its orders is imperative.[7]

## BACKGROUND[8]

On February 23, 2012, this Court entered injunctions that enjoined Argentina from

making further payment on its Exchange Bonds until it concurrently or in advance made a

ratable payment to Plaintiffs ("February 23 Orders").  [Dkt. 371.]  The February 23 Orders

further prohibited "all parties involved, directly or indirectly, in advising upon, preparing,

processing or facilitating any payment on the Exchange Bonds" from "aiding and abetting any

violation . . . including any further violation by the Republic . . . such as any effort to make

payments under the . . . Exchange Bonds" without also making a ratable payment to Plaintiffs.

The February 23 Orders did not specifically name any third parties to which it purported to

apply.

The Republic appealed the February 23 Orders to the Second Circuit, which affirmed the

Orders but expressed "concerns" with their "application to third parties," and remanded the case

to this Court to, among other things, "more precisely determine the third parties to which [the

injunction would] apply before [this Court could] decide whether [its] application to them is

_____

[7] On June 27, 2014, this Court granted Citibank N.A.'s motion for clarification, recognizing the urgent need for third parties to have clarity on their obligations, if any, under the Injunctions. Notably, the reasons for excluding Citibank and the Argentine Law Bonds from the scope of the Injunctions apply *equally* to the third parties that process payments on the Euro Bonds:  both sets of bonds are paid by Argentina outside of the U.S. and are governed by foreign law, and the foreign parties that process the Euro Bond payments will face exposure in their home forums if they comply with the Injunctions.  This Court's jurisdiction over BNYM, the apparent owner of the Banco Central account holding the Euro Bond payment, does not change this analysis, as the Court also has jurisdiction over Citibank, N.A., but excluded it from the Injunctions.  We also note that Plaintiffs have moved for reconsideration on the Citibank order [Dkt. 586], but only as it relates to the USD bonds and not to the non-USD bonds.

[8] The Euro Bondholders presume that the Court is familiar with the background of this case and will not recite the details in full here.

reasonable." *NML Capital Ltd. v. Republic of Argentina*, 699 F.3d 246, 264 (2d Cir. 2012) ("*NML I*").

On remand, BNYM filed a declaration explaining the payment process for the different series of Exchange Bonds. *See* November 16, 2012 Declaration of Kevin F. Binnie ("First Binnie Declaration."), attached to the Declaration of Christopher J. Clark ("Clark Decl.") as Exhibit A. The First Binnie Declaration clearly shows that the payment process for the Euro Bonds is completely different than the one for the USD Bonds. To make payments on the Euro Bonds, the Republic transfers funds to a euro deposit account "in the name of [BNYM] at Banco Central" in Argentina. *Id*. ¶ 10. The funds are then transferred from Banco Central to "a Deutsche Bank account in Frankfurt, Germany, in the name of The Bank of New York Mellon S.A. N.V.," a Belgian entity ('BNYM Brussels'). *Id*. ¶ 10. Next, "BNYM Brussels transfers the funds to Euroclear or Clearstream for distribution to its participants, who then distribute the funds to beneficial holders." *Id*. Euroclear and Clearstream are foreign clearinghouses located in Belgium and Luxembourg, respectively. *Id*. ¶ 8. The entire payment process for the Euro Bonds never enters the United States.

On November 21, 2012, after expedited briefing and without a hearing, this Court issued the amended Injunctions that largely tracked the language of the February 23 Orders. The Court also specifically identified certain third parties purportedly subject to the Injunctions, including Euroclear, Clearstream, BNY Luxembourg, and Bank of New York Mellon (London)—all of which are foreign entities outside the jurisdiction of the district court.[9]

---

[9] In a previous case, when the facts were made clear to the Court, this Court acknowledged that it lacked jurisdiction over Euroclear and Clearstream and denied injunctive relief against them as a result. This Court previously held, "*I have no jurisdiction over property that is solely in a foreign country. I just don't, period ... I have a document on its face which has requests for injunctive relief about trust bonds held in Belgium and Germany. I can't do that.*" April 30,

