UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                        :
NML CAPITAL, LTD.,                                                      :
                                                                        :
                           Plaintiff,                                   :   08 Civ. 6978 (TPG)
                                                                        :   09 Civ. 1707 (TPG)
              - against -                                               :   09 Civ. 1708 (TPG)
                                                                        :
THE REPUBLIC OF ARGENTINA,                                              :
                                                                        :
                           Defendant.                                   :
                                                                        :
------------------------------------------------------------------------X
AURELIUS CAPITAL MASTER, LTD. and                                       :
ACP MASTER, LTD.,                                                       :
                                                                        :
                                                                        :   09 Civ. 8757 (TPG)
                           Plaintiffs,                                  :   09 Civ. 10620 (TPG)
                                                                        :
              - against -                                               :
                                                                        :
                                                                        :
THE REPUBLIC OF ARGENTINA,                                              :
                                                                        :
                           Defendant.                                   :
------------------------------------------------------------------------X
AURELIUS OPPORTUNITIES FUND II, LLC                                     :
and AURELIUS CAPITAL MASTER, LTD.,                                      :   10 Civ. 1602 (TPG)
                                                                        :   10 Civ. 3507 (TPG)
                           Plaintiffs,                                  :   10 Civ. 3970 (TPG)
                                                                        :   10 Civ. 8339 (TPG)
              - against -                                               :
                                                                        :
THE REPUBLIC OF ARGENTINA,                                              :
                                                                        :
                           Defendant.                                   :
------------------------------------------------------------------------X  *(captions continue on following pages)*

**MEMORANDUM OF THE REPUBLIC OF ARGENTINA CONCERNING
RESOLUTION OF OUTSTANDING DEFAULTED INDEBTEDNESS AND IN
SUPPORT OF MOTIONS FOR CLARIFICATION OF THE EURO BONDHOLDRS,
EUROCLEAR  BANK SA/NV, AND CLEARSTREAM BANKING S.A., AND CITIBANK
N.A.'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL
RECONSIDERATION**

```
----------------------------------------------------------------X
BLUE ANGEL CAPITAL I LLC,                       :
                                                :
                              Plaintiff,        :   10 Civ. 4101 (TPG)
                                                :   10 Civ. 4782 (TPG)
               - against -                      :
                                                :
THE REPUBLIC OF ARGENTINA,                      :
                                                :
                              Defendant.        :
                                                :
----------------------------------------------------------------X
OLIFANT FUND, LTD.,                             :
                                                :
                              Plaintiff,        :   10 Civ. 9587 (TPG)
                                                :
               - against -                      :
                                                :
THE REPUBLIC OF ARGENTINA,                      :
                                                :
                              Defendant.        :
                                                :
----------------------------------------------------------------X
PABLO ALBERTO VARELA, et al.,                   :
                                                :
                              Plaintiffs,       :   10 Civ. 5338 (TPG)
                                                :
               - against -                      :
                                                :
THE REPUBLIC OF ARGENTINA,                      :
                                                :
                              Defendant.        :
----------------------------------------------------------------X
```

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT .................................................................................................................................3

    I.    RESOLUTION OF THE CLAIMS AGAINST THE REPUBLIC IS SUBJECT TO VARIOUS LEGAL AND FACTUAL CONSTRAINTS ............3

    II.    THE COURT SHOULD NOT REQUIRE THE BANK OF NEW YORK MELLON TO RETURN THE EXCHANGE BONDHOLDERS' PROPERTY TO THE REPUBLIC ........................................................................7

    III.    THE COURT SHOULD REJECT PLAINTIFFS' REQUEST THAT IT RECONSIDER ITS RULING PERMITTING PAYMENT ON THE ARGENTINE LAW BONDS ..........................................................................10

CONCLUSION ............................................................................................................................12

## TABLE OF AUTHORITIES

**Page**

**Cases**

*EM Ltd. v. Republic of Argentina,*
131 F. App'x 745 (2d Cir. 2005) ............................................................................... 2

*NML Capital, Ltd. v. Republic of Argentina,*
699 F.3d 246 (2d Cir. 2012) ....................................................................................... 9

Defendant the Republic of Argentina (the "Republic") submits this memorandum concerning the resolution of its outstanding defaulted indebtedness and in support of the pending motions for clarification of the Euro Bondholders, Euroclear Bank SA/NV ("Euroclear") and Clearstream Banking S.A. ("Clearstream"), as well as Citibank N.A.'s ("Citibank") opposition to plaintiffs' motion for partial reconsideration.

