UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
                                      :

NML CAPITAL, LTD.,                       :

                  Plaintiff,       :    08 Civ. 6978 (TPG)

                                  :    09 Civ. 1707 (TPG)

           - against -         :    09 Civ. 1708 (TPG)

                                  :

THE REPUBLIC OF ARGENTINA,     :

                  Defendant.    :

------------------------------------------------------------------ X

AURELIUS CAPITAL MASTER, LTD. and   :
ACP MASTER, LTD.,                   :

                                  :    09 Civ. 8757 (TPG)

                Plaintiffs,    :    09 Civ. 10620 (TPG)

                                  :

           - against -         :

                                  :

THE REPUBLIC OF ARGENTINA,     :

                  Defendant.    :

------------------------------------------------------------------ X

AURELIUS OPPORTUNITIES FUND II, LLC   :
and AURELIUS CAPITAL MASTER, LTD.,   :

                                  :    10 Civ. 1602 (TPG)

                                  :    10 Civ. 3507 (TPG)

                Plaintiffs,    :    10 Civ. 3970 (TPG)

                                  :    10 Civ. 8339 (TPG)

           - against -         :

                                  :

THE REPUBLIC OF ARGENTINA,     :

                  Defendant.    :

------------------------------------------------------------------ X  *(captions continue on following pages)*


**DECLARATION OF CARMINE D. BOCCUZZI CONCERNING RESOLUTION OF
OUTSTANDING DEFAULTED INDEBTEDNESS AND IN SUPPORT OF MOTIONS
FOR CLARIFICATION OF THE EURO BONDHOLDRS, EUROCLEAR  BANK SA/NV,
AND CLEARSTREAM BANKING S.A., AND CITIBANK N.A.'S OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL RECONSIDERATION**

```
-------------------------------------------------------------- X
BLUE ANGEL CAPITAL I LLC,                       :
                                                :
                         Plaintiff,             :   10 Civ. 4101 (TPG)
                                                :   10 Civ. 4782 (TPG)
            - against -                         :
                                                :
THE REPUBLIC OF ARGENTINA,                      :
                                                :
                         Defendant.             :
                                                :
--------------------------------------------------------------X
OLIFANT FUND, LTD.,                             :
                                                :
                         Plaintiff,             :   10 Civ. 9587 (TPG)
                                                :
            - against -                         :
                                                :
THE REPUBLIC OF ARGENTINA,                      :
                                                :
                         Defendant.             :
                                                :
--------------------------------------------------------------X
PABLO ALBERTO VARELA, et al.,                   :
                                                :
                         Plaintiffs,            :   10 Civ. 5338 (TPG)
                                                :
            - against -                         :
                                                :
THE REPUBLIC OF ARGENTINA,                      :
                                                :
                         Defendant.             :
--------------------------------------------------------------X
```

Pursuant to 28 U.S.C. § 1746, Carmine D. Boccuzzi declares as follows:

1.      I am an attorney admitted to practice before this Court and a partner at Cleary Gottlieb Steen & Hamilton LLP, counsel for defendant the Republic of Argentina (the "Republic") in these matters.  I submit this declaration on behalf of the Republic concerning resolution of outstanding defaulted indebtedness and in support of motions for clarification of the Euro Bondholders, Euroclear Bank SA/NV, and Clearstream Banking S.A., and in support of Citibank N.A.'s opposition to plaintiffs' motion for partial reconsideration.

2.      Attached to this declaration as Exhibits A-O are true and correct copies of the following documents:

| Ex. | Document |
| --- | --- |
| A | *Argentina and the holdouts: Tick Tock*, The Economist (July 17, 2014) http://www.economist.com/blogs/americasview/2014/07/argentina-and-holdouts; |
| B | Letter of M. McGill to Judge Griesa, dated July 15, 2014; |
| C | Mary Anastasia O'Grady, *The Argentine Bond Mess Gets Messier*, The Wall Street Journal (July 13, 2014), http://online.wsj.com/articles/ogrady-the-argentine-bond-mess-gets-messier-1405291417; |
| D | Letter of A. Weiss to Judge Griesa, dated July 9, 2014; |
| E | Marcelo Etchbarne, *Una cesación de pagos selectiva: ¿el escenario más probable?*, La Nacion (July 6, 2014), http://www.lanacion.com.ar/1707622-una-cesacion-de-pagos-selectiva-el-escenario-mas-probable; |
| F | Order, *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. June 27, 2014); |
| G | Hr'g Tr., *NML Capital Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. June 27, 2014) (excerpts); |
| H | Letter of C. Boccuzzi to Judge Griesa, dated June 23, 2014; |
| I | Order, *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. Nov. 21 2012). |
| J | Trust Indenture, dated June 2, 2005 (excerpts); |

| Ex. | Document |
|---|---|
| K | Prospectus Supplement, dated December 27, 2004 (excerpts); |
| L | Specimen Registered Global Security representing 8.28% U.S. Dollar Denominated Discount Bonds due 2033, issued in the 2005 exchange offer; |
| M | Constitutión Nacional [Const. Nac.] §§ 53, 59 and 60 (Arg.); |
| N | Ministerio de Economía y Finanzas Públicas, Código Penal [Cód Pen.] [Criminal Code] de la Nación Argentina, arts. 248 and 249, *available at* http://www.infoleg.gov.ar/infolegInternet/anexos/15000-19999/16546/texact.htm (last visited July 21, 2014); |
| O | National Public Sector Financial Administration and Control Systems Act No. 24156, §§ 130 and 131. |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 21, 2014, in New York, New York.


      /s/ Carmine Boccuzzi      
CARMINE D. BOCCUZZI

# EXHIBIT A



**The Economist**

---

Americas view
**The Americas**

---

**Argentina and the holdouts**
# Tick tock

Jul 17th 2014, 10:17 by H.C. | BUENOS AIRES

ARGENTINA'S impressive run in the World Cup meant that, for the past few weeks, the country has existed in a state of football-fuelled bliss. Restaurants were strewn with blue and white streamers; bars extended happy hours; and stores offered discounts. Now troublesome reality has returned. Argentina's vice-president is under investigation for corruption; its economy is in recession; and its inflation rate is the second-highest in the world. Most pressingly of all, it is less than two weeks away from default.



Last month the Supreme Court of the United States declined to hear Argentina's defence against NML Capital, a fund that scooped up steeply discounted debt left over from Argentina's 2001 default, and has been holding out for full payment of principal and outstanding interest. Argentina had been hoping to appeal against a decision by Thomas Griesa, a judge in a New York district court, barring Argentina from paying the 93% of investors who exchanged their non-performing securities for performing ones, if it did not also pay the holdouts.

The Supreme Court's decision means that Argentina must either pay or do a deal with NML if it wants to keep current on its restructured debts. If it does not do so by July 30th, when the grace period on a June 30th interest payment to exchange bondholders expires, Argentina will enter into default for the eighth time in its history.

The prevailing assumption is that a deal will be done. But the clock is ticking, and Argentine behaviour since the Supreme Court decision has been erratic, to put it mildly. President Cristina

Fernández de Kirchner and Axel Kicillof, her economy minister, have both expressed willingness to negotiate in certain circumstances, only to blast the court ruling and NML in others. They have taken out full-page adverts in American newspapers lambasting Judge Griesa's decision; Mr Kicillof has delivered impassioned diatribes against vulture funds to the United Nations (UN) and Organisation of American States (OAS).

The country's representatives have met twice with Daniel Pollack, the "Special Master" appointed by Judge Griesa to oversee negotiations, but have yet to meet with anyone from NML itself. In a statement on July 11th, NML vented: "Argentina is still refusing to negotiate with its creditors, either directly or indirectly, about any aspect of this dispute, and we have not heard that it has any plans to change course. Simply put, we have not seen any indication that Argentina is serious about even beginning a negotiation."

Little has been made public about the Argentine delegation's meetings with Mr Pollack, but rumours hold the main sticking-point is timing. Argentina has argued that paying or negotiating a deal with NML before January 1st 2015 could trigger a "Rights on Future Offers" (RUFO) clause written into the restructured bond contracts. This clause, which expires on the last day of this year, says that Argentina cannot "voluntarily" extend a better offer than the one it made during its 2005 and 2010 restructurings without also proffering the same deal to all debt holders. Pay NML what it wants, in other words, and everyone could be entitled to the same treatment.

NML says that the RUFO is a red herring that Argentina is using to stall payment. Since Argentina has appealed its case all the way up to the Supreme Court and lost, no judge would interpret any settlement as "voluntary," NML argues.

Marcelo Etchebarne, a lawyer specialising in sovereign debt, says Argentina could probably pay NML the amount in Judge Griesa's ruling without triggering the RUFO, but that he understands the Republic's caution. The clause is open to interpretation but if it were triggered, he thinks the claims have the potential to overwhelm Argentina's foreign-currency reserves. There is another threat, too: criminal charges. Triggering the RUFO would have the effect of increasing Argentina's debt burden, which could open officials up to malpractice suits. "The market has been optimistic about a negotiated solution, which is logical. There is so much upside to solving this, and so much downside to defaulting," says Mr Etchebarne. "But what the market is not taking into consideration is that if the RUFO clause is triggered, whatever government officials worked on this deal will face years of criminal trials."

Mr Kicillof says he has spoken with Mr Pollack about his desire for a stay on Judge Griesa's order, which would allow Argentina to continue paying the holders of its restructured debt and also run down the clock on the RUFO clause. But Judge Griesa has already rejected one request

for a stay, and there is no obvious reason for him to change his mind now. Alternatively, there is speculation that Argentina may try to dodge the RUFO clause by offering NML promissory notes now and changing them for performing securities in January 2015. Another tack Argentina might take is to ask exchange bondholders to waive the clause altogether. On July 16th a group of creditors asked the courts to let intermediaries reveal the identities of exchange bondholders, which would help Argentina in this task.

Only two weeks remain for Argentina to resolve the conundrum. Judge Griesa has announced a new hearing on July 22nd to hear various requests and motions by banks and creditors. But no new meetings with Mr Pollack have been confirmed. Argentina is infamous for pushing things to the limit; a last-minute accord would not be out of character. Even so, time is running out.

# EXHIBIT B

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel 202.955.8500
www.gibsondunn.com

Matthew D. McGill
Direct: +1 202.887.3680
Fax: +1 202.530.9662
MMcGill@gibsondunn.com

July 15, 2014

**VIA ECF**

The Honorable Thomas P. Griesa
U.S. District Court for the Southern District of New York
United States Courthouse
500 Pearl St., Room 1630
New York, NY 10007-1312

> Re:  *NML Capital, Ltd.* v. *Republic of Argentina*, Nos. 08 Civ. 6978 (TPG), 09
> Civ. 1707 (TPG), 09 Civ. 1708 (TPG); and related cases

Dear Judge Griesa,

I write on behalf of Plaintiffs in the above-referenced actions in regard to the briefing schedule for the Euro Bondholders' emergency motion for clarification in light of their filing yesterday evening of a "corrected" memorandum of law in support of their motion.

The Euro Bondholders filed their original motion and memorandum on June 29, 2014. On July 10, 2014, the Bank of New York Mellon filed a response to that motion that demonstrated that the Euro Bondholders had made numerous misstatements about the payment process on their Exchange Bonds. Of greatest relevance, the Bank of New York Mellon explained in its response that the account at Banco Central de Republica de Argentina ("BCRA") to which Argentina sent approximately €225.9 million in an illegal attempt to pay the Euro Bondholders' Exchange Bonds, was owned by Bank of New York Mellon and not (as the Euro Bondholders had asserted) Bank of New York Luxembourg ("BNY (Lux)"), and that the Bank of New York Mellon, not BNY (Lux), directed and controlled the entire process of payment on the Euro Bonds. ECF No. 581, at 1, 3. That misstatement by the Euro Bondholders was a critical linchpin of their assertion that all of the participants in the payment processes of the euro-denominated Exchange Bonds were "foreign entities that are outside of this Court's jurisdiction." ECF No. 545 at 1. As the Court has repeatedly ruled, both the Bank of New York Mellon and Argentina are subject to the jurisdiction of this Court. Because the BCRA account is owned by the Bank of New York Mellon, not by any foreign entity beyond the Court's jurisdiction, the analysis ends there, and the status of any other entity is irrelevant.

Yesterday, the Euro Bondholders stated that they had "submit[ted] th[e] corrected memorandum based on information that came to light in filings by the Bank of New York

# GIBSON DUNN

The Honorable Thomas P. Griesa
July 15, 2014
Page 2

Mellon ("BNYM") on July 10, 2014, subsequent to the filing of the Euro Bondholders' motion for clarification." But this "corrected" memorandum advances arguments not made in the original memorandum, and seeks relief not sought in the original motion.

Most conspicuously, the "corrected" memorandum includes an entirely new section that asks this Court to modify the injunction to permit the depositories and clearing systems involved in payments on the Exchange Bonds to share the identity of the beneficial owners of the Exchange Bonds **with Argentina**. *Compare* ECF No. 587, at 4-5, 18-19 (corrected motion making this request), *with* ECF No. 545 (original motion, without request). That entirely new request for relief plainly is not a clarification and is most disconcerting to Plaintiffs: Argentina's actions to date have made clear that it is actively attempting to fulfill its payment obligations to the Exchange Bondholders without making a Ratable Payment to Plaintiffs, in clear violation of the Injunction. Identifying the beneficial interest holders of Exchange Bonds to Argentina would facilitate an attempt by Argentina to circumvent Bank of New York Mellon and to set up a new clearing system outside the jurisdiction of this Court to make illegal payments on the Exchange Bonds.

Even if this is not the intention of the Euro Bondholders' new request for relief, that new request for relief plainly exceeds what is allowed under any practice of "correction" of a previously filed motion. *See, e.g.*, *Dudley ex rel. Estate of Patton v. Penn-Am. Ins. Co.*, 313 F.3d 662, 675 (2d Cir. 2002) ("The heart of the distinction between an error that is correctable under Rule 60(a) and one that is not is that a correction under Rule 60(a) cannot alter the substantive rights of the parties, but rather may only correct the record . . . .").

Inasmuch as the agreement of the parties to the briefing schedule stated in the July 14 letter of counsel for the Euro Bondholders was predicated on the filing of a corrected memorandum, and inasmuch as the memorandum was not merely corrected, but instead includes new arguments and adds a new request for relief, Plaintiffs cannot fairly be bound by the schedule to which they had agreed. Unless the Euro Bondholders and plaintiffs agree on a revised schedule, plaintiffs will treat the "corrected" memorandum as the filing of a new motion and will file their opposition accordingly. Obviously, if the Court would prefer a different schedule for consideration of this matter, plaintiffs will comply.

Very truly yours,

/s/ Matthew D. McGill
Matthew D. McGill

cc:     All counsel of record (via ECF)

# EXHIBIT C

WSJ LIVE    MARKETWATCH    BARRON'S    PORTFOLIO    DJX    MORE

News, Quotes, Companies, Videos     SEARCH

≡   |   **OPINION**

Matthew's Journal ▾    Live Help

TOP STORIES IN OPINION    1 of 12


**The Real Putin**

2 of 12
**Job Hunting in the Network Age**

3 of 12

**An Air Disaster a Long Time in the Maki...**

**Senate Hostage Takers**

THE AMERICAS

# The Argentine Bond Mess Gets Messier

Payments to the holdouts ordered by a New York judge may trigger a cascade of new litigation.

