UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NML CAPITAL, LTD. <br><br>                             Plaintiff, <br><br>    -against- <br><br> THE REPUBLIC OF ARGENTINA, <br><br>                             Defendant. | 08 Civ. 6978 (TPG) <br> 09 Civ. 1707 (TPG) <br> 09 Civ. 1708 (TPG) |
| AURELIUS CAPITAL MASTER, LTD. And <br> ACP MASTER, LTD., <br><br>                             Plaintiffs, <br><br>    -against- <br><br> THE REPUBLIC OF ARGENTINA, <br><br>                             Defendant. | 09 Civ. 8757 (TPG) <br> 09 Civ. 10620 (TPG) |
| AURELIUS OPPORTUNITIES FUND II, LLC <br> and AURELIUS CAPITAL MASTER, LTD., <br><br>                             Plaintiffs, <br><br>    -against- <br><br> THE REPUBLIC OF ARGENTINA, <br><br>                             Defendant. | 10 Civ. 1602 (TPG) <br> 10 Civ. 3507 (TPG) <br> 10 Civ. 3970 (TPG) <br> 10 Civ. 8339 (TPG) <br><br> *(captions continue on following page)* |

**DECLARATION OF CHRISTOPHER J. CLARK**

BLUE ANGEL CAPITAL I LLC,

                                  Plaintiff,

    -against-

THE REPUBLIC OF ARGENTINA,

                                  Defendant.

10 Civ. 4101 (TPG)
10 Civ. 4782 (TPG)

---

OLIFANT FUND, LTD.,

                                  Plaintiff,

    -against-

THE REPUBLIC OF ARGENTINA,

                                  Defendant.

10 Civ. 9587 (TPG)

---

PABLO ALBERTO VARELA, et al.,

                                  Plaintiff,

    -against-

THE REPUBLIC OF ARGENTINA,

                                  Defendant.

10 Civ. 5338 (TPG)

I, Christopher J. Clark, am a partner at Latham & Watkins LLP, attorneys for interested non-parties Euro Bondholders.  I am admitted to the Bar of the State of New York and of this Court.  I am submitting this declaration in support of the Euro Bondholders' Emergency Motion for a Stay.

1.   Attached as Exhibit A is a true and correct copy of the July 22, 2014 hearing transcript.

2.   Attached as Exhibit B is a true and correct copy of the Registered Global Security Representing Euro-Denominated Par Bonds due 2038.

3.   Attached as Exhibit C is a true and correct copy of the July 26, 2014 letter from Christopher Clark to Special Master Pollack and counsel for the Republic of Argentina.

I declare under penalty of perjury that the foregoing is true and correct, pursuant to 28 U.S.C. § 1746.


Dated:  July 29, 2014
New York, New York

By  /s/ Christopher J. Clark
      Christopher J. Clark

# EXHIBIT A

```
                                                               1
        E7mrnmlm
 1      UNITED STATES DISTRICT COURT
 1      SOUTHERN DISTRICT OF NEW YORK
 2      ------------------------------x
 2
 3      NML CAPITAL, LTD., et al.,
 3
 4                   Plaintiffs,
 4
 5              v.                           08 CV 6978 (TPG)
 5
 6      THE REPUBLIC OF ARGENTINA,           Argument
 6
 7                   Defendant.
 7
 8      ------------------------------x
 8
 9                                           New York, N.Y.
 9                                           July 22, 2014
10                                           10:30 a.m.
10
11      Before:
11
12              HON. THOMAS P. GRIESA,
13
13                                           District Judge
14
14
15
16              APPEARANCES
17
17      DECHERT LLP
18              Attorneys for Plaintiff NML Capital, Ltd.
18      BY:  ROBERT A. COHEN
19
19
20      FRIEDMAN KAPLAN SEILER & ADELMAN LLP
20              Attorneys for Interested Parties Aurelius Capital Partners
21              and Blue Angel
21      BY:  EDWARD A. FRIEDMAN
22              DANIEL B. RAPPORT
22
23
23      GIBSON DUNN & CRUTCHER LLP
24              Attorneys for Plaintiff NML Capital, Ltd.
24      BY:  MATTHEW D. MCGILL
25
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

        E7mrnmlm
   1                APPEARANCES
   2
   2    MILBERG LLP
   3         Attorneys for Varela plaintiffs
   3    BY:  MICHAEL C. SPENCER
   4
   4
   5    DAVIS POLK & WARDWELL LLP
   5         Attorneys for Citibank
   6    BY:  KAREN E. WAGNER
   6         JAMES L. KERR
   7
   7
   8    LATHAM & WATKINS LLP
   8         Attorneys for the Euro Bondholders
   9    BY:  CHRISTOPHER J. CLARK
   9         CRAIG A. BATCHELOR
  10
  10
  11    REED SMITH LLP
  11         Attorneys for The Bank of New York Mellon, as Indenture
  12         Trustee
  12    BY:  ERIC A. SCHAFFER
  13         NEIL GRAY
  13
  14
  14    LEVI LUBARSKY & FEIGENBAUM LLP
  15         Attorneys for JPMorgan Chase Bank N.A.
  15    BY:  ANDREA LIKWORNIK WEISS
  16         ALAN H. SCHEINER
  16
  17
  17    MORGAN LEWIS & BOCKIUS LLP
  18         Attorneys for Clearstream Banking
  18    BY:  JOHN M. VASSOS
  19
  19
  20    GREENFIELD STEIN & SENIOR LLP
  20         Attorneys for Euroclear Bank
  21    BY:  PAUL T. SHOEMAKER
  21
  22
  22
  23    DANIEL POLLACK
  23         Special Master
  24
  25

3

E7mrnmlm
```
 1
 2                  (Case called)
 3              THE COURT:  We have certain motions to be taken care
 4   of.  I'll take them in any order.  I suppose the logical order
 5   would be to deal with the motion regarding the Citibank
 6   situation in Argentina.  Who wants to speak about that motion?
 7              MR. FRIEDMAN:  Your Honor, Edward Friedman on behalf
 8   of all of the plaintiffs.  I will address that motion.  I'm
 9   with the firm of Friedman Kaplan Seiler & Adelman, attorneys
10   for the Aurelius and Blue Angel plaintiffs.  Mr. Cohen on
11   behalf of NML and I and other plaintiffs' counsel have decided
12   that I will have the honor of addressing this motion on before
13   your Honor on behalf of all the plaintiffs.
14              THE COURT:  Go ahead.
15              MR. FRIEDMAN:  Shall I go to the lectern?
16              THE COURT:  That would help.
17              MR. FRIEDMAN:  May it please the Court, this is a
18   motion for partial reconsideration of your Honor's June 27
19   order with respect to Citibank.  Citibank had made a motion for
20   clarification of the injunction, sometimes referred to as the
21   amended February 23 orders.
22              In granting Citibank's motion for clarification, your
23   Honor clarified that the amended February 23 orders do not as a
24   matter of law prohibit payments by Citibank N.A.'s Argentina
25   branch on peso- and U.S. dollar-denominated bonds governed by
```

4

E7mrnmlm
1   Argentine law and payable in Argentina.  This motion for
2   reconsideration relates only to the U.S. dollar-denominated
3   bonds.  We are not challenging your Honor's ruling that
4   Citibank can pay the peso-denominated bonds.
5          With respect to the U.S. dollar-denominated bonds,
6   however, we believe there are numerous grounds for
7   reconsideration, and we are respectfully requesting that your
8   Honor confirm that the U.S. dollar-denominated bonds are in
9   fact covered by the amended February 23 orders.
10          THE COURT:  How are they covered?
11          MR. FRIEDMAN:  The first basis, your Honor, is that
12  the U.S. dollar-denominated bonds are not simply paid in
13  Argentina.  What the record shows, and this is a filing
14  yesterday by Euroclear, what the record shows is that the funds
15  moved from Citibank with respect to these U.S. dollar-
16  denominated bonds to Euroclear.  Euroclear --
17          THE COURT:  They are simply clearinghouses.  They
18  don't act as banks.  I don't understand this motion, I'll be
19  very frank with you.
20          MR. FRIEDMAN:  If I may, your Honor, I'll try to very
21  briefly address a few basic points.  I'll come back to the
22  payment process.  The first basic point is that in contrast to
23  the peso-denominated bonds, the U.S. dollar-denominated bonds
24  are external indebtedness within the --
25          THE COURT:  I have read that brief.  Couldn't we
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

E7mrnmlm

 1    exercise a little common sense what we have under the major
 2    order is the great bulk, more than bulk, we have the exchange
 3    bonds covered by that order and we have the pari passu, but the
 4    bonds are the exchange bonds.  It is my understanding that the
 5    bonds being talked about in your motion are not part of the
 6    exchange.  Am I right or wrong?
 7            MR. FRIEDMAN:  Respectfully, your Honor, that would
 8    not be correct.  These U.S. dollar-denominated bonds are
 9    unquestionably part of the bonds that were issued in the 2005
10    and 2010 exchanges.  In those exchanges the exchange bonds that
11    were issued and the exchange bonds that were external
12    indebtedness were issued under the laws of the U.S., the UK,
13    Argentina, and Japan.  All of those bonds are exchange bonds.
14            THE COURT:  Where are they payable?
15            MR. FRIEDMAN:  The payment process, your Honor, for
16    all of those --
17            THE COURT:  They go through the indenture trustee,
18    right?
19            MR. FRIEDMAN:  Not for the Japanese and the Argentine
20    law exchange bonds.
21            THE COURT:  I'm glad you mentioned the Japanese.  We
22    will get back to the Japanese in a little while.  You're saying
23    the exceptions are those Argentine bonds and the Japanese
24    bonds.  We'll get to the Japanese later.  I want to talk now
25    about those particular Argentine bonds.  They are not payable

6

E7mrnmlm
```
 1   through the indenture trustee, are they?
 2           MR. FRIEDMAN:  Your Honor, is absolutely correct.  The
 3   Argentine law U.S. dollar-denominated exchange bonds are not
 4   paid through the indenture trustee.
 5           THE COURT:  In your brief you don't spend much time
 6   discussing that.  In my view it is very, very important, but it
 7   is not much discussed in the brief filed.
 8           MR. FRIEDMAN:  Your Honor, what I would say is that
 9   when we look at your Honor's amended February 23 order, there
10   are two very important provisions which bear on this question
11   concerning the fact that Bank of New York not the indentured
12   trustee on the Argentine law bonds.
13           The first provision, which I will mention just briefly
14   because we have talked about it extensively, the first
15   provision says that if Argentina makes a payment on the
16   exchange bonds, Argentina must make a ratable payment to
17   plaintiffs.  That provision, as has been discussed extensively,
18   your Honor, applies to all the exchange bonds whether or not
19   Bank of New York is the indenture trustee.
20           The second, and this is something we have not
21   discussed recently, there is a separate paragraph in your
22   Honor's February 23 order that specifically enjoins the
23   republic from violating the pari passu provision in the fiscal
24   agency agreement.  It is a separate provision from the
25   paragraph that requires the ratable payment.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

7

E7mrnmlm

1                The point of that paragraph enjoining a violation of
2   the pari passu provision is that when we look at this universe
3   of exchange bonds, whether or not the Bank of New York is the
4   indenture trustee, all of these exchange bonds, because they
5   are payable in a currency other than Argentine pesos, they all
6   are external indebtedness within the meaning of the pari passu
7   provision.
8                What we are facing here, your Honor --
9                THE COURT:  Can I interrupt you?
10               MR. FRIEDMAN:  Of course.
11               THE COURT:  I don't understand the practical point
12   that would emerge from your argument.  It seems to me that you
13   have something different.  You have bonds issued in Argentina,
14   payable in Argentina, clients I assume of Citibank in
15   Argentina.  From a practical, common sense standpoint, why do
16   they have to get dragged into this international complex?
17   Can't we just possibly use some common sense and recognize that
18   they have differences?
19               You may be technically right.  Your brief was
20   technically right.  All of that is fine.  But cannot we
21   recognize that there are some people down in Argentina who are
22   really in a different situation, and can't we allow them to get
23   paid instead of dragging them into this overall difficulty,
24   which is certainly difficult?  I'm just saying that I would
25   like to see some common sense applied here and not a lot of

8

E7mrnmlm
```
 1   undoubtedly fine legal reasoning, and so forth.
 2          MR. FRIEDMAN:  Your Honor, I think there is an
 3   important point of clarification I need to make.  I heard your
 4   Honor say we should be practical about bondholders, customers
 5   of Citibank in Argentina who want to be paid.  The important
 6   point of clarification is that when Citibank receives the money
 7   and passes it on so that exchange bondholders can be paid, we
 8   are not simply talking about the bondholders in Argentina.
 9          THE COURT:  We are talking about a couple of
10   clearinghouses in Europe, that's what we are doing, and that's
11   about all.
12          MR. FRIEDMAN:  With all respect, your Honor, if I may
13   say, Euroclear, as your Honor points out, is one of the
14   European clearinghouses.  With respect to these Argentine law
15   U.S. dollar-denominated bonds, Citi has transferred funds to
16   Euroclear bank.  Those funds are now in the account of
17   Euroclear bank in New York.  Euroclear will then send the funds
18   to Euroclear participants whose customers hold Argentine law --
19          THE COURT:  But they are still clearinghouses.
20          MR. FRIEDMAN:  The point I was going to make, your
21   Honor, is that while Euroclear is a clearinghouse, the exchange
22   bondholders who receive payments through Euroclear are exchange
23   bondholders in Europe and the United States.  The simple point
24   I wanted to make for your Honor's consideration is that we are
25   not speaking about --
```

9

E7mrnmlm

1          THE COURT:  This does not go through the indenture
2    trustee, does it?
3          MR. FRIEDMAN:  That is correct, your Honor, it does
4    not go through the indenture trustee.  But these bonds, even
5    though they do not go through the indenture trustee, are not in
6    any sense of the word internal Argentine bonds, because, as
7    your Honor points out, they go through the clearinghouses where
8    the exchange bondholders are all over the United States and
9    Europe.  I want that to be clear.
10          THE COURT:  All right.
11          MR. FRIEDMAN:  Your Honor, the other practical point
12    that I would like to address, since the Court has asked about
13    it, is that I do believe we are trying to be practical.  This
14    is not a technical argument we are presenting.  What I mean by
15    that is we have a situation where your Honor issued a clear
16    order.  It was affirmed by the Second Circuit.  The Republic of
17    Argentina was prohibited from paying exchange bonds, prohibited
18    from paying external indebtedness without making a ratable
19    payment to the plaintiffs.
20          The reason we are here now is that with respect to the
21    entire array of exchange bonds and external indebtedness
22    covered by the pari passu provision, Argentina has transferred
23    funds to pay every single one of them.  That is why we are now
24    in a situation where Citibank, Euroclear --
25          THE COURT:  You are getting into a different subject

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

E7mrnmlm
```
 1  matter.  You are talking about the fact that indeed the
 2  Republic of Argentina made a transfer, whether it was
 3  500 million or a billion, attempted to pay those bonds without
 4  honoring the pari passu clause.  That is a different subject
 5  from this rather minute exception that I am talking about down
 6  in Argentina.  I don't think it is a good idea to confuse all
 7  of that.
 8          MR. FRIEDMAN:  Your Honor, first let me say, if I may,
 9  it is not a minute situation.  The U.S. dollar-denominated
10  exchange bonds we are talking about under Argentine law which
11  are owned by bondholders all over the world, those account for
12  over 20 percent of the exchange bonds that were issued.
13          THE COURT:  Say that again.
14          MR. FRIEDMAN:  The universe of exchange bonds consists
15  of U.S. dollar-denominated bonds under Argentine law, yen bonds
16  under Japanese law, Eurobonds under UK law, and U.S. dollar
17  bonds under New York law.  If we look at the bonds we are now
18  talking about, the Argentine law U.S. dollar-denominated
19  exchange bonds, those are almost 25 percent of the universe of
20  exchange bonds covered by the amended February 23 orders.  They
21  are covered by the orders.  They are external indebtedness.  It
22  is not a little exception.
23          THE COURT:  I didn't realize the percentages were the
24  way you talk about.  There is a lot to do today.  We will be
25  back to you, but I want to hear from Ms. Wagner.  Thank you
```

11

E7mrnmlm
```
 1   very much.
 2            MS. WAGNER:  Good morning, your Honor.  May it please
 3   the Court, Karen Wagner from Davis Polk for Citibank.  Your
 4   Honor, as you have recognized, when you issued your injunction,
 5   your opinion describing the bonds subject to your injunction
 6   were those that were payable through Bank of New York Mellon.
 7            The bonds that we are here discussing right now are
 8   not in any respect paid in any way in the United States.  Those
 9   bonds are paid in Argentina pursuant to local law, to the KRIL,
10   which is the local registration and clearance entity in
11   Argentina.  The payments then go to the Caja de Valores, which
12   accepts payment from the republic on behalf of both Citibank
13   and the holders at Citibank.  This is all laid out in the
14   affidavits that we presented to the Court.  At that point
15   payment by the republic and to the bondholders is complete.
16            At that point, your Honor, it is certainly true that
17   the holders of the bonds, including the Euroclear system, can
18   take the money they get.  They are not required to keep the
19   money in Argentina.  They do whatever they want to with the
20   money.  But the payment under the bond prospectus and under the
21   bond system has been made to them, and that entire payment
22   process is entirely in Argentina.
23            THE COURT:  In contrast to the other situation --
24            MS. WAGNER:  In extreme contrast to the other
25   situation.  In the other situation payment is made to Bank of
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E7mrnmlm
1    New York, and then Bank of New York must make the payment to
2    one of the depositories, and payment by Argentina is not
3    complete until payment to the depository has been made.  That
4    is the same as in Argentina, but in Argentina it is made wholly
5    in Argentina, and on the other bonds it is made outside of
6    Argentina, in part in this country.  So there is a very, very
7    big distinction, your Honor.
8           There is no reason why the fact that your Honor
9    recognizes that there is a difference between what goes on in
10   Argentina and what goes on out of Argentina is somehow going to
11   undo everything that has been done in this court, which is what
12   seems to be suggested here.
13          In addition, your Honor, as we have also argued at
14   great length, Citibank Argentina is in a unique position.
15   Nobody else in this proceeding is in Citibank Argentina's
16   position.  Citibank is a branch bank in Argentina.  It is
17   subject to civil, regulatory, and criminal laws in Argentina,
18   which it must obey.  Your Honor has recognized in past
19   decisions of this Court that that puts Citibank Argentina in a
20   very different position than anybody else.
21          When we had our discussion the last time we were here,
22   I believe that is what your Honor was likely thinking about.
23   We have made this argument in the past and your Honor has
24   accepted it in the past.  Because of the vulnerability of
25   Citibank Argentina, it is treated differently.  Doctrines such

13

E7mrnmlm
```
 1  as Act of State and Sovereign Compulsion apply to that entity
 2  in a way that they would not apply to an entity that is not
 3  subject to local law.
 4           THE COURT:  Let me interrupt you and ask, what is the
 5  volume that we are talking about?
 6           MS. WAGNER:  Your Honor, I heard what you just heard.
 7  I did not think it was that high.  I need to check that for
 8  you.  I will get back to you.  I thought it was smaller.  I
 9  will get back to your Honor.
10           THE COURT:  Go ahead.
11           MS. WAGNER:  All in all, your Honor, I think that for
12  a number of reasons Citibank Argentina and Citibank have
13  presented to you an extremely different picture.  I don't think
14  when your Honor issued the original order, based on the opinion
15  which your Honor issued which describes, as other opinions you
16  have issued described, in detail what the payment is of the
17  bonds you are addressing, you discussed the fact that it is
18  payable to Bank of New York Mellon.  These bonds are not, as
19  has been made clear.
20           I don't want to repeat myself.  It is just an entirely
21  separate situation both in terms of the issuance of the bonds,
22  payment on the bonds, and the fact that Citibank Argentina is
23  acting as custodian of the bonds for various customers, some of
24  them local, some of them not.  But once the money is received
25  by the customer, the customer, obviously, can do whatever it
```

E7mrnmlm
```
 1  wants without implicating the payment system under the bonds.
 2            For all these reasons, your Honor, I think, number
 3  one, there is no reason to believe that we shouldn't be treated
 4  differently.  Number two, if these bonds are treated
 5  differently and Citibank Argentina is treat differently, there
 6  is no impact on anybody else.  These are unique situations, and
 7  I think there is no reason why your Honor should be concerned
 8  that somehow this will affect anything else in this case.
 9            THE COURT:  I don't mean that you should have it down
10  to the last dollar or peso, but can't you give me an idea of
11  the amount involved, some idea of the amount involved?
12            MS. WAGNER:  Your Honor, for Citibank Argentina I
13  believe that the last payment that was made was around a
14  hundred million dollars total, translated.  But I don't know,
15  unfortunately --
16            THE COURT:  Of interest?
17            MS. WAGNER:  Of interest.  I don't know how that
18  translates into a proportion as far as the interest payments
19  across the board.  I apologize for that.  I will try to get
20  that information to your Honor.
21            THE COURT:  Anything else on this motion?
22            MS. WAGNER:  Thank you, your Honor.
23            THE COURT:  Thank you very much, Ms. Wagner.
24            MR. FRIEDMAN:  May I be heard for another minute, your
25  Honor?
```

15

E7mrnmlm

1              THE COURT:  Of course you can.
2              MR. FRIEDMAN:  Thank you.
3              First, I'd like to address one very important
4    practical consideration, and then I would like to respond
5    specifically to some of the arguments by Citibank's counsel.
6              The practical consideration, your Honor, is I believe
7    an important, big-picture consideration that applies to these
8    U.S. dollar-denominated bonds that we are talking about.  It is
9    simply that, as I was starting to say before, Argentina has
10   directly violated your Honor's order and has made payments on
11   all of the exchange bonds.
12             I understand I have to come back and address your
13   Honor's issue about exchange bonds where the Bank of New York
14   is not the indenture trustee.  I just want to be clear that
15   where your Honor's --
16             THE COURT:  What are you now talking about?
17             MR. FRIEDMAN:  What I'm talking about, your Honor, is
18   that we have a situation which I would respectfully submit has
19   very significant consequences that are not limited to payment
20   to Argentine citizens in Argentina, a small portion of the
21   bonds.  We are talking about a situation where payments are
22   made through the clearinghouses which are specifically
23   identified in your Honor's amended February 23 order.  The
24   clearinghouses, as your Honor has ruled, stand between
25   Argentina and various steps and then the exchange bondholders.

E7mrnmlm

