

1095 Avenue of the Americas
New York, NY 10036-6797
+1 212 698 3500 Main
+1 212 698 3599 Fax
www.dechert.com


**ROBERT A. COHEN**

robert.cohen@dechert.com
+1 212 698 3501 Direct
+1 212 314 0001 Fax

August 8, 2014


**VIA E-MAIL**

The Honorable Thomas P. Griesa
U.S. District Court for the Southern District of New York
United States Courthouse
500 Pearl St., Room 1630
New York, NY 10007-1312

> Re:  *NML Capital, Ltd. v. The Republic of Argentina*, 08 Civ. 6978 (TPG), 09 Civ.
> 1707 (TPG), 09 Civ. 1708 (TPG);
> *Aurelius Capital Master Fund, et al v. Republic of Argentina*, 09 Civ. 8757
> (TPG) 09 Civ. 10620 (TPG);
> *Aurelius Opportunities Fund II, et al v. Republic of Argentina*, 10 Civ. 1602
> (TPG), 10 Civ. 3507 (TPG), 10 Civ. 3970 (TPG), 10 Civ. 8339 (TPG);
> *Blue Angel Capital I LLC*, 10 Civ. 4101 (TPG), 10 Civ. 4782 (TPG);
> *Olifant Fund, Ltd. v. Republic of Argentina*, 10 Civ. 9587 (TPG);
> *Varela, et al v. The Republic of Argentina,* 10 CV 5338 (TPG)

Dear Judge Griesa,

We represent plaintiff NML Capital, Ltd., and write on behalf of our client and the other plaintiffs
in the above-captioned actions to bring to Your Honor's attention, in advance of today's hearing
"regarding recent statements made by the Republic of Argentina," certain additional troubling
statements of which the Court may not be aware, and which are clearly in violation of the
Amended February 23, 2012 Order.

On August 6th, Argentina's Ministry of Economy and Public Finances sent a letter to Citibank,
N.A., which plays a role in the mechanism for payment of interest on some of the Exchange
Bonds, demanding that Citibank ignore the "pari passu measures decreed" by this Court, and
requiring Citibank to "inform the Finance Department of the Ministry of the Economy and
Finances within 48 hours what steps you plan to take with regard to the distribution of the
upcoming payment . . . ." In other words, Argentina told Citibank that it intends to defy the
Court's orders when the next interest payment is due ("the upcoming payment") and wants
assurances from Citibank that it will defy the Court's pari passu injunction. A copy of the
original Spanish version of that letter and a certified translation are enclosed as Exhibit A.

On the same day, August 6th, the Ministry also wrote to the Bank of New York Mellon, the
Trustee for the Exchange Bonds. In that letter, Argentina condemns Bank of New York Mellon
for obeying the Court's orders: "In fact, since the June 27 Payment BNY Mellon has been
primarily concerned with Judge Griesa's view of BNY Mellon instead of the steps BNY Mellon



The Honorable Thomas P. Griesa
August 8, 2014
Page 2

could take to ensure that the funds that it now holds for the benefit of the Exchange Bondholders are remitted to the Exchange Bondholders." Of course, for Bank of New York Mellon to remit the funds it is holding to the Exchange Bondholders would violate the Court's orders.

The letter to Bank of New York Mellon goes on to threaten the bank with litigation for complying with the Court's orders, castigates the Court and the Special Master, and directs the bank to distribute to the Exchange Bondholders a "Legal Notice" that was enclosed with the letter.  That Notice, which was also published on August 7th on two full pages of the New York Times, Wall Street Journal and Washington Post, among other things, urges Exchange Bondholders to undertake efforts against the Trustee as a way to evade the pari passu injunction, again in clear violation of the Amended February 23, 2012 Order.  A copy of the letter to Bank of New York Mellon is enclosed as Exhibit B.

Respectfully submitted,

Robert A. Cohen

cc:      (via email)
         Carmine D. Boccuzzi, Esq.
         Jonathan I. Blackman, Esq.

# EXHIBIT A

*"2014 - Año de Homenaje al Almirante Guillermo Brown, en el Bicentenario del Combate Naval de Montevideo"*



*Ministerio de Economía y Finanzas Públicas*

Buenos Aires, 6 de agosto de 2014

Citibank, N.A. (Sucursal Argentina)
Sr. Gabriel Ribisich

De nuestra consideración,

Nos dirigimos a esa Entidad en relación a la causa *NML Capital, Ltd. v. Republic of Argentina*, en la que fueron emitidas órdenes relativas a los pagos efectuados a través de la sucursal argentina de Citibank, N.A. ("Citibank") bajo los bonos que se rigen por ley argentina denominados en pesos y dólares y pagaderos en Argentina (los "Bonos Argentinos del Canje").

