UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NML CAPITAL, LTD.,<br><br>                              Plaintiffs,<br><br>                    v.<br><br>THE REPUBLIC OF ARGENTINA,<br>                              Defendant. | 08 Civ. 6978 (TPG)<br>09 Civ. 1707 (TPG)<br>09 Civ. 1708 (TPG) |
| AURELIUS CAPITAL MASTER, LTD. and ACP<br>MASTER, LTD.,<br><br>                              Plaintiffs,<br><br>                    v.<br><br>THE REPUBLIC OF ARGENTINA,<br>                              Defendant. | 09 Civ. 8757 (TPG)<br>09 Civ. 10620 (TPG) |
| AURELIUS OPPORTUNITIES FUND II, LLC and<br>AURELIUS CAPITAL MASTER, LTD.,<br>                              Plaintiffs,<br><br>                    v.<br><br>THE REPUBLIC OF ARGENTINA,<br>                              Defendant. | 10 Civ. 1602 (TPG)<br>10 Civ. 3507 (TPG)<br>10 Civ. 3970 (TPG)<br>10 Civ. 8339 (TPG)<br><br>*(captions continue on following page)* |

# BRIEF OF *AMICUS CURIAE* THE CLEARING HOUSE ASSOCIATION L.L.C.
## IN SUPPORT OF NON-PARTY CITIBANK, N.A.

Joseph R. Alexander
THE CLEARING HOUSE
  ASSOCIATION L.L.C.
450 West 33rd Street
New York, New York  10001
Tel.:  (212) 613-0100

H. Rodgin Cohen
Bruce E. Clark
    *Of Counsel*

February 9, 2015

Joseph E. Neuhaus
Michael J. Ushkow
Owen R. Wolfe
John P. Collins
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Tel.:  (212) 558-4000

*Counsel for Amicus Curiae*
*The Clearing House Association L.L.C.*

BLUE ANGEL CAPITAL I LLC,

Plaintiffs,

v.

THE REPUBLIC OF ARGENTINA,

Defendant.

10 Civ. 4101 (TPG)
10 Civ. 4782 (TPG)

---

PABLO ALBERTO VARELA, et al.,

Plaintiffs,

v.

THE REPUBLIC OF ARGENTINA,

Defendant.

10 Civ. 5338 (TPG)

---

OLIFANT FUND, LTD.,

Plaintiffs,

v.

THE REPUBLIC OF ARGENTINA,

Defendant.

10 Civ. 9587 (TPG)

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

STATEMENT OF INTEREST OF *AMICUS CURIAE*.................................................................1

PRELIMINARY STATEMENT ........................................................................................2

ARGUMENT ...............................................................................................................4

I.    THE COURT SHOULD NOT APPLY THE AMENDED INJUNCTION TO CITI ARGENTINA'S TRANSMISSION OF PAYMENTS ON THE USD-DENOMINATED BONDS GOVERNED BY ARGENTINE LAW....................4

A.    The Court Should Avoid Ordering Citi Argentina to Violate Argentina's Banking Laws ....................................................................5

B.    Applying the Amended Injunction to Citi Argentina Risks Undermining New York's Standing as a Financial Center ......................10

1.    Citi Argentina is paid by its customers to hold securities in custody accounts ....................................................... 11

2.    Requiring Citi Argentina to block payments on these bonds will impair the reputation of the Bank, and by extension, New York banks generally, in emerging markets ......................................... 12

3.    The United States has an interest in preserving New York's status as the world's preeminent financial center ..................................14

CONCLUSION...........................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allied Bank Int'l* v. *Banco Credito Agricola de Cartago*,
    757 F.2d 516 (2d Cir. 1985)......................................................................................14

*Chase Manhattan Bank, N.A.* v. *Banque de Financement, S.A.*,
    Nos. 75 Civ. 39, 75 Civ. 290, 75 Civ. 299, 1976 U.S. Dist. LEXIS 17394 (S.D.N.Y.
    May 14, 1976)..............................................................................................................7

*Deirmenjian* v. *Deutsche Bank, A.G.*,
    No. CV 06–00774, 2010 WL 3034060 (C.D. Cal. July 30, 2010) ............................6

*Grace* v. *Bank Leumi Trust Co.*,
    443 F.3d 180 (2d Cir. 2006).....................................................................................4–5

*Grace* v. *Rosenstock*,
    228 F.3d 40 (2d Cir. 2000) .........................................................................................4

*Gucci Am., Inc.* v. *Li*,
    768 F.3d 122 (2d Cir. 2014)....................................................................................5, 6

*In re Donald G. Atteberry, DVM, P.A.*,
    159 B.R. 1 (D. Kans. 1993) ........................................................................................7

*LaSala* v. *Lloyds TSB Bank, PLC*,
    514 F. Supp. 2d 447 (S.D.N.Y. 2007)........................................................................7

