# **Exhibit 1**

CONFIDENTIAL—SUBJECT TO COURT ORDER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                     :

NML CAPITAL, LTD.,

                     :

         Plaintiff,         :      08 Civ. 6978 (TPG)

                     :

         v.                :

THE REPUBLIC OF ARGENTINA,    :   **SECOND AMENDED AND**

                     :   **SUPPLEMENTAL COMPLAINT**

         Defendant.      :

                     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiff, NML Capital, Ltd., ("NML"), by its undersigned counsel, as and for its Second Amended and Supplemental Complaint against Defendant Republic of Argentina ("Argentina"), alleges as follows:

## NATURE OF THE ACTION

1.     This is a breach of contract action arising from Argentina's failure to make contractually-mandated principal and interest payments on certain bonds issued by Argentina and held by NML.  The bonds in question were issued pursuant to a Fiscal Agency Agreement, dated October 19, 1994 (the "FAA") between Argentina and Bankers Trust Company, as Fiscal Agent.  For its relief, NML seeks payment of the principal amount of the bonds together with any accrued and unpaid interest, as provided for in the FAA.  A true and accurate copy of the FAA is attached as Exhibit A.

2.     In this pleading, Plaintiff is asserting two additional claims for declaratory and injunctive relief.  The two new claims concern bonds bearing ISIN ARARGE03H413 (the "BONAR 2024 Bonds") and Argentina's other existing and future External Indebtedness (other than the Exchange Bonds which are already the subject of declaratory and injunctive relief issued

by this Court).  Plaintiff is requesting: (i) a declaratory judgment that the BONAR 2024 Bonds are External Indebtedness within the meaning of the FAA, and (ii) specific performance of the Republic's obligations under the Equal Treatment Provision in the FAA by preliminarily and permanently enjoining the Republic from making payments of interest and/or principal on the existing and future BONAR 2024 Bonds and other External Indebtedness unless a "Ratable Payment" is made in respect of Plaintiff's defaulted bonds.

3.      This action also seeks relief based on Argentina's continuing breach of the Equal Treatment Provision of the FAA, paragraph 1(c) of the FAA, which provides for equal treatment in terms of rank and priority of payment for holders of bonds issued under the FAA with respect to any unsecured and unsubordinated External Indebtedness as defined in the FAA (the "Equal Treatment Provision").  Under color of Law 26,017 passed in 2005 and Law 26,547 passed in 2009, Argentina issued bonds in its 2005 and 2010 Bond Exchanges with payment obligations that rank higher than those issued under the FAA and held by NML.  The bonds issued in the Exchanges are External Indebtedness. Argentina's issuance of these higher ranking bonds, its continuing payment of semi-annual interest to the holders of the bonds issued in the 2005 Bond Exchange and its anticipated payment of interest to the holders of the bonds issued in the 2010 Bond Exchange, while paying nothing to NML and other bondholders who did not participate in the Exchanges, violate the Equal Treatment Provision of the FAA.  To prevent further violations, NML seeks specific enforcement of the Equal Treatment Provision.

4.      Beginning in May 2014, the Republic began issuing the BONAR 2024 Bonds and has made payments on them all while paying nothing to plaintiff and other bondholders who did not participate in the 2005 and 2010 Bond Exchanges—in violation of the Equal Treatment Provision.  Accordingly, to remedy this violation and prevent further violations,

plaintiff seeks in its Ninth Claim for Relief specific enforcement of the Equal Treatment Provision with respect to the BONAR 2024 Bonds.

## THE PARTIES

5.       Plaintiff NML is a corporation organized and existing under the laws of the Cayman Islands.

6.       Defendant Republic of Argentina is a Foreign State as defined in 28 U.S.C. § 1603.

## JURISDICTION AND VENUE

7.       This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1330, as Argentina is a Foreign State which has explicitly and unconditionally waived sovereign immunity with respect to actions arising out of the FAA by holders of bonds issued thereunder and is, therefore, not entitled to immunity under 28 U.S.C. §§ 1605-07 or under any applicable international agreement.

8.       In addition, Argentina consented in the FAA to submit to the jurisdiction of this Court in respect to actions arising out of the FAA or bonds issued thereunder.  Pursuant to Section 22 of the FAA, Argentina appointed Banco de la Nación Argentina, 299 Park Avenue, New York, New York 10171, as its authorized agent for service of process.  Section 23 of the FAA provides that the FAA shall be "governed by, and interpreted in accordance with, the laws of the State of New York."

9.       Venue is proper in this district by agreement of the parties and pursuant to 28 U.S.C. § 1391(f).

## FACTUAL ALLEGATIONS

The 11% Global Bonds

10.     Plaintiff is the holder of $225,000 principal amount of 11% Global Bonds issued by the Republic of Argentina, CUSIP No. 040114AN0 (the "11% Bonds").  A true and correct copy of the JP Morgan Global Settled Holdings COB Report, dated October 13, 2010, which shows Plaintiff's current ownership of $9,698,000 principal amount of the 11% Bonds, among other bonds issued by Argentina, is attached as Exhibit B.  The $9,698,000 principal amount of 11% Bonds referenced in Exhibit B includes:  (1) the $225,000 principal amount of 11% Bonds at issue in this action; (2) the $6,031,000 principal amount of 11% Bonds at issue in *NML Capital, Ltd. v. The Republic of Argentina*, brought in the Court as action 07 Civ. 1910 (TPG) and (3) the $3,442,000 principal amount of 11% Bonds at issue in *NML Capital, Ltd. v. The Republic of Argentina*, brought in this Court as action 09 Civ. 1708.

11.     Plaintiff acquired $225,000 of the 11% Bonds in one transaction on July 7, 2008.  A true and correct copy of the Consolidated Settlement ITD Report statements showing Plaintiff's purchase of the 11% Bonds, among other bonds issued by Argentina, is attached as Exhibit C.

12.     The 11% Bonds are a Series of Securities under the terms of the Agreement.

13.     The 11% Bonds matured on October 9, 2006, at which time the entire principal amount of the 11% Bonds became due and payable.

The 11.75% Global Bonds

14.     Plaintiff is the holder of $11,290,000 principal amount of 11.75% Global Bonds issued by the Republic of Argentina, CUSIP No. 040114BE9 (the "11.75% Bonds").  A true and correct copy of the JP Morgan Global Settled Holdings COB Report, dated October 13, 2010, which shows Plaintiff's current ownership of $27,989,000 principal amount of the 11.75%

Bonds, among other bonds issued by Argentina, is attached as Exhibit B.  The $27,989,000 principal amount of 11.75% Bonds referenced in Exhibit B includes:  (1) the $11,290,000 principal amount of 11.75% Bonds at issue in this action; (2) the $1,360,000 principal amount of 11.75% Bonds at issue in *NML Capital, Ltd. v. The Republic of Argentina*, brought in this Court as action 07 Civ. 1910 (TPG) and (3) the $15,339,000 principal amount of 11.75% Bonds at issue in *NML Capital, Ltd. v. The Republic of Argentina*, brought in this Court as action 09 Civ. 1708.

15.    Plaintiff acquired $11,290,000 of the 11.75% Bonds in five transactions: $100,000 on July 7, 2008, $690,000 on July 8, 2008, $5,000,000 on July 10, 2008, $500,000 on July 14, 2008 and $5,000,000 on July 24, 2008.  A true and correct copy of the Consolidated Settlement ITD Report statements showing Plaintiff's purchase of the 11.75% Bonds, among other bonds issued by Argentina, is attached as Exhibit C.

16.    The 11.75% Bonds are a Series of Securities under the terms of the FAA.

17.    The 11.75% Bonds matured on April 7, 2009.

The 11.375% Global Bonds

18.    Plaintiff is the holder of $10,260,000 principal amount of 11.375% Global Bonds issued by the Republic of Argentina, CUSIP No. 040114FC9 (the "11.375%% Bonds"). A true and correct copy of the JP Morgan Global Settled Holdings COB Report, dated October 13, 2010, which shows Plaintiff's current ownership of $22,005,000 principal amount of the 11.375% Bonds, among other bonds issued by Argentina, is attached as Exhibit B.  The $22,005,000 principal amount of 11.375% Bonds referenced in Exhibit B includes:  (1) the $10,260,000 principal amount of 11.375% Bonds at issue in this action; (2) the $6,280,000 principal amount of 11.375% Bonds at issue in *NML Capital, Ltd. v. The Republic of Argentina*,

brought in this Court as action 07 Civ. 1910 (TPG) and (3) the $5,465,000 principal amount of 11.375% Bonds at issue in *NML Capital, Ltd. v. The Republic of Argentina*, brought in this Court as action 09 Civ. 1708.

19.     Plaintiff acquired $10,260,000 of the 11.375% Bonds in two transactions: $260,000 on July 7, 2008 and $10,000,000 on July 21, 2008.  A true and correct copy of the Consolidated Settlement ITD Report statements showing Plaintiff's purchase of the 11.375% Bonds, among other bonds issued by Argentina, is attached as Exhibit C.

20.     The 11.375% Bonds are a Series of Securities under the terms of the FAA.

21.     The 11.375% Bonds matured on March 15, 2010.

The 12.375% Global Bonds

22.     Plaintiff is the holder of $10,500,000 principal amount of 12.375% Global Bonds issued by the Republic of Argentina, CUSIP No. 040114GD6 (the "12.375% Bonds").  A true and correct copy of the JP Morgan Global Settled Holdings COB Report, dated October 13, 2010, which shows Plaintiff's current ownership of $20,429,000 principal amount of the 12.375% Bonds, among other bonds issued by Argentina, is attached as Exhibit B.   The $20,429,000 principal amount of 12.375% Bonds referenced in Exhibit B includes:  (1) the $10,500,000 principal amount of 12.375% Bonds at issue in this action; (2) the $1,720,000 principal amount of 12.375% Bonds at issue in *NML Capital, Ltd. v. The Republic of Argentina*, brought in this Court as action 07 Civ. 1910 (TPG) and (3) the $8,209,000 principal amount of 12.375% Bonds at issue in *NML Capital, Ltd. v. The Republic of Argentina*, brought in this Court as action 09 Civ. 1708.

23.     Plaintiff acquired $10,500,000 of the 12.375% Bonds in two transactions: $500,000 on July 14, 2008 and 10,000,000 on July 24, 2008.  A true and correct copy of the

Consolidated Settlement ITD Report statements showing Plaintiff's purchase of the 12.375% Bonds, among other bonds issued by Argentina, is attached as Exhibit C.

24.     The 12.375% Bonds are a Series of Securities under the terms of the FAA.

25.     The 12.375% Bonds mature on February 21, 2012.

The 11-3/8% Global Bonds

26.     Plaintiff is the holder of $42,155,000 principal amount of 11-3/8% Global Bonds issued by the Republic of Argentina, CUSIP No. 040114AR1 (the "11-3/8% Bonds").  A true and correct copy of the JP Morgan Global Settled Holdings COB Report, dated October 13, 2010, which shows Plaintiff's current ownership of $71,788,000 principal amount of the 11-3/8% Bonds, among other bonds issued by Argentina, is attached as Exhibit B.  The $71,788,000 principal amount of 11-3/8% Bonds referenced in Exhibit B includes:  (1) the $42,155,000 principal amount of 11-3/8% Bonds at issue in this action; (2) the $14,332,000 principal amount of 11-3/8% Bonds at issue in *NML Capital, Ltd. v. The Republic of Argentina*, brought in this Court as action 07 Civ. 1910 (TPG) and (3) the $15,301,000 principal amount of 11-3/8% Bonds at issue in *NML Capital, Ltd. v. The Republic of Argentina*, brought in this Court as action 09 Civ. 1708.

27.     Plaintiff acquired $42,155,000 of the 11-3/8% Bonds in six transactions: $2,000,000 on June 9, 2008, 9,000,000 on June 24, 2008, 5,000,000 on June 27, 2008, 2,500,000 on June 30, 2008, 8,000,000 on July 15, 2008 and 15,655,000 on July 18, 2008.  A true and correct copy of the Consolidated Settlement ITD Report statements showing Plaintiff's purchase of the 11-3/8% Bonds, among other bonds issued by Argentina, is attached as Exhibit C.

28.     The 11-3/8% Bonds are a Series of Securities under the terms of the FAA.

29.     The 11-3/8% Bonds mature on January 30, 2017.

The 12% Global Bonds

30.     Plaintiff is the holder of $1,100,000 principal amount of 12% Global Bonds issued by the Republic of Argentina, CUSIP No. 040114FB1 (the "12% Bonds").  A true and correct copy of the JP Morgan Global Settled Holdings COB Report, dated October 13, 2010, which shows Plaintiff's current ownership of $61,942,000 principal amount of the 12% Bonds, among other bonds issued by Argentina, is attached as Exhibit B.  The $61,942,000 principal amount of 12% Bonds referenced in Exhibit B includes:  (1) the $1,100,000 principal amount of 12% Bonds at issue in this action; (2) the $60,244,000 principal amount of 12% Bonds at issue in *NML Capital, Ltd. v. The Republic of Argentina*, brought in this Court as action 03 Civ. 8845 (TPG); (3) the $300,000 principal amount of 12% Bonds at issue in *NML Capital, Ltd. v. The Republic of Argentina*, brought in this Court as action 07 Civ. 6563 (TPG) and (4) the $298,000 principal amount of 12% Bonds at issue in *NML Capital, Ltd. v. The Republic of Argentina*, brought in this Court as action 09 Civ. 1708.

31.     Plaintiff acquired $1,100,000 of the 12% Bonds in one transaction on July 16, 2008.  A true and correct copy of the Consolidated Settlement ITD Report statements showing Plaintiff's purchase of the 12% Bonds, among other bonds issued by Argentina, is attached as Exhibit C.

32.     The 12% Bonds are a Series of Securities under the terms of the FAA.

33.     The 12% Bonds mature on February 1, 2020.

The 9.75% Global Bonds

34.     Plaintiff is the holder of $5,550,000 principal amount of 9.75% Global Bonds issued by the Republic of Argentina, CUSIP No. 040114AV2 (the "9.75% Bonds").  A true and correct copy of the JP Morgan Global Settled Holdings COB Report, dated October 13,

2010, which shows Plaintiff's current ownership of $26,438,000 principal amount of the 9.75%

Bonds, among other bonds issued by Argentina, is attached as Exhibit B.  The $26,438,000

principal amount of 9.75% Bonds referenced in Exhibit B includes:  (1) the $5,550,000 principal

amount of 9.75% Bonds at issue in this action; (2) the $4,598,000 principal amount of 9.75%

Bonds that is at issue in *NML Capital, Ltd. v. The Republic of Argentina*, 07 Civ. 1910; and (3)

the $16,290,000 principal amount of 9.75% Bonds at issue in *NML Capital, Ltd. v. The Republic

of Argentina*, brought in this Court as action 09 Civ. 1708.

      35.     Plaintiff acquired $5,550,000 of the 9.75% Bonds in four transactions:

$600,000 on July 7, 2008, 1,000,000 on July 15, 2008, 2,000,000 on July 17, 2008 and 1,950,000

on July 21, 2008.  A true and correct copy of the Consolidated Settlement ITD Report statements

showing Plaintiff's purchase of the 9.75% Bonds, among other bonds issued by Argentina, is

attached as Exhibit C.

      36.     The 9.75% Bonds are a Series of Securities under the terms of the FAA.

      37.     The 9.75% Bonds mature on September 19, 2027.

The Republic of Argentina's Default

      38.     Pursuant to Section 12 of the FAA, the following occurrences, among

others, constitute Events of Default:

> (a) Non-Payment:  the Republic fails to pay any principal amount
> of any of the Securities of such Series when due or payable or fails
> to pay any interest on any of the Securities of such Series when
> due and payable and such failure continues for a period of 30 days;
> or
>
> \*   \*   \*
>
> (d) Moratorium:  a moratorium on the payment of principal of, or
> interest on, the Public External Indebtedness of the Republic shall
> be declared by the Republic.

39.     Upon the occurrence of an Event of Default described in Section 12(a) or 12(d) of the FAA, Section 12 further provides that each bondholder may, by notice in writing to the office of the Fiscal Agent, declare the principal amount of the bonds held by it to be due and payable immediately, together with all accrued and unpaid interest.

40.     On December 24, 2001, Argentina declared a moratorium on the payment of principal and interest with respect to all of its foreign debt.

41.     Since then, Argentina has failed to make payments of interest owed on the 11% Bonds, the 11.75% Bonds, the 11.375% Bonds, the 12.375% Bonds, the 11-3/8% Bonds, the 12% Bonds, or the 9.75% Bonds.

42.     Argentina failed to make the interest payments due on the 11% Bonds on April 9, 2002, October 9, 2002, April 9, 2003, October 9, 2003, April 9, 2004, October 9, 2004, April 9, 2005, October 9, 2005, April 9, 2006, October 9, 2006, April 9, 2007, October 9, 2007, April 9, 2008, October 9, 2009, April 9, 2009, October 9, 2009, April 10, 2010 and October 9, 2010, as required by the terms of the 11% Bonds.

43.     Argentina failed to make the interest payments due on the 11.75% Bonds on April 7, 2002, October 7, 2002, April 7, 2003, October 7, 2003, April 7, 2004, October 7, 2004, April 7, 2005, October 7, 2005, April 7, 2006, October 7, 2006, April 7, 2007, October 7, 2007, April 7, 2008, October 7, 2008, April 7, 2009, October 7, 2009, April 7, 2010 and October 7, 2010, as required by the terms of the 11.75% Bonds.

44.     Argentina failed to make the interest payments due on the 11.375% Bonds on March 15, 2002, September 15, 2002, March 15, 2003, September 15, 2003, March 15, 2004, September 15, 2004, March 15, 2005, September 15, 2005, March 15, 2006, September 15, 2006, March 15, 2007, September 15, 2007, March 15, 2008, September 15, 2008, March 15,

2009, September 15, 2009, March 15, 2010 and September 15, 2010, as required by the terms of the 11.375% Bonds.

45.     Argentina failed to make the interest payments due on the 12.375% Bonds on February 21, 2002, August 21, 2002, February 21, 2003, August 21, 2003, February 21, 2004, August 21, 2004, February 21, 2005, August 21, 2005, February 21, 2006, August 21, 2006, February 21, 2007, August 21, 2007, February 21, 2008, August 21, 2008, February 21, 2009, August 21, 2009, February 21, 2010 and August 21, 2010, as required by the terms of the 12.375% Bonds.

46.     Argentina failed to make the interest payments on the 11-3/8% Bonds on January 30, 2002, July 30, 2002, January 30, 2003, July 30, 2003, January 30, 2004, July 30, 2004, January 30, 2005, July 30, 2005, January 30, 2006, July 30, 2006, January 30, 2007, July 30, 2007, January 30, 2008, July 30, 2008, January 30, 2009, July 30, 2009, January 30, 2010 and July 30, 2010, as required by the terms of the 11-3/8% Bonds.

47.     Argentina failed to make the interest payments due on the 12% Bonds on February 25, 2002, August 25, 2002, February 25, 2003, August 25, 2003, February 25, 2004, August 25, 2004, February 25, 2005, August 25, 2005, February 25, 2006, August 25, 2006, February 25, 2007, August 25, 2007, February 25, 2008, August 25, 2008, February 25, 2009, August 25, 2009, February 25, 2010 and August 25, 2010, as required by the terms of the 12% Bonds.

48.     Argentina failed to make the interest payments due on the 9.75% Bonds on March 19, 2002, September 19, 2002, March 19, 2003, September 19, 2003, March 19, 2004, September 19, 2004, March 19, 2005, September 19, 2005, March 19, 2006, September 19, 2006, March 19, 2007, September 19, 2007, March 19, 2008, September 19, 2008, March 19,

2009, September 19, 2009, March 19, 2010 and September 19, 2010, as required by the terms of the 9.75% Bonds.

The Republic of Argentina's Violations of the Equal Treatment Provision

49.   The FAA contains an Equal Treatment Provision which states:

a.   The Securities will constitute… direct, unconditional, unsecured and unsubordinated obligations of the Republic …. **The payment obligations of the Republic under the Securities shall at all times rank at least equally with all of other present and future unsecured and unsubordinated External Indebtedness (as defined in this Agreement)**.

FAA at ¶1(c) (emphasis supplied).

50.   According to its plain language, the Equal Treatment Provision means that Argentina may not make a payment to a holder of External Indebtedness without a ratable payment being made at the same time to NML.

51.   As the Second Circuit has held, the first sentence of the Equal Treatment Provision "prohibits Argentina, as bond *issuer*, from formally subordinating the bonds by issuing superior debt. The second sentence . . . prohibits Argentina, as bond *payor*, from paying on other bonds without paying on the FAA Bonds."   *NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 259 (2d Cir. 2012).

52.   In 2005, Argentina restructured its debt by offering a bond exchange to all holders of non-performing external debt (the "2005 Exchange").

53.   Holders of approximately 25% of Argentina's external debt did not participate in the 2005 Exchange ("Non-tendering Bondholders").

54.   NML did not participate in the 2005 Exchange.

55.   Bondholders who participated in the 2005 Exchange received bonds scheduled to pay semi-annual interest.

56.     In 2005, Argentina began making semi-annual interest payments to holders of bonds issued in the 2005 Exchange (such bonds, the "2005 Exchange Bonds," and such holders, the "2005 Exchange Bondholders").

57.     Argentina paid all subsequent interest due on the 2005 Exchange Bonds until the payment that came due on June 30, 2014.  On June 26, 2014 Argentina attempted to initiate payment to certain holders of 2005 Exchange Bonds by transmitting funds to the Bank of New York Mellon ("BNY") as trustee.  By reason of Orders issued by the Court, BNY did not further transmit these funds to holders of the 2005 Exchange Bonds.  *NML Capital, Ltd v. The Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. Aug. 6, 2014) (ECF No. 633).Upon information and belief, Argentina intends to continue paying or attempting to pay interest on all 2005 Bonds as it becomes due.

58.     To facilitate the 2005 Bond Exchange, the Senate and Chamber of Deputies of the Argentine Nation passed Law 26,017 ("the Lock Law") on February 9, 2005.  A copy of Law 26,017 and a certified translation are annexed hereto as Exhibit D.

59.     In its January 28, 2010 Prospectus, Argentina explained the purpose and effect of the Lock Law as follows:

> In an effort to reassure tendering Bondholders and increase the level of participation on the 2005 debt exchange, Congress subsequently passed Law 26,017, known as the "Lock Law."  The Lock Law prohibited the Executive Branch from reopening the Debt Exchange without Congressional approval **and also prohibited any type of settlement involving untendered securities that were eligible to participate in the 2005 Debt Exchange….**

(Emphasis supplied).

60.     The assurances to tendering bondholders provided by Law 26,017 facilitated Argentina's completion of the 2005 Bond Exchange.

61.     Article 1 of Law 26,017 provided that Bonds not tendered in the 2005 Exchange would be subject to the following provisions:

    a.    Article 2 – The national Executive Power may not, with respect to the bonds referred to in Article 1 of this law, reopen the swap process established in the aforementioned Decree No. 1735/04.

    b.    Article 3 - The national State shall be prohibited from conducting any type of in-court, out-of-court or private settlement with respect to the bonds referred to in Article 1 of this law.

    c.    Article 4 - The national Executive Power must – within the framework of the terms of the issuance of the respective bonds, and the applicable laws and regulations in the corresponding jurisdictions – order the pertinent administrative acts and fulfill the necessary procedures to remove the bonds referred to in the preceding article from listing on all domestic and foreign securities markets and exchanges.

62.     In 2009, in preparation for another bond exchange in 2010, the Senate and Chamber of Deputies of the Argentine Nation passed Law No. 26,547 which, among other things, suspended the Lock Law for purposes of the 2010 Exchange. A copy of Law 26,547 and a certified translation are annexed hereto as Exhibit E.

63.     Law 26,547 provided:

    a.    Article 1.  The operation of Articles 2, 3, and 4 of Law No. 26,017 is suspended until 31 December 2010, or until the National Executive Branch, through the Ministry of Economy and Public Finance, declares that the process of restructuring the public instruments covered by said law is completed, whichever occurs first.

    b.    Article 3.  The financial terms and conditions that may be offered may not be equal to or better than those offered to creditors in the debt restructuring established by Decree No. 1735/04.

    c.    Article 5.  It is forbidden to offer to the holders of public debt that have brought judicial, administrative, or

> arbitration proceedings or any other type of proceeding treatment more favorable than the treatment afforded to holders who did not bring such proceedings.

64.     The prospectus for Argentina's 2010 Exchange stated:

> Eligible Securities in default that are not exchanged pursuant to the Invitation may remain in default indefinitely.  In light of its financial and legal constraints, *Argentina does not expect to resume payments on any eligible Securities in default that remain outstanding following the expiration of the Invitation*.  Argentina has opposed vigorously, and intends to continue to oppose, attempts by holders who did not participate in its prior exchange offers to collect on its defaulted debt through . . . litigation . . .  and other legal proceedings against Argentina.  Argentina remains subject to significant legal constraints regarding its defaulted debt. . . .
> Consequently, if you elect not to tender your Eligible Securities in default pursuant to the Invitation *there can be no assurance that you will receive any future payments or be able to collect through litigation in respect of your Eligible Securities in default.*

65.     NML did not participate in the 2010 Exchange (NML and other Argentine bond holders that participated in neither the 2005 Exchange nor the 2010 Exchange, the "Non-tendering Bondholders").

66.     In 2013, Argentina enacted Law 26,886 purportedly to reopen the bond exchange on the same terms that had been repeatedly rejected by plaintiff.  While Law 26,886 suspends certain provisions of the Lock Law, this suspension has no practical effect, because Law 26,886 "forbid[s]" Argentina from paying NML according to its contract, and only allows Argentina to pay NML on terms that are no "more favorable" than the terms of the original Exchange Offer.  A copy of Law 26,886 and a certified translation are annexed hereto as Exhibit F.

67.     Argentine courts have held that the Lock Law and the Moratorium prevent them from recognizing and enforcing Non-tendering Bondholders' New York judgments.

68.     Argentina violated the Equal Treatment Provision of the FAA by relegating NML's Bonds to a non-paying class pursuant to Law 26,517.

69.     In 2010, Argentina began making semi-annual interest payments to holders of bonds issued in the 2010 Exchange (such bonds, the "2010 Exchange Bonds," and such holders, the "2010 Exchange Bondholders.").

70.     Argentina paid all interest due on the 2010 Exchange Bonds until the payment due on June 30, 2014.  On June 26, 2014 Argentina attempted to initiate payment to certain holders of 2010 Exchange Bonds by transmitting funds to BNY as trustee.  By reason of Orders issued by the Court, BNY did not further transmit those funds to holders of the 2010 Exchange Bonds.  *NML Capital, Ltd v. The Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. Aug. 6, 2014) (ECF No. 633).

71.     Upon information and belief, Argentina intends to continue paying or attempting to pay interest on all 2010 Exchange Bonds as it becomes due.

72.     Upon information and belief, Argentina will continue to pay nothing to NML.

73.     NML and the other non-tendering bondholders have been damaged as a result of these violations and will continue to be damaged by the continuing violations of the Equal Treatment Provision.

74.     In October 2010, NML sought specific performance of the Equal Treatment Provision in this and two other pre-judgment cases.[1]

75.     On December 7, 2011, the Court held that Argentina's actions, as described in paragraphs 56-71, *supra*, violated the Equal Treatment Provision of the FAA and

---

[1]     *NML Capital, Ltd v. The Republic of Argentina* 08 Civ. 6978, 09 Civ. 1707, 09 Civ. 1708 ("Pre-judgment Cases").

granted partial summary judgment to NML on claims for specific performance of the Equal Treatment Provision. A true and correct copy of the Court's December 7, 2011 Order is annexed hereto as Exhibit G.

76. On February 23, 2012, the Court:

a. held that NML had no adequate remedy at law and that, absent equitable relief, NML would suffer irreparable harm;

b. held that the equities strongly supported injunctive relief;

c. held that Argentina had the financial wherewithal to meet its payment obligations to NML in those cases; and

d. issued an injunction to remedy Argentina's continuing violations of the Equal Treatment Provision, which required Argentina to specifically perform its obligations under the Equal Treatment Provision by making ratable payment to NML whenever it paid the 2005 or 2010 Exchange Bondholders the amounts due on their bonds.

77. A true and correct copy of the Court's February 23, 2012 Order is annexed hereto as Exhibit H.

78. On October 26, 2012, the Second Circuit affirmed the Court's February 23, 2012 Order, but remanded the injunction for clarification. *NML Capital, Ltd v. The Republic of Argentina*, No. 12-105(L) (2d Cir. Oct. 26, 2012) (ECF No. 442).

79. Although the Second Circuit's judgment was not final, Argentina petitioned for a writ of certiorari to the United States Supreme Court on October 7, 2013. The petition was denied. *Republic of Argentina v. NML Capital, Ltd., et al.*, No. 12-1494 (S. Ct. Oct. 7, 2013).

80.     On November 21, 2012, the Court issued an Amended Order requiring Argentina to specifically perform its obligations under the Equal Treatment Provision by making ratable payment to NML whenever it paid the 2005 and 2010 Exchange Bondholders the amounts due on their bonds.  A true and correct copy of the Court's November 21, 2012 Order (the "Amended February 23 Order") is annexed hereto as Exhibit I.

81.     In response to the Orders of the Court and the affirmances of the Second Circuit in NML's Pre-judgment Cases, Argentine officials, including President Kirchner, have repeatedly stated that Argentina has no intention of ever paying NML.

82.     For example, in November 2012, after the Second Circuit affirmed the February 23, 2012 Order and remanded the injunction for clarification, President Kirchner stated that Argentina was going to pay the Exchange Bonds, but "not one dollar to the 'vulture funds.'"

83.     During the oral argument of the appeal from the Court's Amended February 23 Order, Argentina's counsel told the Second Circuit Court of Appeals that Argentina would not voluntarily obey any order requiring ratable payment to NML.

84.     On August 23, 2013, the Second Circuit affirmed the Amended February 23 Order.  *NML Capital, Ltd v. The Republic of Argentina*, No. 12-105(L) (2d Cir. Aug. 23, 2012) (ECF No. 1001).

85.     Shortly thereafter, President Kirchner announced that Argentina would offer a new bond exchange that would replace the New York law-governed Exchange Bonds with new bonds governed by Argentine law and payable in Argentina.  This plan to evade the rulings of United States courts evidences Argentina's continuing intention not to fulfill its obligations pursuant to the Equal Treatment Provision.

86.     Argentina subsequently filed another petition for a writ of certiorari, seeking review by the Supreme Court of the Second Circuit's affirmance of the Amended February 23 Order.  That petition was also denied.  *Exchange Bondholder Group v. NML Capital, Ltd., et al.*, No. 13-991 (S. Ct. June 16, 2014).

87.     After this second petition for writ of certiorari was denied, Argentina's Economy Minister Axel Kicillof announced a plan—nearly identical to the plan announced in August 2013 by President Kirchner—to evade the Court's Amended February 23 Order by swapping the Exchange Bonds for new bonds payable in Argentina and outside the Court's reach.

88.     On June 20, 2014, the Court promptly issued an Order ruling that Minister Kicillof's proposed bond swap was in violation of the Court's Orders.  A true and correct copy of the Court's June 20, 2014 Order is annexed hereto as Exhibit J.

89.     Six days later, on June 26, 2014, Argentina attempted to initiate payment to certain holders of the Exchange Bonds by transmitting funds to BNY as trustee, without making ratable payment to NML.

90.     On August 6, 2014, the Court issued an Order finding that the June 26, 2014 payment by Argentina to BNY was illegal and in violation of the Court's previous Orders.  A true and correct copy of the Court's August 6, 2014 Order is annexed hereto as Exhibit K.

91.     Argentina's President Kirchner subsequently announced that Argentina would enact legislation to change the manner in which it makes payments on the Exchange Bonds, such that BNY would be removed as trustee for certain Exchange Bonds and all Exchange Bonds would be paid from a single account in Argentina through a financial institution called *Nación Fideicomisos* that Argentina controls.  Argentina has taken steps to carry out this

plan.  The "Legal Notice" published in The New York Times on September 22, 2014, is attached as Exhibit L hereto.  These actions are another attempt by Argentina to evade the rulings of the Court and to flout its obligations under the Equal Treatment Provision.

92.     As a result of these flagrant and unlawful activities, NML moved by order to show cause to hold Argentina in civil contempt of court.  On September 29, 2014, the Court issued an Order holding Argentina in civil contempt; and on October 3, 2014, the Court issued an Amended and Supplemental Order regarding Argentina's civil contempt.  A true and correct copy of the Court's September 29, 2014 Order is annexed hereto as Exhibit M, and a true and correct copy of the Court's October 3, 2014 Order is annexed hereto as Exhibit N.

93.     Since May 2014, the Republic began issuing bonds the "BONAR 2024 Bonds, which like the bonds issued in the 2005 and 2010 Bond Exchanges are also External Indebtedness.  Argentina has made payments on the BONAR 2024 Bonds, and on information and belief, it will continue to make payments on and issue more BONAR 2024 Bonds – all while paying nothing to NML and other bondholders who did not participate in the 2005 and 2010 Bond Exchanges – in violation of the Equal Treatment Provision.

94.     In May 2014, Argentina initially offered and eventually issued $3.25 billion of BONAR 2024 Bonds to the Spanish oil company, Repsol S.A., to settle claims Repsol had asserted against Argentina, including claims pending in New York and Spanish courts.

95.     Argentina structured the offer to facilitate the issuance of the BONAR 2024 Bonds to Repsol and other international investors.  As part of the settlement agreement with Repsol, Argentina agreed that the BONAR 2024 Bonds would clear through Euroclear, which would make the bonds more attractive to international investors.  JPMorgan also conducted a "shadow bookbuilding process" to ensure that the bonds could be immediately

distributed to international investors interested in purchasing the newly-issued BONAR 2024 Bonds immediately after Repsol received those bonds. Accordingly, just days after Argentina delivered the BONAR 2024 Bonds, Repsol sold them all to JPMorgan Securities PLC, JPMorgan's London-based broker-dealer.   Since their original issuance, the BONAR 2024 Bonds have been actively traded in the over-the-counter market in the United States.

96.     In December, 2014, Argentina issued approximately $650 million additional BONAR 2024 Bonds.   Approximately $380 million of these BONAR 2024 Bonds offered in December 2014 were issued in exchange for BODEN 2015 bonds, with the rest a new issuance of bonds.   ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

97.     In February 2015, Argentina planned to issue more BONAR 2024 Bonds through an underwriting by JPMorgan and Deutsche Bank.   ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

98.     ████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████

99.    ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████

100.    Argentina "suspended" the issuance on February 26, 2015, after this Court compelled JPMorgan and Deutsche Bank to provide discovery about the transaction, ████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

Argentina resumed the issuance process by announcing on April 21 that it would issue more BONAR 2024 Bonds, in a transaction that would settle just two days later.

101.    As it had since February, Deutsche Bank continued to play a key role in the offering, again, on information and belief, as Argentina's agent or in concert with Argentina. Deutsche Bank's New York syndicate desk immediately notified investors that it was taking orders.  ████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████ The Spanish

bank BBVA also accounted for a major portion of the BONAR 2024 Bonds issued in April.  In all, Argentina sold over $1.4 billion principal amount of BONAR 2024 Bonds in the April 2015 issuance, the majority of which was placed by Deutsche Bank.

102.    Argentina tried to create a false appearance that the BONAR 2024 Bonds issued in April 2015 were offered exclusively within Argentina.  As an example, Argentina announced that orders could only be placed through a lengthy list of eligible institutional purchasers in Argentina.

103.    In reality, affiliates of international banks purchased and re-sold internationally almost the entire offering.

104.    Notwithstanding these efforts to disguise the nature of the April 2015 issuance, Argentina targeted international investors and took regulatory steps to encourage their participation.  For example, Argentina enacted regulatory changes which made it easier for foreign purchasers to receive their bonds.  Moreover, on the day Argentina accepted bids for the offering, the Buenos Aires Securities Market, "Merval," issued a notice to its agents that they could "use transfers to Merval's account [in] NY as a means of payment" for the BONAR 2024 Bonds.  Almost all of the bonds were sold to international investors.  Argentina's leaders then publicly trumpeted the offering as evidence of Argentina's ability to tap into the international markets.

105.    Since May 2014, Argentina has issued approximately $5.3 billion of BONAR 2024 Bonds.

106.    In violation of its obligations under the Equal Treatment Provision of the FAA, Argentina made its first payment on the BONAR 2024 Bonds on November 7, 2014, and its second payment on May 7, 2015.

107.    Upon information and belief, Argentina intends to make all payments due under the terms of the BONAR 2024 Bonds.

108.    Upon information and belief, Argentina intends to issue additional External Indebtedness in the future.

109.    Upon information and belief, Argentina intends to make all payments due under the terms of any other existing or future External Indebtedness.

110.    In addition to the bonds issued in the 2005 and 2010 Bond Exchanges and the BONAR 2024 Bonds, Argentina has issued other External Indebtedness, made payments on such External Indebtedness and on information and belief, it will continue to make payments on and issue more of such External Indebtedness.

111.    Argentina's issuance of and payments on the BONAR 2024 Bonds and other External Indebtedness constitute additional violations of the Equal Treatment Provision of the FAA.

112.   NML now seeks payment of the principal amount of NML's Bonds together with any accrued and unpaid interest and specific performance of the Equal Treatment Provision in this case with respect to its beneficial holdings of bonds issued pursuant to the FAA.  NML also seeks specific enforcement of the Equal Treatment Provision with respect to the BONAR 2024 Bonds and with respect to all External Indebtedness.

## FIRST CLAIM FOR RELIEF
### (For Breach of Contract on the 11% Bonds)

113.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 112 herein.

114.    The 11% Bonds matured on October 9, 2006, at which time the entire principal amount of the Bonds became due and payable.

115.    On or about August 1, 2008, Plaintiff advised Argentina, by written notice to Argentina's Fiscal Agent, that it was demanding immediate payment of the $225,000 principal amount of the 11% Bonds held by Plaintiff together with any accrued and unpaid interest.

116.    Argentina has failed to make any payments of principal or interest on the 11% Bonds to the Plaintiff.

117.    By reason of the foregoing Argentina has breached its contractual obligations to Plaintiff, and Argentina is liable to Plaintiff for damages in amount to be determined at trial, but not less than $225,000, together with prejudgment interest at the statutory rate.

## SECOND CLAIM FOR RELIEF
(For Breach of Contract on the 11.75% Bonds)

118.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 117 herein.

119.    Pursuant to Sections 12(a) and (d) of the FAA, the declaration of a moratorium and the nonpayment of interest constitute Events of Default on the 11.75% Bonds entitling Plaintiff to declare the principal amount of the 11.75% Bonds it holds, together with any accrued and unpaid interest, to be due and payable immediately.

120.    On or about August 1, 2008, Plaintiff advised Argentina, by written notice to Argentina's Fiscal Agent, that it was declaring $11,290,000 principal amount of the 11.75% Bonds held by Plaintiff, together with any accrued and unpaid interest, immediately due and payable pursuant to Section 12 of the FAA.