This Court also issued an opinion regarding the Injunctions on November 21, 2012 ("Nov. 21. Op").  [Dkt. 424].  The Court purported to describe the payment process for all of the Exchange Bonds, but discussed only the entities that process the payments for the USD Bonds and omitted any discussion of the foreign entities that process payments for the Euro Bonds.  *See* Nov. 21 Op. at 10.  Although the Court acknowledged that there was a dispute regarding whether the initial payment (for the USD Bonds) takes place in Argentina or the United States, it concluded that "[t]*he rest of the process, without question takes place in the United States*."  *Id.* at 10 n.2 (emphasis added).  That statement, however, does not reflect the undisputed record with respect to the payments on the Euro Bonds, which take place exclusively outside the U.S.

The Republic appealed a second time.  The Euro Bondholders filed a motion to intervene on appeal, which was granted by the Second Circuit on December 6, 2012.  Dec. 6, 2012 Order, No. 12-105 [Dkt. 552].  On August 23, 2013, the Second Circuit affirmed the amended injunctions.  The panel noted, however, that the if "the payment process for [the Euro Bonds] takes place entirely outside the United States, then the district court *misstated that . . . the Exchange Bond payment 'process, without question takes place in the United States.'*"  *NML II*, 727 F.3d at 244) (emphasis added).  The panel also held that the foreign third parties were not bound by the Injunction and would have an opportunity to challenge the injunctions' extraterritorial scope in the district court.  *Id.*

Argentina filed a petition for writ of certiorari to the United States Supreme Court on February 18, 2014.  On June 16, 2014, the Supreme Court denied Argentina's petition for certiorari and, on June 18, 2014, the Second Circuit lifted the stay of the Injunctions.

---

2008 Hr'g Tr. at 51:11-13, 52:7-9, *Seijas v. Republic of Argentina*, No. 04 Civ. 400 (TPG) (S.D.N.Y. Apr. 30, 2008) (emphasis added) [Dkt. 100].

On June 27, 2014, this Court held a hearing during which it was disclosed that Argentina has made an interest payment in Argentina for the benefit of the Euro Bondholders.  During the June 27 hearing, counsel for the Euro Bondholders identified the unique position of the foreign entities that process payments on the Euro Bonds.  This Court reiterated that *"[t]he Republic* is within the jurisdiction of the Court," but did not clarify whether this Court's injunction—either directly or by Rule 65—purports to order the foreign third parties that receive payments on the Euro Bonds, outside the United States, to violate their obligations under foreign law to pass through the money to Euro Bondholders.[10]  The instant memorandum seeks clarification of that question.

## ARGUMENT

### I.  THE FOREIGN THIRD PARTIES THAT PROCESS PAYMENTS ON THE EURO BONDS ARE BEYOND THE JURISDICTION OF U.S. COURTS.

After this Court issued the Injunctions in November 2012, the U.S. Supreme Court expressly resolved the question of when a foreign corporation is subject to general jurisdiction in the U.S.  In *Daimler*, the Supreme Court held that, barring exceptional circumstances not applicable here,[11] a foreign corporation may be subject to general personal jurisdiction only where its "affiliations with the State are so continuous and systematic as to render it essentially *at home* in the forum State."  134 S. Ct. at 761 (2014)  (emphasis added).  The Court further

---

[10] This Court acknowledged that "there may be a need for a sort of special language in any order."  June 27, 2014 Hr. Transcript at 31.  To the extent this Court was acknowledging that there is a need for clarification of the scope of this Court's Injunctions to account for the foreign parties involved in the payment process on the Euro Bonds, Euro Bondholders would welcome that clarification.

[11] The Court left open the possibility that general jurisdiction might also be available in "exceptional circumstances" not present here, such as if a foreign corporation temporarily moved its operations to a U.S. state during a time of military occupation in their place of incorporation. *Daimler*, 134 S.Ct. at 756 (describing *Perkins v. Benguet Consol. Mining Co.*, 342 U. S. 437 (1952)).

clarified that, other than in an "exceptional" case, a corporation is "at home" *only* in the forum where it is incorporated or has its principal place of business. *Id*. at 761, n.19. The Second Circuit confirmed these principles in its recent decision in *Sonera Holding B.V. v. Cukurova Holding A.S*, where it applied the *Daimler* standard and found that "even a company's 'engagement in a substantial, continuous, and systematic course of business' is alone insufficient to render it at home in a forum" other than its country or state of incorporation and the principal place of its business. 2014 U.S. App. LEXIS 7809 (2d Cir. Apr. 25, 2014).