## PRELIMINARY STATEMENT

The Republic seeks the resolution, on a fair, equitable, and sustainable basis, of its outstanding indebtedness with all holders of Republic-issued debt that did not participate in the Republic's Exchange Offers, and an end to the litigation that has long burdened both the Court and the Republic by a minority of holdout creditors that chose to ignore the majority – over 92% – who voluntarily participated in the Republic's sovereign debt restructuring. Any resolution, however, faces two undeniable constraints:

*First*, the holdings of this Court and the Second Circuit, as well as Argentine law and principles of inter-creditor equity, mean that a global resolution by definition cannot address merely the approximately $1.6 billion of claims of the plaintiffs subject to the Amended February 23, 2012 Orders (the "Injunctions"), which represent less than 1% of Republic debt eligible for restructuring, or for that matter, the more than $2.4 billion in claims that these plaintiffs alone have for which they have not yet sought *pari passu* "relief." A global resolution must address all holdout claims. As no party disputes, pending in this Court alone are a total of approximately $10 billion in claims on defaulted debt. Another approximately $10 billion pending in other jurisdictions or not yet subject to suit. Claims of holdout creditors represent less than 7.6% of the total sovereign debt that the Republic began restructuring in 2005, in a process through which the Republic achieved voluntary agreement with more than 92% of its

creditors.  This minority should not be allowed to put at risk the restructuring accomplished through the 2005 and 2010 Exchange Offers, and the Republic must therefore be able to resolve all their claims.

*Second*, any resolution must be conducted consistently with the other contractual obligations of the Republic – including the so-called Rights Upon Future Offers ("RUFO") clause that is contained in the debt of the Exchange Bondholders – as well as applicable Argentine law.  If triggered, the RUFO clause could result in billions of dollars of additional claims against the Republic by Exchange Bondholders, putting at further risk the Republic's successful 2005 and 2010 debt restructuring, which the Court of Appeals expressly recognized was "obviously of critical importance to the economic health of a nation" and which both this Court and the Second Circuit have protected from creditor attacks.  *See EM Ltd. v. Republic of Argentina*, 131 F. App'x 745, 747 (2d Cir. 2005).  Missteps in connection with the RUFO clause, which expires on December 31, 2014, could also lead to civil and criminal liability, and serve as grounds for impeachment, under Argentine law for the Argentine officials charged with responsibility for resolving this matter.  The existence of the RUFO "sunset" provision was one of the bases for the Republic's prior request for a brief stay – which this Court denied – so that Exchange Bondholders would not be prevented by the Injunctions from receiving their payments while the Republic worked on a resolution to the extent possible within the bounds of the RUFO clause.  As those risks remain, so does the necessity and appropriateness of a stay.

The prospect of resolution is further complicated by plaintiffs' continued aggressive litigation efforts, including against separate, majority state-owned entities such as YPF S.A., as well as other non-Argentine entities like Chevron Corporation.  The Republic, however, has engaged and continues to engage with the Special Master appointed by the Court to

assist the parties in reaching a resolution.  But that process must take into account these legal and factual constraints.  Steps that ignore them – or that would impose further burdens on third parties, including the Exchange Bondholders – will only make the current situation more difficult to resolve.  That is why the Court was correct to grant Citibank's motion for clarification of the Injunctions – and should deny plaintiffs' motion to reconsider that decision – and why the Court should grant the motions for clarification by the Euro Bondholders, Euroclear, and Clearstream.