By MARY ANASTASIA O'GRADY



Email    Print    24 Comments

July 13, 2014 6:43 p.m. ET

Federal judge Thomas Griesa won accolades as a champion of the rule of law in 2012 when he decided that Argentina could not pay bondholders who had accepted a write-down after the country's 2001 default. He said those creditors could be paid only if investors who had not exchanged their bonds for new bonds and instead filed for full payment in his court were made whole.

At the center of the legal wrangling was the question of how to interpret "pari passu" clauses in bond contracts, which seek to ensure that all creditors are treated equally. The judge's ruling was upheld on appeal. But other advocates of the rule of law disagree with a wide reading of such clauses. For example, a 2005 study of the issue by the Financial Markets Law Committee of the Bank of England called it "incorrect" to use *pari passu* to prevent payments from insolvent debtors to some creditors if others are not paid.


Enlarge Image

President of Argentina, Cristina Fernandez de Kirchner
*Getty Images*

Although the Bank of New York BK +1.13% is trustee for all the bonds in question, it is also unclear why holders of Argentine Euro bonds governed by U.K. law and payable outside the U.S., who are owed more than half of the interest due at the end of June, ought to be denied payment by a New York judge. What is more, complying with the judge's 2012 order could trigger a clause in the bonds requiring that all bondholders be made whole.

Welcome to the Argentine debt debacle. King Solomon had an easier case before him. The only beneficiary of the fiasco may turn out to be the International Monetary Fund, which is using the mess to revive its calls for a multilateral bankruptcy court with the power to dictate sovereign-debt restructuring.

Since 2005, 93% of the Argentine bonds that went into default in 2001 have been exchanged for new bonds. Those who participated in the exchange accepted a 65% cramdown in order to restart their interest payments. But NML Capital and Aurelius, two New York "vulture" investors, hold bonds that were not exchanged. The irony here is that Argentina only has the ability to pay off these plaintiffs who went before Judge Griesa because it so effectively stiffed the vast majority of creditors.

Argentina knows that paying some holdouts implies future legal action that could eventually require that all holdouts be paid. That could bring the price of a settlement to $15 billion, which would be difficult but still possible. President Cristina Kirchner's strategy of restricting key agricultural exports in order to hold down domestic prices has

**Popular Now**     What's This?

ARTICLES

1   **A Female Fighter Takes On Hollywood**


2   **Air-Defense Intelligence Deepens Mystery**


**Ukraine Plays Role as Aviation Crossroad**

damaged the country's stock of international reserves. A cash settlement with the holdouts would vaporize more than half of the reserves left at the central bank.

It gets worse. Making holdouts whole could trigger the "rights upon future offer" (aka "rufo") clause in the new bonds. It promises to make those who took the write-down a part of any voluntary improved settlement with holdouts that is made before the end of 2014. Argentina could not support the estimated $120 billion in new debt that would be needed to comply with the rufo clause. Any effort by Argentina to argue that the court-ordered settlement with the holdouts is not voluntary would likely be challenged and lead to lengthy litigation.

Alternatively the holdouts could try to strike a deal that would delay any settlement until after the rufo clause expires. But unless Argentina agreed to a partial payment or an escrow deposit, that would require trust, which is in short supply when dealing with Mrs. Kirchner.

Judge Griesa's ruling means that if Argentina doesn't settle with the holdouts, or find a way to make the exchange-bond payments that are due, it will go into default at month's end.

Argentina remains defiant. At the end of June it sent $538 million to the Bank of New York and instructed it to make the interest payments due on the exchange bonds. On Wednesday the government ran a two-page legal notice in The Wall Street Journal explaining that it has "duly deposited" with the Bank of New York, "the amounts of interest due on the New Debt Securities," and that failure to make the payment be a failure on the part of the bank as trustee and not a default.

The Bank of New York is unable to make the payments without crossing the judge and unable to send the money back without instructions from Argentina. It has filed a motion for clarification. Since Judge Griesa has ruled that the trustee may make payments on bonds governed under Argentine law, holders of Euro bonds have filed a motion requesting similar treatment.

This chaos is good news for those who wanted an IMF sovereign-bankruptcy court in 2001. They're back and arguing that markets, even utilizing collective-action clauses, are no match for clever vultures—so instead the world needs to put politically charged multilaterals in control of sovereign defaults. That's not a good prognosis for the rule of law.

*Write to O'Grady @wsj.com*

---

Email   Print   24 Comments   Order Reprints

---

**WSJ In-Depth**


**Costly Drug Is Denied; Medicaid Takes Heat**


**Buffett's Achilles' Heel: Investing in Retail**


**Egypt Tries to Broker Mideast Truce**


**Pimco and Gross Struggle to Heal**


**Stymied in Washington, Obama Hits the Road**


**Interactive: The Lasting Impact of World War I**

3 

4 **How Shakira Became Queen of Facebook** 

5 **Concern Grows Over Crash Investigation** 

**VIDEO**

1 **Ukraine Says Video Shows Rebels Transporting Missiles** 

2 **Video: Rebel Shoot-Down of Ukrainian Military Plane** 

3 **MH17 Crash: Where Rebels Got Their Missiles** 

4 **More Planes Than Just MH17 Shot Out of Ukraine Sky** 

5 **How Flights Like MH17 Decide Their Routes** 

# EXHIBIT D

# LEVI LUBARSKY & FEIGENBAUM LLP

ATTORNEYS AT LAW

1185 AVENUE OF THE AMERICAS

17TH FLOOR

NEW YORK, NEW YORK 10036

TEL. (212) 308-6100

FAX (212) 308-8830

WWW.LLF-LAW.COM

July 9, 2014

***Via ECF and Hand Delivery***

Honorable Thomas P. Griesa
United States District Judge
United States District Court, S.D.N.Y.
500 Pearl Street
New York, New York 10007

   Re: *NML Capital v. The Republic of Argentina*, Nos. 08 Civ. 6978 (TPG), 09 Civ. 1707
    (TPG), 09 Civ. 1708 (TPG) and related cases

Dear Judge Griesa:

   I am writing on behalf of interested non-party JPMorgan Chase Bank, N.A. ("JPMCB"),
pursuant to Paragraph 2(h) of the Court's Amended February 23, 2012 Order, dated November
21, 2012 (the "Order"), to respectfully request clarification of JPMCB's duties under the Court's
orders in this matter. Should the Court require a formal motion for clarification, please let us
know and we will present the question by formal motion.

   JMPCB received a letter dated June 24, 2014 from counsel for plaintiffs, enclosing
several of the Court's orders, stating that the orders were sent "to provide you with actual notice
of the orders described and enclosed herein, and to ensure that you do not engage in any action
that would facilitate or enable Argentina's violation of such orders." June 24, 2014 Letter of
Eric J. Finkelstein, at 1, attached hereto as Exhibit A ("Plaintiffs' Letter"). The Plaintiffs' Letter
cited Fed. R. Civ. P. 65(d)(2), which provides that persons are bound by an injunction who have
"actual notice" and who "are in active concert or participation" with the parties to the injunction
or their agents. *Id*. at 3; Fed. R. Civ. P. 65(d)(2)(C).

   JPMCB seeks clarification with respect to the appropriate treatment of the following
transactions. On or about June 27, 2014, the Tokyo Branch of JPMCB received electronic funds

Hon. Thomas P. Griesa
July 9, 2014
Page 2

transfers from an account of the Bank for International Settlements ("BIS") at Bank of Japan. These transfers originated with the account of Banco Central de la Republica Argentina at BIS (the "Sender"), and were payable to the account of Caja de Valores S.A. ("Caja") at JPMCB (Tokyo Branch) in the amount of ¥212,702,982 (approximately $2,085,323) (the "Funds"). The payment orders transmitting the Funds did not indicate any beneficiary of the transfers other than Caja.

On July 3, 2014, Caja informed JPMCB by letter that the Funds were transferred by the Republic of Argentina (the "Republic") in order to process a payment related to certain Yen-denominated bonds issued by the Republic under Japanese law (the "Bonds"); that the Republic had instructed Caja to make payment for that purpose; and that Caja, on the understanding that there is no legal restraint preventing such a payment, would issue a payment order to JPMCB in accordance with the Republic's instructions. Caja subsequently informed JPMCB that the ISINs of the Bonds are ARARGE03G738, ARARGE03G753 and ARARGE03E667. On July 4, 2014, JPMCB received a payment order from Caja directing payment to the account of Citibank, N.A. (Argentina Branch) at Citibank Japan in the amount of ¥212,702,980.

Since receipt, JPMCB (Tokyo Branch) has held the Funds on the basis that any payments on the Bonds may be subject to the terms of the Court's orders. Among other questions, it is unclear to JPMCB whether the Bonds constitute "Exchange Bonds" pursuant to Paragraph 2(a) of the Order and/or "External Indebtedness" pursuant to Paragraph 1(c) of the 1994 Fiscal Agency Agreement, as referenced in the first recital and Paragraph 2 of the Order, or whether other provisions of the Order may apply.

JPMCB has no contractual role specific to the Bonds, and its only relevant contractual obligations here are to its account holder, Caja. In light of Fed. R. Civ. P. 65(d)(2) and Plaintiffs' Letter, JPMCB seeks to avoid a risk of litigation or liability with respect to its handling of the Funds. To avoid the risk of inconsistent claims with respect to the Funds by the plaintiffs, the Republic, Caja and/or other parties, and so as to not run afoul of the Court's orders, JPMCB seeks direction from the Court regarding the applicability of the orders to JPMCB, its handling of the Funds, and its response to the instructions received from Caja.

Accordingly, JPMCB respectfully requests, pursuant to the Order, Paragraph 2(h), the Court's guidance regarding JPMCB's duties under the Court's orders as applied to the Funds.

Hon. Thomas P. Griesa
July 9, 2014
Page 3

Thank you for your consideration of this matter.

Respectfully submitted,

Andrea Likwornik Weiss

cc: All counsel of record (via ECF)
Caja de Valores S.A. (via email)

# EXHIBIT E

"A selective default: the most probable scenario?"

By Marcelo Etchebarne for *La Nación*

It is possible that Judge Thomas Griesa's ruling, of unpredictable consequences, will have serious consequences for the relationship between Latin America and the United States. The Federal Courts of that country are being much more indulgent when affecting U.S. residents of Stockton or Detroit than Argentineans.

Judge Klein will determine, the day after tomorrow, if Franklin Templeton, creditor of Stockton, receives less than a cent on the dollar. Judge Rohdes [sic] stated that Detroit negotiated in bad faith with its creditors of US$18 billion, but expressed concern about the lack of lighting, the rise of insecurity, and the bad shape of public parks, and could support an 80% haircut without bondholder's consent.

Meanwhile, Argentina says it is unable to negotiate with all of its holdouts before January without risking the triggering of the obligation to offer the same to the rest [of its creditors], the potential cost of which could be more than US$500 billion (judgments for FRAN bonds owned by the holdouts are 23 times higher than the value of the 2010 Exchange Offer ).

The plaintiffs in the pari passu judgments, claiming US$1.65 billion (subject to final liquidation), would have judgments without the pari passu right for an additional US$4 billion.

There seem to be three options: 1) paying the pari passu judgments in full and defending against future litigation (a difficult route after acknowledging that they would lose, but not impossible). This would require a law since when the lock law was suspended, affording plaintiffs a better treatment was prohibited. 2) By mutual agreement with creditors suspending the execution [of the judgments] until January (200 years ago, Sun Tzu recommended leaving an exit path to a corned enemy in order to avoid unnecessary damage to both parties), and 3) falling into a selective default.

In the event of a selective default, such default would most probably only apply to US-denominated bonds under NY Law (approximately US$10 billion in face value plus GDP coupons). The Euro-denominated bonds would probably be paid by removing Bank of New York by judicial order, or by an Order by Griesa excluding Euroclear and Clearstream. The European bondholders have requested a clarification from Griesa over this issue.

In the case of a selective default, the dollar denominated bonds could be bought in the secondary market for a fraction of their value. The problem is that that could require investing US$5 to 6 billion at a time when the country-risk could rise exponentially and dollars become more scarce.

In any of the three options, Argentina should prepare an exchange process with all the holdouts. It would take no less than 6 months and would require the U.S. Securities & Exchange Commission's approval, among other regulators. If accepted by the majority, Argentina could use a law  that imposes the result of the exchange offer on the minority, as in Chapter IX of the bankruptcy act of the United States. It could be approved in that country under Chapter XV of that law. This would be a good mechanism for no longer having holdouts threatening the national sovereignty from January 2015 onwards, when the RUFO clause is no longer applicable.

AFFIDAVIT OF TRANSLATOR
REGARDING ACCURACY OF TRANSLATION

STATE OF NEW YORK )

:ss.:

COUNTY OF NEW YORK )

FLORENCIA ROSENTAL, being duly sworn, deposes and says:

I am an international lawyer employed by Cleary Gottlieb Steen & Hamilton LLP

presently and temporarily residing and working within the State of New York and declare:

I am proficient with the Spanish language and fluent with the English language,

have no prior experience in translating documents in those languages for formal purposes, have

translated the foregoing document (Marchelo Etchebarne Una Cesación de pagos Selectivos,

published in La Nacion on July 6, 2015) from Spanish into English and believe that the

translation is complete and accurate.

*Rsental*

_____
Florencia Rosental

Sworn to before me this
21st day of July 2014

*Marie Jensen*
Notary Public

MARIE JENSEN
Notary Public, State of New York
No. 4980448
Qualified in Richmond County
Certificate Filed in New York County
Commission Expires April 22, 19___
205



# lanacion·com

lanacion.com | Política                    Domingo 06 de julio de 2014 | **Publicado en edición impresa**

Opinión

# Una cesación de pagos selectiva: ¿el escenario más probable?

Por **Marcelo Etchebarne** | Para LA NACION

E s posible que la sentencia del juez Thomas Griesa, de consecuencias aun impredecibles, deje serias secuelas en la relación entre América latina y Estados Unidos. Los tribunales federales de ese país están siendo mucho más complacientes cuando afectan a los residentes estadounidenses de Stockton o Detroit que a los argentinos.

El juez Klein determinará pasado mañana si Franklin Templeton, acreedor de Stockton, recibe menos de un centavo por dólar. El juez Rohdes declaró que Detroit negoció de mala fe con sus acreedores por US$ 18.000 millones, pero expresó preocupación por la falta de iluminación, aumento de la inseguridad, mal estado de los parques públicos, y podría avalar una quita de 80% sin la aprobación de los bonistas.

Mientras tanto, la Argentina dice no poder negociar con todos los *holdouts* antes de enero sin algún riesgo de disparar la obligación de extender la oferta al resto, cuyo costo potencial podría ser de más de US$ 500.000 millones (los bonos FRAN en manos de los *holdouts* tienen sentencias por 23 veces el valor del canje 2010).

Los titulares de la sentencia del pari passu, que reclaman US$ 1650 millones (sujetos a la liquidación final), tendrían sentencias sin el beneficio del pari passu por US$ 4000 millones adicionales.