```
 1              The effectiveness of your Honor's order, which has
 2  been affirmed by the Second Circuit, counts on third parties,
 3  such as the clearinghouses, not --
 4              THE COURT:  I completely fail to comprehend the point
 5  you are now making.  You started out by saying Argentina had
 6  made some kind of a payment.  What payment are you talking
 7  about?
 8              MR. FRIEDMAN:  Your Honor, I apologize for not being
 9  clear.  The payment I'm talking about is the payment that
10  Argentina made, or I should say payments, plural, that
11  Argentina made shortly before June 30, 2014.  These were
12  payments made at a time when your Honor's injunction became
13  effective because --
14              THE COURT:  Can I interrupt you.  Those payments were
15  made to the indenture trustee, right?
16              MR. FRIEDMAN:  Only in part, your Honor.  I'm also
17  referring to payments that were made to pay exchange bonds as
18  to which Bank of New York is not the indenture trustee.
19              THE COURT:  Look, I don't understand what relevance
20  those payments have to the present issue.  Here is what I am
21  talking about.  The republic attempted to pay the interest on
22  the exchange bonds without complying with the requirements of
23  the pari passu clause.  There is no doubt in my mind that the
24  republic was attempting to do that.
25              $500 million or so went to the Bank of New York as the
```

17

E7mrnmlm
1   indenture trustee, and the Bank of New York very, very
2   responsibly stopped at that point, recognizing that to conclude
3   the payment would be a violation of the existing orders.  I
4   don't know the details of any other payments of that kind and I
5   don't know how far they went, and so forth, but --
6           MR. FRIEDMAN:  I can address that, your Honor, if that
7   would be helpful.
8           THE COURT:  It would be helpful.
9           MR. FRIEDMAN:  The other payments that were made have
10  now come to rest in New York and Japan.  In New York, Euroclear
11  is holding the funds it received from Citibank.  Euroclear is
12  waiting to distribute those funds to exchange bondholders in
13  the United States and Europe who hold Argentine law U.S.
14  dollar-denominated exchange bonds.
15          So, in addition to Argentina --
16          THE COURT:  You are getting beyond my question.  What
17  I am talking about is specifically one thing, and that is the
18  attempt by the republic to pay the interest to the exchanges
19  that was due on June 30 and ignore the obligations under the
20  pari passu clause.  That is what I am talking about.  What
21  happened was, I guess we have said this several times this
22  morning, the Bank of New York acted very responsibly and did
23  not complete the payment.  It held the money in regard for my
24  order.  That was a very responsible thing for them to do.
25          That was about 500 million.  I never was presented
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

E7mrnmlm
1 with facts or any applications, to my knowledge, about maybe
2 another 500 million or so.  That is as far as my knowledge went
3 and as far as my action went and as far as what I understood
4 the Bank of New York's situation went.
5          What I don't understand is why any of that is relevant
6 to the situation involved in the motion now being considered,
7 which involves dollar bonds, not peso bonds but some dollar
8 bonds, issued by the republic, payable in Argentina, as I
9 understand it, not payable through the indenture trustee or any
10 similar.  Payable in Argentina.
11          It doesn't help me to talk about another kind of
12 payment.  This seems to me a different kind of payment than I
13 have dealt with in the past and you have referred to.  This is
14 a different kind of payment, is it not?
15          MR. FRIEDMAN:  It is different from the payment to
16 Bank of New York.  But if I may clarify, your Honor, I believe
17 there is a very important point concerning the amended February
18 23 orders and the pari passu provision which maybe I have not
19 articulated as clearly as I should.
20          The simple point is that the amended February 23 order
21 covers bonds issued in the 2005 and 2010 exchanges.  For some
22 of those bonds, but not all, payments are through Bank of New
23 York as a indenture trustee.  The pari passu provision and the
24 amended February 23 orders prohibit payments on any exchange
25 bonds without making a ratable payment.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

E7mrnmlm

 1                 THE COURT:  Say that more slowly.  Go over that very
 2     carefully.
 3                 MR. FRIEDMAN:  Yes.  The amended February 23 orders
 4     and the pari passu provision itself prohibit payments by
 5     Argentina on any exchange bonds unless Argentina makes a
 6     ratable payment to the plaintiffs.  In those orders and in the
 7     pari passu provision itself, exchange bonds constitute all the
 8     bonds issued in the 2005 and 2010 exchanges.
 9                 For some of those bonds, payments are through Bank of
10     New York as indenture trustee.  For others of those bonds,
11     payments move in a different path or process, but they are
12     still clearly covered by the amended February 23 order.
13                 THE COURT:  Step back.
14                 MR. FRIEDMAN:  Sure.
15                 THE COURT:  You have said this about three times.  I
16     want to follow up.  Summarize the provisions of the February 23
17     just once more, and I want to follow up.
18                 MR. FRIEDMAN:  Sure.  There are two important
19     provisions.  One is paragraph 2(a).  Paragraph 2(a) says that
20     if the republic makes a payment on any of the exchange bonds,
21     the republic must in advance or concurrently made a ratable
22     payment to plaintiffs.
23                 THE COURT:  Let me interrupt you.
24                 MR. FRIEDMAN:  Yes.
25                 THE COURT:  Are the bonds we are talking about in this
                        SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300

```
     E7mrnmlm
 1   motion exchange bonds?
 2               MR. FRIEDMAN:  Yes, your Honor, no question about
 3   that.  No question about that.  These U.S. dollar-denominated
 4   bonds --
 5               THE COURT:  When was the exchange?
 6               MR. FRIEDMAN:  These were part of the larger 2005 and
 7   2010 exchange.  There is no dispute about that.
 8               THE COURT:  Say that again.
 9               MR. FRIEDMAN:  The U.S. dollar-denominated bonds
10   issued under Argentine law were part of the exchange bonds
11   issued in the 2005 and 2010 exchanges.  There is no dispute
12   about that.  These are exchange bonds in every sense of the
13   word.
14               THE COURT:  Can I then interrupt you.
15               Ms. Wagner, let me go back to you.  Does that not
16   mean, then, that these bonds are covered by the February 23
17   order?
18               MS. WAGNER:  Your Honor, when you issued the
19   injunction, you issued orders covering exchange bonds and you
20   issued an opinion describing the basis for the injunction.  The
21   opinion describes bonds for which payment is made through Bank
22   of New York.  The order covers exchange bonds.  Our bonds are
23   indeed exchange bonds, and that is why we sought clarification.
24               It was our view that, number one, there was no
25   description of any of our bonds in the opinion describing the
```

21

E7mrnmlm

1   basis for the order.  The opinion describes the Bank of New
2   York bonds.  But we, in an excess of caution, said exchange
3   bonds does include our bonds, we should find out, we should
4   clarify whether the Court really intend to cover us.  So we
5   made a motion for clarification.
6           We don't think the Court intended us to be covered.
7   There is certainly no mention in the orders of Citibank or KRIL
8   or the Caja which you would expect to see if in fact that
9   series of payments was intended to be prohibited.
10          Also, your Honor, we thought then and we think now
11  that as a matter of law it would not be appropriate to include
12  these bonds in that order, because, and I think there is no
13  dispute here, they are paid by the republic in Argentina and
14  payment is received by the holders in Argentina.
15          For that reason as well, and for the third reason that
16  Citibank Argentina is a branch bank in Argentina, we believe
17  that if your Honor had it in mind at all to think about these
18  bonds, which was unlikely, because they were not raised to your
19  Honor's attention during the process by which these injunctions
20  were issued, if your Honor had thought about it and if we had
21  been there, we would have explained as a matter of law why they
22  should not be covered.
23          We are still of the view, your Honor, number one, that
24  you were not considering these bonds when you issued the order.
25  Number two, you shouldn't put these bonds in the order for the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

E7mrnmlm
 1   reasons that we have articulated.  Number three --
 2            THE COURT:  Let's slow down.  This is probably
 3   something that I didn't give attention to at the time.  Now it
 4   has to be given attention.  Let's start one step at a time and
 5   go through your reasoning.  These bonds that we are talking
 6   about are exchange bonds, right?
 7            MS. WAGNER:  Yes.
 8            THE COURT:  They were part of the 2005 or the 2010 or
 9   both, right?
10            MS. WAGNER:  Yes.
11            THE COURT:  Sitting here right now and recognizing
12   that I may have very well not covered things that should have
13   been covered, but sitting here right now it strikes me that,
14   being exchange bonds, they should be treated as exchange bonds
15   and that they should be included with the other exchange bonds
16   in the February 23 order.  That is the way it strikes me now.
17   I'm not trying to review everything that I've gone over.  Why
18   should that not be the case?
19            MS. WAGNER:  Your Honor, we would argue respectfully
20   that it should not be the case, for two reasons.  One, because
21   the bonds are issued in Argentina pursuant to local laws, not
22   pursuant to an indenture.  There is no subjection to U.S.
23   jurisdiction.  They are payable wholly in Argentina.
24            For that reason, various doctrines, such as Act of
25   State and Sovereign Compulsion, would suggest that your Honor
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

23

E7mrnmlm

1  should not be reaching internal Argentine processes with an
2  order of this Court.  That would be the main argument for why
3  these bonds, even though they are exchange bonds, should not be
4  included in your Honor's injunction order.
5          The second argument is that because Citibank Argentina
6  is the custodian, Citibank Argentina should not be subjected to
7  injunctions that require it to restrain property which belongs
8  to customers in a country where they are subject to Argentine
9  law and will be subject to both civil, regulatory, and criminal
10  process if they restrain payment to their customers.
11          Those are the two reasons, your Honor, one having to
12  do with what the bonds are and one having to do with who
13  Citibank Argentina is, that we think as a matter of law it is
14  not appropriate to include these bonds in the injunction order.
15  We would refer your Honor again to some of your prior
16  decisions, the one on the Boden bonds and the one on the Onsess
17  pension payments in which Citibank Argentina made similar
18  arguments which your Honor accepted.  They were not, obviously,
19  identical fact situations, but the legal analysis was the same.
20          THE COURT:  The thing that concerns me is that as a
21  general proposition, the February 23 order dealt with the
22  exchange bonds.  It did, of course.
23          MS. WAGNER:  It did, your Honor, yes.
24          THE COURT:  Without doubt.  Focusing again on the
25  February 23 order, focusing there, I did not make any

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

E7mrnmlm

1  exceptions in that order, right?
2          MS. WAGNER:  That is correct, your Honor.  I would
3  refer you back to your opinion issued on the same day, which
4  does describe the bond that you were talking about at that
5  time.
6          THE COURT:  What is that language?
7          MS. WAGNER:  Let me read you a little bit of it.
8          "The process and the parties involved in making
9  payments on the exchange bonds are as follows.  Argentina
10 transfers funds to the Bank of New York Mellon, which is the
11 indenture trustee in a trust indenture of 2005.  Presumably,
12 there is a similar indenture for the 2010 exchange offer.  BNY
13 then forwards the funds to the registered owner of exchange
14 bonds.  There are two registered owners for the 2005 and 2010
15 exchange bonds.  One is CD & Company and the other is Bank of
16 New York depository.  CD and BNY depositories transfer the
17 funds to a clearing system, such as the Depository Trust
18 Company.  The funds are then deposited into financial
19 institutions, apparently banks, which then transfer the funds
20 to their customers, who are the beneficial interest holders of
21 the bonds."
22         Your Honor, just reading that description, there is no
23 reason to think that the Argentine law bonds were part of this
24 order.  It is absolutely true that for exchange bonds the words
25 in the order didn't make an exception.  But this opinion is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E7mrnmlm
 1  very clearly about these bonds, which clearly does not include
 2  the Argentine law bonds
 3          THE COURT:  The issues raised today I haven't really
 4  dealt with in any opinion, so I have to reserve decision on the
 5  motion before me.  Thank you all very much.  Let's go on to the
 6  next.
 7          MS. WAGNER:  Thank you, your Honor.
 8          MR. FRIEDMAN:  Your Honor, if I might suggest, it
 9  probably makes sense next to consider the motions for
10  clarification by Euroclear and Clearstream, since those motions
11  are based on your Honor's order.
12          THE COURT:  I will reserve decision.  What comes next?
13          MR. FRIEDMAN:  I believe what comes next, and your
14  Honor may feel the same way, we have a letter motion for
15  clarification that was made by JPMorgan relating to the yen-
16  denominated exchange amount.
17          THE COURT:  I will reserve decision.
18          MR. FRIEDMAN:  The positions are set forth in letters
19  that your Honor has.
20          I believe that brings us to the Bank of New York
21  motion for clarification.  There is also a euro bondholder
22  motion for clarification.
23          THE COURT:  Who wants to speak on those motions?
24          MR. FRIEDMAN:  On the Bank of New York motion, their
25  counsel is here.  May I say one thing first, your Honor?

26

E7mrnmlm

1            THE COURT:  Of course.
2            MR. FRIEDMAN:  This will come a little out of left
3    field, but I would like to say it for the record to protect the
4    rights of my clients and all the plaintiffs in these cases
5    where pari passu injunctions have been issued.
6            I mentioned that payments on the U.S. dollar Argentine
7    law bonds have been transferred in part to Euroclear and those
8    funds are now sitting in a Euroclear bank account in New York.
9    I'm sure your Honor has considered, and your Honor has
10   expressed views and we don't dispute those views, as to what
11   should happen with funds that the Court determines were
12   improperly paid.  We are totally respectful of that.
13           For the record, and just to avoid what may be a flurry
14   of litigation, I want to put a motion on the record, with the
15   understanding that your Honor will deny it.
16           THE COURT:  Let me interrupt you.  We'll get back to
17   you.  This recaps what you have said, but let me do it.  About
18   500 million was paid to the Bank of New York, and the Bank of
19   New York has held on to that, right?
20           MR. FRIEDMAN:  Yes, your Honor.
21           THE COURT:  What other funds are you talking about,
22   paid to whom?  I didn't follow you completely.
23           MR. FRIEDMAN:  I apologize, your Honor.  Are you
24   asking a question about what we were discussing earlier or a
25   question about what I was just saying this minute?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

27

E7mrnmlm

```
 1              THE COURT:  What you were just saying.
 2              MR. FRIEDMAN:  I apologize.  What I was saying this
 3    minute was that with respect to the U.S. dollar-denominated
 4    Argentine law exchange bonds where Citibank received payments,
 5    some of the funds received by Citibank have been transferred
 6    along the payment chain to Euroclear and Euroclear would then
 7    distribute the funds to exchange bondholders.  This is a
 8    technical point I just want to have on the record.
 9              The funds held by Euroclear are now in a Euroclear
10    bank account at Citibank in New York, for the record --
11              THE COURT:  Let me interrupt you.  I want to go back
12    to the attempt by the republic to make interest payments as of
13    June 30, when they paid about $500 million to the indenture
14    trustee.  We had a hearing about that.  We all know what
15    happened there.  Did the republic -- maybe you covered it
16    today, but forgive me -- pay another 500 million or so as part
17    of that exercise?
18              MR. FRIEDMAN:  The information we have, my
19    understanding, is that it was not as much as another
20    500 million.  My understanding is that the amount paid to Bank
21    of New York was 539 million.  I believe the additional amounts
22    paid by the republic were somewhat in excess of 200 million,
23    close to 300.
24              THE COURT:  Whatever the amount was to what
25    institution or bank or whatever, who was it paid to?
```

28

E7mrnmlm

1          MR. FRIEDMAN:  As we understand the facts now, your
2     Honor, there are two other institutions involved regarding the
3     payments.  One is Citibank, which we have just been discussing
4     as the recipient of payments on the U.S. dollar-denominated
5     exchange bonds, and the other is JPMorgan Chase Bank, which has
6     disclosed in a letter filed with the Court that it received
7     payments in Japan on exchange bonds that had been issued under
8     Japanese law.
9          So, the extent of our knowledge about the republic's
10    attempts to make payments on exchange bonds is the Bank of New
11    York with 539 million, Citibank with somewhat more than
12    200 million, that is an approximation, and JPMorgan, which has
13    said it received just about 2 million for payment of yen-
14    denominated exchange bonds.
15         THE COURT:  I don't want to get confused between two
16    things.  There are two things that I have in mind that have
17    raised issues.  One is the attempt by the republic to make
18    payment to the exchangers of interest as of June 30.  That's
19    one thing.  That involved the payment to the Bank of New York,
20    and so forth.
21         The other thing is what I understand to be something
22    distinct, although maybe there is an argument about it not
23    being so distinct, but the other thing that we have discussed
24    this morning is the situation in Argentina, which we have
25    discussed and I won't try to recap all that.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

29

E7mrnmlm
1             My understanding is that the two things are different.
2    In other words, the republic was trying to pay the interest
3    to the exchangers; second, the republic is trying to deal with
4    bonds issued in Argentina, payable in Argentina, and so forth.
5             Now I want to talk about the first.  I hope I have
6    them in decent categories.  I think you have answered this, but
7    I'm going to ask you again.  How much money was paid when the
8    republic attempted to make the interest payments to the
9    exchangers on or about June 30th?  We know about the 500-plus
10   million dollars that went to Bank of New York.  You probably
11   said this 15 times today, but please, again, what other
12   payments were made in the category I'm talking about?
13            MR. FRIEDMAN:  The number, the total number, including
14   the 539 million to Bank of New York, I believe is 832 million.
15   But I believe we may, your Honor, have a disconnect about the
16   categories.  The 832 million which I refer to as Argentina's
17   attempting to pay the exchangers, that does include the payment
18   to Citibank for the exchange bonds issued under Argentine law
19   that we have been discussing.
20            THE COURT:  Put aside Citibank for a minute.  What
21   other institutions received money in connection with what you
22   have just talked about?
23            MR. FRIEDMAN:  If we put aside Citibank and if we put
24   aside the Bank of New York, the only other information we have
25   is $2.1 million that is being held by JPMorgan Chase Bank in

E7mrnmlm
```
 1  Japan, where it was received for payment on yen-denominated
 2  exchange bonds.
 3              THE COURT:  Say that again, please.
 4              MR. FRIEDMAN:  Yes.  When we talk about the
 5  exchangers, we are talking about bondholders who have exchange
 6  bonds issued under various laws, and some of the exchangers
 7  hold yen-denominated exchange bonds that were issued under
 8  Japanese law.
 9              We know, based on the letter filed by JPMorgan Chase,
10  that the republic has attempted to make an interest payment as
11  of June 30 in the amount of $2.1 million on the yen-denominated
12  exchange bonds.  Those funds are currently being held at
13  JPMorgan Chase Bank in Japan.
14              THE COURT:  Before we get to JPMorgan Chase in Japan,
15  the other blocks are -- please forgive me.  Repeat it.
16              MR. FRIEDMAN:  The other blocks, your Honor, are the
17  Bank of New York and Citibank.  Those are the only recipients.
18              THE COURT:  Citibank in Argentina?
19              MR. FRIEDMAN:  The payment went to Citibank in
20  Argentina, and from there to New York and other places with
21  respect to the U.S. dollar-denominated bonds.
22              THE COURT:  The amount being?
23              MR. FRIEDMAN:  I believe that the amount paid to
24  Citibank in Argentina is somewhere between 200 million and
25  300 million.  I don't have an exact figure.
```

31

E7mrnmlm

1           THE COURT:  Do you know where that money is now on
2    deposit?
3           MR. FRIEDMAN:  In part, yes, your Honor.  Part of that
4    money is now on deposit in the account of Euroclear Bank in New
5    York, at Euroclear Bank's account in New York at Citibank N.A.
6           THE COURT:  Is that being held?
7           MR. FRIEDMAN:  Euroclear has held that money and
8    Euroclear has asked for permission to pass that money on to the
9    exchange bondholders in the U.S. and Europe who hold the
10   Argentine law U.S. denominated exchange bonds.
11          THE COURT:  I should have written it down.  That
12   entity is called what?
13          MR. FRIEDMAN:  Euroclear Bank, your Honor.
14          THE COURT:  Euroclear.  Aside from Euroclear, are
15   there any of the funds in the category we are talking about?
16          MR. FRIEDMAN:  Not that I know of, your Honor.
17          THE COURT:  So it is really what went to Bank of New
18   York and what went from Citibank to Euroclear, right?
19          MR. FRIEDMAN:  Yes, your Honor.
20          THE COURT:  Is the latter being held?
21          MR. FRIEDMAN:  We have been told by Euroclear yes,
22   that Euroclear at this time is holding the money.
23          THE COURT:  I think we started this discussion because
24   there was some motion by you, right?
25          MR. FRIEDMAN:  Yes.  I apologize, your Honor.  If I
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

E7mrnmlm

1   may, this is a very technical matter.  I'm doing this hopefully
2   to avoid further proceedings and complexity.  As I say, I fully
3   understand that your Honor will not look favorably upon this
4   motion and will, I anticipate, deny it.  But just in case, for
5   the record, I want to make, on behalf of the plaintiffs in the
6   cases where we have pari passu injunctions, a motion for
7   attachment with respect to the funds held by Euroclear in New
8   York.
9           The reason I say that is we don't want to see a big
10  fight with lots of other creditors coming in and multiplying
11  the proceedings.  If for some reason your Honor should decide
12  that this sort of attachment is appropriate, we simply wanted
13  to make the first motion and have the priority that goes with
14  it.  I say with full understanding that --
15          THE COURT:  Has that been part of the briefing before
16  me?
17          MR. FRIEDMAN:  No, your Honor.  This came up only
18  because yesterday for the first time it was disclosed that
19  significant funds went from Citibank in Argentina to Euroclear
20  in New York.  Yesterday, when we saw the Euroclear paper, that
21  was the first time we knew that there were funds in New York.
22          I fully appreciate that your Honor has expressed the
23  view that illegal payments by Argentina should be returned.  I
24  know your Honor does not want to see a lot of litigation about
25  funds in this court or other jurisdictions.  But I just wanted

33

E7mrnmlm

1  to put that motion on the record so that (a) we would have
2  priority and (b) hopefully it will forestall further litigation
3  by other creditors who might otherwise be running into court.
4          THE COURT:  If you have a right to an attachment, you
5  have a right to an attachment.  I don't carry in my mind all
6  the things that you have to show to get an attachment.  It
7  seems to me that there are grounds under state law for
8  attachments.  It seems to me if you file a motion, I'll handle
9  that very quickly.  If there are grounds for the attachment,
10 the attachment will be allowed.
11         Does that complete your motions?
12         MR. FRIEDMAN:  That completes, your Honor, the motion
13 for partial reconsideration with respect to Citibank.  And yes,
14 I appreciate the opportunity to make that attachment motion on
15 the record.  I believe we have already discussed the motions by
16 Euroclear and Clearstream for clarification, which are based on
17 the Citibank order.
18         THE COURT:  On all that, decision is reserved.
19         MR. FRIEDMAN:  Yes.  I understand your Honor also
20 reserved decision on the JPMorgan motion, which we talked about
21 briefly.  That brings us, as I understand it, to the Bank of
22 New York, where I believe the issue simply is the proper form
23 of order to be entered by your Honor.  In other words, the Bank
24 of New York is holding in its account at the Central Bank of
25 Argentina the $539 million dollars.

34

E7mrnmlm