Encontrándose esa Entidad financiera registrada, constituida y autorizada para operar en la República Argentina conforme la Ley de Entidades Financieras N° 21.526, y en atención a que los fondos depositados por la República Argentina a los fines de proceder al pago de los intereses Bonos Argentinos del Canje sujetos a ley y jurisdicción argentina son efectuados en nuestro país para su distribución a los Tenedores, cualquier pedido de aclaración en la causa *NML* deviene innecesario, debiéndose en los futuros vencimientos de intereses (el próximo acaecerá el 30 de septiembre de este año) abstenerse de formular pedidos de nuevas aclaraciones que no hacen más que confundir al mercado y a los Tenedores sobre el alcance de sus derechos y los efectos de las medidas *pari passu* dictadas por el Juez Griesa fuera de la jurisdicción de los Estados Unidos de América.

En consecuencia, en cumplimiento de la legislación aplicable, por medio de la presente le requerimos que continúen actuando en favor y protegiendo los intereses de los Tenedores de Bonos Argentinos del Canje, ajenos a las órdenes procesales mencionadas.

De lo contrario, esa Entidad estaría ejecutando una sentencia de tribunales extranjeros en la República Argentina, sin que la misma cumpla con los requisitos establecidos en el artículo 517 del Código Procesal Civil y Comercial de la Nación; afectando, en consecuencia, el orden público argentino.

Por lo tanto, y toda vez que mediante la Orden de fecha 28 de julio de 2014 el Juez Griesa solo permitió la transferencia de los fondos correspondientes a los bonos adheridos al



*Ministerio de Economía y Finanzas Públicas*

Canje denominados en dólares estadounidenses "por única vez" (algo insólito e inédito) y adelantó que luego del 30 de julio del corriente año anulará la orden del Citibank, se intima a esa Entidad para que en el término de 48 horas informe a la Secretaría de Finanzas del Ministerio de Economía y Finanzas Públicas la actitud que adoptará en relación a la distribución de los próximos pagos, teniendo en cuenta las razones invocadas en la presente.

Se hace saber que se remite copia de la presente al Banco Central de la República Argentina.

Saludamos a Ustedes atentamente.

Ministerio de Economía y Finanzas Públicas

Buenos Aires, August 6, 2014

Dear Sir:

We are writing to your Company with regard to the cause titled *NML Capital Ltd. v. Republic of Argentina,* in which orders were issued pertaining to payments made through the Argentine branch of Citibank, N.A. ("Citibank") on the bonds governed by Argentine law denominated in pesos and dollars and payable in Argentina (the "Argentine Exchange Bonds").

As your financial entity is registered, incorporated and authorized to conduct business in the Argentine Republic pursuant to Financial Entities Law No. 21526, and given that the funds used by the Argentine Republic in order to proceed to pay interest on the Argentine Exchange Bonds subject to Argentine law and jurisdiction are deposited in our country for distribution to the Bondholders, any request for clarification in the *NML* case becomes unnecessary. You should thus refrain from formulating additional requests for clarification with regard to future interest maturations (the next will occur on September 30 of this year), as they merely confuse the market and the Bondholders regarding the scope of their rights and the effects of the *pari passu* measures decreed by Judge Griesa outside the jurisdiction of the United States of America.

Consequently, in compliance with applicable legislation, we hereby demand that you continue acting to further and to protect the interests of the Holders of the Argentine Exchange Bonds, which are independent of the aforementioned procedural orders.

Otherwise, your company would be carrying out in the Argentine Republic a judgment issued in foreign courts, which would constitute a failure to meet the requirements established in Article 517 of the national Code of Civil and Commercial Procedure, thereby undermining the Argentine legal system.

Therefore, and given that in his Order dated July 28, 2014, Judge Griesa only permitted the "one-time" transfer of funds pertaining to the bonds that entered into the

swap that are denominated in US dollars (which is unheard-of and unprecedented) and stated that he will void the Citibank order after July 30 of this year, your Company is hereby required to inform the Finance Department of the Ministry of the Economy and Public Finances within 48 hours what steps you plan to take with regard to the distribution of the upcoming payments, keeping in mind the grounds invoked in this correspondence.

You are hereby informed that a copy of this correspondence is being forwarded to the Central Bank of the Argentine Republic.

Cordial regards,

Ministry of the Economy and Public Finances



August 7, 2014

I hereby certify that I am a professional translator, that I abide by the Code of Ethics and Professional Practice of the *American Translators Association*, that I am fluent in Spanish and English, that I have employed a team of professional translators, and that we have translated, to the best of our knowledge, the attached document entitled

**Citibank Letter**

From Spanish into English

Signed,

Cathleen Waters

Founder, New World Medium

Translator of French, Spanish, Italian, Portuguese and English

American Translator's Association Membership no. 257918

# EXHIBIT B

*"2014 - Año de Homenaje al Almirante Guillermo Brown, en el Bicentenario del Combate Naval de Montevideo"*