*Motorola Credit Corp.* v. *Standard Chartered Bank*,
    21 N.E.3d 223 (N.Y. 2014)..............................................................................7, 9, 13

*NML Capital, Ltd.* v. *Republic of Argentina*,
    727 F.3d 230 (2d Cir. 2013) .......................................................................................5

*Radack* v. *Norwegian Am. Line Agency, Inc.*,
    318 F.2d 538 (2d Cir. 1963)........................................................................................4

*Reebok Int'l Ltd.* v. *McLaughlin*,
    49 F.3d 1387 (9th Cir. 1995) ...................................................................................6–7

*Shaheen Sports, Inc.* v. *Asia Ins. Co.*,
    No. 98 Civ. 5951, 2012 WL 919664 (S.D.N.Y. Mar. 14, 2012) ...............................9

*Stroitelstvo Bulg., Ltd.* v. *Bulgarian-Am. Enter. Fund*,
    598 F. Supp. 2d 875 (N.D. Ill. 2009) ......................................................................6–7

*Winter* v. *NRDC, Inc.*,
   555 U.S. 7 (2008) ...................................................................................16

*Wultz* v. *Bank of China Ltd.*,
   865 F. Supp. 2d 425 (S.D.N.Y. 2012).......................................................6

STATUTES AND RULES

N.Y. Banking Law § 134 ................................................................................8

N.Y. Banking Law § 204-a ............................................................................8

N.Y. U.C.C. Law § 8-501 ..............................................................................8

N.Y. U.C.C. Law § 8-505 ..............................................................................8

Fed. R. Civ. P. 54 ..........................................................................................4

Fed. R. Civ. P. 60 ..........................................................................................4

OTHER AUTHORITIES

*Citi History Timeline*, http://www.citigroup.com/citi/press/mobile/ir/html/timeline/
   index-com.html (last visited Feb. 9, 2015) ...........................................12

*Direct Custody and Clearing*, https://www.citibank.com/mss/dcc/ (last visited Feb. 9, 2015) ...12

Edward L. Glaeser, *Urban Colossus: Why is New York America's Largest City?* .....................15

Floyd Norris, *Ruling on Argentina Gives Investors an Upper Hand*, N.Y. Times, June 20,
   2014...........................................................................................................13

Gordon Platt, *The World's Best Sub-Custodians*, Global Finance (July 5, 2010),
   *available at* https://www.gfmag.com/magazine/julyaugust-2010/the-worlds-best-sub-
   custodians...................................................................................................12

John Gay, *The Fox at the Point of Death*, *in* FABLES (1727) ...........................................13

Michael R. Bloomberg & Charles E. Schumer, *Sustaining New York's and the US'
   Global Financial Services Leadership* (2007)....................................14, 15

Restatement (Third) of Foreign Relations Law § 403 ....................................6

Restatement (Third) of Foreign Relations Law § 441 ....................................9

Thomas P. Fitch, *Dictionary of Banking Terms* 129 (Irwin L. Kellner & Donald G.
   Simonson eds., 5th ed. 2006)...................................................................11

Udaibir S. Das et al., *Sovereign Debt Restructurings 1950-2010: Literature Survey, Data, and Stylized Facts* 41 (Int'l Monetary Fund Working Paper No. 12/203, August 2012), *available at* http://www.un.org/esa/ffd/ecosoc/debt/2013/IMF_wp12_203.pdf. .........14

*World's Best Subcustodians 2014*, Global Finance Magazine (October 9, 2014), *available at* http://www.gfmag.com/magazine/october-2014/best-class?page=5 ..................................12

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

The Clearing House Association L.L.C. ("The Clearing House"), an association of leading commercial banks, submits this memorandum as *amicus curiae* in support of non-party Citibank, N.A. ("Citibank").  Established in 1853, The Clearing House is the oldest banking association and payments company in the United States.  It is owned by the world's largest commercial banks, which collectively hold more than half of all U.S. deposits and which employ over one million people in the United States and more than two million people worldwide.[1]  The Clearing House is a nonpartisan advocacy organization that represents the interests of its owner banks by developing and promoting policies to support a safe, sound and competitive banking system that serves customers and communities.  Its affiliate, The Clearing House Payments Company L.L.C., which is regulated as a systemically important financial market utility under Article VIII of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, owns and operates payments technology infrastructure that provides safe and efficient payment, clearing and settlement services to financial institutions.  It clears almost $2 trillion each day, representing nearly half of all automated clearing house, funds transfer and check-image payments made in the United States.[2]

---

[1]     The members of The Clearing House are, in addition to Citibank, N.A., Banco Santander, S.A.; Bank of America, N.A.; The Bank of New York Mellon; Bank of the West; The Bank of Tokyo-Mitsubishi UFG, Ltd.; Barclays Bank PLC; Branch Banking and Trust Company; Capital One, N.A.; Citizens Bank, N.A.; Comerica Bank; Deutsche Bank Trust Company Americas; Fifth Third Bank; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; KeyBank, N.A.; Manufacturers and Traders Trust Company; PNC Bank, N.A.; State Street Bank and Trust Company; SunTrust Bank; The Toronto-Dominion Bank; UBS AG; U.S. Bank N.A.; and Wells Fargo Bank, N.A.