121.    Despite this notice, Argentina has failed to make any payments of principal or interest on the 11.75% Bonds to the Plaintiff.

122.    By reason of the foregoing Argentina has breached its contractual obligations to Plaintiff, and Argentina is liable to Plaintiff for damages in amount to be determined at trial, but not less than $11,290,000, together with any accrued and unpaid interest due under the terms of the 11.75% Bonds.

**THIRD CLAIM FOR RELIEF**
(For Breach of Contract on the 11.375% Bonds)

123.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 122 herein.

124.    Pursuant to Sections 12(a) and (d) of the FAA, the declaration of a moratorium and the nonpayment of interest constitute Events of Default on the 11.375% Bonds entitling Plaintiff to declare the principal amount of the 11.375% Bonds it holds, together with any accrued and unpaid interest, to be due and payable immediately.

125.    On or about August 1, 2008, Plaintiff advised Argentina, by written notice to Argentina's Fiscal Agent, that it was declaring $10,260,000 principal amount of the 11.375% Bonds Plaintiff holds, together with any accrued and unpaid interest, immediately due and payable pursuant to Section 12 of the FAA.

126.    Despite this notice, Argentina has failed to make any payments of principal or interest on the 11.375% Bonds to the Plaintiff.

127.    By reason of the foregoing Argentina has breached its contractual obligations to Plaintiff, and Argentina is liable to Plaintiff for damages in amount to be determined at trial, but not less than $10,260,000, together with any accrued and unpaid interest due under the terms of the 11.375% Bonds.

**FOURTH CLAIM FOR RELIEF**
(For Breach of Contract on the 12.375% Bonds)

128.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 127 herein.

129.    Pursuant to Sections 12(a) and (d) of the FAA, the declaration of a moratorium and the nonpayment of interest constitute Events of Default on the 12.375% Bonds entitling Plaintiff to declare the principal amount of the 12.375% Bonds it holds, together with any accrued and unpaid interest, to be due and payable immediately.

130.    On or about August 1, 2008, Plaintiff advised Argentina, by written notice to Argentina's Fiscal Agent, that it was declaring $10,500,000 principal amount of the 12.375% Bonds Plaintiff holds, together with any accrued and unpaid interest, immediately due and payable pursuant to Section 12 of the FAA.

131.    Despite this notice, Argentina has failed to make any payments of principal or interest on the 12.375% Bonds to the Plaintiff.

132.    By reason of the foregoing Argentina has breached its contractual obligations to Plaintiff, and Argentina is liable to Plaintiff for damages in amount to be determined at trial, but not less than $10,500,000, together with any accrued and unpaid interest due under the terms of the 12.375% Bonds.

## FIFTH CLAIM FOR RELIEF
### (For Breach of Contract on the 11-3/8% Bonds)

133.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 132 herein.

134.    Pursuant to Sections 12(a) and (d) of the FAA, the declaration of a moratorium and the nonpayment of interest constitute Events of Default on the 11-3/8% Bonds entitling Plaintiff to declare the principal amount of the 11-3/8% Bonds it holds, together with any accrued and unpaid interest, to be due and payable immediately.

135.     On or about August 1, 2008, Plaintiff advised Argentina, by written notice to Argentina's Fiscal Agent, that it was declaring $42,155,000 principal amount of the 11-3/8% Bonds Plaintiff holds, together with any accrued and unpaid interest, immediately due and payable pursuant to Section 12 of the FAA.

136.     Despite this notice, Argentina has failed to make any payments of principal or interest on the 11-3/8% Bonds to the Plaintiff.

137.     By reason of the foregoing Argentina has breached its contractual obligations to Plaintiff, and Argentina is liable to Plaintiff for damages in amount to be determined at trial, but not less than $42,155,000, together with any accrued and unpaid interest due under the terms of the 11-3/8% Bonds.

## SIXTH CLAIM FOR RELIEF
(For Breach of Contract on the 12% Bonds)

138.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 137 herein.

139.     Pursuant to Sections 12(a) and (d) of the FAA, the declaration of a moratorium and the nonpayment of interest constitute Events of Default on the 12% Bonds entitling Plaintiff to declare the principal amount of the 12% Bonds it holds, together with any accrued and unpaid interest, to be due and payable immediately.

140.     On or about August 1, 2008, Plaintiff advised Argentina, by written notice to Argentina's Fiscal Agent, that it was declaring $1,100,000 principal amount of the 12% Bonds Plaintiff holds, together with any accrued and unpaid interest, immediately due and payable pursuant to Section 12 of the FAA.

141.     Despite this notice, Argentina has failed to make any payments of principal or interest on the 12% Bonds to the Plaintiff.

142.    By reason of the foregoing Argentina has breached its contractual obligations to Plaintiff, and Argentina is liable to Plaintiff for damages in amount to be determined at trial, but not less than $1,100,000, together with any accrued and unpaid interest due under the terms of the 12% Bonds.

### SEVENTH CLAIM FOR RELIEF
(For Breach of Contract on the 9.75% Bonds)

143.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 142 herein.

144.    Pursuant to Sections 12(a) and (d) of the FAA, the declaration of a moratorium and the nonpayment of interest constitute Events of Default on the 9.75% Bonds entitling Plaintiff to declare the principal amount of the 9.75% Bonds it holds, together with any accrued and unpaid interest, to be due and payable immediately.

145.    On or about August 1, 2008, Plaintiff advised Argentina, by written notice to Argentina's Fiscal Agent, that it was declaring $5,550,000 principal amount of the 9.75% Bonds Plaintiff holds, together with any accrued and unpaid interest, immediately due and payable pursuant to Section 12 of the FAA.

146.    Despite this notice, Argentina has failed to make any payments of principal or interest on the 9.75% Bonds to the Plaintiff.

147.    By reason of the foregoing Argentina has breached its contractual obligations to Plaintiff, and Argentina is liable to Plaintiff for damages in amount to be determined at trial, but not less than $5,500,000, together with any accrued and unpaid interest due under the terms of the 9.75% Bonds.

### EIGHTH CLAIM FOR RELIEF
(For Specific Enforcement of the Equal Treatment Provision and for Injunctive Relief)

148.     Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 147 herein.

149.     Pursuant to ¶ 1(c) of the FAA, Argentina provided that its bonds issued pursuant to the FAA would constitute "direct, unconditional, unsecured and unsubordinated obligations of the Republic and shall at all times rank pari passu and without preference among themselves . . . ." and that "[t]he payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness…."

150.     Argentina, therefore, may not make any payment of its External Indebtedness without also making a ratable payment at the same time to NML.

151.     Through the passage of Law 26,017, Argentina issued a new series of bonds with payment obligations that rank higher than those held by NML and other non-tendering Bondholders in violation of the Equal Treatment Provision.

152.     Through the passage of Law 26,547 Argentina issued a new series of bonds with payment obligations that rank higher than those held by NML and other non-tendering Bondholders in violation of the Equal Treatment Provision.

153.     The bonds issued in the Exchanges are External Indebtedness and their issuance violated the Equal Treatment Provision.

154.     Argentina's past payment of interest to 2005 Bondholders, while paying nothing to NML and other non-tendering bondholders, violated the Equal Treatment Provision.

155.     Argentina's continuing payments of interest to 2005 Bondholders will be a continuing violation of the Equal Treatment Provision.

156.    Argentina's payment of the scheduled interest to 2010 Bondholders will be a continuing violation of the Equal Treatment Provision.

157.    NML has suffered irreparable injury from Argentina's violation of the Equal Treatment Provision and will continue to suffer such injury unless the Court specifically enforces that Provision with a mandatory injunction requiring Argentina to pay NML ratably whenever it pays interest to 2005 or 2010 Bondholders.

158.    Remedies available at law are inadequate to compensate for such injury.

159.    NML has performed its part of the contract with Argentina.

160.    Argentina is capable of performing its obligations pursuant to the Equal Treatment Provision.

161.    The balance of the equities tips toward the issuance of an injunction.

162.    The public interest would not be disserved by a permanent injunction.

### NINTH CLAIM FOR RELEIF
**(For Specific Enforcement of the Equal Treatment Provision and**
**for Injunctive Relief With Respect to the BONAR 2024 Bonds)**

163.   NML repeats and realleges the allegations set forth in paragraphs 1 through 162 herein.

164.   Pursuant to section 1(c) of the Fiscal Agency Agreement, the Argentina provided that its bonds issued pursuant to the Fiscal Agency Agreement would constitute "direct, unconditional, unsecured and unsubordinated obligations of the Republic and shall at all times rank pari passu and without preference among themselves" and that "[t]he payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness."

165.  Argentina, therefore, may not make any payment of its External Indebtedness without also making a ratable payment at the same time to NML.  Any payment of External Indebtedness where Argentina does not also make a ratable payment at the same time to NML constitutes a violation of the Equal Treatment Provision.

166.  With the issuance of the BONAR 2024 Bonds, Argentina issued a new series of bonds with payment obligations that rank higher than those held by NML and other non-tendering bondholders in violation of the Equal Treatment Provision.

167.  The BONAR 2024 Bonds are External Indebtedness.  The issuance of the BONAR 2024 Bonds to date and future issuances of these bonds has violated and will violate the Equal Treatment Provision.

168.  Argentina's past payments to the holders of the BONAR 2024 Bonds, while paying nothing to NML and other non-tendering bondholders, violated the Equal Treatment Provision.

169.  Argentina's continuing payments to the holders of the BONAR 2024 Bonds will be a continuing violation of the Equal Treatment Provision.

170.  NML has suffered irreparable injury from Argentina's violation of the Equal Treatment Provision and will continue to suffer such injury unless the Court specifically enforces that Provision with a mandatory injunction requiring Argentina to pay NML ratably whenever it pays interest to the holders of the BONAR 2024 Bonds.

171.  Remedies available at law are inadequate to compensate for such injury.

172.  NML has performed its part of the contract with Argentina.

173.  Argentina is capable of performing its obligations pursuant to the Equal Treatment Provision.

174. The balance of the equities tips toward the issuance of an injunction.

175. The public interest would not be disserved by a permanent injunction.

**TENTH CLAIM FOR RELEIF**
**(For Specific Enforcement of the Equal Treatment Provision and**
**for Injunctive Relief With Respect to All External Indebtedness)**

176. NML repeats and realleges the allegations set forth in paragraphs 1 through 175 herein.

177. Pursuant to section 1(c) of the Fiscal Agency Agreement, Argentina provided that its bonds issued pursuant to the Fiscal Agency Agreement would constitute "direct, unconditional, unsecured and unsubordinated obligations of the Republic and shall at all times rank pari passu and without preference among themselves" and that "[t]he payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness."

178. Argentina, therefore, may not make any payment of its External Indebtedness without also making a ratable payment at the same time to NML.  Any payment of External Indebtedness where the Republic of Argentina does not also make a ratable payment at the same time to NML constitutes a violation of the Equal Treatment Provision.

179. The Republic of Argentina has issued—and, on information and belief, will issue in the future—External Indebtedness in violation of the Equal Treatment Provision.

180.  Argentina's past payments to the holders of External Indebtedness, while paying nothing to NML and other non-tendering bondholders, violated the Equal Treatment Provision.

181.  Argentina's continuing payments to the holders of External Indebtedness—including External Indebtedness that the Republic of Argentina will issue in the future—will be a continuing violation of the Equal Treatment Provision.

182.  NML has suffered irreparable injury as a result of Argentina's violation of the Equal Treatment Provision and will continue to suffer such injury unless the Court specifically enforces that Provision with a mandatory injunction requiring Argentina to pay NML ratably whenever it pays interest to the holders of External Indebtedness (including, for the avoidance of doubt, any bonds with the ISIN ARARGE03H413, whether issued before or after the entry of the injunction) or holders of "Replacement Obligations" (meaning bonds or other obligations issued, whether before or after entry of the injunction, in exchange, substitution, restructuring, refinancing or satisfaction of any BONAR 2024 Bonds or other Replacement Obligations).

183.  Remedies available at law are inadequate to compensate for such injury.

184.  NML has performed its part of the contract with Argentina.

185.  Argentina is capable of performing its obligations pursuant to the Equal Treatment Provision.

186.  The balance of the equities tips toward the issuance of an injunction.

187.  The public interest would not be disserved by a permanent injunction.

WHEREFORE, Plaintiff NML demands judgment against the Republic of Argentina, as follows:

a.      On the First Claim for Relief, awarding Plaintiff a money judgment in an amount to be determined at trial, but not less than $225,000, together with prejudgment interest at the statutory rate.

b.      On the Second Claim for Relief, awarding Plaintiff a money judgment in an amount to be determined at trial, but not less than $11,290,000, together with any accrued and unpaid interest due under the terms of the 11.75% Bonds.

c.      On the Third Claim for Relief, awarding Plaintiff a money judgment in an amount to be determined at trial, but not less than $10,260,000, together with any accrued and unpaid interest due under the terms of the 11.375% Bonds.

d.      On the Fourth Claim for Relief, awarding Plaintiff a money judgment in an amount to be determined at trial, but not less than $10,500,000, together with any accrued and unpaid interest due under the terms of the 12.375% Bonds.

e.      On the Fifth Claim for Relief, awarding Plaintiff a money judgment in an amount to be determined at trial, but not less than $42,155,000, together with any accrued and unpaid interest due under the terms of the 11-3/8% Bonds.

f.      On the Sixth Claim for Relief, awarding Plaintiff a money judgment in an amount to be determined at trial, but not less than $1,100,000, together with any accrued and unpaid interest due under the terms of the 12% Bonds.

g.      On the Seventh Claim for Relief, awarding Plaintiff a money judgment in an amount to be determined at trial, but not less than $5,500,000, together with any accrued and unpaid interest due under the terms of the 9.75% Bonds.

h.      On the Eighth Claim for Relief, an Order specifically enforcing the Equal Treatment Provision with respect to all outstanding External Indebtedness and to all External Indebtedness that the Republic of Argentina will issue in the future by requiring ratable payment to NML whenever Argentina makes or attempts to make payments on the 2005 and 2010 Exchange Bonds..

i. On the Ninth Claim for Relief, an Order specifically enforcing the Equal Treatment Provision with respect to the BONAR 2024 Bonds;

j. On the Tenth Claim for Relief, an Order specifically enforcing the Equal Treatment Provision with respect to all External Indebtedness; and

k. Awarding Plaintiff its costs, prejudgment interest, attorneys' fees and such other and further relief as the Court shall deem just and proper.

Dated: New York, New York
_____ 2015

DECHERT LLP

By: /s/ Robert A. Cohen
Robert A. Cohen
(robert.cohen@dechert.com)
Dennis H. Hranitzky
(dennis.hranitzky@dechert.com)

1095 Avenue of the Americas
New York, NY 10036-6797
Telephone (212) 698-3500
Facsimile (212) 698-3599

*Attorneys for Plaintiff NML Capital, Ltd.*

**<u>Exhibit 2</u>**

CONFIDENTIAL—SUBJECT TO COURT ORDER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                    :
NML CAPITAL, LTD.,
                                                    :
              Plaintiff,
                                                    :     09 Civ.  1707 (TPG)
                                                    :
        v.
                                                    :
THE REPUBLIC OF ARGENTINA,
                                                    :     **SECOND AMENDED AND**
              Defendant.                            :     **SUPPLEMENTAL COMPLAINT**
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiff, NML Capital, Ltd., ("NML"), by and through its undersigned counsel, as and for its Second Amended and Supplemental Complaint against Defendant Republic of Argentina ("Argentina"), alleges as follows:

<u>NATURE OF THE ACTION</u>

1.      This is a breach of contract action arising from Argentina's failure to make contractually-mandated principal and interest payments on certain Floating Rate Accrual Notes ("FRANs") issued by Argentina in which NML holds beneficial interests.  The FRANs were issued pursuant to a Fiscal Agency Agreement, dated October 19, 1994 (the "FAA") between Argentina and Bankers Trust Company, as Fiscal Agent.  For its relief, NML seeks payment of the principal amount of its FRANs together with any accrued and unpaid interest, as provided for in the FAA and pursuant to the terms of the FRANs.  A true and correct copy of the FAA is annexed hereto as Exhibit A.

2.      In this pleading, Plaintiff is asserting two additional claims for declaratory and injunctive relief.  The two new claims concern bonds bearing ISIN ARARGE03H413 (the "BONAR 2024 Bonds") and Argentina's other existing and future External Indebtedness (other

than the Exchange Bonds which are already the subject of declaratory and injunctive relief issued by this Court).  Plaintiff is requesting: (i) a declaratory judgment that the BONAR 2024 Bonds are External Indebtedness within the meaning of the FAA, and (ii) specific performance of the Republic's obligations under the Equal Treatment Provision in the FAA by preliminarily and permanently enjoining the Republic from making payments of interest and/or principal on the existing and future BONAR 2024 Bonds and other External Indebtedness unless a "Ratable Payment" is made in respect of Plaintiff's defaulted bonds.

3.    This action also seeks relief based on Argentina's continuing breach of the Equal Treatment Provision of the FAA, paragraph 1 (c) of the FAA, which provides for equal treatment in terms of rank and priority of payment for holders of the bonds issued under the FAA with respect to any unsecured and unsubordinated External Indebtedness as defined in the FAA (the "Equal Treatment Provision").  Under color of Law 26,017 passed in 2005 and Law 26,547 passed in 2009, Argentina issued bonds in its 2005 and 2010 Bond Exchanges with payment obligations that rank higher than those issued under the FAA and held by NML. The bonds issued in the Exchanges are External Indebtedness. Argentina's issuance of these higher ranking bonds, its continuing payment of semi-annual interest to the holders of the bonds issued in the 2005 Bond Exchange and its anticipated payment of interest to the holders of the bonds issued in the 2010 Bond Exchange, while paying nothing to NML and other bondholders who did not participate in the Exchanges, violate the Equal Treatment Provision of the FAA.  To prevent further violations, NML seeks specific enforcement of the Equal Treatment Provision.

4.    Beginning in May 2014, the Republic began issuing the BONAR 2024 Bonds and has made payments on them all while paying nothing to plaintiff and other bondholders who did not participate in the 2005 and 2010 Bond Exchanges—in violation of the

Equal Treatment Provision.  Accordingly, to remedy this violation and prevent further violations, plaintiff seeks in its Third Claim for Relief specific enforcement of the Equal Treatment Provision with respect to the BONAR 2024 Bonds.

THE PARTIES

5.      Plaintiff NML is a corporation organized and existing under the laws of the Cayman Islands.

6.      Defendant Argentina is a foreign state as defined in 28 U.S.C. § 1603.

JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1330 because Argentina is a foreign state which has explicitly and unconditionally waived sovereign immunity with respect to actions arising out of the FAA and is, therefore, not entitled to immunity under 28 U.S.C. §§ 1605-07 or under any applicable international agreement.

8.      In addition, Argentina consented in the FAA to submit to the jurisdiction of this Court in respect of actions arising out of the FAA, including any suit to recover on the FRANs.  Pursuant to Section 22 of the FAA, Argentina appointed Banco de la Nación Argentina, which currently maintains offices at 225 Park Avenue, New York, New York 10169, as its authorized agent for service of process.  Section 23 of the FAA provides that the FAA shall be "governed by, and interpreted in accordance with, the laws of the State of New York."

9.      Venue is proper in this district by agreement of the parties and pursuant to 28 U.S.C. § 1391(f).

FACTUAL ALLEGATIONS

The FRANs

10.     NML is the owner of a beneficial interest representing $30,000 principal amount of FRANs issued by Argentina, ISIN US040114AX83.  A true and correct copy of the JP Morgan Global Settled Holdings COB Report, October 13, 2010, showing NML's current total ownership of a beneficial interest representing $132,030,000 principal amount of the FRANs, is annexed hereto as Exhibit B.   The $132,030,000 is composed of the $32,000,000 principal amount of FRANs that is the subject of *NML Capital, Ltd. v. The Republic of Argentina*, 05 Civ. 2434 (TPG), the $54,850,000 principal amount of FRANs that is the subject of *NML Capital, Ltd. v. The Republic of Argentina*, 06 Civ. 6466 (TPG), the $15,300,000 principal amount of FRANs that is the subject of *NML Capital, Ltd. v. The Republic of Argentina*, 07 Civ. 2690 (TPG), the $29,850,000 principal amount of FRANs that is the subject of *NML Capital, Ltd. v. The Republic of Argentina*, 08 Civ. 3302 Civ.  (TPG), and the $30,000 principal amount of FRANs that is the subject of this action.  A true and correct copy of the Prospectus Supplement pertaining to the FRANs, dated March 27, 1998, is annexed hereto as Exhibit C.

11.     NML acquired the $30,000 beneficial interest in the FRANs at issue in this action in one transaction on October 16, 2008.  A true and correct copy of the JP Morgan Consolidated Settlement ITD Report statement showing NML's purchase of this interest is annexed hereto as Exhibit D.

12.     The FRANs are a Series of Securities under the terms of the FAA.

13.     Pursuant to the FAA, the record holder of the FRANs is an institution designated by the issuer as the "depositary," or its nominee.  Financial institutions, known as "participants," maintain accounts with the depositary through which they hold interests – or participations – in the FRANs.  Investors such as NML own beneficial interests in the FRANs through the participants.  In this case, the depositary is the Depositary Trust Company (the

"Depositary").  The FRANs are held of record by the Depositary's nominee, Cede & Co., and the

participant through which NML owns its beneficial interests in the FRANs is JP Morgan Chase

Bank.

The Republic of Argentina's Default

14.     Pursuant to Section 12 of the FAA, the following occurrences, among

others, constitute Events of Default:

> (a) Non-Payment:  the Republic fails to pay any principal amount
> of any of the Securities of such Series when due or payable or fails
> to pay any interest on any of the Securities of such Series when
> due or payable and such failure continues for a period of 30 days
> or
>
> *     *     *
>
> (d) Moratorium:  a moratorium on the payment of principal of, or
> interest on, the Public External Indebtedness of the Republic shall
> be declared by the Republic . . . .

15.     In or about December 2001, Argentina declared a moratorium on the

payment of principal and interest with respect to all of its foreign debt, including the FRANs.

16.     The FRANs matured on April 10, 2005, at which time the entire principal

amount of the FRANs became due and payable.  Upon maturity, however, Argentina failed to

pay the principal amount of the FRANs at issue in this action owed to NML's predecessor-in-

interest.

17.     Since Argentina declared the moratorium in December 2001, it has failed

to make any payment of principal or interest on the FRANs – to NML, or to anyone else.

The Republic of Argentina's Violations of the Equal Treatment Provision

18.     The FAA contains an Equal Treatment Provision which states:

> a.     The Securities will constitute… direct, unconditional,
> unsecured and unsubordinated obligations of the

Republic.… **The payment obligations of the Republic under the Securities shall at all times rank at least equally with all of other present and future unsecured and unsubordinated External Indebtedness (as defined in this Agreement).**

FAA at ¶1(c) (emphasis supplied).

19.     According to its plain language, the Equal Treatment Provision means that Argentina may not make a payment to a holder of External Indebtedness without a ratable payment being made at the same time to NML.

20.     As the Second Circuit has held, the first sentence of the Equal Treatment Provision "prohibits Argentina, as bond *issuer*, from formally subordinating the bonds by issuing superior debt. The second sentence . . . prohibits Argentina, as bond *payor*, from paying on other bonds without paying on the FAA Bonds."  *NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 259 (2d Cir. 2012).

21.     In 2005, Argentina restructured its debt by offering a bond exchange to all holders of non-performing external debt (the "2005 Exchange").

22.     Holders of approximately 25% of Argentina's external debt did not participate in the 2005 Exchange ("Non-tendering Bondholders").

23.     NML did not participate in the 2005 Exchange.

24.     Bondholders who participated in the 2005 Exchange received bonds scheduled to pay semi-annual interest.

25.     In 2005, Argentina began making semi-annual interest payments to holders of bonds issued in the 2005 Exchange (such bonds, the "2005 Exchange Bonds," and such holders, the "2005 Exchange Bondholders").

26.     Argentina paid all subsequent interest due on the 2005 Exchange Bonds until the payment that came due on June 30, 2014.  On June 26, 2014 Argentina attempted to

initiate payment to certain holders of 2005 Exchange Bonds by transmitting funds to the Bank of

New York Mellon ("BNY") as trustee.  By reason of Orders issued by the Court, BNY did not

further transmit these funds to holders of the 2005 Exchange Bonds.  *NML Capital, Ltd v. The*

*Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. Aug. 6, 2014) (ECF No. 633).

27.    Upon information and belief, Argentina intends to continue paying or

attempting to pay interest on all 2005 Bonds as it becomes due.

28.    To facilitate the 2005 Bond Exchange, the Senate and Chamber of

Deputies of the Argentine Nation passed Law 26,017 ("the Lock Law") on February 9, 2005.  A

copy of Law 26,017 and a certified translation are annexed hereto as Exhibit E.

29.    In its January 28, 2010 Prospectus, Argentina explained the purpose and

effect of the Lock Law as follows:

> In an effort to reassure tendering Bondholders and increase the
> level of participation on the 2005 debt exchange, Congress
> subsequently passed Law 26,017, known as the "Lock Law."  The
> Lock Law prohibited the Executive Branch from reopening the
> Debt Exchange without Congressional approval **and also**
> **prohibited any type of settlement involving untendered**
> **securities that were eligible to participate in the 2005 Debt**
> **Exchange….**

(Emphasis supplied.)

30.    The assurances to tendering bondholders provided by Law 26,017

facilitated Argentina's completion of the 2005 Bond Exchange.

31.    Article 1 of Law 26,017 provided that Bonds not tendered in the 2005

Exchange would be subject to the following provisions:

> a.    Article 2 – The national Executive Power may not, with
> respect to the bonds referred to in Article 1 of this law,
> reopen the swap process established in the aforementioned
> Decree No. 1735/04.

      b.      Article 3 - The national State shall be prohibited from conducting any type of in-court, out-of-court or private settlement with respect to the bonds referred to in Article 1 of this law.

      c.      Article 4 - The national Executive Power must – within the framework of the terms of the issuance of the respective bonds, and the applicable laws and regulations in the corresponding jurisdictions – order the pertinent administrative acts and fulfill the necessary procedures to remove the bonds referred to in the preceding article from listing on all domestic and foreign securities markets and exchanges.

32.      In 2009, in preparation for another bond exchange in 2010, the Senate and Chamber of Deputies of the Argentine Nation passed Law No. 26,547 which, among other things, suspended the Lock Law for purposes of the 2010 Exchange. A copy of Law 26,547 and a certified translation are annexed hereto as Exhibit F.

33.      Law 26,547 provided:

      a.      Article 1.  The operation of Articles 2, 3, and 4 of Law No. 26,017 is suspended until 31 December 2010, or until the National Executive Branch, through the Ministry of Economy and Public Finance, declares that the process of restructuring the public instruments covered by said law is completed, whichever occurs first.

      b.      Article 3.  The financial terms and conditions that may be offered may not be equal to or better than those offered to creditors in the debt restructuring established by Decree No. 1735/04.

      c.      Article 5.  It is forbidden to offer to the holders of public debt that have brought judicial, administrative, or arbitration proceedings or any other type of proceeding treatment more favorable than the treatment afforded to holders who did not bring such proceedings.

34.      The prospectus for Argentina's 2010 Exchange stated:

Eligible Securities in default that are not exchanged pursuant to the Invitation may remain in default indefinitely.  In light of its financial and legal constraints, *Argentina does not expect to resume payments*

> *on any eligible Securities in default that remain outstanding following the expiration of the Invitation.*  Argentina has opposed vigorously, and intends to continue to oppose, attempts by holders who did not participate in its prior exchange offers to collect on its defaulted debt through . . . litigation . . .  and other legal proceedings against Argentina.  Argentina remains subject to significant legal constraints regarding its defaulted debt. . . .
> Consequently, if you elect not to tender your Eligible Securities in default pursuant to the Invitation *there can be no assurance that you will receive any future payments or be able to collect through litigation in respect of your Eligible Securities in default.*

35.    NML did not participate in the 2010 Exchange (NML and other Argentine bond holders that participated in neither the 2005 Exchange nor the 2010 Exchange, the "Non-tendering Bondholders").

36.    In 2013, Argentina enacted Law 26,886 purportedly to reopen the bond exchange on the same terms that had been repeatedly rejected by plaintiff.  While Law 26,886 suspends certain provisions of the Lock Law, this suspension has no practical effect, because Law 26,886 "forbid[s]" Argentina from paying NML according to its contract, and only allows Argentina to pay NML on terms that are no "more favorable" than the terms of the original Exchange Offer.  A copy of Law 26,886 and a certified translation are annexed hereto as Exhibit G.

37.    Argentine courts have held that the Lock Law and the Moratorium prevent them from recognizing and enforcing Non-tendering Bondholders' New York judgments.

38.    Argentina violated the Equal Treatment Provision of the FAA by relegating NML's Bonds to a non-paying class pursuant to Law 26,517.

39.    In 2010, Argentina began making semi-annual interest payments to holders of bonds issued in the 2010 Exchange (such bonds, the "2010 Exchange Bonds," and such holders, the "2010 Exchange Bondholders.").

40.    Argentina paid all interest due on the 2010 Exchange Bonds until the payment due on June 30, 2014.  On June 26, 2014 Argentina attempted to initiate payment to certain holders of 2010 Exchange Bonds by transmitting funds to BNY as trustee.  By reason of Orders issued by the Court, BNY did not further transmit those funds to holders of the 2010 Exchange Bonds.  *NML Capital, Ltd v. The Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. Aug. 6, 2014) (ECF No. 633).

41.    Upon information and belief, Argentina intends to continue paying or attempting to pay interest on all 2010 Exchange Bonds as it becomes due.

42.    Upon information and belief, Argentina will continue to pay nothing to NML.

43.    NML and the other non-tendering bondholders have been damaged as a result of these violations and will continue to be damaged by the continuing violations of the Equal Treatment Provision.

44.    In October 2010, NML sought specific performance of the Equal Treatment Provision in this and two other pre-judgment cases.[1]

45.    On December 7, 2011, the Court held that Argentina's actions, as described in paragraphs 21-41 *supra*, violated the Equal Treatment Provision of the FAA and granted partial summary judgment to NML on claims for specific performance of the Equal Treatment Provision.  A true and correct copy of the Court's December 7, 2011 Order is annexed hereto as Exhibit H.

46.    On February 23, 2012, the Court:

---

[1]    *NML Capital, Ltd v. The Republic of Argentina* 08 Civ. 6978, 09 Civ. 1707, 09 Civ. 1708 ("Pre-judgment Cases").

a. held that NML had no adequate remedy at law and that, absent equitable relief, NML would suffer irreparable harm;

b. held that the equities strongly supported injunctive relief;

c. held that Argentina had the financial wherewithal to meet its payment obligations to NML in those cases; and

d. issued an injunction to remedy Argentina's continuing violations of the Equal Treatment Provision, which required Argentina to specifically perform its obligations under the Equal Treatment Provision by making ratable payment to NML whenever it paid the 2005 or 2010 Exchange Bondholders the amounts due on their bonds.

47. A true and correct copy of the Court's February 23, 2012 Order is annexed hereto as Exhibit I.

48. On October 26, 2012, the Second Circuit affirmed the Court's February 23, 2012 Order, but remanded the injunction for clarification. *NML Capital, Ltd v. The Republic of Argentina*, No. 12-105(L) (2d Cir. Oct. 26, 2012) (ECF No. 442).

49. Although the Second Circuit's judgment was not final, Argentina petitioned for a writ of certiorari to the United States Supreme Court on October 7, 2013. The petition was denied. *Republic of Argentina v. NML Capital, Ltd., et al.*, No. 12-1494 (S. Ct. Oct. 7, 2013).

50. On November 21, 2012, the Court issued an Amended Order requiring Argentina to specifically perform its obligations under the Equal Treatment Provision by making ratable payment to NML whenever it paid the 2005 and 2010 Exchange Bondholders the

amounts due on their bonds.  A true and correct copy of the Court's November 21, 2012 Order (the "Amended February 23 Order") is annexed hereto as Exhibit J.

51.     In response to the Orders of the Court and the affirmances of the Second Circuit in NML's Pre-judgment Cases, Argentine officials, including President Kirchner, have repeatedly stated that Argentina has no intention of ever paying NML.

52.     For example, in November 2012, after the Second Circuit affirmed the February 23, 2012 Order and remanded the injunction for clarification, President Kirchner stated that Argentina was going to pay the Exchange Bonds, but "not one dollar to the 'vulture funds.'"

53.     During the oral argument of the appeal from the Court's Amended February 23 Order, Argentina's counsel told the Second Circuit Court of Appeals that Argentina would not voluntarily obey any order requiring ratable payment to NML.

54.     On August 23, 2013, the Second Circuit affirmed the Amended February 23 Order.  *NML Capital, Ltd v. The Republic of Argentina*, No. 12-105(L) (2d Cir. Aug. 23, 2012) (ECF No. 1001).

55.     Shortly thereafter, President Kirchner announced that Argentina would offer a new bond exchange that would replace the New York law-governed Exchange Bonds with new bonds governed by Argentine law and payable in Argentina.  This plan to evade the rulings of United States courts evidences Argentina's continuing intention not to fulfill its obligations pursuant to the Equal Treatment Provision.

56.     Argentina subsequently filed another petition for a writ of certiorari, seeking review by the Supreme Court of the Second Circuit's affirmance of the Amended February 23 Order.  That petition was also denied.  *Exchange Bondholder Group v. NML Capital, Ltd., et al.*, No. 13-991 (S. Ct. June 16, 2014).

57.     After this second petition for writ of certiorari was denied, Argentina's Economy Minister Axel Kicillof announced a plan—nearly identical to the plan announced in August 2013 by President Kirchner—to evade the Court's Amended February 23 Order by swapping the Exchange Bonds for new bonds payable in Argentina and outside the Court's reach.

58.     On June 20, 2014, the Court promptly issued an Order ruling that Minister Kicillof's proposed bond swap was in violation of the Court's Orders.  A true and correct copy of the Court's June 20, 2014 Order is annexed hereto as Exhibit K.

59.     Six days later, on June 26, 2014, Argentina attempted to initiate payment to certain holders of the Exchange Bonds by transmitting funds to BNY as trustee, without making ratable payment to NML.

60.     On August 6, 2014, the Court issued an Order finding that the June 26, 2014 payment by Argentina to BNY was illegal and in violation of the Court's previous Orders.  A true and correct copy of the Court's August 6, 2014 Order is annexed hereto as Exhibit L.

61.     Argentina's President Kirchner subsequently announced that Argentina would enact legislation to change the manner in which it makes payments on the Exchange Bonds, such that BNY would be removed as trustee for certain Exchange Bonds and all Exchange Bonds would be paid from a single account in Argentina through a financial institution called *Nación Fideicomisos* that Argentina controls.  Argentina has taken steps to carry out this plan.  The "Legal Notice" published in The New York Times on September 22, 2014, is attached as Exhibit M hereto.  These actions are another attempt by Argentina to evade the rulings of the Court and to flout its obligations under the Equal Treatment Provision.

62.     As a result of these flagrant and unlawful activities, NML moved by order to show cause to hold Argentina in civil contempt of court.  On September 29, 2014, the Court issued an Order holding Argentina in civil contempt; and on October 3, 2014, the Court issued an Amended and Supplemental Order regarding Argentina's civil contempt.  A true and correct copy of the Court's September 29, 2014 Order is annexed hereto as Exhibit N, and a true and correct copy of the Court's October 3, 2014 Order is annexed hereto as Exhibit O.

63.     Since May 2014, the Republic began issuing bonds the "BONAR 2024 Bonds, which like the bonds issued in the 2005 and 2010 Bond Exchanges are also External Indebtedness.  Argentina has made payments on the BONAR 2024 Bonds, and on information and belief, it will continue to make payments on and issue more BONAR 2024 Bonds—all while paying nothing to NML and other bondholders who did not participate in the 2005 and 2010 Bond Exchange—in violation of the Equal Treatment Provision.

64.     In May 2014, Argentina initially offered and eventually issued $3.25 billion of BONAR 2024 Bonds to the Spanish oil company, Repsol S.A., to settle claims Repsol had asserted against Argentina, including claims pending in New York and Spanish courts.

65.     Argentina structured the offer to facilitate the issuance of the BONAR 2024 Bonds to Repsol and other international investors.  As part of the settlement agreement with Repsol, Argentina agreed that the BONAR 2024 Bonds would clear through Euroclear, which would make the bonds more attractive to international investors.  JPMorgan also conducted a "shadow bookbuilding process" to ensure that the bonds could be immediately distributed to international investors interested in purchasing the newly-issued BONAR 2024 Bonds immediately after Repsol received those bonds. Accordingly, just days after Argentina delivered the BONAR 2024 Bonds, Repsol sold them all to JPMorgan Securities PLC,

JPMorgan's London-based broker-dealer.   Since their original issuance, the BONAR 2024 Bonds have been actively traded in the over-the-counter market in the United States.

66.     In December, 2014, Argentina issued approximately $650 million additional BONAR 2024 Bonds.   Approximately $380 million of these BONAR 2024 Bonds offered in December 2014 were issued in exchange for BODEN 2015 bonds, with the rest a new issuance of bonds. ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████

67.     In February 2015, Argentina planned to issue more BONAR 2024 Bonds through an underwriting by JPMorgan and Deutsche Bank. ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

68.     ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████

69.     ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████

70.     Argentina "suspended" the issuance on February 26, 2015, after this Court

compelled JPMorgan and Deutsche Bank to provide discovery about the transaction, ████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

Argentina resumed the issuance process by announcing on April 21 that it would issue more

BONAR 2024 Bonds, in a transaction that would settle just two days later.

71.     As it had since February, Deutsche Bank continued to play a key role in

the offering, again, on information and belief, as Argentina's agent or in concert with Argentina.

Deutsche Bank's New York syndicate desk immediately notified investors that it was taking

orders.  ████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████  The Spanish

bank BBVA also accounted for a major portion of the BONAR 2024 Bonds issued in April.  In

all, Argentina sold over $1.4 billion principal amount of BONAR 2024 Bonds in the April 2015 issuance, the majority of which was placed by Deutsche Bank.

72.     Argentina tried to create a false appearance that the BONAR 2024 Bonds issued in April 2015 were offered exclusively within Argentina.  As an example, Argentina announced that orders could only be placed through a lengthy list of eligible institutional purchasers in Argentina.

73.     In reality, affiliates of international banks purchased and re-sold internationally almost the entire offering.

74.     Notwithstanding these efforts to disguise the nature of the April 2015 issuance, Argentina targeted international investors and took regulatory steps to encourage their participation.  For example, Argentina enacted regulatory changes which made it easier for foreign purchasers to receive their bonds.  Moreover, on the day Argentina accepted bids for the offering, the Buenos Aires Securities Market, "Merval," issued a notice to its agents that they could "use transfers to Merval's account [in] NY as a means of payment" for the BONAR 2024 Bonds.  Almost all of the bonds were sold to international investors.  Argentina's leaders then publicly trumpeted the offering as evidence of Argentina's ability to tap into the international markets.