Under *Daimler*, this Court unambiguously does not have jurisdiction over the foreign third parties that process the Euro Bond payments and that were specifically named in the Injunctions. For example, it is undisputed that Euroclear is a commercial bank and securities settlement system incorporated in Belgium, with its principal place of business also in Belgium. *See* Jan. 3, 2013 Euroclear Br. at 1-2, attached to Clark Decl. as Exhibit B. Euroclear's registered office is located in Brussels, Belgium, and the entity is regulated by the National Bank of Belgium. *Id*. at 1. Euroclear is not incorporated in the United States, nor does it have its principal place of business in the United States. In fact, Euroclear has no operations in the United States at all, thus it cannot be considered "at home" here.[12] *See Daimler*, 134 S. Ct. at 761. In short, there is no basis on which to find that this Court has general jurisdiction over Euroclear. Likewise, Clearstream, another European clearinghouse, is not incorporated in the United States and does not have its principal place of business there. Similarly, BNY Luxembourg and BNYM Brussels are incorporated in Luxembourg and Belgium, respectively,

---

[12] Although Euroclear maintains a small representative office in New York for client relationship and support purposes, that does not subject it to jurisdiction in the United States according to the Supreme Court's holding in *Daimler*.

and have their principal places of business in those respective countries.[13]  Thus, under the dictates of *Daimler* and *Cukurova*, this Court lacks jurisdiction over all of those entities. [14]

In the Second Circuit, plaintiffs also contended that the Injunctions are proper because federal courts can "enjoin conduct [] that 'has or is intended to have a substantial effect within the United States.'"  Aurelius Br. at 33 (quoting *United States v. Davis*, 767 F.2d 1025, 1036 (2d Cir. 1985)).  But here, the uncontroverted record shows that payments on the Euro Bonds do not involve U.S. currency and never flow through the U.S. at all.  The conduct of the parties processing payments on the Euro Bonds has *no effect*—let alone a substantial one—within the United States.

On appeal, the Second Circuit explained that it understood the Injunctions to directly enjoin only Argentina, but acknowledged that the district court understood Rule 65(d)(2) to extend the force and effect of the injunction to "foreign payment system participants (such as Clearstream Banking S.A., Euroclear Bank S.A./N.V., and Bank of New York (Luxembourg) S.A.)."  *NML II*, 727 F.3d at 244 (emphasis added).  The Second Circuit also made clear that "when questions arise as to who is bound by an injunction . . . district courts will not withhold a clarification."  *Id*. at 243.  Lacking jurisdiction over those foreign entities, this Court should now clarify that they are not subject to the Injunctions either directly or by operation of Rule 65(d)(2).

---

[13] The Bank of New York Mellon (Luxembourg) S.A. is incorporated in Luxembourg as a société anonyme and has its registered office at 2-4 rue Eugène Ruppert, L-2453, Luxembourg. The Bank of New York Mellon SA/NV is incorporated in Belgium as a société anonyme/naamloze venootschap and has its statutory address at 46 Rue Montoyerstraat, B-1000 Brussels, Belgium.

[14] On appeal, plaintiffs conceded that these entities are not U.S. corporations.  "[The Injunctions] specifically name[] entities – Clearstream Banking S.A., Euroclear Bank S.A./N.V., The Bank of New York (Luxembourg) S.A., . . . *that are not American corporations*."  Jan. 25, 2013 Aurelius Br. at 33, No. 12-105 [Dkt. 820] (emphasis added).  Plaintiffs went on to argue that this Court has jurisdiction over those entities based on law that has since been superseded by *Daimler* and *Cukurova*.  *See id*. at 34.