## ARGUMENT

**I.    RESOLUTION OF THE CLAIMS AGAINST THE REPUBLIC IS SUBJECT TO VARIOUS LEGAL AND FACTUAL CONSTRAINTS**

The Exchange Bonds issued by the Republic in 2005 and 2010 contain the RUFO clause, which provides:

> if at any time on or prior to December 31, 2014, the Republic voluntarily makes an offer to purchase or exchange (a "Future Exchange Offer"), or solicits consents to amend (a "Future Amendment Process"), any outstanding Non-Performing Securities, each Holder of Securities shall have the right . . . to exchange any of such Holder's Securities for (as applicable): (i) the consideration in cash or in kind received by holders of Non-Performing Securities in connection with any such Future Exchange Offer, or (ii) debt obligations having terms substantially the same as those resulting from any such Future Amendment Process.

*See, e.g.*, Specimen Registered Global Security representing 8.28% U.S. Dollar-Denominated Discount Bonds due 2033 (Ex. L).[1]

The RUFO clause thus represents a legal obligation of the Republic to the holders of its restructured bonds that expires in December 2014, and, consistent with internationally accepted principles of inter-creditor equity, requires that the Republic not make a better offer to

---

[1] The quoted text is from the RUFO clause governing bonds issued pursuant to the 2005 Exchange Offer.  The RUFO clause governing bonds issued pursuant to the 2010 Exchange Offer is substantially identical, except that it is limited to Future Exchange Offers or Future Amendment Processes other than those that are "the same as, or less favorable than," the Republic's 2010 offer.

All exhibits are attached to the accompanying declaration of Carmine D. Boccuzzi, dated July 21, 2014.

defaulted debt holders without extending the same terms to all holders of restructured debt. Proceeding to a global resolution would create an unacceptable risk that Exchange Bondholders could successfully argue that the RUFO clause had been triggered. Although difficult to quantify, this risk clearly exists as there is no precedent on the issue and, as this litigation demonstrates, novel interpretations can be applied to seldom-litigated sovereign debt contract provisions (even where the United States Government takes a contrary position).[2] Moreover, the risk applies not only to an adverse U.S. court ruling, but to the other jurisdictions under which Exchange Bonds were issued, including England and Japan.

The result of such a finding, which could be coupled with Exchange Bondholder requests for billions of dollars in damages and/or injunctions requiring that they receive the same offer, would be the destruction of the Republic's 2005 and 2010 Exchange Offers and have a catastrophic impact on the Republic's economy. Commentators have stated that the potential liability from triggering the RUFO clause could run into the hundreds of billions of dollars. *See* Marcelo Etchebarne, *Una cesación de pagos selectiva: ¿el escenario más probable?*, La Nacion (July 6, 2014), http://www.lanacion.com.ar/1707622-una-cesacion-de-pagos-selectiva-el-escenario-mas-probable (Ex. E) (estimating potential liability of over $500 billion). In light of the magnitude of the potential consequences of triggering the RUFO clause, even a small probability of triggering it renders the risk unacceptable. *See* Mary Anastasia O'Grady, *The Argentine Bond Mess Gets Messier*, The Wall Street Journal (July 13, 2014), http://online.wsj.com/articles/ogrady-the-argentine-bond-mess-gets-messier-1405291417 (Ex. C) ("Making holdouts whole could trigger the [RUFO] clause in the new bonds. . . . Argentina could not support the estimated $120 billion in new debt that would be needed to comply with the

---

[2] *See* United States *Amicus* Br. at 5, *NML Capital, Ltd. v. Republic of Argentina*, 12-105-cv(L) (2d Cir. April 4, 2012) (interpretation of *pari passu* clause "deviates from decades of settled market expectations [and] is contrary to United States economic policy").

[RUFO] clause.  Any effort by Argentina to argue that [a deal] with the holdouts is not voluntary would likely be challenged and lead to lengthy litigation.").