Las opciones parecen tres: 1) Pagar el total de la sentencia del pari passu y defenderse de futuros juicios (difícil luego de reconocer que se perderían, pero no imposible). Requiere de una ley ya que al suspenderse la ley cerrojo se prohibió dar un mejor trato a los litigantes. 2) Suspender la ejecución hasta enero de común acuerdo con los acreedores (Sun Tzu recomendaba hace 2000 años dejarle una vía de salida a un enemigo acorralado para evitar daños innecesarios a ambas partes) y 3) Incurrir en un default selectivo.

Lo más probable, en el caso de un default selectivo, sería que aplique sólo sobre los bonos en dólares bajo ley de Nueva York (aproximadamente US$ 10.000 millones de nominales más cupones PBI). Los bonos en euros posiblemente sean pagados mediante la eventual remoción judicial del Bank of New York o por una exclusión decretada por Griesa de Euroclear y Clearstream. Los bonistas europeos han pedido aclaración a Griesa sobre este punto.

En caso de un default selectivo, los bonos en dólares podrían ser adquiridos en el mercado secundario por una fracción de su valor. El problema es que podría requerir de una inversión de alrededor de entre US$ 5000 a 6000 millones en un momento en que el riesgo país puede subir exponencialmente y los dólares volverse más escasos.

En cualquiera de las tres opciones, la Argentina debería preparar un proceso de canje con todos los *holdouts*. Este demoraría no menos de 6 meses y requeriría aprobación de la Securities & Exchange Commission de EE.UU., entre otros reguladores. Si es aceptado por la mayoría, la Argentina podría utilizar una ley que imponga el resultado del canje a la minoría en forma análoga al Capítulo IX de la ley de quiebras de EE.UU. Podría ser homologada en ese país bajo el Capítulo XV de esa ley. Sería un buen mecanismo para que no queden más *holdouts* que amenacen la soberanía nacional a partir de enero de 2015, cuando no tenga aplicación la cláusula RUFO. ◼

DESDE LA WEB

# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/27/14

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                        :
NML CAPITAL, LTD.,                                      :
                            Plaintiff,                  :      No. 08 Civ. 6978 (TPG)
          - against -                                  :      No. 09 Civ. 1707 (TPG)
THE REPUBLIC OF ARGENTINA,                             :      No. 09 Civ. 1708 (TPG)
                            Defendant.                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x
AURELIUS CAPITAL MASTER, LTD. and                      :
ACP MASTER, LTD.,                                       :
                            Plaintiffs,                 :      No. 09 Civ. 8757 (TPG)
          - against -                                  :      No. 09 Civ. 10620 (TPG)
THE REPUBLIC OF ARGENTINA,                             :
                            Defendant.                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x
AURELIUS OPPORTUNITIES FUND II, LLC                    :
and AURELIUS CAPITAL MASTER, LTD.,                     :      No. 10 Civ. 1602 (TPG)
                            Plaintiffs,                 :      No. 10 Civ. 3507 (TPG)
          - against -                                  :      No. 10 Civ. 3970 (TPG)
THE REPUBLIC OF ARGENTINA,                             :      No. 10 Civ. 8339 (TPG)
                            Defendant.                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x
BLUE ANGEL CAPITAL I LLC,                              :
                            Plaintiff,                  :
          - against -                                  :      No. 10 Civ. 4101 (TPG)
THE REPUBLIC OF ARGENTINA,                             :      No. 10 Civ. 4782 (TPG)
                            Defendant.                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x   *(captions continue on following page)*


**ORDER CLARIFYING**
**AMENDED FEBRUARY 23, 2012 ORDERS**

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
OLIFANT FUND, LTD.,                    :
                    Plaintiff,         :
                                       :
      - against -                      :    No. 10 Civ. 9587 (TPG)
                                       :
THE REPUBLIC OF ARGENTINA,             :
                    Defendant.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                       :
PABLO ALBERTO VARELA, et al.,          :
                    Plaintiffs,        :
                                       :
      - against -                      :    No. 10 Civ. 5338 (TPG)
                                       :
THE REPUBLIC OF ARGENTINA,             :
                    Defendant.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

UPON consideration of Citibank, N.A.'s motion for clarification or modification, plaintiffs' opposition thereto, and all other arguments submitted to the Court in the parties' papers and at oral argument, it is hereby:

1.     CLARIFIED that this Court's Amended February 23, 2012 Orders do not as a matter of law prohibit payments by Citibank, N.A.'s Argentine branch on Peso- and U.S. Dollar-denominated bonds—governed by Argentine law and payable in Argentina—that were issued by the Republic of Argentina in 2005 and 2010 to customers for whom it acts as custodian in Argentina.

Dated: June 27, 2014

Hon. Thomas P. Griesa
United States District Judge

1

# EXHIBIT G

1

```
     E6RZNMLM                    Motion
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2
 3   NML CAPITAL, LTD.,
 3
 4                     Plaintiff,
 4
 5           v.                            08 CV 6978 (TPG)
 5
 6   THE REPUBLIC OF ARGENTINA,
 6
 7                     Defendant.
 7
 8   ------------------------------x
 8
 9                                         June 27, 2014
 9                                         10:40 a.m.
10
10   Before:
11
11                    HON. THOMAS P. GRIESA,
12
12                                         District Judge
13
13                        APPEARANCES
14
14   DECHERT LLP
15        Attorneys for Plaintiff NML Capital, Ltd.
15   BY:  ROBERT A. COHEN
16        MATTHEW McGILL
17
17   FRIEDMAN KAPLAN SEILER & ADELMAN LLP
18        Attorneys for Plaintiff
18   BY:  EDWARD A. FRIEDMAN
19        DANIEL B. RAPPORT
20
20   CLEARY GOTTLIEB STEEN & HAMILTON LLP
21        Attorneys for Defendant
21   BY:  CARMINE BOCCUZZI, JR.
22        JONATHAN I. BLACKMAN
23   DAVIS POLK & WARDWELL LLP
23        Attorneys for Citibank
24   BY:  KAREN E. WAGNER
24        JAMES L. KERR
25
```

E6RZNMLM                         Motion

1   is a very good lawyer.  That isn't way you make any application
2   to a Court.  You can't do it that way.  You can't just throw a
3   phrase into a letter.  If you're going to apply for something,
4   you apply.  And you know how to apply.  And what you do is to
5   state what you're applying for, what would be affected by the
6   application and the reason and so forth.  Nothing of even
7   approaching that was contained in the letters.
8           Now, I wrote a little ruling denying the application,
9   but I never really received any proper application.  And, in
10  any event, there was nothing in there to indicate any real need
11  for assistance or relief or timing in connection with
12  settlement negotiations.
13          Now, why haven't the settlement negotiations gone
14  forward?  Surely that little application -- I mean, nobody
15  could reasonably believe that that little application would
16  have any effect.  Why haven't the settlement negotiations gone
17  forward?  Why aren't they going forward today instead of having
18  us sit in court?
19          MR. BOCCUZZI:  The hope, your Honor, was to have those
20  discussions with the parties, but without the threat of the
21  default that would result if the payments were made on
22  June 30th.  And so the request, the application was for that
23  breathing space so that as --
24          THE COURT:  Now, look, I'm going to interrupt you.
25          We all knew that if there was to be fruitful

E6RZNMLM                         Motion

1   settlement negotiations, they probably weren't going to be
2   concluded this week, maybe not next week.  Everybody knew that.
3   And what goes on in settlement negotiations is the people who
4   are participating arrange to maintain a status quo, status quo.
5   That's what's done over and over and over in litigation.
6            Now, what was necessary, if anybody wanted to
7   negotiate, was to figure out a way to maintain a status quo so
8   there would not be a default on June 30, but the situation
9   would remain -- and I'm using the phrase over and over again
10  forgive me, in status quo.
11           You had a Special Master who could have assisted a
12  discussion of how that would be done.  But it doesn't take any
13  rocket scientist to figure out how to do that.  This is done in
14  litigation every day in the world in this country to figure out
15  a way to maintain the status quo.
16           Now, the Republic does not need to engage in
17  settlement negotiations, and it doesn't even need to give
18  excuses.  If it doesn't want to engage in settlement
19  negotiations, don't.  It doesn't have to.  But in the strongest
20  way they indicated they wanted to.  They said they were going
21  to send a delegation to see me.  Well, I can't participate.  I
22  appointed a special master, a very talented special master to
23  assist.  So I set up the circumstances under which there could
24  be settlement negotiations.
25           Now, what needs to be done -- and it can be done
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

E6RZNMLM                    Motion

1   beginning now -- is to figure out a way to get through the
2   weekend and June 30, and maintain -- I'm using the term the
3   status quo.  That was what was, what any litigating, any
4   litigator would know had to be done.
5           And there were discussions, I am informed -- and I'm
6   not fully informed because I'm not the special master -- but I
7   believe there were discussions along that line, and that's the
8   line that was needed to be taken.  And then all of a sudden we
9   have this payment.  This is a disruption.  Can we get back on
10  track and have settlement negotiations?
11          MR. BOCCUZZI:  I hope so, your Honor.
12          THE COURT:  And how will that be done?
13          MR. BOCCUZZI:  What is the situation that was facing
14  the Republic this week with the approaching June 30th payment,
15  the need for time is the constraints on the Republic that they
16  have to deal with and are trying to deal with imposed both by
17  local, law Argentine law where you need legislative action or
18  otherwise a nonpayment on the June 30th is not authorized by
19  Argentine law, and I am informed by my client, would subject
20  the officials or the employees, the government employees
21  involved with that payment, potentially subject to criminal
22  prosecution.
23          THE COURT:  Now, look -- look here.
24          MR. BOCCUZZI:  I'm just -- your Honor, just -- that's
25  why we need time, as well as the obligations that are owed

25
E6RZNMLM                       Motion
1   important.  They are important.  They're more important than
2   the details of this or that that might be invoked or put in
3   place around the events of June 30th.
4           The important thing are the settlement negotiations.
5   There is a lot of litigation still out there.  And if there is
6   a default, there's going to be a lot more.  It would be very
7   desirable to reach a settlement.  But that's not going to
8   happen by Sunday or Monday.
9           I want to say this to Mr. Boccuzzi and Mr. Blackman.
10  I've had trouble, and I've expressed it, with the Republic, but
11  both of you have been fair and square in every way before me,
12  and I appreciate that.
13          Now, what I would like to do is to really -- I will
14  enter whatever order is appropriate nullifying this purported
15  payment.  But I would hope, I would hope that the Republic does
16  not find barriers and difficulties in the circumstances which
17  would prevent settlement discussions.  I would hope they would
18  start this afternoon and continue according to the schedule
19  that can be worked out with the Special Master.  And I'm going
20  to tell you, it being 11:30, time is better spent arranging for
21  settlement negotiations than having continued argument here in
22  court, and I'm ready to adjourn.
23          MS. WAGNER:  Your Honor, may I be heard, please?
24          MR. BETCHELER:  I'd also like to be heard, your Honor.
25          MS. WAGNER:  Good morning, your Honor, Karen Wagner
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

E6RZNMLM                          Motion

1   from Davis Polk representing Citibank.
2           Your Honor, we made a motion last week which has
3   become extremely urgent.  Citibank Argentina is a branch bank
4   in Argentina, and it expects to receive a payment on some bonds
5   shortly.  It has not received the payment yet.  The bonds for
6   which it is custodian are internal Argentine bonds.
7           THE COURT:  Can I just interrupt you?
8           MS. WAGNER:  Sure.
9           THE COURT:  I apologize for not getting to your
10  motion.  There are other things.  I want to get to it.  Is
11  there any opposition to that motion?
12          MR. FRIEDMAN:  Your Honor, this is Edward Friedman on
13  behalf of the Aurelius and Blue Angel plaintiffs.
14          The opposition to that motion is, to begin with, that
15  your Honor's amended February 23 orders are clear that the
16  orders cover exchange bonds, and Citibank is now asking the
17  Court to modify the amended February 23 orders so that --
18          THE COURT:  Let me interrupt you.  It is my
19  understanding, Ms. Wagner, correct me if I'm wrong --
20          MS. WAGNER:  Certainly, your Honor.
21          THE COURT:  -- because we've been at this before.
22          MS. WAGNER:  Yes, we have, your Honor.
23          THE COURT:  And it is my understanding that the bonds
24  you're talking about have been treated differently --
25          MS. WAGNER:  Completely --

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

```
          E6RZNMLM                    Motion
 1                THE COURT:  -- all along.
 2                MS. WAGNER:  Completely differently, your Honor.  Yes.
 3                THE COURT:  And I think that to grant your motion --
 4        and I may have granted a similar motion before -- to grant your
 5        motion does not affect the other bonds of concern at all.
 6                MS. WAGNER:  That's correct, your Honor.
 7                THE COURT:  All right.  I will grant your --
 8                MR. FRIEDMAN:  Your Honor, may I be heard, please?
 9                THE COURT:  What?
10                MR. FRIEDMAN:  With all respect, the Citibank motion
11        addresses bonds that are clearly within the scope of exchange
12        bonds.  It is illegal under your Honor's orders that have been
13        affirmed for Argentina to pay those bonds, and it is illegal
14        for Citibank to facilitate those payments.  This is a very
15        serious matter as far --
16                THE COURT:  I simply disagree with everything you're
17        now saying.  I will grant Ms. Wagner's motion.
18                MS. WAGNER:  Thank you very much, your Honor.
19                THE COURT:  Now, what do I need to sign?
20                MS. WAGNER:  We'll hand up an order, your Honor.
21                THE COURT:  Good.
22                MS. WAGNER:  Thank you.
23                THE COURT:  I'll do it, I'll do it.
24                MS. WAGNER:  Thank you, your Honor.
25                Anything else?
```

E6RZNMLM                      Motion
 1              MR. BATCHELOR:  Yes, your Honor.  May I be heard?
 2              THE COURT:  Yes.
 3              MR. BATCHELOR:  Good morning, your Honor.  I'm Craig
 4     Batchelor from Latham & Watkins, and I represent the so-called
 5     euro bondholders.  This is a group of holders of the Republic's
 6     exchange bonds that were issued in the 2005 and 2006.
 7              THE COURT:  Holders of what?  Say it again?
 8              MR. BATCHELOR:  I represent a group of holders that
 9     hold exchange bonds denominated in euros.
10              And I just wanted to clarify a couple of points that
11     were raised by the lawyer for the Bank of New York.
12              As he recognized, there are payments, there are bonds
13     that are denominated in U.S. dollars under the exchanges, and
14     there are also bonds that are denominated in euros.  And one
15     thing that's been overlooked in this litigation up until this
16     point is that the payments on those two sets, two different
17     sets of bonds are made very differently.  The Bank of New York
18     issued a -- submitted an affidavit in November of 2012, prior
19     to your Court ordering, issuing the amended February 23rd
20     injunctions that clarified that the payments made on the euro
21     bonds are made outside the United States, they're made in
22     euros, and they're processed through foreign entities.  These
23     payments never flow through the United States at all.  They are
24     paid in Argentina.  The money is then transferred to Belgium or
25     to Germany, excuse me, and then to clearing houses in Belgium