```
 1                THE COURT:  Holding where?
 2                MR. FRIEDMAN:  The Bank of New York is holding
 3     $539 million at the Bank of New York's account at the Central
 4     Bank of Argentina.  That is where the Bank of New York has
 5     advised the funds are being held.
 6                THE COURT:  Let's conclude.  Thank you.  You have been
 7     very helpful.
 8                MR. VASSOS:  Your Honor, if I could just a moment on
 9     the last motion before moving on?
10                THE COURT:  Of course.
11                MR. VASSOS:  Thank you.  John Vassos of Morgan Lewis &
12     Bockius on behalf of Clearstream.
13                Your Honor, I wanted to make a couple of points of
14     clarification.  Your Honor asked Mr. Friedman where the money
15     from Argentina went, and he said Euroclear.  Money has also
16     gone to my client, Clearstream.  I want that to be clear on the
17     record to make sure your Honor has all the information.
18                The only other point I have, your Honor, and I think
19     it is one actually and rarely not in dispute, plaintiffs in
20     their papers dealing with the Citibank rehearing has said that
21     they concede that payments in Argentina peso-denominated bonds
22     are not subject to the injunction and can be made.
23                To the extent that money has gone through Citibank
24     Argentina to my client and I believe also to Euroclear on
25     peso-denominated bonds, if there is no dispute about that and
```

35

E7mrnmlm
1  we are holding that money as the clearinghouse, I would ask
2  that we be given permission to pass that money on to the
3  investors.
4           MR. FRIEDMAN:  Your Honor, may I address that?
5           THE COURT:  Right.
6           MR. FRIEDMAN:  I agree, plaintiffs are not challenging
7  your Honor's Citibank order with respect to the peso-
8  denominated bonds.  We would agree that Citibank can pass on
9  those payments and that when Euroclear and Clearstream receive
10 payments on the peso-denominated bonds, they may pass on the
11 payments to the exchange bonds.
12          THE COURT:  Of course.  Thank you very much.
13          MS. WAGNER:  Your Honor, may I be heard for one
14 moment?
15          THE COURT:  Of course.
16          MS. WAGNER:  Karen Wagner again.  Your Honor, to the
17 best of our knowledge, Mr. Friedman's numbers are not quite
18 correct.  Also, the Euroclear funds are not being held at
19 Citibank.  We will get the correct numbers to the Court.
20          THE COURT:  If there is anything that needs
21 correcting, there is the U.S. mail.
22          MS. WAGNER:  Thank you, your Honor, yes.
23          MR. VASSOS:  On the peso-denominated bonds, your
24 Honor, what we will do is draft up a proposed order, submit it
25 to the party, and hen hopefully submit it to the Court.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

36

E7mrnmlm

1              THE COURT:  Anybody else?
2              MR. CLARK:  Chris Clark for the euro bondholders.  If
3    it please the Court, I think if we addressed our motion before
4    the Bank of New York's, it might make more logical sense.  But
5    we will defer to whatever the Court desires.
6              THE COURT:  Say that again.
7              MR. CLARK:  Chris Clark for the euro bondholders.  We
8    have made a motion for clarification.  I think it might make
9    more logical sense if we address it before Bank of New York
10   addresses their motion for clarification.
11             THE COURT:  Very good.
12             MR. CLARK:  Thank you, your Honor.
13             THE COURT:  That concludes dealing with the motions.
14   I want to now discuss something else.
15             Do you have anything?
16             MR. CLARK:  That something else would be my motion or
17   something from your Honor?
18             THE COURT:  If there is another motion, make your
19   motion.
20             MR. CLARK:  Thank you, your Honor.  We move the Court
21   to clarify the injunction to the extent that it brings into its
22   sway bonds governed by non-U.S. law and that it binds foreign
23   parties who act solely outside the United States not subject to
24   the jurisdiction of this Court.
25             First of all, I want to say, your Honor, we don't
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

37

E7mrnmlm
1  condone or we didn't participate in or ask for in any way
2  Argentina to make the payment in question to Bank of New York.
3  However, we have investors, your Honor, in the various funds
4  that I represent.
5          THE COURT:  You represent who?
6          MR. CLARK:  I represent a group of funds who owned
7  euro-denominated exchange bonds which are paid in euro and
8  governed by English law.  We are here, your Honor, to request
9  that you clarify the order so that at the very least the
10 foreign parties over whom you don't have jurisdiction are not
11 subject to the order's dictates.
12         THE COURT:  The crucial thing is the Court has
13 jurisdiction over the Republic of Argentina, and the Republic
14 of Argentina is making these payments.  That is the crucial
15 thing.
16         MR. CLARK:  We concur with your Honor a thousand
17 percent.  We don't dispute that in any manner.  And Euroclear,
18 for instance, has joined us.  Your Honor discussed earlier that
19 Euroclear is just a clearinghouse.  With regard to our bonds,
20 it operates solely in Belgium.  It does nothing in the United
21 States.  It doesn't come into the United States to undertake
22 its duties.  Your Honor's order has the effect of requiring it
23 to do something that violates Belgian law.
24         Our application would ask, your Honor, for a simple
25 amendment to the injunction that says nothing in the injunction

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

38

E7mrnmlm
1  requires a party to violate the law of its forum state or the
2  law of the place of performance.  We don't know why that would
3  be objectionable.  It would certainly hopefully forestall
4  something --
5            THE COURT:  I know why it would be objectionable.  It
6  would start making important exceptions to the basic ruling and
7  injunction which this Court has entered.  I will not start
8  making those exceptions.  Is your motion brief?
9            MR. CLARK:  It is, your Honor.
10           THE COURT:  I will certainly deal with it in a ruling.
11 But I'm going to tell you right now I'm not going to start
12 making exceptions of the kind -- I don't expect to be making
13 exceptions of the kind you're talking about.  But I will
14 consider it and write a ruling.  Thank you very much.
15           MR. CLARK:  Can I raise one other issue not relating
16 directly to the exception issue?
17           THE COURT:  OK.
18           MR. CLARK:  I know that the mediator is in the
19 courtroom today I just want to state for the record that we are
20 substantial holders of exchange bonds.  We strongly support a
21 negotiated solution to this issue.  We in our brief that your
22 Honor will review suggested one possible way to try to resolve
23 difficulties relating to the RUFO clause.  I don't think either
24 party thought it was necessarily a solution.
25           We would certainly be willing on behalf of our group
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

E7mrnmlm

1   to consider and accept a fair and effective waiver of the RUFO
2   clause if that would help negotiations.  I wanted to let the
3   Court know that we have made this application because we think
4   there are serious issues that arise under the injunction and
5   that the injunction should be corrected in the manner that we
6   have stated, but that we also want to try to be constructive
7   and resolve this matter, your Honor.
8              THE COURT:  I think the special master had better get
9   your name, address, and phone number.
10             MR. CLARK:  I'm happy to provide it, your Honor.  It
11  is on our brief as well.
12             THE COURT:  I think you undoubtedly ought to exchange
13  contact information.  Thank you very much for your remarks.
14  They are very helpful.
15             MR. SCHAFFER:  Your Honor, Eric Schaffer from
16  ReedSmith for the Bank of New York Mellon.  We are the last
17  motion I think that is left.  Let me say we are the good guys
18  here.  We complied with your Honor's injunction.  We agree we
19  acted very responsibly.  We agree with plaintiffs that we
20  thwarted violations.
21             Our issue goes to what do we do with the money.  Under
22  the existing injunctions, we hold the money.  The plaintiffs
23  have asked that we return the money.  As set forth in our
24  motion, our memorandum, that creates a lot of unnecessary
25  issues for the Bank of New York Mellon.

40

E7mrnmlm

1             THE COURT:  Can I interrupt you?
2             MR. SCHAFFER:  Of course.
3             THE COURT:  What do you believe should be done with
4  the money?
5             MR. SCHAFFER:  Your Honor, think consistent with the
6  existing injunctions we should be holding the money pending
7  whatever further proceedings take place here either with the
8  special master or --
9             THE COURT:  I agree with that.  Thank you very much.
10            MR. SCHAFFER:  Thank you, your Honor.
11            MR. FRIEDMAN:  Your Honor, may I be heard briefly with
12  respect to that?
13            THE COURT:  Sure.
14            MR. FRIEDMAN:  Thank you.  Two things, your Honor.
15  First, when the issue was first presented to the Court, your
16  Honor expressed the view that the attempted payment by the
17  Republic of Argentina to the Bank of New York was an illegal
18  payment and should be nullified.  What the Court said at that
19  time was that the funds should be returned to Argentina.  We
20  have since then had discussions with counsel for the Bank of
21  New York about an appropriate order.
22            I would like to state very briefly why we believe that
23  your Honor's original statement that the funds should be
24  returned is both --
25            THE COURT:  Can I interrupt you?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

E7mrnmlm