*Ministerio de Economía y Finanzas Públicas*

BUENOS AIRES, August 6, 2014

**VIA FIRST CLASS MAIL AND EMAIL (dagus@bnymellon.com)**

To

The Bank of New York

101 Barclay Street

New York, NY 10286

RE:    *Trust Indenture, dated as of June 2, 2005, as supplemented as of April 30, 2010*
*(Republic of Argentina as Issuer)*

I am writing to you in your capacity of counsel for the Trustee, within the framework of the  Trust Indenture dated June 2, 2005, as amended on April 30, 2010 ("Trust Indenture"), between the Republic of Argentina (the "Republic") and the Bank of New York (n/k/a The Bank of New York Mellon), (a) to address certain concerns raised by The Bank of New York Mellon's ("BNY Mellon's") conduct as Trustee under the Trust Indenture Trust Indenture, (b) to direct the Trustee to distribute the enclosed "Legal Notice To The Exchange Bondholders Of Argentine Debt Adhering To 2005-2010 Exchanges" (the "Legal Notice"), and (c) to inform BNY Mellon that the Republic will seek to hold BNY Mellon liable for any damages the Republic has suffered and may suffer as a result of BNY Mellon's acts and omissions, as described in this letter and otherwise.

**_Concerns Raised by BNY Mellon's Acts and Omissions_**

I am informed that on or about July 31, 2014, BNY Mellon sent a notice (the "July 31 Notice") to holders ("Exchange Bondholders") of the Debt Securities issued by the Republic pursuant to the Trust Indenture (the "Exchange Bonds" or "Debt Securities"). The Notice appears to be designed to justify BNY Mellon's failure to remit to the Exchange Bondholders the payment made by the Republic on June 27, 2014 pursuant to Section 3.5 of the Trust Indenture (the "June 27 Payment" or the "Exchange Bondholders' Retained Funds"). Notably, BNY Mellon expressly cites Section 4.11 of the Trust Indenture



*Ministerio de Economía y Finanzas Públicas*

to alert Exchange Bondholders of the right of the Holders of a Majority in aggregate principal amount Outstanding of the Debt Securities of any Series . . . to direct the time, method, and place of conducting any proceeding for any remedy available to the Trustee . . . ."

The July 31 Notice, and BNY Mellon's conduct since the Republic made the June 27 Payment, raise serious concerns about BNY Mellon's performance of its obligations as Trustee. BNY Mellon has placed its interests, and those of the plaintiffs in *NML Capital, Ltd. v. The Republic of Argentina* (the "FAA Litigation"), over those of the Exchange Bondholders, in violation of BNY's duties as Trustee. In fact, since the June 27 Payment BNY Mellon has been primarily concerned with Judge Griesa's view of BNY Mellon instead of the steps BNY Mellon could take to ensure that the funds that it now holds for the benefit of the Exchange Bondholders are remitted to the Exchange Bondholders.

For example, prior to the June 27 Payment, BNY Mellon raised an argument in the Second Circuit that the Court in the FAA Litigation lacked jurisdiction to bind BNY in the November 21, 2012 Amended Injunction. The Second Circuit indicated that questions of personal jurisdiction were premature and could be raised later. In its court papers and appearances since the June 27 Payment, however, BNY Mellon has almost presumed that it would be exposed to liability if it were to remit the Exchange Bondholders' Funds. After exploring whether to attempt to return the Exchange Bondholders' Funds to the Republic – an action that is not authorized anywhere in the Trust Indenture – BNY Mellon then asked the court in the FAA Litigation for permission to retain the Exchange Bondholders' Funds, conduct that also contravenes the terms of the Trust Indenture.

BNY Mellon did not raise with Judge Griesa the fact that pursuant to the terms of the Trust Indenture, the funds transmitted in the June 27 Payment were no longer the property of the Republic and were being held for the benefit of the Exchange Bondholders – and that consequently any action then taken by BNY Mellon was beyond the court's jurisdiction or the scope of Rule 65. It did not seek to create an immediately appealable issue to seek relief from the Second Circuit so that it would be able to remit the Exchange Bondholders' funds. Rather, it continued to act to safeguard its own interests.

*"2014 - Año de Homenaje al Almirante Guillermo Brown, en el Bicentenario del Combate Naval de Montevideo"*



*Ministerio de Economía y Finanzas Públicas*

Whether BNY Mellon has adequately taken steps to protect the interests of the Exchange Bondholders as to the Exchange Bondholders' Funds is obviously an issue that is between the Exchange Bondholders and BNY Mellon. The Exchange Bondholders' Funds are not Argentina's property and, as discussed below, Argentina has performed under the terms of the Trust Indenture. ***However, to the extent that, as a result of the Notice or otherwise, Exchange Bondholders seek to hold the Republic liable for BNY Mellon's acts or omissions, the Republic intends to look to BNY Mellon for indemnification and/or hold BNY Mellon liable.*** As you know, Section 5.1 of the Trust Indenture makes clear that BNY Mellon shall not be relieved "from liability for its own grossly negligent action, its own grossly negligent failure to act, its bad faith or its own willful misconduct or breach of trust . . . ."