[2]     *See* The Clearing House's web page at www.theclearinghouse.org.

The Clearing House regularly appears as *amicus curiae* before courts in cases that raise significant legal issues relating to banking and national and international payment systems. The Clearing House has a substantial interest in the issues presented in this proceeding.  Its member banks and their affiliates are significant participants as financial intermediaries in the U.S. and international financial and credit markets, including, in particular, in connection with holding securities in custody for their retail customers.  As discussed in this brief, applying the Amended February 23, 2012 Injunction (the "Amended Injunction") to Citibank's branch in Argentina ("Citi Argentina") to prohibit Citi Argentina from transmitting payments on bonds that it holds as custodian for its banking customers would order a bank to violate a foreign state's own banking laws and regulations.  At a time when the reliability of financial institutions around the world remains under scrutiny, an order that would mandate that Citi Argentina break Argentine law requiring that it credit its customers' accounts would raise anew the question of whether bank customers can trust their own bank to comply with the most basic banking and custody obligation:  paying customers their money.  Further, enjoining Citibank could have a broad impact on New York's standing as the world's leading financial center.

## PRELIMINARY STATEMENT

Citibank and Argentina will present the reasons why applying the Amended Injunction to the Argentine law bonds at issue here would be contrary to law and the proper exercise of equity.  The Clearing House endorses those reasons and will not repeat them here. This brief seeks to bring to the Court's attention policy matters that, the Clearing House submits, also require that the Amended Injunction not be applied to Citi Argentina.

First, the Court should take into account the well-accepted role of Argentine law in regulating Citi Argentina's relationship with its customers.  Under principles of law and international comity, United States courts regularly modify the force of injunctive or other relief,

or dismiss actions premised on U.S. law, in order not to interfere with the primary role of foreign law in banking relationships centered abroad. This is particularly the case where the banking law Citi Argentina would be required to violate—the obligation to timely credit customer accounts upon the receipt of funds on the customer's behalf—is the same law that would apply to a bank or securities custodian within the United States. It is not some obscure law or regulation that conflicts with U.S. or international expectations within the banking and financial community.

The Court should also take into account the central fact here—that Citi Argentina had no involvement with the issuance of the sovereign bonds at issue and has not been assigned any role in the payment stream for those bonds. Citi Argentina did not choose to hold the bonds at issue. Rather, Citibank is before the Court because numerous retail and institutional customers chose Citi Argentina, over local institutions and custodians headquartered elsewhere, as a safe and reliable place to hold their investments. The Clearing House is deeply concerned that requiring a bank in the position of Citi Argentina to violate the most fundamental element of the trust the customers placed in the bank because the bank is within the jurisdiction of this Court, will have long-term deleterious consequences for New York banks generally in their efforts to compete in foreign countries. The Clearing House submits that extending the reach of the Amended Injunction that far would erode the hard-won reputation for reliability that New York banks enjoy and would undermine New York's preeminence as a financial center.

As discussed below, these policy concerns weigh heavily in favor of vacating any existing restraint imposed by the Court's July 28, 2014 Order, and of making clear that the Amended Injunction does not require mere custodians to withhold from their customers the payments received on the bonds at issue here.

## ARGUMENT

I. **THE COURT SHOULD NOT APPLY THE AMENDED INJUNCTION TO CITI ARGENTINA'S TRANSMISSION OF PAYMENTS ON THE USD-DENOMINATED BONDS GOVERNED BY ARGENTINE LAW.**

The Court should vacate or modify any existing restraint imposed by the July 28 Order. That Order was by its terms not intended to be a final order on the subject, as the Court recognized in scheduling the present proceedings. *See* 9/26/2013 Tr. 31:5–18 (the July 28 Order was rendered before "full briefing and argument" and did not "attempt to cover" all of the issues involving Citi Argentina). The Court is therefore free to reconsider its ruling under Federal Rule of Civil Procedure 54(b). *See Grace* v. *Rosenstock*, 228 F.3d 40, 51 (2d Cir. 2000) ("All interlocutory orders remain subject to modification or adjustment prior to the entry of a final judgment adjudicating the claims to which they pertain." (citing Fed. R. Civ. P. 54(b)).