75.     Since May 2014, Argentina has issued approximately $5.3 billion of BONAR 2024 Bonds.

76.     In violation of its obligations under the Equal Treatment Provision of the FAA, Argentina made its first payment on the BONAR 2024 Bonds on November 7, 2014, and its second payment on May 7, 2015.

77.     Upon information and belief, Argentina intends to make all payments due under the terms of the BONAR 2024 Bonds.

78.     Upon information and belief, Argentina intends to issue additional External Indebtedness in the future.

79.     Upon information and belief, Argentina intends to make all payments due under the terms of any other existing or future External Indebtedness.

80.     In addition to the bonds issued in the 2005 and 2010 Bond Exchanges and the BONAR 2024 Bonds, Argentina has issued other External Indebtedness, made payments on such External Indebtedness and on information and belief, it will continue to make payments on and issue more of such External Indebtedness.

81.     Argentina's issuance of and payments on the BONAR 2024 Bonds and other External Indebtedness constitute additional violations of the Equal Treatment Provision of the FAA.

82.     NML now seeks payment of the principal amount of NML's Bonds together with any accrued and unpaid interest and specific performance of the Equal Treatment Provision in this case with respect to its beneficial holdings of bonds issued pursuant to the FAA. NML also seeks specific enforcement of the Equal Treatment Provision with respect to the BONAR 2024 Bonds and with respect to all External Indebtedness.

## FIRST CLAIM FOR RELIEF
### (For Breach of Contract)

83.     NML repeats and realleges the allegations set forth in paragraphs 1 through 82 herein.

84.     By reason of the foregoing, Argentina has breached its contractual obligations to NML, and Argentina is liable to NML for damages in an amount to be determined

at trial, but not less than $30,000 together with all accrued and unpaid interest due pursuant to the terms of the FRANs and New York law.

## SECOND CLAIM FOR RELIEF
(For Specific Enforcement of the Equal Treatment Provision and for Injunctive Relief)

85.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 84 herein.

86.    Pursuant to ¶ 1(c) of the FAA, Argentina provided that its bonds issued pursuant to the FAA would constitute "direct, unconditional, unsecured and unsubordinated obligations of the Republic and shall at all times rank <u>pari</u> <u>passu</u> and without preference among themselves . . . ." and that "[t]he payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness…."

87.    Argentina, therefore, may not make any payment of its External Indebtedness without also making a ratable payment at the same time to NML.

88.    Through the passage of Law 26,017, Argentina issued a new series of bonds with payment obligations that rank higher than those held by NML and other non-tendering Bondholders in violation of the Equal Treatment Provision.

89.    Through the passage of Law 26,547 Argentina issued a new series of bonds with payment obligations that rank higher than those held by NML and other non-tendering Bondholders in violation of the Equal Treatment Provision.

90.    The bonds issued in the Exchanges are External Indebtedness and their issuance violated the Equal Treatment Provision.

91.    Argentina's past payment of interest to 2005 Bondholders, while paying nothing to NML and other non-tendering bondholders, violated the Equal Treatment Provision.

92.     Argentina's continuing payments of interest to 2005 Bondholders will be a continuing violation of the Equal Treatment Provision.

93.     Argentina's payment of the scheduled interest to 2010 Bondholders will be a continuing violation of the Equal Treatment Provision.

94.     NML has suffered irreparable injury from Argentina's violation of the Equal Treatment Provision and will continue to suffer such injury unless the Court specifically enforces that Provision with a mandatory injunction requiring Argentina to pay NML ratably whenever it pays interest to 2005 or 2010 Bondholders.

95.     Remedies available at law are inadequate to compensate for such injury.

96.     NML has performed its part of the contract with Argentina.

97.     Argentina is capable of performing its obligations pursuant to the Equal Treatment Provision.

98.     The balance of the equities tips toward the issuance of an injunction.

99.     The public interest would not be disserved by a permanent injunction

### THIRD CLAIM FOR RELEIF
(For Specific Enforcement of the Equal Treatment Provision and
for Injunctive Relief With Respect to the BONAR 2024 Bonds)

100.  NML repeats and realleges the allegations set forth in paragraphs 1 through 99 herein.

101.  Pursuant to section 1(c) of the Fiscal Agency Agreement, the Argentina provided that its bonds issued pursuant to the Fiscal Agency Agreement would constitute "direct, unconditional, unsecured and unsubordinated obligations of the Republic and shall at all times rank pari passu and without preference among themselves" and that "[t]he payment obligations

of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness."

102.  Argentina, therefore, may not make any payment of its External Indebtedness without also making a ratable payment at the same time to NML.  Any payment of External Indebtedness where Argentina does not also make a ratable payment at the same time to NML constitutes a violation of the Equal Treatment Provision.

103.  With the issuance of the BONAR 2024 Bonds, Argentina issued a new series of bonds with payment obligations that rank higher than those held by NML and other non-tendering bondholders in violation of the Equal Treatment Provision.

104.  The BONAR 2024 Bonds are External Indebtedness.  The issuance of the BONAR 2024 Bonds to date and future issuances of these bonds has violated and will violate the Equal Treatment Provision.

105.  Argentina's past payments to the holders of the BONAR 2024 Bonds, while paying nothing to NML and other non-tendering bondholders, violated the Equal Treatment Provision.

106.  Argentina's continuing payments to the holders of the BONAR 2024 Bonds will be a continuing violation of the Equal Treatment Provision.

107.  NML has suffered irreparable injury from Argentina's violation of the Equal Treatment Provision and will continue to suffer such injury unless the Court specifically enforces that Provision with a mandatory injunction requiring Argentina to pay NML ratably whenever it pays interest to the holders of the BONAR 2024 Bonds.

108.  Remedies available at law are inadequate to compensate for such injury.

109.  NML has performed its part of the contract with Argentina.

110.  Argentina is capable of performing its obligations pursuant to the Equal Treatment Provision.

111.  The balance of the equities tips toward the issuance of an injunction.

112.  The public interest would not be disserved by a permanent injunction.

### FOURTH CLAIM FOR RELEIF
(For Specific Enforcement of the Equal Treatment Provision and
for Injunctive Relief With Respect to All External Indebtedness)

113.  NML repeats and realleges the allegations set forth in paragraphs 1 through 112 herein.

114.  Pursuant to section 1(c) of the Fiscal Agency Agreement, Argentina provided that its bonds issued pursuant to the Fiscal Agency Agreement would constitute "direct, unconditional, unsecured and unsubordinated obligations of the Republic and shall at all times rank pari passu and without preference among themselves" and that "[t]he payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness."

115.  Argentina, therefore, may not make any payment of its External Indebtedness without also making a ratable payment at the same time to NML.  Any payment of External Indebtedness where the Republic of Argentina does not also make a ratable payment at the same time to NML constitutes a violation of the Equal Treatment Provision.

116.  The Republic of Argentina has issued—and, on information and belief, will issue in the future—External Indebtedness in violation of the Equal Treatment Provision.

117.  Argentina's past payments to the holders of External Indebtedness, while paying nothing to NML and other non-tendering bondholders, violated the Equal Treatment Provision.

118.  Argentina's continuing payments to the holders of External Indebtedness—including External Indebtedness that the Republic of Argentina will issue in the future—will be a continuing violation of the Equal Treatment Provision.

119.  NML has suffered irreparable injury as a result of Argentina's violation of the Equal Treatment Provision and will continue to suffer such injury unless the Court specifically enforces that Provision with a mandatory injunction requiring Argentina to pay NML ratably whenever it pays interest to the holders of External Indebtedness (including, for the avoidance of doubt, any bonds with the ISIN ARARGE03H413, whether issued before or after the entry of the injunction) or holders of "Replacement Obligations" (meaning bonds or other obligations issued, whether before or after entry of the injunction, in exchange, substitution, restructuring, refinancing or satisfaction of any BONAR 2024 Bonds or other Replacement Obligations).

120.  Remedies available at law are inadequate to compensate for such injury.

121.  NML has performed its part of the contract with Argentina.

122.  Argentina is capable of performing its obligations pursuant to the Equal Treatment Provision.

123.  The balance of the equities tips toward the issuance of an injunction.

124.  The public interest would not be disserved by a permanent injunction.

WHEREFORE, Plaintiff NML demands judgment against the Republic of Argentina, as follows:

a.      Awarding NML a money judgment in an amount to be determined at trial, but not less than $30,000 together with all accrued and unpaid interest due under the terms of the FRANs and pursuant to New York law.

b.      On the Second Claim for Relief, an Order specifically enforcing the Equal Treatment Provision with respect to all outstanding External Indebtedness and to all External Indebtedness that the Republic of Argentina will issue in the future by requiring ratable payment to NML whenever Argentina makes or attempts to make payments on the 2005 and 2010 Exchange Bonds;

c.      On the Third Claim for Relief, an Order specifically enforcing the Equal Treatment Provision with respect to the BONAR 2024 Bonds;

d.      On the Fourth Claim for Relief, an Order specifically enforcing the Equal Treatment Provision with respect to all External Indebtedness; and

e.      Awarding NML its costs and attorneys fees and such other further relief as the Court shall deem just and proper.

Dated: New York, New York

_____, 2015

DECHERT LLP

By: /s/ Robert A. Cohen
Robert A. Cohen
(robert.cohen@dechert.com)
Dennis H. Hranitzky
(dennis.hranitzky@dechert.com)

1095 Avenue of the Americas
New York, New York 10036-6797
(212) 698-3500 (phone)
(212) 698-3599 (facsimile)

*Attorneys for Plaintiff NML Capital, Ltd.*

**<u>Exhibit 3</u>**

CONFIDENTIAL—SUBJECT TO COURT ORDER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                              :
NML CAPITAL, LTD.,
                                              :
                     Plaintiff,
                                              :      09 Civ. 1708 (TPG )
              v.                              :
                                              :
THE REPUBLIC OF ARGENTINA,
                                              :    **SECOND AMENDED AND**
                     Defendant.               :    **SUPPLEMENTAL COMPLAINT**
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

        Plaintiff, NML Capital, Ltd., ("NML"), by and through its undersigned counsel,

as and for its Second Amended and Supplemental Complaint against Defendant Republic of

Argentina ("Argentina"), alleges as follows:

NATURE OF THE ACTION

        1.     This is a breach of contract action arising from Argentina's failure to make

contractually-mandated principal and interest payments on certain bonds issued by Argentina in

which NML owns beneficial interests.  The bonds were issued pursuant to a Fiscal Agency

Agreement, dated October 19, 1994 (the "FAA") between Argentina and Bankers Trust

Company, as Fiscal Agent.  For its relief, NML seeks payment of the principal amount of its

bonds together with any accrued and unpaid interest, as provided for in the FAA and pursuant to

the terms of the bonds.  A true and correct copy of the FAA is attached hereto as Exhibit A.

        2.     In this pleading, Plaintiff is asserting two additional claims for declaratory

and injunctive relief.  The two new claims concern bonds bearing ISIN ARARGE03H413 (the

"BONAR 2024 Bonds") and Argentina's other existing and future External Indebtedness (other

than the Exchange Bonds which are already the subject of declaratory and injunctive relief issued by this Court).  Plaintiff is requesting: (i) a declaratory judgment that the BONAR 2024 Bonds are External Indebtedness within the meaning of the FAA, and (ii) specific performance of the Republic's obligations under the Equal Treatment Provision in the FAA by preliminarily and permanently enjoining the Republic from making payments of interest and/or principal on the existing and future BONAR 2024 Bonds and other External Indebtedness unless a "Ratable Payment" is made in respect of Plaintiff's defaulted bonds.

3.    This action also seeks relief based on Argentina's continuing breach of the Equal Treatment Provision of the FAA, paragraph 1(c) of the FAA, which provides for equal treatment in terms of rank and priority of payment for holders of the bonds issued under the FAA with respect to any unsecured and unsubordinated External Indebtedness as defined in the FAA (the "Equal Treatment Provision").  Under color of Law 26,017 passed in 2005 and Law 26,547 passed in 2009, Argentina issued bonds in its 2005 and 2010 Bond Exchanges with payment obligations that rank higher than those issued under the FAA and held by NML.  The bonds issued in the Exchanges are External Indebtedness. Argentina's issuance of these higher ranking bonds, its continuing payment of semi-annual interest to the holders of the bonds issued in the 2005 Bond Exchange and its anticipated payment of interest to the holders of the bonds issued in the 2010 Bond Exchange, while paying nothing to NML and other bondholders who did not participate in the Exchanges, violate the Equal Treatment Provision of the FAA.  To prevent further violations, NML seeks specific enforcement of the Equal Treatment Provision.

4.    Beginning in May 2014, the Republic began issuing the BONAR 2024 Bonds and has made payments on them all while paying nothing to plaintiff and other

bondholders who did not participate in the 2005 and 2010 Bond Exchanges—in violation of the Equal Treatment Provision.  Accordingly, to remedy this violation and prevent further violations, plaintiff seeks in its Tenth Claim for Relief specific enforcement of the Equal Treatment Provision with respect to the BONAR 2024 Bonds.

## THE PARTIES

5.     Plaintiff NML is a corporation organized and existing under the laws of the Cayman Islands.

6.     Defendant Argentina is a foreign state as defined in 28 U.S.C. § 1603.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1330 because Argentina is a foreign state which has explicitly and unconditionally waived sovereign immunity with respect to actions arising out of the FAA and is, therefore, not entitled to immunity under 28 U.S.C. §§ 1605-07 or under any applicable international agreement.

8.     In addition, Argentina consented in the FAA to submit to the jurisdiction of this Court in respect to actions arising out of the FAA, including any suit to recover on the bonds.  Pursuant to Section 22 of the FAA, Argentina appointed Banco de la Nación Argentina, which currently maintains offices at 225 Park Avenue, New York, New York 10169, as its authorized agent for service of process.  Section 23 of the FAA provides that the FAA shall be "governed by, and interpreted in accordance with, the laws of the State of New York."

9.     Venue is proper in this district by agreement of the parties and pursuant to 28 U.S.C. § 1391(f).

## FACTUAL ALLEGATIONS

<u>NML's Beneficial Interest In Bonds</u>

10.    Pursuant to the FAA, the record holder of all of the bonds at issue in this action is an institution designated by the issuer as the "depositary," or its nominee.  Financial institutions, known as "participants," maintain accounts with the depositary, through which they hold interests – or participations – in these bonds.  Investors such as NML own beneficial interests in the bonds through the participants.  In this case, the depositary is the Depositary Trust Company ("DTC").  The bonds at issue in this action are held of record by DTC or its nominee, and the participant through which NML owns its beneficial interests in these bonds is JP Morgan Chase Bank.

<u>The 11% Global Bonds</u>

11.    NML is the owner of a beneficial interest representing $3,442,000 principal amount of 11% Global Bonds issued by Argentina, CUSIP No. 040114AN0 (the "11% Bonds").  A true and correct copy of the JP Morgan Global Settled Holdings COB Report, dated October 13, 2009, showing NML's current total ownership of a beneficial interest representing $9,698,000 principal amount of the 11% Bonds, among interests in other bonds issued by Argentina, is annexed hereto as Exhibit B.  The $9,698,000 principal amount of 11% Bonds referenced in Exhibit B includes:  (1) the $3,442,000 principal amount of 11% Bonds that is the subject of this action; (2) the $225,000 principal amount of 11% Bonds that is the subject of *NML Capital, Ltd. v. The Republic of Argentina*, 08 Civ. 6978 (TPG); and (3) the $6,031,000 principal amount of 11% Bonds that is the subject of *NML Capital, Ltd. v. The Republic of Argentina*, 07 Civ. 1910 (TPG).

12.   NML's beneficial interest in the $3,442,000 of 11% Bonds at issue in this action is the result of six transactions:   purchases of $5,340,000 on November 10, 2008, $3,330,000 on November 13, 2008, $245,000 on November 13, 2008, $379,000 on November 20, 2008 and $179,000 on July 2, 2010, and a sale of $6,031,000 on November 23, 2009.  A true and correct copy of the Consolidated Settlement ITD Report statements showing NML's purchase of this interest, among interests in other bonds issued by Argentina, is annexed hereto as Exhibit C.

13.   The 11% Bonds are a Series of Securities under the terms of the FAA.

14.   The 11% Bonds matured on October 9, 2006, at which time the entire principal amount of the 11% Bonds became due and payable.

The 11.75% Global Bonds

15.   NML is the owner of a beneficial interest representing $15,339,000 principal amount of 11.75% Global Bonds issued by Argentina, CUSIP No. 040114BE9 (the "11.75% Bonds").  A true and correct copy of the JP Morgan Global Settled Holdings COB Report, dated October 13, 2010, showing NML's current total ownership of a beneficial interest representing $27,989,000 principal amount of the 11.75% Bonds, among interests in other bonds issued by Argentina, is annexed hereto as Exhibit B.  The $27,989,000 principal amount of 11.75% Bonds referenced in Exhibit B includes:  (1) the $15,339,000 principal amount of 11.75% Bonds that is the subject of this action; (2) the $11,290,000 principal amount of 11.75% Bonds that is the subject of *NML Capital, Ltd. v. The Republic of Argentina*, 08 Civ. 6975 (TPG); and (3) the $1,360,000 principal amount of 11.75% Bonds that is the subject of *NML Capital, Ltd. v. The Republic of Argentina*, 07 Civ. 1910 (TPG).

16.   NML's beneficial interest in the $15,339,000 of 11.75% Bonds at issue in this action is the result of three transactions:   purchases of $798,000 on August 4, 2008 and $15,901,000 on November 26, 2008, and a sale of $1,360,000 on November 24, 2009.   A true and correct copy of the Consolidated Settlement ITD Report statements showing NML's purchase of this interest, among interests in other bonds issued by Argentina, is annexed hereto as Exhibit C.

17.   The 11.75% Bonds are a Series of Securities under the terms of the FAA.

18.   The 11.75% Bonds matured on April 7, 2009.

The 11.375% Global Bonds

19.   NML is the holder of a beneficial interest representing $5,465,000 principal amount of 11.375% Global Bonds issued by Argentina, CUSIP No. 040114FC9 (the "11.375% Bonds").   A true and correct copy of the JP Morgan Global Settled Holdings COB Report, dated January 15, 2009, showing NML's current total ownership of a beneficial interest representing $22,005,000 principal amount of the 11.375% Bonds, among interests in other bonds issued by Argentina, is annexed hereto as Exhibit B.   The $22,005,000 principal amount of 11.375% Bonds referenced in Exhibit B includes:   (1) the $5,465,000 principal amount of 11.375% Bonds that is the subject of this action; (2) the $10,260,000 principal amount of 11.375% Bonds that is the subject of *NML Capital, Ltd. v. The Republic of Argentina*, 08 Civ. 6978 (TPG); and (3) the $6,280,000 principal amount of 11.375% Bonds that is the subject of *NML Capital, Ltd. v. The Republic of Argentina*, 07 Civ. 1910 (TPG).

20.   NML acquired the $5,465,000 beneficial interest in the 11.375% Bonds at issue in this action in seven transactions:   $770,000 on October 2, 2008, $1,000,000 on October

15, 2008, $2,000,000 on October 22, 2008, $481,000 on October 29, 2008, $670,000 on October 29, 2008, $500,000 on November 7, 2008 and $44,000 on November 13, 2008.  A true and correct copy of the Consolidated Settlement ITD Report statements showing NML's purchase of this interest, among interests in other bonds issued by Argentina, is annexed hereto as Exhibit C.

21.   The 11.375% Bonds are a Series of Securities under the terms of the FAA.

22.   The 11.375% Bonds matured on March 15, 2010.

The 12.375% Global Bonds

23.   NML is the owner of a beneficial interest representing $8,209,000 principal amount of 12.375% Global Bonds issued by Argentina, CUSIP No. 040114GD6 (the "12.375% Bonds").  A true and correct copy of the JP Morgan Global Settled Holdings COB Report, dated October 13, 2010, showing NML's current total ownership of a beneficial interest representing $20,429,000 principal amount of the 12.375% Bonds, among interests in other bonds issued by Argentina, is annexed hereto as Exhibit B.   The $20,429,000 principal amount of 12.375% Bonds referenced in Exhibit B includes:  (1) the $8,209,000 principal amount of 12.375% Bonds that is the subject of this action; (2) the $10,500,000 principal amount of 12.375% Bonds that is the subject of *NML Capital, Ltd. v. The Republic of Argentina*, 08 Civ. 6978 (TPG); and (3) the $1,720,000 principal amount of 12.375% Bonds that is the subject of *NML Capital, Ltd. v. The Republic of Argentina*, 07 Civ. 1910 (TPG).

24.   NML's beneficial interest in the $8,209,000 of 12.375% Bonds at issue in this action is the result of four transactions:  purchases of $3,900,000 on August 25, 2008, $1,154,000 on October 30, 2008 and $4,875,000 on November 13, 2008, and a sale of $1,720,000 on November 24, 2009.  A true and correct copy of the Consolidated Settlement ITD

Report statements showing NML's purchase of this interest, among interests in other bonds issued by Argentina, is annexed hereto as Exhibit C.

25.   The 12.375% Bonds are a Series of Securities under the terms of the FAA.

26.   The 12.375% Bonds mature on February 21, 2012.

The 11-3/8% Global Bonds

27.   NML is the owner of a beneficial interest representing $15,301,000 principal amount of 11-3/8% Global Bonds issued by Argentina, CUSIP No. 040114AR1 (the "11-3/8% Bonds").  A true and correct copy of the JP Morgan Global Settled Holdings COB Report, dated January 15, 2009, showing NML's current ownership of a beneficial interest representing $71,788,000 principal amount of the 11-3/8% Bonds, among interests in other bonds issued by Argentina, is annexed hereto as Exhibit B.  The $71,788,000 principal amount of 11-3/8% Bonds referenced in Exhibit B includes:  (1) the $15,301,000 principal amount of 11-3/8% Bonds that is the subject of this action; (2) the $42,155,000 principal amount of 11-3/8% Bonds that is the subject of *NML Capital, Ltd. v. The Republic of Argentina*, 08 Civ. 6978 (TPG); and (3) the $14,332,000 principal amount of 11-3/8% Bonds that is the subject of *NML Capital, Ltd. v. The Republic of Argentina*, 07 Civ. 1910 (TPG).

28.   NML acquired the $15,301,000 beneficial interest in the 11-3/8% Bonds at issue in this action in seven transactions:  $2,500,000 on August 25, 2008, $1,500,000 on October 29, 2008, $1,220,000 on November 7, 2008, $225,000 on November 13, 2008, $8,856,000 on November 24, 2008, $685,000 on December 5, 2008 and $315,000 on January 2, 2009.  A true and correct copy of the Consolidated Settlement ITD Report statements showing

NML's purchase of this interest, among interests in other bonds issued by Argentina, is annexed hereto as Exhibit C.

29.   The 11-3/8% Bonds are a Series of Securities under the terms of the FAA.

30.   The 11-3/8% Bonds mature on January 30, 2017.

The 12% Global Bonds

31.   NML is the owner of a beneficial interest representing $298,000 principal amount of 12% Global Bonds issued by Argentina, CUSIP No. 040114FB1 (the "12% Bonds"). A true and correct copy of the JP Morgan Global Settled Holdings COB Report, dated January 15, 2009, showing NML's current total ownership of a beneficial interest representing $61,942,000 principal amount of the 12% Bonds, among interests in other bonds issued by Argentina, is annexed hereto as Exhibit B.   The $61,942,000 principal amount of 12% Bonds referenced in Exhibit B includes:  (1) the $298,000 principal amount of 12% Bonds that is the subject of this action; and (2) the $1,100,000 principal amount of 12% Bonds that is the subject of *NML Capital, Ltd. v. The Republic of Argentina*, 08 Civ. 6978 (TPG); (3) the $300,000 principal amount of 12% Bonds that is the subject of *NML Capital, Ltd. v. The Republic of Argentina*, 07 Civ. 6563 (TPG); and (4) the $60,244,000 principal amount of 12% Bonds that is the subject of *NML Capital, Ltd. v. The Republic of Argentina*, 03 Civ. 8845 (TPG).

32.   NML acquired the $298,000 beneficial interest in the 12% Bonds at issue in this action in one transaction on November 13, 2008.   A true and correct copy of the Consolidated Settlement ITD Report statement showing NML's purchase of this interest, among interests in other bonds issued by Argentina, is annexed hereto as Exhibit C.

33.   The 12% Bonds are a Series of Securities under the terms of the FAA.

34. The 12% Bonds mature on February 1, 2020.

The 9.75% Global Bonds

35. NML is the owner of a beneficial interest representing $16,290,000 principal amount of 9.75% Global Bonds issued by Argentina, CUSIP No. 040114AV2 (the "9.75% Bonds"). A true and correct copy of the JP Morgan Global Settled Holdings COB Report, dated October 13, 2010, showing NML's current total ownership of a beneficial interest representing $26,438,000 principal amount of the 9.75% Bonds, among interests in other bonds issued by Argentina, is annexed hereto as Exhibit B. The $26,438,000 principal amount of 9.75% Bonds referenced in Exhibit B includes: (1) the $16,290,000 principal amount of 9.75% Bonds that is the subject of this action; and (2) the $4,598,000 principal amount of 9.75% Bonds that is the subject of *NML Capital, Ltd. v. The Republic Of Argentina*, 07 Civ. 1910 and (3) the $5,550,000 principal amount of 9.75% Bonds that is the subject of *NML Capital, Ltd. v. The Republic of Argentina*, 08 Civ. 6978 (TPG).

36. NML's beneficial interest in the $16,290,000 of 9.75% Bonds at issue in this action is the result of seven transactions: purchases of $7,400,000 on November 10, 2008, $490,000 on November 13, 2008, $2,150,000 on November 19, 2008, $6,050,000 on November 26, 2008 and $6,100,000 on November 27, 2008, and sales of $2,400,000 on November 25, 2009 and $3,500,000 on November 27, 2009. A true and correct copy of the Consolidated Settlement ITD Report statements showing NML's purchase of this interest, among interests in other bonds issued by Argentina, is annexed hereto as Exhibit C.

37. The 9.75% Bonds are a Series of Securities under the terms of the FAA.

38. The 9.75% Bonds mature on September 19, 2027.

The 2018 Global Bonds

39.   NML is the owner of a beneficial interest representing $76,545,549 principal amount of 2018 Global Bonds issued by Argentina, CUSIP No. 040114GG9 (the "2018 Bonds"). A true and correct copy of the JP Morgan Global Settled Holdings COB Report, dated January 15, 2009, showing NML's current total ownership of a beneficial interest representing $114,721,177 principal amount of the 2018 Bonds, among interests in other bonds issued by Argentina, is annexed hereto as Exhibit B.  The $114,721,177 principal amount of 2018 Bonds referenced in Exhibit B includes:  (1) the $76,545,549 principal amount of 2018 Bonds that is the subject of this action; (2) the $16,719,628 principal amount of 2018 Bonds that is the subject of *NML Capital, Ltd. v. The Republic of Argentina*, 08 Civ. 2541 (TPG); and (3) the $21,456,000 principal amount of 2018 Bonds that is the subject of *NML Capital, Ltd. v. The Republic of Argentina*, 07 Civ. 1910 (TPG).

40.   NML acquired the $76,545,549 beneficial interest in the 2018 Bonds at issue in this action in nine transactions:  $11,780,976 on August 11, 2008, $733,635 on October 2, 2008, $1,980,000 on October 15, 2008, $1,616,365 on October 29, 2008, $21,500,000 on October 31, 2008, $12,133,635 on November 3, 2008, $10,000,000 on November 5, 2008, $11,800,938 on November 11, 2008 and $5,000,000 on December 10, 2008.  A true and correct copy of the Consolidated Settlement ITD Report statements showing NML's purchase of this interest, among interests in other bonds issued by Argentina, is annexed hereto as Exhibit C.

41.   The 2018 Bonds are a Series of Securities under the terms of the FAA.

42.   The 2018 Bonds mature on June 19, 2018.

The Republic of Argentina's Default

11

43.   Pursuant to Section 12 of the FAA, the following occurrences, among others, constitute Events of Default:

(a) Non-Payment:  the Republic fails to pay any principal amount of any of the Securities of such Series when due or payable or fails to pay any interest on any of the Securities of such Series when due and payable and such failure continues for a period of 30 days; or

\*   \*   \*

(d) Moratorium:  a moratorium on the payment of principal of, or interest on, the Public External Indebtedness of the Republic shall be declared by the Republic.

44.   Upon the occurrence of an Event of Default described in Section 12(a) or 12(d) of the FAA, Section 12 further provides that each bondholder may, by notice in writing to the office of the Fiscal Agent, declare the principal amount of the bonds held by it to be due and payable immediately, together with all accrued and unpaid interest.

45.   In or about December, 2001, Argentina declared a moratorium on the payment of principal and interest with respect to all of its foreign debt, including the bonds at issue in this action.

46.   Since then, Argentina has failed to make payments of principal or interest owed on the 11% Bonds, the 11.75% Bonds, the 11.375% Bonds, the 12.375% Bonds, the 11-3/8% Bonds, the 12% Bonds, the 9.75% Bonds, and 12-1/8% Bonds, or the 2018 Bonds to NML, or to anyone else.

The Republic of Argentina's Violations of the Equal Treatment Provision

47.   The FAA contains an Equal Treatment Provision which states:

a.     The Securities will constitute… direct, unconditional, unsecured and unsubordinated obligations of the

> Republic…. **The payment obligations of the Republic under the Securities shall at all times rank at least equally with all of other present and future unsecured and unsubordinated External Indebtedness (as defined in this Agreement).**

FAA at ¶1(c) (emphasis supplied).

48.   According to its plain language, the Equal Treatment Provision means that Argentina may not make a payment to a holder of External Indebtedness without a ratable payment being made at the same time to NML.

49.   As the Second Circuit has held, the first sentence of the Equal Treatment Provision "prohibits Argentina, as bond *issuer*, from formally subordinating the bonds by issuing superior debt. The second sentence . . . prohibits Argentina, as bond *payor*, from paying on other bonds without paying on the FAA Bonds."  *NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 259 (2d Cir. 2012).

50.   In 2005, Argentina restructured its debt by offering a bond exchange to all holders of non-performing external debt (the "2005 Exchange").

51.   Holders of approximately 25% of Argentina's external debt did not participate in the 2005 Exchange ("Non-tendering Bondholders").

52.   NML did not participate in the 2005 Exchange.

53.   Bondholders who participated in the 2005 Exchange received bonds scheduled to pay semi-annual interest.

54.   In 2005, Argentina began making semi-annual interest payments to holders of bonds issued in the 2005 Exchange (such bonds, the "2005 Exchange Bonds," and such holders, the "2005 Exchange Bondholders").

55.     Argentina paid all subsequent interest due on the 2005 Exchange Bonds until the payment that came due on June 30, 2014.  On June 26, 2014 Argentina attempted to initiate payment to certain holders of 2005 Exchange Bonds by transmitting funds to the Bank of New York Mellon ("BNY") as trustee.  By reason of Orders issued by the Court, BNY did not further transmit these funds to holders of the 2005 Exchange Bonds.  *NML Capital, Ltd v. The Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. Aug. 6, 2014) (ECF No. 633).

56.     Upon information and belief, Argentina intends to continue paying or attempting to pay interest on all 2005 Bonds as it becomes due.

57.     To facilitate the 2005 Bond Exchange, the Senate and Chamber of Deputies of the Argentine Nation passed Law 26,017 ("the Lock Law") on February 9, 2005.  A copy of Law 26,017 and a certified translation are annexed hereto as Exhibit D.

58.     In its January 28, 2010 Prospectus, Argentina explained the purpose and effect of the Lock Law as follows:

> In an effort to reassure tendering Bondholders and increase the level of participation on the 2005 debt exchange, Congress subsequently passed Law 26,017, known as the "Lock Law."  The Lock Law prohibited the Executive Branch from reopening the Debt Exchange without Congressional approval **and also prohibited any type of settlement involving untendered securities that were eligible to participate in the 2005 Debt Exchange. . . .**

(Emphasis supplied.)

59.     The assurances to tendering bondholders provided by Law 26,017 facilitated Argentina's completion of the 2005 Bond Exchange.

60.     Article 1 of Law 26,017 provided that Bonds not tendered in the 2005 Exchange would be subject to the following provisions:

a.    Article 2 – The national Executive Power may not, with respect to the bonds referred to in Article 1 of this law, reopen the swap process established in the aforementioned Decree No. 1735/04.

b.    Article 3 - The national State shall be prohibited from conducting any type of in-court, out-of-court or private settlement with respect to the bonds referred to in Article 1 of this law.

c.    Article 4 - The national Executive Power must – within the framework of the terms of the issuance of the respective bonds, and the applicable laws and regulations in the corresponding jurisdictions – order the pertinent administrative acts and fulfill the necessary procedures to remove the bonds referred to in the preceding article from listing on all domestic and foreign securities markets and exchanges.

61.  In 2009, in preparation for another bond exchange in 2010, the Senate and Chamber of Deputies of the Argentine Nation passed Law No. 26,547 which, among other things, suspended the Lock Law for purposes of the 2010 Exchange. A copy of Law 26,547 and a certified translation are annexed hereto as Exhibit E.

62.  Law 26,547 provided:

a.    Article 1.  The operation of Articles 2, 3, and 4 of Law No. 26,017 is suspended until 31 December 2010, or until the National Executive Branch, through the Ministry of Economy and Public Finance, declares that the process of restructuring the public instruments covered by said law is completed, whichever occurs first.

b.    Article 3.  The financial terms and conditions that may be offered may not be equal to or better than those offered to creditors in the debt restructuring established by Decree No. 1735/04.

c.    Article 5.  It is forbidden to offer to the holders of public debt that have brought judicial, administrative, or arbitration proceedings or any other type of proceeding

> treatment more favorable than the treatment afforded to holders who did not bring such proceedings.

63.    The prospectus for Argentina's 2010 Exchange stated:

> Eligible Securities in default that are not exchanged pursuant to the Invitation may remain in default indefinitely.  In light of its financial and legal constraints, *Argentina does not expect to resume payments on any eligible Securities in default that remain outstanding following the expiration of the Invitation*.  Argentina has opposed vigorously, and intends to continue to oppose, attempts by holders who did not participate in its prior exchange offers to collect on its defaulted debt through . . . litigation . . .  and other legal proceedings against Argentina.  Argentina remains subject to significant legal constraints regarding its defaulted debt. . . .
> Consequently, if you elect not to tender your Eligible Securities in default pursuant to the Invitation *there can be no assurance that you will receive any future payments or be able to collect through litigation in respect of your Eligible Securities in default.*

64.    NML did not participate in the 2010 Exchange (NML and other Argentine bond holders that participated in neither the 2005 Exchange nor the 2010 Exchange, the "Non-tendering Bondholders").

65.    In 2013, Argentina enacted Law 26,886 purportedly to reopen the bond exchange on the same terms that had been repeatedly rejected by plaintiff.  While Law 26,886 suspends certain provisions of the Lock Law, this suspension has no practical effect, because Law 26,886 "forbid[s]" Argentina from paying NML according to its contract, and only allows Argentina to pay NML on terms that are no "more favorable" than the terms of the original Exchange Offer.  A copy of Law 26,886 and a certified translation are annexed hereto as Exhibit F.

66.    Argentine courts have held that the Lock Law and the Moratorium prevent them from recognizing and enforcing Non-tendering Bondholders' New York judgments.

67.     Argentina violated the Equal Treatment Provision of the FAA by relegating NML's Bonds to a non-paying class pursuant to Law 26,517.

68.     In 2010, Argentina began making semi-annual interest payments to holders of bonds issued in the 2010 Exchange (such bonds, the "2010 Exchange Bonds," and such holders, the "2010 Exchange Bondholders.").

69.     Argentina paid all interest due on the 2010 Exchange Bonds until the payment due on June 30, 2014.  On June 26, 2014 Argentina attempted to initiate payment to certain holders of 2010 Exchange Bonds by transmitting funds to BNY as trustee.  By reason of Orders issued by the Court, BNY did not further transmit those funds to holders of the 2010 Exchange Bonds.  *NML Capital, Ltd v. The Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. Aug. 6, 2014) (ECF No. 633).

70.     Upon information and belief, Argentina intends to continue paying or attempting to pay interest on all 2010 Exchange Bonds as it becomes due.

71.     Upon information and belief, Argentina will continue to pay nothing to NML.

72.     NML and the other non-tendering bondholders have been damaged as a result of these violations and will continue to be damaged by the continuing violations of the Equal Treatment Provision.

73.     In October 2010, NML sought specific performance of the Equal Treatment Provision in this and two other pre-judgment cases.[1]

---

[1]     *NML Capital, Ltd v. The Republic of Argentina* 08 Civ. 6978, 09 Civ. 1707, 09 Civ. 1708 ("Pre-judgment Cases").

74. On December 7, 2011, the Court held that Argentina's actions, as described in paragraphs 50-71, *supra*, violated the Equal Treatment Provision of the FAA and granted partial summary judgment to NML on claims for specific performance of the Equal Treatment Provision.  A true and correct copy of the Court's December 7, 2011 Order is annexed hereto as Exhibit G.

75. On February 23, 2012, the Court:

a. held that NML had no adequate remedy at law and that, absent equitable relief, NML would suffer irreparable harm;

b. held that the equities strongly supported injunctive relief;

c. held that Argentina had the financial wherewithal to meet its payment obligations to NML in those cases; and

d. issued an injunction to remedy Argentina's continuing violations of the Equal Treatment Provision, which required Argentina to specifically perform its obligations under the Equal Treatment Provision by making ratable payment to NML whenever it paid the 2005 or 2010 Exchange Bondholders the amounts due on their bonds.

76. A true and correct copy of the Court's February 23, 2012 Order is annexed hereto as Exhibit H.

77. On October 26, 2012, the Second Circuit affirmed the Court's February 23, 2012 Order, but remanded the injunction for clarification.  *NML Capital, Ltd v. The Republic of Argentina*, No. 12-105(L) (2d Cir. Oct. 26, 2012) (ECF No. 442).

78.     Although the Second Circuit's judgment was not final, Argentina petitioned for a writ of certiorari to the United States Supreme Court on October 7, 2013.  The petition was denied.  *Republic of Argentina v. NML Capital, Ltd., et al.*, No. 12-1494 (S. Ct. Oct. 7, 2013).

79.     On November 21, 2012, the Court issued an Amended Order requiring Argentina to specifically perform its obligations under the Equal Treatment Provision by making ratable payment to NML whenever it paid the 2005 and 2010 Exchange Bondholders the amounts due on their bonds.  A true and correct copy of the Court's November 21, 2012 Order (the "Amended February 23 Order") is annexed hereto as Exhibit I.

80.     In response to the Orders of the Court and the affirmances of the Second Circuit in NML's Pre-judgment Cases, Argentine officials, including President Kirchner, have repeatedly stated that Argentina has no intention of ever paying NML.