It is well-established that "[i]njunctions operate only on the parties within the personal jurisdiction of the courts." *Laker Airways, Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 927 (D.C. Cir. 1984).  "A district court cannot exercise personal jurisdiction over a nonparty to a litigation, on the basis that the nonparty is acting 'in active concert or participation', within the meaning of Fed. R. Civ. P. 65(d), with a party who is subject to an injunction, unless personal jurisdiction is established over the nonparty." *Canterbury Belts, Ltd. v. Lane Walker Rudkin, Ltd.*, 869 F.2d 34, 40 (2d Cir. 1989); *see also* 11A C. Wright & A. Miller, Federal Practice and Procedure § 2960, at 377 (1995).  The requirement that the district court establish jurisdiction is in turn tied to the principle that "[a] court should not issue an unenforceable injunction." *Hilao v. Estate of Marcos (In re: Estate of Marcos Human Rights Litig.*), 94 F.3d 539, 545 (9th Cir. 1996).  For this reason, courts properly reject calls to enjoin non-parties over which they cannot obtain personal jurisdiction.  *See id.*, 94 F.3d at 545 ("an injunction against [the target] in the absence of personal jurisdiction over it would be futile, as the court would be powerless to enforce its injunction").

Here, plaintiffs have markedly failed to satisfy their burden to establish that this Court has jurisdiction to issue and enforce an injunction applying to the foreign third parties that process payments on the Euro Bonds.  *See Metro. Life Ins. Co. v. Robertson–Ceco Corp*., 84 F.3d 560, 566-67 (2d Cir. 1996) (burden is on the proponent of the injunction to establish jurisdiction over parties named in the injunction).  Nor has this Court ever made any findings to that effect.  Indeed, this Court apparently was under the mistaken impression—as noted by the Second Circuit—that payments on the Euro Bonds pass through the United States.  They do not. The Injunctions are therefore unenforceable against the foreign third parties that process payment on the Euro Bonds (including Euroclear, Clearstream, BNYM Brussels, and BNYM

Luxembourg), either directly or by operation of Rule 65(d)(2). This Court should clarify that those parties are not within its scope.

## II.    THE FOREIGN THIRD PARTIES THAT PROCESS PAYMENTS ON THE EURO BONDS CANNOT COMPLY WITH THE INJUNCTIONS UNDER FOREIGN LAW

The Injunctions also should be modified because they purport to restrict certain foreign third parties from fulfilling their contractual and legal duties on foreign soil, under foreign law. "[I]t is well established that 'a state may not require a person to do an act in another state that is prohibited by the law of that state.'" *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 60 (2d Cir. 2004) (quoting Restatement (Third) of Foreign Relations Law § 441 (1987)). "[N]or can the person be required to refrain from an act that is required," in a foreign nation by that country's laws. *Reebok Int'l v. McLaughlin*, 49 F.3d 1387, 1392 (9th Cir. 1995); *see also In re Sealed Case*, 825 F.2d 494, 498 (D.C. Cir. 1987) (rejecting "attempt by an American court to compel a foreign person to violate the laws of a different foreign sovereign on that sovereign's own territory"). Seeking to enjoin foreign parties from acting in a manner that contravenes their legal responsibilities under their own forum's law runs afoul of longstanding principles restraining courts from extraterritorial overreaching. *See, e.g., Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 647 (2d Cir. 1956) ("[C]ourts of one state are reluctant to impose liability upon a person who acts pursuant to a privilege conferred by the law of the place where the acts occurred.").

Indeed, the Second Circuit has warned that enjoining activities on foreign soil "should be exercised with great reluctance when it [would] be difficult to secure compliance … or when the exercise of such power is fraught with possibilities of discord and conflict with the authorities of another country." *Vanity Fair Mills*, 234 F.2d at 647; *see also Nguyen Thang Loi v. Dow Chem. Co.* (*In re Agent Orange Prod. Liab. Litig.*), 373 F. Supp. 2d 7, 45 (E.D.N.Y. 2005), aff'd 517

F.3d 104 (2d Cir. 2008) ("Requests for extraterritorial injunctions often raise serious concerns for sovereignty and enforceability which compel denial.").  Such concerns are particularly acute when a court attempts to "arrogate to the federal courts the power to control the banking systems of other countries within their own territory."  *Reebok Int'l*, 49 F.3d, at 1395; *see also Harrods*, 237 F. Supp. 2d at 413.