Nor can the Argentine public officials who would be involved in such a transaction risk triggering the RUFO clause, as they would face exposure to numerous sources of domestic liability, including criminal charges.  *See, e.g.*, *Argentina and the holdouts: Tick Tock*, The Economist (July 17, 2014) http://www.economist.com/blogs/americasview/2014/07/argentina-and-holdouts (Ex. A) (practitioner stating that "whatever government officials worked on this deal will face years of criminal trials.") (quotation marks omitted).  Under Argentine law, if public servants cause foreseeable harm to State property, due to either their recklessness or lack of due care, they are subject to impeachment as well as civil and criminal liability.  *See* Constitutión Nacional [Const. Nac.] §§ 53, 59 and 60 (Arg.) (Ex. M); National Public Sector Financial Administration and Control Systems Act No. 24156, §§ 130 and 131 (Ex. O); Ministerio de Economía y Finanzas Públicas, Código Penal [Cód Pen.] [Criminal Code] de la Nación Argentina, arts. 248 and 249, *available at* http://www.infoleg.gov.ar/infolegInternet/anexos/15000-19999/16546/texact.htm (last visited July 21, 2014) (Ex. N).[3]  Here, public officials would plainly be exposed to such liability if, notwithstanding the above-mentioned risks of triggering the RUFO clause, they nonetheless took actions that did so and thereby significantly increased the Republic's liabilities and jeopardized its debt restructuring.  This risk of liability on Argentine civil servants is not theoretical; former

---

[3] The Supreme Court of the Republic, Argentina's highest judicial authority, has expressly emphasized that public officials *must* abide by Argentine law.  *See* Corte Suprema de Justicia de la Nación [CSJN] [National Supreme Court of Justice], 19/11/1992, "Naveiro de la Serna de López Helena María c. Bauhoffer, Martha Beatriz (recurso de hecho)," Base Colección de Fallos (1992-315-2771) (Arg.) ("[I]t is inherent to the exercise of administrative activity that it be performed in accordance with the law as it constitutes one of the expressions of State power and such activity must abide by it.").

5

officials involved in the Republic's 2001 "megaswap" are still facing recently re-opened investigations in Argentina thirteen years later.[4]

Although it is possible to amend the Exchange Bonds to eliminate the RUFO clause, that process is uncertain and, even if successful, could take months to complete. The Republic would need to obtain the written consent of either 75% of the outstanding principal amount of each series of Exchange Bonds or at least 85% of the outstanding aggregate principal amount of all affected series (taken as a whole) *plus* approval by at least 66 2/3% of the outstanding principal amount of each affected series.[5] In either case, the requisite approval would be extremely difficult to obtain, particularly because the RUFO clause was demanded by creditors for their protection.[6]

Given the prohibitive risks outlined above, the Republic cited the RUFO clause as one of several reasons why the Court should stay the Injunctions to provide shelter (a legal umbrella) so that the Republic may engage in a productive dialogue with the aim of resolving this litigation. *See* Letter of C. Boccuzzi to Judge Griesa, dated June 23, 2014 (Ex. H). Although the Court expressed a desire that the status quo be maintained so that the Exchange Bondholders could receive payments while the parties engaged in a dialogue, *see* June 27, 2014 Hr'g Tr. at 20:3-10 (Ex. G), the Court denied that request. Order, *NML Capital Ltd. v. Republic*

---

[4] Eight Argentine officials and former Under Secretary of the U.S. Treasury and bank executive Mulford are involved in this investigation.

[5] The Euro Bondholders are incorrect to suggest that the Court needs to clarify that the Injunctions do not prohibit the relevant depositories and clearing systems, including the Depository Trust Company, Euroclear, and Clearstream, from sharing information about the identity of the Exchange Bondholders in order to facilitate any amendment process. *See* Corrected Euro Bondholders Br. at 18-19. Although in fact those entities do not possess the relevant identification information, the Injunctions do not bar the Republic from communicating with its Exchange Bondholders in an effort to resolve this litigation. Plaintiffs' contention that the Republic would use such information to "evade" the injunctions. *See, e.g.*, Letter of M. McGill to Judge Griesa, dated July 15, 2014 (Ex. B), is baseless.