# EXHIBIT H

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA

NEW YORK, NY 10006-1470

(212) 225-2000

FACSIMILE (212) 225-3999

WWW.CLEARYGOTTLIEB.COM

WASHINGTON, DC • PARIS • BRUSSELS • LONDON • MOSCOW

FRANKFURT • COLOGNE • ROME • MILAN • HONG KONG

BEIJING • BUENOS AIRES • SÃO PAULO • ABU DHABI • SEOUL

LAURENT ALPERT
VICTOR I LEWKOW
LESLIE N SILVERMAN
ROBERT L TORTORIELLO
LEE C BUCHHEIT
JAMES M PEASLEE
ALAN L BELLER
THOMAS J MOLONEY
JONATHAN I BLACKMAN
MICHAEL L RYAN
ROBERT P DAVIS
YARON Z REICH
RICHARD S LINCER
JAIME A EL KOURY
STEVEN G HOROWITZ
JAMES A DUNCAN
STEVEN M LOEB
CRAIG B BROD
MITCHELL A LOWENTHAL
EDWARD J ROSEN
LAWRENCE B FRIEDMAN
NICOLAS GRABAR
CHRISTOPHER E AUSTIN
SETH GROSSHANDLER
WILLIAM A GROLL
HOWARD S ZELBO
DAVID E BRODSKY
MICHAEL R LAZERWITZ
ARTHUR H KOHN
RICHARD J COOPER
JEFFREY S LEWIS
FILIP MOERMAN
PAUL J SHIM
STEVEN L WILNER
ERIKA W NIJENHUIS
LINDSEE P GRANFIELD
ANDRES DE LA CRUZ
DAVID C LOPEZ

CARMEN A CORRALES
JAMES L BROMLEY
MICHAEL A GERSTENZANG
LEWIS J LIMAN
LEV L DASSIN
NEIL Q WHORISKEY
JORGE U JUANTORENA
MICHAEL D WEINBERGER
DAVID LEINWAND
JEFFREY A ROSENTHAL
ETHAN A KLINGSBERG
MICHAEL J VOLKOVITSCH
MICHAEL D DAYAN
CARMINE D BOCCUZZI JR
JEFFREY D KARPF
KIMBERLY BROWN BLACKLOW
ROBERT J RAYMOND
LEONARD C JACOBY
SANDRA L FLOW
FRANCISCO L CESTERO
FRANCESCA L ODELL
WILLIAM L MCRAE
JASON FACTOR
MARGARET S PEPONIS
LISA M SCHWEITZER
JUAN G GIRÁLDEZ
DUANE MCLAUGHLIN
BREON S PEACE
MEREDITH E KOTLER
CHANTAL E KORDULA
BENET J O'REILLY
DAVID AMAN
ADAM E FLEISHER
SEAN A O'NEAL
GLENN P MCGRORY
MATTHEW P SALERNO
MICHAEL J ALBANO
VICTOR L HOU

ROGER A COOPER
AMY R SHAPIRO
JENNIFER KENNEDY PARK
ELIZABETH LENAS
LUKE A BAREFOOT
PAMELA L MARCOGLIESE
PAUL M TIGER
JONATHAN S KOLODNER
RESIDENT PARTNERS

SANDRA M ROCKS
S DOUGLAS BORISKY
JUDITH KASSEL
DAVID E WEBB
PENELOPE L CHRISTOPHOROU
BOAZ S MORAG
MARY E ALCOCK
DAVID H HERRINGTON
HEIDE H ILGENFRITZ
HUGH C CONROY JR
KATHLEEN M EMBERGER
WALLACE L LARSON JR
JAMES D SMALL
AVRAM E LUFT
DANIEL ILAN
ANDREW WEAVER
HELENA K GRANNIS
GRANT M BINDER
MEYER H FEDIDA
CAROLINE F HAYDAY
JOHN V HARRISON
RESIDENT COUNSEL

LOUISE M PARENT
OF COUNSEL

June 23, 2014

BY HAND AND ECF

Honorable Thomas P. Griesa
United States District Court for
the Southern District of New York
500 Pearl Street
New York, New York 10007

Re: *NML Capital, Ltd. v. Republic of Argentina*, Nos. 08 Civ. 6978 (TPG),
09 Civ. 1707 (TPG) and 09 Civ. 1708 (TPG); and related cases

Dear Judge Griesa:

I write to follow up on my report to the Court during last Wednesday's conference that the Republic of Argentina (the "Republic") is willing to negotiate in good faith. The Republic respectfully requests a stay of the Amended Injunctions to allow the Republic to engage in a dialogue with the plaintiffs in a reasonable timeframe for these kinds of negotiations.

The Republic has recently successfully settled major disputes, including the one with Repsol, which had a claim for $10 billion before ICSID for the expropriation of 51% of YPF S.A. shares, $9.7 billion in claims held by the nations that comprise the Paris Club, and hundreds of millions of dollars of ICSID arbitral awards. These recent settlements – which were the product of lengthy negotiations and resulted in necessary haircuts, maturity extensions, and interest rate reductions in line with the Republic's capacity to pay – were breakthroughs that reflect Argentina's focus on emerging from the crisis of 2001 and normalizing its relationship

CLEARY GOTTLIEB STEEN & HAMILTON LLP OR AN AFFILIATED ENTITY HAS AN OFFICE IN EACH OF THE CITIES LISTED ABOVE

Honorable Thomas P. Griesa, p. 2

with its creditors. These settlements were voluntary and, therefore, equitable for the parties involved. Argentina wants to emerge from the litigation that has burdened both it and the courts. Hence, the Republic respectfully requests that Your Honor stay the Amended Injunctions. A stay would provide shelter (a legal umbrella) for negotiations to take place in light of the legal and financial complexity inherent to the process.

The Second Circuit's decision requires Argentina, when it makes an interest payment on restructured debt, to pay full principal and interest to all holders of defaulted debt. The Republic cannot afford to do this, nor can it pay some creditors in full and not others. The total amount due to holdouts from the Republic's debt restructuring exceeds half the country's reserves. No country could pay half of its reserves, and Argentina cannot afford to be left without the means to manage its currency or handle the rest of its economy, including meeting the needs of its citizenry. Nor can Argentina ignore the Rights Upon Future Offers clause (the "RUFO" clause) governing its New York-law restructured debt, which expires on December 31, 2014, as it could give rise to litigation in other jurisdictions that could destroy the successful restructuring of 92% of the Republic's defaulted debt. *See* Exhibit A (example RUFO clause). Argentina is also subject, as a sovereign nation, to its own Constitutional processes and the laws concerning debt restructuring enacted by its Congress.

Argentina is therefore committed to engaging in a dialogue with plaintiffs that can lead to the resolution of this litigation, if the right circumstances for negotiation contemplating the interests of 100% of its creditors are established as the Republic requests here.

In sum, the Republic is committed to a dialogue that will be followed by what the Republic intends to be a resolution of this litigation and the entirety of its outstanding debt burden, which is a matter of public interest to all Argentine citizens. The Republic has honored its obligations, including to the restructured bondholders, and wants to continue doing so with 100% of its creditors. The Republic accordingly respectfully asks that Your Honor grant this stay to allow for the commencement of good faith negotiations between Argentina and its creditors.

Respectfully submitted,

Carmine D. Boccuzzi Jr.

cc: Counsel of Record (by email)

# Exhibit A

THIS GLOBAL SECURITY (THIS "<u>SECURITY</u>") IS A GLOBAL SECURITY WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF THE BANK OF NEW YORK DEPOSITARY (NOMINEES) LIMITED, AS NOMINEE OF THE COMMON DEPOSITARY FOR EUROCLEAR BANK S.A./N.V., AS OPERATOR OF THE EUROCLEAR SYSTEM ("<u>EUROCLEAR</u>") AND CLEARSTREAM BANKING, SOCIÉTÉ ANONYME ("<u>CLEARSTREAM, LUXEMBOURG</u>"). THIS SECURITY MAY NOT BE EXCHANGED, IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS SECURITY IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN THE COMMON DEPOSITARY OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.

## REGISTERED GLOBAL SECURITY

No. 2

ISIN: XS0501194756
Common Code: 050119475

representing

U.S. Dollar Denominated 8.28% Discount Bonds due 2033

Original Principal Amount U.S. $92,729,033.00

THE REPUBLIC OF ARGENTINA (the "<u>Republic</u>"), for value received, hereby promises to pay to The Bank of New York Depositary (Nominees) Limited or registered assigns, the Adjusted Principal Amount (as defined below) hereof, in twenty semi-annual installments on June 30 and December 31 of each year commencing on June 30, 2024 (each such date, a "<u>Principal Payment Date</u>"). The amount of each such principal payment shall equal the Adjusted Principal Amount of this Security outstanding as of any such Principal Payment Date, divided by the number of principal installments from and including such Principal Payment Date to and including December 31, 2033.

The Republic further unconditionally promises to pay interest at the rate of 8.28% per annum on the Adjusted Principal Amount of this Security outstanding from time to time, which interest shall accrue from and including the most recent date to which interest has been paid, capitalized or duly provided for, or, if no interest has been paid, capitalized or duly provided for, from and including December 31, 2009 to, but excluding, the date on which payment of said principal sum has been made or duly provided for.

Interest shall be payable in arrears on each June 30 and December 31 of each year (each such date, an "<u>Interest Payment Date</u>") commencing on June 30, 2010; *provided* that (i) interest payable in cash for the period from and including December 31, 2009 to but excluding June 30, 2010 shall be payable on September 24, 2010 and (ii) interest for the period from and including June 30, 2010 to but excluding December 31, 2010 shall be payable on the second Interest

any) or interest on, any such Performing Public External Indebtedness having an aggregate principal amount of U.S. $30,000,000 (or its equivalent in other currencies) or more, shall occur when and as the same shall become due and payable, if such default shall continue for more than the period of grace, if any, originally applicable thereto; or

(iv)     Moratorium: a moratorium on the payment of principal of, or interest on, the Performing Public External Indebtedness of the Republic shall be declared by the Republic; or

(v)     Validity: the validity of the Securities shall be contested by the Republic.

(b)     Upon the occurrence and during the continuance of an Event of Default, the Holders of at least 25% in aggregate principal amount of the Securities then Outstanding may by written notice given to the Republic (with a copy to the Trustee) declare the Securities to be immediately due and payable; and upon such declaration the principal amount of the Securities and the accrued interest on the Securities will become immediately due and payable upon the date that such written notice is received at the office of the Trustee, unless prior to such date all Events of Default in respect of the Securities have been cured. Notwithstanding the foregoing, in the case of an Event of Default specified in clauses (ii) or (v) of Paragraph 5(a), the principal amount of and the accrued interest on the Securities may only be declared immediately due and payable if such event is materially prejudicial to the interests of the Holders of the Securities. The right to give such acceleration notice when termination the event giving rise to such right has been cured before such right is exercised. Holders holding in the aggregate at least 50% in principal amount of the then Outstanding Securities may waive any existing defaults, and rescind or annul any notice of acceleration, on behalf of all Holders of Securities, if (A) following the declaration of the Securities due and payable immediately, the Republic has deposited with the Trustee an amount sufficient to pay all overdue installments of principal, interest and Additional Amounts in respect of the Securities (with interest on overdue amounts of interest, to the extent permitted by law, and on such principal of each of the Securities at the rate of interest applicable thereto, to the date of such payment) as well as the reasonable fees and compensation of the Trustee; and (B) all other Events of Default have been remedied. In the event of a declaration of acceleration because of an Event of Default set forth in clause (iii) of Paragraph 5(a), such declaration of acceleration shall be automatically rescinded and annulled if the event triggering such Event of Default pursuant to such clause (iii) shall be remedied, cured or waived by the holders of the relevant indebtedness, within 60 days after such event.

(c)     Upon the occurrence of an Event of Default under Paragraph 5(a), the Republic shall give written notice promptly after becoming aware thereof to the Trustee. Within 15 days after becoming aware of the occurrence of an event which with the giving of notice or lapse of time or both would, unless remedied, cured or waived, become an Event of Default under Paragraph 5(a), the Republic shall give written notice thereof to the Trustee.

6.     Rights upon Future Offers. (a) Subject to Paragraph 6(b) below, if at any time on or prior to December 31, 2014, the Republic voluntarily makes an offer to purchase or exchange (a "Future Exchange Offer"), or solicits consents to amend (a "Future Amendment Process"), any outstanding securities of the Republic listed in Schedule B hereto ("Non-Performing Securities"), other than any Future Exchange Offer or Future Amendment Process on terms

substantially the same as, or less favorable than, the Republic's April 30, 2010 invitation to holders of certain eligible securities to exchange such eligible securities for certain new securities (the "2010 Exchange Offer"), each Holder of Securities shall have the right, for a period of 30 calendar days following the announcement of any such Future Exchange Offer or Future Amendment Process, to exchange any of such Holder's Securities for (as applicable):

       (i)    the consideration in cash or in kind received by holders of Non-Performing Securities in connection with any such Future Exchange Offer, or

       (ii)    debt obligations having terms substantially the same as those resulting from any such Future Amendment Process,

in each case in accordance with the terms and conditions of such Future Exchange Offer or Future Amendment Process. For purposes of receiving the consideration or debt obligations specified in clauses (i) and (ii) above, each such Holder's Securities shall be treated as though they were Non-Performing Securities (x) denominated in the same currency as such Securities, and (y) that had a principal amount outstanding as of December 31, 2001, together with any accrued and unpaid interest up to by excluding December 31, 2001, equal to the outstanding principal amount of such Securities (calculated without giving effect to any Capitalization Amounts or Exchange Capitalization Amount) multiplied by 2.96735905. The Republic covenants and agrees to take all steps necessary, including making any required filings with regulatory authorities, in order to enable Holders to participate in any Future Exchange Offer or Future Amendment Process as provided in this Paragraph 6.

       (b)    Each Holder's right to participate in any Future Exchange Offer or Future Amendment Process as provided in Paragraph 6(a), and the Republic's obligation to take all actions necessary to enable such participation, shall be conditioned upon such Holder (i) surrendering to the Trustee, for cancellation, a principal amount of the Republic's U.S. Dollar-Denominated 8.75% Global Bonds due 2017, ISIN XS0501195480 (the "2017 Globals") equal to the principal amount of 2017 Globals originally issued together with the principal amount of Securities such holder wishes to exchange and (ii) either (A) surrendering to the Trustee, for cancellation, GDP-linked Securities in a notional amount equal to (x) the principal amount of the Securities (calculated without giving effect to any Capitalization Amounts or Exchange Capitalization Amount) such Holder wishes to exchange pursuant to or in connection with such Future Exchange Offer or Future Amendment Process, multiplied by (y) 2.96735905; or (B) paying cash to the Republic in an amount equal to the market price of such GDP-linked Securities calculated on the Market Observation Date (as defined below) that is at least one month before but closest to the announcement of such Future Exchange Offer or Future Amendment Process, as the case may be; *provided* that, with respect to clause (b)(ii)(B) above, the Holder may pay such cash to the Republic in lieu of surrendering to the Trustee the GDP-linked Securities specified in clause (b)(ii)(A) above, only if an active trading market and published secondary market price quotations exist for GDP-linked Securities. "Market Observation Date" means, in respect of any GDP-linked Securities, the last day of each month, as of which dates the Trustee shall calculate the market price of such GDP-linked Securities for purposes of this Paragraph 6(b)(ii). "GDP-Linked Securities" means, for purposes of this Paragraph 6(b), U.S. Dollar-Denominated GDP-Linked Securities governed by New York law issued by the Republic (ISIN US040114GM64 or ISIN XS0501197262).