```
 1                 MR. FRIEDMAN:  Yes.
 2                 THE COURT:  Look, of all the issues we have, and there
 3       are a lot of issues, it seems to me this surely should be able
 4       to be agreed on.  The republic attempted to pay interest.  That
 5       attempt was improper.  We talked about that many, many times.
 6       But money actually had been paid.  The bank was very
 7       responsible and certainly paid attention to my existing order
 8       and complied with it as well as it could.  It didn't refuse the
 9       receipt of the money, but it did not carry it on.  Very
10       responsible.
11                 What should be done now with that money?  Can't the
12       parties agree?  It's money.  Whether it should go back to the
13       republic or not, can't you agree on that?
14                 MR. FRIEDMAN:  We, your Honor, have had discussions,
15       and I'm certainly willing to pursue those discussions.  What I
16       would say to the Court is there really are two major concerns
17       with respect to the Bank of New York retaining the money.
18                 One is that with the funds at the Bank of New York,
19       the republic has been proclaiming its continued defiance of
20       your Honor's order and asserting that it has paid and will
21       continue to pay the exchangers.  The republic points to the
22       539 million paid to the Bank of New York.
23                 Second, the term I would use with respect to the funds
24       held at Bank of New York would be "attractive nuisance" in the
25       sense that we are already seeing rumblings of litigation in
```

E7mrnmlm

1  courts other than the United States.  Your Honor heard a little
2  bit about that from counsel for the exchange bondholders who
3  hold euro bonds.  We are concerned that with the funds at Bank
4  of New York, we will be in and out of this Court and other
5  courts.
6         THE COURT:  Let me interrupt you.  I don't really know
7  the effects of banking law, and so forth.  The reason the funds
8  are in the hands of the Bank of New York was really an illegal
9  move on the part of the Republic of Argentina.  It was illegal.
10  Now, is it possible to clear the decks and to eliminate the
11  effects of that illegality?  Is it possible to return the money
12  to the republic?
13         MR. FRIEDMAN:  I would say yes, your Honor.  What I
14  will discuss with counsel for the Bank of New York is whether
15  we can agree on a simple form of order that would say that the
16  Bank of New York will return the funds and that the republic
17  shall not obstruct or prevent but shall provide necessary
18  information and otherwise cooperate, because the republic is of
19  course subject to your Honor's jurisdiction.  We would
20  understand that if the republic --
21         THE COURT:  Can I interrupt you again.  I want to
22  conclude this and get to something else.  I would say to you
23  that I would be certainly willing to sign an appropriate order
24  having that money returned.  It should be returned.  Maybe
25  there will be objections to the order.  Obviously, I don't

43

E7mrnmlm
1   care.  I think the money should be returned.  Can we leave it
2   at that?
3           MR. FRIEDMAN:  Yes.  I will try to negotiate with
4   counsel for Bank of New York on a form of order.  If there are
5   any disagreements, we will come back to your Honor.
6           THE COURT:  Very good.
7           MR. FRIEDMAN:  Thank you.
8           MR. SCHAFFER:  Your Honor, Eric Schaffer for Bank of
9   New York Mellon.  Your Honor, I won't repeat everything that is
10  in our memorandum, but return exposes the trustee needlessly to
11  a lot more litigation in a lot of countries.  We have complied
12  with this Court's order.  There are practical problems.  There
13  are due process problems.
14          THE COURT:  Can you tell me what should be done.
15          MR. SCHAFFER:  Your Honor, I believe the answer is we
16  hold the money right where it is, that we do exactly what your
17  existing injunctions require.
18          THE COURT:  I'm completely silent because I have
19  nothing to say.  Try to work something out that you can agree
20  on, the thing that will create the least problems, the least
21  potential litigation we want to do.  Unfortunately, we are in
22  the soup.  I can't help that.  Thank you very much, everybody.
23          MR. CLARK:  Your Honor, can I make one request?
24  Before any order is submitted to your Honor to be signed, that
25  it be docketed so that the other parties who might be
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

E7mrnmlm
```
 1   interested can view it?
 2           THE COURT:  Absolutely.
 3           MR. CLARK:  Thank you, your Honor.
 4           THE COURT:  I want to turn now to something that is
 5   really of the greatest possible importance, and that is that if
 6   sensible steps are not taken, there could well be a default by
 7   the republic as of the end of July.  I think because of a grace
 8   period there was no default as of the end of June, but there
 9   could be a default as of the end of July.  A default meaning
10   that interest payments would not be made to the exchangers and
11   an appropriate payment would not be made under the pari passu
12   clause.
13            I have appointed a special master, Daniel Pollack, to
14   work with the parties to the litigation about an attempt to
15   settle.  Mr. Pollack is here.  Could Mr. Pollack stand up.
16   Thank you.
17           I want to do a little history.  After the default in
18   around 2001 or whenever it was, in accordance with the
19   contractual provisions in the bonds, many lawsuits were filed
20   in this court against the republic based on the defaults.  I
21   don't know how many, but judgments were obtained.  There really
22   wasn't any opposition generally to proceedings to obtain
23   judgments, and judgments were obtained by various parties
24   against the republic in various amounts.  Judgments.
25           In 2005 and 2010 the republic made offers to exchange
```

E7mrnmlm
1  the existing bonds for new bonds with a lower interest rates,
2  and so forth.  It is my information that maybe 90 percent or so
3  of the bondholders accepted those exchange offers, but not
4  everybody did.  There were people who had their judgments, and
5  they were not willing to give up those judgments in exchange
6  for a new offer.  They were exercising their rights under the
7  law and under the contractual provisions which the republic
8  originally offered in the bond contracts.  Over 10 or 11 years
9  the people who had these valid judgments sought to recover on
10 those judgments.  With possibly one small exception, those
11 efforts were unsuccessful.
12       The republic does not have a substantial store of
13 assets of any kind in the United States which can be recovered
14 upon.  What the people who had the judgments did was to find
15 something that they thought might be an asset and that they
16 might be able to recover on, but, with one possible exception,
17 those attempts were turned down by me.  I think to the extent
18 they went up to the Court of Appeals, basically they were
19 turned down in the Court of Appeals.
20       We went for about 10 years, 11 years, whatever it was,
21 with the republic refusing to pay the judgments, and of course
22 they didn't supply anything against which the judgments could
23 be recovered.  The rhetoric that was developed in the republic
24 during this time was unfortunate, although not as incendiary as
25 recent rhetoric.

E7mrnmlm

1          The republic took every step it could to indicate it
2   would not pay the judgments, it would not negotiate the
3   judgments.  I think laws were passed in the Congress, and so
4   forth.  The judgments were treated as things that the republic
5   should have nothing to do with.  This was unfortunate.
6          Judgments are judgments.  The people who obtained the
7   judgments obtained those judgments because of the contractual
8   provisions granted by the republic.  But for 11 years or so the
9   republic not only did not pay the judgments but in every way
10  indicated its unwillingness to recognize those judgments.
11         This changed.  I can't remember whether it was 2010 or
12  2011, but thereabouts, the attorneys for the plaintiffs
13  requested the Court to recognize a provision which had been in
14  the contractual documents all along but had not been relied on,
15  and that is the pari passu provisions, essentially meaning if
16  the republic paid certain kinds of debts, there had to be a
17  recognition -- and I'm not trying to get into the arithmetic --
18  there had to be a recognition of the rights of people with
19  judgments under the pari passu clauses, whatever they were.
20         This changed the situation, meaning it was necessary
21  for the republic to deal with the judgments.  Speaking in a
22  general, rather loose way, after the invocation of the pari
23  passu clauses, it was now clear that the republic could not pay
24  the exchangers without a recognition, and I won't get into the
25  formula, recognition of the people with the judgments who were

47

E7mrnmlm
1   invoking the pari passu clause.
2           That means, and I'm repeating myself, that there had
3   to be a dealing with and a recognition of the judgments.  The
4   desirability of a settlement is always clear to a judge.  It
5   became clear to me that it was very, very important to try to
6   arrive at a settlement, a settlement which would at long last
7   take into account the exchangers, take into account the people
8   who had the judgments, take into account all of the obligations
9   of the republic.  I emphasize obligations.
10          The obligations under the judgments didn't arise
11  yesterday.  They arose 10 years ago, 11 years ago, whenever.
12  But the republic sought to hold them aside, so to speak.  That
13  could not any longer be done, because of the invocation of the
14  pari passu clause, which I held could be done, and the Court of
15  Appeals affirmed me.
16          In many cases a settlement is a nice thing, but one of
17  many options.  What we have here facing the republic and others
18  is something much more crucial.  If proper arrangements are not
19  made, there could be a default by the republic on or about July
20  30.  That would be most unfortunate, unfortunate for the people
21  who were expecting interest payments, etc., and certainly
22  unfortunate for the republic itself.
23          To try to see if a settlement of issues could be
24  achieved, the Court appointed the gentleman I introduced to you
25  a few moments ago, Daniel Pollack, as special master.  He is a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

E7mrnmlm
1  special master to assist in settlement negotiations.
2          The reason I've gone into this history is to indicate
3  that we have had years of background, but now we are at a very
4  either the crucial time or a crucial time.  We have arrived
5  there.  If it is possible, it would be good to have the
6  rhetoric consisting of full-page newspaper ads let up.  If
7  there is a default, it will be pretty stale in people's mouths.
8  They may have talked about vultures, and so forth. what we are
9  talking about is real live issues, real live litigation, real
10 live dollars and cents.
11         I know there are hard feelings.  I know there are hard
12 feelings by the republic about the people who have the
13 judgments and wouldn't settle, wouldn't exchange.  But if the
14 republic could recognize that the people who have the judgments
15 simply have what they have a right to have under the very
16 contracts that the republic put forward, and if the republic
17 and everybody else would recognize that there are obligations
18 here, there are obligations, and those obligations of course
19 need to be dealt with.
20         I'm taking a step to implement the order that I
21 entered in appointing the special master.  I'm doing this
22 because time is short.  There is not a long time before the end
23 of July.  If the end of July comes and there is a default, that
24 will be very, very sad and unfortunate.  We want to do
25 everything we can to avoid that.  And that means settlement.

49

E7mrnmlm

1           I am adding to the provisions that I put down in my
2   appointment of the special master this direction.  I am
3   directing, and please take note of this, that the parties and
4   their lawyers in this case meet with the Special Master Daniel
5   Pollack promptly, at a time to be set by Mr. Pollack, and to
6   meet with him continuously until a solution is reached.
7           If there can be no solution, I want to hear about it
8   in open court.  I think there can be a solution.  I think there
9   can be a negotiated situation here.  I repeat, I'm directing
10  that the parties and their lawyers in this case meet with Mr.
11  Pollack promptly, at a time to be set by him, and to meet with
12  him continuously in the greatest attempt to reach a negotiated
13  solution.
14          With that, please.
15          MR. BLACKMAN:  Your Honor, Jonathan Blackman
16  representing the Republic of Argentina.  I know it has been a
17  long morning, and we appreciate everything the Court has said
18  and appreciate the decade and more that we have spent before
19  you.
20          The first time I ever stood at this podium, which was
21  in 2002, a shocking thought, I told the Court that sovereign
22  debt restructuring is necessarily voluntary.  I said that the
23  republic's wish then was to try to reach a negotiated
24  resolution with all of its creditors.  That was the only way a
25  resolution could be reached.

50

E7mrnmlm

1           There is no cram-down, there is no bankruptcy for
2    states.  If there were, we wouldn't be here, because the 92
3    percent of originally defaulted debt that was resolved through
4    the exchange offers is far more than this country or any
5    country would require to bind the holdouts.  We don't have that
6    regime.
7           I said at this podium again in 2002 that we recognize
8    the rights of creditors who do not wish to voluntarily settle
9    or exchange to assert their legal rights.  We did have a quite
10   profound disagreement with the Court as to what those legal
11   rights were or were not with respect to the pari passu clause.
12   But we are past that.
13          We are in a situation now where, as a result of the
14   Court's orders, the republic does face a very imminent risk of
15   default at the end of this month.  Those orders, I would have
16   to remind the Court, are very blunt instruments.
17          I know the Court's objective was to require the
18   republic or encourage the republic to engage with the holdout
19   creditors.  But the fact is that under those orders, those
20   holdout creditors have a legal right, as the Court interpreted
21   that clause, to be paid 100 cents on the dollar of all of their
22   principal and all of their interest for any single interest
23   payment to the made to the 92 percent.
24          We want to negotiate a settlement with everyone, but
25   to do that requires movement.  We can't have a situation where

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

51

E7mrnmlm
1    holdout creditors are insisting on their judgment or their
2    claim.  That is point one.
3            Point two, there are very, very significant
4    constraints on the ability to reach a resolution between now
5    and the end of the month.  We have set those forth in our
6    papers.  First, there is the so call RUFO clause, the right of
7    first refusal.  Until the end of this year the exchange
8    bondholders, the 92 percent, who, as the Court recognized, also
9    have legal right and to whom the republic has obligations, have
10   a right that in essence is to get whatever improved treatment
11   the holdouts get in any further voluntary exchange.
12           As I think the Court recognizes --
13           THE COURT:  Say that last again.
14           MR. BLACKMAN:  The RUFO clause in essence says that if
15   the republic at any time before December 31, 2014, offers a
16   better deal -- I'm being colloquial -- offers a better deal to
17   the holdouts, the exchange bondholders have a right to that
18   deal as well.  This was put in there deliberately to prevent
19   the republic from making a deal with 92 percent and then
20   turning around the next day and making a better deal with other
21   people.  It's totally understandable.
22           The Court has talked about all the judgment holders.
23   Beyond all the judgment holders, there are people who don't yet
24   have judgments but who also have pari passu rights under the
25   Court's interpretation.  What this means is we have to make a

52

E7mrnmlm

1   global offer to everybody.  But we also are constrained by the
2   RUFO that we can't do that before the end of the year without
3   triggering that clause for the benefit of the exchange
4   bondholders.
5            That is the first huge constraint.  That was one of
6   the features of our stay applications.  It will be hugely
7   complex to resolve this in any event.  The RUFO adds a whole
8   additional layer of complexity.  That at least sunsets, it's
9   gone after December 31.  But until then, that is a huge issue.
10           The second issue is Argentina is a state.  The Court's
11  order contemplates things that I remember, I'm sure the Court
12  does, from earlier days when labor/management negotiations
13  would go on around the clock, and so on, and there would be a
14  federal mediator.  I have visions of reading the newspapers
15  from the '50s and '60s.
16           States don't operate like that.  With all respect,
17  your Honor, a minister cannot be expected to sit in New York in
18  Mr. Pollack's office continuously.  He has to hear.  He has to
19  report.  He has to consult at the literally highest level of
20  the state, its president.  These are not only economic
21  decisions, they are political decisions, they are policy
22  decisions.
23           Very importantly, and this is the next constraint,
24  they are constitutional and legal decisions.  Argentina can't
25  just sign a contract.  It has laws that need to be addressed.

53

E7mrnmlm

1   It has constitutional obligations incumbent on its officials,
2   including, as Ms. Wagner mentioned with respect to her client
3   Citi, criminal penalties and the like.  Argentine officials are
4   subject to and have been prosecuted in the past for doing
5   things with respect to debt restructuring that were not fully
6   authorized by Argentine law.  That is a separate set of
7   constraints, legal/constitutional constraints.
8           Finally, as in any settlement, but I will emphasize
9   them, there are financial constraints.  Argentina could not,
10  and we have told the Court this, pay the holdout creditors in
11  full, as the pari passu clause as interpreted by the Court
12  would require, or anything like that.  There are going to have
13  to be detailed and, I suspect, painful negotiations with a
14  universe of people, not just these plaintiffs, not even the $10
15  billion of judgment holders in this court, but the entire
16  universe of holdouts whose claims we estimate to be in excess
17  of $20 billion, to make a deal which has to treat everyone the
18  same.
19          What I would therefore ask your Honor are two things.
20  One, I would be remiss in my duty as a lawyer for my client if
21  I did not repeat our request for a stay at least to get us
22  through this payment and through the end of the year so we
23  don't have the RUFO to deal with anymore.
24          Number two, to modify your order.  Having round-the-
25  clock negotiations between now and the end of the year is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

54

E7mrnmlm

1   unlikely, in fact I would say impossible, for all the reasons
2   that I gave you, to result in a settlement.  The RUFO alone, if
3   it's not allowed to die an actual death at the end of the year,
4   will require months to get the waivers that counsel for one of
5   the other parties mentioned earlier.  It simply can't be done
6   by the end of this month.
7           I would respectfully suggest that rather than round-
8   the-clock negotiations, we do think it is a good idea -- we
9   have had meetings.  There should be more of them.  We should be
10  exchanging ideas.  But rather than create the kind of
11  artificial pressure cooker that in this situation if a stay is
12  not going to work, that we proceed down the road that we are
13  proceeding.  But we would think a stay would really expedite
14  that and facilitate it.
15          MR. COHEN:  Your Honor, may I respond?
16          THE COURT:  No.
17          Thank you.  I'm glad you spoke, Mr. Blackman.  The
18  problem with the so-called stay application was that it would
19  take away the rights.  It would take away rights.  It really
20  wouldn't be a stay in the sense of holding the status quo.  In
21  my view, the stay application, pro or con, is not something
22  that is necessary to a negotiation of settlement.
23          You have articulated very well maybe not all but most
24  of the problems.  The reason for having settlement negotiations
25  is to try to deal with those problems.  That's what settlement

55

E7mrnmlm

1   negotiations are about.  Most importantly, to avoid a default
2   at the end of July.
3           In my view, every single problem you are talking about
4   is susceptible of being handled in some way in a settlement.
5   It is not going to be a settlement written in one paragraph.
6   It will deal, have to deal, with complex problems, with
7   conflicts.  It will have to deal with all that.  But if we
8   don't, there will be a default on July 30th, and that is the
9   worst thing.  That is about the worst thing that, sitting here,
10  I can envision.  I don't want that to happen.  People will be
11  hurt by that, real hurt.  Not vultures being hurt, but real
12  people will be hurt.
13          Whether the negotiations are round-the-clock or
14  something, we have a special master.  I have not really tried
15  to tell him how to conduct the negotiations.  That's up to him.
16  But what I want to indicate, and more than indicate, I am
17  directing that the parties and the lawyers meet promptly and
18  continuously.  I don't mean anything absurd.  I don't mean that
19  the finance minister of the Republic of Argentina has to
20  personally be in New York round the clock.  Of course.  But he
21  undoubtedly has staff.
22          If the parties here recognize the absolute necessity
23  of trying to reach a settlement by the end of the month -- and
24  that settlement won't take care of all issues that might arise
25  in the next year.  It may.  But there are ways to somehow avoid

56

E7mrnmlm
1   a default.  That is what is being attempted.
2              I expect the parties and the lawyers to work really
3   continuously.  There isn't a lot of time.  This isn't two years
4   ago.  It's today.  The best thing we can do is to adjourn this
5   court session, which has been very helpful.  Everybody who has
6   spoken has been helpful.
7              Mr. Pollack is up here in front.  I will ask you now
8   what you would suggest as far as the mechanics at the moment.
9   Could you please address that and speak to the group, Mr.
10  Pollack.
11             MR. POLLACK:  Thank you, your Honor.  I would suggest
12  that we meet promptly at 10 a.m. and that representatives of
13  the parties and the lawyers both be present.
14             THE COURT:  10 a.m. tomorrow at your office?
15             MR. POLLACK:  Correct.
16             THE COURT:  We are adjourned.  Thank you.
17             (Adjourned)
18
19
20
21
22
23
24
25

# **EXHIBIT B**

THIS GLOBAL SECURITY (THIS "SECURITY") IS A GLOBAL SECURITY WITHIN THE MEANING OF THE INDENTURE REFERRED TO HEREINAFTER AND IS REGISTERED IN THE NAME OF THE BANK OF NEW YORK DEPOSITARY (NOMINEES) LIMITED, AS NOMINEE OF THE COMMON DEPOSITARY FOR EUROCLEAR BANK S.A./N.V., AS OPERATOR OF THE EUROCLEAR SYSTEM ("EUROCLEAR") AND CLEARSTREAM BANKING, SOCIÉTÉ ANONYME ("CLEARSTREAM, LUXEMBOURG").  THIS SECURITY MAY NOT BE EXCHANGED, IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS SECURITY IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN THE COMMON DEPOSITARY OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.

REGISTERED GLOBAL SECURITY

No. 1

ISIN: XS0205537581
Common Code: 020553758

representing

Euro-Denominated Par Bonds due 2038

Original Principal Amount €5,072,556,413

THE REPUBLIC OF ARGENTINA (the "Republic"), for value received, hereby promises to pay to The Bank of New York Depositary (Nominees) Limited or registered assigns, the principal sum set forth in the Schedule of Principal Increases and Decreases annexed hereto as Schedule A, in twenty semi-annual installments, the first nineteen installments on March 31 and September 30 of each year commencing on September 30, 2029, and the last installment on December 31, 2038 (each such date, a "Principal Payment Date").  The amount of each such principal payment shall equal the principal amount of this Security outstanding as of any such Principal Payment Date, divided by the number of principal installments from and including such Principal Payment Date to and including December 31, 2038.

The Republic further unconditionally promises to pay interest at the rate per annum set forth below on the principal amount of this Security outstanding from time to time, which interest shall accrue from and including the most recent date to which interest has been paid or duly provided for, or, if no interest has been paid or duly provided for, from and including December 31, 2003, to, but excluding, the date on which payment of said principal sum has been made or duly provided for.

| From and including | To but excluding | Interest Rate |
|---|---|---|
| December 31, 2003 | March 31, 2009 | 1.20% |
| March 31, 2009 | March 31, 2019 | 2.26% |
| March 31, 2019 | March 31, 2029 | 3.38% |
| March 31, 2029 | December 31, 2038 | 4.74% |