### *Direction to Distribute The Legal Notice to Exchange Bondholders*

The Republic also is concerned that the July 31 Notice, by directing the Exchange Bondholders' attention to Section 4.11 of the Trust Indenture, improperly suggests to the Exchange Bondholders that some remedy under Article Four (Defaults and Remedies) of the Trust Indenture is warranted based on the FAA Litigation and BNY Mellon's retention of the Exchange Bondholders' Funds. The Republic believes that the July 31 Notice is misleading and that BNY Mellon needs to take immediate steps to correct this misrepresentation. ***To that end, the Republic directs BNY Mellon, as Trustee, to distribute to Exchange Bondholders the enclosed Legal Notice.***

As the Republic of Argentina previously explained in Legal Notices dated June 27, 2014 and July 7, 2014, the Republic has timely and duly paid interest owed on the Debt Securities. As a result, there has been no Event of Default under the terms of the Trust Indenture.

The terms of the Trust Indenture could not be clearer. Under Section 4.1(i), a Non-Payment event of default arises only when "the Republic fails to pay any principal . . . or fails to pay any interest on the Debt Securities." Under Section 3.5 of the Trust Indenture, the Republic effects "payment of principal of and interest on the Debt Securities" by "pay[ing] or caus[ing] to be paid to an account of the Trustee [BNY Mellon] . . . an amount which . . . shall be sufficient to pay the aggregate amount of interest or principal



*Ministerio de Economía y Finanzas Públicas*

or both . . . becoming due in respect of such Debt Securities on such Payment Date." Section 3.5 then provides that "the Trustee shall apply such amount to the payment due on such Payment Date." Until such funds are applied to the Exchange Bondholders' accounts, "such amounts shall be held in trust by the Trustee for the exclusive benefit of the Trustee and Holders entitled thereto in accordance with their respective interests and the Republic shall have no interest whatsoever in such amounts."

There is no dispute that the Republic has paid the amounts due on the Exchange Bonds or that the Republic has made that payment in the manner required by the Trust Indenture pursuant to which the Exchange Bonds were issued – by paying the funds to "an account of the Trustee." In other words, the Republic has paid.

Moreover, as you know, certain statements that the United States District Judge and the so-called "impartial mediator" have made about default are wrong, improper and beyond their authority. The Exchange Bondholders and BNY are not parties to the FAA Lawsuit, and the operative agreement that Judge Griesa has been asked to interpret is the 1994 Fiscal Agency Agreement, not the Exchange Bonds or Trust Indenture. It is, therefore, beyond Judge Griesa's jurisdiction and authority to rule on whether an Event of Default has arisen under the Trust Indenture or the Exchange Bonds.

Similarly, the mediator's job is to conduct confidential settlement discussions involving the parties to the FAA Lawsuit. He was not given any right to interpret the rights and obligations of the parties to the Trust Indenture or the Exchange Bonds. To the extent the mediator has speculated that the Republic is in default, his opinion is both uniformed and wrong, and frankly, merits no further discussion.

In the same vein, the "default" determination of the International Swaps and Derivatives Association ("ISDA") for purposes of certain credit default swap instruments has no bearing whatsoever on Exchange Bondholders' rights under the Debt Securities. The Trust Indenture and Debt Securities set forth several grounds for an Event of Default, but a determination by ISDA is not one of the grounds for an Event of Default. While ISDA's decision may affect those who hold certain credit default swaps, it does not create any rights or obligations under the terms of the Debt Securities or the Trust Indenture. In fact, the credibility and fairness of the findings of ISDA has been raised by certain

*"2014 - Año de Homenaje al Almirante Guillermo Brown, en el Bicentenario del Combate Naval de Montevideo"*



*Ministerio de Economía y Finanzas Públicas*

published reports that one of the vulture funds (NML Capital) is a voting member of ISDA, and there has been speculation that the same vulture fund owns the credit default swaps that have substantially increased in value as a result of the ISDA "default" determination.

Since 2005, the Republic of Argentina has demonstrated that it has the resources and the willingness to comply with the obligations undertaken in the 2005 and 2010 Exchange Offers. The Republic is resolved to continue to make payments under the Exchange Bonds and to urge Judge Griesa to remove the impediments that currently appear to be interfering with the orderly administration of the payment the Republic has made.

Finally, contrary to what some have argued, no Event of Default arises from the language in the Debt Securities that discusses a requirement, in certain circumstances, that payments be received by Exchange Bondholders before the Republic's payment obligations are satisfied. That requirement is not applicable where, as here, the Republic has complied with its payment obligations by paying the requisite funds to the Trustee. The confusion appears to have arisen from an alternative mailing payment method set forth in the Debt Securities. The Debt Securities provides for two methods of payments: Payment to the Trustee (who then holds the funds on behalf of the Exchange Bondholders) or payment by mail.