Even under the standards applicable to modifying orders under Federal Rule of Civil Procedure 60, the standard that plaintiffs contend applies,[3] this Court has ample power to vacate the July 28 Order for any reason that justifies relief. *See, e.g.*, *Radack* v. *Norwegian Am. Line Agency, Inc.*, 318 F.2d 538, 542 (2d Cir. 1963) (Fed. R. Civ. P. 60(b) provides the Court with "a 'grand reservoir o[f] equitable power to do justice in a particular case.'"). Although the text of Rule 60 limits relief to "parties," there are exceptions that give interested non-parties standing to seek relief from an order, such as that here, that was intended to be implemented primarily through non-parties. *See, e.g.*, *Grace* v. *Bank Leumi Trust Co.*, 443 F.3d 180, 189 (2d Cir. 2006) (non-party transferees in fraudulent conveyance action had standing to vacate

---

[3]      Plaintiffs' Memorandum of Law in Opposition to Non-Party Citibank, N.A.'s Motion by Order to Show Cause, *NML Capital, Ltd.* v. *The Republic of Argentina*, No. 08-cv-6978, at 10-11 (S.D.N.Y. Sept. 26, 2014), Dkt. No. 680 ("Pls.' Br.").

judgment that was obtained with the aim of "laying the burden of compensating plaintiffs squarely on non-party movants").

A.    The Court Should Avoid Ordering Citi Argentina to Violate Argentina's Banking Laws.

Granting relief from the July 28 Order is justified here because the Court's order demands that Citi Argentina violate foreign law, foreign law that is, moreover, completely in accord with U.S. law.  That the Court should consider this factor is well-established by the doctrine of international comity.

The Second Circuit has recently made clear that the Court should undertake a comity analysis before ordering a bank to take action in a foreign country that may violate foreign law.  *Gucci Am., Inc.* v. *Li*, 768 F.3d 122, 138–39 (2d Cir. 2014) (reversing order directing bank to comply with a freeze of assets abroad and remanding for comity analysis where there was "an apparent conflict" with "the requirements of Chinese banking law").[4]

The Second Circuit has looked to the factors set forth in the Restatement (Third) of Foreign Relations Law to define the Court's comity inquiry.  Three of those factors are particularly relevant here:

- "the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;"

---

[4]    The Court should undertake that analysis now, and not after forcing Citi Argentina to decide whether to risk contempt in order to test whether the Amended Injunction may properly be held to apply to it.  *See Gucci Am.*, 768 F.3d at 139 ("A comity analysis drawing upon § 403 is similarly appropriate *before* ordering a nonparty foreign bank to freeze assets abroad in apparent contravention of foreign law to which it is subject.") (emphasis added); *NML Capital, Ltd.* v. *Republic of Argentina*, 727 F.3d 230, 243 (2d Cir. 2013) (noting that "[t]he doors of the district court obviously remain open for . . . applications" to clarify who is bound by the Amended Injunction).

- "the extent to which the regulation is consistent with the traditions of the international system;" and

- "the likelihood of conflict with regulation by another state."

*See* Restatement (Third) of Foreign Relations Law § 403(2); *Gucci Am.*, 768 F.3d at 139 n.20. These factors all weigh strongly in favor of Citibank and against subjecting Citi Argentina to the Amended Injunction.[5]

As to the first of these factors, "the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted," Argentina has a strong and well-accepted interest in the regulation of banks operating within its borders. Courts throughout the United States have for decades applied foreign law to cases before them, or have dismissed cases altogether, out of deference to the interests of foreign states in regulating banking activity within their borders.[6] For example, in *Reebok*, the Ninth Circuit

---

[5]     The other factors in the comity analysis also point decidedly towards deferring to Argentina's law here. They are: "the link of the activity to the territory of the regulating state [here, Argentina], *i.e.*, the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory"; "the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect"; "the existence of justified expectations that might be protected or hurt by the regulation"; "the importance of the regulation to the international political, legal, or economic system"; and "the extent to which another state may have an interest in regulating the activity." Restatement (Third) of Foreign Relations Law § 403(2).

[6]     *See, e.g.*, *Reebok Int'l Ltd.* v. *McLaughlin*, 49 F.3d 1387 (9th Cir. 1995) (discussed in text); *Wultz* v. *Bank of China Ltd.*, 865 F. Supp. 2d 425, 429 (S.D.N.Y. 2012) (finding that Chinese law applied to the case due to "China's interest in regulating bank conduct within its borders"); *Deirmenjian* v. *Deutsche Bank, A.G.*, No. CV 06–00774, 2010 WL 3034060, at *12, *14 (C.D. Cal. July 30, 2010) (finding that Turkish law applied to the case due to Turkey's "interest in regulating banks within its borders"); *Stroitelstvo Bulg., Ltd.* v. *Bulgarian-Am. Enter. Fund*, 598 F. Supp. 2d 875, 888–89 (N.D. Ill. 2009)

overturned a finding of contempt against a foreign bank for releasing funds to a depositor in

violation of the district court's order.  49 F.3d at 1388–89.  The foreign bank was subject to

competing orders because Luxembourg law required the release of a depositor's funds on

demand.  *Id.* at 1392.  The Ninth Circuit held that the plaintiff "cannot . . . turn to the United

States district court to punish [the foreign bank] for complying with its own country's statutory

and judicial law within that country.  The injunctive power of a federal district court cannot

extend *that* far."  *Id.* at 1393.  The court concluded that "we cannot arrogate to the federal courts

the power to control the banking systems of other countries within their own territory."  *Id.* at

1395.