81.     For example, in November 2012, after the Second Circuit affirmed the February 23, 2012 Order and remanded the injunction for clarification, President Kirchner stated that Argentina was going to pay the Exchange Bonds, but "not one dollar to the 'vulture funds.'"

82.     During the oral argument of the appeal from the Court's Amended February 23 Order, Argentina's counsel told the Second Circuit Court of Appeals that Argentina would not voluntarily obey any order requiring ratable payment to NML.

83.     On August 23, 2013, the Second Circuit affirmed the Amended February 23 Order.  *NML Capital, Ltd v. The Republic of Argentina*, No. 12-105(L) (2d Cir. Aug. 23, 2012) (ECF No. 1001).

84.     Shortly thereafter, President Kirchner announced that Argentina would offer a new bond exchange that would replace the New York law-governed Exchange Bonds with new bonds governed by Argentine law and payable in Argentina.  This plan to evade the rulings of United States courts evidences Argentina's continuing intention not to fulfill its obligations pursuant to the Equal Treatment Provision.

85.     Argentina subsequently filed another petition for a writ of certiorari, seeking review by the Supreme Court of the Second Circuit's affirmance of the Amended February 23 Order.  That petition was also denied.  *Exchange Bondholder Group v. NML Capital, Ltd., et al.*, No. 13-991 (S. Ct. June 16, 2014).

86.     After this second petition for writ of certiorari was denied, Argentina's Economy Minister Axel Kicillof announced a plan—nearly identical to the plan announced in August 2013 by President Kirchner—to evade the Court's Amended February 23 Order by swapping the Exchange Bonds for new bonds payable in Argentina and outside the Court's reach.

87.     On June 20, 2014, the Court promptly issued an Order ruling that Minister Kicillof's proposed bond swap was in violation of the Court's Orders.  A true and correct copy of the Court's June 20, 2014 Order is annexed hereto as Exhibit J.

88.     Six days later, on June 26, 2014, Argentina attempted to initiate payment to certain holders of the Exchange Bonds by transmitting funds to BNY as trustee, without making ratable payment to NML.

89.     On August 6, 2014, the Court issued an Order finding that the June 26, 2014 payment by Argentina to BNY was illegal and in violation of the Court's previous Orders. A true and correct copy of the Court's August 6, 2014 Order is annexed hereto as Exhibit K.

90.     Argentina's President Kirchner subsequently announced that Argentina would enact legislation to change the manner in which it makes payments on the Exchange Bonds, such that BNY would be removed as trustee for certain Exchange Bonds and all Exchange Bonds would be paid from a single account in Argentina through a financial institution called *Nación Fideicomisos* that Argentina controls.  Argentina has taken steps to carry out this plan.  The "Legal Notice" published in The New York Times on September 22, 2014, is attached as Exhibit L hereto.  These actions are another attempt by Argentina to evade the rulings of the Court and to flout its obligations under the Equal Treatment Provision.

91.     As a result of these flagrant and unlawful activities, NML moved by order to show cause to hold Argentina in civil contempt of court.  On September 29, 2014, the Court issued an Order holding Argentina in civil contempt; and on October 3, 2014, the Court issued an Amended and Supplemental Order regarding Argentina's civil contempt.  A true and correct copy of the Court's September 29, 2014 Order is annexed hereto as Exhibit M, and a true and correct copy of the Court's October 3, 2014 Order is annexed hereto as Exhibit N.

92.     Since May 2014, the Republic began issuing bonds the "BONAR 2024 Bonds, which like the bonds issued in the 2005 and 2010 Bond Exchanges are also External Indebtedness.  Argentina has made payments on the BONAR 2024 Bonds, and on information and belief, it will continue to make payments on and issue more BONAR 2024 Bonds – all while

paying nothing to NML and other bondholders who did not participate in the 2005 and 2010 Bond Exchanges—in violation of the Equal Treatment Provision.

93.     In May 2014, Argentina initially offered and eventually issued $3.25 billion of BONAR 2024 Bonds to the Spanish oil company, Repsol S.A., to settle claims Repsol had asserted against Argentina, including claims pending in New York and Spanish courts.

94.     Argentina structured the offer to facilitate the issuance of the BONAR 2024 Bonds to Repsol and other international investors.  As part of the settlement agreement with Repsol, Argentina agreed that the BONAR 2024 Bonds would clear through Euroclear, which would make the bonds more attractive to international investors.  JPMorgan also conducted a "shadow bookbuilding process" to ensure that the bonds could be immediately distributed to international investors interested in purchasing the newly-issued BONAR 2024 Bonds immediately after Repsol received those bonds. Accordingly, just days after Argentina delivered the BONAR 2024 Bonds, Repsol sold them all to JPMorgan Securities PLC, JPMorgan's London-based broker-dealer.  Since their original issuance, the BONAR 2024 Bonds have been actively traded in the over-the-counter market in the United States.

95.     In December, 2014, Argentina issued approximately $650 million additional BONAR 2024 Bonds.  Approximately $380 million of these BONAR 2024 Bonds offered in December 2014 were issued in exchange for BODEN 2015 bonds, with the rest a new issuance of bonds. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████

96.     In February 2015, Argentina planned to issue more BONAR 2024 Bonds

through an underwriting by JPMorgan and Deutsche Bank.   ██████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████

97.     ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

98.     ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████

99.     Argentina "suspended" the issuance on February 26, 2015, after this Court compelled JPMorgan and Deutsche Bank to provide discovery about the transaction, ███████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ Argentina resumed the issuance process by announcing on April 21 that it would issue more BONAR 2024 Bonds, in a transaction that would settle just two days later.

100.    As it had since February, Deutsche Bank continued to play a key role in the offering, again, on information and belief, as Argentina's agent or in concert with Argentina. Deutsche Bank's New York syndicate desk immediately notified investors that it was taking orders. ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ The Spanish bank BBVA also accounted for a major portion of the BONAR 2024 Bonds issued in April.  In all, Argentina sold over $1.4 billion principal amount of BONAR 2024 Bonds in the April 2015 issuance, the majority of which was placed by Deutsche Bank.

101.    Argentina tried to create a false appearance that the BONAR 2024 Bonds issued in April 2015 were offered exclusively within Argentina.  As an example, Argentina announced that orders could only be placed through a lengthy list of eligible institutional purchasers in Argentina.

102.    In reality, affiliates of international banks purchased and re-sold internationally almost the entire offering.

103.     Notwithstanding these efforts to disguise the nature of the April 2015 issuance, Argentina targeted international investors and took regulatory steps to encourage their participation.   For example, Argentina enacted regulatory changes which made it easier for foreign purchasers to receive their bonds.   Moreover, on the day Argentina accepted bids for the offering, the Buenos Aires Securities Market, "Merval," issued a notice to its agents that they could "use transfers to Merval's account [in] NY as a means of payment" for the BONAR 2024 Bonds.   Almost all of the bonds were sold to international investors.   Argentina's leaders then publicly trumpeted the offering as evidence of Argentina's ability to tap into the international markets.

104.     Since May 2014, Argentina has issued approximately $5.3 billion of BONAR 2024 Bonds.

105.     In violation of its obligations under the Equal Treatment Provision of the FAA, Argentina made its first payment on the BONAR 2024 Bonds on November 7, 2014, and its second payment on May 7, 2015.

106.     Upon information and belief, Argentina intends to make all payments due under the terms of the BONAR 2024 Bonds.

107.     Upon information and belief, Argentina intends to issue additional External Indebtedness in the future.

108.     Upon information and belief, Argentina intends to make all payments due under the terms of any other existing or future External Indebtedness.

109.     In addition to the bonds issued in the 2005 and 2010 Bond Exchanges and the BONAR 2024 Bonds, Argentina has issued other External Indebtedness, made payments on

such External Indebtedness and on information and belief, it will continue to make payments on and issue more of such External Indebtedness.

110.    Argentina's issuance of and payments on the BONAR 2024 Bonds and other External Indebtedness constitute additional violations of the Equal Treatment Provision of the FAA.

111.    NML now seeks payment of the principal amount of NML's Bonds together with any accrued and unpaid interest and specific performance of the Equal Treatment Provision in this case with respect to its beneficial holdings of bonds issued pursuant to the FAA. NML also seeks specific enforcement of the Equal Treatment Provision with respect to the BONAR 2024 Bonds and with respect to all External Indebtedness.

<u>FIRST CLAIM FOR RELIEF</u>
(For Breach of Contract on the 11% Bonds)

112. NML repeats and realleges the allegations set forth in paragraphs 1 through 111.

113. The 11% Bonds matured on October 9, 2006, at which time the entire principal amount of the 11% bonds became due and payable.

114. Upon maturity, however, Argentina failed to pay the principal amount of the 11% Bonds at issue in this action owed to NML's predecessor-in-interest.

115. By reason of the foregoing Argentina has breached its contractual obligations to NML, and Argentina is liable to NML for damages in amount to be determined at trial, but not less than $3,442,000, together with all accrued and unpaid interest due pursuant to the terms of the 11% Bonds and New York law.

## SECOND CLAIM FOR RELIEF
### (For Breach of Contract on the 11.75% Bonds)

116. NML repeats and realleges the allegations set forth in paragraphs 1 through 115.

117. Pursuant to Sections 12(a) and (d) of the FAA, the declaration of a moratorium and the nonpayment of interest constitute Events of Default on the 11.75% Bonds entitling NML to declare the principal amount of the 11.75% Bonds it holds, together with all accrued and unpaid interest, to be due and payable immediately.

118. On or about February 4, 2009, NML advised Argentina, by written notice to Argentina's Fiscal Agent, that it was declaring $16,699,000 principal amount of the 11.75% Bonds held by NML, together with all accrued and unpaid interest, immediately due and payable pursuant to Section 12 of the FAA.

119. Despite this notice, Argentina has failed to make any payments of principal or interest on the 11.75% Bonds to NML.

120. By reason of the foregoing Argentina has breached its contractual obligations to NML, and Argentina is liable to NML for damages in amount to be determined at trial, but not less than $15,339,000, together with all accrued and unpaid interest due pursuant to the terms of the 11.75% Bonds and New York law.

## THIRD CLAIM FOR RELIEF
### (For Breach of Contract on the 11.375% Bonds)

121. NML repeats and realleges the allegations set forth in paragraphs 1 through 120.

122. Pursuant to Sections 12(a) and (d) of the FAA, the declaration of a moratorium and the nonpayment of interest constitute Events of Default on the 11.375% Bonds entitling NML to declare the principal amount of the 11.375% Bonds it holds, together with all accrued and unpaid interest, to be due and payable immediately.

123. On or about February 4, 2009, NML advised Argentina, by written notice to Argentina's Fiscal Agent, that it was declaring $5,465,000 principal amount of the 11.375% Bonds NML holds, together with all accrued and unpaid interest, immediately due and payable pursuant to Section 12 of the FAA.

124. Despite this notice, Argentina has failed to make any payments of principal or interest on the 11.375% Bonds to NML.

125. By reason of the foregoing Argentina has breached its contractual obligations to NML, and Argentina is liable to NML for damages in amount to be determined at trial, but not less than $5,465,000, together with all accrued and unpaid interest due pursuant to the terms of the 11.375% Bonds and New York law.

FOURTH CLAIM FOR RELIEF
(For Breach of Contract on the 12.375% Bonds)

126. NML repeats and realleges the allegations set forth in paragraphs 1 through 125.

127. Pursuant to Sections 12(a) and (d) of the FAA, the declaration of a moratorium and the nonpayment of interest constitute Events of Default on the 12.375% Bonds entitling NML to declare the principal amount of the 12.375% Bonds it holds, together with all accrued and unpaid interest, to be due and payable immediately.

128.    On or about February 4, 2009, NML advised Argentina, by written notice to Argentina's Fiscal Agent, that it was declaring $9,929,000 principal amount of the 12.375% Bonds NML holds, together with all accrued and unpaid interest, immediately due and payable pursuant to Section 12 of the FAA.

129.    Despite this notice, Argentina has failed to make any payments of principal or interest on the 12.375% Bonds to NML.

130.    By reason of the foregoing Argentina has breached its contractual obligations to NML, and Argentina is liable to NML for damages in amount to be determined at trial, but not less than $8,209,000, together with all accrued and unpaid interest due pursuant to the terms of the 12.375% Bonds and New York law.

<u>FIFTH CLAIM FOR RELIEF</u>
(For Breach of Contract on the 11-3/8% Bonds)

131.    NML repeats and realleges the allegations set forth in paragraphs 1 through 130.

132.    Pursuant to Sections 12(a) and (d) of the FAA, the declaration of a moratorium and the nonpayment of interest constitute Events of Default on the 11-3/8% Bonds entitling NML to declare the principal amount of the 11-3/8% Bonds it holds, together with all accrued and unpaid interest, to be due and payable immediately.

133.    On or about February 4, 2009, NML advised Argentina, by written notice to Argentina's Fiscal Agent, that it was declaring $15,301,000 principal amount of the 11-3/8% Bonds NML holds, together with all accrued and unpaid interest, immediately due and payable pursuant to Section 12 of the FAA.

134.    Despite this notice, Argentina has failed to make any payments of principal or interest on the 11-3/8% Bonds to NML.

135.    By reason of the foregoing Argentina has breached its contractual obligations to NML, and Argentina is liable to NML for damages in amount to be determined at trial, but not less than $15,301,000, together with all accrued and unpaid interest due pursuant to the terms of the 11-3/8% Bonds and New York law.

SIXTH CLAIM FOR RELIEF<br>(For Breach of Contract on the 12% Bonds)

136.    NML repeats and realleges the allegations set forth in paragraphs 1 through 135.

137.    Pursuant to Sections 12(a) and (d) of the FAA, the declaration of a moratorium and the nonpayment of interest constitute Events of Default on the 12% Bonds entitling NML to declare the principal amount of the 12% Bonds it holds, together with all accrued and unpaid interest, to be due and payable immediately.

138.    On or about February 4, 2009, NML advised Argentina, by written notice to Argentina's Fiscal Agent, that it was declaring $298,000 principal amount of the 12% Bonds NML holds, together with all accrued and unpaid interest, immediately due and payable pursuant to Section 12 of the FAA.

139.    Despite this notice, Argentina has failed to make any payments of principal or interest on the 12% Bonds to NML.

140.    By reason of the foregoing Argentina has breached its contractual obligations to NML, and Argentina is liable to NML for damages in amount to be determined at

trial, but not less than $298,000, together with all accrued and unpaid interest due pursuant to the terms of the 12% Bonds and New York law.

SEVENTH CLAIM FOR RELIEF
(For Breach of Contract on the 9.75% Bonds)

141.    NML repeats and realleges the allegations set forth in paragraphs 1 through 140.

142.    Pursuant to Sections 12(a) and (d) of the FAA, the declaration of a moratorium and the nonpayment of interest constitute Events of Default on the 9.75% Bonds entitling NML to declare the principal amount of the 9.75% Bonds it holds, together with all accrued and unpaid interest, to be due and payable immediately.

143.    On or about February 4, 2009, NML advised Argentina, by written notice to Argentina's Fiscal Agent, that it was declaring $22,190,000 principal amount of the 9.75% Bonds NML holds, together with all accrued and unpaid interest, immediately due and payable pursuant to Section 12 of the FAA.

144.    Despite this notice, Argentina has failed to make any payments of principal or interest on the 9.75% Bonds to NML.

145.    By reason of the foregoing Argentina has breached its contractual obligations to NML, and Argentina is liable to NML for damages in amount to be determined at trial, but not less than $16,290,000, together with all accrued and unpaid interest due pursuant to the terms of the 9.75% Bonds and New York law.

EIGHTH CLAIM FOR RELIEF

(For Breach of Contract on the 2018 Bonds)

146.    NML repeats and realleges the allegations set forth in paragraphs 1 through 145.

147.    Pursuant to Sections 12(a) and (d) of the FAA, the declaration of a moratorium and the nonpayment of interest constitute Events of Default on the 2018 Bonds entitling NML to declare the principal amount of the 2018 Bonds it holds, together with all accrued and unpaid interest, to be due and payable immediately.

148.    On or about February 4, 2009, NML advised Argentina, by written notice to Argentina's Fiscal Agent, that it was declaring $76,545,549 principal amount of the 2018 Bonds NML holds, together with all accrued and unpaid interest, immediately due and payable pursuant to Section 12 of the FAA.

149.    Despite this notice, Argentina has failed to make any payments of principal or interest on the 2018 Bonds to NML.

150.    By reason of the foregoing Argentina has breached its contractual obligations to NML, and Argentina is liable to NML for damages in amount to be determined at trial, but not less than $76,545,549, together with all accrued and unpaid interest due pursuant to the terms of the 2018 Bonds and New York law.

<u>NINTH CLAIM FOR RELIEF</u>
(For Specific Enforcement of the Equal Treatment Provision and for Injunctive Relief)

151.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 150 herein.

152.    Pursuant to ¶ 1(c) of the FAA, Argentina provided that its bonds issued pursuant to the FAA would constitute "direct, unconditional, unsecured and unsubordinated obligations of the Republic and shall at all times rank <u>pari</u> <u>passu</u> and without preference among

themselves . . . ." and that "[t]he payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness…."

153.    Argentina, therefore, may not make any payment of its External Indebtedness without also making a ratable payment at the same time to NML.

154.    Through the passage of Law 26,017, Argentina issued a new series of bonds with payment obligations that rank higher than those held by NML and other non-tendering Bondholders in violation of the Equal Treatment Provision.

155.    Through the passage of Law 26,547 Argentina issued a new series of bonds with payment obligations that rank higher than those held by NML and other non-tendering Bondholders in violation of the Equal Treatment Provision.

156.    The bonds issued in the Exchanges are External Indebtedness and their issuance violated the Equal Treatment Provision.

157.    Argentina's past payment of interest to 2005 Bondholders, while paying nothing to NML and other non-tendering bondholders, violated the Equal Treatment Provision.

158.    Argentina's continuing payments of interest to 2005 Bondholders will be a continuing violation of the Equal Treatment Provision.

159.    Argentina's payment of the scheduled interest to 2010 Bondholders will be a continuing violation of the Equal Treatment Provision.

160.    NML has suffered irreparable injury from Argentina's violation of the Equal Treatment Provision and will continue to suffer such injury unless the Court specifically

enforces that Provision with a mandatory injunction requiring Argentina to pay NML ratably whenever it pays interest to 2005 or 2010 Bondholders.

161.    Remedies available at law are inadequate to compensate for such injury.

162.    NML has performed its part of the contract with Argentina.

163.    Argentina is capable of performing its obligations pursuant to the Equal Treatment Provision.

164.    The balance of the equities tips toward the issuance of an injunction.

165.    The public interest would not be disserved by a permanent injunction.

<u>TENTH CLAIM FOR RELEIF</u>
(For Specific Enforcement of the Equal Treatment Provision and
for Injunctive Relief With Respect to the BONAR 2024 Bonds)

166.  NML repeats and realleges the allegations set forth in paragraphs 1 through 165 herein.

167.  Pursuant to section 1(c) of the Fiscal Agency Agreement, the Argentina provided that its bonds issued pursuant to the Fiscal Agency Agreement would constitute "direct, unconditional, unsecured and unsubordinated obligations of the Republic and shall at all times rank pari passu and without preference among themselves" and that "[t]he payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness."

168.  Argentina, therefore, may not make any payment of its External Indebtedness without also making a ratable payment at the same time to NML.  Any payment of External Indebtedness where Argentina does not also make a ratable payment at the same time to NML constitutes a violation of the Equal Treatment Provision.

169.  With the issuance of the BONAR 2024 Bonds, Argentina issued a new series of bonds with payment obligations that rank higher than those held by NML and other non-tendering bondholders in violation of the Equal Treatment Provision.

170.  The BONAR 2024 Bonds are External Indebtedness.  The issuance of the BONAR 2024 Bonds to date and future issuances of these bonds has violated and will violate the Equal Treatment Provision.

171.  Argentina's past payments to the holders of the BONAR 2024 Bonds, while paying nothing to NML and other non-tendering bondholders, violated the Equal Treatment Provision.

172.  Argentina's continuing payments to the holders of the BONAR 2024 Bonds will be a continuing violation of the Equal Treatment Provision.

173.  NML has suffered irreparable injury from Argentina's violation of the Equal Treatment Provision and will continue to suffer such injury unless the Court specifically enforces that Provision with a mandatory injunction requiring Argentina to pay NML ratably whenever it pays interest to the holders of the BONAR 2024 Bonds.

174.  Remedies available at law are inadequate to compensate for such injury.

175.  NML has performed its part of the contract with Argentina.

176.  Argentina is capable of performing its obligations pursuant to the Equal Treatment Provision.

177.  The balance of the equities tips toward the issuance of an injunction.

178. The public interest would not be disserved by a permanent injunction.

<u>ELEVENTH CLAIM FOR RELIEF</u>

(For Specific Enforcement of the Equal Treatment Provision and
for Injunctive Relief With Respect to All External Indebtedness)

179.   NML repeats and realleges the allegations set forth in paragraphs 1 through 178 herein.

180.   Pursuant to section 1(c) of the Fiscal Agency Agreement, Argentina provided that its bonds issued pursuant to the Fiscal Agency Agreement would constitute "direct, unconditional, unsecured and unsubordinated obligations of the Republic and shall at all times rank pari passu and without preference among themselves" and that "[t]he payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness."

181.   Argentina, therefore, may not make any payment of its External Indebtedness without also making a ratable payment at the same time to NML.  Any payment of External Indebtedness where the Republic of Argentina does not also make a ratable payment at the same time to NML constitutes a violation of the Equal Treatment Provision.

182.   The Republic of Argentina has issued—and, on information and belief, will issue in the future—External Indebtedness in violation of the Equal Treatment Provision.

183.   Argentina's past payments to the holders of External Indebtedness, while paying nothing to NML and other non-tendering bondholders, violated the Equal Treatment Provision.

184.   Argentina's continuing payments to the holders of External Indebtedness— including External Indebtedness that the Republic of Argentina will issue in the future—will be a continuing violation of the Equal Treatment Provision.

185.  NML has suffered irreparable injury as a result of Argentina's violation of the Equal Treatment Provision and will continue to suffer such injury unless the Court specifically enforces that Provision with a mandatory injunction requiring Argentina to pay NML ratably whenever it pays interest to the holders of External Indebtedness (including, for the avoidance of doubt, any bonds with the ISIN ARARGE03H413, whether issued before or after the entry of the injunction) or holders of "Replacement Obligations" (meaning bonds or other obligations issued, whether before or after entry of the injunction, in exchange, substitution, restructuring, refinancing or satisfaction of any BONAR 2024 Bonds or other Replacement Obligations).

186.  Remedies available at law are inadequate to compensate for such injury.

187.  NML has performed its part of the contract with Argentina.

188.  Argentina is capable of performing its obligations pursuant to the Equal Treatment Provision.

189.  The balance of the equities tips toward the issuance of an injunction.

190.  The public interest would not be disserved by a permanent injunction.

WHEREFORE, NML demands judgment against Argentina, as follows:

a.       On the First Claim for Relief, awarding NML a money judgment in an amount to be determined at trial, but not less than $3,442,000, together with all accrued and unpaid interest due under the terms of the 11% Bonds and pursuant to New York law.

b.       On the Second Claim for Relief, awarding NML a money judgment in an amount to be determined at trial, but not less than $15,339,000, together with all accrued and unpaid interest due under the terms of the 11.75% Bonds and pursuant to New York law.

c.      On the Third Claim for Relief, awarding NML a money judgment in an amount to be determined at trial, but not less than $5,465,000, together with all accrued and unpaid interest due under the terms of the 11.375% Bonds and pursuant to New York law.

d.      On the Fourth Claim for Relief, awarding NML a money judgment in an amount to be determined at trial, but not less than $8,209,000, together with all accrued and unpaid interest due under the terms of the 12.375% Bonds and pursuant to New York law.

e.      On the Fifth Claim for Relief, awarding NML a money judgment in an amount to be determined at trial, but not less than $15,301,000, together with all accrued and unpaid interest due under the terms of the 11-3/8% Bonds and pursuant to New York law.

f.      On the Sixth Claim for Relief, awarding NML a money judgment in an amount to be determined at trial, but not less than $298,000, together with all accrued and unpaid interest due under the terms of the 12% Bonds and pursuant to New York law.

g.      On the Seventh Claim for Relief, awarding NML a money judgment in an amount to be determined at trial, but not less than $16,290,000, together with all accrued and unpaid interest due under the terms of the 9.75% Bonds and pursuant to New York law.

h.      On the Eighth Claim for Relief, awarding NML a money judgment in an amount to be determined at trial, but not less than $76,545,549, together with all accrued and unpaid interest due under the terms of the 2018 Bonds and pursuant to New York law.

i.      On the Ninth Claim for Relief, an Order specifically enforcing the Equal Treatment Provision with respect to all outstanding External Indebtedness and to all External Indebtedness that the Republic of Argentina will issue in the future by requiring ratable payment

to NML whenever Argentina makes or attempts to make payments on the 2005 and 2010 Exchange Bonds.

j.      On the Tenth Claim for Relief, an Order specifically enforcing the Equal Treatment Provision with respect to the BONAR 2024 Bonds.

k.      On the Eleventh Claim for Relief, an Order specifically enforcing the Equal Treatment Provision with respect to all External Indebtedness.

l.      Awarding NML its costs and attorneys' fees, and such other and further relief as the Court shall deem just and proper.

Dated: New York, New York
           _____, 2015

                                        DECHERT LLP

                                        By: /s/ Robert A. Cohen
                                        Robert A. Cohen
                                        (robert.cohen@dechert.com)
                                        Dennis H. Hranitzky
                                        (dennis.hranitzky@dechert.com)

                                        1095 Avenue of the Americas
                                        New York, NY  10036-6797
                                        Telephone (212) 698-3500
                                        Facsimile (215) 698-3599

                                        *Attorneys for Plaintiff NML Capital, Ltd.*

# **Exhibit 4**

CONFIDENTIAL—SUBJECT TO COURT ORDER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                               :

NML CAPITAL, LTD.,

                               :

            Plaintiff,           :       14 Civ. 8988 (TPG)

                               :

            v.                     :

THE REPUBLIC OF ARGENTINA,     :  **SECOND AMENDED AND**

            Defendant.      :  **SUPPLEMENTAL COMPLAINT**

                               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

      Plaintiff, NML Capital, Ltd., ("NML"), by its undersigned counsel, as and for its Second Amended and Supplemental Complaint against Defendant Republic of Argentina ("Argentina"), alleges as follows:

## NATURE OF THE ACTION

      1.    This is a breach of contract action based on certain bonds issued by Argentina and beneficially owned by NML ("NML's Bonds," as defined in paragraphs 11 through 20 below). NML's Bonds were issued pursuant to a Fiscal Agency Agreement, dated October 19, 1994 (the "FAA") between Argentina and Bankers Trust Company, as Fiscal Agent. A true and correct copy of the FAA is annexed hereto as Exhibit A.

      2.    In this pleading, Plaintiff is asserting two additional claims for declaratory and injunctive relief. The two new claims concern bonds bearing ISIN ARARGE03H413 (the "BONAR 2024 Bonds") and Argentina's other existing and future External Indebtedness (other than the Exchange Bonds which are already the subject of declaratory and injunctive relief issued by this Court). Plaintiff is requesting: (i) a

declaratory judgment that the BONAR 2024 Bonds are External Indebtedness within the meaning of the FAA, and (ii) specific performance of the Republic's obligations under the Equal Treatment Provision in the FAA by preliminarily and permanently enjoining the Republic from making payments of interest and/or principal on the existing and future BONAR 2024 Bonds and other External Indebtedness unless a "Ratable Payment" is made in respect of Plaintiff's defaulted bonds.

3. Argentina has failed to make contractually-mandated principal and interest payment on NML's Bonds.  For its relief, NML seeks payment of the principal amount of the bonds together with any accrued and unpaid interest, as provided for in the FAA.

4. Argentina has also failed to comply with its obligations pursuant to the Equal Treatment Provision of the FAA, paragraph 1(c) of the FAA, which provides for equal treatment in terms of rank and priority of payment for beneficial owners of bonds issued pursuant to the FAA with respect to any unsecured and unsubordinated External Indebtedness, as defined in the FAA (the "Equal Treatment Provision").  For its relief, NML seeks specific performance of Argentina's payment obligations pursuant to the Equal Treatment Provision of the FAA.

5. Beginning in May 2014, the Republic began issuing the BONAR 2024 Bonds and has made payments on them all while paying nothing to plaintiff and other bondholders who did not participate in the 2005 and 2010 Bond Exchanges—in violation of the Equal Treatment Provision.  Accordingly, to remedy this violation and prevent further violations, plaintiff seeks in its Fifth Claim for Relief specific enforcement of the Equal Treatment Provision with respect to the BONAR 2024 Bonds.

## THE PARTIES

6.      Plaintiff NML is a corporation organized and existing under the laws of the Cayman Islands.

7.      Defendant Republic of Argentina is a Foreign State as defined in 28 U.S.C. § 1603.

## JURISDICTION AND VENUE

8.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1330, as Argentina is a Foreign State which has explicitly and unconditionally waived sovereign immunity with respect to actions arising out of the FAA by holders of bonds issued thereunder and is, therefore, not entitled to immunity under 28 U.S.C. §§ 1605-07 or under any applicable international agreement.

9.      In addition, Argentina consented in the FAA to submit to the jurisdiction of the Court in respect to actions arising out of the FAA or bonds issued thereunder.  Pursuant to Section 22 of the FAA, Argentina appointed Banco de la Nación Argentina, 299 Park Avenue, New York, New York, 10171, as its authorized agent for service of process.  Paragraph 23 of the FAA provides that the FAA shall be "governed by, and interpreted in accordance with, the laws of the State of New York."

10.     Venue is proper in this district by agreement of the parties and pursuant to 28 U.S.C. § 1391(f).

## FACTUAL ALLEGATIONS

11.     NML owns beneficial interests in certain Argentine bonds issued pursuant to the FAA—specifically, in 11% Bonds, 11-3/8% Bonds and 15.5% Bonds—as set forth below (collectively "NML's Bonds").

3

The 11% Global Bonds

12.    NML is the beneficial owner of $1,535,000 principal amount of 11%

Global Bonds issued by the Republic of Argentina, ISIN No. US040114AZ32 (the "11%

Bonds").

13.    The 11% Bonds are a Series of Securities under the terms of the

FAA.

14.    The 11% Bonds matured on December 4, 2005, at which time the

entire principal amount of the 11% Bonds became due and payable.

The 11-3/8% Global Bonds

15.    NML is the beneficial owner of $1,008,000 principal amount of 11-

3/8% Global Bonds issued by the Republic of Argentina, ISIN No. US040114AR16 (the

"11-3/8% Bonds").

16.    The 11-3/8% Bonds are a Series of Securities under the terms of the

FAA.

17.    The 11-3/8% Bonds were scheduled to mature on January 30, 2017,

but as NML and other creditors made demand for payment of principal following

Argentina's default, the entire principal amount of the 11-3/8% Bonds is due and

payable.

The 15.5% Global Bonds

18.    NML is the beneficial owner of $151,745 principal amount of 15.5%

Global Bonds issued by the Republic of Argentina, ISIN No. US040114GF14 (the

"15.5% Bonds").

4

19.   The 15.5% Bonds are a Series of Securities under the terms of the FAA.

20.   The 15.5% Bonds were scheduled to mature on December 19, 2049, but as NML and other creditors made demand for payment of principal following Argentina's default, the entire principal amount of the 15.5% Bonds is due and payable.

<u>The Republic of Argentina's Default</u>

21.   Pursuant to Section 12 of the FAA, the following occurrences, among others, constitute Events of Default:

> (a) Non-Payment:  the Republic fails to pay any principal amount of any of the Securities of such Series when due and payable or fails to pay any interest on any of the Securities of such Series when due and payable and such failure continues for a period of 30 days; or
>
> \*     \*     \*
>
> (d) Moratorium:  a moratorium on the payment of principal of, or interest on, the Public External Indebtedness of the Republic shall be declared by the Republic.

Exhibit A ¶ 12.

22.   Upon the occurrence of an Event of Default described in Section 12(a) or 12(d) of the FAA, Section 12 further provides that each bondholder may, by notice in writing to the office of the Fiscal Agent, declare the principal amount of the bonds held by it to be due and payable immediately, together with all accrued and unpaid interest.

23.   On December 24, 2001, Argentina declared a moratorium on the payment of principal and interest with respect to all of its foreign debt.

24.     Since then, Argentina has failed to make payments of interest owed on the 11% Bonds, 11-3/8% Bonds or the 15.5% Bonds to NML.

NML's Actions Against Argentina for Payment of Principal and Interest

25.     Beginning in November 2003, NML brought a total of eleven actions against Argentina in this Court based on Argentina's failure to pay principal and interest on NML's Bonds.

26.     The Court has entered summary judgment or final judgment in eight of those actions, as follows:

a.     *NML Capital, Ltd v. The Republic of Argentina*, 03 Civ. 8845, was filed on November 7, 2003.  Final Judgment in the amount of $284,184,632.30, plus post-judgment interest, was entered on January 10, 2007;

b.     *NML Capital, Ltd v. The Republic of Argentina*, 05 Civ. 2434, was filed on February 28, 2005.  A Second Amended (final) Judgment in the amount of $311,177,898, plus post-judgment interest, was entered on October 26, 2011;

c.     *NML Capital, Ltd v. The Republic of Argentina*, 06 Civ. 6466, was filed on August 25, 2006.  An Amended (final) Judgment in the amount of $533,378,361, plus post-judgment interest, was entered on June 15, 2009;

d.     *NML Capital, Ltd v. The Republic of Argentina*, No. 07 Civ. 1910 (S.D.N.Y.), was filed on March 5, 2007.  Summary Judgment was granted for the principal amount, plus accrued interest, on April 10, 2008, and that summary judgment order was modified on April 14, 2008;

6

e.      *NML Capital, Ltd v. The Republic of Argentina*, 07 Civ. 2690, was filed on April 2, 2007.  An Amended (final) Judgment in the amount of $148,781,936, plus post-judgment interest, was entered on June 15, 2009;

f.      *NML Capital, Ltd v. The Republic of Argentina*, 07 Civ. 6563, was filed on July 20, 2007.  Summary Judgment was granted for the principal amount, plus accrued interest, on April 10, 2008, and that summary judgment order was modified  on April 14, 2008;

g.      *NML Capital, Ltd v. The Republic of Argentina*, N08 Civ. 2541, was filed on March 13, 2008.  Summary Judgment was granted for the principal amount, plus accrued interest, on March 4, 2009, and that summary judgment order was modified  on March 6, 2009;

h.      *NML Capital, Ltd v. The Republic of Argentina*, 08 Civ. 3302, was filed on April 2, 2008.  An Amended (final) Judgment in the amount of $290,270,631, plus post-judgment interest, was entered on June 15, 2009.

27.    Argentina has made no voluntary payment to NML in connection with any of NML's Bonds.

The Republic of Argentina's Violations of the Equal Treatment Provision

28.    The FAA contains an Equal Treatment Provision that states:

> The Securities will constitute . . . direct, unconditional, unsecured and unsubordinated obligations of the Republic . . . . **The payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness (as defined in this Agreement)**.

Exhibit A ¶ 1(c) (emphasis added).

7

29.     According to its plain language, the Equal Treatment Provision prohibits Argentina from making or attempting to make a payment to a holder of External Indebtedness without making a ratable payment to NML on NML's bonds.

30.     As the Second Circuit has held, the first sentence of the Equal Treatment Provision "prohibits Argentina, as bond *issuer*, from formally subordinating the bonds by issuing superior debt. The second sentence . . . prohibits Argentina, as bond *payor*, from paying on other bonds without paying on the FAA Bonds."   *NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 259 (2d Cir. 2012).

31.     In 2001, Argentina declared a moratorium (the "Moratorium") on the bonds governed by the FAA (as well as on other bonds).

32.     Argentina has passed legislation each year renewing the Moratorium.

33.     In 2005, Argentina attempted to restructure its defaulted debt by offering a bond exchange to all holders of non-performing, including the bonds governed by the FAA (the "2005 Exchange").

34.     The Prospectus for the 2005 Exchange stated:

> Existing defaulted bonds eligible for exchange that are not tendered may remain in default indefinitely. . . . The Government has announced that it has no intention of resuming payment on any bonds eligible to participate in [the] exchange offer. . . . that are not tendered or otherwise restructured as part of such transaction.  Consequently, if you elect not to tender your bonds in an exchange offer there can be no assurance that you will receive any future payments in respect to your bonds.

35.     Holders of approximately 25% of Argentina's non-performing bonds did not participate in the 2005 Exchange.

8

36.    NML did not participate in the 2005 Exchange.

37.    In 2005, Argentina began making semi-annual interest payments to holders of bonds issued in the 2005 Exchange (such bonds, the "2005 Exchange Bonds," and such holders, the "2005 Exchange Bondholders").

38.    Argentina paid all subsequent interest due on the 2005 Exchange Bonds until the payment that came due on June 30, 2014.  On June 26, 2014 Argentina attempted to initiate payment to certain holders of 2005 Exchange Bonds by transmitting funds to the Bank of New York Mellon ("BNY") as trustee.  By reason of Orders issued by the Court, BNY did not further transmit these funds to holders of the 2005 Exchange Bonds.  *NML Capital, Ltd v. The Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. Aug. 6, 2014) (ECF No. 633).

39.    Upon information and belief, Argentina intends to continue paying or attempting to pay interest on all 2005 Exchange Bonds as it becomes due.

40.    To facilitate the 2005 Bond Exchange, the Senate and Chamber of Deputies of the Argentine Nation passed Law 26,017 (the "Lock Law") on February 9, 2005.  A true and correct copy of the Lock Law and a certified translation are annexed hereto as Exhibit B.

41.    In its January 28, 2010 Prospectus, Argentina explained the purpose and effect of the Lock Law as follows:

> In an effort to reassure tendering Bondholders and increase the level of participation on the 2005 Debt Exchange, Congress subsequently passed Law 26,017, known as the "Lock Law."  The Lock Law prohibited the Executive Branch from reopening the 2005 Debt Exchange without Congressional approval **and also prohibited any type of**

9

> **settlement involving untendered securities that were**
> **eligible to participate in the 2005 Debt Exchange . . . .**

(emphasis added).

42.    Article 1 of the Lock Law provides that Bonds not tendered in the

2005 Exchange would be subject to the following provisions:

> a.    Article 2 – The national Executive Power may not, with respect to the bonds referred to in Article 1 of this law, reopen the swap process established in the aforementioned Decree No. 1735/04.
>
> b.    Article 3 - The national State shall be prohibited from conducting any type of in-court, out-of-court or private settlement with respect to the bonds referred to in Article 1 of this law.
>
> c.    Article 4 - The national Executive Power must— within the framework of the terms of issuance of the respective bonds, and the applicable laws and regulations in the corresponding jurisdictions— order the pertinent administrative acts and fulfill the necessary procedures to remove the bonds referred to in the preceding article from listing on all domestic and foreign securities markets and exchanges.