Here, both Belgian and Luxembourgian law render unenforceable any court orders purporting to restrain clearing systems from their duty to process payments.   In response to a previous effort to enjoin Euroclear from distributing funds to the exchange bondholders of another nation's sovereign debt, the Belgian parliament enacted a law (colloquially known as the "Euroclear Law") in 2004 that expressly precludes enforcement of an injunction against Euroclear or other Belgian or foreign credit institutions acting as cash correspondents.   The law states:

> "Any cash settlement account maintained with the operator of a system or with a cash settlement agent, as well as any cash transfer, through a Belgian or foreign credit institution, to be credited to such cash settlement account, cannot be attached, put under sequestration or otherwise blocked by any means by a participant (other than the operator or the settlement agent), a counterpart or a third party."

Article 9 of the Belgian Act of April 28, 1999 implementing the EU Settlement Finality Directive as amended by Article 15 of the Law of November 19, 2004.

The purpose of the Belgian law is to safeguard the liquidity of the financial markets by ensuring that settlement accounts are free from obstruction.  In fact, the Belgian law was passed *specifically* in response to a previous effort to enjoin Euroclear from distributing funds to the exchange bondholders of Nicaragua's sovereign debt in 2003.  Thus, the Belgian legislature, faced with a situation almost identical to the present, decided that it was against Belgium's public policy to recognize or give effect to injunctions purporting to block the transfers and

15

payments processed by Euroclear in Belgium.  The Euro Bondholders have initiated litigation in

Belgium against Euroclear and BNYM Brussels to obtain an order confirming that the

Injunctions are unenforceable there.

Luxembourgian law likewise prohibits the enforcement of an injunction against funds

passing through Clearstream.  Article 15 of the Luxembourg Securities Act states that "neither an

attachment of, nor an enforcement against, nor a conservatory measure with respect to accounts

to which securities accounts in the securities settlement system are booked are permitted."  *See*

European Commission, EU Clearing and Settlement Legal Certainty Group Questionnaire

Horizontal Answers 294 (Apr 24, 2006).  The Injunctions, therefore, conflict with the laws of

Belgium and Luxembourg—both of which host third party financial intermediaries that process

Argentina's payments on the Euro Bonds.

If interpreted to cover the foreign third parties processing payments on the Euro Bonds,

the Injunctions would inappropriately attempt to forbid Euroclear and other foreign

intermediaries operating in Belgium or Luxembourg from satisfying their legal obligations under

foreign law.  See, *e.g., Reebok Int'l*, 49 F.3d, at 1392 (rejecting order restraining Luxembourg

bank from releasing funds in Luxembourg based on the fact that "Luxembourg banking law

normally compels … the release of depositors' funds on demand").  This, in turn, will make it

impossible for these parties to comply simultaneously with the Injunctions and with their

contractual obligations under governing foreign law, and would result in those foreign parties

being subject to additional litigation and inconsistent judgments.  This Court can avoid those

complications by clarifying that Euroclear, Clearstream, BNYM Brussels, and BNYM

Luxembourg are excluded from the scope of  the Injunctions, and making clear that—whether

directly or by operation of Rule 65(d)(2)—the Injunctions are not directed at the payment process for the Euro Bonds, which involves a foreign currency and takes place outside the U.S.[15]