[6] It is likely that, without the RUFO clause, fewer creditors would have participated in the Republic's 2005 and 2010 Exchange Offers.

*of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. June 27, 2014) (Ex. F).  The risks, however, undoubtedly remain.  In opposing the Republic's request for a stay, plaintiffs offered only their *ipse dixit* assertions that the RUFO clause is not a problem here.  Consistent with the reality of that risk, plaintiffs avoid taking it on themselves (through, for example, an instrument or other guarantee that would provide assurances to the Republic that it would not be left with the financial burden of the RUFO clause being triggered).  Plaintiffs greatly minimize the risk posed by the RUFO clause, to the point of practically ignoring it, but it is a very real one.

In sum, it is impossible for the Republic to move forward with a resolution of its debt in a fair, equitable, and sustainable manner with those creditors who did not participate in the 2005 and 2010 Exchange Offers, if it is not given assurances to protect the debt it restructured with 92.4% of its creditors.  Therefore, absent an instrument that would give the Republic certainty that it will not have to face the financial burden resulting from triggering the RUFO clause, a stay remains necessary and appropriate for the Republic to fully proceed towards the global resolution that all parties and the Court desire.

## II. THE COURT SHOULD NOT REQUIRE THE BANK OF NEW YORK MELLON TO RETURN THE EXCHANGE BONDHOLDERS' PROPERTY TO THE REPUBLIC

The Court should grant the Bank of New York Mellon's ("BNYM") request that it not be required to return to the Republic Exchange Bondholder funds it possesses in connection with the June 30, 2014 payment due on the Exchange Bonds.  That request is fully consistent with the fact that the Exchange Bondholders *own that property*.  There is no basis for plaintiffs' demand that BNYM return the Exchange Bondholders' funds to the Republic, which no longer has title over them, or otherwise turn them over to the Court.  Such an order would needlessly complicate further the present situation while creating additional litigation.

BNYM's motion stems from the Republic's June 26, 2014 payment on the Exchange Bonds, which the Republic made by depositing $539 million into the trust account maintained by BNYM at Banco Central de la República Argentina ("BCRA"). The Republic transferred those funds in compliance with its obligations under Sections 3.1 and 3.5 of the June 2, 2005 Trust Indenture governing the Exchange Bonds. Under that Indenture, BNYM owes duties only to the Exchange Bondholders – and not to the Republic – and any funds received by BNYM must be held in trust for the Exchange Bondholders and be transferred on to them; no other use of the funds is permitted. *See* Trust Indenture, dated June 2, 2005 § 3.1 (the "Indenture") (Ex. J) ("All monies . . . paid to the Trustee under the [restructured debt] and this Indenture shall be held by it in trust for itself and the [Exchange Bondholders] in accordance with their respective interests to be applied by the Trustee to payments due under the [restructured debt]."). As pointed out by the Euro Bondholders, in the context of the euro-denominated Exchange Bonds, that subsequent transfer of monies involves entities located outside the United States. *See* Corrected Euro Bondholders Br. at 10-14. Thus, "this Court unambiguously does not have jurisdiction over the foreign third parties that process the Euro Bond payments and that were specifically named in the Injunctions." *See id.* Likewise, "the financial instruments which are held in accounts maintained at Euroclear Bank are subject to a protective regime enshrined in the Belgian Royal Decree nr. 62 of November 10, 1967, coordinated on January 27, 2004, on the deposit of fungible financial instruments and the settlement of transactions in those instruments . . . . Because of the importance of the Euroclear System on the international and national financial markets, the Euroclear System is moreover recognized and protected by the Belgian Act of April 28, 1999, implementing the European

8

Directive 98/26/EC of May 19, 1998, on settlement finality in payment and securities settlement systems." *See* July 9, 2014 Declaration of Fabien Debarre ¶15.