R-8

# EXHIBIT I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------x
                                           :
NML CAPITAL, LTD.,                         :
                                           :           ORDER
                              Plaintiff,   :
                                           :       08 Civ. 6978 (TPG)
                 – against –               :       09 Civ. 1707 (TPG)
                                           :       09 Civ. 1708 (TPG)
REPUBLIC OF ARGENTINA,                     :
                                           :
                             Defendants.   :
                                           :
-------------------------------------------x
```

**AMENDED FEBRUARY 23, 2012 ORDER**

WHEREAS, in an Order dated December 7, 2011, this Court found that,
under Paragraph 1(c) of the 1994 Fiscal Agency Agreement ("FAA"), the
Republic is "required . . . at all times to rank its payment obligations pursuant
to NML's Bonds at least equally with all the Republic's other present and future
unsecured and unsubordinated External Indebtedness."

WHEREAS, in its December 7, 2011 Order, this Court granted partial
summary judgment to NML on its claim that the Republic repeatedly has
breached, and continues to breach, its obligations under Paragraph 1(c) of the
FAA by, among other things, "ma[king] payments currently due under the
Exchange Bonds, while persisting in its refusal to satisfy its payment
obligations currently due under NML's Bonds."

And WHEREAS NML Capital, Ltd. ("NML") has filed a renewed motion for equitable relief as a remedy for such violations pursuant to Rule 65(d) of the Federal Rules of Civil Procedure and the Court's inherent equitable powers.

Upon consideration of NML's renewed motion, the response of the Republic of Argentina (the "Republic") thereto, NML's reply, and all other arguments submitted to the Court in the parties' papers and at oral argument, it is HEREBY ORDERED that:

1.     It is DECLARED, ADJUDGED, and DECREED that NML is irreparably harmed by and has no adequate remedy at law for the Republic's ongoing violations of Paragraph 1(c) of the FAA, and that the equities and public interest strongly support issuance of equitable relief to prevent the Republic from further violating Paragraph 1(c) of the FAA, in that:

    a. Absent equitable relief, NML would suffer irreparable harm because the Republic's payment obligations to NML would remain debased of their contractually-guaranteed status, and NML would never be restored to the position it was promised that it would hold relative to other creditors in the event of default.

    b. There is no adequate remedy at law for the Republic's ongoing violations of Paragraph 1(c) of the FAA because the Republic has made clear – indeed, it has codified in Law 26,017 and Law

26,547 – its intention to defy any money judgment issued by

this Court.

c.  The balance of the equities strongly supports this Order in light

of the clear text of Paragraph 1(c) of the FAA and the Republic's

repeated failures to make required payments to NML.  In the

absence of the equitable relief provided by this Order, the

Republic will continue to violate Paragraph 1(c) with impunity,

thus subjecting NML to harm.  On the other hand, the Order

requires of the Republic only that which it promised NML and

similarly situated creditors to induce those creditors to

purchase the Republic's bonds.  Because the Republic has the

financial wherewithal to meet its commitment of providing equal

treatment to both NML (and similarly situated creditors) and

those owed under the terms of the Exchange Bonds, it is

equitable to require it to do so.  Indeed, equitable relief is

particularly appropriate here, given that the Republic has

engaged in an unprecedented, systematic scheme of making

payments on other external indebtedness, after repudiating its

payment obligations to NML, in direct violation of its

contractual commitment set forth in Paragraph 1(c) of the FAA.

d.  The public interest of enforcing contracts and upholding the

rule of law will be served by the issuance of this Order,

particularly here, where creditors of the Republic have no

3

recourse to bankruptcy regimes to protect their interests and must rely upon courts to enforce contractual promises. No less than any other entity entering into a commercial transaction, there is a strong public interest in holding the Republic to its contractual obligations.

2.  The Republic accordingly is permanently ORDERED to specifically perform its obligations to NML under Paragraph 1(c) of the FAA as follows:

a.  Whenever the Republic pays any amount due under terms of the bonds or other obligations issued pursuant to the Republic's 2005 or 2010 Exchange Offers, or any subsequent exchange of or substitution for the 2005 and 2010 Exchange Offers that may occur in the future (collectively, the "Exchange Bonds"), the Republic shall concurrently or in advance make a "Ratable Payment" to NML (as defined below and as further defined in the Court's Opinion of November 21, 2012).

b.  Such "Ratable Payment" that the Republic is ORDERED to make to NML shall be an amount equal to the "Payment Percentage" (as defined below) multiplied by the total amount currently due to NML in respect of the bonds at issue in these cases (08 Civ. 6978, 09 Civ. 1707, and 09 Civ. 1708), including pre-judgment interest (the "NML Bonds").

c.  Such "Payment Percentage" shall be the fraction calculated by dividing the amount actually paid or which the Republic

4

intends to pay under the terms of the Exchange Bonds by the total amount then due under the terms of the Exchange Bonds.

d. The Republic is ENJOINED from violating Paragraph 1(c) of the FAA, including by making any payment under the terms of the Exchange Bonds without complying with its obligation pursuant to Paragraph 1(c) of the FAA by concurrently or in advance making a Ratable Payment to NML.

e. Within three (3) days of the issuance of this ORDER, the Republic shall provide copies of this ORDER to all participants in the payment process of the Exchange Bonds ("Participants"). Such Participants shall be bound by the terms of this ORDER as provided by Rule 65(d)(2) and prohibited from aiding and abetting any violation of this ORDER, including any further violation by the Republic of its obligations under Paragraph 1(c) of the FAA, such as any effort to make payments under the terms of the Exchange Bonds without also concurrently or in advance making a Ratable Payment to NML.

f. "Participants" refer to those persons and entities who act in active concert or participation with the Republic, to assist the Republic in fulfilling its payment obligations under the Exchange Bonds, including: (1) the indenture trustees and/or registrars under the Exchange Bonds (including but not limited to The Bank of New York Mellon f/k/a/ The Bank of New York);

(2) the registered owners of the Exchange Bonds and nominees of the depositaries for the Exchange Bonds (including but not limited to Cede & Co. and The Bank of New York Depositary (Nominees) Limited) and any institutions which act as nominees;  (3) the clearing corporations and systems, depositaries, operators of clearing systems, and settlement agents for the Exchange Bonds (including but not limited to the Depository Trust Company, Clearstream Banking S.A., Euroclear Bank S.A./N.V. and the Euroclear System);  (4) trustee paying agents and transfer agents for the Exchange Bonds (including but not limited to The Bank of New York (Luxembourg) S.A. and The Bank of New York Mellon (including but not limited to the Bank of New York Mellon (London));  and (5) attorneys and other agents engaged by any of the foregoing or the Republic in connection with their obligations under the Exchange Bonds.

g.  Nothing in this ORDER shall be construed to extend to the conduct or actions of a third party acting solely in its capacity as an "intermediary bank," under Article 4A of the U.C.C. and N.Y.C.L.S. U.C.C. § 4-A-104, implementing a funds transfer in connection with the Exchange Bonds.

h.  Any non-party that has received proper notice of this ORDER, pursuant to Rule 65(d)(2), and that requires clarification as to

> its duties, if any, under this ORDR may make an application to this Court, with notice to the Republic and NML. Such clarification will be promptly provided.
>
> i. Concurrently or in advance of making a payment on the Exchange Bonds, the Republic shall certify to the Court and give notice of this certification to its Participants, and to counsel for NML, that the Republic has satisfied its obligations under this ORDER to make a Ratable Payment to NML.

3. NML shall be entitled to discovery to confirm the timing and amounts of the Republic's payments under the terms of the Exchange Bonds; the amounts the Republic owes on these and other obligations; and such other information as appropriate to confirm compliance with this ORDER;

4. The Republic is permanently PROHIBITED from taking action to evade the directives of this ORDER, render it ineffective, or to take any steps to diminish the Court's ability to supervise compliance with the ORDER, including, but not limited to, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without obtaining prior approval by the Court;

5. This Court shall retain jurisdiction to monitor and enforce this ORDER, and to modify and amend it as justice requires to achieve its equitable purposes and to account for changing circumstances.

Dated: New York, New York
      November, 21 2012

Thomas P. Griesa
U.S. District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/21/12

# EXHIBIT J

**Execution Copy**

---

THE REPUBLIC OF ARGENTINA
as Issuer

and

THE BANK OF NEW YORK
as Trustee

**TRUST INDENTURE**

dated as of June 2, 2005

_____

DEBT SECURITIES

---

may be imposed in relation thereto, which shall be borne by the party requesting such transfer, registration or exchange.

Section 2.7.   Mutilated, Defaced, Destroyed, Stolen and Lost Debt Securities; Cancellation and Destruction of Debt Securities.  (a)  The Republic shall execute and deliver to the Trustee Debt Securities in such amounts and at such times as to enable the Trustee to fulfill its responsibilities under this Indenture and the Debt Securities.

(b)     The Trustee is hereby authorized, in accordance with and subject to the conditions set forth in paragraph 7(a) of the Terms, to authenticate and deliver from time to time Debt Securities of any Series in exchange for or in lieu of Debt Securities of such Series which become mutilated, defaced, destroyed, stolen or lost.  Each Debt Security authenticated and delivered in exchange for or in lieu of any Debt Security shall carry all the rights to principal and interest (including rights to accrued and unpaid interest) which were carried by such Debt Security before such mutilation, defacement, destruction, theft or loss.

(c)     In the case of the replacement of Debt Securities, the Trustee will keep a record of the Debt Securities so replaced, and the Debt Securities issued in replacement thereof.  In the case of the cancellation of any of the Debt Securities (including upon repayment), the Trustee will keep a record of the Debt Securities so canceled and the date on which such Debt Securities were canceled and shall promptly deliver a certificate of disposition stating the serial numbers, U.S. dollar value (or equivalent value in the currency or currencies in which the Debt Securities of such Series are denominated) and total number of all Debt Securities disposed of hereunder, to the Republic.

(d)     In the case of a mutilated, defaced, destroyed, lost or stolen Debt Security, indemnity satisfactory to the Trustee and the Republic will be required of the Holder of such Debt Security before a replacement Debt Security will be issued.  All expenses (including the reasonable legal fees and expenses of the Republic and the Trustee) associated with obtaining such indemnity and in issuing the new Debt Security will be borne by the Holder of the mutilated, defaced, destroyed, lost or stolen Debt Security.

(e)     All Debt Securities issued pursuant to this Section in lieu of any mutilated, defaced, destroyed, lost or stolen Debt Security shall constitute an original additional contractual obligation of the Republic, whether or not the mutilated, defaced, destroyed, lost or stolen Debt Security shall be at any time enforceable by anyone, and shall be entitled to the same benefits under this Indenture equally and proportionately with any and all other Debt Securities of that Series duly issued hereunder.

ARTICLE THREE

COVENANTS

Section 3.1.   Payment of Principal and Interest.  The Republic covenants and agrees that it will duly and punctually pay or cause to be paid the principal of and interest (including Additional Amounts) on each of the Debt Securities and any other payments to be made by the

16

Republic under the Debt Securities and this Indenture to the Trustee, at the place or places, at the respective times and in the manner provided in the Debt Securities and this Indenture.

All monies (save for its own account) paid to the Trustee under the Debt Securities and this Indenture shall be held by it in trust for itself and the Holders of Debt Securities in accordance with their respective interests to be applied by the Trustee to payments due under the Debt Securities and this Indenture at the time and in the manner provided for in the Debt Securities and this Indenture.

Section 3.2.   Additional Amounts.  The Republic covenants and agrees that all payments of principal, premium, if any, and interest in respect of the Debt Securities by the Republic will be made free and clear of, and without withholding or deduction for or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed, levied, collected, withheld or assessed by or within the Republic or any authority therein or thereof having power to tax (together "Taxes"), unless such withholding or deduction is required by law.  In such event, the Republic shall pay such additional amounts ("Additional Amounts") as will result in receipt by the Holders of Debt Securities of such amounts of principal, premium and interest as would have been received by them had no such withholding or deduction been required, except that no such Additional Amounts shall be payable with respect to any Debt Security:

(a)     to a Holder (or to a third party on behalf of a Holder) where such Holder is liable for such Taxes in respect of any Debt Security by reason of his having some connection with the Republic other than the mere holding of such Debt Security or the receipt of principal, premium or interest in respect thereof;

(b)     where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 2003/48/EC or any other Directive implementing the conclusions of the ECOFIN Council meeting of November 26-27, 2002 on the taxation of savings income or any law implementing or complying with, or introduced in order to conform to, such Directive;

(c)     presented for payment by or on behalf of a Holder who would have been able to avoid the withholding or deduction by presenting the relevant Debt Security to another Paying Agent in a Member State of the European Union; or

(d)     presented for payment more than 30 days after the Relevant Date, except to the extent that the Holder thereof would have been entitled to Additional Amounts on presenting the same for payment on the last day of such period of 30 days.

"Relevant Date" in respect of Debt Securities of any Series means the date on which payment in respect thereof becomes due or (if the full amount of the money payable on such date has not been received by the Trustee on or prior to such due date) the date on which notice is duly given to the Holders in the manner described in Section 12.4 that such monies have been so received and are available for payment.  Any reference in this Indenture to "principal" and/or "interest" shall be deemed to include any Additional Amounts which may be payable under the Debt Securities of any Series.

Section 3.3.     Offices for Payments.  So long as any of the Debt Securities remain Outstanding, the Republic covenants and agrees to maintain an office or agency where:  (a) the Debt Securities may be presented for payment, (b) the Debt Securities may be presented for exchange, transfer and registration of transfer as in this Indenture provided and (c) notices and demands to or upon the Republic in respect of the Debt Securities or of this Indenture may be served.  The Republic hereby designates for each such purpose the Corporate Trust Office and/or such other office or agency as may be designated from time to time by the Trustee with the consent of the Republic.  The Republic shall give to the Trustee prompt written notice of the location of any such office or agency and of any change of location thereof.  If at any time the Republic shall fail to maintain any such required office or agency or shall fail to give such notice of the location or of any change in the location thereof, presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office.  If any Series of Debt Securities are listed on the Luxembourg Stock Exchange and the Luxembourg Stock Exchange so requires, the Trustee will maintain a trustee paying agent in Luxembourg for such Series.  The Trustee shall also maintain a trustee paying agent in a Member State of the European Union that is not obliged to deduct or withhold tax pursuant to European Council Directive 2003/48/EC or any other European Council Directive implementing the conclusions of the ECOFIN Council meeting of November 26-27, 2002 on the taxation of savings income or any law implementing or complying with, or introduced in order to, conform to such Directive.  The Trustee shall give to the Republic and the Holders prompt written notice of the location of any such office or agency and of any change of location thereof.

Section 3.4.     Appointment to Fill a Vacancy in Office of Trustee.  The Republic, whenever necessary to avoid or fill a vacancy in the office of Trustee, will appoint, in the manner provided in Section 5.9, a Trustee, so that there shall at all times be a Trustee hereunder for each Series of Debt Securities.