Interest shall be payable in arrears on March 31 and September 30 of each year, and on December 31, 2038 (each such date, an "Interest Payment Date") commencing on March 31, 2004, provided that (i) interest accrued from and including December 31, 2003 to but excluding March 31, 2005 shall be payable on June 2, 2005 (the "Original Settlement Date").

As further noted in Paragraph 2(b) of the Terms and Conditions set forth on the reverse hereof (the "Terms"), if any date for payment of the principal of or the interest on this Security is not a Business Day, no payment shall be made until the next following Business Day, and no interest nor other sum shall be payable in respect of such postponed payment.

\*      \*      \*

The statements in the legend relating to the Depositary set forth above are an integral part of the terms of this Security and by acceptance hereof each Holder of this Security agrees to be subject to and bound by the terms and provisions set forth in such legend.

This Security is governed by (i) the Trust Indenture dated as of June 2, 2005, between the Republic and The Bank of New York, as trustee (the "Trustee"), as amended from time to time (the "Indenture"), the terms of which are incorporated herein by reference, and (ii) by the Terms, as supplemented or amended by the Authorization (as defined in the Indenture) of the Republic for this Security, the terms of which are incorporated herein by reference. This Security shall in all respects be entitled to the same benefits as other Debt Securities under the Indenture and the Terms.

Upon any exchange of all or a portion of this Security for Certificated Securities in accordance with the Indenture, this Security shall be endorsed on Schedule A to reflect the change of the principal amount evidenced hereby.

Unless the certificate of authentication hereon has been executed by the Trustee, this Security shall not be valid or obligatory for any purpose.

Capitalized terms used but not defined herein shall have the meaning assigned to each such term in the Terms, and, if not defined therein, in the Indenture.

IN WITNESS WHEREOF, the Republic has caused this instrument to be duly executed.

Dated:   JUN   2 2005

THE REPUBLIC OF ARGENTINA

By:

Name:   Federico C. Molina
Tile:   Financial Representative of the
Republic of Argentina in
Washington, D.C.

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This is one of the Debt Securities of the Series designated on the reverse hereof and issued under the Indenture.

The Bank of New York
as Trustee

Dated:   JUN   2 2005

By: Elizabeth DaSilva
ELIZABETH DaSILVA
VICE PRESIDENT

3

SCHEDULE A

SCHEDULE OF PRINCIPAL INCREASES AND DECREASES

| Date | Principal Amount of Certificated Securities | Remaining Principal Amount of this Global Security | Notation Made By |
|------|---------------------------------------------|---------------------------------------------------|------------------|
|      |                                             |                                                   |                  |
|      |                                             |                                                   |                  |
|      |                                             |                                                   |                  |
|      |                                             |                                                   |                  |
|      |                                             |                                                   |                  |
|      |                                             |                                                   |                  |
|      |                                             |                                                   |                  |

COPY

1

REVERSE OF SECURITY

TERMS AND CONDITIONS OF THE SECURITIES

1.      General. (a) This Security is one of a duly authorized series of debt securities (each, a "Series") of The Republic of Argentina (the "Republic"), designated as its Euro-Denominated Par Bonds Due 2038 (each Security of this Series a "Security," and collectively, the "Securities"), and issued or to be issued in one or more Series (such Series collectively, the "Debt Securities") pursuant to a Trust Indenture dated as of June 2, 2005 between the Republic and The Bank of New York, as Trustee (the "Trustee"), as amended from time to time (the "Indenture"). The Holders (as defined below) of the Securities will be entitled to the benefits of, be bound by, and be deemed to have notice of, all of the provisions of the Indenture. A copy of the Indenture is on file and may be inspected at the Corporate Trust Office of the Trustee in the City of London. Subject to Paragraph 16, the Republic hereby certifies and warrants that all acts, conditions and things required to be done and performed and to have happened precedent to the creation, execution and, as applicable, issuance of the Indenture and the Securities and to constitute the same legal, valid and binding obligations of the Republic enforceable in accordance with their terms, have been done and performed and have happened in due and strict compliance with all applicable laws. All capitalized terms used in this Security but not defined herein shall have the meanings assigned to them in the Indenture. Insofar as the provisions of the Indenture may conflict with the provisions set forth in this Security, the latter shall control for purposes of this Security.

(b)      The Securities are issuable only in fully registered form without coupons and are represented by one or more registered global securities (each, a "Global Security") held by or on behalf of the Person or Persons that are designated, pursuant to the Indenture, by the Republic to act as depositary for such Global Securities (the "Depositary"). Securities issued in certificated form ("Certificated Securities") will be available only in the limited circumstances set forth in the Indenture. The Securities, and transfers thereof, shall be registered as provided in Section 2.6 of the Indenture. Any person in whose name a Security shall be registered (each, a "Holder") may (to the fullest extent permitted by applicable law) be treated at all times, by all persons and for all purposes as the absolute owner of such Security regardless of any notice of ownership, theft, loss or any writing thereon.

(c)      The Securities are issuable in authorized denominations of €1.00 and integral multiples of €1.00 in excess thereof.

(d)      As used herein, the following terms have the meanings set forth below:

"Business Day" means any day other than (i) a Saturday or a Sunday, (ii) a day on which banking institutions or trust companies are authorized or obligated by law, regulation or executive order to close in the City of Buenos Aires, or (iii) a day on which the Trans-European Automated Real-Time Gross Settlement Express Transfer ("TARGET") System, or any successor thereto, is closed for business.

2.      Payments and Trustee Paying Agents. (a) Principal of and interest on the Securities will be payable in the single currency adopted by those states participating in

European Monetary Union from time to time. Payments of principal of and interest on each Security will be made in immediately available funds to the person in whose name such Security is registered at the close of business on the Record Date (as defined below) for the relevant Principal Payment Date and Interest Payment Date, respectively. The Republic will make payments of principal of and interest on the Securities by (i) providing the Trustee or trustee paying agent (as defined below) the amount of such payment, in immediately available funds, not later than 1:00 P.M. local time at the place of payment, not later than the Business Day prior to each Principal Payment Date or Interest Payment Date, as applicable; and (ii) directing the Trustee to hold these funds in trust for the Trustee and the beneficial owners of the Securities in accordance with their respective interests and to make a wire transfer of such amount to The Bank of New York Depositary (Nominees) Limited, as the registered owner of the Securities, which will receive the funds in trust for distribution to the beneficial owners of the Securities; *provided* that the Republic may, subject to applicable laws and regulations, make payments of principal of and interest on the Securities by mailing, or directing the Trustee to mail, from funds made available by the Republic for such purpose, a check to the person entitled thereto, on or before the due date for the payment at the address that appears on the security register maintained by the Registrar on the applicable record date.

The record date with respect to any Interest Payment Date or Principal Payment Date will be the 15th day prior to such date (each such day, a "Record Date"), whether or not such day is a Business Day notwithstanding the cancellation of such Securities upon any transfer or exchange thereof subsequent to the Record Date and prior to such Interest Payment Date or Principal Payment Date. Notwithstanding anything herein to the contrary, the Republic's obligation to make payments of principal of and interest on the Securities shall not have been satisfied until such payments are received by the Holders of the Securities.

None of the Republic, the Trustee or any paying agent that shall be appointed by the Trustee at the expense of the Republic (each, a "trustee paying agent") will have any responsibility or liability for any aspect of the records relating to, or payments made on account of, beneficial ownership interests in the Securities or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

(b) Any payment of principal or interest required to be made on a Principal Payment Date or Interest Payment Date, as applicable, that is not a Business Day (or, in the case of the Luxembourg Trustee Paying Agent, as defined in Paragraph 2(d), that is a day on which banking institutions or trust companies in Luxembourg are required or authorized by law to close) need not be made on such day, but may be made on the next succeeding Business Day (or, in the case of a Luxembourg Trustee Paying Agent, the next succeeding day on which banking institutions or trust companies in Luxembourg are not required or authorized by law to close) with the same force and effect as if made on such Principal Payment Date or Interest Payment Date, and no interest will accrue with respect to any such principal payment for the period from and after such Principal Payment Date.

(c) Interest shall be calculated on the basis of a 360-day year of twelve 30-day months.

(d) So long as any of the Securities are outstanding, the Trustee shall appoint, at the expense of the Republic, a trustee paying agent and a transfer agent in a Western European city

for payment on and transfers of the Securities (which will be Luxembourg, so long as the Securities are listed on the Luxembourg Stock Exchange and the rules of such Exchange so require), a Registrar having a specified office in the City of London and a trustee paying agent having a specified office in the City of London. The Trustee has initially appointed The Bank of New York (Luxembourg) S.A., as Luxembourg Trustee Paying Agent and Transfer Agent for the Securities, and The Bank of New York, as trustee paying agent. The Trustee shall also maintain a trustee paying agent in a member state of the European Union that is not obliged to deduct or withhold tax pursuant to European Council Directive 2003/48/EC or any other Directive implementing the conclusions of the ECOFIN Council meeting of November 26-27, 2002 on the taxation of savings income or any law implementing or complying with, or introduced in order to conform to, such Directive. Subject to the foregoing, the Republic shall have the right at any time to instruct the Trustee to terminate any such appointment and to appoint any other paying agents or transfer agents in such other places as it may deem appropriate for the purpose of making payments for the exclusive benefit of Holders. Notwithstanding the foregoing, the trustee paying agent and any trustee paying agent appointed hereunder shall be agents solely of the Trustee, and the Republic shall have no authority over or any direct relationship with the trustee paying agent or any such trustee paying agent.

(e) All money paid to the Trustee pursuant to these Terms shall be held by it in trust exclusively for itself and the Holders of the Securities in accordance with their respective interests to be applied by the Trustee to payments due on the Securities or to the Trustee at the time and in the manner provided for in these Terms and in the Indenture, and the Holders of the Securities may, subject to the next sentence, look only to the Trustee for any payment to which the Holders may be entitled. Any monies deposited with the Trustee for the payment of the principal of or interest (including Additional Amounts) on any Security remaining unclaimed for ten years (in the case of principal) or five years (in the case of interest) or, in either case, any shorter prescription period provided by law after such principal or interest shall have become due and payable shall be repaid to the Republic upon written request without interest, and the Holder of any such Security may thereafter look only to the Republic for any payment to which such Holder may be entitled.

3.    Taxation. All payments of principal, premium, if any, and interest in respect of this Security by the Republic shall be made free and clear of, and without withholding or deduction for or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed, levied, collected, withheld or assessed by or within the Republic or any authority therein or thereof having power to tax (together "Taxes"), unless such withholding or deduction is required by law. In such event, the Republic shall pay to the registered Holders of this Security such additional amounts ("Additional Amounts") as will result in receipt by such Holders of such amounts of principal, premium and interest as would have been received by them had no such withholding or deduction been required; except that no such Additional Amounts shall be payable with respect to any Security (i) to a Holder (or to a third party on behalf of a Holder) where such Holder is liable for such Taxes in respect of this Security by reason of his having some connection with the Republic other than the mere holding of such Security or the receipt of principal, premium or interest in respect thereof; (ii) where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 2003/48/EC or any other directive implementing the conclusions of the ECOFIN Council meeting of November 26-27, 2002 on the taxation of

R-3

savings income or any law implementing or complying with, or introduced in order to conform to, such Directive; (iii) presented for payment by or on behalf of a Holder who would have been able to avoid the withholding or deduction by presenting this Security to another trustee paying agent in a member state of the European Union or (iv) presented for payment more than 30 days after the Relevant Date, as defined herein, except to the extent that the Holder thereof would have been entitled to Additional Amounts on presenting the same for payment on the last day of such period of 30 days.

"Relevant Date" in respect of any Security means the date on which payment in respect thereof becomes due or (if the full amount of the money payable on such date has not been received by the Trustee on or prior to such due date) the date on which notice is duly given to the Holders that such moneys have been so received and are available for payment. Any reference herein to "principal" and/or "interest" shall be deemed to include any Additional Amounts which may be payable on this Security.

4.     Status and Negative Pledge Covenant. (a) The Securities will constitute the direct, unconditional, unsecured and unsubordinated obligations of the Republic. Each Series will rank *pari passu* with each other Series, without any preference one over the other by reason of priority of date of issue or currency of payment or otherwise, and at least equally with all other present and future unsecured and unsubordinated External Indebtedness (as defined herein) of the Republic.

(b)     So long as any Security remains Outstanding (as defined in Paragraph 23(f) below), save for the exceptions set forth below, the Republic will not create or permit to subsist any lien, pledge, mortgage, security interest, deed of trust, charge or other encumbrance or preferential arrangement which has the practical effect of constituting a security interest ("Lien") upon the whole or any part of its assets or revenues to secure any Public External Indebtedness of the Republic unless, at the same time or prior thereto, the Republic's obligations under the Securities either (i) are secured equally and ratably therewith, or (ii) have the benefit of such other security, guarantee, indemnity or other arrangement as shall be approved by the Holders of the Securities (as provided in Paragraph 23).

Notwithstanding the foregoing, the Republic may permit to subsist:

(i)     any Lien upon property to secure Public External Indebtedness of the Republic incurred for the purpose of financing the acquisition of such property; any renewal or extension of any such Lien which is limited to the original property covered thereby and which secures any renewal or extension of the original secured financing;

(ii)     any Lien existing on such property at the time of its acquisition to secure Public External Indebtedness of the Republic and any renewal or extension of any such Lien which is limited to the original property covered thereby and which secures any renewal or extension of the original secured financing;

(iii)     any Lien created in connection with the transactions contemplated by the Republic of Argentina 1992 Financing Plan dated June 23, 1992 sent to the international banking community with the communication dated June 23, 1992 from the Minister of

Economy and Public Works and Services of Argentina (the "1992 Financing Plan") and the implementing documentation therefore, including any Lien to secure obligations under the collateralized securities issued thereunder (the "1992 Par and Discount Bonds") and any Lien securing indebtedness outstanding on the date hereof to the extent required to be equally and ratably secured with the 1992 Par and Discount Bonds;

     (iv)    any Lien in existence on the date of the Indenture;

     (v)    any Lien securing Public External Indebtedness of the Republic issued upon surrender or cancellation of any of the 1992 Par and Discount Bonds or the principal amount of any indebtedness outstanding as of June 23, 1992, in each case, to the extent such Lien is created to secure such Public External Indebtedness on a basis comparable to the 1992 Par and Discount Bonds;

     (vi)    any Lien on any of the 1992 Par and Discount Bonds; and

     (vii)    any Lien securing Public External Indebtedness incurred for the purpose of financing all or part of the costs of the acquisition, construction or development of a project; *provided* that (a) the holders of such Public External Indebtedness expressly agree to limit their recourse to the assets and revenues of such project as the principal source of repayment of such Public External Indebtedness and (b) the property over which such Lien is granted consists solely of such assets and revenues.

For purposes of these Terms:

     "External Indebtedness" means obligations (other than the Securities) for borrowed money or evidenced by securities, debentures, notes or other similar instruments denominated or payable, or which at the option of the holder thereof may be payable, in a currency other than the lawful currency of the Republic, *provided* that no Domestic Foreign Currency Indebtedness, as defined below, shall constitute External Indebtedness.

     "Performing Public External Indebtedness" means Public External Indebtedness issued on or after the Original Settlement Date.

     "Public External Indebtedness" means any External Indebtedness of, or guaranteed by, the Republic which (i) is publicly offered or privately placed in securities markets, (ii) is in the form of, or represented by, bonds, notes or other securities or any guarantees thereof and (iii) is, or was intended at the time of issue to be, quoted, listed or traded on any stock exchange, automated trading system or over-the-counter securities market (including securities eligible for sale pursuant to Rule 144A under the U.S. Securities Act of 1933, as amended (the "Securities Act") (or any successor law or regulation of similar effect)).

     "Domestic Foreign Currency Indebtedness" means (i) the following indebtedness to the extent not redenominated into pesos pursuant to Argentine law and thereby converted into Domestic Indebtedness: (a) Bonos del Tesoro issued under Decree No. 1527/91 and Decree No. 1730/91, (b) Bonos de Consolidación issued under Law

No. 23,982 and Decree No. 2140/91, (c) Bonos de Consolidación de Deudas Previsionales issued under Law No. 23,982 and Decree No. 2140/91, (d) Bonos de la Tesorería a 10 Años de Plazo issued under Decree No. 211/92 and Decree No. 526/92, (e) Ferrobonos issued under Decree No. 52/92 and Decree No. 526/92, (f) Bonos de Consolidación de Regalías Hidrocarburíferas a 16 Años de Plazo issued under Decree No. 2284/92 and Decree No. 54/93, (g) Letras de Tesorería en Dólares Estadounidenses issued under the Republic's annual budget laws, including those Letras de Tesorería issued under Law No. 24,156 and Decree No. 340/96, (h) Bonos de Consolidación issued under Law No. 24,411 and Decree No. 726/97, (i) Bonos Externos de la República Argentina issued under Law No. 19,686 enacted on June 15, 1972, (j) Bonos del Tesoro a Mediano Plazo en Dólares Estadounidenses issued under Law No. 24,156 and Decree No. 340/96 and (k) Bonos del Gobierno Nacional in Dólares Estadounidenses issued under Decree No. 905/2002, Decree No. 1836/2002 and Decree No. 7396/2003; (ii) any indebtedness issued in exchange, or as replacement, for the indebtedness referred to in (i) above; and (iii) any other indebtedness payable by its terms, or which at the option of the holder may be payable, in a currency other than the lawful currency of the Republic which is (a) offered exclusively within the Republic or (b) issued in payment, exchange, substitution, discharge or replacement of indebtedness payable in the lawful currency of the Republic.

5.    Default; Acceleration of Maturity.    (a)  Each of the following events will constitute an "Event of Default" under the Securities:

(i)    Non-Payment:  the Republic fails to pay any principal of any of the Securities when due and payable and such failure continues for 30 days or fails to pay any interest on any of the Securities when due and payable and such failure continues for a period of 30 days; or

(ii)    Breach of Other Obligations:  the Republic does not perform or comply with any one or more of its other obligations in the Securities or in the Indenture, which default is incapable of remedy or is not remedied within 90 days after written notice of request to remedy such default shall have been given to the Republic by the Trustee; or

(iii)    Cross Default:  any event or condition shall occur which results in the acceleration of the maturity (other than by optional or mandatory prepayment or redemption) of any Performing Public External Indebtedness of the Republic having an aggregate principal amount of U.S. $30,000,000 (or its equivalent in other currencies) or more, or any default in the payment of principal of, or premium or prepayment charge (if any) or interest on, any such Performing Public External Indebtedness having an aggregate principal amount of U.S. $30,000,000 (or its equivalent in other currencies) or more, shall occur when and as the same shall become due and payable, if such default shall continue for more than the period of grace, if any, originally applicable thereto; or

(iv)    Moratorium:  a moratorium on the payment of principal of, or interest on, the Performing Public External Indebtedness of the Republic shall be declared by the Republic; or

R-6

(v)     Validity: the validity of the Securities shall be contested by the Republic.

(b)     Upon the occurrence and during the continuance of an Event of Default, the Holders of at least 25% in aggregate principal amount of the Securities then Outstanding may by written notice given to the Republic (with a copy to the Trustee) declare the Securities to be immediately due and payable; and upon such declaration the principal amount of the Securities and the accrued interest on the Securities will become immediately due and payable upon the date that such written notice is received at the office of the Trustee, unless prior to such date all Events of Default in respect of the Securities have been cured.  Notwithstanding the foregoing, in the case of an Event of Default specified in clauses (ii) or (v) of Paragraph 5(a), the principal amount of and the accrued interest on the Securities may only be declared immediately due and payable if such event is materially prejudicial to the interests of the Holders of the Securities. The right to give such acceleration notice will terminate if the event giving rise to such right has been cured before such right is exercised.  Holders holding in the aggregate at least 50% in principal amount of the then Outstanding Securities may waive any existing defaults, and rescind or annul any notice of acceleration, on behalf of all Holders of Securities, if (A) following the declaration of the Securities due and payable immediately, the Republic has deposited with the Trustee an amount sufficient to pay all overdue installments of principal, interest and Additional Amounts in respect of the Securities (with interest on overdue amounts of interest, to the extent permitted by law, and on such principal of each of the Securities at the rate of interest applicable thereto, to the date of such payment or interest) as well as the reasonable fees and compensation of the Trustee; and (B) all other Events of Default have been remedied.  In the event of a declaration of acceleration because of an Event of Default set forth in clause (iii) of Paragraph 5(a), such declaration of acceleration shall be automatically rescinded and annulled if the event triggering such Event of Default pursuant to such clause (iii) shall be remedied, cured or waived by the Holders of the relevant indebtedness, within 60 days after such event.