Section 2 of the Debt Securities provides, in pertinent part, "The Republic will make payments of principal of and interest on the Securities by providing the Trustee or trustee paying agent the amount of such payment . . . and directing the Trustee to hold these funds in trust for the Trustee and the beneficial owners of the Securities in accordance with their respective interests . . .; provided that the Republic may . . . . make payments of principal of and interest on the Securities by mailing, or directing the Trustee to mail, from funds made available by the Republic for such purpose, a check to the person entitled thereto . . . . Notwithstanding anything herein to the contrary, the Republic's obligation to make payments of principal of and interest on the Securities shall not have been satisfied until such payments are received by the Holders of the Securities."

When payment is made to the Trustee – the method set forth in the Trust Indenture – the funds become the property of the Exchange Bondholders as soon as the funds are wired. When funds are mailed, however, they may not reach the Exchange



*"2014 - Año de Homenaje al Almirante Guillermo Brown, en el Bicentenario del Combate Naval de Montevideo"*

*Ministerio de Economía y Finanzas Públicas*

Bondholders due to problems with international mail delivery. Under such circumstances, the funds remain in the Republic's accounts until the check is received and cashed. If the check never arrives, the Debt Securities make clear, the Republic's payment obligation are not satisfied until the Holders ultimately receive payment. This way the Exchange Bondholder can demand payment for the unreceived check. Obviously, that circumstance is not presented where, as here, the Republic wires funds to the Trustee and relinquishes all right to the funds in favor of the Exchange Bondholders for whose benefit the Indenture Trustee holds the funds.

By distributing the Legal Notice to the Exchange Bondholders, BNY Mellon can hopefully mitigate damages caused by the July 31 Notice. The July 31 Notice states, "Holders interested in directing the Trustee or who have questions concerning this Notice may contact the Trustee by e-mail . . . ." To the extent BNY Mellon receives any such inquiries, BNY Mellon should take appropriate steps to convey the information set forth in the Legal Notice and to alert the Exchange Bondholders that no Event of Default has occurred.

Moreover, to the extent that as a result of the misinformation provided by BNY Mellon and others, certain Exchange Bondholders mistakenly seek to direct BNY Mellon as Trustee to take any action set forth in Article Four that could arise as a result of an Event of Default, the Republic directs BNY Mellon to inform any such Exchange Bondholder that such action or remedy is not warranted or available because no Event of Default has occurred.

### *Reservation of Rights and Remedies*

The Republic has performed its obligations under the Trust Indenture and Debt Securities. Nonetheless, the acts and omissions of BNY Mellon, as set forth in this letter and otherwise – including without limitation BNY Mellon's conduct in connection with the FAA Litigation, its retention of the Exchange Bondholders' Funds and the July 31 Notice – have caused and may continue to cause the Republic harm.

While the Republic urges and instructs BNY Mellon to take steps to attempt to mitigate this damage, including without limitation sending the Legal



*Ministerio de Economía y Finanzas Públicas*

Notice to Exchange Bondholders, the Republic reserves all rights and remedies at equity and law.

Sincerely,

Ministry of Economy and Public Finances

<u>**CC**</u>:

Eric A. Schaffer
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222-2716
E-mail address: **eschaffer@reedsmith.com**

*"2014 - Año de Homenaje al Almirante Guillermo Brown, en el Bicentenario del Combate Naval de Montevideo"*



*Ministerio de Economía y Finanzas Públicas*

---

| |
|---|
| **LEGAL NOTICE**<br>TO THE HOLDERS OF ARGENTINE DEBT ADHERING TO THE 2005-2010 EXCHANGES |

In the past week, there have been some incorrect, misleading and contradictory press reports about the current status of the obligations undertaken by the Argentine Republic in the 2005 and 2010 Prospectuses and in the Trust Indenture dated 2 June 2005 as amended on 30 April 2010. This situation has arisen due to the erroneous and improper interpretations of the District Court for the Southern District of New York in the case of *NML Capital Ltd., et al, v. Republic of Argentina*; the press release published by the Special Master appointed in such case, Mr. Daniel Pollack, on 30 July 2014; and the legal notice published by the Bank of New York Mellon (BNY Mellon) on 31 July 2014.

By means of this legal notice, the Argentine Republic complies with its obligation to ensure the Holders of Argentine Debt Adhering to the 2005 and 2010 Sovereign Debt Exchanges ("Exchange Bondholders") their right to avail themselves of the precise, complete and correct information on the current status of the performance of the Republic's obligations under the Trust Indenture, and the legal rights and remedies available to them, in light of the fact that the funds duly deposited by the Argentine Republic in the account of the Trustee [BNY Mellon] in the Central Bank of the Argentine Republic are exclusively owned the Exchange Bondholders.