        These principles apply both to the operations of foreign banks in their home

countries and to the foreign offices of banks headquartered in the United States and elsewhere.

*See, e.g.*, *LaSala*, 514 F. Supp. 2d at 462 (Swiss office of Lloyds TSB Bank); *Deirmenjian*, 2010

WL 3034060, at *12, *14 (activities of Deutsche Bank, A.G. in Ottoman Empire territory that

later became Turkey); *see also Motorola Credit Corp.* v. *Standard Chartered Bank*, 21 N.E.3d

223, 226–27, 229–30 (N.Y. 2014) (noting that comity applies to activities of Standard Chartered

Bank in Jordan and the United Arab Emirates).  Banks acting in foreign countries are governed

---

(dismissed on the ground of *forum non conveniens* in part due to Bulgaria's "interest in
regulating the activities of the [Bulgarian] Bank"); *LaSala* v. *Lloyds TSB Bank, PLC*, 514
F. Supp. 2d 447, 462, 481 (S.D.N.Y. 2007) (dismissed on the ground of *forum non
conveniens* in part due to the fact that "Switzerland possesses a strong interest in
regulating the conduct of banks within its borders"); *In re Donald G. Atteberry, DVM,
P.A.*, 159 B.R. 1, 9 (D. Kan. 1993) (affirmed bankruptcy court's decision to dismiss on
the ground of *forum non conveniens* in part because "England has a compelling interest in
regulating local banking activities without the second guessing or interference of foreign
courts," since "the local banking industry is an important variable in a country's
economic policy"); *Chase Manhattan Bank, N.A.* v. *Banque de Financement, S.A.*, Nos.
75 Civ. 39, 75 Civ. 290, 75 Civ. 299, 1976 U.S. Dist. LEXIS 17394, at *6–8 (S.D.N.Y.
May 14, 1976) (Swiss law prevails over New York law because "Switzerland has an
interest in regulating the relationship between its banks and their customers.").

and regulated by local law and local banking authorities.  Argentina, too, has an undeniably

strong interest in regulating its banking industry.

The second *Restatement* factor discussed above, "the extent to which the

regulation is consistent with the traditions of the international system," also weighs in Citi

Argentina's favor.  Argentine law requiring payment to customers of amounts received on

instruments held in custody is completely "consistent with the traditions of the international

system."  New York law, for example, provides that a "securities intermediary," which includes

"a bank acting as securities custodian [for] its custodial customers," *see* N.Y. U.C.C. Law § 8-

501 cmt. 1, "is obligated to its entitlement holder for those payments or distributions made by the

issuer that are in fact received by the intermediary," N.Y. U.C.C. Law § 8-505 cmt. 3.[7]

Further, there is little doubt about the existence of a conflict with regulation of

another state, the third *Restatement* factor discussed above.  The unrebutted record shows that

Citi Argentina's failure to make payments received on instruments held in its custody for its

customers, such as the USD-denominated Argentine law exchange bonds, would breach its

obligations to its customers and thereby violate Argentine law, banking regulations, and even

---

[7]     That a foreign court's injunction cannot relieve Citi Argentina of its obligations to its
        custody customers in Argentina, *see* Declaration of Maximiliano D'Auro, dated May 21,
        2013 ("D'Auro Decl.") at ¶¶ 16–18 (No. 09-cv-1707, Dkt. No. 276), is likewise
        consistent with New York law.  Under Sections 134 and 204-a(1) of New York Banking
        Law, for example, a foreign claim that would block payment of a credit balance owed to
        a bank's customer, even a claim backed by a foreign court's order, "shall not be effectual
        in this state to cause [the bank] to recognize said adverse claimant unless said adverse
        claimant shall also either procure a restraining order, injunction or other appropriate
        process against [the bank] from a court of competent jurisdiction in the United States" or
        obtain a bond.  N.Y. Banking Law § 204-a(1); *accord* N.Y. Banking Law § 134(4)–(5).
        In other words, if an Argentine bank owed money to a customer at its New York branch,
        a foreign court order purporting to bar its payment in New York "shall not be effectual in
        this state" so as to excuse the bank from paying the obligation unless the foreign order is
        backed up by an order of a United States court.

criminal law.  D'Auro Decl. at ¶¶ 19–23; Declaration of Manuel Beccar Varela, dated May 21, 2013,  ¶¶ 4–7 (No. 09-cv-1707, Dkt. No. 275).