Exhibit B.

43.    Argentina violated the Equal Treatment Provision of the FAA by

lowering the rank of its payment obligations under NML's Bonds below that of other

unsecured and unsubordinated External Indebtedness by relegating NML's Bonds to a

non-paying class pursuant to the Lock Law.

44.    In 2009, in preparation for a new bond exchange that took place in

2010 (the "2010 Exchange"), the Argentine Senate and Chamber of Deputies passed Law

No. 26,547 which, among other things, suspended the Lock Law for purposes of the 2010

Exchange.  A true and correct copy of Law 26,547 and a certified translation are annexed

hereto as Exhibit C.

45.    Law 26,547 provides:

a.    Article 1.  The operation of Articles 2, 3, and 4 of Law No. 26,017 is suspended until 31 December 2010, or until the National Executive Branch, through the Ministry of Economy and Public Finance, declares that the process of restructuring the public instruments covered by said law is completed, whichever occurs first.

b.    Article 3.  The financial terms and conditions that may be offered may not be equal to or better than those offered to creditors in the debt restructuring established by Decree No. 1735/04.

c.    Article 5. … It is forbidden to offer to the holders of public debt that have brought judicial, administrative, or arbitration proceedings or any other type of proceeding treatment more favorable than the treatment afforded to holders who did not bring such proceedings.

Exhibit C.

46.    The prospectus for Argentina's 2010 Exchange stated:

Eligible Securities in default that are not exchanged pursuant to the Invitation may remain in default indefinitely.  In light of its financial and legal constraints, *Argentina does not expect to resume payments on any eligible Securities in default that remain outstanding following the expiration of the Invitation*. Argentina has opposed vigorously, and intends to continue to oppose, attempts by holders who did not participate in its prior exchange offers to collect on its defaulted debt through . . . litigation . . .  and other legal proceedings against Argentina. Argentina remains subject to significant legal constraints regarding its defaulted debt. . . .
Consequently, if you elect not to tender your Eligible Securities in default pursuant to the Invitation *there can be no assurance that you will receive any future payments or be able to collect through litigation in respect of your Eligible Securities in default.*

11

47.   NML did not participate in the 2010 Exchange (NML and other Argentine bond holders that participated in neither the 2005 Exchange nor the 2010 Exchange, the "Non-tendering Bondholders").

48.   In 2013, Argentina enacted Law 26,886 purportedly to reopen the bond exchange on the same terms that had been repeatedly rejected by plaintiff.  While Law 26,886 suspends certain provisions of the Lock Law, this suspension has no practical effect, because Law 26,886 "forbid[s]" Argentina from paying NML according to its contract, and only allows Argentina to pay NML on terms that are no "more favorable" than the terms of the original Exchange Offer.  A copy of Law 26,886 and a certified translation are annexed hereto as Exhibit D.

49.   Argentine courts have held that the Lock Law and the Moratorium prevent them from recognizing and enforcing Non-tendering Bondholders' New York judgments.

50.   Argentina violated the Equal Treatment Provision of the FAA by relegating NML's Bonds to a non-paying class pursuant to Law 26,517.

51.   In 2010, Argentina began making semi-annual interest payments to holders of bonds issued in the 2010 Exchange (such bonds, the "2010 Exchange Bonds," and such holders, the "2010 Exchange Bondholders.").

52.   Argentina paid all interest due on the 2010 Exchange Bonds until the payment due on June 30, 2014.  On June 26, 2014 Argentina attempted to initiate payment to certain holders of 2010 Exchange Bonds by transmitting funds to BNY as trustee.  By reason of Orders issued by the Court, BNY did not further transmit those

funds to holders of the 2010 Exchange Bonds.  *NML Capital, Ltd v. The Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. Aug. 6, 2014) (ECF No. 633).

53.    Upon information and belief, Argentina intends to continue paying or attempting to pay interest on all 2010 Exchange Bonds as it becomes due.

54.    Upon information and belief, without an order of the Court, Argentina will continue to pay or attempting to pay the 2005 and 2010 Exchange Bondholders while paying nothing to NML in violation of the Equal Treatment Provision.

55.    NML has been damaged as a result of Argentina's violations and will continue to be damaged by the continuing violations of the Equal Treatment Provision.

56.    In October 2010, NML sought specific performance of the Equal Treatment Provision in three pre-judgment cases.[1]

57.    On December 7, 2011, the Court held that Argentina's actions, as described in paragraphs 31-54, *supra*, violated the Equal Treatment Provision of the FAA and granted partial summary judgment to NML on claims for specific performance of the Equal Treatment Provision.  A true and correct copy of the Court's December 7, 2011 Order is annexed hereto as Exhibit E.

58.    On February 23, 2012, the Court:

a.    held that NML had no adequate remedy at law and that, absent equitable relief, NML would suffer irreparable harm;

---

[1]    *NML Capital, Ltd v. The Republic of Argentina* 08 Civ. 6978, 09 Civ. 1707, 09 Civ. 1708 ("Pre-judgment Cases").

b.      held that the equities strongly supported injunctive relief;

c.      held that Argentina had the financial wherewithal to meet its payment obligations to NML in those cases; and

d.      issued an injunction to remedy Argentina's continuing violations of the Equal Treatment Provision, which required Argentina to specifically perform its obligations under the Equal Treatment Provision by making ratable payment to NML whenever it paid the 2005 or 2010 Exchange Bondholders the amounts due on their bonds.

A true and correct copy of the Court's February 23, 2012 Order is annexed hereto as Exhibit F.

59.    On October 26, 2012, the Second Circuit affirmed the Court's February 23, 2012 Order, but remanded the injunction for clarification. *NML Capital, Ltd v. The Republic of Argentina*, No. 12-105(L) (2d Cir. Oct. 26, 2012) (ECF No. 442).

60.    Although the Second Circuit's judgment was not final, Argentina petitioned for a writ of certiorari to the United States Supreme Court on October 7, 2013. The petition was denied. *Republic of Argentina v. NML Capital, Ltd., et al.*, No. 12-1494 (S. Ct. Oct. 7, 2013).

61.    On November 21, 2012, the Court issued an Amended Order requiring Argentina to specifically perform its obligations under the Equal Treatment Provision by making ratable payment to NML whenever it paid the 2005 and 2010 Exchange Bondholders the amounts due on their bonds. A true and correct copy of the Court's November 21, 2012 Order (the "Amended February 23 Order") is annexed hereto as Exhibit G.

62.     In response to the Orders of the Court and the affirmances of the Second Circuit in NML's Pre-judgment Cases, Argentine officials, including President Kirchner, have repeatedly stated that Argentina has no intention of ever paying NML.

63.     For example, in November 2012, after the Second Circuit affirmed the February 23, 2012 Order and remanded the injunction for clarification, President Kirchner stated that Argentina was going to pay the Exchange Bonds, but "not one dollar to the 'vulture funds.'"

64.     During the oral argument of the appeal from the Court's Amended February 23 Order, Argentina's counsel told the Second Circuit Court of Appeals that Argentina would not voluntarily obey any order requiring ratable payment to NML.

65.     On August 23, 2013, the Second Circuit affirmed the Amended February 23 Order.  *NML Capital, Ltd v. The Republic of Argentina*, No. 12-105(L) (2d Cir. Aug. 23, 2012) (ECF No. 1001).

66.     Shortly thereafter, President Kirchner announced that Argentina would offer a new bond exchange that would replace the New York law-governed Exchange Bonds with new bonds governed by Argentine law and payable in Argentina. This plan to evade the rulings of United States courts evidences Argentina's continuing intention not to fulfill its obligations pursuant to the Equal Treatment Provision.

67.     Argentina subsequently filed another petition for a writ of certiorari, seeking review by the Supreme Court of the Second Circuit's affirmance of the Amended February 23 Order.  That petition was also denied.  *Exchange Bondholder Group v. NML Capital, Ltd., et al.*, No. 13-991 (S. Ct. June 16, 2014).

15

68.     After this second petition for writ of certiorari was denied, Argentina's Economy Minister Axel Kicillof announced a plan—nearly identical to the plan announced in August 2013 by President Kirchner—to evade the Court's Amended February 23 Order by swapping the Exchange Bonds for new bonds payable in Argentina and outside the Court's reach.

69.     On June 20, 2014, the Court promptly issued an Order ruling that Minister Kicillof's proposed bond swap was in violation of the Court's Orders.  A true and correct copy of the Court's June 20, 2014 Order is annexed hereto as Exhibit H.

70.     Six days later, on June 26, 2014, Argentina attempted to initiate payment to certain holders of the Exchange Bonds by transmitting funds to BNY as trustee, without making ratable payment to NML.

71.     On August 6, 2014, the Court issued an Order finding that the June 26, 2014 payment by Argentina to BNY was illegal and in violation of the Court's previous Orders.   A true and correct copy of the Court's August 6, 2014 Order is annexed hereto as Exhibit I.

72.     Argentina's President Kirchner subsequently announced that Argentina would enact legislation to change the manner in which it makes payments on the Exchange Bonds, such that BNY would be removed as trustee for certain Exchange Bonds and all Exchange Bonds would be paid from a single account in Argentina through a financial institution called *Nación Fideicomisos* that Argentina controls.  Argentina has taken steps to carry out this plan.  The "Legal Notice" published in The New York Times on September 22, 2014, is attached as Exhibit J hereto.  These actions are another attempt

16

by Argentina to evade the rulings of the Court and to flout its obligations under the Equal Treatment Provision.

73.     As a result of these flagrant and unlawful activities, NML moved by order to show cause to hold Argentina in civil contempt of court.  On September 29, 2014, the Court issued an Order holding Argentina in civil contempt; and on October 3, 2014, the Court issued an Amended and Supplemental Order regarding Argentina's civil contempt.  A true and correct copy of the Court's September 29, 2014 Order is annexed hereto as Exhibit K, and a true and correct copy of the Court's October 3, 2014 Order is annexed hereto as Exhibit L.

74.     Since May 2014, the Republic began issuing bonds the "BONAR 2024 Bonds, which like the bonds issued in the 2005 and 2010 Bond Exchanges are also External Indebtedness.  Argentina has made payments on the BONAR 2024 Bonds, and on information and belief, it will continue to make payments on and issue more BONAR 2024 Bonds—all while paying nothing to NML and other bondholders who did not participate in the 2005 and 2010 Bond Exchanges—in violation of the Equal Treatment Provision.

75.     In May 2014, Argentina initially offered and eventually issued $3.25 billion of BONAR 2024 Bonds to the Spanish oil company, Repsol S.A., to settle claims Repsol had asserted against Argentina, including claims pending in New York and Spanish courts.

76.     Argentina structured the offer to facilitate the issuance of the BONAR 2024 Bonds to Repsol and other international investors.  As part of the settlement agreement with Repsol, Argentina agreed that the BONAR 2024 Bonds would

17

clear through Euroclear, which would make the bonds more attractive to international investors. JPMorgan also conducted a "shadow bookbuilding process" to ensure that the bonds could be immediately distributed to international investors interested in purchasing the newly-issued BONAR 2024 Bonds immediately after Repsol received those bonds. Accordingly, just days after Argentina delivered the BONAR 2024 Bonds, Repsol sold them all to JPMorgan Securities PLC, JPMorgan's London-based broker-dealer. Since their original issuance, the BONAR 2024 Bonds have been actively traded in the over-the-counter market in the United States.

77.   In December, 2014, Argentina issued approximately $650 million additional BONAR 2024 Bonds. Approximately $380 million of these BONAR 2024 Bonds offered in December 2014 were issued in exchange for BODEN 2015 bonds, with the rest a new issuance of bonds. ████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

78.   In February 2015, Argentina planned to issue more BONAR 2024 Bonds through an underwriting by JPMorgan and Deutsche Bank. ████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████

██████████

79. ████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

80. ████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

81.    Argentina "suspended" the issuance on February 26, 2015, after this
Court compelled JPMorgan and Deutsche Bank to provide discovery about the
transaction, ██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████Argentina resumed the issuance process by announcing
on April 21 that it would issue more BONAR 2024 Bonds, in a transaction that would
settle just two days later.

19

82.   As it had since February, Deutsche Bank continued to play a key role in the offering, again, on information and belief, as Argentina's agent or in concert with Argentina.  Deutsche Bank's New York syndicate desk immediately notified investors that it was taking orders.  ███████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████  The Spanish bank BBVA also accounted for a major portion of the BONAR 2024 Bonds issued in April.  In all, Argentina sold over $1.4 billion principal amount of BONAR 2024 Bonds in the April 2015 issuance, the majority of which was placed by Deutsche Bank.

83.   Argentina tried to create a false appearance that the BONAR 2024 Bonds issued in April 2015 were offered exclusively within Argentina.  As an example, Argentina announced that orders could only be placed through a lengthy list of eligible institutional purchasers in Argentina.

84.   In reality, affiliates of international banks purchased and re-sold internationally almost the entire offering.

85.   Notwithstanding these efforts to disguise the nature of the April 2015 issuance, Argentina targeted international investors and took regulatory steps to encourage their participation.  For example, Argentina enacted regulatory changes which made it easier for foreign purchasers to receive their bonds.  Moreover, on the day Argentina accepted bids for the offering, the Buenos Aires Securities Market, "Merval," issued a notice to its agents that they could "use transfers to Merval's account [in] NY as a means of payment" for the BONAR 2024 Bonds.  Almost all of the bonds were sold to

20

international investors. Argentina's leaders then publicly trumpeted the offering as evidence of Argentina's ability to tap into the international markets.

86.    Since May 2014, Argentina has issued approximately $5.3 billion of BONAR 2024 Bonds.

87.    In violation of its obligations under the Equal Treatment Provision of the FAA, Argentina made its first payment on the BONAR 2024 Bonds on November 7, 2014, and its second payment on May 7, 2015.

88.    Upon information and belief, Argentina intends to make all payments due under the terms of the BONAR 2024 Bonds.

89.    Upon information and belief, Argentina intends to issue additional External Indebtedness in the future.

90.    Upon information and belief, Argentina intends to make all payments due under the terms of any other existing or future External Indebtedness.

91.    In addition to the bonds issued in the 2005 and 2010 Bond Exchanges and the BONAR 2024 Bonds, Argentina has issued other External Indebtedness, made payments on such External Indebtedness and on information and belief, it will continue to make payments on and issue more of such External Indebtedness.

92.    As a result of the Orders of the Court, the doctrine of issue preclusion (also known as collateral estoppel) bars Argentina from denying (a) that it has not breached its contractual obligation to pay principal and interest on the Bonds, and (b) that both Argentina's issuance of higher-ranking bonds in the 2005 and 2010 Bond Exchanges and Argentina's continuing payments and attempts to pay the holders of these

21

Case 1:08-cv-06978-TPG   Document 783-1   Filed 05/12/15   Page 125 of 224

bonds—while paying nothing to NML—constitute violations of the Equal Treatment

Provision of the FAA.  Argentina's issuance of and payments on the BONAR 2024

Bonds and other External Indebtedness constitute additional violations of the Equal

Treatment Provision of the FAA.

93.   NML now seeks payment of the principal amount of NML's Bonds

together with any accrued and unpaid interest and specific performance of the Equal

Treatment Provision in this case with respect to its beneficial holdings of bonds issued

pursuant to the FAA.  NML also seeks specific enforcement of the Equal Treatment

Provision with respect to the BONAR 2024 Bonds and with respect to all External

Indebtedness.

**FIRST CLAIM FOR RELIEF**
(For Breach of Contract on the 11% Bonds)

94.   NML repeats and realleges the allegations set forth in paragraphs 1

through 93 herein.

95.   The 11% Bonds matured on December 4, 2005, at which time the

entire principal amount of the Bonds became due and payable.

96.   Argentina has failed to make any payments of principal or interest on

the 11% Bonds to NML.

97.   By reason of the foregoing Argentina has breached its contractual

obligations to NML, and Argentina is liable to NML for damages in amount to be

determined at trial, but not less than $1,535,000, together with all accrued and unpaid

interest due pursuant to the terms of the 11% Bonds and New York law.

**SECOND CLAIM FOR RELIEF**
(For Breach of Contract on the 11-3/8% Bonds)

22

98. NML repeats and realleges the allegations set forth in paragraphs 1 through 97 herein.

99. Pursuant to Sections 12(a) and (d) of the FAA, the declaration of a moratorium and the non-payment of interest constitute Events of Default on the 11-3/8% Bonds entitling NML to declare the principal amount of the 11-3/8% Bonds, together with all accrued and unpaid interest, to be due and payable immediately.

100. Argentina has been advised, by written notice to Argentina's Fiscal Agent, that payment of the principal amount of the 11-3/8% Bonds together with any accrued and unpaid interest is due and payable immediately.

101. Argentina has failed to make any payments of principal or interest on the 11-3/8% Bonds to NML.

102. By reason of the foregoing Argentina has breached its contractual obligations to NML, and Argentina is liable to NML for damages in amount to be determined at trial, but not less than $1,008,000, together with all accrued and unpaid interest due pursuant to the terms of the 11-3/8% Bonds and New York law.

## THIRD CLAIM FOR RELIEF
(For Breach of Contract on the 15.5% Bonds)

103. NML repeats and realleges the allegations set forth in paragraphs 1 through 102 herein.

104. Pursuant to Sections 12(a) and (d) of the FAA, the declaration of a moratorium and the non-payment of interest constitute Events of Default on the 15.5% Bonds entitling NML to declare the principal amount of the 15.5% Bonds, together with all accrued and unpaid interest, to be due and payable immediately.

105.   Argentina has been advised, by written notice to Argentina's Fiscal Agent, that payment of the principal amount of the 15.5% Bonds together with any accrued and unpaid interest is due and payable immediately.

106.   Argentina has failed to make any payments of principal or interest on the 15.5% Bonds to NML.

107.   By reason of the foregoing Argentina has breached its contractual obligations to NML, and Argentina is liable to NML for damages in amount to be determined at trial, but not less than $151,745, together with all accrued and unpaid interest due pursuant to the terms of the 15.5% Bonds and New York law.

### FOURTH CLAIM FOR RELIEF
(For Specific Enforcement of the Equal Treatment Provision)

108.   NML repeats and realleges the allegations set forth in paragraphs 1 through 107 herein.

109.   Pursuant to ¶ 1(c) of the FAA (i.e. the Equal Treatment Provision), Argentina provided that its bonds issued pursuant to the FAA would constitute "direct, unconditional, unsecured and unsubordinated obligations of the Republic" and that "[t]he payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness . . . ."

110.   Argentina, therefore, may not make or attempt to make any payment on its 2005 and 2010 Exchange Bonds without also making a ratable payment at the same time to NML on NML's beneficial interests in bonds issued pursuant to the FAA.

24

111.  Argentina has engaged in a course of conduct violative of the Equal Treatment Provision.

112.  Through the passage of Law 26,017 (i.e. the Lock Law), Argentina issued a new series of bonds with payment obligations that rank higher than those held by NML in violation of the Equal Treatment Provision.

113.  Through the passage of Law 26,547 Argentina issued a new series of bonds with payment obligations that rank higher than those held by NML in violation of the Equal Treatment Provision.

114.  The bonds issued in the 2005 Exchange and the 2010 Exchange are External Indebtedness.

115.  Argentina's legislative actions forbidding payment on non-tendered bonds violate the Equal Treatment Provision

116.  Argentina's past payments of interest to 2005 Exchange Bondholders, while paying nothing to NML, violated the Equal Treatment Provision.

117.  Argentina's continuing payments of interest or attempts to pay interest to 2005 Exchange Bondholders without ratable payment to NML will be further and continuing violations of the Equal Treatment Provision.

118.  Argentina's past payments of the scheduled interest to 2010 Exchange Bondholders, while paying nothing to NML, violated the Equal Treatment Provision.

119.  Argentina's continuing payments of interest or attempts to pay interest to 2010 Exchange Bondholders without ratable payment to NML will be further and continuing violations of the Equal Treatment Provision.

25

120.  NML has suffered irreparable injury from Argentina's violation of the Equal Treatment Provision and will continue to suffer such injury unless the Court specifically enforces the Equal Treatment Provision with a mandatory injunction requiring Argentina to pay NML ratably whenever it pays or attempts to pay interest to 2005 or 2010 Exchange Bondholders.

121.  Remedies available at law are inadequate to compensate NML for such injury.

122.  NML has performed its part of the contract with Argentina.

123.  Argentina is capable of performing its obligations pursuant to the Equal Treatment Provision.

124.  The balance of the equities tips toward the issuance of an injunction.

125.  The public interest would not be disserved by a permanent injunction.

### FIFTH CLAIM FOR RELEIF
### (For Specific Enforcement of the Equal Treatment Provision and for Injunctive Relief With Respect to the BONAR 2024 Bonds)

126.  NML repeats and realleges the allegations set forth in paragraphs 1 through 125 herein.

127.  Pursuant to section 1(c) of the Fiscal Agency Agreement, the Argentina provided that its bonds issued pursuant to the Fiscal Agency Agreement would constitute "direct, unconditional, unsecured and unsubordinated obligations of the Republic and shall at all times rank pari passu and without preference among themselves" and that "[t]he payment obligations of the Republic under the Securities shall at all times

rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness."

128.   Argentina, therefore, may not make any payment of its External Indebtedness without also making a ratable payment at the same time to NML.  Any payment of External Indebtedness where Argentina does not also make a ratable payment at the same time to NML constitutes a violation of the Equal Treatment Provision.

129.   With the issuance of the BONAR 2024 Bonds, Argentina issued a new series of bonds with payment obligations that rank higher than those held by NML and other non-tendering bondholders in violation of the Equal Treatment Provision.

130.   The BONAR 2024 Bonds are External Indebtedness.  The issuance of the BONAR 2024 Bonds to date and future issuances of these bonds has violated and will violate the Equal Treatment Provision.

131.   Argentina's past payments to the holders of the BONAR 2024 Bonds, while paying nothing to NML and other non-tendering bondholders, violated the Equal Treatment Provision.

132.   Argentina's continuing payments to the holders of the BONAR 2024 Bonds will be a continuing violation of the Equal Treatment Provision.

133.   NML has suffered irreparable injury from Argentina's violation of the Equal Treatment Provision and will continue to suffer such injury unless the Court specifically enforces that Provision with a mandatory injunction requiring Argentina to pay NML ratably whenever it pays interest to the holders of the BONAR 2024 Bonds.

134.   Remedies available at law are inadequate to compensate for such injury.

135.   NML has performed its part of the contract with Argentina.

136.   Argentina is capable of performing its obligations pursuant to the
Equal Treatment Provision.

137.   The balance of the equities tips toward the issuance of an injunction.

138.   The public interest would not be disserved by a permanent
injunction.

## SIXTH CLAIM FOR RELIEF
### (For Specific Enforcement of the Equal Treatment Provision and for Injunctive Relief With Respect to All External Indebtedness)

139.   NML repeats and realleges the allegations set forth in paragraphs 1
through 138 herein.

140.   Pursuant to section 1(c) of the Fiscal Agency Agreement, Argentina
provided that its bonds issued pursuant to the Fiscal Agency Agreement would constitute
"direct, unconditional, unsecured and unsubordinated obligations of the Republic and
shall at all times rank pari passu and without preference among themselves" and that
"[t]he payment obligations of the Republic under the Securities shall at all times rank at
least equally with all its other present and future unsecured and unsubordinated External
Indebtedness."

141.   Argentina, therefore, may not make any payment of its External
Indebtedness without also making a ratable payment at the same time to NML.  Any
payment of External Indebtedness where the Republic of Argentina does not also make a
ratable payment at the same time to NML constitutes a violation of the Equal Treatment
Provision.

28

142.  The Republic of Argentina has issued—and, on information and belief, will issue in the future—External Indebtedness in violation of the Equal Treatment Provision.

143.  Argentina's past payments to the holders of External Indebtedness, while paying nothing to NML and other non-tendering bondholders, violated the Equal Treatment Provision.

144.  Argentina's continuing payments to the holders of External Indebtedness—including External Indebtedness that the Republic of Argentina will issue in the future—will be a continuing violation of the Equal Treatment Provision.

145.  NML has suffered irreparable injury as a result of Argentina's violation of the Equal Treatment Provision and will continue to suffer such injury unless the Court specifically enforces that Provision with a mandatory injunction requiring Argentina to pay NML ratably whenever it pays interest to the holders of External Indebtedness (including, for the avoidance of doubt, any bonds with the ISIN ARARGE03H413, whether issued before or after the entry of the injunction) or holders of "Replacement Obligations" (meaning bonds or other obligations issued, whether before or after entry of the injunction, in exchange, substitution, restructuring, refinancing or satisfaction of any BONAR 2024 Bonds or other Replacement Obligations).

146.  Remedies available at law are inadequate to compensate for such injury.

147.  NML has performed its part of the contract with Argentina.

148.  Argentina is capable of performing its obligations pursuant to the Equal Treatment Provision.

149.  The balance of the equities tips toward the issuance of an injunction.

150.  The public interest would not be disserved by a permanent injunction.

WHEREFORE, Plaintiff NML demands judgment against the Republic of Argentina, as follows:

a.      On the First Claim for Relief, awarding Plaintiff NML a money judgment in an amount to be determined at trial, but not less than $1,535,000, together with all accrued and unpaid interest due pursuant to the terms of the 11% Bonds and New York law.

b.      On the Second Claim for Relief, awarding Plaintiff NML a money judgment in an amount to be determined at trial, but not less than $1,008,000, together with all accrued and unpaid interest due pursuant to the terms of the 11-3/8% Bonds and New York law.

c.      On the Third Claim for Relief, awarding Plaintiff NML a money judgment in an amount to be determined at trial, but not less than $151,745, together with all accrued and unpaid interest due pursuant to the terms of the 15.5% Bonds and New York law.

d.      On the Fourth Claim for Relief, an Order specifically enforcing the Equal Treatment Provision with respect to all outstanding External Indebtedness and to all External Indebtedness that the Republic of Argentina will issue in the future by

requiring ratable payment to NML whenever Argentina makes or attempts to make payments on the 2005 and 2010 Exchange Bonds.

        e.      On the Fifth Claim for Relief, an Order specifically enforcing the Equal Treatment Provision with respect to the BONAR 2024 Bonds;

        f.      On the Sixth Claim for Relief, an Order specifically enforcing the Equal Treatment Provision with respect to all External Indebtedness; and

        g.      Awarding Plaintiff NML its costs, attorneys' fees and such other and further relief as the Court shall deem just and proper.

Dated:  New York, New York
           _____, 2015

                             DECHERT LLP

                             By: /s/ Robert A. Cohen
                                Robert A. Cohen
                                (robert.cohen@dechert.com)
                                Dennis H. Hranitzky
                                (dennis.hranitzky@dechert.com)

                           1095 Avenue of the Americas
                           New York, NY  10036-6797
                           Telephone (212) 698-3500
                           Facsimile (212) 698-3599

                           *Attorneys for Plaintiff NML Capital, Ltd.*

31

# **Exhibit 5**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x
                               :

NML CAPITAL, LTD.,              :

               Plaintiff,      :         **ORDER**

                               :      08 Civ. 6978 (TPG)

        – against –        :      09 Civ. 1707 (TPG)

                               :      09 Civ. 1708 (TPG)

REPUBLIC OF ARGENTINA,      :

                               :

             Defendants.     :

                               :
------------------------------------------x

## AMENDED FEBRUARY 23, 2012 ORDER

WHEREAS, in an Order dated December 7, 2011, this Court found that, under Paragraph 1(c) of the 1994 Fiscal Agency Agreement ("FAA"), the Republic is "required . . . at all times to rank its payment obligations pursuant to NML's Bonds at least equally with all the Republic's other present and future unsecured and unsubordinated External Indebtedness."

WHEREAS, in its December 7, 2011 Order, this Court granted partial summary judgment to NML on its claim that the Republic repeatedly has breached, and continues to breach, its obligations under Paragraph 1(c) of the FAA by, among other things, "ma[king] payments currently due under the Exchange Bonds, while persisting in its refusal to satisfy its payment obligations currently due under NML's Bonds."

1

And WHEREAS NML Capital, Ltd. ("NML") has filed a renewed motion for equitable relief as a remedy for such violations pursuant to Rule 65(d) of the Federal Rules of Civil Procedure and the Court's inherent equitable powers.

Upon consideration of NML's renewed motion, the response of the Republic of Argentina (the "Republic") thereto, NML's reply, and all other arguments submitted to the Court in the parties' papers and at oral argument, it is HEREBY ORDERED that:

1.   It is DECLARED, ADJUDGED, and DECREED that NML is irreparably harmed by and has no adequate remedy at law for the Republic's ongoing violations of Paragraph 1(c) of the FAA, and that the equities and public interest strongly support issuance of equitable relief to prevent the Republic from further violating Paragraph 1(c) of the FAA, in that:

a. Absent equitable relief, NML would suffer irreparable harm because the Republic's payment obligations to NML would remain debased of their contractually-guaranteed status, and NML would never be restored to the position it was promised that it would hold relative to other creditors in the event of default.

b. There is no adequate remedy at law for the Republic's ongoing violations of Paragraph 1(c) of the FAA because the Republic has made clear – indeed, it has codified in Law 26,017 and Law

26,547 – its intention to defy any money judgment issued by
this Court.

c. The balance of the equities strongly supports this Order in light
of the clear text of Paragraph 1(c) of the FAA and the Republic's
repeated failures to make required payments to NML.  In the
absence of the equitable relief provided by this Order, the
Republic will continue to violate Paragraph 1(c) with impunity,
thus subjecting NML to harm.  On the other hand, the Order
requires of the Republic only that which it promised NML and
similarly situated creditors to induce those creditors to
purchase the Republic's bonds.  Because the Republic has the
financial wherewithal to meet its commitment of providing equal
treatment to both NML (and similarly situated creditors) and
those owed under the terms of the Exchange Bonds, it is
equitable to require it to do so.  Indeed, equitable relief is
particularly appropriate here, given that the Republic has
engaged in an unprecedented, systematic scheme of making
payments on other external indebtedness, after repudiating its
payment obligations to NML, in direct violation of its
contractual commitment set forth in Paragraph 1(c) of the FAA.

d. The public interest of enforcing contracts and upholding the
rule of law will be served by the issuance of this Order,
particularly here, where creditors of the Republic have no

3

recourse to bankruptcy regimes to protect their interests and must rely upon courts to enforce contractual promises. No less than any other entity entering into a commercial transaction, there is a strong public interest in holding the Republic to its contractual obligations.

2.    The Republic accordingly is permanently ORDERED to specifically perform its obligations to NML under Paragraph 1(c) of the FAA as follows:

a.  Whenever the Republic pays any amount due under terms of the bonds or other obligations issued pursuant to the Republic's 2005 or 2010 Exchange Offers, or any subsequent exchange of or substitution for the 2005 and 2010 Exchange Offers that may occur in the future (collectively, the "Exchange Bonds"), the Republic shall concurrently or in advance make a "Ratable Payment" to NML (as defined below and as further defined in the Court's Opinion of November 21, 2012).

b.  Such "Ratable Payment" that the Republic is ORDERED to make to NML shall be an amount equal to the "Payment Percentage" (as defined below) multiplied by the total amount currently due to NML in respect of the bonds at issue in these cases (08 Civ. 6978, 09 Civ. 1707, and 09 Civ. 1708), including pre-judgment interest (the "NML Bonds").

c.  Such "Payment Percentage" shall be the fraction calculated by dividing the amount actually paid or which the Republic

4

intends to pay under the terms of the Exchange Bonds by the total amount then due under the terms of the Exchange Bonds.

d. The Republic is ENJOINED from violating Paragraph 1(c) of the FAA, including by making any payment under the terms of the Exchange Bonds without complying with its obligation pursuant to Paragraph 1(c) of the FAA by concurrently or in advance making a Ratable Payment to NML.

e. Within three (3) days of the issuance of this ORDER, the Republic shall provide copies of this ORDER to all participants in the payment process of the Exchange Bonds ("Participants"). Such Participants shall be bound by the terms of this ORDER as provided by Rule 65(d)(2) and prohibited from aiding and abetting any violation of this ORDER, including any further violation by the Republic of its obligations under Paragraph 1(c) of the FAA, such as any effort to make payments under the terms of the Exchange Bonds without also concurrently or in advance making a Ratable Payment to NML.

f. "Participants" refer to those persons and entities who act in active concert or participation with the Republic, to assist the Republic in fulfilling its payment obligations under the Exchange Bonds, including: (1) the indenture trustees and/or registrars under the Exchange Bonds (including but not limited to The Bank of New York Mellon f/k/a/ The Bank of New York);

5

(2) the registered owners of the Exchange Bonds and nominees

of the depositaries for the Exchange Bonds (including but not

limited to Cede & Co. and The Bank of New York Depositary

(Nominees) Limited) and any institutions which act as

nominees;  (3) the clearing corporations and systems,

depositaries, operators of clearing systems, and settlement

agents for the Exchange Bonds (including but not limited to the

Depository Trust Company, Clearstream Banking S.A.,

Euroclear Bank S.A./N.V. and the Euroclear System);  (4)

trustee paying agents and transfer agents for the Exchange

Bonds (including but not limited to The Bank of New York

(Luxembourg) S.A. and The Bank of New York Mellon (including

but not limited to the Bank of New York Mellon (London));  and

(5) attorneys and other agents engaged by any of the foregoing

or the Republic in connection with their obligations under the

Exchange Bonds.

g.  Nothing in this ORDER shall be construed to extend to the

conduct or actions of a third party acting solely in its capacity

as an "intermediary bank," under Article 4A of the U.C.C. and

N.Y.C.L.S. U.C.C. § 4-A-104, implementing a funds transfer in

connection with the Exchange Bonds.

h.  Any non-party that has received proper notice of this ORDER,

pursuant to Rule 65(d)(2), and that requires clarification as to

its duties, if any, under this ORDR may make an application to this Court, with notice to the Republic and NML. Such clarification will be promptly provided.

    i.  Concurrently or in advance of making a payment on the Exchange Bonds, the Republic shall certify to the Court and give notice of this certification to its Participants, and to counsel for NML, that the Republic has satisfied its obligations under this ORDER to make a Ratable Payment to NML.

3.    NML shall be entitled to discovery to confirm the timing and amounts of the Republic's payments under the terms of the Exchange Bonds; the amounts the Republic owes on these and other obligations; and such other information as appropriate to confirm compliance with this ORDER;

4.    The Republic is permanently PROHIBITED from taking action to evade the directives of this ORDER, render it ineffective, or to take any steps to diminish the Court's ability to supervise compliance with the ORDER, including, but not limited to, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without obtaining prior approval by the Court;

5.    This Court shall retain jurisdiction to monitor and enforce this ORDER, and to modify and amend it as justice requires to achieve its equitable purposes and to account for changing circumstances.

Dated:  New York, New York
        November, 21 2012

_Thomas P. Griesa_

Thomas P. Griesa
U.S. District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
#:
DATE FILED: 11/21/12

8

# **Exhibit 6**

FISCAL AGENCY AGREEMENT

between

THE REPUBLIC OF ARGENTINA

and

BANKERS TRUST COMPANY, Fiscal Agent

Dated as of October 19, 1994

ARG 0001

# TABLE OF CONTENTS

Page

1.  Securities Issuable in Series . . . . . . . . . . . . . .   1

2.  Appointment of Fiscal Agent; Paying Agents . . . . . . .   3

3.  Authentication . . . . . . . . . . . . . . . . . . . . .   3

4.  Registration, Transfers and Exchanges . . . . . . . . .   4

5.  Global Securities . . . . . . . . . . . . . . . . . . .   6

6.  Payment . . . . . . . . . . . . . . . . . . . . . . . .   9

7.  Additional Amounts . . . . . . . . . . . . . . . . . .   11

8.  Mutilated, Destroyed, Stolen or Lost Certificates . . .  11

9.  Redemption and Purchases . . . . . . . . . . . . . . .   12

10. Cancellation and Destruction . . . . . . . . . . . . .   14

11. Negative Pledge and Covenants . . . . . . . . . . . .   14

12. Default; Acceleration of Maturity . . . . . . . . . . .  17

13. Limit on Liability; Acceptance of Appointment . . . . .  19

14. Expenses and Indemnity . . . . . . . . . . . . . . . .   20

15. Successor Fiscal Agent . . . . . . . . . . . . . . . .   20

16. Meetings of Holders of Securities; Modifications . . . .  22

17. Further Issues . . . . . . . . . . . . . . . . . . . .   26

18. Reports . . . . . . . . . . . . . . . . . . . . . . .   26

19. Forwarding of Notice; Inquiries . . . . . . . . . . . .  27

20. Listings . . . . . . . . . . . . . . . . . . . . . . .   27

21. Notices . . . . . . . . . . . . . . . . . . . . . . .   27

22. Consent to Service; Jurisdiction . . . . . . . . . . .   28

23. Governing Law and Counterparts . . . . . . . . . . . .   29

-i-

ARG 0002

Page

24.  Headings . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

Exhibit A - Form of Registered Security

ARG 0003

THE REPUBLIC OF ARGENTINA


          FISCAL AGENCY AGREEMENT dated as of October 19,
1994, between The Republic of Argentina (the "Republic") and
Bankers Trust Company, a New York banking corporation, as
fiscal agent.

          1.   <u>Securities Issuable in Series</u>.  (a)  The
Republic may issue its notes, securities, debentures or
other evidences of indebtedness (the "Securities") in
separate series from time to time (each such series of
Securities being hereinafter referred to as a "Series" or
the "Securities of a Series").  The aggregate principal
amount of the Securities of all Series which may be
authenticated and delivered under this Agreement and which
may be outstanding at any time is not limited by this
Agreement.  The text of the Securities of a Series delivered
to the Fiscal Agent (as hereinafter defined) for
authentication on original issuance pursuant to Section 3 of
this Agreement shall establish (i) the specific designation
of the Securities of such Series (which shall distinguish
the Securities of such Series from all other Series); (ii)
any limit on the aggregate principal amount of the
Securities of such Series which may be authenticated and
delivered under this Agreement (except for Securities
authenticated and delivered upon registration of transfer
of, or in exchange for, or in lieu of, other Securities of
such Series pursuant to the provisions of this Agreement or
of the Securities of such Series); (iii) the price or prices
(expressed as a percentage of the aggregate principal amount
thereof) at which the Securities of such Series will be
issued; (iv) the date or dates on which the principal and
premium, if any, of the Securities of such Series is
payable; (v) the rate or rates (which may be fixed or
floating) per annum at which the Securities of such Series
shall bear interest, if any, the date or dates from which
such interest, if any, shall accrue, the interest payment
dates on which such interest shall be payable and the record
dates for the determination of holders of the Securities of
such Series to whom interest is payable; (vi) the place or
places where the principal of, and premium, if any, and
interest on the Securities of such Series are payable; (vii)
the price or prices at which, the period or periods within
which and the terms and conditions upon which Securities of
such Series may be redeemed, in whole or in part, at the
option of the Republic or otherwise; (viii) the obligation,
if any, of the Republic to redeem, purchase or repay
Securities of such Series pursuant to any sinking fund or
analogous provisions and the price or prices at which, the

ARG 0004

period or periods within which, and the terms and conditions upon which Securities of such Series shall be redeemed, purchased or repaid, in whole or in part, pursuant to such obligation; (ix) the minimum denomination and any multiples thereof of the Securities of such Series, which may be in U.S. dollars, another foreign currency, units of two or more currencies or amounts determined by reference to an index; (x) the currency or currencies in which the principal, premium, if any, or interest on such Securities may be payable; (xi) the manner in which the amount of payments of principal, premium, if any, or interest on such Securities is to be determined and if such determination is to be made with reference to any index; (xii) any covenants or agreements of the Republic and events which give rise to the right of a holder of a Security of such Series to accelerate the maturity of such Security other than such covenants, agreements or events specified herein; and (xiii) any other terms of the Securities of such Series.  Securities may be issuable pursuant to warrants (if so provided in the text of such Securities) and the Fiscal Agent may act as warrant agent or in any similar capacity in connection therewith.