Clarification is particularly warranted because the exclusion of the foreign parties involved in the Euro Bond payment process will not diminish the force and effect of this Court's equitable remedy.  As this Court has recognized, its Injunctions were not intended "literally to carry out the Pari Passu Clause, as would be done in a normal commercial situation, but to provide a remedy for Argentina's violation of the Clause."  November 21, 2012 Order at 6 [Dkt. No. 425].  The manifest objective of naming third parties in the Court's Injunctions was "to ensure enforcement of the Injunctions' requirement that payments are to be made on the Exchange Bonds only if appropriate payments are made concurrently or in advance to plaintiffs." *Id.* at 9.  Because the parties involved in making payment on over $10 billion of New York-governed, USD Bonds will still be subject to the Injunctions, there is no risk that excluding the foreign parties involved in the Euro Bond payment process will leave the Court's Injunctions without force or deny an adequate remedy to the plaintiffs.  To the contrary, clarifying that the Injunctions apply only to U.S. entities—not foreign third parties or foreign subsidiaries—will ensure that the Injunctions rest on solid legal ground in light of *Daimler* and *Cukurova*.

---

[15] Similarly, the June 26 payment on the Euro Bonds—which constitutes the Euro Bondholders' property—is being held by BNYM pursuant to a trust that is governed by the law of England and Wales.  (*See* Sections 3.1 (Payments) and 12.7 (Governing Law) of the Trust Indenture).  This Court should not prohibit BNYM from transferring those funds to the beneficial owners in the absence of an order from an English court holding otherwise.  An order from this Court directing BNYM to return the Euro Bond payment to Argentina will expose BNYM to liability in England if it complies.  For these reasons, this Court should clarify that BNYM may transfer the Euro Bond payment to the Euro Bondholders, in accordance with the terms of the Indenture and Euro Bonds.

III.   **THE DEPOSITORIES AND CLEARING SYSTEMS INVOLVED IN PAYMENTS ON THE EXCHANGE BONDS SHOULD BE PERMITTED TO SHARE INFORMATION WITH ARGENTINA.**

This Court should clarify that the Injunctions do not prohibit the depositories and clearing systems involved in payments on the Exchange Bonds, including the Depository Trust Company, Euroclear, and Clearstream, from sharing information regarding the identity of the beneficial owners of the Exchange Bonds with Argentina, as such information may be necessary for settlement.

The Exchange Bonds contain a RUFO provision that states if, prior to December 31, 2014, Argentina "voluntarily makes an offer to purchase or exchange . . . or solicits to amend . . . any outstanding Non-Performing Securities," the Exchange Bondholders have the right to exchange their bonds for the same consideration or terms that were provided to the holders of the Non-Performing Securities. *See, e.g.* Euro-Denominated Par Bond due 2038 at Section 8. If Argentina offers to settle with the plaintiffs by, for example, exchanging their Non-Performing Securities for new bonds with better terms than those offered in the 2005 and 2010 exchanges, the RUFO provision may be implicated and Exchange Bondholders may demand similar terms. If that happened, Argentina could owe the Exchange Bondholders additional billions, thus making a settlement prohibitively expensive for Argentina.

The potential triggering of the RUFO provision may be causing a chilling effect on settlement negotiations. It may be necessary, therefore, for Argentina to conduct a consent solicitation seeking a waiver of the RUFO provision by the Exchange Bondholders in advance of a potential settlement. In order to conduct that solicitation, Argentina will need to receive information regarding the identity of the Exchange Bondholders from various depositories and clearing systems, but those entities may refuse to provide that information to Argentina on the ground that it may be considered a violation of the Injunctions to do so. This Court, which has

18

strongly encouraged a settlement, can avoid that obstacle by clarifying now that the Injunctions

do not prohibit the depositories and clearing systems, including specifically DTC, Euroclear, and

Clearstream, from sharing information about the Exchange Bondholders with Argentina.  Such

clarification will promote settlement and lead to an orderly resolution of the case.

## CONCLUSION

For the reasons stated above, this Court should clarify that the Injunctions do not apply to

the third parties that process payments on the Euro Bonds and do not prevent depositories and

clearing houses from sharing information with Argentina.


Dated:      July 14, 2014
            New York, New York

                              Respectfully submitted,

                              LATHAM & WATKINS LLP

                              By  /s/ Christopher J. Clark

                                 Christopher J. Clark
                                 Craig A. Batchelor
                                 885 Third Avenue
                                 New York, New York 10022
                                 Tel: (212) 906-1200

                                 *Attorneys for Non-Parties Euro
                                 Bondholders*