Once the initial transfer to BNYM's account takes place, the Republic has no right to the funds, and they are no longer the property of the Republic. *See* Indenture § 3.5(a) (Ex. J) ("[S]uch amounts shall be held in trust by the Trustee for the exclusive benefit of the Trustee and the [Exchange Bondholders] . . . in accordance with their respective interests and the Republic shall have no interest whatsoever in such amounts.").

Since it received the funds on June 26, BNYM has kept the funds in its account at BCRA. Therefore, absent a stay of the Injunctions, the Court should grant BNYM's motion so that the property rights of the bondholders are not affected. The Republic's position is that the Court should allow BNYM to fulfill its fiduciary obligation to transfer the Exchange Bondholders' property on to them, as any contrary action is inconsistent with that obligation. Preventing BNYM from fulfilling its fiduciary obligations is even more problematic with respect to the Euro Bondholders, who have separately moved for clarification that the Injunctions do not prohibit foreign entities from transferring their funds to them because those entities are beyond the jurisdiction of the Court and subject to conflicting foreign laws.

The option before the Court proposed by plaintiffs – ordering BNYM to transfer the Exchange Bondholders' property *back* to the Republic even after title has transferred or otherwise turn their property over to the Court where it will be subject to improper execution attempts – lacks any legal or contractual basis and will prompt additional disputes before the Court. Indeed the latter option is particularly inappropriate, in light of plaintiffs' insistence in both this Court and the Second Circuit that they were not seeking to execute on any property of the Exchange Bondholders – an assertion upon which the Court of Appeals expressly relied

9

when ruling that the Injunctions do not violate the Foreign Sovereign Immunities Act or New York trust and attachment law. *See NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 262 & n.14 (2d Cir. 2012) ("Nothing in the Injunctions suggests that plaintiffs would 'execute upon' any funds, much less those held in trust for the exchange bondholders."). Granting plaintiffs' request would thus result in an illegal appropriation of funds that belong to third parties, and would contradict the Second Circuit.

### III. THE COURT SHOULD REJECT PLAINTIFFS' REQUEST THAT IT RECONSIDER ITS RULING PERMITTING PAYMENT ON THE ARGENTINE LAW BONDS

On June 27, 2014, this Court held that the Injunctions "do not as a matter of law prohibit payments by Citibank, N.A.'s Argentine branch" on Argentine Law Bonds, *i.e.*, "Peso- and U.S. Dollar-denominated bonds – governed by Argentine law and payable in Argentina – that were issued by the Republic of Argentina in 2005 and 2010." Order, *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. June 27, 2014) (Ex. F). In reaching that conclusion, the Court expressly "disagree[d]" with plaintiffs' assertion that the Argentine Law Bonds are "within the scope of [the] exchange bonds" covered by the Court's Injunctions and that it is therefore "illegal under [Y]our Honor's orders that have been affirmed for Argentina to pay those bonds, and . . . illegal for Citibank to facilitate those payments." June 27, 2014 Hr'g Tr. at 27:10-17 (Ex. G). Payment on the Argentine Law Bonds is therefore proper and does not violate the Court's Orders.

After the Court entered its June 27 Order, Citibank processed payments on the Argentine Law Bonds in accordance with its contractual obligations, including by transferring funds to Euroclear and Clearstream. Out of an abundance of caution, those entities have asked the Court to clarify that they may similarly transfer on to their customers the Argentine Law

Bond funds that they properly received from Citibank.  Plaintiffs have since filed a motion of their own, asking the Court to take the unusual step of reversing its prior holding that the U.S. Dollar-denominated Argentine Law Bonds are not subject to the Injunctions.  The Court should grant the motions for clarification of Euroclear and Clearstream and deny plaintiffs' motion for reconsideration.