Section 3.5.     Payments.  (a)  In order to provide for the payment of principal of and interest on the Debt Securities of any Series as such principal and interest will become due and payable, the Republic hereby agrees to pay or to cause to be paid to an account of the Trustee at the Corporate Trust Office or such other office of the Trustee as may be agreed between the Trustee and the Republic (or, in the case of payments denominated in a currency other than U.S. Dollars, at such other place as set forth in an Authorization), not later than 1:00 P.M. local time at such place of payment no later than the Business Day prior to each interest payment date or principal payment date (each, a "Payment Date") of such Debt Securities, in immediately available funds in U.S. dollars (or in such other currency as shall be specified in the Terms of the Debt Securities of the Series with respect to which payment is to be made), an amount which (together with any funds then held by the Trustee and available for the purpose) shall be sufficient to pay the aggregate amount of interest or principal or both and any other amounts, as the case may be, becoming due in respect of such Debt Securities on such Payment Date. Subject to actual receipt of such funds in accordance with this Section 3.5(a), the Trustee shall apply such amount to the payment due on such Payment Date.  Pending such application, such amounts shall be held in trust by the Trustee for the exclusive benefit of the Trustee and the Holders entitled thereto in accordance with their respective interests and the Republic shall have no interest whatsoever in such amounts.

The Trustee may also appoint, at the expense of the Republic, one or more paying agents (each a "trustee paying agent") for the purpose of facilitating the Republic's payment of amounts due in respect of the Debt Securities of any Series for the exclusive benefit of the Holders of such Debt Securities. The Republic may provide directly to any such trustee paying agent or agents the funds for the payment of the principal of and premium and interest, if any, payable on the Debt Securities under an agreement with respect to such funds containing substantially the same terms and conditions set forth in this Section; and the Trustee shall have no responsibility with respect to any funds so provided by the Republic to any such trustee paying agent or for any act or omission of any trustee paying agent.  Subject to the foregoing, the Republic shall have the right at any time to instruct the Trustee to terminate the appointment of any trustee paying agent and to appoint any other paying agents in any place as it may deem appropriate for the purpose of making payments for the exclusive benefit of Holders.  Notwithstanding the foregoing, any trustee paying agents appointed pursuant to this Indenture shall be agents solely of the Trustee, and the Republic shall have no authority over or any direct relationship with any such trustee paying agent or agents.

(b)      At least five Business Days prior to the first date for payment of interest on each Series of Debt Securities and, if there has been any change with respect to the matters set forth in the below-mentioned certificate, at least five Business Days prior to each date thereafter for the payment of principal of or interest on such Debt Securities, the Republic shall furnish the Trustee with a certificate of any one of the Authorized Representatives specifically instructing the Trustee as to any circumstances in which payments of principal of or interest on such Debt Securities due on such date shall be subject to deduction or withholding for or on account of any taxes described in Section 3.2 and the rate of any such deduction or withholding.  If any such deduction or withholding shall be required and if the Republic therefore becomes liable to pay Additional Amounts pursuant to Section 3.2, then at least five Business Days prior to the date of any such payment of principal or interest, the Republic will furnish the Trustee with a certificate which specifies the amount required to be withheld on such payment to Holders of such Debt Securities and the Additional Amounts, if any, due to Holders of such Debt Securities, and simultaneously will pay to the Trustee such Additional Amounts as shall be required to be paid to such Holders.

(c)      Whenever the Trustee shall appoint a trustee paying agent for the purpose of paying amounts due to Holders in respect of the Debt Securities of any Series, it will cause such trustee paying agent to execute and deliver to the Trustee an instrument in which such agent shall agree with the Trustee and the Republic, subject to the provisions of this Section,

(i).      that such trustee paying agent will hold all sums received by it as such agent for the payment of the Debt Securities of that Series in trust for the exclusive benefit of the Trustee and the Holders of the Debt Securities of that Series in accordance with their respective interests,

(ii).      that such trustee paying agent will give the Trustee prompt notice of any failure by the Republic to make any payment of the principal of or interest on the Debt Securities of that Series and any other payments to be made by or on behalf of the Republic under this Indenture, when the same shall be due and payable, and

(iii).        that such trustee paying agent will pay any such sums so held in trust by it to the Trustee upon the Trustee's written request at any time during the continuance of a failure referred to in clause (ii) above.

Anything in this Section to the contrary notwithstanding, the Republic may at any time, for the purpose of obtaining a satisfaction and discharge of this Indenture or for any other reason, pay or cause to be paid to the Trustee all sums held by any trustee paying agent in trust for the Holders hereunder, as required by this Section, such sums to be held by the Trustee in trust for itself and the Holders in accordance with their respective interests.

(d)        If the Trustee and the Republic determine that a change in the manner, procedures or payment mechanics (including place of payment to the Trustee or a trustee paying agent or the timing of payment to the Trustee or the Holders) of any amount due hereunder or under the Debt Securities is necessary or desirable to carry out the objective of assuring payment to the Holders, the Trustee and the Republic shall implement such change, provided that no such change would result in a delay of the date upon which the Holders receive their proportionate share of such payment or reduce the amount of such payment.

(e)        Anything in this Section to the contrary notwithstanding, the agreements to hold sums in trust for the Holders as provided in this Section are subject to the provisions of Section 11.3 and Section 11.4.

Section 3.6.    Limitation on Liens.  The Republic covenants and agrees that so long as Debt Securities of any Series remain Outstanding, save for the exceptions set forth below, the Republic will not create or permit to subsist any lien, pledge, mortgage, security interest, deed of trust, charge or other encumbrance or preferential arrangement which has the practical effect of constituting a security interest ("Lien") upon the whole or any part of its assets or revenues to secure any Public External Indebtedness of the Republic unless, at the same time or prior thereto, the Republic's obligations under the Debt Securities of all Series either (i) are secured equally and ratably therewith, or (ii) have the benefit of such other security, guarantee, indemnity or other arrangement as shall be approved by the Holders of the Debt Securities (as provided in Article Nine).

Notwithstanding the foregoing, the Republic may permit to subsist:

(i).        any Lien upon property to secure Public External Indebtedness of the Republic incurred for the purpose of financing the acquisition of such property; any renewal or extension of any such Lien which is limited to the original property covered thereby and which secures any renewal or extension of the original secured financing;

(ii).        any Lien existing on such property at the time of its acquisition to secure Public External Indebtedness of the Republic and any renewal or extension of any such Lien which is limited to the original property covered thereby and which secures any renewal or extension of the original secured financing;

(iii).        any Lien created in connection with the transactions contemplated by the Republic of Argentina 1992 Financing Plan dated June 23, 1992 sent to the international banking community with the communication dated June 23, 1992 from the Minister of

20

# EXHIBIT K

424B5 1 roa-424b5_0428.htm

<u>PROSPECTUS SUPPLEMENT</u>                                                    Filed pursuant to Rule 424(b)(5)
(to Prospectus dated April 13, 2010)                                         Registration No. 333-163784

# The Republic of Argentina
**Invites the Owners of each Series of Bonds**
listed in Annexes A-1 and A-2 and related claims (collectively, the "Eligible Securities") to submit offers
to exchange Eligible Securities for New Securities and, in certain cases, cash, on the terms and conditions described herein.
**The aggregate Eligible Amount (as defined herein) of all Pre-2005 Eligible Securities (as defined herein) currently outstanding is U.S.$18.3 billion, comprising U.S.$17.6 billion of principal and U.S.$0.7 billion of accrued but unpaid interest as of December 31, 2001, based on currency exchange rates in effect on December 31, 2003.**

**For a discussion of risk factors that you should consider in evaluating the Invitation, see "Risk Factors" beginning on page S-53 of this document and page 7 of the accompanying prospectus.**

---

**The Invitation will expire at 5:00 P.M. (New York City time) on June 7, 2010, unless extended or earlier terminated by Argentina (such date and time, as the same may be extended, the "Expiration Date").**

**Large Holders (as defined herein) electing the Discount Option (as defined herein) who validly tender their Eligible Securities (1) by no later than 5:00 P.M. (New York City time) on May 12, 2010, unless extended (such date and time, as the same may be extended, the "Early Tender Deadline") will be eligible to receive the Total Consideration (as defined herein), or (2) after the Early Tender Deadline but on or prior to the Expiration Date, will be eligible to receive the Consideration (as defined herein). Small Holders (as defined herein) will be eligible to receive the Total Consideration even if their tenders are received after the Early Tender Deadline, so long as they validly tender their Eligible Securities on or prior to the Expiration Date. All tenders will be irrevocable and may not be withdrawn except under certain limited circumstances as described in this document.**

---

The New Securities, other than those governed by Argentine law, will contain provisions regarding acceleration (if applicable) and future modifications to their terms. These provisions, which are commonly referred to as "collective action clauses," are described in the sections entitled "Description of the Securities—Default and Acceleration of Maturity" and "Description of the Securities—Collective Action Clauses" on pages 20 and 21, respectively, of the accompanying prospectus. Under those provisions, modifications affecting certain reserved matters, including modifications to payment and other important terms, may be made to a single series of New Securities, other than those governed by Argentine law, with the consent of the holders of 75% of the aggregate principal or notional amount outstanding of that series, and to multiple series of New Securities, other than those governed by Argentine law, with the consent of the holders of 85% of the aggregate principal or notional amount outstanding of all affected series and 66⅔% in aggregate principal or notional amount outstanding of each affected series.

This document, the accompanying prospectus and the related electronic acceptance notices and letters of transmittal are together referred to as the "Invitation Materials." The transactions contemplated by the Invitation Materials are referred to as the "Invitation."

Prior to the termination of the Invitation, Argentina is offering U.S.$1,000,000,000 principal amount of global bonds due 2017 for cash. We refer to this offering as the "concurrent cash offering." The completion of the Invitation is conditioned on Argentina's receipt of the proceeds from the concurrent cash offering and the other conditions described herein.

Application has been made to list each series of the New Securities on the Luxembourg Stock Exchange and to have the New Securities admitted to trading on the Euro MTF market of the Luxembourg Stock Exchange, and application will be made to list each series of the New Securities on the Buenos Aires Stock Exchange and to have the New Securities admitted to trading on the *Mercado Abierto Electrónico*. See "Plan of Distribution."

**Neither the Securities and Exchange Commission nor any other regulatory body has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus supplement or the prospectus to which it relates. Any representation to the contrary is a criminal offense.**

*(cover continues on next page)*

---

*Global Coordinator*

**Barclays Capital**

*International Joint Dealer Managers*

**Barclays Capital**                              **Citi**                              **Deutsche Bank Securities**

The date of this prospectus supplement is April 28, 2010.

|  | The CER-adjusted principal amount of any peso-denominated Discounts or Pars will be determined by the Office of National Public Credit of the Ministry of Economy and Public Finance of Argentina prior to the date on which any principal and/or interest payments on such securities is due (in the case of interest, whether payable in cash or capitalized).  The Office of National Public Credit will determine this CER-adjusted principal amount by multiplying (x) the original principal amount of the peso-denominated Discounts or Pars as of December 31, 2003, by (y) a fraction, the numerator of which is equal to the CER corresponding to the 10-day period immediately preceding the relevant payment date (or the 10-day period immediately preceding March 30, 2010, in the case of the first interest payment on the Pars, or June 30, 2010, in the case of the first interest payment on the Discounts), and the denominator of which is the CER corresponding to the 10-day period immediately preceding December 31, 2003.  Argentina will announce any such adjustments to the outstanding principal amount of any peso-denominated Discounts and Pars at least annually by notice to the holders of such securities, as necessary, as described under "Description of the New Securities—Notices." |
|---|---|
| **Further Issues** | New Securities governed by Argentine law do not contain provisions restricting Argentina's ability to create and issue additional debt securities ranking *pari passu* with the New Securities or having the same terms and conditions as any series of the New Securities. |
| **Absence of Certain Covenants or Events of Default under New Securities Governed by Argentine Law** | New Securities governed by Argentine law will be issued under an Argentine government decree that will not contain certain covenants granted to holders of New Securities governed by New York law or English law.  Argentina will have no obligation with respect to New Securities governed by Argentine law to pay additional amounts for any withholding of Argentine taxes, duties or assessments on payments of principal, interest or other amounts on such New Securities.  Nor will New Securities governed by Argentine law include certain of the covenants set forth in the accompanying prospectus, such as the negative pledge or *pari passu* clause, or contain events of default. |

S - 42

**DESCRIPTION OF THE NEW SECURITIES**

*This document describes the terms of the New Securities in greater detail than the accompanying prospectus and may provide information that differs from the accompanying prospectus. If the information in this document differs from the accompanying prospectus, you should consider the information in this document.*

*Argentina will issue the New Securities under either a trust indenture or an Argentine government decree. New Securities governed by New York law or English law will be issued under the trust indenture dated as of June 2, 2005 between Argentina and The Bank of New York Mellon, as U.S.-European trustee, as supplemented. New Securities issued under Argentine law will not be issued under the trust indenture but rather under a Decree issued by Argentina on April 26, 2010 (the "Issuance Decree"). Although the trust indenture and the Issuance Decree contain many similar terms, a number of their terms differ, in some cases, significantly, as a result of differences in applicable law and local market practice. See "Risk Factors—Risks Factors Relating to the New Securities—Risks Relating to New Securities Governed by Argentine Law."*

*The information contained in this section summarizes some of the terms of the New Securities, the trust indenture and the Issuance Decree. Because this is a summary, it does not contain all of the information that may be important to you as a potential investor in the New Securities. Argentina, therefore, urges you to read the trust indenture, the Issuance Decree and the forms of the securities in making your investment decision. Argentina has filed or will file copies of these documents with the United States Securities and Exchange Commission and will also file copies of these documents at the offices of each of the U.S.-European trustee and the Luxembourg listing agent, where they will be made available to you.*

**General Terms Common to All New Securities**

The New Securities offered are:

Discount Bonds due December 31, 2033:

- U.S. dollar-denominated Discounts governed by New York law;
- U.S. dollar-denominated Discounts governed by Argentine law;
- Euro-denominated Discounts governed by English law; and
- Peso-denominated Discounts governed by Argentine law.

Global Bonds due 2017:

- U.S. dollar-denominated 2017 Globals governed by New York law.

Par Bonds due December 31, 2038:

- U.S. dollar-denominated Pars governed by New York law;
- U.S. dollar-denominated Pars governed by Argentine law;
- Euro-denominated Pars governed by English law; and
- Peso-denominated Pars governed by Argentine law.

GDP-linked Securities:

GDP-linked Securities expiring no later than December 15, 2035. Each GDP-linked Security issued in exchange for any Pre-2005 Eligible Securities will be denominated in the same currency, and governed by the same law, as the Discounts or Pars issued in exchange for the same Pre-2005 Eligible Securities.

The New Securities will:

- pay interest and principal (or, in the case of GDP-linked Securities, make payments in accordance with their terms) to persons in whose names the New Securities are registered at the close of business on the business day preceding (or, in the case of the GDP-linked Securities denominated in euro, the 15th day preceding) the payment date;

S - 103

**Further Issues**

Under the terms of the trust indenture, Argentina may, from time to time without the consent of holders of the New Securities governed by New York law or English law, create and issue additional securities ranking *pari passu* with the New Securities and having the same terms and conditions as any series of the New Securities, or the same terms and conditions except for the amount of the first payment of interest or other amounts on such additional securities, or, if applicable, the initial interest or other payment date or interest accrual date. Argentina may also consolidate the additional securities to form a single series with any outstanding series of New Securities.

Any such additional debt securities (excluding New Securities issued on the Final Settlement Date), however, may not have, for purposes of U.S. federal income taxation, a greater amount of OID than the relevant series of New Securities have as of the date of the issuance of such additional debt securities.

Under the terms of the Issuance Decree, New Securities governed by Argentine law contain no restrictions relating to the creation or issuance by Argentina of additional securities, including securities that may rank *pari passu* with such New Securities or having the same terms and conditions of such New Securities.

**Seniority**

The New Securities governed by New York law and English law will constitute the direct, unconditional, unsecured and unsubordinated obligations of Argentina and will rank *pari passu* and without preference among themselves by reason of priority of date of issue or currency of payment or otherwise, and at least equally with all of Argentina's other present and future unsecured and unsubordinated External Indebtedness (as defined in the accompanying prospectus under "Description of the Securities—Description of Debt Securities—Negative Pledge").

**Special Terms of New Securities Governed by Argentine Law**

Under the terms of the Issuance Decree for the New Securities governed by Argentine law, the outstanding principal amount of all Discounts and Pars denominated in pesos will be adjusted for inflation based on the CER. The CER is published by the Central Bank of Argentina on a monthly basis. The amount of principal amortizations on the Discounts and Pars denominated in pesos will be adjusted over time to reflect the CER-adjusted principal amount of these securities, which will increase whenever Argentina experiences inflation and will decrease if Argentina experiences deflation. Likewise, the amount of interest that accrues on these securities will be determined on the CER-adjusted principal amount.

The CER-adjusted principal amount of any peso-denominated Discounts or Pars will be determined by the Office of National Public Credit of the Ministry of Economy and Public Finance of Argentina prior to the date on which any principal and/or interest payments on such securities is due (in the case of interest, whether payable in cash or capitalized). The Office of National Public Credit will determine this CER-adjusted principal amount by multiplying (x) the original principal amount of the peso-denominated Discounts or Pars as of December 31, 2003, by (y) a fraction, the numerator of which is equal to the CER corresponding to the 10-day period immediately preceding the relevant payment date (or the 10-day period immediately preceding March 30, 2010, in the case of the first interest payment on the Pars, or June 30, 2010, in the case of the first interest payment on the Discounts), and the denominator of which is the CER corresponding to the 10-day period immediately preceding December 31, 2003. Argentina will announce any such adjustments to the outstanding principal amount of any peso-denominated Discounts and Pars at least annually by notice to the holders of such securities, as described under "—Notices."

The Issuance Decree does not contain certain covenants granted to holders of Discounts, Pars and GDP-linked Securities governed by New York law or English law. Argentina will have no obligation with respect to Discounts, Pars and GDP-linked Securities governed by Argentine law to pay additional amounts for any withholding of Argentine taxes, duties or assessments on payments of principal, interest or other amounts on such New Securities. Nor will New Securities governed by Argentine law include certain of the covenants set forth in the accompanying prospectus, such as the negative pledge or *pari passu* clause, or contain events of default.

S - 113

**Notices**

Argentina will deliver all notices to holders of New Securities by first-class prepaid mail to each holder's address as it appears in the register for the New Securities.

In addition, in respect of any series of New Securities listed on the Luxembourg Stock Exchange and as long as such series is so listed, Argentina will publish all notices with respect to such series of New Securities on the website of the Luxembourg Stock Exchange (http://www.bourse.lu) or, if publication is not practicable, Argentina will publish in another manner consistent with the rules of the Luxembourg Stock Exchange.

Any notice shall be deemed to have been given on the date of such publication or, if published more than once or on different dates, on the first date on which publication is made.

**Governing Law**

The Discounts and Pars will be governed as follows:

- if they are denominated in U.S. dollars, by the laws of the State of New York, unless the Eligible Securities you tendered for such Discounts or Pars were governed by Argentine law, in which case you will receive Discounts or Pars, respectively governed by Argentine law;

- if they are denominated in euros, by English law; and

- if they are denominated in pesos, by Argentine law.

The 2017 Globals will be governed by the laws of the State of New York.

The GDP-linked Securities will be governed by the law that governs the Discounts or Pars received in exchange for the same Eligible Securities.

**Jurisdiction**

Subject to certain exceptions, under the trust indenture and the terms and conditions of the New Securities issued pursuant thereto, Argentina will submit to the jurisdiction of the following courts in connection with any suit, legal action or proceeding against Argentina with respect to the New Securities governed by New York or English Law:

- with respect to any New Securities governed by New York law, Argentina will submit to the jurisdiction of any New York State or U.S. federal court sitting in the Borough of Manhattan, The City of New York and the courts of Argentina; and

- with respect to any New Securities governed by English law, Argentina will submit to the jurisdiction of the courts of England and the courts of Argentina;

In addition, Argentina will agree that a final non-appealable judgment in any proceeding described above will be binding upon it and may be enforced by a suit upon such judgment in any such courts or in any other courts that may have jurisdiction over Argentina.

Subject to certain exceptions, the federal courts of the City of Buenos Aires will have jurisdiction over any suit, legal action or proceeding against Argentina with respect to New Securities governed by Argentine law.

S - 114

**Registration and Book-Entry System**

*U.S. dollar-denominated New Securities (other than U.S. dollar-denominated New Securities governed by Argentine law) and euro-denominated New Securities*

New Securities denominated in U.S. dollars (other than U.S. dollar-denominated New Securities governed by Argentine law) and euros will be represented by interests in one or more permanent global securities in fully registered form, without interest coupons attached, which will be registered in the name of a nominee of a common depositary of Euroclear and Clearstream, Luxembourg and which will be deposited on or before the Early Settlement Date or the Final Settlement Date, as applicable, with that common depositary. Financial institutions, acting as direct and indirect participants in either Euroclear or Clearstream, Luxembourg, will represent your beneficial interests in the global security. These financial institutions will record the ownership and transfer of your beneficial interests through book-entry accounts, eliminating the need for physical movement of securities.

If you wish to hold securities through the Euroclear or Clearstream, Luxembourg system, you must either be a direct participant in Euroclear or Clearstream, Luxembourg or hold securities through a direct participant in Euroclear or Clearstream, Luxembourg. Direct participants include securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations that have accounts with Euroclear or Clearstream, Luxembourg. Each of *Caja de Valores*, Clearstream Banking AG, Iberclear, Monte Titoli S.p.A., OEKB and SIS has an account with one or both of these clearing systems. Indirect participants are securities brokers and dealers, banks, trust companies and trustees that do not have an account with Euroclear or Clearstream, Luxembourg, but that clear through or maintain a custodial relationship with a direct participant. Thus, indirect participants have access to the Euroclear or Clearstream, Luxembourg system through direct participants.

The laws of some jurisdictions require that certain persons take physical delivery of securities in definitive form. Such laws may impair the ability to transfer beneficial interests in these New Securities to such persons.

In sum, you may elect to hold your beneficial interests in New Securities denominated in U.S. dollars (other than U.S. dollar-denominated New Securities governed by Argentine law) and euros:

- through Euroclear or Clearstream, Luxembourg;

- in Argentina, through *Caja de Valores*; or

- through organizations that participate in such systems.

The New Securities will not be made eligible for clearance, settlement or trading in the book-entry system of DTC.

As an owner of a beneficial interest in the global securities, you will generally not be considered the holder of any New Securities under the trust indenture.

*Peso-denominated New Securities and U.S. dollar-denominated New Securities governed by Argentine law*

Peso-denominated New Securities and U.S. dollar-denominated New Securities governed by Argentine law will be registered in the name of CRYL and deposited with CRYL. You may hold a beneficial interest directly if you have an account with CRYL or indirectly through an institution that has an account with CRYL (including *Caja de Valores*). Each of Euroclear and Clearstream, Luxembourg holds an account with an Argentine depositary, which acts as a link with *Caja de Valores*. *Caja de Valores* has an account with CRYL.

**Definitive Securities**

Argentina will issue securities in definitive form in exchange for interests in a global security only if:

**Settlement**

Argentina will condition its authorization of the transfer of the New Securities to the accounts of the tendering holders within the principal clearing systems on the Early Settlement Date or the Final Settlement Date, as applicable, to the cancellation of all the Eligible Securities tendered in the Invitation for settlement on that date. Argentina may not waive this condition.

*U.S. dollar-denominated New Securities (other than U.S. dollar-denominated New Securities governed by Argentine law) and euro-denominated New Securities*

If you receive interests in U.S. dollar-denominated or euro-denominated New Securities, you must hold your New Securities through Euroclear or Clearstream, Luxembourg accounts or through direct or indirect participants and you must follow the settlement procedures applicable to conventional Eurobonds in registered form. Interest in those New Securities will be credited to the securities custody accounts at Euroclear and Clearstream, Luxembourg on the Settlement Date. Each of *Caja de Valores*, Clearstream Banking AG, CRYL, Iberclear, Monte Titoli S.p.A., OEKB and SIS has an account with one or both of these clearing systems.

The New Securities will not be made eligible for clearance, settlement or trading in the book-entry system of DTC.

*Peso-denominated New Securities and U.S. dollar-denominated New Securities governed by Argentine law*

Peso-denominated New Securities and U.S. dollar-denominated New Securities governed by Argentine law will be registered in the name of CRYL and deposited with CRYL. You may hold a beneficial interest directly through an account with CRYL or indirectly through an institution that has an account with CRYL, including *Caja de Valores*. Each of Euroclear and Clearstream, Luxembourg has an account with an Argentine depositary, which acts as a link with *Caja de Valores*.

**Secondary Market Trading**

Since the purchaser determines the place of delivery, it is important for you to establish at the time of a secondary market trade the location of both the purchaser's and seller's accounts to ensure that settlement can be made on the desired value date.

*Trading between Euroclear and/or Clearstream, Luxembourg Participants*

Secondary market trading between Clearstream, Luxembourg participants and/or Euroclear participants will be settled using the procedures applicable to conventional Eurobonds in same-day funds.

*Trading between CRYL Participants*

Secondary market trading between CRYL participants will occur in the ordinary way in accordance with the applicable rules and operating procedures of CRYL.

*Trading between Caja de Valores Participants*

Secondary market trading between *Caja de Valores* participants will occur in the ordinary way in accordance with the applicable rules and operating procedures of *Caja de Valores*.

*Trading between Euroclear, Clearstream, Luxembourg and Caja de Valores Participants*

S - 118

## The Republic of Argentina

*The exchange agent for the Invitation is:*

**The Bank of New York Mellon**
101 Barclay Street
Floor 4 East
Corporate Trust Administration
New York, New York 10286
United States
Tel: +1 732 667 9754

*The Luxembourg listing agent
for the Invitation is:*

**The Bank of New York Mellon  (Luxembourg) S.A.**
Aerogolf Center, 1A, Hoehenhof,
L-1736 Senningerberg,
Luxembourg
Tel: +352 34 20 90 5635
Fax: +352 34 20 90 6035

*The information agent for the Invitation is:*
**Georgeson S.r.l.**

*In New York:*
199 Water St.
New York, New York 10038
United States
U.S. toll free: 866 742 4029
Institutions: +39 06 42 17 17 77

*In London:*
Vintners' Place
68 Upper Thames Street
London EC4V 3BJ
England
Institutions: +39 06 42 17 17 77

*In Italy:*
Via Emilia 88,
00187 Rome,
Italy
Toll free: 800 189922
Institutions: +39 06 42 17 17 17

*In Germany:*
Prannerstrasse 8
80333 Munich,
Germany
Toll free: 0800 000 1564
Institutions: +39 06 42 17 17 77

*The global coordinator for the Invitation is:*
**Barclays Capital Inc.**
745 Seventh Avenue
New York, New York 10019
United States
Collect: +1 212 528 7581
U.S. toll free: 800 438 3242
Collect London: +44 20 7773 5484

*The international joint dealer managers for the Invitation are:*

**Barclays Capital Inc.**
745 Seventh Avenue
New York, New York 10019
United States
Collect: +1 212 528 7581
U.S. toll free: 800 438 3242
Collect London: +44 20 7773 5484

**Citigroup Global Markets Inc.**
Liability Management Group
390 Greenwich Street, 4th Floor
New York, New York 10013
United States
Collect: +1 212 723 6106
U.S. toll free: 800 558 3745

**Deutsche Bank Securities Inc.**
Liability Management Group
60 Wall Street
New York, New York 10005
United States
Collect: +1 212 250 2955
U.S. toll free: 866 627 0391

# EXHIBIT L

THIS GLOBAL SECURITY (THIS "SECURITY") IS A GLOBAL SECURITY WITHIN THE MEANING OF THE INDENTURE REFERRED TO HEREINAFTER AND IS REGISTERED IN THE NAME OF CEDE & CO., AS NOMINEE OF THE DEPOSITORY TRUST COMPANY ("DTC").  THIS SECURITY MAY NOT BE EXCHANGED, IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS SECURITY IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN DTC OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.

UNLESS THIS SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE REPUBLIC OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, OR ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS NOMINATED BY AN AUTHORIZED REPRESENTATIVE OF DTC, ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL IN AS MUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.



REGISTERED GLOBAL SECURITY

No. 6

CUSIP No:  040114GL8
ISIN:  US040114GL81

representing

8.28% U.S. Dollar-Denominated Discount Bonds due 2033

Original Principal Amount U.S. $500,000,000

THE REPUBLIC OF ARGENTINA (the "Republic"), for value received, hereby promises to pay to Cede & Co. or registered assigns, the principal sum set forth in the Schedule of Principal Increases and Decreases annexed hereto as Schedule A, in twenty semi-annual installments on June 30 and December 31 of each year commencing on June 30, 2024 (each such date, a "Principal Payment Date").  The amount of each such principal payment shall equal the principal amount of this Security outstanding as of any such Principal Payment Date, divided by the number of principal installments from and including such Principal Payment Date to and including December 31, 2033.

The Republic further unconditionally promises to pay interest at the rate of 8.28% per annum on the principal amount of this Security outstanding from time to time, which interest shall accrue from and including the most recent date to which interest has been paid, capitalized or duly provided for, or, if no interest has been paid, capitalized or duly provided for, from and including December 31, 2003 to, but excluding, the date on which payment of said principal sum has been made or duly provided for.

for such Reference Year.  All calculations necessary to determine Excess GDP based on the information published by INDEC will be performed by the Ministry of Economy and Production of the Republic, and such calculations shall be binding on the Trustee, the Registrar, the trustee paying agent and each other trustee paying agent and all Holders of Securities, absent bad faith, willful misconduct or manifest error on the part of the Ministry of Economy and Production of the Republic.