(c)     Upon the occurrence of an Event of Default under Paragraph 5(a), the Republic shall give written notice promptly after becoming aware thereof to the Trustee.  Within 15 days after becoming aware of the occurrence of an event which with the giving of notice or lapse of time or both would, unless remedied, cured or waived, become an Event of Default under Paragraph 5(a), the Republic shall give written notice thereof to the Trustee.

6.     Repurchase of the Securities by the Republic with Excess Payment Capacity. Subject to the provisions set forth in this Paragraph 6, the Republic covenants and agrees to apply the Annual Excess Payment Capacity, if any, for any calendar year from and including 2004 to and including 2009, towards the repurchase of any Public Performing Indebtedness.  All Public Performing Indebtedness so repurchased shall be cancelled in accordance with the terms thereof.  Such repurchases shall take place no later than twelve months after the end of each such calendar year.  In every case, the Republic shall determine within its sole discretion which Public Performing Indebtedness to repurchase.  These repurchases may be conducted, at the Republic's sole discretion by Tender, in the secondary market or otherwise.  No Holder will be entitled to demand that the Republic repurchase or offer to repurchase any of such Holder's Securities pursuant to this Paragraph 6.  The Republic shall announce any such repurchases to be conducted by Tender by publishing a prior notice in various newspapers as described in Paragraph 13 hereof.

For purposes of these Terms:

"Annual Eligible Debt Service" means, in respect of any calendar year from and including the year 2004 to and including the year 2009, the sum of (i) any payments to holders of New Securities pursuant to the terms thereof; (ii) any payments to holders of any Non-Performing Securities pursuant to the terms thereof, but only if the terms of such Non-Performing Securities have been amended subsequent to Original Settlement Date, and (iii) any payments made to holders of any Non-Performing Securities pursuant to a judgment by a court of competent jurisdiction or pursuant to a post-judgment settlement entered into with the plaintiff in connection with any such judgment.

"Annual Excess Payment Capacity" means, in respect of any calendar year from and including the year 2004 to and including the year 2009, the difference between the Annual Payment Capacity for such year and the Annual Eligible Debt Service for such year.

"Annual Payment Capacity" means, in respect of any calendar year from and including the year 2004 to and including the year 2009, the amount set forth below for such year:

| Calendar Year | Annual Payment Capacity (in millions of U.S. dollars) |
|---|---|
| 2004 | U.S. $   891.0 |
| 2005 | 973.2 |
| 2006 | 1,007.0 |
| 2007 | 1,042.2 |
| 2008 | 1,078.9 |
| 2009 | 1,615.5 |

"New Securities" means the securities listed in Schedule B hereto.

"Non-Performing Securities" means the securities issued by the Republic which are listed in Schedule C hereto.

"Public Performing Indebtedness" means:

(i)     any outstanding New Securities; and

(ii)     any outstanding debt obligations of the Republic other than any Non-Performing Securities.

"Tender" shall mean any bidding process in which holders of Public Performing Indebtedness are invited to present competing offers for the sale to the Republic of any Public Performing Indebtedness they hold.

7.     Repurchase of the Securities by the Republic with Excess GDP.  Subject to the provisions set forth in this Paragraph 7, the Republic covenants and agrees to apply 5% of the Excess GDP for any Reference Year towards the repurchase of any outstanding New Securities. All New Securities so repurchased shall be cancelled in accordance with the terms thereof.  Such repurchases shall take place during the calendar year following the Calculation Date for the

relevant Reference Year.  In every case, the Republic shall determine within its sole discretion which New Securities to repurchase. These repurchases may be conducted, at the Republic's sole discretion by Tender, in the secondary market or otherwise.  No Holder will be entitled to demand that the Republic repurchase or offer to repurchase any of such Holder's Securities pursuant to this Paragraph 7.  The Republic shall announce any such repurchases to be conducted by Tender by publishing a prior notice in various newspapers as described in Paragraph 13 hereof.

For purposes of these Terms:

"Actual Nominal GDP" means, for any Reference Year, an amount equal to Actual Real GDP for such Reference Year multiplied by the GDP Deflator for such Reference Year.

"Actual Real GDP" means, for any Reference Year, the gross domestic product of Argentina for such Reference Year measured in constant prices for the Year of Base Prices, as published by INDEC.

"Base Case GDP" means, for any Reference Year, the amount set forth in the chart below for such year:

| Reference Year | Base Case GDP (in millions of constant 1993 pesos) |
|---|---|
| 2005 | Ps.  287,012.52 |
| 2006 | 297,211.54 |
| 2007 | 307,369.47 |
| 2008 | 317,520.47 |
| 2009 | 327,968.83 |
| 2010 | 338,675.94 |

*provided* that, if the Year of Base Prices employed by INDEC for determining Actual Real GDP shall at any time be a calendar year other than the year 1993, then the Base Case GDP for each Reference Year shall be adjusted to reflect any such change in the Year of Base Price by multiplying the Base Case GDP for such Reference Year (as set forth in chart above) by a fraction, the numerator of which shall be the Actual Real GDP for such Reference Year measured in constant prices of the Year of Base Prices, and the denominator of which shall be the Actual Real GDP for such Reference Year measured in constant 1993 prices.

"Calculation Date" means, for any Reference Year, the 1st of November of the calendar year following such Reference Year.

"Excess GDP" means, for any Reference Year, the amount (expressed in billions), if any, by which Actual Nominal GDP for such Reference Year exceeds the Nominal Base Case GDP for such Reference Year.  All calculations necessary to determine Excess GDP based on the information published by INDEC will be performed by the Ministry of Economy and Production of the Republic, and such calculations shall be binding on the Trustee, the Registrar, the trustee paying agent and each other trustee paying agent and all Holders of Securities, absent bad faith,

willful misconduct or manifest error on the part of the Ministry of Economy and Production of the Republic.

"GDP Deflator" means, for any Reference Year, the number that results from dividing (i) the gross domestic product of Argentina for such Reference Year measured at the current prices of such Reference Year, as published by INDEC, by (ii) the Actual Real GDP for such Reference Year.

"INDEC" means the *Instituto Nacional de Estadística y Censos* of the Republic of Argentina.

"Nominal Base Case GDP" means, for any Reference Year, an amount equal to Base Case GDP for such Reference Year multiplied by the GDP Deflator for such Reference Year.

"Reference Year" means any calendar year from and including the year 2005 to and including the year 2010.

"Year of Base Prices" means the year 1993; *provided* that if the calendar year employed by INDEC for purposes of determining Actual Real GDP shall at any time be a calendar year other than the year 1993, then the Year of Base Prices shall mean such other calendar year.

8.  Rights upon Future Offers.  (a)  Subject to Paragraphs 8(b) and 8(c) below, if at any time on or prior to December 31, 2014, the Republic voluntarily makes an offer to purchase or exchange (a "Future Exchange Offer"), or solicits consents to amend (a "Future Amendment Process"), any outstanding Non-Performing Securities, each Holder of Securities shall have the right, for a period of 30 calendar days following the announcement of any such Future Exchange Offer or Future Amendment Process, to exchange any of such Holder's Securities for (as applicable):

>  (i)  the consideration in cash or in kind received by holders of Non-Performing Securities in connection with any such Future Exchange Offer, or

>  (ii)  debt obligations having terms substantially the same as those resulting from any such Future Amendment Process,

in each case in accordance with the terms and conditions of such Future Exchange Offer or Future Amendment Process.  For purposes of receiving the consideration or debt obligations specified in clauses (i) and (ii) above, each such Holder's Securities shall be treated as though they were Non-Performing Securities (x) denominated in the same currency as such Securities, and (y) that had a principal amount outstanding as of December 31, 2001, together with any accrued and unpaid interest up to by excluding December 31, 2001, equal to the outstanding principal amount of such Securities multiplied by 2.96735905.  The Republic covenants and agrees to take all steps necessary, including making any required filings with regulatory authorities, in order to enable Holders to participate in any Future Exchange Offer or Future Amendment Process as provided in this Paragraph 8.

(b)  Each Holder's right to participate in any Future Exchange Offer or Future Amendment Process as provided in Paragraph 8(a), and the Republic's obligation to take all

actions necessary to enable such participation, shall be conditioned upon such Holder either (i) surrendering to the Trustee, for cancellation, GDP-linked Securities in a notional amount equal to (x) the principal amount of the Securities such Holder wishes to exchange pursuant to or in connection with such Future Exchange Offer or Future Amendment Process, multiplied by (y) 2.96735905; or (ii) paying cash to the Republic in an amount equal to the market price of such GDP-linked Securities calculated on the Market Observation Date that is at least six months prior to the announcement of such Future Exchange Offer or Future Amendment Process, as the case may be; *provided* that, with respect to clause (b)(ii) above, the Holder may pay such cash to the Republic in lieu of surrendering to the Trustee the GDP-linked Securities specified in clause (b)(i) above, only if an active trading market and published secondary market price quotations exist for GDP-linked Securities. "Market Observation Date" means, in respect of any GDP-linked Securities, any March 31 or September 30, as of which dates the Trustee shall calculate the market price of such GDP-linked Securities for purposes of this Paragraph 8(b). "GDP-Linked Securities" means, for purposes of this Paragraph 8(b), any euro-denominated securities by such name listed in Schedule B hereto.

(c)     The right of Holders to participate in any Future Exchange Offer or any Future Amendment Processes in accordance with this Paragraph 8 shall not apply to any exchange offer conducted pursuant to Presidential Decree No. 1,375 of the Republic.

9.     Purchase of the Securities by the Republic.  The Republic may at any time purchase or acquire any of the Securities in any manner and at any price in the open market, in privately negotiated transactions or otherwise.  Securities that are purchased or acquired by the Republic may, at the Republic's discretion, be held, resold or surrendered to the Trustee for cancellation, but any Security so purchased by the Republic may not be re-issued or resold except in compliance with the Securities Act and other applicable law.

10.     Replacement, Exchange and Transfer of Securities.  (a) If any Security becomes mutilated or is defaced, destroyed, lost or stolen, the Trustee shall authenticate and deliver a new Security, on such terms as the Republic and the Trustee may require, in exchange and substitution for the mutilated or defaced Security or in lieu of and in substitution for the destroyed, lost or stolen Security.  In every case of mutilation, defacement, destruction, loss or theft, the applicant for a substitute Security must furnish to the Republic and the Trustee such indemnity as the Republic and the Trustee may require and evidence to their satisfaction of the destruction, loss or theft of such Security and of the ownership thereof.  In every case of mutilation or defacement of a Security, the Holder must surrender to the Trustee the Security so mutilated or defaced.  In addition, prior to the issuance of any substitute Security, the Republic may require the payment of a sum sufficient to cover any stamp or other tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.  If any Security that has matured or is scheduled to mature within 15 days becomes mutilated or defaced or is apparently destroyed, lost or stolen, the Republic may pay or authorize payment of such Security without issuing a substitute Security.

(b)     Upon the terms and subject to the conditions set forth in the Indenture, a Security or Securities may be exchanged for a Security or Securities of equal aggregate principal amount in such same or different authorized denominations as may be requested by the Holder, by

surrender of such Security or Securities at the office of the Registrar, or at the office of any transfer agent, together with a written request for the exchange. Any registration of transfer or exchange shall be effected upon the Republic being satisfied with the documents of title and identity of the person making the request and subject to such reasonable regulations as the Republic may from time to time agree with the Trustee.

(c)     Upon the terms and subject to the conditions set forth in the Indenture, a Security may be transferred in whole or in part by the Holder or Holders surrendering the Security for registration of transfer at the Corporate Trust Office of the Trustee in the City of London or at the office of any transfer agent, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Republic and the Registrar or any such transfer agent, as the case may be, duly executed by the Holder or Holders thereof or its attorney-in-fact or attorneys-in-fact duly authorized in writing.

(d)     No service charge will be imposed upon the Holder of a Security in connection with exchanges for Securities of a different denomination or for registration of transfers thereof, but the Republic and the Trustee may charge the party requesting any registration of transfer, exchange or registration of Securities a sum sufficient to reimburse it for any stamp or other tax or other governmental charge required to be paid in connection with such transfer, exchange or registration.

11.     Trustee. For a description of the duties and the immunities and rights of the Trustee under the Indenture, reference is made to the Indenture, and the obligations of the Trustee to the Holder hereof are subject to such immunities and rights.

12.     Enforcement. Except as provided in Section 4.9 of the Indenture with respect to the right of any Holder of a Security to enforce the payment of the principal of and interest on its Security on the stated maturity date for such payment expressed in such Security (as the Securities may be amended or modified pursuant to Paragraph 23), no Holder of a Security shall have any right by virtue of or by availing itself of any provision of the Indenture or the Securities to institute any suit, action or proceeding in equity or at law upon or under or with respect to the Indenture or the Securities, or for any other remedy hereunder or under the Indenture, unless:

(a)     such Holder previously shall have given to the Trustee written notice of default and of the continuance thereof with respect to the Securities;

(b)     the Holders of not less than 25% in aggregate principal amount of the Outstanding Securities shall have made written request to the Trustee to institute such action, suit or proceeding in its own name as Trustee under the Indenture;

(c)     such Holder or Holders shall have provided to the Trustee such reasonable indemnity and/or security as it may require against the costs, expenses and liabilities to be incurred therein or thereby;

(d)     the Trustee for 60 days after its receipt of such notice, request and provision of indemnity and/or security shall have failed to institute any such action, suit or proceeding; and

R-12

(e)      no direction inconsistent with such written request shall have been given to the Trustee pursuant to Section 4.11 of the Indenture;

it being understood and intended, and being expressly covenanted by every Holder of Securities with every other Holder of Securities and the Trustee, that no one or more Holder shall have any right in any manner whatever by virtue or by availing itself of any provision of the Indenture or of the Securities to affect, disturb or prejudice the rights of any other Holder of Securities or to obtain priority over or preference to any other such Holder, or to enforce any right under the Indenture or under the Securities, except in the manner herein provided and for the equal, ratable and common benefit of all Holders of the Securities. Subject to the foregoing, for the protection and enforcement of this Paragraph, each and every Holder and the Trustee shall be entitled to such relief as can be given either at law or in equity. The Republic expressly acknowledges, with respect to the right of any Holder to pursue a remedy under the Indenture or the Securities, the right of any beneficial owner of Securities to pursue such remedy with respect to the portion of the Global Security that represents such beneficial owner's interest in this Security as if Certificated Securities had been issued to such beneficial owner.

13.     <u>Notices</u>. All notices to the Holders of Securities will be (i) given by first-class prepaid post to the addresses of such Holders as they appear in the Register and (ii) published in the *Financial Times, The Wall Street Journal* and in Spanish in a newspaper of general circulation in Argentina as the Republic shall determine. So long as the Securities are listed on the Luxembourg Stock Exchange or on a regulated market organized and managed by *Borsa Italiana S.p.A.*, the Republic shall also publish all such notices in newspapers with general circulation in Luxembourg and in Italy, respectively. If at any time publication in the *Financial Times* or *The Wall Street Journal* is not practicable, notices will be valid if published in an English language newspaper with general circulation in the respective market regions as the Republic with the approval of the Trustee shall determine. Any such notice shall be deemed to have been given on the date of such publication or, if published more than once or on different dates, on the first date on which publication is made.

All notices to the Trustee with respect to these Securities shall be addressed to One Canada Square, 48th Floor, London, E14 5AL, and notices to the Republic with respect to the Securities shall be addressed to Ministry of Economy and Production, Hipólito Yrigoyen 250, Piso 10, Oficina 1029, 1310 Buenos Aires, Argentina, Attention: Subsecretaria de Financiamiento. Such notices shall be delivered in person or sent by first class prepaid post or by facsimile transmission subject, in the case of facsimile transmission, to confirmation by telephone to the foregoing address. Any such notice shall take effect in the case of delivery in person, at the time of delivery, in the case of delivery by first class prepaid post seven (7) business days after dispatch and in the case of delivery by facsimile transmission, at the time of confirmation by telephone.

All notices delivered to the Trustee hereunder shall be in writing and in English and shall be deemed effective upon actual receipt.

14.     <u>Further Issues of Securities</u>. The Republic may from time to time without the consent of the Holders of the Securities create and issue additional debt securities ranking *pari passu* with the Securities and having terms and conditions which are the same as those of the

Securities, or the same except for the amount of the first payment of interest, which additional debt securities may be consolidated and form a single Series with the outstanding Securities; *provided* that such additional debt securities do not have, for purposes of U.S. federal income taxation (regardless of whether any Holders of such additional debt securities are subject to U.S. federal tax laws), a greater amount of original issue discount than the Securities have as of the date of the issue of such additional Securities.

15.     Prescription. All claims against the Republic for payment of principal of or interest (including Additional Amounts) on or in respect of the Securities shall be prescribed unless made within ten years (in the case of principal) and five years (in the case of interest) from the date on which such payment first became due, or a shorter period if provided by law.

16.     Authentication. This Security will not be valid or obligatory for any purpose until the certificate of authentication hereon shall have been executed by manual signature by or on behalf of the Trustee.

17.     Governing Law. This Security shall be governed by and construed in accordance with the laws of England and Wales without regard to principles of conflicts of laws, except with respect to authorization and execution by the Republic, which shall be governed by the laws of the Republic.

18.     Jurisdiction. (a) Subject to Paragraph 21, the Republic irrevocably submits to the jurisdiction of the courts of England and the courts of the Republic (each, a "Specified Court") over any suit, action or proceeding against it or its properties, assets or revenues with respect to the Securities of this Series or the Indenture (a "Related Proceeding"). The Republic agrees that a final non-appealable judgment in any Related Proceeding (the "Related Judgment") shall be conclusive and binding upon it and may be enforced in any Specified Court or in any other courts to the jurisdiction of which the Republic is or may be subject (the "Other Courts"), by a suit upon such judgment.

(b)     The Republic hereby irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to Related Proceedings brought in a Specified Court whether on the grounds of venue, residence or domicile or on the ground that the Related Proceedings have been brought in an inconvenient forum.

19.     Consent to Service. Subject to Paragraph 21, the Republic hereby appoints The Republic of Argentina Financial Representative Office in Europe, at its office located at The Ministry of Economy, 78 Cornhill, 6th Floor, London EC3V 3QQ, United Kingdom, and, if such person is not maintained by the Republic as its agent for such purpose, the Republic will appoint Banco de la Nación (Oficina de Enlace), presently located at Longbow House, 14/20 Chiswell Street, London EC1Y 4TD, United Kingdom, to act as its authorized agent (the "Authorized Agent") upon whom process may be served in any Related Proceeding or any action or proceeding to enforce or execute any Related Judgment governed by English law, in either case brought against it in any English Court. Such appointment shall be irrevocable until all amounts in respect of the principal of and any interest due and to become due on or in respect of all the Securities have been provided to the Trustee pursuant to the terms hereof and the Trustee has given notice to the Holders in accordance with the terms hereof of the availability of such

amounts for payment to the Holders, except that, if for any reason, such Authorized Agent ceases to be able to act as Authorized Agent or to have an address in the City of London, the Republic will appoint another person in the City of London, selected in its discretion, as such Authorized Agent.  Prior to the date of issuance of any Securities of this Series, the Republic shall obtain the consent of The Republic of Argentina Financial Representative Office in Europe to its appointment as such Authorized Agent, a copy of which acceptance it shall provide to the Trustee.  The Republic shall take any and all action, including the filing of any and all documents and instruments that may be necessary to continue such appointment or appointments in full force and effect as aforesaid.  Service of process upon the Authorized Agent at the address indicated above, as such address may be changed within the City of London, by notice given by the Authorized Agent to each party hereto, shall be deemed, in every respect, effective service of process upon the Republic.

Nothing in this Paragraph 19 shall affect the right of the Trustee or (in connection with legal action or proceedings by any Holder as permitted by the Indenture and this Security) any Holder to serve legal process in any other manner permitted by law or affect the right of the Trustee or any such Holder to bring any action or proceeding against the Republic or its property in the courts of other jurisdictions.

The appointment and acceptance of jurisdiction set out in Paragraphs 18 and 19 above are intended to be effective upon execution of this Security without further act by the Republic before any such court and introduction of a true copy of this Security into evidence shall be conclusive and final evidence of such waiver.