**Firstly**, and as stated in the Legal Notices dated 27 June 2014 and 7 July 2014, the Argentine Republic has paid in due time and manner the amounts of interest due on the New Securities issued within the framework of the 2005 - 2010 Exchanges (the "Exchange Bonds"). **Consequently, no *Event of Default* has arisen under the Trust Indenture or the Exchange Bonds.**

In this regard, the terms of the Trust Indenture are clear and precise:
Pursuant to Section 4.1 (i), a Non-Payment event of default arises only when "the Republic fails to pay any principal . . . or fails to pay any interest on the Debt Securities." Under Section 3.5 of the Trust Indenture, the Republic effects "payment of principal of and interest (including the Additional Amounts) on the Debt Securities" by "pay[ing] or caus[ing] to be paid to an account of the Trustee [BNY Mellon] . . . an amount which . . . shall be sufficient to pay the aggregate amount of interest (including the Additional Amounts) or principal or both . . . becoming due in respect of such Debt Securities on such Payment Date." Until such funds are applied to the Exchange Bondholders' accounts, "**such amounts shall be held in trust by the Trustee for the exclusive benefit of the Holders entitled thereto in accordance with their respective interests <u>and the Republic shall have no interest whatsoever in such amounts</u>**."

There is no doubt whatsoever that the Republic of Argentina has duly paid the amounts due on the Exchange Bonds in the manner **<u>required</u>** by the Trust Indenture – by paying the funds to "an account of the Trustee." In other words, the Republic has paid.  The issue of the distribution of



*"2014 - Año de Homenaje al Almirante Guillermo Brown, en el Bicentenario del Combate Naval de Montevideo"*

*Ministerio de Economía y Finanzas Públicas*

the funds is now a separate issue between the Trustee and the Bondholders, which has arisen only **after the Republic has already performed its obligations under the Trust Indenture and the Exchange Bonds.**

**Secondly,** the Republic of Argentina acknowledges the Bondholders' absolute and unconditional right to collect the funds deposited by Republic of Argentina in the Trust Account of the Trustee (BNY Mellon), **such funds being exclusively owned by the Bondholders**. For this reason, on July 3, 2014 a letter was sent to BNY Mellon, in its capacity as Trustee, to request that BNY Mellon comply with its obligations – under Sections 3.1, 4.5, and 4.9 of the Trust Indenture – to distribute the funds that the Republic had deposited to the Exchange Bondholders.[i]

However, as a result of ongoing legal proceedings before the District Court for the Southern District of New York in the case of *NML Capital Ltd., et al, v. Republic of Argentina*, which involves a small number of holdout creditors, some of the payments duly made by the Republic of Argentina have not yet reached the accounts of the Bondholders who adhered to the 2005 and 2010 Exchanges.

This risk factor had already been informed by the Republic of Argentina in the Prospectuses of its Sovereign Debt 2005 and 2010 Exchange Offers, where it was specifically explained that: *"Argentina's payments in connection with the Offer (including any payments due from Argentina upon settlement of the Offer) or to holders of New Securities may be attached, enjoined or otherwise challenged by holders that declined to participate in the Offer or by other creditors of Argentina. In recent years, holdouts have used litigation against Sovereign States (for instance, against Peru and Nicaragua) to attach or interrupt payments made by these sovereign debtors to, among others, bondholders who have agreed to a debt restructuring and accepted new securities in an exchange offer. Argentina has been subjected to suits to collect on amounts due on defaulted bonds in Germany, the United States and Italy. Some of these actions have resulted in judgments against Argentina.* **There can be no assurance that a holdout creditor will not be able to interfere, through an attachment of assets, injunction, temporary restraining order or otherwise, with <u>payments made</u> in connection with the Offer (including any payments due from Argentina upon settlement of the Offer).**[ii]

This delay in processing the payment distribution of funds has been vigorously protested both by Argentina and by a number of the bondholders who are the intended recipients of the payment though, as of the time of this writing, the funds remain blocked at the account of the trustee in the Republic of Argentina.

**Thirdly,** certain statements made by the United States District Judge and the Special Master appointed in the case of *NML Capital Ltd., et al, v. Republic of Argentina* about an event of default are wrong, improper and false, and beyond their authority.  The referred to lawsuit involves a dispute between certain Vulture Funds and the Republic of Argentina under the 1994 Fiscal



*Ministerio de Economía y Finanzas Públicas*

Agency Agreement – a wholly different security than the Exchange Bonds issued under the Trust Indenture.

**The District Court for the Southern District of New York lacks jurisdiction over the 2005 and 2010 Exchange Bonds, and the Exchange Bondholders and the BNY Mellon are not parties to the case of *NML Capital Ltd., et al, v. Republic of Argentina*.  It is beyond the authority of the United States District Judge to rule on whether an Event of Default has arisen under the Trust Indenture or the Trust Instrument in a different lawsuit involving different parties and a different agreement.**

Similarly, the job of the Special Master is to conduct confidential discussions with and between the parties – not to issue press releases speculating about the consequences of an agreement or lack of agreement.  In any event, the Special Master's comments lack any authority whatsoever, given that he has no power to interpret the Trust Indenture, which at no time was submitted to his interpretation.