That a comity analysis would lead to lifting the application of the Amended Injunction in this case is also strongly supported by the separate Foreign Sovereign Compulsion doctrine, which is set forth in the Restatement (Third) of Foreign Relations Law § 441(1):  "In general, a state may not require a person (a) to do an act in another state that is prohibited by the law of that state . . . ; or (b) to refrain from doing an act in another state that is required by the law of that state."  Here, compliance with the Amended Injunction would force Citi Argentina to violate Argentine law.

The Separate Entity Rule, which treats a foreign bank branch as a separate entity from its U.S.-based counterparts for purposes of court orders requiring action overseas, provides further support for restricting the reach of the Amended Injunction.  As the New York Court of Appeals recently explained in upholding the Rule, foreign branches of international banks will not be required to violate foreign law governing those branches because they are deemed separate entities for legal purposes.  *See Motorola Credit Corp.*, 21 N.E.3d at 229 ("the separate entity rule promotes international comity and serves to avoid conflicts among competing legal systems" and noting that this reason for adoption of the rule "still ring[s] true today"); *see also, e.g.*, *Shaheen Sports, Inc.* v. *Asia Ins. Co.*, Nos. 98 Civ. 5951, 11 Civ. 920, 2012 WL 919664, at *3, *5 (S.D.N.Y. Mar. 14, 2012) (noting that the Separate Entity Rule was created to "avoid[] the 'intolerable burden' that would otherwise be placed on banking and commerce")).

Plaintiffs assert that Citi Argentina should be subjected to conflicting laws because Citibank chose to do business in many jurisdictions and now must live with the consequences.  *See* Pls.' Br. at 25.  But that amounts to a suggestion that the United States courts

-9-

should not recognize the limits of their reach over the international operations of transnational business enterprises.  Citibank could not have structured its business operations in a way to avoid the conflict it now faces unless it ceased all custodial business outside the United States, with the inevitable attendant loss of other business with custodial clients.  Requiring Citibank to avoid all business operations in certain markets does not make sense, and directly contravenes United States and New York public policy, as discussed below.

     **B.**    **Applying the Amended Injunction to Citi Argentina Risks Undermining New York's Standing as a Financial Center.**

The Clearing House further respectfully submits that applying the Amended Injunction to Citi Argentina's obligations as a custodian in Argentina could have unintended adverse effects on New York banks and New York's standing as a financial center, and this provides a separate reason to decline to apply the Amended Injunction to Citibank.  The Court should give considerable weight to the risk that requiring Citi Argentina to withhold payment of funds it receives for its customers in Argentina would have on the reputation of both Citi Argentina, and New York-headquartered banks in general, for reliability in serving their emerging market customers.

We explain immediately below, first, that Citi Argentina is a custodian, not a trustee, paying agent, or any other entity that is paid by Argentina to facilitate the servicing of Argentina's debt; second, how forcing Citi Argentina to withhold payment it receives on account of the bonds at issue here, where the bank is compelled to comply because it has an office in New York, is likely to damage the reputation of New York banks for reliability and New York's status as a financial center; and third, the public policy considerations favoring the Court's considering, in close cases, the impact of its decisions on New York's role as a global financial center.

-10-

1. <u>Citi Argentina is paid by its customers to hold securities in custody accounts.</u>

Citi Argentina serves as custodian or sub-custodian on, among other things, certain Argentine law USD-denominated bonds.  A custodian bank is a financial institution that holds customers' securities, bonds and other assets in electronic or physical form.  "The bank holds the customer's property in safekeeping, as provided by a written agreement, collects dividends and interest payments, and sells or delivers securities when instructed by the principal."  Thomas P. Fitch, *Dictionary of Banking Terms* 129 (Irwin L. Kellner & Donald G. Simonson eds., 5th ed. 2006).  Thus, a custodian owes duties to its custodial account holders, not to the issuers of the securities that it holds.

Indeed, in its capacity as custodian, Citi Argentina does not have any contractual relationship with Argentina.  Citi Argentina owes its duty to, and is compensated by, its customers who hold the bonds at issue in exchange for the custodial services of Citi Argentina, which include, among other things, receiving payment from Caja de Valores S.A., paying agent on corporate and government securities, *see* D'Auro Decl. at  ¶¶ 7, 10, and timely crediting customer accounts with the funds received on their behalf.  The funds that Citi Argentina receives are indisputably the property of its customers, not Argentina or anyone else.  The funds became the customers' property when the funds were deposited in Citi Argentina's account at the Central Bank of Argentina.  *See* D'Auro Decl. at ¶ 10.  Because the money belongs to its customers, Citi Argentina is obligated both by contract entered into with its customers and by Argentine law to credit its customers' accounts.  *See id.* at ¶¶ 11–12, 20–21.  Citi Argentina is not acting on behalf of, in the interest of, or satisfying an obligation owed to, Argentina.