(b)   The Securities of a Series are to be issued in fully registered form only, without interest coupons, and will be issuable in the denominations specified in the text of the Securities of such Series, substantially in the form of Exhibit A hereto ("registered Securities").  The Securities of a Series may also have such additional provisions, omissions, variations or substitutions as are not inconsistent with the provisions of this Agreement, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon as may be required to comply with any law or with any rules made pursuant thereto or with the rules of any securities exchange or governmental agency or as may, consistent herewith, be determined by the officials executing such Securities, as evidenced by their execution of such Securities.  All Securities of a particular Series shall be otherwise substantially identical except as to denomination and as provided herein.

(c)   The Securities will constitute (except as provided in Section 11 below) direct, unconditional, unsecured and unsubordinated obligations of the Republic and shall at all times rank pari passu and without any preference among themselves.  The payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness (as defined in this Agreement).

2

ARG 0005

2.   <u>Appointment of Fiscal Agent: Paying Agents</u>.
(a)  The Republic hereby appoints Bankers Trust Company, at
present having its office at 4 Albany Street, New York, New
York 10006 as fiscal agent, transfer agent, registrar and
principal paying agent of the Republic for the Securities,
upon the terms and conditions set forth herein.  Bankers
Trust Company accepts such appointments, and along with its
successors as such fiscal agent, is hereinafter referred to
as the "Fiscal Agent".  The Republic reserves the right to
appoint different fiscal agents for different series of
securities.

(b)  The Republic may appoint one or more
additional agents (hereinafter called a "Paying Agent" or
the "Paying Agents") for the payment (subject to the
applicable laws and regulations) of the applicable payment
of principal, premium, if any, and interest or Additional
Amounts (as defined in Section 7 hereof), if any, on the
Securities at such place or places as the Republic may
determine pursuant to an agreement (each, a "Paying Agency
Agreement"); provided that the Republic will maintain at all
times until no Security is outstanding a Paying Agent (who
may be the Fiscal Agent) in the Borough of Manhattan, The
City of New York.  The Republic will keep the Fiscal Agent
informed as to the name, address, and telephone and
facsimile numbers of each Paying Agent appointed by it and
will notify the Fiscal Agent of the resignation of any
Paying Agent.  The Fiscal Agent shall arrange with each
Paying Agent for the payment, as provided herein, of the
principal and interest or Additional Amounts, if any, on the
Securities on terms previously approved in writing by the
Republic (further references herein to principal and
interest shall be deemed to also refer to any Additional
Amounts).

3.   <u>Authentication</u>.  (a)  The Fiscal Agent shall,
upon delivery of the Securities to it by the Republic, and a
written order or orders to authenticate and deliver
Securities in a stated aggregate principal amount, (i)
authenticate and register not more than said aggregate
principal amount of Securities and deliver them in
accordance with the written order or orders of the Republic
and (ii) thereafter authenticate and register Securities and
deliver them in accordance with the provisions of Sections
4, 5 and 9 of this Agreement.  The total principal amount of
the Securities to be issued and outstanding at any time
shall not be limited hereby.

(b)  The Fiscal Agent may, with the prior written
consent of the Republic, appoint by an instrument or
instruments in writing one or more agents (which may include

3

ARG 0006

itself) for the authentication of Securities of a Series and, with such consent, vary or terminate any such appointment upon written notice and approve any change in the office through which any authenticating agent acts.  The Republic (by written notice to the Fiscal Agent and the authenticating agent whose appointment is to be terminated) may also terminate any such appointment at any time.  The Fiscal Agent hereby agrees to solicit written acceptances from the entities concerned (in form and substance satisfactory to the Republic) of such appointments.  In its acceptance of such appointment, each such authenticating agent shall agree to act as an authenticating agent pursuant to the terms and conditions of this Agreement.

        (c)  Until definitive Securities of a Series are prepared, the Republic may execute, and there shall be authenticated and delivered in accordance with the provisions hereof (in lieu of definitive Securities of such Series), temporary Securities of such Series.  Such temporary Securities of a Series shall be subject to the same limitations and conditions and entitled to the same rights and benefits as definitive Securities of such Series, except as provided herein or therein.  Temporary Securities of a Series shall be exchangeable for definitive Securities of such Series when such definitive Securities are available for delivery; and upon the surrender for exchange of such temporary Securities of a Series, the Republic shall execute and there shall be authenticated and delivered, in accordance with the provisions of Sections 3 and 4 hereof, in exchange for such temporary Securities of a Series, a like aggregate principal amount of definitive Securities of such Series and of like tenor.  The Republic shall pay all charges, including (without limitation) stamp and other taxes and governmental charges, incident to any exchange of temporary Securities for definitive Securities.  All temporary Securities shall be identified as such and shall describe the right of the holder thereof to effect an exchange for definitive Securities and the manner in which such an exchange may be effected.

        4.  <u>Registration, Transfers and Exchanges</u>.  (a) The Fiscal Agent, as agent of the Republic for such purpose, will at all times keep at the office of the Fiscal Agent in the Borough of Manhattan, The City of New York, a register or registers for the registration and registration of transfers and exchanges of Securities, in which shall be entered the names and addresses of the registered holders of Securities and the particulars of the Securities held by such registered holders.  Subject to Section 5 hereof, upon surrender for transfer of any Security of any Series at said office, the Fiscal Agent shall authenticate, register and

4

ARG 0007

deliver in the name of the transferee or transferees a new Security or Securities of any Series for a like aggregate principal amount. Subject to Section 5 hereof, upon surrender of any Security at said office for exchange, the Fiscal Agent shall authenticate, register and deliver in exchange for such Security a new Security or new Securities of the appropriate authorized denomination(s) and for a like aggregate principal amount in accordance with the provisions of the Securities.

(b) All new Securities authenticated and delivered by the Fiscal Agent upon registration of transfer or in exchange for Securities of other denominations shall be so dated that neither gain nor loss of interest shall result from such registration of transfer or exchange.

(c) All Securities presented or surrendered for registration of transfer, exchange or payment shall be accompanied by a written instrument or instruments of transfer in form satisfactory to the Fiscal Agent, duly executed by the registered holder or its attorney duly authorized in writing and with the signatures thereon duly guaranteed by a commercial bank or trust company having its principal office in The City of New York or by a member of the New York Stock Exchange.

(d) The Fiscal Agent shall not impose any service charge on the registered holder on any such registration, transfer or exchange of Securities; however, the Republic may require of the party requesting such transfer or exchange, as a condition precedent to the exercise of any right of transfer or exchange contained in this Agreement or in the Securities, the payment of a sum sufficient to cover any stamp or other tax or other governmental charge payable in connection therewith.

(e) The Republic, the Fiscal Agent and any Paying Agent may treat the person in whose name any Security is registered as the owner of such Security for the purpose of receiving payment of principal of and interest on such Security, and all other purposes whatsoever, whether or not such Security be overdue, and none of the Republic, the Fiscal Agent or any Paying Agent shall be affected by any notice to the contrary and any such payment shall be a good and sufficient discharge to the Republic, the Fiscal Agent and any Paying Agent for the amount so paid.

(f) The Fiscal Agent shall not be required to register any transfer or exchange of Securities during the period from the Regular Record Date (as defined in such Securities) to the Interest Payment Date (as defined in such

5

Securities) and for the purposes of any interest payment made in accordance with Section 6 hereof, such payment shall be made to those persons in whose names the Securities are registered on such Regular Record Date.

5.   <u>Global Securities</u>.  The Securities of any Series may be issued in whole or in part in the form of one or more global securities ("Global Securities") that will be deposited with, or on behalf of, a depositary (the "Depositary") relating to such Series.  Global Securities may be issued only in fully registered form and in either temporary or definitive form.  Unless and until it is exchanged in whole or in part for Securities in definitive form, a Global Security may not be transferred except as a whole by the Depositary for such Global Security to a nominee of such Depositary or by a nominee of such Depositary to such Depositary or another nominee of such Depositary or by such Depositary or any nominee of such Depositary to a successor Depositary or any nominee of such successor.

Upon the issuance of a Global Security, the Depositary for such Global Security will credit on its book-entry registration and transfer system the respective principal amounts of the Securities represented by such Global Security to the accounts of Persons that have accounts with such Depositary ("Participants").  The accounts to be credited shall be designated by the agents or underwriters with respect to such Securities or by the Republic if such Securities are offered and sold directly by the Republic.  Ownership of beneficial interests in a Global Security will be limited to Participants or Persons that may hold interests through Participants.  Ownership of beneficial interests in a Global Security will be shown on, and the transfer of that ownership will be effected only through, records maintained by the applicable Depositary (with respect to interests of Participants) and records of Participants (with respect to interests of Persons who hold through Participants).  Owners of beneficial interests in a Global Security (other than Participants) will not receive written confirmation from the applicable Depositary of their purchase.  Each beneficial owner is expected to receive written confirmation providing details of the transaction, as well as periodic statements of its holdings, from the Depositary (if such beneficial owner is a Participant) or from the Participant through which such beneficial owner entered into the transaction (if such beneficial owner is not a Participant).  The laws of some states require that certain purchasers of securities take physical delivery of such securities in definitive form.  Such limits and such

6

ARG 0009

laws may impair the ability to own, pledge or transfer beneficial interests in a Global Security.

So long as the Depositary for a Global Security, or its nominee, is the registered owner of such Global Security, such Depositary or such nominee, as the case may be, will be considered the sole owner or holder of the Securities represented by such Global Security for all purposes under this Agreement.  Except as specified below or with respect to the terms of Securities of a Series, owners of beneficial interests in a Global Security will not be entitled to have any of the individual Securities represented by such Global Security registered in their names, and will not receive or be entitled to receive physical delivery of any such Securities in definitive form and will not be considered the owners or holders thereof under such Securities or this Agreement.  Accordingly, each Person owning a beneficial interest in a Global Security must rely on the procedures of the Depositary for such Global Security and, if such Person is not a Participant, on the procedures of the Participant through which such Person owns its interest, to exercise any rights of a holder under the Securities or this Agreement.  The Republic understands that under existing industry practices, if the Republic requests any action of holders, or an owner of a beneficial interest in such Global Security desires to take any action which a holder is entitled to take under the Fiscal Agency Agreement, the Depositary for such Global Security would authorize the Participants holding the relevant interests to take such action, and such Participants would authorize beneficial owners owning through such Participants to take such action or would otherwise act upon the instructions of beneficial owners holding through them.

Payments of principal of and any premium and any interest on Securities registered in the name of a Depositary or its nominee will be made to the Depositary or its nominee, as the case may be, as the holder of the Global Security representing such Securities.  None of the Republic, any Paying Agent or the Fiscal Agent, in its capacity as registrar for such Debt Securities, will have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial interests in a Global Security or for maintaining, supervising or reviewing any records relating to such beneficial interests.

The Republic expects that the Depositary for a series of Securities or its nominee, upon receipt of any payment of principal, premium or interest in respect of a Global Security representing such Securities will credit

ARG 0010

Participants' accounts with payments in amounts proportionate to their respective beneficial interests in the principal amount of such Global Security as shown on the records of such Depositary. The Republic also expects that payments by Participants to owners of beneficial interests in such Global Security held through such Participants will be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers in bearer form or registered in "street name". Such payments will be the responsibility of such Participants.

If at any time the Depositary notifies the Republic that it is unwilling or unable to continue as Depositary for the Securities, or if the Republic notifies the Depositary that it will no longer continue as Depositary for the Securities, or if at any time the Depositary ceases to be a clearing agency registered under the United States Securities Exchange Act of 1934, as amended, or otherwise ceases to be eligible to be a Depositary, the Republic shall appoint a successor Depositary with respect to such Securities. If a successor Depositary for such Securities is not appointed by the Republic within 90 days after the Republic receives such notice or becomes aware of such ineligibility, or if the Depositary notifies the Fiscal Agent or the Republic of the acceleration of the indebtedness under the Securities in accordance with the terms of the Securities, the Republic will execute, and the Fiscal Agent upon receipt of such executed definitive Securities will authenticate and deliver, Securities in definitive registered form without coupons, in denominations of U.S.$1,000 and integral multiples thereof (unless some other denomination is specified in terms of the Securities of a Series), in an aggregate principal amount equal to the aggregate principal amount of the Global Securities.

The Republic may at any time and in its sole discretion determine not to have any of the Securities held in the form of Global Securities. In such event, the Republic will execute, and the Fiscal Agent, upon receipt of such executed definitive Securities will authenticate and deliver, Securities in definitive registered form without coupons, in denominations of U.S.$1,000 and integral multiples thereof (unless some other denomination is specified in terms of the Securities of a Series, in an aggregate principal amount equal to the aggregate principal amount of the Global Securities.

Upon the exchange of the Global Securities for Securities in definitive registered form the Global Securities shall be canceled by the Fiscal Agent.

8

ARG 0011

Securities in definitive registered form issued in exchange
for the Global Securities pursuant to this section shall be
registered in such names as the Depositary, pursuant to
instructions from its direct or indirect participants or
otherwise, shall instruct the Fiscal Agent or the Republic.
The Fiscal Agent shall deliver such Securities in definitive
registered form to or as directed by the persons in whose
names such definitive registered Securities are so
registered and will direct all payments to be made in
respect of such Securities in definitive registered form to
the registered holders thereof on or after such exchange
regardless of whether such exchange occurred after the
record date for such payment.

All Securities in definitive registered form,
issued upon the exchange of the Global Securities, shall be
valid obligations of the Republic, evidencing the same debt,
and entitled to the same benefits under this Agreement, as
the Global Securities surrendered upon such exchange.

6. Payment. (a) The Republic will pay to the
Fiscal Agent, the amounts, at the times and for the purposes
set forth herein and in the text of the Securities of a
Series, not later than 1:00 p.m. New York City time to an
account to be specified by the Fiscal Agent, on the day on
which the same shall become due, all amounts to be paid on
the Securities of such Series as required by the terms of
the Securities, and the Republic hereby authorizes and
directs the Fiscal Agent, from the funds so paid to it, to
make payments in respect of the Securities in accordance
with their terms and the provisions set forth below.  If any
date for payment in respect of a Security is not a Business
Day, such payment shall be made on the next following
Business Day.  "Business Day" means a day on which banking
institutions in The City of New York and at the applicable
place of payment are not authorized or obligated by law or
executive order to be closed.  The Fiscal Agent shall
arrange directly with any Paying Agent who may have been
appointed pursuant to the provisions of Section 2 hereof for
the payment from funds so paid by the Republic of the
principal of (and premium, if any) and any interest on the
Securities of such Series as set forth herein and in the
text of said Securities.  Notwithstanding the foregoing,
where the terms of such Securities expressly so provide and
the Republic so notifies the Fiscal Agent the Republic may
provide directly a Paying Agent with funds for the payment
of the principal thereof and premium and interest, if any,
payable thereon under an agreement with respect to such
funds containing substantially the same terms and conditions
set forth in this Section; and the Fiscal Agent shall have

9

ARG 0012

no responsibility with respect to any funds so provided by the Republic to any such Paying Agent.

(b)    All payments with respect to the Global Securities shall be made by the Fiscal Agent to the Depositary in accordance with the regular procedures established from time to time by the Depositary.

(c)    Payment of principal and premium, if any, in respect of Securities in definitive registered form issued pursuant hereto shall be made at the office of the Fiscal Agent in the Borough of Manhattan, The City of New York, or at the office of any Paying Agent appointed by the Republic for such purpose pursuant to this Agreement against surrender of such Securities.  Any interest on Securities of a Series shall be paid, unless otherwise provided in the text of the Securities of such Series, to the persons in whose names such Securities are registered on the register maintained for such purposes at the close of business on the record dates designated in the text of the Securities of such Series.  If so provided with respect to the Securities of a Series, payments of interest due prior to or on maturity may be made by forwarding by post or otherwise delivering a check to the registered addresses of registered holders of Securities, or, at the option of the Republic, otherwise transferring funds to the registered holders of the Securities.  Such check shall be made payable to the order of the registered holder or, in the case of joint registered holders, to the order of all such joint holders (failing instructions from them to the contrary) and shall be sent to the address of that one of such joint holders whose name stands first in the register as one of such joint holders.  The Fiscal Agent shall mail or otherwise deliver such checks to the names and addresses of registered holders of Securities sufficiently in advance of the relevant due date for payment that receipt of such checks by registered holders on or before the due date is reasonably assured.

(d)    All money paid to the Fiscal Agent under Section 6(a) of this Agreement shall be held by it in a separate account from the moment when such money is received until the time of actual payment, in trust for the registered holders of Securities to be applied by the Fiscal Agent to payments due on the Securities at the time and in the manner provided for in this Agreement and the Securities.  Any money deposited with the Fiscal Agent for the payment in respect of any Security remaining unclaimed for two years after such principal or interest shall have become due and payable shall be repaid to the Republic upon written request without interest, and the registered holder

10

of Security may thereafter look only to the Republic for any payment to which such holder may be entitled.

7.  Additional Amounts.  All payments of principal, premium, if any, and interest in respect of the Securities by the Republic will be made free and clear of, and without withholding or deduction for or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed, levied, collected, withheld or assessed by or within the Republic or any authority therein or thereof having power to tax (together "Taxes"), unless such withholding or deduction is required by law.  In such event, the Republic shall pay such additional amounts ("Additional Amounts") as will result in receipt by the holders of Securities of such amounts of principal, premium and interest as would have been received by them had no such withholding or deduction been required, except that no such Additional Amounts shall be payable with respect to any Security:

(a)  to a holder (or to a third party on behalf of a holder) where such holder is liable for such Taxes in respect of any Security by reason of his having some connection with the Republic other than the mere holding of such Security or the receipt of principal, premium or interest in respect thereof; or

(b)  presented for payment more than 30 days after the Relevant Date, as defined herein, except to the extent that the holder thereof would have been entitled to Additional Amounts on presenting the same for payment on the last day of such period of 30 days.

"Relevant Date" in respect of any Security means the date on which payment in respect thereof becomes due or (if the full amount of the money payable on such date has not been received by the Fiscal Agent on or prior to such due date) the date on which notice is duly given to the holders in the manner described in Section 21 below that such moneys have been so received and are available for payment.  Any reference herein to "principal" and/or "interest" shall be deemed to include any Additional Amounts which may be payable under the Securities.

So long as any Security remains outstanding, the Republic covenants to maintain its membership in, and its eligibility to use the general resources of, the International Monetary Fund.

11

ARG 0014

8.   <u>Mutilated, Destroyed, Stolen or Lost
Certificates</u>.   (a)   In case any Security certificate is
mutilated, defaced, destroyed, stolen or lost, application
for replacement shall be made to the Fiscal Agent who shall
promptly transmit such application to the Republic.   Such
application shall be accompanied by the mutilated or defaced
certificate or receipt of proof, satisfactory to the
Republic in its discretion, of the destruction, theft or
loss of the certificate, and upon receipt by it of an
indemnity satisfactory to the Republic and the Fiscal Agent,
the Republic shall execute a new certificate of like tenor,
and upon written instructions from the Republic the Fiscal
Agent shall thereupon cancel the mutilated or defaced
certificate if applicable and authenticate, register and
deliver such new certificate in exchange for the mutilated
or defaced certificate or in substitution for the destroyed,
stolen or lost certificate.   Such new certificate will be so
dated that neither gain nor loss in interest will result
from such exchange or substitution.   All expenses associated
with procuring such indemnity and with the preparation,
authentication and delivery of a new certificate will be
borne by the registered holder of the mutilated, defaced,
destroyed, stolen or lost certificate.

(b)   Whenever any Security, alleged to have been
lost, stolen or destroyed in replacement for which a new
Security has been issued, is presented to the Fiscal Agent
or any Paying Agent for payment at maturity or at redemption
or for registration of transfer or exchange, the Fiscal
Agent or the Paying Agent, as the case may be, shall
immediately notify the Republic in respect thereof and shall
deal with such Security in accordance with the Republic's
instructions.

9.   <u>Redemption and Purchases</u>.   (a)   Unless
otherwise permitted by the terms of the Securities of a
Series, Securities will not be redeemable prior to maturity
at the option of the Republic or the registered holders
thereof.

(b)   The Republic hereby authorizes and directs
the Fiscal Agent to administer the sinking fund with respect
to the Securities of any Series having a mandatory sinking
fund or similar provision in accordance with the provisions
set forth in the terms of the Securities of such Series.   If
the provisions of the Securities of a Series permit the
Republic to redeem Securities of such Series at its option,
then the Republic shall, unless otherwise provided in the
terms of the Securities of such Series, give written notice
to the Fiscal Agent of the principal amount of Securities of
such Series to be so redeemed not less than 60 days prior to

12

the optional redemption date.  If the provisions of the
Securities of a Series permit the Republic to redeem
Securities of such Series only upon the occurrence or
satisfaction of a condition or conditions precedent thereto,
then prior to the giving of notice of redemption of the
Securities of such Series, the Republic shall deliver to the
Fiscal Agent a certificate stating that the Republic is
entitled to effect such redemption and setting forth in
reasonable detail a statement of facts showing that such
condition or conditions precedent have occurred or been
satisfied.  If the provisions of the Securities of a Series
obligate the Republic at the request of the holders to
redeem Securities of such Series upon the occurrence of
certain events (each hereinafter referred to as a
"Redemption Event"), then the Republic shall promptly
deliver written notice to the Fiscal Agent that a Redemption
Event has occurred.  Promptly after receiving written notice
of a Redemption Event, the Fiscal Agent shall deliver
written notice to each holder of the Securities of such
Series stating that a Redemption Event has occurred and that
such holder may tender its Securities by delivering written
notice of its election to tender for redemption, together
with the certificate or certificates for the Securities to
be redeemed, to the Fiscal Agent within 60 days of the
Fiscal Agent's notice (hereinafter referred to as the
"Option Period").  Thereafter, the Republic shall (i) in the
manner provided in the provisions of the Securities of such
Series and as contemplated by Section 6 hereof, arrange with
the Fiscal Agent (and each Paying Agent for the purpose, if
applicable) for the provision of funds sufficient to make
payments to such holders in respect of such redemptions, and
(ii) redeem such Securities within 60 days of the expiration
of the Option Period.  The Fiscal Agent shall provide the
Republic from time to time during and upon expiration of the
Option Period with reasonable detailed information as to
Securities tendered for redemption.

         All notices of redemption of or Redemption Events
relating to Securities of a Series to the holders thereof
shall be made in the name and at the expense of the Republic
and shall be given in accordance with the provisions
applicable thereto set forth in the terms of the Securities
of such Series.

         Whenever less than all the Securities of a Series
with the same interest rate and maturity at any time
outstanding are to be redeemed at the option of the
Republic, the particular Securities of such Series with such
interest rate and maturity to be redeemed shall be selected
not more than 60 days prior to the redemption date by the
Fiscal Agent from the outstanding Securities of such Series

13

not previously called for redemption by such usual method as the Fiscal Agent shall deem fair and appropriate, which method may provide for the selection for redemption of portions of the principal amount of registered Securities of such Series the minimum denominations of which, if any, will be specified in the terms of the Securities of such Series. Upon any partial redemption of a registered Security of a Series, the Fiscal Agent shall authenticate and deliver in exchange therefor one or more registered Securities of such Series, of any authorized denomination and like tenor as requested by the holder thereof, in aggregate principal amount equal to the unredeemed portion of the principal of such Security.

(c)   The Republic may at any time purchase Securities at any price in the open market or otherwise, provided that in any such case such purchase or purchases are in compliance with all relevant laws, regulations and directives.  Securities so purchased by the Republic, may, at the Republic's discretion, be held, resold or surrendered to the Fiscal Agent for cancellation.  The Securities so purchased, while held by or on behalf or for the benefit of the Republic shall not entitle the registered holder thereof to vote at any meetings of registered holders of Securities and shall not be deemed to be outstanding for the purposes of calculating quorums at meetings of the registered holders of the Securities.  Notwithstanding the foregoing, the Republic will not acquire any beneficial interest in any Securities unless it gives prior written notice of each acquisition to the Fiscal Agent.  The Fiscal Agent will be entitled to rely without further investigation on any such notification (or lack thereof).

(d)   If the Republic elects to cancel any Securities when Securities have been issued in the form of a Global Security, it may request the Fiscal Agent to instruct the Depositary to reduce the outstanding aggregate principal amount of the Global Securities in accordance with the regular procedures of the Depositary in effect at such time.

10.   Cancellation and Destruction.  All Securities which are paid at maturity or upon earlier repurchase, or are mutilated, defaced or surrendered in exchange for other certificates, shall be cancelled by the Fiscal Agent who shall register such cancellation.  The Fiscal Agent shall, as soon as practicable after the date of any such cancellation, furnish the Republic with a certificate or certificates stating the serial numbers and total number of Securities that have been cancelled.  The Fiscal Agent shall destroy all cancelled Securities in accordance with the instructions of the Republic and shall furnish to the

14

ARG 0017

Republic, on a timely basis, certificates of destruction stating the serial numbers, dollar value and total number of all Securities destroyed hereunder.

11.  Negative Pledge and Covenants.  So long as any Security remains outstanding, save for the exceptions set forth below, the Republic will not create or permit to subsist any lien, pledge, mortgage, security interest, deed of trust, charge or other encumbrance or preferential arrangement which has the practical effect of constituting a security interest ("Lien") upon the whole or any part of its assets or revenues to secure any Public External Indebtedness of the Republic unless, at the same time or prior thereto, the Republic's obligations under the Securities either (i) are secured equally and ratably therewith, or (ii) have the benefit of such other security, guarantee, indemnity or other arrangement as shall be approved by the holders of the Securities (as provided in Section 16).

Notwithstanding the foregoing, the Republic may permit to subsist:

(i)   any Lien upon property to secure Public External Indebtedness of the Republic incurred for the purpose of financing the acquisition of such property; any renewal or extension of any such Lien which is limited to the original property covered thereby and which secures any renewal or extension of the original secured financing;

(ii)  any Lien existing on such property at the time of its acquisition to secure Public External Indebtedness of the Republic and any renewal or extension of any such Lien which is limited to the original property covered thereby and which secures any renewal or extension of the original secured financing;

(iii) any Lien created in connection with the transactions contemplated by the Republic of Argentina 1992 Financing Plan dated June 23, 1992 sent to the international banking community with the communication dated June 23, 1992 from the Minister of Economy and Public Works and Services of Argentina (the "1992 Financing Plan") and the implementing documentation therefor, including any Lien to secure obligations under the collateralized securities issued thereunder (the "Par and Discount Bonds") and any Lien securing indebtedness outstanding on the date hereof to the extent required to be equally and rateably secured with the Par and Discount Bonds;

15

ARG 0018

(iv)  any Lien in existence on the date of this Agreement;

(v)  any Lien securing Public External Indebtedness of the Republic issued upon surrender or cancellation of any of the Par and Discount Bonds or the principal amount of any indebtedness outstanding as of June 23, 1992, in each case, to the extent such Lien is created to secure such Public Indebtedness on a basis comparable to the Par and Discount Bonds;

(vi)  any Lien on any of the Par and Discount Bonds; and

(vii)  any Lien securing Public External Indebtedness incurred for the purpose of financing all or part of the costs of the acquisition, construction or development of a project provided that (a) the holders of such Public External Indebtedness expressly agree to limit their recourse to the assets and revenues of such project as the principal source of repayment of such Public External Indebtedness and (b) the property over which such Lien is granted consists solely of such assets and revenues.

For purposes of this Agreement:

"External Indebtedness" means obligations (other than the Securities) for borrowed money or evidenced by securities, debentures, notes or other similar instruments denominated or payable, or which at the option of the holder thereof may be payable, in a currency other than the lawful currency of the Republic provided that no Domestic Foreign Currency Indebtedness, as defined below, shall constitute External Indebtedness.

"Public External Indebtedness" means, with respect to the Republic, any External Indebtedness of, or guaranteed by, the Republic which (i) is publicly offered or privately placed in securities markets, (ii) is in the form of, or represented by, securities, notes or other securities or any guarantees thereof and (iii) is, or was intended at the time of issue to be, quoted, listed or traded on any stock exchange, automated trading system or over-the-counter or other securities market (including, without prejudice to the generality of the foregoing, securities eligible for PORTAL or a similar market for the trading of securities eligible for sale pursuant to Rule 144A under the U.S. Securities Act of 1933 (or any successor law or regulation of similar effect)).

16

ARG 0019

"Domestic Foreign Currency Indebtedness" means (i) the following indebtedness: (a) Bonos del Tesoro issued under Decree No. 1527/91 and Decree No. 1730/91, (b) Bonos de Consolidación issued under Law No. 23,982 and Decree No. 2140/91, (c) Bonos de Consolidación de Deudas Previsionales issued under Law No. 23,982 and Decree No. 2140/91, (d) Bonos de la Tesorería a 10 Años de Plazo issued under Decree No. 211/92 and Decree No. 526/92, (e) Bonos de la Tesorería a 5 Años Plazo issued under Decree No. 211/92 nd Decree No. 526/92, (f) Ferrobonos issued under Decree No. 52/92 and Decree No. 526/92 and (g) Bonos de Consolidación de Regalías Hidrocarburíferas a 16 Años de Plaxo issued under Decree No 2284/92 and Decree No. 54/93; (ii) any indebtedness issued in exchange, or as replacement, for the indebtedness referred to in (i) above; and (iii) any other indebtedness payable by its terms, or which at the option of the holder thereof may be payable, in a currency other than the lawful currency of the Republic of Argentina which is (a) offered exclusively within the Republic of Argentine or (b) issued in payment, exchange, substitution, discharge or replacement of indebtedness payable in the lawful currency of the Republic of Argentine; _provided_ that in no event shall the following indebtedness be deemed to constitute "Domestic Foreign Currency Indebtedness": (1) Bonos Externos de la República Argentina issued under Law No. 19,686 enacted on June 15, 1972 and (2) any indebtedness issued by the Republic in exchange, or as replacement, for any indebtedness referred to (1) above.

12.   Default: Acceleration of Maturity. If any of the following events ("Events of Default") with respect to the Securities of any Series occurs and is continuing:

(a)   Non-Payment:  the Republic fails to pay any principal of any of the Securities of such Series when due and payable or fails to pay any interest on any of the Securities of such Series when due and payable and such failure continues for a period of 30 days; or

(b)   Breach of Other Obligations:  the Republic does not perform or comply with any one or more of its other obligations in the Securities of such Series or in this Agreement, which default is incapable of remedy or is not remedied within 90 days after written notice of such default shall have been given to the Republic by the Fiscal Agent; or

(c)   Cross Default:  any event or condition shall occur which results in the acceleration of the maturity (other than by optional or mandatory prepayment or redemption) of the Securities of any other Series or of any

17

ARG 0020

Public External Indebtedness of the Republic having an aggregate principal amount of U.S. $30,000,000 or more, or any default in the payment of principal of, or premium or prepayment charge (if any) or interest on, the Securities of any other Series or any such Public External Indebtedness having an aggregate principal amount of U.S. $30,000,000 or more, shall occur when and as the same shall become due and payable, if such default shall continue for more than the period of grace, if any, originally applicable thereto; or

(d) Moratorium: a moratorium on the payment of principal of, or interest on, the Public External Indebtedness of the Republic shall be declared by the Republic or;

(e) Validity: the validity of the Securities of such Series shall be contested by the Republic;

then the holders of not less than 25 percent in aggregate principal amount of the Securities of such Series by notice in writing to the Republic at the specified office of the Fiscal Agent shall declare the principal amount of all the Securities of such Series to be due and payable immediately, and, in the case of (a) and (d) above, each holder of Securities of such Series may by such notice in writing declare the principal amount of Securities of such Series held by it to be due and payable immediately, and upon any such declaration the same shall become and shall be immediately due and payable upon the date that such written notice is received by the Republic unless prior to such date all Events of Default in respect of all the Securities of such Series shall have been cured; provided that in the case of (b), (d) and (e) above, such event is materially prejudicial to the interests of the holders of the Securities of such Series, and provided further, that if, at any time after the principal of the Securities of such Series shall have been so declared due and payable, and before any sale of property under any judgment or decree for the payment of the monies due shall have been obtained or entered as hereinafter provided, the Republic shall pay or shall deposit with the Fiscal Agent a sum sufficient to pay all matured amounts of interest and principal upon all the Securities which shall have become due and otherwise than solely by declaration (with interest on overdue amounts of interest, to the extent permitted by law, and on such principal of each of the Securities at the rate of interest applicable thereto, to the date of such payment or deposit) and the expenses of the Fiscal Agent, and reasonable compensation to the Fiscal Agent, its agents, legal advisers, and any and all defaults under the Securities of such Series, other than the non-payment of principal on the

18

Securities of such Series which shall have become due solely by declaration, shall have been remedied, then, and in every such case, the holders of 75 percent in aggregate principal amount of the Securities of such Series then outstanding, after a meeting of holders of Securities held in accordance with the procedures described in Section 16 below, by written notice to the Republic at the specified office of the Fiscal Agent, may on behalf of the holders of all of the Securities of such Series waive all defaults and rescind and annul such declaration and its consequences: but no such waiver or rescission and annulment shall extend to or shall affect any subsequent default, or shall impair any right consequent thereon.

13.   (a)   _Limit on Liability_.   In acting under this Agreement the Fiscal Agent and any Paying Agent are acting solely as agents of the Republic and do not assume any obligation or relationship of agency or trust for or with any of the holders of the Securities, except that all funds held by the Fiscal Agent for payment of principal or interest shall be held in trust, subject to the provisions of Section 6.

(b)   _Acceptance of Appointment_.   The Fiscal Agent and each Paying Agent accepts its obligations set forth in or arising under this Agreement, the Paying Agency Agreements and the Securities upon the terms and conditions hereof and thereof, including the following, to all of which the Republic agrees and to all of which the holders of the Securities shall be subject:

(i)   the Fiscal Agent may consult as to legal matters with lawyers selected by it, who may be employees of or regular independent counsel to the Republic, and the Fiscal Agent shall be protected and shall incur no liability for action taken, or suffered to be taken, with respect to such matters in good faith and in accordance with the opinion of such lawyers; and

(ii)   the Fiscal Agent and each Paying Agent, and their officers, directors and employees, may become the holder of, or acquire any interest in, any Securities, with the same rights that it or they would have if it were not the Fiscal Agent or a Paying Agent hereunder, or they were not such officers, directors, or employers, and may engage or be interested in any financial or other transaction with the Republic and may act on, or as depository, trustee or agent for, any committee or body of holders of Securities or other obligations of the Republic as freely as if it were not

19

ARG 0022

the Fiscal Agent or a Paying Agent hereunder or they were not such officers, directors, or employees.

14.  Expenses and Indemnity.  (a)  In connection with the Fiscal Agent's appointment and duties as Fiscal Agent, the Republic will pay the Fiscal Agent compensation agreed upon by them.  The Republic will indemnify the Fiscal Agent and each Paying Agent against any loss or liability and agrees to pay or reimburse the Fiscal Agent and each Paying Agent for any reasonable expense, which loss, liability or reasonable expense may be incurred by the Fiscal Agent or any Paying Agent by reason of, or in connection with, the Fiscal Agent's or any Paying Agent's appointment and duties as such, except as such result from the negligence, bad faith or wilful misconduct of the Fiscal Agent or any Paying Agent or their respective directors, officers, employees or agents.  In addition, the Republic shall pursuant to arrangements separately agreed upon by the Republic and the Fiscal Agent, transfer to the Fiscal Agent, upon presentation of substantiating documentation satisfactory to the Republic, amounts sufficient to reimburse the Fiscal Agent for certain out-of-pocket expenses reasonably incurred by it and by any Paying Agent in connection with their services.  The obligation of the Republic under this paragraph shall survive payment of the Securities and resignation or removal of the Fiscal Agent.

(b)  The Fiscal Agent and each Paying Agent agrees to indemnify and hold harmless the Republic against all direct claims, actions, demands, damages, costs, losses and liabilities (excluding consequential and punitive damages) arising out of or relating to the bad faith or wilful misconduct of the Fiscal Agent or any Paying Agent or their respective directors, officers, employees or agents.

15.  Successor Fiscal Agent.  (a)  The Republic agrees that there shall at all times be a Fiscal Agent hereunder, and that the Fiscal Agent shall be a bank or trust company organized and doing business under the laws of the United States of America or of the State of New York, in good standing and having a place of business in the Borough of Manhattan, The City of New York, and authorized under such laws to exercise corporate trust powers.

Any corporation or bank into which the Fiscal Agent hereunder may be merged or converted, or any corporation with which the Fiscal Agent may be consolidated, or any corporation or bank resulting from any merger, conversion or consolidation to which the Fiscal Agent shall sell or otherwise transfer all or substantially all of the corporate trust business of the Fiscal Agent, provided that

20

ARG 0023

it shall be qualified as aforesaid, shall be the successor Fiscal Agent under this Agreement without the execution or filing of any paper or any further act on the part of any of the parties hereto, but subject to prior notice to and the prior approval of the Republic.

(b)   The Fiscal Agent may at any time resign by giving written notice to the Republic of its resignation, specifying the date on which its resignation shall become effective (which shall not be less than 120 days after the date on which such notice is given unless the Republic shall agree to a shorter period);  provided that no such notice shall expire less than 30 days before or 30 days after the due date for any payment of principal or interest in respect of the Securities.  The Republic may remove the Fiscal Agent at any time by giving written notice to the Fiscal Agent specifying the date on which such removal shall become effective.  Such resignation or removal shall only take effect upon the appointment by the Republic of a successor Fiscal Agent and upon the acceptance of such appointment by such successor Fiscal Agent.  Any Paying Agent may resign or may be removed at any time upon like notice, and the Republic in any such case may appoint in substitution therefor a new Paying Agent or Paying Agents.