The Court's June 27 ruling that the Argentine Law Bonds are not subject to its Injunctions was entirely correct.  The Argentine Law Bonds are fundamentally different from the bonds governed by New York law and, as the Court recognized, have been treated as such in this litigation.  *See id.* at 26:23-27:1 (Ex. G) (stating the Court's "understanding that the bonds you're talking about have been treated differently . . . all along").  From day one, plaintiffs have sought to enjoin *only* payments on the Exchange Bonds that are paid through BNYM.  *See, e.g.*, NML Summary Judgment Br. at 18-19 n.12, Oct. 20, 2012, Dkt. # 230 (specifically targeting payments on 2005 and 2010 bonds that flow through BNYM); NML Renewed Specific Performance Br. at 7, Jan. 6, 2012, Dkt. # 361 ("Under the 2005 Exchange Offers, Argentina provides funds to the Bank of New York or that Bank's 'trustee paying agent'"); *id.* at 7 n.2 ("Under the 2010 Exchange Bonds, the Republic provides funds to BNY Mellon"); Pls. Remand Br. at 10-11, Nov. 13, 2012, Dkt. # 390 ("Argentina transfers funds to [BNYM]" when "making its payments on the Exchange Bonds" subject to the Court's Orders).  Before now, throughout the more than three years that this action has been pending before the Court, plaintiffs did not once claim that payment on the Argentine Law Bonds – which does not involve BNYM at all – was improper.  Plaintiffs never asked the Court to bar payments on the Argentine Law Bonds, and the Court accordingly never purported to do so.

11

Nor could the Court have intended to do so, as the Argentine Law Bonds are fundamentally different from the bonds governed by New York law subject to the Orders. Unlike the latter, the Argentine Law Bonds were issued by domestic Executive Decrees, are governed by domestic Argentine law, are sitused in Argentina, are listed only domestically on the Argentine stock exchange, and did not submit to U.S. jurisdiction. *See* Prospectus Supplement at S-42, S-103, S-113-S-115, S-118 (Ex. K).[7] Moreover, as with the funds corresponding to bonds governed by the law of England and Wales, and Japan, the funds pertaining to bonds governed by Argentine law at no moment in the payment chain need to pass through the United States. Those funds are therefore beyond the jurisdiction of the Court.

The Court should accordingly decline plaintiffs' invitation to needlessly and improperly expand the scope of the Injunctions at this late stage to also cover the Argentine Law Bonds. *See* Citibank Br. at 8-23; Euroclear Br. at 2-6; Clearstream Br. at 1-4. Expanding those Orders now to cover the Argentine Law Bonds is incorrect given the nature of those bonds and would unnecessarily jeopardize additional bondholder payments and incite further motion practice without helping to bring about the global resolution that plaintiffs purport to desire. The Court should decline to do so.

## CONCLUSION

For the reasons stated here, a stay, along with adequate and sufficient protection of the Republic against economic and financial RUFO-clause risk, are necessary and appropriate to allow, on the one hand, the Exchange Bondholders to receive scheduled payments on their

---

[7] For all the same reasons, the Court should permit JPMorgan Chase Bank N.A.'s Tokyo Branch to process payments on Yen-denominated Japanese law bonds. *See* Letter of A. Weiss to Judge Griesa, dated July 9, 2014 (Ex. D) (requesting clarification with respect to whether the Injunctions cover the Yen bonds). Those bonds are similarly not the subject of the Injunctions or accompanying Opinion and differ fundamentally from the New York-law bonds subject to the Court's Orders.

12

bond interests, while on the other hand, to allow the Republic, if appropriately protected from RUFO risk, to seek a fair, equitable resolution of all of the Republic's indebtedness.

Likewise, the Court should grant the motions for clarification of the Euro Bondholders, Euroclear, and Clearstream, and deny plaintiffs' motion for reconsideration.

Dated: New York, New York
July 21, 2014

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:  /s/ Carmine Boccuzzi
    Jonathan I. Blackman (jblackman@cgsh.com)
    Carmine D. Boccuzzi (cboccuzzi@cgsh.com)

One Liberty Plaza
New York, New York 10006
(212) 225-2000
Attorneys for the Republic of Argentina