"GDP Deflator" means, for any Reference Year, the number that results from dividing (i) the gross domestic product of Argentina for such Reference Year measured at the current prices of such Reference Year, as published by INDEC, by (ii) the Actual Real GDP for such Reference Year.

"INDEC" means the *Instituto Nacional de Estadística y Censos* of the Republic of Argentina.

"Nominal Base Case GDP"  means, for any Reference Year, an amount equal to Base Case GDP for such Reference Year multiplied by the GDP Deflator for such Reference Year.

"Reference Year" means any calendar year from and including the year 2005 to and including the year 2010.

"Year of Base Prices" means the year 1993; *provided* that if the calendar year employed by INDEC for purposes of determining Actual Real GDP shall at any time be a calendar year other than the year 1993, then the Year of Base Prices shall mean such other calendar year.

8.   Rights upon Future Offers.  (a) Subject to Paragraphs 8(b) and 8(c) below, if at any time on or prior to December 31, 2014, the Republic voluntarily makes an offer to purchase or exchange (a "Future Exchange Offer"), or solicits consents to amend (a "Future Amendment Process"), any outstanding Non-Performing Securities, each Holder of Securities shall have the right, for a period of 30 calendar days following the announcement of any such Future Exchange Offer or Future Amendment Process, to exchange any of such Holder's Securities for (as applicable):

(i)       the consideration in cash or in kind received by holders of Non-Performing Securities in connection with any such Future Exchange Offer, or

(ii)      debt obligations having terms substantially the same as those resulting from any such Future Amendment Process,

in each case in accordance with the terms and conditions of such Future Exchange Offer or Future Amendment Process.  For purposes of receiving the consideration or debt obligations specified in clauses (i) and (ii) above, each such Holder's Securities shall be treated as though they were Non-Performing Securities (x) denominated in the same currency as such Securities, and (y) that had a principal amount outstanding as of December 31, 2001, together with any accrued and unpaid interest up to by excluding December 31, 2001, equal to the outstanding principal amount of such Securities multiplied by 2.96735905.  The Republic covenants and agrees to take all steps necessary, including making any required filings with regulatory

authorities, in order to enable Holders to participate in any Future Exchange Offer or Future Amendment Process as provided in this Paragraph 8.

(b)     Each Holder's right to participate in any Future Exchange Offer or Future Amendment Process as provided in Paragraph 8(a), and the Republic's obligation to take all actions necessary to enable such participation, shall be conditioned upon such Holder either (i) surrendering to the Trustee, for cancellation, GDP-linked Securities in a notional amount equal to (x) the principal amount of the Securities such Holder wishes to exchange pursuant to or in connection with such Future Exchange Offer or Future Amendment Process, multiplied by (y) 2.96735905; or (ii) paying cash to the Republic in an amount equal to the market price of such GDP-linked Securities calculated on the Market Observation Date that is at least six months prior to the announcement of such Future Exchange Offer or Future Amendment Process, as the case may be; *provided* that, with respect to clause (b)(ii) above, the Holder may pay such cash to the Republic in lieu of surrendering to the Trustee the GDP-linked Securities specified in clause (b)(i) above, only if an active trading market and published secondary market price quotations exist for GDP-linked Securities. "Market Observation Date" means, in respect of any GDP-linked Securities, any March 31 or September 30, as of which dates the Trustee shall calculate the market price of such GDP-linked Securities for purposes of this Paragraph 8(b).  "GDP-Linked Securities" means, for purposes of this Paragraph 8(b), any U.S. dollar-denominated securities by such name listed in Schedule B hereto.

(c)     The right of Holders to participate in any Future Exchange Offer or any Future Amendment Processes in accordance with this Paragraph 8 shall not apply to any exchange offer conducted pursuant to Presidential Decree No. 1,375 of the Republic.

9.     Purchase of the Securities by the Republic.  The Republic may at any time purchase or acquire any of the Securities in any manner and at any price in the open market, in privately negotiated transactions or otherwise.  Securities that are purchased or acquired by the Republic may, at the Republic's discretion, be held, resold or surrendered to the Trustee for cancellation, but any Security so purchased by the Republic may not be re-issued or resold except in compliance with the Securities Act and other applicable law.

10.     Replacement, Exchange and Transfer of Securities.  (a) If any Security becomes mutilated or is defaced, destroyed, lost or stolen, the Trustee shall authenticate and deliver a new Security, on such terms as the Republic and the Trustee may require, in exchange and substitution for the mutilated or defaced Security or in lieu of and in substitution for the destroyed, lost or stolen Security.  In every case of mutilation, defacement, destruction, loss or theft, the applicant for a substitute Security must furnish to the Republic and the Trustee such indemnity as the Republic and the Trustee may require and evidence to their satisfaction of the destruction, loss or theft of such Security and of the ownership thereof.  In every case of mutilation or defacement of a Security, the Holder must surrender to the Trustee the Security so mutilated or defaced.  In addition, prior to the issuance of any substitute Security, the Republic may require the payment of a sum sufficient to cover any stamp or other tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.  If any Security that has matured or is scheduled to mature within 15 days becomes mutilated or defaced or is apparently destroyed, lost

# EXHIBIT M

# CONSTITUTION OF THE ARGENTINE NATION

## PREAMBLE

We, the representatives of the people of the Argentine Nation, gathered in General Constituent Assembly by the will and election of the Provinces which compose it, in fulfillment of pre-existing pacts, in order to form a national union, guarantee justice, secure domestic peace, provide for the common defense, promote the general welfare and secure the blessings of liberty to ourselves, to our posterity, and to all men of the world who wish to dwell on argentine soil: invoking the protection of God, source of all reason and justice: do ordain, decree, and establish this Constitution for the Argentine Nation.

## FIRST PART

## CHAPTER I
## DECLARATIONS, RIGHTS AND GUARANTEES

Section 1.- The Argentine Nation adopts the federal republican representative form of government, as this Constitution establishes.

Section 2.- The Federal Government supports the Roman Catholic Apostolic religion.

Section 3.- The authorities in charge of the Federal Government shall reside in the city to be declared Capital of the Republic by a special law of Congress, once settled the cession of the territory to be federalized by one or more provincial legislatures.

Section 4.- The Federal Government provides for the expenditures of the Nation with the funds of the National Treasury, composed of the proceeds of export and import duties, the sale or lease of lands owned by the Nation, the revenues of the Posts, other taxes equitably and proportionally levied on the population by the National Congress, and of whatever loans and credit transactions Congress may order in case of national emergencies or for enterprises of national interest.

Section 5.- Each province shall enact its own constitution under the republican, representative system, in accordance with the principles, declarations, and guarantees of the National Constitution, ensuring its administration of justice, municipal regime, and elementary education. Under these conditions, the Federal Government shall guarantee each province the full exercise of its institutions.

Section 6.- The Federal Government may intervene in the territory of the provinces in order to guarantee the republican form of government or to repel foreign invasions; and at the request of their constituted authorities, it may intervene to support or reestablish them, should they have been deposed by sedition or invasion from another province.

Section 7.- The public acts and judicial proceedings of one province are worthy of full faith in the others; and Congress may, by general laws, prescribe the manner in which such acts and proceedings shall be proved and the legal effects thereof.

Section 8.- The citizens of each province shall be entitled to all rights, privileges, and immunities inherent in the condition of citizen in the other provinces. The extradition of criminals is a reciprocal obligation among all the provinces.

Section 9.- Throughout the territory of the Nation there shall be no other Customs than the national ones, in which the tariffs enacted by Congress shall be in force.

Section 48.- In order to be a deputy it is necessary to have attained to the age of 25 years; to have been four years a fully qualified citizen; and to be a native of the province electing him or to have two years of immediate residence therein.

Section 49.- On this occasion, the Legislatures of the provinces shall regulate the means to hold the direct election of the deputies of the Nation; in the future, Congress shall enact a general law.

Section 50.- Deputies shall hold office for a term of four years and may be re-elected; but the House shall be renewed by halves every two years; for this purpose those elected for the first legislative session, after meeting, shall draw lots to decide which seats shall be vacated after the first period.

Section 51.- In case of vacancy, the Government of the province or of the Capital City shall proceed to call a legal election for a new member.

Section 52.- All bills for raising revenue and for the recruitment of troops shall exclusively originate in the House of Deputies.

Section 53.- Only the House of Deputies has the power to impeach before the Senate the President, the Vice-President, the Chief of the Ministerial Cabinet, the Ministers, and the Justices of the Supreme Court, in such cases of responsibility as are brought against them for misconduct or crimes committed in the fulfillment of their duties; or for ordinary crimes, after having known about them and after the decision to bring an action had been voted by a majority of two-thirds of its members present.

CHAPTER II
**The Senate**

Section 54.- The Senate shall be composed of three senators from each province, and three from the City of Buenos Aires, who shall be jointly and directly elected, corresponding two seats to the most voted political party, and the other seat to the political party following in number of votes. Each senator shall have one vote.

Section 55.- In order to be elected senator the following conditions are required: to have attained to the age of 30, to have been six years a citizen of the Nation, to have an annual income of two thousand strong pesos or similar revenues, and to be a native of the province electing him or to have two years of immediate residence therein.

Section 56.- Senators shall hold office for a term of six years and may be indefinitely re-elected; but the Senate shall be renewed by one-third of the constituencies every two years.

Section 57.- The Vice-President of the Nation shall be the President of the Senate; but he shall have no vote unless in case of equality of votes.

Section 58.- The Senate shall appoint a President pro tempore to preside it in case of absence of the Vice-President, or when he holds the office of President of the Nation.

Section 59.- The Senate shall have the sole power to judge in public trial those impeached by the House of Deputies, and its members must be on oath when sitting for this purpose. When the President of the Nation is impeached, the Senate shall be presided by the Chief Justice of the Supreme Court. No person shall be declared guilty without the concurrence of two-thirds of the members present.

Section 60.- The judgment shall not extend further than to remove the accused person from office, and to disqualify him to hold any office of honor, trust, or profit in the Nation. But the party declared guilty shall, nevertheless, be subject to accusation, trial, and punishment according to law before the ordinary courts.

Section 61.- In case of foreign attack, the Senate is also empowered to authorize the

# EXHIBIT N

**FREE TRANSLATION**

**CRIMINAL CODE OF THE ARGENTINE NATION**

[...]

**FIRST BOOK**

[...]

**TITLE XI**

**CRIMES AGAINST THE PUBLIC ADMINISTRATION**

[...]

**Chapter IV**

**Abuse of authority and violation of public officials' duties**

[...]

**ARTICLE 248.** - The public official who passes resolutions or orders contrary to national or provincial constitutions or laws, or executes orders or resolutions of this kind already in existence, or does not execute the laws whose compliance is incumbent upon him, will be punished with imprisonment of one month to two years and special disqualification for twice the time.

**ARTICLE 249.** – The public official who illegitimately omits, refuses to do, or delays any act of his or her official employment, will be punished with a fine of seven hundred and fifty pesos to twelve thousand five hundred pesos and special disqualification for one month to one year.

[...]

AFFIDAVIT OF TRANSLATOR
REGARDING ACCURACY OF TRANSLATION

STATE OF NEW YORK )

:ss.:

COUNTY OF NEW YORK )

IGNACIO ZAPIOLA, being duly sworn, deposes and says:

I am an attorney employed by Cleary Gottlieb Steen & Hamilton LLP presently

residing and working within the State of New York and declare:

I am proficient with the Spanish language and the English language, have had

prior experience in translating documents in those languages, have translated the foregoing

document (Criminal Code of the Argentine Republic, Articles 248 and 249) from Spanish into

English and believe that the translation is complete and accurate.

Ignacio Zapiola

Sworn to before me this
21st day of July 2014

Notary Public

ALICIA E. COOKE
Notary Public, State of New York
No. 4970402
Qualified in Nassau County
Certificate Filed in New York County
Commission Expires August 13,

**CODIGO PENAL DE LA NACION ARGENTINA**

[…]

**LIBRO PRIMERO**

[…]

**TITULO XI**

**DELITOS CONTRA LA ADMINISTRACION PUBLICA**

[…]

**Capítulo IV**

**Abuso de autoridad y violación de los deberes de los funcionarios públicos**

[…]

**ARTICULO 248.** - Será reprimido con prisión de un mes a dos años e inhabilitación especial por doble tiempo, el funcionario público que dictare resoluciones u órdenes contrarias a las constituciones o leyes nacionales o provinciales o ejecutare las órdenes o resoluciones de esta clase existentes o no ejecutare las leyes cuyo cumplimiento le incumbiere.

[…]

**ARTICULO 249.** - Será reprimido con multa de pesos setecientos cincuenta a pesos doce mil quinientos e inhabilitación especial de un mes a un año, el funcionario público que ilegalmente omitiere, rehusare hacer o retardare algún acto de su oficio.

[…]

Source:   http://www.infoleg.gov.ar/infolegInternet/anexos/15000-19999/16546/texact.htm

# EXHIBIT O

# National Public Sector Financial Administration and Control Systems Act

## No. 24.156
*(translation)*

**THE ARGENTINE REPUBLIC**

MINISTRY OF ECONOMY, PUBLIC WORKS AND SERVICES

TREASURY SECRETARIAT

Case 1:08-cv-06978-TPG   Document 603   Filed 07/21/14   Page 80 of 80

(e)    Review progress reports on the approved work program, make such observations thereon as may be appropriate, and indicate such changes to such program as it may consider desirable;

(f)    Review the annual report which the General Audit Office is to submit by May 1 each year.

## Chapter III
## Liability

**SECTION 130.-** Any individual working in a any of the jurisdictions or entities falling within the authority of the General Audit Office shall be liable for any pecuniary damages sustained by the jurisdictions or entities on account of such individual's negligence, willful misconduct, or fraud in the performance of his or her duties, provided such individual is not otherwise subject to special legal regime in respect of pecuniary liability.

**SECTION 131.-** Actions for enforcement of the pecuniary liability incurred by any individual working under the agencies and entities referred to in sections 117 and 120 hereof shall be subject to the statute of limitations within the terms set forth in the Civil Code, computed as from occurrence of the event causing the damage or, if later, of the actual damage, whichever the legal regime on pecuniary liability may be applicable to such individual.

## TITLE VIII
## Miscellaneous Provisions

## Chapter I
## General Provisions

**SECTION 132.-** The government bodies having authority to organize the Office of the Comptroller General and the General Audit Office are hereby empowered to execute agreements as between themselves for the reassignment of officers and employees of the Comptroller General of Public Enterprises (*Sindicatura General de Empresses Públicas SIGEP*) and the National Accounts Court *(Tribunal de Cuentas de la Nación)*.

## Chapter II
## Interim Provisions

**SECTION 133.-** The provisions of this Act shall begin to apply from the first fiscal year commencing after enactment hereof.

The National Executive Branch shall set the schedules and time frames required for the full implementation of the budget, public debt, treasury, accounting, and internal control systems provided for herein, which are requisite for the gradual establishment of the external and internal control structure as regulated above.

**SECTION 134.-** Objection as per Decree 1957/92 (October 26 1992), National Executive Branch.

**SECTION 135 .-** Within ninety (90) days after promulgation hereof, the National Executive Branch shall submit to the National Congress a draft law regulating the government contracting and procurement system and another draft law organizing the administration of government property.

**SECTION 136.-** The National Executive Branch shall issue the implementing regulations to this Act within ninety (90) days after promulgation hereof.

Sections 116 through 129 (both inclusive) shall not be subject to regulation by the National Executive Branch.