20.    Waiver of Immunity.  (a)  Subject to Paragraph 21, to the extent that the Republic or any of its revenues, assets or properties shall be entitled, in any jurisdiction in which any Specified Court is located, in which any Related Proceeding may at any time be brought against it or any of its revenues, assets or properties, or in any jurisdiction in which any Specified Court or Other Court is located in which any suit, action or proceeding may at any time be brought solely for the purpose of enforcing or executing any Related Judgment, to any immunity from suit, from the jurisdiction of any such court, from set-off, from attachment prior to judgment, from attachment in aid of execution of judgment, from execution of a judgment or from any other legal or judicial process or remedy, and to the extent that in any such jurisdiction there shall be attributed such an immunity, the Republic irrevocably waives such immunity to the fullest extent permitted by the laws of such jurisdiction, including the United States Foreign Sovereign Immunities Act of 1976 (the "Immunities Act") (and consents to the giving of any relief or the issue of any process in connection with any Related Proceeding or Related Judgment as permitted by applicable law, including the Immunities Act), *provided, however,* that such waiver shall not extend to and the Republic shall be immune in respect of and in relation to any suit, action or proceeding or enforcement of any Related Judgment against (i) assets that constitute freely available reserves pursuant to Sections 5 and 6 of Law No. 23,928, as amended, (ii) property in the public domain located in the territory of the Republic of Argentina that falls within the purview of Sections 2337 and 2340 of the Civil Code of the Republic, (iii) property located in or outside the territory of the Republic that provides an essential public service, (iv) property (whether in the form of cash, bank deposits, securities, third party obligations or any other methods of payment) of the Argentine government, its governmental agencies and other governmental entities relating to the performance of the budget, within the purview of Section 67

of Law No. 11,672 (t.o. 1999), as supplemented by Sections 94, 95 and 96 of Law No. 25,401, (v) property entitled to the privileges and immunities of the Vienna Convention on Diplomatic Relations of 1961, (vi) property not used for commercial activity that is entitled to the immunities of the Immunities Act, (vii) property used by a diplomatic, governmental or consular mission of the Republic or (viii) property of a military character or under the control of a military authority or defense agency of the Republic.

(b)      This waiver of sovereign immunity constitutes only a limited and specific waiver for the purpose of the Securities of this Series and the Indenture and under no circumstances shall it be interpreted as a general waiver of the Republic or a waiver with respect to proceedings unrelated to the Securities of this Series or the Indenture. Insofar as this waiver relates to the jurisdiction in which an Other Court is located, the Republic extends it solely for the purpose of enabling the Trustee or a Holder of Securities of this Series to enforce or execute a Related Judgment.

21.      Limitation on Actions.  The Republic reserves the right to plead sovereign immunity under the Immunities Act with respect to actions brought against it under the U.S. federal securities laws or any state securities laws and the appointment of an Authorized Agent does not extend to such actions, but without prejudice to the rights of the Trustee or the other specified persons to the indemnification and contribution as set forth in Section 5.6 of the Indenture.

22.      Effect of Headings.  The paragraph headings herein are for convenience only and shall not affect the construction hereof.

23.      Modifications.  (a) Any modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action provided by the Indenture or these Terms (each, a "Modification") to the Indenture or the terms and conditions of the Debt Securities of one or more Series (including these Securities) may be made, given, or taken pursuant to (i) a written action of the Holders of the Debt Securities of such affected Series without the need for a meeting, or (ii) by vote of the Holders of the Debt Securities of such affected Series taken at a meeting or meetings of Holders thereof, in each case in accordance with the terms of this Paragraph 23 and the other applicable provisions of the Debt Securities of the affected Series and the Indenture.

(b)      Modifications to the Terms of these Securities, or to the Indenture insofar as it affects these Securities, may be made, and future compliance therewith may be waived, with the consent of the Republic and

(i)      in the case of any Non-Reserved Matter (as defined below), (A) at any meeting of Holders of these Securities duly called and held as specified in Paragraph 24 below, upon the affirmative vote, in person or by proxy thereunto duly authorized in writing, of the Holders of not less than 66⅔% of the aggregate principal amount of these Securities then Outstanding that are represented at such meeting, or (B) with the written consent of the Holders of not less than 66⅔% of the aggregate principal amount of these Securities then Outstanding, or

(ii)    in the case of any Reserved Matter (as defined below), (A) at any meeting of Holders of these Securities duly called and held as specified in Paragraph 24 below, upon the affirmative vote, in person or by proxy thereunto duly authorized in writing, of the Holders of not less than 75% of the aggregate principal amount of these Securities then Outstanding, or (B) with the written consent of the Holders of not less than 75% of the aggregate principal amount of these Securities then Outstanding.

(c)    If the Republic proposes any Modification constituting a Reserved Matter to the Terms of these Securities and to the terms and conditions of at least one other Series of Debt Securities, or to the Indenture insofar as it affects these Securities and at least one other Series of Debt Securities, in either case as part of a single transaction, the Republic may elect to proceed pursuant to this Paragraph 23(c) instead of Paragraph 23(b), provided that the Republic may revoke any such election at any time and proceed pursuant to Paragraph 23(b) instead. The Republic may do this without recommending the procedure if the Trustee agrees that it would not be materially prejudicial to Holders not to recommend the procedure. In the event of such an election, any such Reserved Matter Modification may be made, and future compliance therewith may be waived, with the consent of the Republic and

(i)    (A) at any meetings of Holders of Debt Securities of the two or more Series that would be affected by the proposed Modification duly called and held as specified in Paragraph 24 below, upon the affirmative vote, in person or by proxy thereunto duly authorized in writing, of the Holders of not less than 85% of the aggregate principal amount of the Debt Securities then Outstanding of all such affected Series (taken in the aggregate), or (B) with the written consent of the Holders of not less than 85% of the aggregate principal amount of the Debt Securities then Outstanding of all such affected Series (taken in the aggregate), and

(ii)    (A) at any meeting of Holders of these Securities duly called and held as specified in Paragraph 24 below, upon the affirmative vote, in person or by proxy thereunto duly authorized in writing, of the Holders of not less than 66⅔% of the aggregate principal amount of these Securities then Outstanding, or (B) with the written consent of the Holders of not less than 66⅔% of the aggregate principal amount of these Securities then Outstanding.

If the Debt Securities of any Series that would be affected by any Modification proposed pursuant to this Paragraph 23(c) (including these Securities) are denominated in a currency or currency unit other than U.S. dollars, the principal amount of such Debt Securities for purposes of voting shall be the amount of U.S. dollars that could have been obtained with the principal amount of such Debt Securities on the date on which any proposed modification is submitted to Holders using the noon U.S. dollar buying rate in New York City for cable transfers of such currency or currency unit other than U.S. dollars for such date published by the Federal Reserve Bank of New York. If at the time a vote is solicited pursuant to this Paragraph 23(c) separate Trustees have been appointed for these Securities and any other Series of Debt Securities affected by that vote, the Trustee acting for the Series (or multiple Series, including for these Securities) having the greatest aggregate principal amount of the Debt Securities then Outstanding affected by that vote will be responsible for administering the voting procedures contemplated by this Paragraph 23(c).

(d)     The Republic and the Trustee may, without the vote or consent of any Holder of the Securities, amend these Securities or the Indenture for the purpose of (A) adding to the covenants of the Republic for the benefit of the Holders of the Securities, (B) surrendering any right or power conferred upon the Republic, (C) securing the Securities pursuant to the requirements of the Securities or otherwise, (D) curing any ambiguity, or curing, correcting or supplementing any proven (to the satisfaction of the Trustee) error thereof, (E) making any change which is of a formal, minor or technical nature, or (F) amending the Securities or the Indenture in any manner which the Republic and the Trustee may determine that shall not adversely affect the interests of any Holder of Securities.

(e)     Any instrument given by or on behalf of any Holder of a Security in connection with any consent to or vote for any Modification to the Terms of these Securities or the Indenture as of the effective time of such instrument will be irrevocable and will be conclusive and binding on all subsequent Holders of this Security or any Security issued directly or indirectly in exchange or substitution therefor or in lieu thereof.  Any such Modification to the Terms of these Securities or the Indenture will be conclusive and binding on all Holders of these Securities, whether or not they have given such consent or cast such vote, and whether or not notation of such Modification is made upon the Securities.  Notice of any Modification to the Terms of these Securities or the Indenture (other than for purposes of curing any ambiguity or of curing, correcting or supplementing any proven (to the satisfaction of the Trustee) error hereof or thereof) shall be given to each Holder of the Securities, as provided in Paragraph 13 above.

Securities authenticated and delivered after the effectiveness of any such Modification may bear a notation in the form approved by the Trustee and the Republic as to any matter provided for in such Modification.  New Securities modified to conform, in the opinion of the Trustee and the Republic, to any such Modification may be prepared by the Republic, authenticated by the Trustee (or any authenticating agent appointed pursuant to the Indenture) and delivered in exchange for Outstanding Securities.

It shall not be necessary for the vote or consent of the Holders of the Securities to approve the particular form of any proposed Modification, but it shall be sufficient if such vote or consent shall approve the substance thereof.

(f)     For the purposes of these Securities,

"Non-Reserved Matter" means any Modification other than a Modification constituting a Reserved Matter.

"Outstanding" means, in respect of the Securities, the Securities authenticated and delivered pursuant to these Terms and the Indenture *except*:

(i)     Securities theretofore canceled by the Trustee or delivered to the Trustee for cancellation or held by the Trustee for reissuance but not reissued by the Trustee; or

(ii)    Securities that have been called for redemption in accordance with their terms or which have become due and payable at maturity or otherwise and with respect to which the Republic's obligation to make payments of the principal thereof (and premium,

if any) and any interest thereon shall have been satisfied in accordance with the Terms of these Securities; or

      (iii)    Securities in lieu of or in substitution for which other Securities of a Series shall have been authenticated and delivered pursuant to these Terms and the Indenture;

*provided*, however, that in determining whether the Holders of the requisite principal amount of Securities Outstanding have consented to or voted in favor of any Modification or other action or instruction hereunder or, in the case of a meeting called and held pursuant to Paragraph 24, whether sufficient Holders are present for quorum purposes, any Securities owned or controlled, directly or indirectly, by the Republic or any Public Sector Instrumentality of the Republic shall be disregarded and deemed not to be Outstanding. As used in these Terms, "Public Sector Instrumentality" means Banco Central de la República Argentina, any department, ministry or agency of the government of the Republic or any corporation, trust, financial institution or other entity owned or controlled by the government of the Republic or any of the foregoing, and, with respect to any Public Sector Instrumentality, "control" means the power, directly or indirectly, through the ownership of voting securities or other ownership interest or otherwise, to direct the management of or elect or appoint a majority of the board of directors or other persons performing similar functions in lieu of, or in addition to, the board of directors of a corporation, trust, financial institution or other entity.

In determining whether the Trustee shall be protected in relying upon any such Modification or other action or instruction, only Securities that the Trustee knows to be so owned or controlled shall be so disregarded; *provided* that prior to the solicitation of any consent or the taking of any vote in respect of any Modification or other action or instruction hereunder affecting the Securities, the Republic shall deliver to the Trustee one or more Officer's Certificates specifying any Securities owned or controlled, directly or indirectly, by the Republic or any Public Sector Instrumentality of the Republic.

Securities so owned or controlled that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such Securities and that the pledgee is not the Republic or a Public Sector Instrumentality.

"Reserved Matter" means any Modification that would:

      (i)    change the due date for the payment of the principal of (or premium, if any) or any installment of interest on the Securities;

      (ii)    reduce the principal amount of the Securities, the portion of such principal amount which is payable upon acceleration of the maturity of the Securities, the interest rate thereon or the premium payable upon redemption thereof;

      (iii)    change the coin or currency in which payment with respect to interest, premium or principal in respect of the Securities is payable;

(iv)    shorten the period during which the Republic is not permitted to redeem the Securities, or permit the Republic to redeem the Securities if, prior to such action, the Republic is not permitted to do so;

(v)    reduce the proportion of the principal amount of the Securities the vote or consent of the Holders of which is necessary to modify, amend or supplement these Terms or the Indenture or to make, take or give any request, demand, authorization, direction, notice, consent, waiver or other action provided hereby or thereby to be made, taken or given, or change the definition of "Outstanding" with respect to the Securities;

(vi)    change the obligation of the Republic to pay Additional Amounts with respect to the Securities;

(vii)    change the governing law provision of the Securities;

(viii)    change the courts to the jurisdiction of which the Republic has submitted, the Republic's obligation to appoint and maintain an Authorized Agent in the City of London, or the Republic's waiver of immunity, in respect of actions or proceedings brought by any Holder based upon the Securities, as set forth in these Terms;

(ix)    in connection with an exchange offer for the Securities, amend any Event of Default;

(x)    change the status of the Securities as set forth in Paragraph 4 of these Terms;

(xi)    authorize the Trustee, on behalf of all Holders of the Securities, to exchange or substitute all the Securities for, or convert all the Securities into, other obligations or securities of the Republic or any other Person; or

(xii)    amend, supplement or waive the obligations of the Republic pursuant to, or the rights of the Holders resulting from, the covenant of the Republic set forth in Paragraph 8 hereof.

24.  Holders' Meetings. (a) The Republic may at any time ask for written consents from or call a meeting of Holders of the Securities at any time and from time to time to make, give or take any Modification (as defined in Paragraph 23(a) above) to these Terms as hereinafter provided. Any such meeting shall be held at such time and at such place as the Republic shall determine and as shall be specified in a notice of such a meeting that shall be furnished to the Holders of the Securities at least 30 days and not more than 60 days prior to the date fixed for the meeting. In addition, the Trustee may at any time and from time to time call a meeting of Holders of the Securities for any such purpose, to be held at such time and at such place as the Trustee shall determine and as shall be specified in a notice of such meeting that shall be furnished to the Holders of the Securities at least 30 days and no more than 60 days prior to the date fixed for the meeting. If, upon the occurrence of an Event of Default under Paragraph 5(a) the Holders of at least 10% in aggregate principal amount of the Securities at that time Outstanding shall have requested the Trustee to call a meeting of the Holders of the Securities for any such purpose, by written request setting forth in reasonable detail the action proposed to be taken at the meeting, the Trustee shall call such meeting, to be held at such time and at such place as the Trustee shall determine, for such purposes by giving notice thereof. Such notice

shall be given at least 30 days and not more than 60 days prior to the meeting.  Notice of every meeting of Holders of the Securities shall set forth in general terms the action proposed to be taken at such meeting.

To be entitled to vote at any meeting of Holders of the Securities, a person shall be a Holder of Outstanding Securities or a person duly appointed by an instrument in writing as Proxy for such a Holder.  At any meeting of Holders, other than a meeting to discuss a Reserved Matter (as defined in Paragraph 23(f)), the persons entitled to vote a majority in aggregate principal amount of the Outstanding Securities shall constitute a quorum, and at the reconvening of any such meeting adjourned for a lack of a quorum, the persons entitled to vote 25% in aggregate principal amount of the Outstanding Securities shall constitute a quorum for the taking of any action set forth in the notice of the original meeting.  At any meeting of Holders held to discuss a Reserved Matter, the persons entitled to vote 75% in aggregate principal amount of the Outstanding Securities shall constitute a quorum.  The Trustee may make such reasonable and customary regulations, as it shall deem advisable for any meeting of Holders of Securities with respect to the proof of the holding of the Securities and of the appointment of proxies in respect of Holders of registered Securities, the record date for determining the registered owners of registered Securities who are entitled to vote at such meeting (which date shall be set forth in the notice calling such meeting hereinabove referred to and which shall be not less than 15 nor more than 60 days prior to such meeting), the adjournment and chairmanship of such meeting, the appointment and duties of inspectors of votes, the submission and examination of proxies, certificates and other evidence of the right to vote, and such other matters concerning the conduct of the meeting as it shall deem appropriate.

SCHEDULE B

<u>NEW SECURITIES</u>

1. U.S. Dollar-Denominated Par Bonds due 2038 (governed by New York law)
2. U.S. Dollar-Denominated Par Bonds due 2038 (governed by Argentine law)
3. Euro-Denominated Par Bonds due 2038
4. Argentine Peso-Denominated Par Bonds due 2038
5. 8.28% U.S. Dollar-Denominated Discount Bonds due 2033 (governed by New York Law)
6. 8.28% U.S. Dollar-Denominated Discount Bonds due 2033 (governed by Argentine Law)
7. 7.82% Euro-Denominated Discount Bonds due 2033
8. 5.83% Argentine Peso-Denominated Discount Bonds due 2033
9. U.S. Dollar-Denominated GDP-Linked Securities (governed by New York law)
10. U.S. Dollar-Denominated GDP-Linked Securities (governed by Argentine law)
11. Euro-Denominated GDP-Linked Securities
12. Argentine Peso-Denominated GDP-Linked Securities
13. Argentine Peso-Denominated Quasi-Par Bonds due 2045

# SCHEDULE C

## NON-PERFORMING SECURITIES

| Non-Performing Securities | CUSIP | | Common Code | | ISIN | |
|---|---|---|---|---|---|---|
| | 144A | REGS | 144A | REGS | 144A | REGS |
| Lecras Externas, Argentine peso 11.75% due 2007 | 040114AS9 | P04S0KAB9 | 008239606 | 007358270 | US040114AS98 | USP04S0KAB90 |
| Lecras Externas, Argentine peso 8.75% due 2002? | 040114AT7 | P8055KAP0 | | 0078l5590 | US040114AT71 | USP8055KAP05 |
| Lecras Externas, Austrian schillings 7% due 2004 | | | 007572719 | | AT0001912331 | |
| Lecras Externas, euro 8.75% due 2003 | | | 008407142 | | XS0084071421 | |
| Lecras Externas, euro 10% due 2005 | | | 010569478 | | XS0105694789 | |
| Lecras Externas, euro EURIBOR + 5.10% due 2004 | | | 010522447 | | XS0105224470 | |
| Lecras Externas, euro 8.125% due 2004 | | | 010920329 | | XS0109203198 | |
| Lecras Externas, euro 9% due 2005 | 040114FZ8 | P8055KFQ3 | 012438079 | | US040114FZ86 | USP8055KFQ33 |
| Lecras Externas, euro 9.25% due 2004 | | | 011383151 | 011130704 | XS0113833510 | |
| Lecras Externas, euro 10% due 2007 | | | 012452870 | | XS0124528703 | |
| Lecras Externas, euro Fixed-rate due 2028 | 040114MAR1 | 040114NAR9 | | 008730261 | US040114MAR16 | US040114NAR98 |
| Strip Coupon, euro Fixed-rate due 2006 | 040114MAL4 | 040114NAL2 | | 008730202 | US040114MAL46 | US040114NAL29 |
| Strip Coupon, euro Fixed-rate due 2011 | 040114MAM2 | 040114NAM0 | | 008730229 | US040114MAM29 | US040114NAM02 |
| Strip Coupon, euro Fixed-rate due 2016 | 040114MAN0 | 040114NAN8 | | 008730237 | US040114MAN02 | US040114NAN84 |
| Strip Coupon, euro Fixed-rate due 2021 | 040114MAF5 | 040114NAF3 | | 008730245 | US040114MAF59 | US040114NAF33 |
| Strip Coupon, euro Fixed-rate due 2026 | 040114MAQ3 | 040114NAQ1 | 010794862 | 008730253 | US040114MAQ33 | US040114NAQ16 |
| Lecras Externas, euro 8.50% due 2010? | | | 008927782 | | XS0089277825 | |
| Lecras Externas, euro 10.50% 2000 and 7% 2001-2000 due 2004 | | P8055KLDQ5 | 009096075 | | XS0090960751 | |
| Lecras Externas, euro 7.125% due 2002? | | | 009831487 | | XS0098314874 | |
| Lecras Externas, British pounds sterling 10% due 2007 | | P8055KAJ4 | 007724373 | | XS0077243730 | |
| Lecras Externas, Italian lira 11% due 2003 | | | 007053142 | | XS0070531420 | |
| Lecras Externas, Italian lira 10% due 2007 | | | 007189834 | | XS0071898349 | |
| Lecras Externas, Italian lira LIBOR + 1.6% due 2004? | | | 007639724 | | XS0076397248 | |
| Lecras Externas, Italian lira 10% 1997-1999 and 7.625% 1999-2007 due 2007 | | | 007850239 | | XS0078502399 | |
| Lecras Externas, Italian lira 9.25% 1997-1999 and 7% 1999-2004 due 2004 | | | 008080925 | | XS0080809253 | |
| Lecras Externas, Italian lira 9% 1997-1999 and 7% 1999-2004 due 2004 | | | 008105758 | | XS0081057589 | |
| Lecras Externas, Italian lira 10.375% 1998-2000 and 8% 2001-2009 due 2009 | | P8055KBM6 | 008483348 | | XS0084832483 | |
| Lecras Externas, Italian lira LIBOR + 2.5% due 2005 | | | 008859086 | | XS0088590863 | |
| Lecras Externas, Japanese yen 7.4% due 2005 (EMTN Series 38) | | | 006549098 | | XS0065490988 | |
| Lecras Externas, Japanese yen 7.4% due 2006 (EMTN Series 40) | | | 006612555 | | XS0066125559 | |
| Lecras Externas, Japanese yen 7.4% due 2006 (EMTN Series 36) | | | 006491081 | | XS0064910812 | |
| Lecras Externas, Japanese yen 6% due 2005 | | | 007080816 | | XS0070808166 | |
| Lecras Externas, Japanese yen 4.4% due 2004 | | | 007624930 | | XS0076249308 | |

| Non-Performing Securities | CUSIP | | Common Code | | ISIN | |
|---|---|---|---|---|---|---|
| | 144A | REGS | 144A | REGS | 144A | REGS |
| *Lerma Externas, Japanese yen 3.5% due 2009* | | | 010035406 | | | XS0100354066 |
| *Lerma Externas, U.S. dollar LIBOR+5.75% due 2004* | 04011MAS59 | 04011MAS57 | | 009590684 | US04011MAS98 | US04011MAS71 |
| *Lerma Externas, U.S. dollar BADLAR +2.98% due 2004 (Series 75)* | | | | | | |
| Strip Interest % | | | 14224041 | | | XS0142240414 |
| Strip Interest 02/02 | | | 14231129 | | | XS0142311298 |
| Strip Interest 03/02 | | | 14231137 | | | XS0142311371 |
| Strip Interest 04/02 | | | 14231170 | | | XS0142311702 |
| Strip Interest 05/02 | | | 14231196 | | | XS0142311967 |
| Strip Interest 06/02 | | | 14231218 | | | XS0142312189 |
| Strip Interest 07/02 | | | 14231234 | | | XS0142312346 |
| Strip Interest 08/02 | | | 14231269 | | | XS0142312692 |
| Strip Interest 09/02 | | | 14231277 | | | XS0142312775 |
| Strip Interest 10/02 | | | 14231293 | | | XS0142312932 |
| Strip Interest 11/02 | | | 14231307 | | | XS0142313070 |
| Strip Interest 12/02 | | | 14231323 | | | XS0142313237 |
| Strip Interest 01/03 | | | 14231374 | | | XS0142313740 |
| Strip Interest 02/03 | | | 14231463 | | | XS0142314631 |
| Strip Interest 03/03 | | | 14231536 | | | XS0142315364 |
| Strip Interest 04/03 | | | 14231587 | | | XS0142315877 |
| Strip Interest 05/03 | | | 14231625 | | | XS0142316255 |
| Strip Interest 06/03 | | | 14231641 | | | XS0142316412 |
| Strip Interest 07/03 | | | 14231676 | | | XS0142316768 |
| Strip Interest 08/03 | | | 14231684 | | | XS0142316842 |
| Strip Interest 09/03 | | | 14231714 | | | XS0142317147 |
| Strip Interest 10/03 | | | 14231757 | | | XS0142317576 |
| Strip Interest 11/03 | | | 14231773 | | | XS0142317733 |
| Strip Interest 12/03 | | | 14231781 | | | XS0142317816 |
| Strip Interest ½ | | | 14231811 | | | XS0142318111 |
| Strip Interest 02/04 | | | 14231854 | | | XS0142318541 |
| Strip Interest % | | | 14231919 | | | XS0142319192 |
| Strip Interest 04/04 | | | 14231935 | | | XS0142319358 |