**Fourthly**, the determination of "default" of the International Swaps and Derivatives Association ("ISDA") for purposes of certain credit default swap instruments relating to the Republic of Argentina's sovereign debt has no bearing whatsoever on the Bondholders' rights under the Trust Indenture or the Exchange Bonds.  The Trust Indenture sets forth several grounds for an Event of Default, but **a determination by ISDA is not one of the grounds for an Event of Default to arise under the Trust Indenture.**  While ISDA's decision may affect those who hold credit default swaps, it does not create any rights or obligations under the terms of the Trust Indenture or the Exchange Bonds.

In fact, complaints have been filed –both with the Securities and Exchange Commission of the Republic of Argentina (*Comisión Nacional de Valores*, "CNV" as per its acronym in Spanish) and the US Securities and Exchange Commission ("SEC") – concerning potential actions carried out by the firm Elliot Management Corporation and its controlled and/or related companies, on the basis of the presumed existence of conflicts of interest based on the fact that such Corporation: (i) takes part, in its capacity as "Voting Non-dealer" in the ISDA Credit Derivatives Determination Committee; (ii) pursues aggressive litigation strategies against the Republic of Argentina in the referred to case of *NML Capital Ltd., et al, v. Republic of Argentina*, impairing the distribution of the payments made in due time and manner, in connection with the amounts due on the Exchange Bonds, which have substantially increased in value as a result of the ISDA "default" determination.

**Fifth**, the Republic of Argentina –as it has demonstrated since 2005–has the resources and the will to comply with the obligations undertaken in the 2005 and 2010 Exchange Offers.

In addition, the Republic of Argentina will continue to demand that the Trustee comply with its obligations under the Trust Indenture and to urge the United States courts to remove the impediments that are currently interfering with the orderly distribution of the payments made by the Republic.



*Ministerio de Economía y Finanzas Públicas*

**Finally**, may we remind the Bondholders that there are numerous rights and remedies available to them under the Trust Indenture in the event the Trustee breaches its obligations, in particular its obligation to transfer the payments made by the Republic of Argentina to the Bondholders. By way of example, Section 5.9.c of the Trust Indenture provides that the Holders of a Majority in aggregate principal amount Outstanding of the Debt Securities of any Series may at any time remove the Trustee and appoint a successor trustee.  Section 7.1 provides for the modifications the Agreement may be subject to.[lii]

The foregoing is without prejudice to the possibility of the Exchange Bondholders actively pursuing any other actions as may be proper to enforce their rights –given that the funds exclusively owned by such Bondholders are being unduly withdrawn– including the filing of appeals from such orders of the District Court for the Southern District of New York as such Exchange Bondholders may deem to be detrimental to their interests, or the commencement of new actions as they may deem fit and proper. Notwithstanding this, the Republic of Argentina will continue to pursue courses of action to defend and preserve its rights and those of the Exchange Bondholders.

This notice shall not be construed or understood as legal advice or guidance of the Republic of Argentina.

The Ministry of Economy and Public Finance shall keep you regularly updated as this situation unfolds.

**Ministry of Economy and Public Finances.**

---

[*] The Trust Indenture (dated 2 June 2005 as amended on 30 April 2010) provides in relevant part:

**Section 3.1. Payment of Principal and Interest.**

The Republic covenants and agrees that it will duly and punctually pay or cause to be paid the principal of and interest (including Additional Amounts) on each of the Debt Securities and any other payments to be made by the Republic under the Debt Securities and this Indenture to the Trustee, at the place or places, at the respective times and in the manner provided in the Debt Securities and this Indenture.

All monies (save for its own account) paid to the Trustee under the Debt Securities and this Indenture shall be held by it in trust for itself and the Holders of Debt Securities in accordance with their respective interests to be applied by the Trustee to payments due under the Debt Securities and this Indenture at the time and in the manner provided for in the Debt Securities and this Indenture

**Section 4.5. Application of Proceeds.**

Any monies collected by the Trustee pursuant to this Article shall be applied in the following order at the date or dates fixed by the Trustee and, in case of the distribution of such monies on account of principal or interest, upon presentation of the Debt Securities of the Series in respect of which money has been collected and stamping (or otherwise noting) thereon the payment, or issuing Debt Securities in reduced principal amounts in exchange for the presented Debt Securities if only partially paid, or upon surrender thereof if fully paid:



*Ministerio de Economía y Finanzas Públicas*

---

FIRST: To the payment of all amounts due to the Trustee or any agent or Appointee thereof under or in connection with this Indenture or the Debt Securities of any Series including (without limitation) amounts due under Section 5.6;