Thus, unlike the entities expressly named in the Amended Injunction, Citi Argentina is not part of the payment stream that was contemplated when the bonds were issued. It is before the Court because of decisions made by numerous customers to hold Argentine debt.

2. <u>Requiring Citi Argentina to block payments on these bonds will impair the reputation of the Bank, and by extension, New York banks generally, in emerging markets.</u>

New York-based banks with global operations are engaged by customers to serve as financial intermediaries for a reason. From an investor or customer's perspective, New York banks are trusted, reliable entities. Citi Argentina is a leading participant in the market for custodial services in Argentina. Its role has been recognized repeatedly in awards by leading publications in the field. *See, e.g.*, *World's Best Subcustodians 2014*, Global Finance Magazine (October 9, 2014), *available at* http://www.gfmag.com/magazine/october-2014/best-class?page=5 (naming Citi the best sub-custodian in Argentina, and noting local institutions prevailed in many other countries). Its position is undoubtedly due, in large measure, to its reputation for reliability, a reputation it has been building since Citibank opened its first Argentine branch in 1914.[8] *See, e.g.*, Gordon Platt, *The World's Best Sub-Custodians*, Global Finance (July 5, 2010), *available at* https://www.gfmag.com/magazine/julyaugust-2010/the-worlds-best-sub-custodians (noting that the best custodial banks in the world, including Citi, were chosen because they are "institutions that reliably provide the best custody services"). Enjoining Citi Argentina from crediting its customers' accounts would undermine that long-standing reputation, not only in Argentina, but in numerous other countries as well.[9]

---

[8]  *See Citi History Timeline*, http://www.citigroup.com/citi/press/mobile/ir/html/timeline/index-com.html (last visited Feb. 9, 2015).

[9]  Citibank offers custodial services in over 60 markets worldwide. *See Direct Custody and Clearing*, https://www.citibank.com/mss/dcc/ (last visited Feb. 9, 2015).

The concern is that a New York order requiring Citi Argentina to violate the trust that thousands of Argentine individuals and institutions have placed in it would have a larger effect on New York's status. That concern is far from fanciful. *Cf.* Floyd Norris, *Ruling on Argentina Gives Investors an Upper Hand*, N.Y. Times, June 20, 2014, at B1 (opining that Amended Injunction "most likely damaged the status of New York as the world's financial capital" and could "lead to countries choosing to borrow under English law, rather than New York law, and thus diminish the role of New York as a world financial center"). It is virtually certain that Argentine institutions and possibly others whose operations are beyond the reach of this Court will capitalize on the spectacle of Argentine holders of their government's debt going unpaid on account of having placed their securities in the custody of a branch of a New York-based bank. There will be ripple effects of that breach of trust, even if it is impossible to predict how large the waves, how many other banks will be in their path, or how significant the damage. *See* John Gay, *The Fox at the Point of Death*, line 46, *in* FABLES (1727) ("A lost good name is ne'er retriev'd.").

The New York Court of Appeals recognized this basic policy concern in its recent decision upholding the Separate Entity Rule. The Court noted that the Rule, which it called "a firmly established principle of New York law," had "played a role in shaping New York's 'status as the preeminent commercial and financial nerve center of the Nation and the world.'" *Motorola Credit Corp.*, 21 N.E.3d at 227, 229. The Court concluded, "[W]e believe that abolition of the separate entity rule would result in serious consequences in the realm of international banking to the detriment of New York's preeminence in global financial affairs." *Id.* at 230. The Court of Appeals' decision constitutes not only a reaffirmation of a well-established principle of relevant law, but an authoritative statement of the public policy of New

York to trim the extraterritorial exercise of judicial power in light of its effect on New York's status as a financial center.  The Clearing House submits that treating Citi Argentina as though it were one and the same as Citibank here in New York, so as to impose on Citi Argentina obligations inconsistent with its obligations in Argentina, raises precisely the same concern.