(c)   The appointment of the Fiscal Agent hereunder shall forthwith terminate, whether or not notice of such termination shall have been given, if at any time the Fiscal Agent becomes incapable of performing its duties hereunder, or is adjudged bankrupt or insolvent, or files a voluntary petition on bankruptcy or makes an assignment for the benefit of its creditors or consents to the appointment of a liquidator or receiver of all or any substantial part of its property or admits in writing its inability to pay or meet its debts as they mature or suspends payment thereof, or if a resolution is passed or an order made for the winding up or dissolution of the Fiscal Agent, or if a liquidator or receiver of the Fiscal Agent of all or any substantial part of its property is appointed, or if any order of any court is entered approving any petition filed by or against it under the provisions of any applicable bankruptcy or insolvency law or if any public officer takes charge or control of the Fiscal Agent or its property or affairs for the purposes of rehabilitation, conservation or liquidation.

(d)   Prior to the effective date of any such resignation or removal of the Fiscal Agent, or if the Fiscal Agent shall become unable to act as such or shall cease to be qualified as aforesaid, the Republic shall appoint a successor Fiscal Agent, qualified as aforesaid.  Upon the appointment of a successor Fiscal Agent and its acceptance

21

ARG 0024

of such appointment, the retiring Fiscal Agent shall, at the direction of the Republic and upon payment of its compensation and expenses then unpaid, deliver and pay over to its successor any and all securities, money and any other properties then in its possession as Fiscal Agent and shall thereupon cease to act hereunder.

Any successor Fiscal Agent appointed hereunder shall execute, acknowledge and deliver to its predecessor and to the Republic an instrument accepting such appointment hereunder, and thereupon such successor without any further act, deed or conveyance, shall become vested with all the authority, rights, powers, trusts, immunities, duties and obligations of such predecessor, with like effect as if originally named Fiscal Agent hereunder.

(e)   If the Fiscal Agent resigns or ceases to act as the Republic's fiscal agent in respect of the Securities pursuant to Section 15(c) of this Agreement, the Fiscal Agent shall only be entitled to annual fees otherwise payable to it under this Agreement on a pro rata basis for that period since the most recent anniversary of this Agreement during which the Fiscal Agent has acted as fiscal agent hereunder.   In the event that the Fiscal Agent ceases to act as the Republic's fiscal agent in respect of the Securities for any other reason, the Fiscal Agent shall be entitled to receive the full amount of the annual fees payable to it in respect of the Securities pursuant to Section 14 of this Agreement.

16.   Meetings of Holders of Securities; Modifications.   (a)   A meeting of registered holders of Securities of any Series may be called at any time and from time to time to make, give or take any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Agreement or the Securities of any Series to be made, given or taken by registered holders of Securities of any Series or to modify, amend or supplement the terms of the Securities of any Series or this Agreement as hereinafter provided.   The Fiscal Agent may at any time call a meeting of registered holders of Securities of any Series for any such purpose to be held at such time and at such place as the Fiscal Agent shall determine.   Notice of every meeting of registered holders of Securities of any Series, setting forth the time and the place of such meeting and in general terms the action proposed to be taken at such meeting, shall be given as provided in the terms of the Securities of any Series, not less than 30 nor more than 60 days prior to the date fixed for the meeting.   In case at any time the Republic or the registered holders of at least 10% in aggregate principal amount of the Outstanding

22

Securities of any Series (as defined in subsection (d) of
this Section) shall have requested the Fiscal Agent to call
a meeting of the registered holders of Securities of any
Series for any such purpose, by written request setting
forth in reasonable detail the action proposed to be taken
at the meeting, the Fiscal Agent shall call such meeting for
such purposes by giving notice thereof.

To be entitled to vote at any meeting of
registered holders of Securities of any Series, a person
shall be a registered holder of Outstanding Securities of
any Series or a person duly appointed by an instrument in
writing as proxy for such a holder.  Any person appointed by
an instrument in writing as proxy for a registered holder
need not be a registered holder of Outstanding Securities of
any Series.  At any meeting each registered holder shall be
entitled to one vote for each of those amounts held by such
holder which represent the lowest denomination in which
Securities of such Series as to which such holder is a
holder may be transferred.  The persons entitled to vote a
majority in principal amount of the Outstanding Securities
of any Series shall constitute a quorum.  At the reconvening
of any meeting adjourned for a lack of a quorum, the persons
entitled to vote 25% in principal amount of the Outstanding
Securities of any Series shall constitute a quorum for the
taking of any action set forth in the notice of the original
meeting.  The Fiscal Agent may make such reasonable and
customary regulations as it shall deem advisable for any
meeting of registered holders of Securities of any Series
with respect to the appointment of proxies in respect of
registered holders of Securities, the record date for
determining the registered holders of Securities who are
entitled to vote at such meeting (which date shall be set
forth in the notice calling such meeting hereinabove
referred to and which shall be not less than 30 nor more
than 90 days prior to such meeting, the adjournment and
chairmanship of such meeting) the appointment and duties of
inspectors of votes, the submission and examination of
proxies, certificates and other evidence of the right to
vote, and such other matters concerning the conduct of the
meeting as it shall deem appropriate.

(b)   (i)  At any meeting of registered holders of
Securities of a Series duly called and held as specified
above, upon the affirmative vote, in person or by proxy
thereunto duly authorized in writing, of the registered
holders of not less than 66 2/3% in aggregate principal
amount of the Securities  of any Series then Outstanding (or
of such other percentage as may be set forth in the
Securities of any Series with respect to the action being
taken), or (ii) with the written consent of the owners of

23

ARG 0026

not less than 66 2/3% in aggregate principal amount of the Securities of any Series then Outstanding (or of such other percentage as may be set forth in the text of the Securities of any Series with respect to the action being taken), the Republic and the Fiscal Agent may modify, amend or supplement the terms of the Securities of any Series or this Agreement, in any way, and the registered holders of Securities of any Series may make, take or give any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Agreement or the Securities of any Series to be made, given, or taken by registered holders of Securities of any Series; provided, however, that no such action may, without the consent of the registered holder of each Security of such Series, (A) change the due date for the payment of the principal of (or premium, if any,) or any installment of interest on any Security of such Series, (B) reduce the principal amount of any Security of such Series, the portion of such principal amount which is payable upon acceleration of the maturity of such Security, the interest rate thereon or the premium payable upon redemption thereof, (C) change the coin or currency in which or the required places at which payment with respect to interest, premium or principal in respect of Securities of such Series is payable, (D) amend the definition of Redemption Event in the Securities of such Series or the procedures provided therefore, (E) shorten the period during which the Republic is not permitted to redeem the Securities of such Series if, prior to such action, the Republic is not permitted to do so, (F) reduce the proportion of the principal amount of Securities of such Series the vote or consent of the holders of which is necessary to modify, amend or supplement this Agreement or the terms and conditions of the Securities of such Series or to make, take or give any request, demand, authorization, direction, notice, consent, waiver or other action provided hereby or thereby to be made, taken or given, or (G) change the obligation of the Republic to pay additional amounts.

The Fiscal Agent and the Republic may agree, without the consent of the registered holders of Securities of any Series, to (i) any modification of any provisions of the Fiscal Agency Agreement which is of a formal, minor or technical nature or is made to correct a manifest error and (ii) any other modification (except as mentioned in this Agreement), and any waiver or authorization of any breach or proposed breach, of any of the provisions of this Agreement which is in the opinion of the Fiscal Agent not materially prejudicial to the interests of the registered holders of Securities.  Any such modification, authorization or waiver shall be binding on the registered holders of Securities of any Series and, if the Fiscal Agent so requires, such

24

ARG 0027

modification shall be notified to the registered holders of Securities of any Series as soon as practicable.

It shall not be necessary for the vote or consent of the registered holders of the Securities of any Series to approve the particular form of any proposed modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action, but it shall be sufficient if such vote or consent shall approve the substance thereof.

(c)   Any instrument given by or on behalf of any registered holder of a Security in connection with any consent to or vote for any such modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action will be irrevocable once given and will be conclusive and binding on all subsequent registered holders of such Security or any Security issued directly or indirectly in exchange or substitution therefor or in lieu thereof.   Any such modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action with respect to the Securities of a Series will be conclusive and binding on all registered holders of Securities of such Series, whether or not they have given such consent or cast such vote, and whether or not notation of such modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action is made upon the Securities of such Series. Notice of any modification or amendment or, supplement to, or request, demand, authorization, direction, notice, consent, waiver or other action with respect to the Securities of such Series or this Agreement (other than for purposes of curing any ambiguity or of curing, correcting or supplementing any defective provision hereof or thereof) shall be given to each registered holder of Securities of such Series, in all cases as provided in the Securities of such Series.

Securities of any Series authenticated and delivered after the effectiveness of any such modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action with respect to such Series may bear a notation in the form approved by the Fiscal Agent and the Republic as to any matter provided for in such modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action.  New Securities modified to conform, in the opinion of the Fiscal Agent and the Republic, to any such modification, amendment, supplement, request, demand, authorization, direction,

25

ARG 0028

notice, consent, waiver or other action may be prepared by the Republic, authenticated by the Fiscal Agent (or any authenticating agent appointed pursuant to Section 3 hereof) and delivered in exchange for Outstanding Securities of any Series.

(d)   For purposes of the provisions of this Agreement and the Securities of any Series, any Security authenticated and delivered pursuant to this Agreement shall, as of any date of determination, be deemed to be "Outstanding", except:

(i)   Securities of any Series theretofore cancelled by the Fiscal Agent or delivered to the Fiscal Agent for cancellation or held by the Fiscal Agent for reissuance but not reissued by the Fiscal Agent; or

(ii)   Securities of any Series which have become due and payable at maturity or otherwise and with respect to which monies sufficient to pay the principal thereof, premium, if any, and any interest thereon shall have been made available to the Fiscal Agent;

provided, however, that in determining whether the registered holders of the requisite principal amount of Outstanding Securities of any Series are present at a meeting of registered holders of Securities for quorum purposes or have consented to or voted in favor of any request, demand, authorization, direction, notice, consent, waiver, amendment, modification or supplement hereunder, Securities of any Series owned directly or indirectly by the Republic shall be disregarded and deemed not to be Outstanding.

17.   Further Issues.  The Republic may from time to time, without notice to or the consent of the registered holders of the Securities of a Series, create and issue further securities ranking pari passu with the Securities of such Series in all respects (or in all respects except for the payment of interest accruing prior to the issue date of such further securities or except for the first payment of interest following the issue date of such further securities) and so that such further securities shall be consolidated and form a single series with the Securities of such Series and shall have the same terms as to status, redemption or otherwise as the Securities.

18.   Reports.  (a)  The Fiscal Agent shall furnish to the Republic such reports as may be required by the Republic relative to the Fiscal Agent's performance under

26

ARG 0029

this Agreement.  The Republic may, whenever it deems it necessary, inspect books and records maintained by the Fiscal Agent pursuant to this Agreement, if any.

(b)   The Fiscal Agent shall (on behalf of the Holders) submit such reports or information as may be required from time to time in relation to the issue and purchase of Securities by applicable law, regulations and guidelines promulgated by the United States government.

(c)   The Republic covenants to notify the Fiscal Agent in writing immediately on becoming aware of any Event of Default or any event or circumstance which could with the giving of notice or lapse of time become an Event of Default (a "Potential Event of Default").

(d)   The Republic will send to the Fiscal Agent, on or before December 31 in each year (beginning with December 31, 1994), and within 14 days after any written notice by the Fiscal Agent, a certificate of the Republic signed by a duly authorized official of the Republic to the effect that, having made all reasonable inquiries, to the best knowledge of such duly authorized official, no Event of Default or Potential Event of Default has occurred and is continuing on the date of such certificate or, if an Event of Default or a Potential Event of Default has occurred, the circumstances surrounding it and the steps that the Republic has taken or proposes to take to remedy it.

(e)   The Republic will send to the Fiscal Agent as soon as practicable after being so requested by the Fiscal Agent a certificate of the Republic, signed by a duly authorized official of the Republic stating the aggregate principal amount of the Securities held by or on behalf of the Republic at the date of such certificate.

19.   Forwarding of Notice; Inquiries.  (a)  If the Fiscal Agent shall receive any notice or demand addressed to the Republic pursuant to the provisions of the Securities, the Fiscal Agent shall promptly forward such notice or demand to the Republic.

(b)   The Fiscal Agent shall respond promptly to any inquiries received from any registered holder of Securities regarding the matters covered by paragraphs (b), (c) or (d) of Section 18 of this Agreement.

20.   Listings.  In the event that the terms of the Securities of any Series provide for a listing on any stock exchange, the Republic agrees to use all reasonable endeavors to maintain the listing of the Securities on such

27

ARG 0030

exchange.  If, however, it is unable to do so, having used such endeavors, or if the maintenance of such listing is agreed by the Fiscal Agent to be unduly onerous and the Fiscal Agent is satisfied that the interests of registered holders of the Securities would not thereby be materially prejudiced, it will instead use all reasonable endeavors to obtain and maintain a listing of the Securities on such other stock exchange or exchanges as it may decide.

      21.  Notices.  (a)  Any communications from the Republic to the Fiscal Agent with respect to this Agreement shall be addressed to Bankers Trust Company, 4 Albany Street, New York, New York 10006, Fax No.: 212-250-6961 or 212-250-6392, Tel. No.: 212-250-6571 and any communications from the Fiscal Agent to the Republic with respect to this Agreement shall be addressed to the Subsecretaría de Financiamiento, Hipolito Yrigoyen 250, Piso 10 - Oficina 1001, 1310 - Buenos Aires, Attention: Deuda Externa, Fax No.: 011-54-1-349-6080, Tel. No.: 011-541-349-6242 (or such other address as shall be specified in writing by the Fiscal Agent or by the Republic, as the case may be) and shall be delivered in person or sent by first class prepaid post or by facsimile transmission subject, in the case of facsimile transmission, to confirmation by telephone to the foregoing addresses.  Such notice shall take effect in the case of delivery in person, at the time of delivery, in the case of delivery by first class prepaid post seven (7) business days after dispatch and in the case of delivery by facsimile transmission, at the time of confirmation by telephone.

      (b)  All notices to the registered holders of Securities of a Series will be published in such publications at such locations as any of the Securities of such Series are listed for the period of time of such listing and as otherwise provided pursuant to the terms of the Securities of such Series.  If at any time publication in any such publication is not practicable, notices will be valid if published in an English language newspaper with general circulation in the respective market regions as the Republic with the approval of the Fiscal Agent, shall determine.  [In addition, notices will be published in Spanish in a newspaper of general circulation in Argentina, as the Republic shall determine.]  Any such notice shall be deemed to have been given on the date of such publication or, if published more than once or on different dates, on the first date on which publication is made.  Written notice will also be given to the Depositary, if at the time of such notice any of the Securities is represented by a Global Security.

28

ARG 0031

22.  Consent to Service; Jurisdiction.  The Republic hereby appoints Banco de la Nación Argentina, at its office located at 299 Park Avenue, New York, New York 10171, and, if such person is not maintained by the Republic as its agent for such purpose, the Republic will appoint CT Corporation System to act as its agent for such purpose] as its authorized agent (the "Authorized Agent") upon whom process may be served in any action arising out of or based on the Securities or this Agreement by the holder of any Security which may be instituted in any state or federal court in The City of New York, and expressly accepts the jurisdiction of any such court in respect of such action. Such appointment shall be irrevocable until all amounts in respect of the principal of and any interest due and to become due on or in respect of all the Securities have been provided to the Fiscal Agent pursuant to the terms hereof, except that, if for any reason, such Authorized Agent ceases to be able to act as Authorized Agent or to have an address in the Borough of Manhattan, The City of New York, the Republic will appoint another person in the Borough of Manhattan, The City of New York, selected in its discretion, as such Authorized Agent.  Prior to the date of issuance of any Securities hereunder, the Republic shall obtain the consent of Banco de la Nación Argentina to its appointment as such Authorized Agent, a copy of which acceptance it shall provide to the Fiscal Agent.  The Republic shall take any and all action, including the filing of any and all documents and instruments, that may be necessary to continue such appointment or appointments in full force and effect as aforesaid.  Upon receipt of such service of process, the Authorized Agent shall advise the Subministry of Finance promptly by telecopier at 011-54-1-349-6080.  Service of process upon the Authorized Agent at the address indicated above, as such address may be changed within the Borough of Manhattan, The City of New York by notice given by the Authorized Agent to each party hereto, shall be deemed, in every respect, effective service of process upon the Republic.  The Republic hereby irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any aforesaid action arising out of or in connection with this Agreement brought in any such court has been brought in an inconvenient forum.  Neither such appointment nor such acceptance of jurisdiction shall be interpreted to include actions brought under the United States federal securities laws.  This appointment and acceptance of jurisdiction is intended to be effective upon execution of this agreement without any further act by the Republic before any such court and introduction of a true copy of this Agreement into evidence shall be conclusive and final evidence of such waiver.

29

ARG 0032

Notwithstanding the foregoing, any action arising out of or based on the Securities may be instituted by the holder of any Security in any competent court in the Republic of Argentina.

The Republic hereby irrevocably waives and agrees not to plead any immunity from the jurisdiction of any such court to which it might otherwise be entitled in any action arising out of or based on the Securities or this Agreement by the holder of any Security.

23.   Governing Law and Counterparts.   This Agreement shall be governed by, and interpreted in accordance with, the laws of the State of New York.   This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

24.   Headings.   The headings for the sections of this Agreement are for convenience only and are not part of this Agreement.

30

ARG 0033

IN WITNESS WHEREOF, the parties hereto have executed this Fiscal Agency Agreement as of the date first above written.

THE REPUBLIC OF ARGENTINA


By:  /s/ Noemi LaGreca
     Name:  Noemi LaGreca
     Title: Financial
        Representative of
           Argentina in the
           United States


BANKERS TRUST COMPANY


By:  /s/ Wanda Camacho
     Name:  Wanda Camacho
     Title: Assistant
        Secretary

31

ARG 0034

EXHIBIT A

FORM OF REGISTERED SECURITY

[Form of Face
of Security]

[If the Security is a global Security, insert a legend
relating to limitations on the transferability of such
global Security in such form as may be required by the U.S.
Depositary.]

[INSERT ANY LEGEND(S) REQUIRED BY THE INTERNAL REVENUE CODE]

THE REPUBLIC OF ARGENTINA

[Title of Series of Securities]

No. R-_____                              [Principal Amount]

Issue Price:

Original Issue Date:

Maturity Date:

Currency of Denomination:

Option to Receive Payments
in Specified Currency:              _____Yes   _____No

Authorized Denominations:

Form:                               ( )  Book-Entry
                                    ( )  Certificated

Initial Interest
Payment Date:

Interest Rate:

Interest Rate Reset:                ( )  The Interest Rate may not
                                         be changed prior to
                                         Maturity Date.

ARG 0035

( )  The Interest Rate may be
changed prior to Stated
Maturity (see attached).

Optional Reset Dates
(if applicable):

Interest Payment Dates:

Optional Extension of
Maturity Date:                        _____Yes  _____No

    Final Maturity:

Total Amount of OID:

Yield to Maturity:

Initial Accrual Period OID:

Optional Redemption:                  _____Yes  _____No

    Optional Redemption Dates:

    If applicable as described above, the Redemption Price
    shall initially be       % of the principal amount of
    this Security to be redeemed and shall decline at each
    anniversary of the Initial Redemption Date by       % of
    the principal amount to be redeemed until the
    Redemption Price is 100% of such principal amount;
    provided, however, that if this Security is a Discount
    Note (as defined below), the Redemption Price shall be
    the Amortized Face Amount (as defined below) of this
    Note.

Optional Repayment:                   _____Yes  _____No

    Optional Repayment Dates:

    Optional Repayment Prices:

Conversion into or
Exchange for
Other Securities               ( )  This Security may not be
                                    converted into or
                                    exchanged for other
                                    securities.

                               ( )  This Security may be
                                    converted into or

2

ARG 0036

exchanged for _____
[specify securities].

Terms of Conversion
or Exchange
(if applicable):

Indexed Note:   _____ Yes (see attached) _____ No

Exchange Rate Agent:

Other Terms:                  _____ Yes _____ No

A-3

ARG 0037

THE REPUBLIC OF ARGENTINA (herein called the
"Republic"), for value received, hereby promises to pay to
_____

or registered assigns, the principal sum of _____ U.S.
Dollars (U.S.$ _____) [other currency] on _____
[If the Security is to bear interest prior to maturity,
insert--, and to pay interest thereon from _____ or
from the most recent Interest Payment Date to which interest
has been paid or duly provided for, [specify frequency] in
arrears on [and _____] in each year,
commencing _____ (each an "Interest Payment Date"), at
the rate [of ____ % per annum] [to be determined in
accordance with the provisions hereinafter set forth], until
the principal hereof is paid or made available for payment.
The interest so payable, and punctually paid or duly
provided for, on any Interest Payment Date will, as provided
in the Fiscal Agency Agreement hereinafter referred to, be
paid to the person (the "registered Holder") in whose name
this Security (or one or more predecessor Securities) is
registered in the register of such Securities maintained
pursuant to the Fiscal Agency Agreement at the close of
business on the date (whether or not a business day) [, as
the case may be] (each a "Regular Record Date") [,] [_____
calendar days] next preceding such Interest Payment Date;
provided, however, that the first payment of interest on any
Security originally issued on a date between a Regular
Record Date and an Interest Payment Date or on an Interest
Payment Date will be made on the Interest Payment Date
following the next succeeding Regular Record Date to the
registered Holder on such next succeeding Regular Record
Date.  Any such interest not so punctually paid or duly
provided for will forthwith cease to be payable to the
registered Holder on such Regular Record Date and may either
be paid to the person in whose name this Security (or one or
more predecessor Securities) is registered at the close of
business on a special record date for the payment of such
interest to be fixed by the Republic, notice whereof shall
be given to registered Holders of Securities of this Series
not less than 10 days prior to such special record date, or
be paid at any time in any other lawful manner [not
inconsistent with the requirements of any securities
exchange on which the Securities of this series may be
listed, and upon such notice as may be required by such
exchange.]

        [Insert floating interest rate provisions, if
applicable.]

        [If the Security is not to bear interest prior to
maturity, insert--(the "Stated Maturity").  The principal of

A-4

ARG 0038

this Security shall not bear interest except in the case of a default in payment of principal upon acceleration, upon redemption or at Stated Maturity.]

Principal of (and premium, if any, on) [and interest payable at maturity or upon earlier redemption or repayment in respect of] this Security shall be payable in immediately available funds against surrender hereof at the corporate trust office of the Fiscal Agent hereinafter referred to and at the offices of such other Paying Agents as the Republic shall have appointed pursuant to the Fiscal Agency Agreement.  Payments of principal of (and premium, if any[, on]) [and interest on] this Security shall be made in same-day funds in accordance with the foregoing and subject to applicable laws and regulations, by [(if the Republic so elects) transfer to an account denominated in U.S. dollars which is maintained by the payee with [any] [a] bank [located in _____].  If the Republic does not so elect, payments of principal (and premium, if any) shall be made against surrender of this Security [if applicable, insert--, and payments of interest shall be made,] by] forwarding by post or otherwise delivering a check [on or before the due date for such payment] to the registered address of the registered Holder of this Security.  [If applicable, insert payment provisions for Securities denominated in a currency other than U.S. dollars].  This Security is a direct obligation of the Republic and does not have the benefit of any separate undertaking of other government entities (including Banco Central).  The Republic covenants that until all amounts in respect of the principal and interest due and to become due on or in respect of this Security have been paid as provided herein or in the Fiscal Agency Agreement, it will at all times maintain offices or agencies in the Borough of Manhattan, The City of New York for the payment of the principal of [and premium, if any[, on]) [and interest on] the Securities as herein provided.

Reference is hereby made to the further provisions of this Security set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon has been executed by the Fiscal Agent by manual signature, this Security shall not be valid or obligatory for any purpose.

λ-5

ARG 0039

IN WITNESS WHEREOF, the Republic has caused this instrument to be duly executed.

Dated:

THE REPUBLIC OF ARGENTINA

By_____
                [Title]

Attest:

_____
        [Title]

Date of Authentication:

This is one of the Securities of the series designated therein referred to in the within-mentioned Fiscal Agency Agreement.

BANKERS TRUST COMPANY,
as Fiscal Agent

By_____
        Authorized Signatory

A-6

ARG 0040

[Form of reverse
of Security]

This Security is one of a duly authorized issue of securities of the Republic (herein called the "Securities") issued and to be issued in one or more series in accordance with a Fiscal Agency Agreement, dated as of _____ (herein called the "Fiscal Agency Agreement"), between the Republic and Bankers Trust Company, as Fiscal Agent (herein called the "Fiscal Agent"), which term includes any successor fiscal agent under the Fiscal Agency Agreement), copies of which Fiscal Agency Agreement are on file and available for inspection at the corporate trust office of the Fiscal Agent in the Borough of Manhattan, The City of New York. This Security is one of the Securities of the Series designated on the face hereof[, limited in aggregate principal amount to U.S.$_____ ]. The Fiscal Agency Agreement may be amended from time to time in accordance with the terms thereof.

The Securities will constitute the direct, unconditional, unsecured and unsubordinated obligations of the Republic. Each Series will rank pari passu with each other Series, without any preference one over the other by reason of priority of date of issue or currency of payment or otherwise, and at least equally with all other present and future unsecured and unsubordinated External Indebtedness (as defined in the Fiscal Agency Agreement) of the Republic.

The Securities of this Series are issuable only in fully registered form. The Securities are issuable in [the] authorized denomination[s] of [currency/U.S.$_____ [and [any integral multiple thereof] [integral multiples of [currency/U.S.$_____ above that amount]].

Until all amounts in respect of the principal and interest due and to become due on or in respect of this Security have been paid, the Republic shall maintain in the Borough of Manhattan, The City of New York, an office or agency where Securities may be surrendered for registration of transfer or exchange. The Republic has initially appointed the corporate trust office of the Fiscal Agent as its agent in the Borough of Manhattan, The City of New York, for such purpose and has agreed to cause to be kept at such office a register in which subject to such reasonable regulations as it may prescribe, the Republic will provide for the registration of Securities and of transfers of Securities. The Republic reserves the right to vary or terminate the appointment of the Fiscal Agent as security

A-7

ARG 0041

registrar or transfer agent or to appoint additional or other registrars or transfer agents or to approve any change in the office through which any security registrar or any transfer agent acts, provided that there will at all times be a security registrar in the Borough of Manhattan, The City of New York.

Subject to the provisions on the face hereof concerning transfer restrictions, the transfer of a Security is registrable on the aforementioned register upon surrender of such Security at the corporate trust office of the Fiscal Agent duly endorsed by, or accompanied by a written instrument of transfer in form attached hereto duly executed by, the registered Holder thereof or his attorney duly authorized in writing. Upon such surrender of this Security for registration of transfer, the Republic shall execute, and the Fiscal Agent shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Securities, dated the date of authentication thereof, of any authorized denominations and of a like aggregate principal amount.

Subject to the provisions on the face hereof concerning transfer restrictions, at the option of the registered Holder upon request confirmed in writing, Securities may be exchanged for Securities of any authorized denominations and of a like aggregate principal amount, upon surrender of the Securities to be exchanged at the corporate trust office of the Fiscal Agent. Any registration of transfer or exchange will be effected upon the Fiscal Agent being satisfied with the documents of title and identity of the person making the request and subject to such reasonable regulations as the Republic may from time to time agree with the Fiscal Agent. Whenever any Securities are so surrendered for exchange, the Republic shall execute, and the Fiscal Agent shall authenticate and deliver, the Securities which the registered Holder making the exchange is entitled to receive. The new Security issued upon such exchange shall be so dated that neither gain nor loss of interest shall result from such exchange. [If the Security is a permanent global Security, insert--Notwithstanding the foregoing, the exchange of this Security is subject to certain limitations set forth in the Fiscal Agency Agreement and on the face hereof.]

[In the event of a redemption of the Securities of this series in part, the Republic shall not be required (i) to register the transfer of or exchange any Security during a period beginning at the opening of business 15 days before, and continuing until, the date notice is given identifying the Securities to be redeemed, or (ii) to

A-8

register the transfer of or exchange any Security, or
portion thereof, called for redemption.]

All Securities issued upon any registration of
transfer or exchange of Securities shall be the valid
obligation of the Republic evidencing the same indebtedness
and entitled to the same benefits this Security has at the
time of such registration of transfer or exchange.

No service charge shall be made for any
registration of transfer or exchange, but the Republic may
require payment of a sum sufficient to cover any tax or
other governmental charge payable in connection therewith,
other than an exchange in connection with a partial
redemption of a Security not involving any registration of a
transfer.

Prior to due presentment of this Security for
registration of transfer, the Republic, the Fiscal Agent and
any agent of the Republic or the Fiscal Agent may treat the
person in whose name this Security is registered as the
owner hereof for all purposes, whether or not this Security
is overdue, and neither the Republic nor the Fiscal Agent
nor any such agent shall be affected by notice to the
contrary.

In any case where the due date or the payment of
the principal of (and premium, if any[, on]) [or interest
on] any Security[, or the date fixed for redemption of any
Security,] shall be, at any place from which any check in
respect thereof is to be mailed or where such Security is to
be surrendered for payment [or, in the case of payments by
transfer, where such transfer is to be made], a day on which
banking institutions [If the Securities are denominated in
U.S. dollars, insert--in The City of New York] [If the
Securities are denominated in a currency other than U.S.
Dollars, insert--in [name of financial center of the country
in whose currency the securities are denominated] are
authorized or obligated by law to close [If the Securities
are denominated in a currency other than U.S. Dollars,
insert--or a day on which banking institutions in [name of
non-U.S. financial center] are not carrying out transactions
in [name of non-U.S. currency]], then such payment need not
be made on such date at such place but may be made on the
next succeeding day at such place which is not a day on
which banking institutions are authorized or obligated by
law to close, with the same force and effect as if made on
the date for such payment payable in respect of any such
delay.

A-9

ARG 0043

The Republic shall provide to the Fiscal Agent at
its principal office in the Borough of Manhattan, The City
of New York, prior to each date on which a payment on or in
respect of the Securities of this series shall become due,
monies in such amounts which (together with any amounts then
held by the Fiscal Agent and available for the purpose) are
sufficient to make such payment.  Any monies provided by the
Republic to the Fiscal Agent for the payment on or in
respect of the Securities of this series and remaining
unclaimed at the end of two years after such payment shall
have become due shall then be returned to the Republic, and
upon the return of such monies all liabilities of the Fiscal
Agent with respect thereto shall cease, without, however,
limiting in any way any obligation the Republic may have to
pay the principal of (or premium, if any[, on]) [or interest
on] this Security as the same shall become due.

So long as any Security remains outstanding, save
for the exceptions set forth in the Fiscal Agency Agreement,
the Republic will not create or permit to subsist, or permit
Banco Central to create or permit to subsist, any lien,
pledge, mortgage, security interest, deed of trust, charge
or other encumbrance or preferential arrangement which has
the practical effect of constituting a security interest
("Lien") upon the whole or any part of its assets or
revenues to secure any Public External Indebtedness (as
defined in the Fiscal Agency Agreement) of the Republic or
Banco Central unless, at the same time or prior thereto, the
Republic's obligations under the Securities either (i) are
secured equally and ratably therewith, or (ii) have the
benefit of such other security, guarantee, indemnity or
other arrangement as shall be approved by not less than 66
2/3% of the registered holders of Securities of any Series
then outstanding.

If an Event of Default (as defined in the Fiscal
Agency Agreement) occurs and is continuing then the holders
of not less than 25 percent in aggregate principal amount of
the Securities of this Series, by notice in writing to the
Republic at the specified office of the Fiscal Agent, shall
declare the principal amount of all the Securities of this
Series to be due and payable as set forth in the Fiscal
Agency Agreement.

All payments of principal, premium, if any, and
interest on this Security by the Republic will be made free
and clear of, and without withholding or deduction for or on
account of, any present or future taxes, duties, assessments
or governmental charges of whatever nature imposed, levied
collected, withheld or assessed by or within the Republic or
any authority therein or thereof having power to tax

A-10

ARG 0044

(together "Taxes"), unless such withholding or deduction is required by law.  In such event, the Republic shall pay such Additional Amounts as will result in receipt by the holders of Securities of this Series of such amounts of principal, premium and interest which would have been received by them had no such withholding or deduction been required, save for the exceptions set forth in the Fiscal Agency Agreement.

So long as any Security remains outstanding, the Republic covenants to maintain its membership in, and its eligibility to use the general resources of, the International Monetary Fund.

[The Securities of this Series will not be subject to any sinking fund and will not be redeemable except as described below.]

[The Securities of this Series are subject to redemption upon not less than 30 days' notice given as hereinafter provided, (if applicable, insert--(1) on _____ in any year commencing with the year ____ and ending with the year ____ through operation of the sinking fund for this series at a redemption price equal to 100% of the principal amount, (2)] [at any time [on or after _____, 19__], as a whole or in part, at the election of the Republic, at the following redemption prices (expressed as percentages of the principal amount of the Securities to be redeemed): If redeemed [on or before _____, ___%, _____ of the years indicated,

| Year | Redemption Price | Year | Redemption Price |
|------|------------------|------|------------------|
|      |                  |      |                  |

and thereafter at a redemption price equal to ___% of the principal amount, and (3)] under the circumstances described in the next succeeding paragraph at a redemption price equal to 100% of the principal amount of the Securities to be redeemed, together in each case with accrued interest (except if the redemption date is an Interest Payment Date) to the redemption date, but interest installments on Securities that are due on or prior to such redemption date will be payable to the holders of such Securities of record at the close of business on the relevant Record Dates referred to above; provided, that if the redemption date occurs between a Record Date and an Interest Payment Date, the interest due and payable will be paid to the holders of

A-11

ARG 0045

such Securities of record at the close of business on such Record Date. [Partial redemptions must be in an amount not less than U.S.$_____ principal amount of Securities.]

[As and for a sinking fund for the retirement of the Securities of this Series, the Republic will, until all Securities of this Series are paid or payment thereof provided for, deposit with the Fiscal Agent, prior to _____ in each year, commencing in ____ and ending in ____, an amount in cash sufficient to redeem on such _____ [not less than U.S.$_____ and not more than] U.S.$_____ principal amount of Securities of this Series at the redemption price specified above for redemption through operation of the sinking fund. [The minimum amount of any sinking fund payment as specified in this Paragraph is herein referred to as a "mandatory sinking fund payment", and any payment in excess of such minimum amount is herein referred to as an "optional sinking fund payment".] The cash amount of any [mandatory] sinking fund payment is subject to reduction as provided below. Each sinking fund payment shall be applied to the redemption of Securities in this Series on such _____ as herein provided. [The right to redeem Securities of this Series through optional sinking fund payments shall not be cumulative and to the extent not availed of on any sinking fund redemption date will terminate.]]

[Notwithstanding the foregoing, the Republic may not, prior to _____, redeem any Securities of this Series as [and optional sinking fund payment] contemplated by the preceding paragraph as a part of, or in anticipation of, any refunding operation by the application, directly or indirectly, of monies borrowed having an interest cost to the Republic (calculated in accordance with general accepted financial practice) of less than __% per annum.]

[Securities of this Series acquired or redeemed by the Republic otherwise than through [mandatory] sinking fund payments may be credited against subsequent [mandatory] sinking fund payments otherwise required to be made [in the inverse order in which they become due].]

[The Republic (i) may deliver outstanding Securities of this Series (other than any previously called for redemption) and (ii) may apply as a credit Securities of this series which have been redeemed otherwise than through the application of [mandatory] sinking fund payments, in each case in satisfaction of all or any part of any [mandatory] sinking fund payment and the amount of such [mandatory] sinking fund payment shall be reduced accordingly.]

A-12

ARG 0046

[In the case of any partial redemption of Securities of this Series pursuant to the sinking fund or at the option of the Republic, the Securities to be redeemed shall be selected by the Fiscal Agent not more than 60 days prior to the redemption date from the outstanding Securities not previously called for redemption, by such method as the Fiscal Agent shall deem fair and appropriate and which may provide for the selection for redemption of portions (equal to U.S.$_____ or any integral multiple thereof) of the principal amount of Securities of a denomination larger than U.S.$_____].

[This Security shall be redeemed, at the option of the registered Holder thereof, upon the occurrence, on or after _____, of a Redemption Event (as hereinafter defined), at the redemption price equal to 100% of the principal amount of this Security, together with interest accrued thereon to the date of redemption; provided, however, that the right of the registered Holder to present this Security [if the Security is a permanent global Security, insert--, or evidence of ownership of the Securities represented by this permanent global Security (as hereinafter provided),] for redemption shall, if the Republic gives a Notice of Redemption Event (as hereinafter defined), terminate upon expiration of the Option Period (as hereinafter defined) relating to such Redemption Event.  In the event of the occurrence of more than one Redemption Event, each such Redemption Event shall be deemed to confer upon the registered Holder of this Security a separate right of redemption.]

[The Republic agrees that, if a Redemption Event occurs, it will promptly give written notice thereof to the Fiscal Agent (a "Notice of Redemption Event").  Promptly after receiving such Notice of Redemption Event, the Fiscal Agent shall give written notice to the registered Holder of this Security (a "Notice of Right to Tender") stating that a Redemption Event has occurred and including a form of notice (a "Redemption Notice") pursuant to which the registered Holder of this Security may elect to cause redemption.  The Republic may, but shall not be obligated to, fix a record date for the purpose of determining the registered Holders of Securities of this series entitled to elect to cause redemption of any such Holder elects to cause redemption of this Security, deliver the Redemption Notice, together with the certificate or certificates representing the Securities to be redeemed [if the Security is a permanent global Security, insert--, or evidence of ownership of the Securities represented by this permanent global Security (as hereinafter provided),] to the Fiscal Agent within a period of 60 days (the "Option Period") of the date of the Notice

A-13

ARG 0047

of Right to Tender, and [(ii) the Republic shall select a
date for redemption (the "Redemption Date"), which shall be
within 60 days from the end of the Option Period, and, on
the Redemption Date, shall redeem the Securities tendered
for redemption within the Option Period.  At least 10 days
prior to the Redemption Date, the Republic shall [(i)]
deliver notice of the Redemption Date in the manner provided
for herein to each registered Holder who requested
redemption[, or (ii) publish notice of the Redemption Date
in the manner provided for herein, as the case may be].]

        [If the Security is a permanent global Security.
insert—It is understood that, notwithstanding the foregoing
provisions relating to redemption at the option of a
registered Holder and without otherwise limiting any right
of any other registered Holder to act by agent or proxy, the
Fiscal Agent may treat a person authorized, in a manner
satisfactory to the Fiscal Agent, by the U.S. Depositary to
take action in respect of a portion of this permanent global
Security as the registered Holder of such portion of such
Security and may make arrangements satisfactory to it, the
Republic and the U.S. Depositary in connection with this
partial redemption of this permanent global Security.]

        [Insert description of those events, if any, which
constitute Redemption Events.]