| Strip Interest 05/04 | | | 14232010 | | | XS0142320109 |
| Strip Principal 05/11/03 | | | 14242414 | | | XS0142424141 |
| Strip Principal 08/11/03 | | | 14242619 | | | XS0142426195 |
| Strip Principal 11/11/03 | | | 14242678 | | | XS0142426781 |
| Strip Principal 02/11/04 | | | 14242759 | | | XS0142427599 |
| Strip Principal 05/11/04 | | | 14242813 | | | XS0142428134 |
| *Lerma Externas, U.S. dollar BADLAR +2.98% due 2004 (Series 75) (Tranche 7)* | | | | | | |
| Strip Interest 01/02 T.7 | | | 14224297 | | | XS0142424972 |
| Strip Interest % | | | 14246541 | | | XS0142465417 |
| Strip Interest 03/02 T.7 | | | 14246576 | | | XS0142465763 |

| Non-Performing Securities | CUSIP | | Common Code | | ISIN | |
|---|---|---|---|---|---|---|
| | 144A | REGS | 144A | REGS | 144A | REGS |
| Strip Interest 04/02 T.7 | | | 14246592 | | XS0142465920 | |
| Strip Interest 05/02 T.7 | | | 14246614 | | XS0142466142 | |
| Strip Interest 06/02 T.7 | | | 14246665 | | XS0142466654 | |
| Strip Interest 07/02 T.7 | | | 15078979 | | XS0150789799 | |
| Strip Interest 08/02 T.7 | | | 15085312 | | XS0150853124 | |
| Strip Interest 09/02 T.7 | | | 15085339 | | XS0150853397 | |
| Strip Interest 10/02 T.7 | | | 15085347 | | XS0150853470 | |
| Strip Interest 11/02 T.7 | | | 15085355 | | XS0150853553 | |
| Strip Interest 12/02 T.7 | | | 15085363 | | XS0150853637 | |
| Strip Interest 01/03 T.7 | | | 15740523 | | XS0157405233 | |
| Strip Interest 02/03 T.7 | | | 15740647 | | XS0157406470 | |
| Strip Interest 03/03 T.7 | | | 15740809 | | XS0157408096 | |
| Strip Interest 04/03 T.7 | | | 15740876 | | XS0157408765 | |
| Strip Interest 05/03 T.7 | | | 15740906 | | XS0157409060 | |
| Strip Interest 06/03 T.7 | | | 15740914 | | XS0157409144 | |
| Strip Interest 07/03 T.7 | | | 17014943 | | XS0170149438 | |
| Strip Interest 08/03 T.7 | | | 17015016 | | XS0170150360 | |
| Strip Interest 09/03 T.7 | | | 17015087 | | XS0170150873 | |
| Strip Interest 10/03 T.7 | | | 17015125 | | XS0170151251 | |
| Strip Interest 11/03 T.7 | | | 17015290 | | XS0170152903 | |
| Strip Interest 12/03 T.7 | | | 17015427 | | XS0170154271 | |
| Strip Interest 01/04 T.7 | | | 17069072 | | XS0170690721 | |
| Strip Interest 02/04 T.7 | | | 17869153 | | XS0178691539 | |
| Strip Interest 03/04 T.7 | | | 17969242 | | XS0179692420 | |
| Strip Interest 04/04 T.7 | | | 17969447 | | XS0179694475 | |
| Strip Interest 05/04 T.7 | | | 18880571 | | XS0188805716 | |
| Strip Principal 05/11/03 T.7 | | | 16933139 | | XS0169331393 | |
| Strip Principal 08/11/03 T.7 | | | 16933239 | | XS0169352399 | |
| Strip Principal 11/11/03 T.7 | | | 16935379 | | XS0169353793 | |
| Strip Principal 02/11/04 T.7 | | | 16935468 | | XS0169354684 | |
| Strip Principal 05/11/04 T.7 | | | 16935565 | | XS0169355657 | |
| *Lerma Externa, U.S. dollar ENCUESTA + 4.95% due 2004 (Series 74)* | | | | | | |
| Strip Interest 01/02 | | | 14223908 | | XS0142239085 | |
| Strip Interest 02/02 | | | 14227687 | | XS0142276871 | |
| Strip Interest 03/02 | | | 14227768 | | XS0142277689 | |
| Strip Interest 04/02 | | | 14227946 | | XS0142279461 | |
| Strip Interest 05/02 | | | 14228128 | | XS0142281285 | |
| Strip Interest 06/02 | | | 14228179 | | XS0142281798 | |
| Strip Interest 07/02 | | | 14228225 | | XS0142282159 | |
| Strip Interest 08/02 | | | 14228268 | | XS0142282689 | |
| Strip Interest 09/02 | | | 14228276 | | XS0142282762 | |
| Strip Interest 10/02 | | | 14228349 | | XS0142283497 | |

| Non-Performing Securities | CUSIP | | Common Code | | ISIN | |
|---|---|---|---|---|---|---|
| | 144A | REGS | 144A | REGS | 144A | REGS |
| Strip Interest 11/02 | | | 14228381 | | XS0142283810 | |
| Strip Interest 12/02 | | | 14228390 | | XS0142283901 | |
| Strip Interest 01/03 | | | 14228420 | | XS0142284206 | |
| Strip Interest 02/03 | | | 14228519 | | XS0142285195 | |
| Strip Interest 03/03 | | | 14228756 | | XS0142287563 | |
| Strip Interest 04/03 | | | 14228772 | | XS0142287720 | |
| Strip Interest 05/03 | | | 14228829 | | XS0142288298 | |
| Strip Interest 06/03 | | | 14228861 | | XS0142288611 | |
| Strip Interest 07/03 | | | 14228918 | | XS0142289189 | |
| Strip Interest 08/03 | | | 14229027 | | XS0142290278 | |
| Strip Interest 09/03 | | | 14229078 | | XS0142290781 | |
| Strip Interest 10/03 | | | 14229159 | | XS0142291599 | |
| Strip Interest 11/03 | | | 14229230 | | XS0142292308 | |
| Strip Interest 12/03 | | | 14229272 | | XS0142292720 | |
| Strip Interest ½ | | | 14229299 | | XS0142292993 | |
| Strip Interest 02/04 | | | 14229418 | | XS0142294189 | |
| Strip Interest ¼ | | | 14229485 | | XS0142294858 | |
| Strip Interest 04/04 | | | 14229515 | | XS0142295152 | |
| Strip Interest 05/04 | | | 14229566 | | XS0142295665 | |
| Strip Principal 05/11/05 | | | 14245405 | | XS0142454056 | |
| Strip Principal 08/11/03 | | | 14245472 | | XS0142454726 | |
| Strip Principal 11/11/03 | | | 14245847 | | XS0142458479 | |
| Strip Principal 02/11/04 | | | 14245936 | | XS0142459360 | |
| Strip Principal 05/11/04 | | | 14245987 | | XS0142459873 | |
| *Lanxa Exterman, U.S. dollar ENCUESTA + 4.95% due 2004 (Series 74) (Tranch 7)* | | | | | | |
| Strip Interest 01/02 T.7 | | | 14224203 | | XS0142242030 | |
| Strip Interest 02/02 T.7 | | | 14246177 | | XS0142461770 | |
| Strip Interest 03/02 T.7 | | | 14246231 | | XS0142462315 | |
| Strip Interest 04/02 T.7 | | | 14246274 | | XS0142462745 | |
| Strip Interest 05/02 T.7 | | | 14246347 | | XS0142463479 | |
| Strip Interest 06/02 T.7 | | | 14246444 | | XS0142464444 | |
| Strip Interest 07/02 T.7 | | | 15042583 | | XS0150425832 | |
| Strip Interest 08/02 T.7 | | | 15047470 | | XS0150474707 | |
| Strip Interest 09/02 T.7 | | | 15047631 | | XS0150476314 | |
| Strip Interest 10/02 T.7 | | | 15047828 | | XS0150478286 | |
| Strip Interest 11/02 T.7 | | | 15047992 | | XS0150479920 | |
| Strip Interest 12/02 T.7 | | | 15048115 | | XS0150481157 | |
| Strip Interest 01/03 T.7 | | | 15739762 | | XS0157397620 | |
| Strip Interest 02/03 T.7 | | | 15739886 | | XS0157398867 | |
| Strip Interest 03/03 T.7 | | | 15739924 | | XS0157399246 | |
| Strip Interest 04/03 T.7 | | | 15739932 | | XS0157399329 | |
| Strip Interest 05/03 T.7 | | | 15739959 | | XS0157399592 | |

| Non-Performing Securities | CUSIP 144A | CUSIP REGS | Common Code 144A | Common Code REGS | ISIN 144A | ISIN REGS |
|---|---|---|---|---|---|---|
| Strip Interest 06/03 T.7 | | | 15739983 | | XS0157399832 | |
| Strip Interest 07/03 T.7 | | | 17014781 | | XS0170147812 | |
| Strip Interest 08/03 T.7 | | | 17014811 | | XS0170148117 | |
| Strip Interest 09/03 T.7 | | | 17014838 | | XS0170148380 | |
| Strip Interest 10/03 T.7 | | | 17014846 | | XS0170148463 | |
| Strip Interest 11/03 T.7 | | | 17014854 | | XS0170148547 | |
| Strip Interest 12/03 T.7 | | | 17014889 | | XS0170148893 | |
| Strip Interest 01/04 T.7 | | | 17966546 | | XS0179665466 | |
| Strip Interest 03/04 T.7 | | | 17968416 | | XS0179684161 | |
| Strip Interest 03/04 T.7 | | | 17968688 | | XS0179686885 | |
| Strip Interest 04/04 T.7 | | | 17968734 | | XS0179687347 | |
| Strip Interest 05/04 T.7 | | | 18879921 | | XS0188799216 | |
| Strip Principal 05/11/03 T.7 | | | 16930601 | | XS0169306015 | |
| Strip Principal 08/11/03 T.7 | | | 16932388 | | XS0169323887 | |
| Strip Principal 11/11/03 T.7 | | | 16932523 | | XS0169325239 | |
| Strip Principal 02/11/04 T.7 | | | 16932639 | | XS0169326393 | |
| Strip Principal 05/11/04 T.7 | | | 16932698 | | XS0169326989 | |
| Bonds, German deutsche mark 7% due 2004 | P8055KAF2 | | 0074232279 | | DE0001904308 | |
| Bonds, German deutsche mark 8% due 2009 | P8055KAW5 | | 008115036 | | DE0001954907 | |
| Bonds, German deutsche mark 7.875% due 2005 | | | 008902712 | | DE0002248509 | |
| Bonds, German deutsche mark 14% 1999 - 2000 and 9% 2001 - 2008 due 2008 | P8055KCQ6 | | 009213457 | | DE0001767101 | |

| Description | | | | | | | |
|---|---|---|---|---|---|---|---|
| Bonds, German deutsche mark medium-term 2002 10.5% | | | 006115667 | | | | DE0001300200 |
| Bonds, German deutsche mark medium-term 2003 10.25% | P1024ECK6 | | 006295690 | | | | DE0001303669 |
| Bonds, German deutsche mark 2006 11.25% | P1024ECX8 | | 006505724 | | | | DE0001319507 |
| Bonds, German deutsche mark 11.75% due 2011 | P1024EDG4 | | 006615490 | | | | DE0001125017 |
| Bonds, German deutsche mark 9% due 2003 | P1024EDP4 | | 006937985 | | | | DE0001340909 |
| Bonds, German deutsche mark 12% due 2016 | P1024EDU3 | | 006937993 | | | | DE0001340917 |
| Bonds, German deutsche mark 11.75% due 2026 | P1024EDV1 | | 007080239 | | | | DE0001348100 |
| Bonds, German deutsche mark 8.5% due 2005 | P1024EEB4 | | 007208324 | | | | DE0001354751 |
| Bonds, euro 11% 1999-2001 and 8% 2002-2008 due 2008 | | | 008421285 | | | | DE0001974608 |
| Bonds, euro 8% 1999-2002, 8.25% 2002-2006 and 9% 2007-2010 due 2010 | P8055KCBK0 | | 008819530 | | | | DE0002483203 |
| Bonds, euro 9% due 2003 | | | 011250858 | | | | DE0002466208 |
| Bonds, euro 10% due 2007 | P8055KGF6 | | 011674445 | | | | DE0005450258 |
| Bonds, euro 9% due 2006 | P8055KDM4 | | 009662979 | | | | DE0002908552 |
| Bonds, euro 10% due 2004 | P8055KET8 | | 010461661 | | | | DE0004500558 |
| Bonds, euro 9.75% due 2003 | P8055KEQ4 | | 010419328 | | | | DE0003538914 |
| Bonds, euro 10.25% due 2007 | P8055KEZ4 | | 010632471 | | | | DE0004509005 |
| Bonds, euro 15% 2000-2001 and 8% 2002-2008 due 2008 | | | 009474447 | | | | DE0002923851 |
| Bonds, euro 9.5% due 2004 | P8055KCZ6 | | 009491929 | | | | DE0002929452 |
| Bonds, euro 9% due 2009 | P8055KFB8 | | 009746064 | | | | DE0003045357 |
| Bonds, euro 8.5% due 2004 | P8055KDT9 | | 009871608 | | | | DE0003089850 |
| Bonds, euro 9.25% due 2002 | P8055KDY8 | | 010254680 | | | | DE0003527966 |
| Bonds, Swiss franc 7% due 2003 | P8055KEH4 | | 007109873 | | | | CH0005458101 |
| Bonds, euro 8% due 2002 | | | 009519882 | | | | IT0006527292 |
| Bonds, euro EURIBOR + 4% due 2003 | | | 010016819 | | | | IT0006529769 |
| Samurai Bonds, Japanese yen 5% due 2002 | | | 007225113 007225156 | | | | JP503200ASC0 |
| Samurai Bonds, (Series 5) 5.40% due 2003 | | | 010551528 010551544 | | | | JP503200AWC2 |
| Samurai Bonds, Japanese yen (Series 6) 5.125% due 2004 | | | 011249965 011249884 | | | | JP503200A061 |
| Samurai Bonds, Japanese yen (Series 7) 4.85% 2000-2005 | | | 011732127 011732003 | | | | JP503200A095 |
| Discount Bonds, German deutsche mark DEM 1+0.8125% due 2023 | | | 004327080 | | | | DE004103015 |

| Non-Performing Securities | CUSIP | | Common Code | | ISIN | |
|---|---|---|---|---|---|---|
| | 144A | REGS | 144A | REGS | 144A | REGS |
| Par Bonds, German deutsche mark DEM 5.87% due 2023 | | | 004327098 | | DE0004103007 | |
| Global Bonds, Argentine peso 10% 2001-2004 and 12% 2004-2008 due 2008 | P8055K3X2 | | 010027846 | | XS0130278467 | |
| Global Bonds, euro 8.125% due 2008 | 040114GF1 | | 008631347 | | XS0086333472 | |
| Global Bonds, 7% 2001-2004 and 15.5% 2004-2008 due 2008 | 040114GG9 | | 010278917 | | US040114GF14 | |
| Global Bonds, U.S. dollar 12.25% due 2018 | 040114GH7 | | 010279135 | | US040114GG06 | |
| Global Bonds, U.S. dollar 12% due 2031 (capitalized) | | | 013027994 | | US040114GH79 | |
| Discount Bonds, U.S. dollar L+0.8125% due 2023 (BR) and (RG) | P04981BQ1 | | 004311817 | | XS0043118172 XS0043118339 | |
| Par Bonds, U.S. dollar 6% due 2023 (BR) and (RG) | P04981BN8 | | 004311914 | | XS0043119147 XS0043119576 | |
| Bonds, U.S. dollar floating rate L + 0.8125% (BR) and (RG) | P04981CE7 | | 004312023 004785428 | | XS0012020236 XS0043120582 XS0043120822 | |
| Global Bonds, U.S. dollar 8.375% due 2003 | 040114AH3 | | 001522990 | | US040114AH34 | |
| Alternative Participation Instruments, U.S. dollar 4% due 2013 | | | 007022140 | | XS0015229908 | |
| Global Bonds, U.S. dollar 11% due 2006 | 040114AN0 | | 007321473 | | US040114AN02 | |
| Global Bonds, U.S. dollar 11.375% due 2017 | 040114AR1 | | 008010129 | | US040114AR16 | |
| Global Bonds, U.S. dollar 9.75% due 2027 | 040114AV2 | | 008307385 | | US040114AV28 | |
| Adjustable Margin Bonds, U.S. dollar due November 2002 (Span 02) | 040114AW0 | | 008607184 | | US040114AW01 | |
| Bonds, U.S. dollar variable rate due 2005 (FRAN) | 040114AX8 | | 009529985 | | US040114AX83 | |
| Global Bonds, U.S. dollar amortizing 8.875% due 2029 | 040114BD1 | | 009272780 | | US040114BD11 | |
| Global Bonds, U.S. dollar 11% due 2005 | 040114AZ3 | | 009515755 | | US040114AZ32 | |
| Global Bonds, U.S. dollar 12.125% due 2019 | 040114BG3 | | 009639713 | | US040114BG38 | |
| Global Bonds, U.S. dollar 11.75% due 2009 | 040114BE9 | | 010302960 | | US040114BE93 | |
| Global Bonds, U.S. dollar zero-coupon due October 2003 (Series E) | 040114BK5 | | 010302978 | | US040114BK53 | |
| Global Bonds, U.S. dollar zero-coupon due October 2004 (Series F) | 040114BL3 | | 011453040 | | US040114BL37 | |
| Global Bonds, U.S. dollar 10.25% due 2030 | 040114GB0 | | 012370750 | | US040114GB00 | |
| Global Bonds, U.S. dollar 12% due 2031 | P8055KGV1 | | 012423040 | | USP8055KGV19 | |
| Global Bonds, U.S. dollar 12.375% due 2012 | 040114GD6 | | 010730554 | | US040114GD65 | |
| Global Bonds, U.S. dollar 12% due 2020 | 040114FB1 | | 010906899 | | US040114FB19 | |
| Global Bonds, U.S. dollar 11.375% due 2010 | 040114FC9 | | 011259197 | | US040114FC91 | |
| Global Bonds, U.S. dollar 11.75% due 2015 | 040114GA2 | | 007611960 | | US040114GA27 | |
| Bonds, Spanish peseta 7.5% due 2002 | P04981EP0 | | | | ES0273541013 | |

| Non-Performing Securities | CUSIP | | Common Code | | ISIN | |
|---|---|---|---|---|---|---|
| | 144A | REGS | 144A | REGS | 144A | REGS |
| Bonds, euro 14% 2000-2001 and 8% 2002-2008 due 2008F | | | | | DE0002966900 | |
| Bonds, euro 10% 1999-2001 and 8% 2002-2008 due 2008 (fungible) | | | 009611215 | | XS0103457585 | |
| Bonds, 1992 (Bontes 92) | | | 010345758 | | ARARGE030122 | |
| Bonds, 1992 (Bontes 92) March 2002 interest coupon | | | | | ARARGE044404 | |
| Bontes, 9.9375% due 2027 | | | | | ARARGE032156 | |
| Bontes, 11.25% due 2004 | | | | | ARARGE032409 | |
| Bontes, 11.75% due 2006 | | | | | ARARGE033076 | |
| Bontes, 11.75% due 2003 | | | | | ARARGE032573 | |
| Bontes, 12.125% due 2005 | | | | | ARARGE032581 | |
| Bontes, 8.75% due 2002 | | | | | ARARGE031633 | |
| Bontes, variable rate ENCUESTA+ 3.2% due 2003 | | | | | ARARGE032086 | |
| Bono del Gobierno Nacional, 9% due 2002 (RML) | | | | | ARARGE033233 | |
| Pagaré o Bono del Gobierno Nacional, variable rate ENCUESTA + 5.8% due 2006 | | | | | ARARGE033340 | |
| Bono Pagaré, Series A ENCUESTA + 5.8% due 2002 | | | | | ARARGE033449 | |
| Bono Pagaré, Series B BADLAR + 3% due 2002 | | | | | ARARGE033456 | |
| Bono Pagaré, Series C BADLAR + 0.75% due 2002 | | | | | ARARGE033464 | |
| Bono Pagaré, Series III ENCUESTA + 4% due 2002 | | | | | ARARGE032714 | |
| Bono Pagaré, Series IV ENCUESTA + 3.3% due 2002 | | | | | ARARGE032862 | |
| Bono Pagaré, Series V ENCUESTA + 5.8% due 2002 | | | | | ARARGE032953 | |
| Bono Pagaré, Series VI ENCUESTA + 4.35% due 2004 | | | | | ARARGE033084 | |
| Pagaré, fixed rate Series I 14.75% due 2002 (HEXAGON II) | | | | | ARARGE03D206 | |
| Pagaré, fixed rate Series II 14.75% due 2002 (HEXAGON III) | | | | | ARARGE03D214 | |
| Pagaré, U.S. dollar floating rate BADLAR + 4.5% due 2006 (RADAR III) | | | | | ARARGE033415 | |
| Pagaré, U.S. dollar floating rate BADLAR + 4.5% due 2006 (RADAR IV) | | | | | ARARGE033431 | |
| Pagaré, U.S. dollar floating rate BADLAR + 4% due 2005 (HEXAGON IV) | | | | | ARARGE033522 | |
| Pagaré, U.S. dollar floating rate Series I BADLAR + 4.5% due 2007 (CELTIC 1) | | | | | ARARGE033472 | |
| Pagaré, U.S. dollar floating rate Series I BADLAR + 4.05% due 2003 (RADAR I) | | | | | ARARGE033266 | |

COPY

| Non-Performing Securities | CUSIP 144A | CUSIP REGS | Common Code 144A | Common Code REGS | ISIN 144A | ISIN REGS |
|---|---|---|---|---|---|---|
| Pagaré, U.S. dollar floating rate Series II BADLAR + 4.05% due 2003 (BADAR II) | | | | | ARARGE033274 | |
| Pagaré, U.S. dollar floating rate Series II BADLAR + 4.5% due 2007 (CELTIC II) | | | | | ARARGE033480 | |
| Debt Consolidation Bonds, U.S. dollar 3rd Series (Pre 6) | | | | | ARARGE033183 | |
| Debt Consolidation Bonds, U.S. dollar 2nd Series (Pre 4) | | | 004590619 | | ARP04981DG19 | |
| Debt Consolidation Bonds, U.S. dollar 2nd Series (Pre 4) Amortizing Payment Coupon January 2002 | | | | | ARARGE043901 | |
| Debt Consolidation Bonds, U.S. dollar 2nd Series (Pre 4) Amortizing Payment Coupon February 2002 | | | | | ARARGE044032 | |
| Debt Consolidation Bonds, U.S. dollar 2nd Series (Pre 4) Amortizing Payment Coupon March 2002 | | | | | ARARGE044198 | |
| Debt Consolidation Bonds, U.S. dollar 1st Series (Pro 2) | | | 004309979 | | ARP04981BA66 | |
| Debt Consolidation Bonds, U.S. dollar 1st Series (Pro 2) Amortizing Payment Coupon January 2002 | | | | | ARARGE043927 | |
| Debt Consolidation Bonds, U.S. dollar 1st Series (Pro 2) Amortizing Payment Coupon February 2002 | | | | | ARARGE044008 | |
| Debt Consolidation Bonds, U.S. dollar 1st Series (Pro 2) Amortizing Payment Coupon March 2002 | | | | | ARARGE044164 | |
| Debt Consolidation Bonds, U.S. dollar 2nd Series (Pro 4) | | | 009172521 | | ARARGE031773 | |
| Debt Consolidation Bonds, U.S. dollar 2nd Series (Pro 4) Amortizing Payment Coupon December 2001 | | | | | ARARGE043877 | |
| Debt Consolidation Bonds, U.S. dollar 2nd Series (Pro 4) Amortizing Payment Coupon January 2002 | | | | | ARARGE044073 | |
| Debt Consolidation Bonds, U.S. dollar 2nd Series (Pro 4) Amortizing Payment Coupon February 2002 | | | | | ARARGE044230 | |
| Debt Consolidation Bonds, U.S. dollar 3rd Series (Pro 6) | | | 009650036 | | ARARGE032177 | |
| Debt Consolidation Bonds, U.S. dollar 3rd Series (Pro 6) Amortizing Payment Coupon January 2002 | | | | | ARARGE043851 | |
| Debt Consolidation Bonds, U.S. dollar 4th Series (Pro 8) | | | | | ARARGE033191 | |
| Debt Consolidation Bonds, U.S. dollar 5th Series (Pro 10) | | | | | ARARGE033217 | |
| Debt Consolidation Bonds, U.S. dollar 5th Series (Pro 10) Interest Coupon | | | | | ARARGE043836 | |

| Non-Performing Securities | CUSIP 144A | CUSIP REGS | Common Code 144A | Common Code REGS | ISIN 144A | ISIN REGS |
|---|---|---|---|---|---|---|
| Treasury Bonds, capitalized interest 11.49128% 2000-2020 | | | | | ARARGE03D222 | |
| Capitalized Certificate, U.S. dollar 10.5% 1998-2018 | | | | | ARARGE03D210 | |
| Hydrocarbon Royalties Restructuring Bonds | | | 007821859 | | ARARGE030114 | |
| Hydrocarbon Royalties Restructuring Bonds, Amortizing Payment Coupons January 2002 | | | | | ARARGE044081 | |
| Hydrocarbon Royalties Restructuring Bonds, Amortizing Payment Coupons February 2002 | | | | | ARARGE043992 | |
| Hydrocarbon Royalties Restructuring Bonds, Amortizing Payment Coupons March 2002 | | | | | ARARGE044156 | |
| Ferrobonos | | | | | ARARGE030056 | |
| Letra del Tesoro 90 due March 2002 | | | | | ARARGE033134 | |
| Letra del Tesoro 105 due February 2002 | | | | | ARARGE033738 | |
| Letra del Tesoro 106 due March 2002 | | | | | ARARGE033746 | |
| Letra del Tesoro 108 due February 2002 | | | | | ARARGE03795 | |
| Letra del Tesoro 109 due March 2002 | | | | | ARARGE033803 | |
| Debt Consolidation Bonds, Argentine peso 2nd Series (Pre 3) | | | 004590520 | | ARP04981DH91 | |
| Debt Consolidation Bonds, Argentine peso 2nd Series (Pre 3) Amortizing Payment Coupon due January 2002 | | | | | ARARGE043893 | |
| Debt Consolidation Bonds, Argentine peso 2nd Series (Pre 3) Amortizing Payment Coupon due February 2002 | | | | | ARARGE044057 | |
| Debt Consolidation Bonds, Argentine peso 2nd Series (Pre 3) Amortizing Payment Coupon due March 2002 | | | | | ARARGE044214 | |
| Debt Consolidation Bonds, Argentine peso 1st Series (Pro 1) | | | 004316347 | | ARP04981DV04 | |
| Debt Consolidation Bonds, Argentine peso 1st Series (Pro 1) Amortizing Payment Coupon due January 2002 | | | | | ARARGE043919 | |
| Debt Consolidation Bonds, Argentine peso 1st Series (Pro 1) Amortizing Payment Coupon due February 2002 | | | | | ARARGE044016 | |
| Debt Consolidation Bonds, Argentine peso 1st Series (Pro 1) Amortizing Payment Coupon due March 2002 | | | | | ARARGE044172 | |
| Debt Consolidation Bonds, Argentine peso 2nd Series (Pro 3) | | | 013035997 | | ARARGE031781 | |
| Debt Consolidation Bonds, Argentine peso 2nd Series (Pro 3) Amortizing Payment Coupon due December 2001 | | | | | ARARGE043885 | |
| Debt Consolidation Bonds, Argentine peso 2nd Series (Pro 3) Amortizing Payment Coupon due January 2002 | | | | | ARARGE044065 | |

| Non-Performing Securities | CUSIP | | Common Code | | ISIN | |
|---|---|---|---|---|---|---|
| | 144A | REGS | 144A | REGS | 144A | REGS |
| Debt Consolidation Bonds, Argentine peso 2nd Series (Pro 3) Amortizing Payment Coupon due February 2002 | | | | | | ARARGE044222 |
| Debt Consolidation Bonds, Argentine peso 3rd Series (Pro 5) | 009592342 | | | | | ARARGE032185 |
| Debt Consolidation Bonds, Argentine peso 3rd Series (Pro 5) Amortizing Payment Coupon due January 2002 | | | | | | ARARGE043869 |
| Debt Consolidation Bonds, Argentine peso 5th Series (Pro 9) | | | | | | ARARGE033225 |
| Debt Consolidation Bonds, Argentine peso 5th Series (Pro 9) Payment Coupon due January 2002 | | | | | | ARARGE043844 |
| Leta Bice due July 2002 | | | | | | ARARGE03D248 |
| Derechos Creditorios | | | | | | ARARGE03D255 |

Copy

IN WITNESS WHEREOF, the Republic has caused this instrument to be duly executed.

Dated:  June 2, 2005

THE REPUBLIC OF ARGENTINA

By:_____
Name:    Federico C. Molina
Tile:     Financial Representative of the
          Republic of Argentina in
          Washington, D.C.

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This is one of the Debt Securities of the Series designated on the reverse hereof and issued under the Indenture.

_____
The Bank of New York
as Trustee

Dated:  June 2, 2005                    By:_____

3

# **EXHIBIT C**

**Christopher J. Clark**
Direct Dial: (212) 906-1350
Christopher.clark2@lw.com

53rd at Third
885 Third Avenue
New York, New York  10022-4834
Tel: +1.212.906.1200  Fax: +1.212.751.4864
www.lw.com

# LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Abu Dhabi | Milan |
| Barcelona | Moscow |
| Beijing | Munich |
| Boston | New Jersey |
| Brussels | New York |
| Chicago | Orange County |
| Doha | Paris |
| Dubai | Riyadh |
| Düsseldorf | Rome |
| Frankfurt | San Diego |
| Hamburg | San Francisco |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

July 26, 2014

**VIA EMAIL**

**SETTLEMENT COMMUNICATION**
**PURSUANT TO FRE 408**

Special Master Daniel Pollack
McCarter & English LLP
245 Park Avenue, 27th Floor
New York, New York 10167

Jonathan Blackman
Carmine Boccuzzi
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006

Re:    *NML Capital, Ltd. v. Republic of Argentina*, 08 Civ. 6978 (TPG) and related cases

Dear Messrs. Pollack, Blackman and Boccuzzi:

This firm represents the Euro Bondholders[1] in connection with the above-referenced action.  As you are aware, the Euro Bondholders are eager to see a negotiated resolution to this matter.  Based on press reports, we understand that the Republic of Argentina believes that the Right Upon Future Offers ("RUFO") clause is an impediment to settlement.  The Euro Bondholders believe that there are solutions to any RUFO concerns and desire to work with the parties to implement ways to remove the RUFO clause as an obstacle to a resolution.

---

[1] The Euro Bondholders are Knighthead Capital Management, LLC, Redwood Capital Management, LLC, Perry Capital LLC, VR Global Partners, LP, Monarch Master Funding 2 (Luxembourg) S.à r.l., Centerbridge Partners, L.P., QVT Fund IV LP, QVT Fund V LP, and Quintessence Fund LP (each on behalf of itself or one or more investment funds or accounts managed or advised by it).

LATHAM&WATKINS LLP

As you are further aware, the Euro Bondholders already have stated that they would be willing to waive the RUFO clause in a permanent and conclusive manner as part of a settlement among all parties allowing for the prompt and permanent resumption of payments on the exchange bonds.[2]  We have been in touch with other interested investors who also would be willing to waive the RUFO clause in the manner described above.  In briefs filed with the Court, we suggested that the Republic should undertake a consent solicitation seeking a waiver of the RUFO clause.  Between the Euro Bondholders and other aligned investors with whom we have been in contact in only the last 24 hours, there is a group holding approximately €5.2 billion (notional value) in euro-denominated exchange securities willing to waive the RUFO clause to bring about a resolution of this matter.  These securities are held in the approximate amounts per series as set forth below.

| ISIN | Amount |
|---|---|
| XS0501195134 | €1,177,000,000 |
| XS0205545840 | €1,330,000,000 |
| XS0205537581 | €1,251,000,000 |
| XS0501195993 | €65,500,000 |
| XS0209139244 | €1,356,000,000 |

It is our understanding that numerous additional bondholders may wish to express their support for a waiver of the RUFO clause, and we will supplement the amount of the group's holdings as needed.  In addition, the group holding the euro-denominated securities detailed above also has meaningful holdings of US dollar denominated securities and would be amenable to an identical RUFO waiver concerning those securities.

Although we suggested that the Republic undertake a consent solicitation, we are open to alternate means to resolve any issues related to the RUFO clause.  Based on our informal efforts so far, we have identified a substantial number of bondholders who would be willing to waive the RUFO clause.  In order for that to happen, however, the Republic must not be in default and must be given a reasonable period to conduct a consent solicitation complying with the securities laws of the U.S., U.K., Japan, and Argentina.

---

[2] Nothing herein in intended to waive any of the Euro Bondholders' rights under the Indenture governing the exchange bonds or applicable law, including the Euro Bondholders' argument that the euro-denominated exchange bonds should not be subject to the Court's injunctions.

July 26, 2014
Page 3

**LATHAM&WATKINS** LLP

Please let me know if you would like to discuss these issues further.

Respectfully,

 /s/ Christopher J. Clark

Christopher J. Clark
of LATHAM & WATKINS LLP

cc:     Robert Cohen
        Edward Friedman
        Matthew McGill
        Michael Spencer
        Robert Carroll