SECOND: In case the principal of the Debt Securities of such Series shall not have become and be then due and payable, to the payment of overdue interest in default on such Series of Debt Securities in the order of the maturity of the installments of such interest, with interest (to the extent that such interest has been collected by the Trustee) upon the overdue installments of interest at the same rate as the rate of interest specified in such Debt Securities, such payments to be made ratably to the Persons entitled thereto, without discrimination or preference;

THIRD: In case the principal of the Debt Securities of such Series shall have become and shall be then due and payable, to the payment of the whole amount then owing and unpaid upon all Debt Securities of such Series for principal and interest at the rate of interest specified in such Debt Securities; and in case such monies shall be insufficient to pay in full the whole amount so due and unpaid upon the Debt Securities of such Series, then to the payment of such principal and interest, without preference or priority of principal over interest, or of interest over principal, or of any installment of interest over any other installment of interest, or of any Debt Security of such Series over any other Debt Securities of the same Series, ratably to the aggregate of such principal and accrued and unpaid interest.

**Section 4.9. Unconditional Right of Holders to Receive Principal and Interest.**

Notwithstanding Section 4.8, each Holder of Debt Securities shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on its Debt Security on the stated maturity date for such payment expressed in such Debt Security (as such Debt Security may be amended or modified pursuant to Article Seven) and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.

" Prospectus 2005, S-31, Risks of Participating in the Offer. Prospectus 2010, S-57, Risks of Participating in the Invitation.

"' The Trust Indenture (dated 2 June 2005 as amended on 30 April 2010) provides in pertinent part:

**Section 5.9. Resignation and Removal; Appointment of Successor Trustee.**

(a) The Trustee may at any time resign with respect to the Debt Securities of one or more Series by giving not less than 90 days' written notice of resignation to the Republic and by providing notice thereof to the affected Holders at the expense of the Republic as provided in Section 12.4 below and without giving any reason therefor. Upon receiving such notice of resignation, the Republic shall promptly appoint a successor trustee with respect to such Series by written instrument in duplicate, one copy of which instrument shall be delivered to the resigning Trustee and one copy to the successor trustee. If no successor trustee shall have been so appointed and have accepted appointment within 60 days after such notice of resignation has been given, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee, or any Holder of Debt Securities of the affected Series who has been a bona fide Holder of a Debt Security of such Series for at least six months may, on behalf of himself and all others similarly situated, petition any such court for the appointment of a successor trustee in respect of such Series of Debt Securities. Such court may thereupon, after such notice, if any, as it may deem proper, appoint a successor trustee with respect to the Debt Securities of the affected Series.

(b) In case at any time any of the following shall occur: the Trustee shall cease to be eligible in accordance with the provisions of Section 5.8 and shall fail to resign after written request therefor by or on behalf of the Republic or by any Holder; or the Trustee shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver or liquidator of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation; then, in any such case, (A) the Republic may remove the Trustee and appoint a successor trustee with respect to all affected Debt Securities by written instrument, in duplicate, one copy of such instrument shall be delivered to the Trustee so removed and one copy to the successor trustee, or (B) any Holder who has been a bona fide Holder of a Debt Security of any affected Series for at least six months may on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor trustee or trustees with respect to the Debt Securities of such Series.

(c) The Holders of a Majority in aggregate principal amount Outstanding of the Debt Securities of any Series may at any time remove the Trustee and appoint a successor trustee for the Debt Securities of such Series by delivering to the Trustee so removed, to the successor trustee so appointed and to the Republic the evidence provided for in Section 6.1 of the action in that regard taken by the Holders. If at any time there is more than one Trustee with respect to Debt Securities of different Series issued pursuant to this Indenture, each reference to the "Trustee" shall be read as a reference to the Trustee for the time being in place in respect of the relevant Series of Debt Securities. The foregoing sentence is without prejudice to Section 5.12.

(d) The Republic shall give notice of each resignation and removal of the Trustee with respect to the Debt Securities of any Series to all Holders of Debt Securities of such Series in the manner provided in Paragraph 10 of the Terms.

(e) Any resignation or removal of the Trustee and any appointment of a successor trustee pursuant to any of the provisions of this Section 5.9 shall become effective upon acceptance of appointment by the successor trustee as provided in Section 5.10.

**Section 7.1. Modifications.**

(a) Any modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture or the terms and conditions of the Debt Securities of one or more Series (each, a "Modification") to this Indenture or the terms and conditions of the Debt Securities of one or more Series may be made, given, or taken pursuant to (i) a written action of the Holders of the Debt Securities of such affected Series without the need for a meeting, or (ii) by vote of the Holders of the Debt Securities of such affected Series taken at a meeting or meetings of Holders thereof, in each case in accordance with the terms of this Article Seven and the other applicable provisions of this Indenture and the Debt Securities of such affected Series.

b) Except as provided in a GDP-Linked Securities Authorization and/or the terms and conditions of the Debt Securities of any Series, this Article Seven shall apply to all Modifications to this Indenture and/or to the terms and conditions of the Debt Securities of such Series.