3.  <u>The United States has an interest in preserving New York's status as the world's preeminent financial center.</u>

The United States has long had "an interest in maintaining New York's status as one of the foremost commercial centers in the world." *Allied Bank Int'l* v. *Banco Credito Agricola de Cartago*, 757 F.2d 516, 521 (2d Cir. 1985).  This status is reflected in many ways.  It is reflected, for example, in the leading position that New York law occupies among sovereign and commercial issuers of bonds.  *See* Udaibir S. Das et al., *Sovereign Debt Restructurings 1950-2010: Literature Survey, Data, and Stylized Facts* 41 (Int'l Monetary Fund Working Paper No. 12/203, August 2012) (as of March 2009, out of a total of $411 billion of emerging market sovereign bonds, New York law governed a total outstanding amount of $272 billion), *available at* http://www.un.org/esa/ffd/ecosoc/debt/2013/IMF_wp12_203.pdf.  This motion concerns a different aspect of New York's role—the perceived reliability of its institutions.  New York's role in the international financial marketplace is extremely important to New York and the United States more generally.  It provides jobs in the finance sector and related industries and is an important element of the tax base.  *See, e.g.*, Michael R. Bloomberg & Charles E. Schumer, *Sustaining New York's and the US' Global Financial Services Leadership* 34–35 (2007) ("The financial services sector is a vital element of the US economy, and it is of particular importance to New York and a number of other states.  It is a large industry, fast-growing, a major contributor to the tax base, and a major source of quality jobs nationwide.").  New York is one of only two of the Top 10 cities in the United States to have a larger population today than in 1930.

-14-

That is because "New York . . . has reinvented itself over the past eighty years as a service city increasingly oriented around finance."  *See* Edward L. Glaeser, *Urban Colossus:  Why is New York America's Largest City?*, FRBNY Econ. Pol'y Rev., Dec. 2005, at 8, 20.  That trend has persisted through the last decade as "Manhattan employment is remarkably dependent on finance, business management, and business services."  *Id*.  It is no surprise, then, that the financial services sector "represents approximately 15 percent of real gross product for both New York City and New York State . . . .   The financial services sector is also critical to the local tax base, accounting for approximately 36 percent of the City's business income tax revenues in fiscal year 2005."  Bloomberg & Schumer, *Global Financial Leadership*, *supra*, at 35–36.

Global operations have a material impact on the financial success of New York-based banks.  Citigroup generates a majority of its revenue outside the United States, most of that from emerging markets, with a substantial investment in Argentina.  Citigroup, Inc., Annual Report (Form 10-K) 61, 130 (Mar. 3, 2014) ("During 2013, international revenues accounted for approximately 59% of Citi's total revenues," 41% of total revenues were from emerging markets, and as of December 31, 2013, Citi's net investment in its Argentine operations was approximately $730 million).  In 2013, JP Morgan Chase's Corporate and Investment Bank derived nearly half of its $34.2 billion revenue from international business activities.  *See* JPMorgan Chase & Co., Annual Report (Form 10-K) 102 (Feb. 20, 2014).  Morgan Stanley derived over 49% of its revenue from outside the United States in 2013.  *See* Morgan Stanley, Banking Organization Systemic Risk Report (Form FR Y-15) Schedule F (Dec. 31, 2013).

It may be said that enlisting the assistance of global institutions within the jurisdiction of this Court, and imposing upon them the resulting costs and burdens even if they are really no more than bystanders, was the *sine qua non* of the Amended Injunction.  But in

addition to other applicable legal limits on the reach of the Amended Injunction in this case, the proper exercise of this Court's injunctive power always lies in striking the correct balance between competing interests. *See Winter* v. *NRDC, Inc.*, 555 U.S. 7, 24 (2008) (Roberts, C.J.) ("In each case, courts must balance the competing claims of injury and must consider the effect on each party . . . .  In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." (internal quotation marks omitted)).  The balance here is between the significance in ratcheting up the pressure on Argentina and increasing the likelihood of compliance, on the one hand, and the damage done to third parties whose connections to the delinquent actor are attenuated or nonexistent, on the other hand.  The Clearing House submits that, in striking that balance, the benefits of extending the Amended Injunction beyond the U.S. law bonds that were the focus of the litigation at the time the Amended Injunction was issued are marginal.  But the risks presented to Citi Argentina's business and to New York's financial sector are substantial and counsel against extending the injunction in this way.

## CONCLUSION

The Clearing House supports Citibank's arguments in its brief on this motion.  In addition, in deciding this matter, the Court should consider the well-established policies against directing actions in violation of banking obligations and regulation abroad, particularly where the obligations are the neutral and commonplace obligations at issue here.  This Court should also consider the risks of harm to Citi Argentina, to New York banks' reputation for reliability, and to New York as a financial center.  These considerations strongly support Citibank's arguments.

Dated: February 9, 2015
      New York, New York

                        Respectfully submitted,

Joseph R. Alexander           /s/ *Joseph E. Neuhaus*
THE CLEARING HOUSE       Joseph E. Neuhaus
  ASSOCIATION L.L.C.        Michael J. Ushkow
450 West 33rd Street           Owen R. Wolfe
New York, New York  10001     John P. Collins
(212) 613-0100               SULLIVAN & CROMWELL LLP
                        125 Broad Street
H. Rodgin Cohen            New York, New York  10004-2498
Bruce E. Clark              Tel.:  (212) 558-4000
    *Of Counsel*

                        *Counsel for Amicus Curiae The Clearing*
                        *House L.L.C.*