        [If notice of redemption has been given in the
manner set forth herein, the Securities so to be redeemed
shall become due and payable on the redemption date
specified in such notice and upon presentation and surrender
of the Securities [if the Security is a permanent global
Security. insert--, or evidence of ownership of the
Securities represented by this permanent global Security
satisfactory to the Fiscal Agent,] at the place or places
specified in such notice, the Securities shall be paid and
redeemed by the Republic et the places, in the manner and
currency and at the redemption price herein specified
together with accrued interest (unless the redemption date
is an Interest Payment Date) to the redemption date.  From
and after the redemption date, if monies for the redemption
of Securities called for redemption shall have been made
available at the corporate trust office of the Fiscal Agent
for redemption on the redemption date, the Securities called
for redemption shall cease to bear interest, and the only
right of the holder of such Securities shall be to receive
payment of the redemption price together with accrued
interest (unless the redemption date is an Interest Payment
Date) to the redemption date as aforesaid.  If monies for
the redemption of the Securities are not made available for
payment until after the redemption date, the Securities

A-14

ARG 0048

called for redemption shall not cease to bear interest until such monies have been so made available.]

[Any Security which is to be redeemed only in part shall be surrendered with, if the Republic or the Fiscal Agent so requires, due endorsement by, or a written instrument of transfer in form satisfactory to the Republic and the Fiscal Agent duly executed by, the holder thereof or such holder's attorney duly authorized in writing, and the Republic shall execute, and the Fiscal Agent shall authenticate and deliver to the registered Holder of such Security without service charge, a new Security or Securities of this Series, of any authorized denomination as required by such Holder, in aggregate principal amount equal to and in exchange for the unredeemed portion of the principal of the Security so surrendered.]

A meeting of registered holders of Securities of this Series may be called at any time and from time to time to make, give or take any request, demand, authorization, direction, notice, consent, waiver or other action provided by the Fiscal Agency Agreement or the Securities of this Series to be made, given or taken by registered holders of Securities of this Series or to modify, amend or supplement the terms of the Securities of this Series or the Fiscal Agency Agreement as hereinafter provided. The Fiscal Agent may at any time call a meeting of registered holders of Securities of this Series for any such purpose to be held at such time and at such place as the Fiscal Agent shall determine. Notice of every meeting of registered holders of Securities of this Series, setting forth the time and the place of such meeting and in general terms the action proposed to be taken at such meeting, shall be given as provided in the terms of the Securities of this Series, not less than 30 nor more than 60 days prior to the date fixed for the meeting. In case at any time the Republic or the registered holders of at least 10% in aggregate principal amount of the Outstanding Securities of this Series (as defined in the Fiscal Agency Agreement) shall have requested the Fiscal Agent to call a meeting of the registered holders of Securities of this Series for any such purpose, by written request setting forth in reasonable detail the action proposed to be taken at the meeting, the Fiscal Agent shall call such meeting for such purposes by giving notice thereof.

At any meeting of registered holders of Securities duly called and held as specified above, upon the affirmative vote, in person or by proxy thereunto duly authorized in writing, of the registered holders of not less than 66-2/3% [or ___ %] in aggregate principal amount of the

A-15

ARG 0049

Securities of this Series then Outstanding, or (ii) with the written consent of the registered holders of not less than 66-2/3% [or ___ %] in aggregate principal amount of the Securities of this Series then Outstanding, the Republic [and the Fiscal Agent] may modify, amend or supplement the terms or provisions contained in the Securities of this Series, in any way, and the registered holders of Securities of this Series may make, take or give any request, demand, authorization, direction, notice, consent, waiver or other action provided by the Fiscal Agency Agreement or the Securities of this Series to be made, given, or taken by registered holders of Securities of this Series; provided, however, that no such action may, without the consent of the registered holder of each Security, (A) change the due date for the payment of the principal of or any installment of interest on any Security, (B) reduce the principal amount of any Security, the portion of such principal amount which is payable upon acceleration of the maturity of such Security or the interest rate thereon, (C) change the coin or currency in which or the required places at which payment with respect to interest or principal in respect of the Securities of this Series is payable, (D) reduce the proportion of the principal amount of Securities of this Series the vote or consent of the holders of which is necessary to modify, amend or supplement this Agreement or the terms and conditions of the Securities of this Series or to make, take or give any request, demand, authorization, direction, notice, consent, waiver or other action provided hereby or thereby to be made, taken or given, or (E) change the obligation of the Republic to pay additional amounts.

The Fiscal Agent and the Republic may agree, without the consent of the registered holders of Securities of this Series to (i) any modification of any provisions of the Fiscal agency Agreement which is of a formal, minor or technical nature or is made to correct a manifest error and (ii) any other modification (except as mentioned in the Fiscal Agency Agreement), and any waiver or authorization of any breach or proposed breach, of any of the provisions of the fiscal Agency Agreement which is in the opinion of the Fiscal Agent not materially prejudicial to the interests of the registered holders of Securities.  Any such modification, authorization or waiver shall be binding on the registered holders of Securities of this Series and, if the Fiscal Agent so requires, such modification shall be notified to the registered holders of Securities of this Series as soon as practicable.

All notices to the registered holders of Securities will be published in such publications at such locations as any of the Securities are listed for the period

A-16

ARG 0050

of time of such listing and as otherwise provided pursuant to the terms of the Securities of this Series. If at any time publication in any such publication is not practicable, notices will be valid if published in an English language newspaper with general circulation in the respective market regions as the Republic with the approval of the Fiscal Agent, shall determine. In addition, notices will be published in Spanish in a newspaper of general circulation in Argentina, as the Republic shall determine. Any such notice shall be deemed to have been given on the date of such publication or, if published more than once or on different dates, on the first date on which publication is made.

No reference herein to the Fiscal Agency Agreement and no provision of this Security or of the Fiscal Agency Agreement shall alter or impair the obligation of the Republic to pay the principal of (and premium, if any[, on]) [and interest on] this Security at the times, place and rate, and in the coin or currency, herein prescribed.

Claims against the Republic for payment in respect of the Securities of this Series and interest payments thereon shall be prescribed and become void unless made within 10 years (in the case of principal) and 5 years (in the case of interest) from the appropriate Relevant Date in respect thereof.

This Security shall be governed by and construed in accordance with the laws of the State of New York, except with respect to authorization and execution by the Republic.

The Republic has in the Fiscal Agency Agreement irrevocably submitted to the jurisdiction of any New York state or federal court sitting in the Borough of Manhattan, The City of New York and the courts of the Republic of Argentina (the "Specified Courts") over any suit, action, or proceeding against it or its properties, assets or revenues with respect to the Securities of this Series or the Fiscal Agency Agreement (a "Related Proceeding"). The Republic has in the Fiscal Agency Agreement waived any objection to Related Proceedings in such courts whether on the grounds of venue, residence or domicile or on the ground that the Related Proceedings have been brought in an inconvenient forum. The Republic agrees that a final non-appealable judgment in any such Related Proceeding (the "Related Judgment") shall be conclusive and binding upon it and may be enforced in any Specified Court or in any other courts to the jurisdiction of which the Republic is or may be subject (the "Other Courts"), by a suit upon such judgment.

A-17

ARG 0051

The Republic has in the Fiscal Agency Agreement agreed that (i) service of all writs, process and summonses in any Related Proceeding or any action or proceeding to enforce or execute any Related Judgment brought against it in the State of New York may be made upon Banco de la Nación Argentina, presently located at 399 Park Avenue, New York, New York 10171, and, if such person is not maintained by the Republic as its agent for such purpose, the Republic will appoint CT Corporation System to act as its agent for such purpose.

To the extent that the Republic or any of its revenues, assets or properties shall be entitled, in any jurisdiction in which any Specified Court is located, in which any Related Proceeding may at any time be brought against it or any of its revenues, assets or properties, or in any jurisdiction in which any Specified Court or Other Court is located in which any suit, action or proceeding may at any time be brought solely for the purpose of enforcing or executing any Related Judgment, to any immunity from suit, from the jurisdiction of any such court, from set-off, from attachment prior to judgment, form attachment in aid of execution of judgment, from execution of a judgment or from any other legal or judicial process or remedy, and to the extent that in any such jurisdiction there shall be attributed such an immunity, the Republic has irrevocably agreed not to claim and has irrevocably waived such immunity to the fullest extent permitted by the laws of such jurisdiction (and consents generally for the purposes of the Foreign Sovereign Immunities Act to the giving of any relief or the issue of any process in connection with any Related Proceeding or Related Judgment), provided that such waiver shall not be effective (i) with respect to the assets which constitute freely available reserves pursuant to Article 6 of the Convertibility Law (the "Convertibility Law"), the amount, composition and investment of which will be reflected on the balance sheet and accounting statement of Banco Central consistently prepared pursuant to Article 5 of the Convertibility Law and (ii) with respect to property of the public domain located in the territory of The Republic of Argentina or property owned by the Republic and located in its territory which is dedicated to the purpose of an essential public service, and provided further that such agreement and waiver, insofar as it relates to any jurisdiction other than a jurisdiction in which a Specified Court is located, is given solely for the purpose of enabling the Fiscal Agent or a holder of Securities of this Series to enforce or execute a Related Judgment.  The waiver of immunities referred to herein constitutes only a limited and specific waiver for the purpose of the Securities of this Series and the Fiscal Agency Agreement and under no

A-18

ARG 0052

circumstances shall it be interpreted as a general waiver of the Republic or a waiver with respect to proceedings unrelated to the Securities of this Series or the Fiscal Agency Agreement.

Unless the certificate of authentication hereon has been executed by the Fiscal Agent by manual signature, this Security shall not be entitled to any benefit under the Fiscal Agency Agreement or be valid or obligatory for any purpose.

A-19

ARG 0053

FOR VALUE RECEIVED the undersigned hereby sell(s), assigns
or transfers unto
PLEASE INSERT SOCIAL SECURITY OR OTHER
  IDENTIFYING NUMBER OF ASSIGNEE

_____

Please print or typewrite name and address including postal

zip code of assignee

the within Security and all rights thereunder, hereby

irrevocably constituting and appointing to transfer such

Security on the books of the Trustee, with full power of

substitution in the premises.

Dated: _____     Signature: _____

                                  Notice:  the signature to
                                  this assignment must
                                  correspond with the name
                                  as written upon the face
                                  of the written instrument
                                  in every particular,
                                  without alteration or
                                  enlargement or any change
                                  whatever.

A-20

ARG 0054

# **Exhibit 7**

1

F4M7NMLC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   NML CAPITAL, LTD.,

4                   Plaintiff,

5            v.                        08 Civ 6978 (TPG)

6   THE REPUBLIC OF ARGENTINA,

7                   Defendant.

8   ------------------------------x
                                      New York, N.Y.
9                                     April 22, 2015
                                      1:00 p.m.
10
    Before:
11
                      HON. THOMAS P. GRIESA
12
                                      District Judge
13
                          APPEARANCES
14
    DECHERT LLP
15       Attorneys for Plaintiff NML Capital LLC
    BY:  ROBERT COHEN
16
    FRIEDMAN KAPLAN SEILER & ADELMAN LLP
17       Attorneys for Plaintiffs Aurelius Capital Master, Ltd.
    BY:  EDWARD FRIEDMAN
18       DANIEL RAPPORT

19  SIMON LESSOR P.C.
         Attorneys for Plaintiff Olifant Fund, Ltd.
20  BY:  LEONARD LESSER

21  CLEARY GOTTLIEB STEEN & HAMILTON LLP
         Attorneys for Defendant The Republic of Argentina
22  BY:  JONATHAN BLACKMAN
         CARMINE BOCCUZZI
23       EZEQUIEL HERRERA
         KRISTIN BRESNAHAN
24

25


                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

2

F4M7NMLC

1    APPEARANCES (Continued)

2    MOSES & SINGER
          Attorneys for nonparty Deutsche Bank
3    BY:  PHILIPPE ZIMMERMAN
          VALERIA CASTERARO

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

F4M7NMLC

1          (Case called)

2          (In open court)

3          THE COURT:  NML asked for this meeting, so would you

4    lead off, please.

5          MR. COHEN:  Yes, your Honor.  Good afternoon, your

6    Honor.  Robert Cohen from Dechert on behalf of NML and speaking

7    for the moment on behalf of the other plaintiffs with pari

8    passu injunctions.

9          Your Honor, we are here to ask for an order to show

10   cause with a requirement that Argentina and two banks provide

11   to us on an urgent immediate yet basis information with respect

12   to a bond offering that Argentina announced on Tuesday that

13   will we think close perhaps tomorrow, maybe on Friday.

14         Now, your Honor, you will remember that we were before

15   you in February in a similar situation where we asked for

16   expedited discovery from two banks, and you allowed us to have

17   that discovery, and in response to that that offering was

18   canceled.

19         The headline in an Argentine newspaper on Tuesday says

20   "Government Issues Debt of U.S. $500 million Domestically Today

21   In Order to Evade Griesa."

22         Now, there are several other articles that indicate

23   that the way that this offering is structured is somehow

24   designed to evade this court's orders.  We are not suggesting,

25   your Honor, that Argentina may not raise new money.  We are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3067160.1

4

F4M7NMLC

1    suggesting, your Honor, that they may not do things in the

2    course of that that facilitate the evasion of your injunctions,

3    and they may not do it in a way that is designed to prevent

4    creditors of Argentina from having opportunities to perhaps,

5    for example, attach the proceeds of those offerings.

6            We understand that two banks in New York have

7    subscribed to this offering which is now reported to be almost

8    one and a half billion dollars.

9            THE COURT:  What bank has subscribed?

10           MR. COHEN:  We understand that Deutsche Bank and a

11   bank whose acronym is BBVA.  It's a foreign bank with a

12   presence in New York.  And perhaps other banks.

13           THE COURT:  Give me those initials again.

14           MR. COHEN:  BBVA.

15           THE COURT:  You have to say it again.

16           MR. COHEN:  B as in boy, B as in boy, V as in Victor,

17   A as in Alpha.

18           THE COURT:  And is it your information that that is a

19   bank?

20           MR. COHEN:  Yes, your Honor.  And the information we

21   have is that Deutsche Bank has subscribed either on behalf of

22   itself or customers for about a billion dollars of these bonds,

23   and that BBVA has subscribed for as much as $400 million

24   dollars.  Those numbers are reported in the press.  We are not

25   vouching for them, but that's what we understand.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F4M7NMLC

1              THE COURT:  And the amount of the bond offering again

2       is what?

3              MR. COHEN:  It could be up to a billion five.  So, we

4       think that might be substantially all that has been subscribed.

5       But we have had other reports that it's even bigger and that

6       there are aspects of this offering that are being done in

7       Europe.  We have heard that JP Morgan may be involved.  We're

8       not sure.  But we do have unreasonably good authority that at

9       least those two banks are involved, Deutsche Bank and BBVA.

10             What we are asking for, your Honor, is that you

11      require Argentina to tell us about this transaction.  By that I

12      mean we want to know how the money is flowing to Argentina.

13             THE COURT:  How what?

14             MR. COHEN:  How the money that is going to Argentina

15      to buy these bonds will flow, if Deutsche Bank or BBVA is going

16      to be buying these bonds, how do they send the money to

17      Argentina.  We may hear that that's a transaction that takes

18      place solely in Argentina, and there is nothing to do with New

19      York, and this is entirely within Argentina, so there is

20      nothing for this court to do and nothing for those banks to

21      tell us.  That may be the case.  If that were the case, maybe

22      we will have wasted our time and the court's time.

23             But we would like to have under oath answers to those

24      questions.  We have had discovery outstanding with Argentina

25      for many months, actually years.  Your Honor ordered them to

6

F4M7NMLC

1   provide to us.  The Second Circuit affirmed that we should have

2   that discovery, set deadlines; we never got it.  We are

3   skeptical that we are going to get anything in response to the

4   documents requests if you allow us to serve them.  And we may

5   have to come back to the court and say, your Honor, if they

6   won't give us this information, you may have to suspend the

7   closing of this transaction -- which may happen tomorrow or the

8   day after -- until we have an opportunity to understand exactly

9   what is happening here.

10       That's our request:  Let us serve discovery on

11  Argentina, with a very, very short return time.  I would like

12  to have it this evening or late tonight.  This is a transaction

13  that is in the works as we speak, so the idea that those

14  documents are not available is not a believable or acceptable

15  answer.  And to serve Deutsche Bank and BBVA, to get

16  information from them on a reasonable timetable for them,

17  hopefully today, if not tomorrow morning, so that we can have

18  that information in time to do something about it.

19       THE COURT:  Now, look, what is it that could involve

20  the jurisdiction of this court?  And I am talking about the

21  proposed new bond offering.  What about that new bond offering

22  could invoke the jurisdiction of this court?  And what could

23  reasonably be opposed by you as some step that this court could

24  take in regard to the new bond offering?

25       MR. COHEN:  With respect to jurisdiction, your Honor,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3067160.1

7

F4M7NMLC

1   of course Argentina is before the court and is subject to the

2   court's jurisdiction and injunctions and directions.

3          THE COURT:  I have no problem with personal

4   jurisdiction.  Well, I won't go even that far.  But, anyway, I

5   want to hear from you in response to my questions.

6          MR. COHEN:  Sure.  And with respect to the other two

7   banks, there is jurisdiction because they are here.  And, for

8   example, if they owed a debt to Argentina --

9          THE COURT:  Actually, I'm really talking about subject

10  matter jurisdiction right now.  That's what I'm talking about.

11         MR. COHEN:  OK.  Your Honor, the dispute that we have

12  with Argentina extends to, for example, post-judgment

13  enforcement actions.  So if we were able to find that a debt

14  was due from Deutsche Bank, or BBVA, to Argentina as a result

15  of this transaction, you could allow us to attach that debt in

16  New York, being used for commercial activity in New York, to

17  partially satisfy our debt.  So that's one easy product of this

18  discovery if we get it.

19         THE COURT:  When you refer to your debt, you're

20  referring to this long-standing debt --

21         MR. COHEN:  Our judgment.

22         THE COURT:  -- including judgments.

23         MR. COHEN:  Judgment enforcement debt, your Honor.

24  Yes, enforcement of our judgments.  Not the pari passu clause,

25  but we are owed close to $3 billion by Argentina, and we have

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3067160.1

8

F4M7NMLC

1    judgments.

2           THE COURT:  That's what I'm talking about.  In other

3    words, you have this debt that really relates back to the

4    default on the 1994 bond issue, right?

5           MR. COHEN:  Yes, your Honor.

6           THE COURT:  And that debt has been outstanding now for

7    what, a dozen years or how long.

8           MR. COHEN:  Yes, your Honor.  The default was in 2001;

9    we have judgments that go back to the early 2000s.

10          THE COURT:  So, you've got debt which is now about 14

11   years old, right?

12          MR. COHEN:  Roughly, your Honor, yes.

13          THE COURT:  Roughly, 13 or 14.

14          Now, I go back to my question you started to answer

15   when I interrupted you.  What is it that you believe could even

16   potentially be done by this court in connection with the debt

17   we are talking about?  Obviously I'm talking about something

18   relating to the new debt.

19          MR. COHEN:  Yes, this bond offering that's about to

20   happen, what could the court do?  What relief could you give

21   us?  One example is discovery from the banks as to how the

22   transaction is going to unfold, and when they will owe money to

23   Argentina, and where that money is.

24          THE COURT:  OK, list that again.  Discovery on what

25   points?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F4M7NMLC

1            MR. COHEN:  How the transaction works.  By that I mean

2     when do they get their bonds and when do they have to tender

3     their money in exchange for those bonds.  How does that

4     transaction work?  And is there a time when they owe money to

5     Argentina while the money has not yet gone to Argentina in

6     payment of those bonds?  And if we can find that moment -- they

7     bought the bonds, they haven't yet paid for them -- we should

8     be able to attach that debt to Argentina to satisfy our debt.

9            So, if Deutsche Bank is buying a million dollars of

10    these bonds, and hasn't yet paid for them but is obligated to

11    do so, we can say don't pay Argentina, pay NML.

12           That's how a standard attachment would work.  We would

13    have to satisfy you that we meet all the tests in the Foreign

14    Sovereign Immunities Act about that debt, that it's in the

15    U.S., that the obligation is an obligation of Argentina's and

16    it's being used for commercial activity and all of those

17    things, but we don't get there until we get to discovery and

18    see whether or not there is the possibility of doing that.

19           There are other things, I think, your Honor, that I

20    think would be very useful as this matter unfolds.  When we

21    were dealing with the Citibank case, you remember there was

22    this issue about ISINs, what number were attached to certain

23    bonds, and that complicated things.  We would like to know

24    whether they are trying to do that again, trying to complicate

25    things by using ISINs that were previously applied to exchange

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

F4M7NMLC

1    bonds.

2                THE COURT:  What are those initials again?

3                MR. COHEN:  ISIN.  And we would like to know if there

4    is a plan afoot to evade.  The headlines say that this is a

5    transaction that was done in order to evade Griesa.  Now, we

6    don't know exactly what that means.  We would like to get

7    communications between Argentina and people who might be

8    interested in this transaction, to find out if they are trying

9    to find ways to get around the injunction, possibly making the

10   existing injunction of relatively little value if they can find

11   ways around New York and this court.  So, tell us how this deal

12   works, what is the deal dynamic and how did it come about.

13   That's what we answer, your Honor.

14               THE COURT:  OK.  I guess we ought to hear from The

15   Republic.

16               MR. BLACKMAN:  Thank you, your Honor.  Jonathan

17   Blackman for Republic of Argentina.

18               First of all, your Honor, there is no emergency

19   whatever here.  Argentina has entered into similar issuances of

20   new debt for many years and did so last year with exactly the

21   same bonds that we are talking about now.

22               Mr. Cohen admitted to you -- as he had to do -- that

23   there is nothing in the 1994 Fiscal Agency Agreement, nothing

24   in the court's injunctions, nothing anywhere else that forbids

25   Argentina from borrowing new money from people.  So, Argentina,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3067160.1

F4M7NMLC

1   like any state, is allowed to borrow money and finance itself,

2   and it has been doing so on a regular basis for over a decade.

3   Just as the United States sells treasury bills in auctions

4   every week, Argentina has done an auction of new debt.  It's a

5   purely domestic transaction; it has no road show externally; it

6   has no external offering documents.  So, there is nothing

7   unusual and there is nothing --

8            THE COURT:  Let me interrupt you there.  You are

9   talking about what method of raising money.

10           MR. BLACKMAN:  Correct.

11           THE COURT:  Just expand on that.

12           MR. BLACKMAN:  I'm saying that not only, as Mr. Cohen

13   admits, is there nothing unlawful about Argentina raising new

14   money, but the particular way it is raising new money here does

15   not implicate in any way the pari passu clause, because this is

16   a purely internal domestic Argentine debt offering of a kind

17   that Argentina has done repeatedly over many years, so it

18   doesn't involve so-called external indebtedness, which might

19   raise an issue under the pari passu clause, and it certainly

20   doesn't involve exchange bonds which were the subject of the

21   court's injunction.

22           THE COURT:  Let me interrupt you.

23           I'm not sure whether this has significance or not, but

24   I'm going to ask it.  What you say is over these years

25   Argentina has raised money through debt, right?

12

F4M7NMLC

1              MR. BLACKMAN:  Correct, your Honor.

2              THE COURT:  And has that been a form of debt like U.S.

3      treasury notes?  Or has it been bonds?  What has gone on?

4      Because right now apparently there are bonds contemplated.  So

5      what is going on over the years?

6              MR. BLACKMAN:  What has gone on over the years I

7      believe is a variety of instruments.  These particular

8      instruments are called BONARS, and they are domestic debt.

9      Whether you call them a bond, or whether they are the

10     equivalent of a T-bill, I can't answer that question

11     definitively, but they are debt.  They are not short-term debt

12     like a T-bill, they are longer term debt.

13             But the important point to be paid legally is these

14     are domestic debt that Argentina uses to finance itself.  This

15     particular debt will be used for infrastructure in Argentina;

16     it will be used to pay social charges in Argentina.  It's

17     general obligation bonds, if you will, but purely internal, not

18     external indebtedness.

19             THE COURT:  When you say purely internal, what do you

20     mean?

21             MR. BLACKMAN:  Offered exclusively in Argentina and

22     therefore not falling within the definition in the 1994 Fiscal

23     Agency Agreement of external indebtedness that was the subject

24     of the court's pari passu decisions and the subject of the

25     injunction.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

3067160.1

F4M7NMLC

1           So, for Mr. Cohen to say this is "evading any order of

2      the court" is just flat out wrong.  The Argentine press prints

3      a lot of things, and some of them are planted by his client.

4      But there is no evasion.

5           THE COURT:  In fairness to Mr. Cohen, I think he was

6      quoting the press but not adopting the press.

7           MR. BLACKMAN:  Well, I don't know why he quoted it

8      then, because the fact is this couldn't possibly evade the

9      court's injunctions, because the court's injunctions involve

10     payment on exchange bonds which are a form of external

11     indebtedness, and these are not exchange bonds, not external

12     indebtedness.  And, as he began by saying, and as I began by

13     saying, even if they were, borrowing new money doesn't violate

14     the court's injunctions, doesn't violate the pari passu clause.

15     So what he wants to do is fish.  He wants to fish.

16          THE COURT:  He wants what?

17          MR. BLACKMAN:  He wants to fish.  He is hoping to find

18     something here to attach.

19          Well, the fact of the matter is this is a purely

20     internal transaction.  There is not going to be any money owed

21     in the United States to Argentina, and if there were, that debt

22     would not be used for commercial activity in the United States,

23     as the Sovereign Immunities Act requires; it would be a debt to

24     purchase domestic bonds in Argentina by a financial institution

25     that has gone to Argentina to purchase those bonds.  So, there

F4M7NMLC

1       is no basis that has been shown here for emergency discovery.

2               And now we turn to not only is there no emergency, but

3       what is being asked for here is on its face -- with all respect

4       to Mr. Cohen -- ridiculous.  He says in his order that he wants

5       us to produce documents by 6 p.m.  That's four and a half hours

6       from now, in response to a document request that hasn't even

7       been served.  That just is obviously not doable.

8               And what he said earlier was quite revealing.  He

9       said, well, if that ridiculous deadline isn't met, he will ask

10      the court to enjoin or stop this transaction.  And your Honor

11      quite rightly asked how do you have jurisdiction to do that.

12      And you don't.  Argentina agreed to jurisdiction for suits

13      under the FAA bonds.  There is no case that I am aware of, and

14      no legal basis on which your Honor could enjoin somebody from

15      going to Argentina to buy Argentina domestic debt.  That would

16      in effect be telling your court that you can shut down the

17      Argentine economy.

18              The pari passu injunctions have been much debated and

19      litigated -- I'm not going to go into them here -- but they

20      have nothing whatsoever to do with what is now being proposed

21      by Mr. Cohen, which is to try to interfere with a local debt

22      offering in Argentina.

23              There is no evidence whatsoever of any property in the

24      United States that could be covered or attached.  And, your

25      Honor, this issue came up in the Rossini case before your

15

F4M7NMLC

1    Honor, another one of our Argentine debt cases.  And the

2    Rossini plaintiffs tried to attack and to get discovery of a

3    local debt offering.  Your Honor said, no, that's outside the

4    scope of what is permissible, and the Second Circuit affirmed

5    you.

6           So, this is not, you know, a new theory or new ground.

7    It has been attempted before, and it has been attempted

8    unsuccessfully, because there is simply no basis for what is

9    being sought.

10          The idea that this transaction can be interfered with

11   on a half a day's notice, or should be the basis for emergency

12   discovery, when this is a transaction like many others that

13   have occurred over the years, just has no foundation.

14          THE COURT:  Look, the problem is that there is a large

15   debt that has been owed by The Republic to various parties

16   dating back 13 years or so.  And I'm not trying to get into the

17   complications, because there are complications.  There is debt

18   that originated in the 1994 bonds and have been the subject of

19   exchange bonds and so forth.

20          But I'm just speaking in a very general way, and, that

21   is, there is a very substantial debt that has been unpaid for

22   all these years and remains unpaid.  There is nothing more to

23   be done on that debt in the way of -- I'm speaking a little

24   inaccurately but substantially -- there is no real function for

25   additional judgments, additional orders of the court in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

16

F4M7NMLC

1    response to motions; that's all over with.

2            What remains is taking care of the debt as it exists,

3    subject to the injunction, etc.  I have appointed a special

4    master to help negotiate a settlement of that debt, and I hope

5    The Republic at long last will be willing to negotiate.

6            As far as Mr. Cohen's presence here today and the new

7    bond offering, essentially what Mr. Cohen is seeking is

8    information that might lead him to a way to find assets that

9    could be applied to his debt.  Right, Mr. Cohen?

10           MR. COHEN:  Yes, your Honor.

11           THE COURT:  OK.  Now, that is a very legitimate

12   inquiry.  It is a very legitimate quest.  And his inquiry today

13   is occasioned by the new bond offering which both of you have

14   discussed.

15           I don't know whether the new bond offering follows a

16   pattern of financings that have occurred over the last ten

17   years or so.  I don't know.  But there is apparently this new

18   bond offering, and there is enough information about it, even

19   from your statement, to indicate that something will take

20   place.

21           Now, what does the court do in response to Mr. Cohen's

22   request and your objections?  We start with jurisdiction.  This

23   court had jurisdiction over the earlier financing because

24   jurisdiction of the court was agreed to in the basic debt

25   instrument.  There is no such instrument to my knowledge now.

17

F4M7NMLC

1          MR. BLACKMAN:  That's correct.

2          THE COURT:  And there is no indication or claim by

3    anybody that the new debt is issued pursuant to the old debt

4    instrument.

5          MR. BLACKMAN:  Correct.

6          THE COURT:  Mr. Cohen, let me go back to you.  What is

7    the basis that you say -- if you do say -- what do you say

8    about subject matter jurisdiction?

9          MR. COHEN:  This is post-judgment enforcement

10   discovery, your Honor.  As you described it, we have judgments.

11         THE COURT:  I'm not hearing you very well.

12         MR. COHEN:  This is post-judgment enforcement

13   discovery.  As your Honor recited, we have had judgments for

14   many, many years.  We think we may have an asset that is

15   attachable in this jurisdiction, and you have jurisdiction in

16   assisting us to gathering information, discovery, with respect

17   to potential assets.

18         THE COURT:  You are asserting subject matter

19   jurisdiction on the basis that has been asserted over the

20   years.  You are attempting to recover on those earlier --

21         MR. COHEN:  -- judgments.

22         THE COURT:  -- judgments, about which jurisdiction has

23   long since been recognized.

24         MR. COHEN:  Yes, your Honor.

25         THE COURT:  So you are attempting to recover on that,

3067160.1

F4M7NMLC

1    and I would think that it would not -- I would hold without any

2    question that the court has subject matter jurisdiction on

3    legitimate efforts to recover on that former indebtedness.

4          MR. COHEN:  Yes, your Honor.

5          THE COURT:  So it seems to me you properly asserted

6    subject matter jurisdiction because of what you are seeking.

7          You asked me to sign an order to show cause?

8          MR. ZIMMERMAN:  Your Honor, before considering the

9    order to show cause, on behalf of Deutsche Bank we would like

10   to be heard regarding the expedited nature.

11         THE COURT:  I just have to take it one step at a time,

12   and I am sure there are other people to be heard from.

13         If you could go back to the lectern, Mr. Cohen.  Now,

14   in paragraph 2, numbered paragraph 2 of the proposed order to

15   show cause, you refer to various Deutsche Bank entities.  What

16   is the basis for referring to those entities?

17         MR. COHEN:  Press reports, your Honor, that they have

18   subscribed to purchase about a billion dollars worth of these

19   bonds.

20         THE COURT:  Well, that answers the question.

21         Can you describe -- maybe you have already done it,

22   but I need repetition.  What information are you seeking in

23   discovery?

24         MR. COHEN:  Your Honor, generally it is how this

25   transaction works.  Argentina has invited the market to buy its

19

F4M7NMLC

1   bonds.  We don't know exactly where people have to be to accept

2   those offers.  We have heard Mr. Blackman represent, for

3   example, that this is entirely within Argentina.  Now, we heard

4   that from Citibank, you may remember, that the offering on

5   certain bonds were entirely within Argentina.  Here we know

6   that Deutsche Bank in New York is buying these bonds.

7           THE COURT:  Is what?

8           MR. COHEN:  Is buying these bonds.  So, are they being

9   offered exclusively in Argentina?  Or are they being offered

10  outside of Argentina?  I mean that issue is important, but it's

11  really quite honestly for another day.  It's not going to

12  assist us in the attachment.

13          THE COURT:  What information do you have about

14  Deutsche Bank in New York?

15          MR. COHEN:  That they are buyers of these bonds.  In

16  fact, calls have been made to some of the plaintiffs by

17  Deutsche Bank to buy the bonds in New York.  So, we know

18  they're out there trying to buy them and resell them to other

19  people and in effect making a market in these bonds.  We would

20  like to understand how that works.

21          We'd like to understand from the discovery to

22  Argentina why it was structured this way.  Is it being done the

23  way Mr. Blackman represents it's been done forever, or is it

24  being done as a way to evade this court?  Is this a path toward

25  future evasion?

F4M7NMLC

```
 1              Have there been discussions with people about how we
 2    can structure bond offerings that will successfully avoid this
 3    court's jurisdiction?  In which case we may see a migration of
 4    some of the exchange bonds into a different form.
 5              But that will all become known to us if they give us
 6    the deal documents, show us how it's done, and the
 7    correspondence with the people to whom they are trying to sell
 8    it.  And they must have that stuff because it is happening as
 9    we speak.  This is not an ancient transaction; it's happening
10    right now.  It's supposed to close tomorrow.
11              THE COURT:  I do not take seriously the press remark
12    about evading what I have ruled, although maybe there is
13    something to it.
14              MR. COHEN:  Your Honor, may I just say something on
15    that point?  None of the other bond offerings that we were
16    aware were done in two days.  This is the first time that we
17    know of an offering by Argentina that was announced and closed
18    within two days.
19              Now, you can draw whatever conclusions you want from
20    that, but it may be that it was done so that this court and
21    Argentina's creditors would not have an opportunity to find out
22    what is going on and see if there are opportunities to attach.
23              THE COURT:  Let me just say this:  That's something
24    different from evading what I have previously ordered.  Evading
25    what I previously ordered, that is -- if evading has any
```

F4M7NMLC

1    meaning at all, it would be some kind of fraud that I can't

2    even conceive of what it would be.  But I think right now I

3    don't have anything before me -- that doesn't mean that it

4    couldn't happen -- but I don't have anything before me with any

5    factual indication that The Republic is trying to evade prior

6    orders.

7            Now, that doesn't solve the problem, because the

8    problem you're really raising is how do you enforce the

9    judgments, and can this new bond offering have a relationship

10   to enforcing your judgments.  And that is a legitimate inquiry

11   and a legitimate question, because enforcing your judgments,

12   unless The Republic pays voluntarily, means finding something

13   to attach or some way to obtain money that The Republic has

14   refused to pay voluntarily, despite all of these years of its

15   debt.

16           So, what I'm trying to say -- and I'm going to have to

17   conclude this shortly -- as this court has expressed on

18   numerous occasions, and everybody knows, The Republic has a

19   long indebtedness, which it was obligated to pay, and it has

20   not paid.  And the plaintiffs have been compelled to resort to

21   various difficult ways of finding assets or methods of

22   obtaining payment, and that has occupied the court and counsel

23   over many years, and I hope that can draw to a close through

24   the efforts of the special master and so forth.

25           Now, I believe that the parties you represent are

22

F4M7NMLC

1    entitled to discovery about this new financing.  I believe and

2    I'm ruling that the plaintiffs are entitled to discovery to

3    determine if the new financing will produce assets which are

4    available to satisfy in whole or in part the plaintiffs'

5    long-standing unsatisfied debt.

6            I don't think the discovery can take place by 6 p.m.

7    tonight or anything like that, but there is -- despite what I

8    just said -- merit to the plaintiffs' assertion that this new

9    financing might very quickly assume forms that might not be

10   there now but might be used to insulate the proceeds of the

11   transaction from any possible legitimate use to satisfy your

12   judgment.

13           So, what to do?  Mr. Cohen has a legitimate need for

14   very prompt information.  Mr. Blackman has always been

15   cooperative with the court in any legitimate needs.

16           What I would ask is, Mr. Cohen, if you present

17   Mr. Blackman -- you can do it informally or through writing or

18   whatever you feel -- but if you would specify to him the

19   information you need -- you say you need -- and not just all

20   about the transaction but what specifically do you need.  And I

21   would expect Mr. Blackman, as he has always done, to respond

22   promptly and reasonably with that request.  Farther I'm not

23   going to go right now; I can't.

24           MR. COHEN:  Just one question, your Honor.  May we do

25   the same with the two banks I mentioned?  We will work with

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3067160.1

23

F4M7NMLC

1      them to get just what we need?

2             THE COURT:  Absolutely.  What I'm trying to say --

3      because I have a trial going on, and I just have to have

4      everybody understand that there has to be some cooperation now.

5      But you are entitled to know the information about the

6      transaction, the proceeds, the geography, etc., etc., what you

7      have talked about, and you are entitled to have that about from

8      whatever banks are involved.  And I will expect the relevant

9      lawyers to meet together.  You can use my jury room or confer

10     wherever you want to, but I think you've got to get to work

11     right now.  And if there is a problem, I'm here.

12            MR. COHEN:  Thank you, your Honor.

13            THE COURT:  OK.  With that, we will recess, we will

14     adjourn.

15            MR. ZIMMERMAN:  Your Honor, on behalf of Deutsche

16     Bank, while we are certainly prepared to cooperate, we think

17     it's unfortunate we are not provided an opportunity to speak

18     when we are dragged down here without any papers, any evidence.

19     Mr. Cohen makes certain statements representing what they have

20     read concerning this transaction -- or have been told.  We

21     believe that information should be submitted in writing to the

22     court, and allow us to respond.

23            THE COURT:  I didn't mean to not hear you.

24            MR. ZIMMERMAN:  Essentially on behalf of the Deutsche

25     Bank entities that have been brought down here, we are

3067160.1

24

F4M7NMLC

1    certainly prepared to cooperate, but we find it's unfortunate

2    and frankly troubling that the plaintiffs failed to provide us

3    any documents or information supporting their claims.  Their

4    representations concerned alleged New York subscriptions to

5    this transaction -- which are inconsistent with what I have

6    been advised by the client -- we think the plaintiffs rather

7    than just showing us here, and making statements, dragging us

8    down one hour before today's hearing, even though they had time

9    to issue a press release or get press coverage about this an

10   hour and a half before.  They should certainly present

11   evidence.

12           THE COURT:  I understand your point, but the point is

13   that if the plaintiff has information about some activities of

14   Deutsche Bank, then it would be a good idea for you to

15   participate in any discussion.  That's all I can say.  All

16   right.

17           MR. ZIMMERMAN:  Thank you.  We would just like to see

18   the information.

19                                * * *

20

21

22

23

24

25

3067160.1