UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

NML CAPITAL, LTD.,

                      Plaintiff,

                      v.

THE REPUBLIC OF ARGENTINA,

                      Defendant.

Civil Action Nos.
08 Civ. 6978 (TPG)
09 Civ. 1707 (TPG)
09 Civ. 1708 (TPG)

-------------------------------------------------------x

AURELIUS CAPITAL MASTER, LTD. and
ACP MASTER LTD.,

                      Plaintiff,

                      v.

THE REPUBLIC OF ARGENTINA,

                      Defendant.

Civil Action Nos.
09 Civ. 8757 (TPG)
09 Civ. 10602 (TPG)

-------------------------------------------------------x

AURELIUS OPPORTUNITIES FUND II,
LLC and AURELIUS CAPITAL MASTER,
LTD.,

                      Plaintiff,

                      v.

THE REPUBLIC OF ARGENTINA,

                      Defendant.

Civil Action Nos.
10 Civ. 1602 (TPG)
10 Civ. 3507 (TPG)

-------------------------------------------------------x   (*captions continued on next page*)

## THE DB ENTITIES' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION FROM NON-PARTY BANKS AND IN SUPPORT OF THE DB ENTITIES' <u>CROSS-MOTION TO QUASH AND/OR LIMIT THE SUBPOENAS AT ISSUE</u>

-------------------------------------------------------x

AURELIUS CAPITAL MASTER, LTD. and
AURELIUS OPPORTUNITIES FUND II,
LLC,

                        Plaintiff,

                      v.

THE REPUBLIC OF ARGENTINA,

                        Defendant.

Civil Action Nos.
10 Civ. 3970 (TPG)
10 Civ. 8339 (TPG)

-------------------------------------------------------x

BLUE ANGEL CAPITAL I LLC,

                        Plaintiff,

                      v.

THE REPUBLIC OF ARGENTINA,

                        Defendant.

Civil Action Nos.
10 Civ. 4101 (TPG)
10 Civ. 4782 (TPG)

-------------------------------------------------------x

PABLO ALBERTO VARELA, et. al.,

                        Plaintiff,

                      v.

THE REPUBLIC OF ARGENTINA,

                        Defendant.

Civil Action No.
10 Civ. 5338 (TPG)

-------------------------------------------------------x

OLIFANT FUND, LTD.,

                        Plaintiff,

                      v.

THE REPUBLIC OF ARGENTINA,

                        Defendant.

Civil Action No.
10 Civ. 9587 (TPG)

-------------------------------------------------------x

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS ........................................................................................5

ARGUMENT ............................................................................................................8

I.      PLAINTIFFS' MOTION SHOULD BE DISMISSED AS PREMATURE ...........8

II.     THE SUBPOENAS ARE UNDULY BURDENSOME, OVERLY
BROAD AND UNLIKELY TO LEAD TO DISCOVERY OF
RELEVANT INFORMATION .......................................................................9

III.    THE DB ENTITIES SHOULD NOT BE COMPELLED TO PRODUCE,
AND THE SUBPOENAS SHOULD BE QUASHED CONCERNING,
THE IRRELEVANT, HIGHLY SENSITIVE INFORMATION
DEMANDED BY PLAINTIFFS .....................................................................13

      A.    Plaintiffs Seek The Impermissible Disclosure Of Confidential
Commercial Information................................................................13

      B.    Should The Court Compel Disclosure, It Should Be On An
Attorneys' Eyes Only Basis............................................................14

IV.    THE DB ENTITIES SHOULD NOT BE COMPELLED TO PRODUCE
DOCUMENTS FROM DB SA......................................................................17

      A.    This Court Does Not Have Personal Jurisdiction Over DB SA.................17

      B.    The DB Entities Do Not Have Control Over DB SA's Documents ..........20

      C.    Principles Of International Comity Warrant Denial Of Plaintiffs'
Motion And The Granting of the DB Entities' Cross-Motion..................21

            1.    The Importance Of The Information To The Litigation ...............23

            2.    The Degree Of Specificity Of The Request...................................24

            3.    Whether The Information Originated In The United States ..........24

            4.    The Availability Of Alternative Means To Securing The
Information ...................................................................................25

            5.    The Balance Of National Interests................................................27

            6.    The Hardship Of Compliance .......................................................29

7.  The Good Faith Of The Resisting Person .....................................30

CONCLUSION ...........................................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AP Links, LLC v. Russ,*
  299 F.R.D. 7 (E.D.N.Y. 2014) ............................................................................10

*Application to Enforce Admin. Subpoenas Duces Tecum of the S.E.C. v. Knowles,*
  87 F.3d 413 (10th Cir. 1996) .............................................................................19

*Asch/Grossbardt Inc. v. Asher Jewelry Co.,*
  No. 02 Civ. 5914(SAS), 2003 WL 660833 (S.D.N.Y. Feb. 28, 2003) ...................14

*Asset Value Fund Ltd. P'ship v. Care Grp., Inc.,*
  No. 97 Civ. 1487 (DLC)(JCF), 1997 WL 706320 (S.D.N.Y. Nov. 12, 1997) .......10

*In re Biovail Corp. Sec. Litig.,*
  247 F.R.D. 72 (S.D.N.Y. 2007) ..........................................................................11

*CE Int'l Res. Holdings, LLC v. SA Minerals Ltd. P'ship,*
  No. 12 Civ. 08087(CM)(SN), 2013 WL 2661037 (S.D.N.Y. June 12, 2013) ................ *passim*

*Concord Boat Corp. v. Brunswick Corp.,*
  169 F.R.D. 44 (S.D.N.Y. 1996) ..........................................................................11

*Daimler AG v. Bauman,*
  134 S. Ct. 746 (2014) ...................................................................................17, 20

*Gucci Am., Inc. v. Curveal Fashion,*
  No. 09 Civ. 8458 (RJS)(THK), 2010 WL 808639 (S.D.N.Y. Mar. 8, 2010) .......25

*Gucci Am., Inc. v. Weixing Li,*
  768 F.3d 122 (2d Cir. 2014) ........................................................................17, 20

*Gucci Am., Inc. v. Weixing Li,*
  No. 10 Civ. 4974 (RJS), 2015 WL 5707135 (S.D.N.Y. Sept. 29, 2015) ...............19

*Hudson v. Hermann Pfauter GmbH & Co.,*
  117 F.R.D. 33 (N.D.N.Y. 1987) ..........................................................................26

*Ings v. Ferguson,*
  282 F.2d 149 (2d Cir. 1960) ...............................................................................22

*Intercont'l Credit Corp. v. Roth,*
  154 Misc.2d 639, 595 N.Y.S.2d 602 (Sup. Ct. N.Y. Cty. 1991) ..........................26

*JPMorgan Chase Bank v. Winnick*,
    No. 03 Civ. 8535, 2006 WL 278192 (S.D.N.Y. Feb. 6, 2006) ................................................10

*Laker Airways Ltd., v. Pan Am. World Airways*,
    607 F. Supp. 324 (S.D.N.Y. 1985) ...............................................................................23

*Linde v. Arab Bank, PLC*,
    262 F.R.D. 136 (E.D.N.Y. 2009) ...........................................................20, 21, 23, 25

*Minpeco, SA v. Conticommodity Servs., Inc.*,
    116 F.R.D. 517 (S.D.N.Y. 1987) .........................................................................23, 27, 30

*In re NASDAQ Market-Makers Antitrust Litig.*,
    164 F.R.D. 346 (S.D.N.Y 1996) .................................................................................14

*Nissan Fire & Marine Ins. Co. v. Fortress Re, Inc.*,
    No. M8-85 (GEL), 2002 WL 1870084 (S.D.N.Y. Aug. 14, 2002).........................................23

*Orlich v. Helm Bros.*,
    160 A.D.2d 135, 560 N.Y.S.2d 10 (1st Dep't 1990) ...................................................26

*Robinson Steel Co. v. Caterpillar, Inc.*,
    No. 10 Civ. 438 (JTM) (PRC), 2012 WL 5903769 (N.D. Ind. Nov. 21, 2012).....................25

*Soto v. Castlerock Farming & Transport, Inc.*,
    No. 09 Civ. 00701 (AWI), 2011 WL 2680839 (E.D. Cal. July 8, 2011)...............................26

*Tiffany (NJ) LLC v Qi Andrew*,
    276 F.R.D. 143 (S.D.N.Y. 2011) .............................................................22, 27, 29, 30

*Vera v. Republic of Cuba*,
    No. 12 Civ. 1596, 2015 WL 1244050 (S.D.N.Y. Mar. 17, 2015) ..........................................19

*Vesta Corset Co. v. Carmen Founds., Inc.*,
    No. 97 Civ. 5139 (WHP), 1999 WL 13257 (S.D.N.Y. Jan. 13, 1999) .............................14, 15

*In re Vivendi Universal, SA Sec. Litig.*,
    No. 02 Civ. 5571, 2009 WL 8588405 (S.D.N.Y. July 10, 2009) ...........................................21

*In re Vivendi Universal, SA Sec. Litig.*,
    No. 02 Civ. 5571 RJH, 2004 WL 3019766 (S.D.N.Y. Dec. 30, 2004) ...................................26

*Zenith Elecs. LLC v. Vizio, Inc.*,
    M8-85, 2009 WL 3094889 (S.D.N.Y. Sept. 25, 2009).........................................................21

**Statutes**

Argentina's Capital Markets Act, Law No. 26,831 ........................................................28

Argentina's Personal Data Protection Act, Law No. 25,326 .................................27, 28

Argentina's Penal Code, Article 157 ..........................................................................28

N.Y. Banking Law § 200(3) (Consol. 1937) ...............................................................18

**Other Authorities**

9 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE §45.52 (3d ed.) ..............................13

Fed. R. Civ. P. 26 ..............................................................................................8, 14, 15

Fed. R. Civ. P. 30 ....................................................................................................24

Fed. R. Civ. P. 37 ......................................................................................................8

Fed. R. Civ. P. 45 ..............................................................................................9, 13, 24

Rules of the U.S. Dist. Ct., S.D.N.Y., R. 37.2 ............................................................8

Restatement (Third) of Foreign Relations Law of the United States............................23

Non-parties Deutsche Bank AG – New York Branch ("DB AG – New York"), Deutsche Bank Americas Holding Corp. (subpoenaed as Deutsche Bank America Holding Corp. ("DBAHC"), Deutsche Bank Securities Inc. ("DBSI"), Deutsche Bank Trust Company Americas ("DBTCA") and DB USA Corporation f/k/a Taunus Corporation ("Taunus"; collectively, the "DB Entities") submit this Memorandum of Law (i) in opposition to Plaintiffs'[1] Motion to Compel Production from Non-Party Banks[2] (the "Motion")[3] and (ii) in support of the DB Entities' Cross-Motion to Quash and/or Limit the Subpoenas at issue (the "Cross-Motion").

## PRELIMINARY STATEMENT

Over the last 8 years the DB Entities have responded to dozens of third-party subpoenas issued by Plaintiffs and other parties seeking to obtain and collect on judgments against the Republic of Argentina (the "Republic").  During that time, the DB Entities have produced thousands of pages of documents, reviewed tens of thousands of documents and expended an enormous amount of time and effort.  Prior to the time Plaintiffs filed their Motion, the DB Entities thought that the parties were moving towards an agreement that would provide Plaintiffs with requested information while minimizing the burden on the DB Entities, protecting the reputation of the DB Entities and their affiliated companies, and protecting the confidential information of the entities with which their affiliated companies work.

---

[1]  "Plaintiffs" refers collectively to NML Capital Ltd. ("NML"), Aurelius Capital Master, Ltd., Blue Angel Capital I LLC, ACP Master, Ltd., and Aurelius Opportunities Fund II, LLC (together, "Aurelius"), Pablo Alberto Varela, et al. ("Varela") and Olifant Fund, Ltd. ("Olifant").

[2]  "Non-Party Banks" refers collectively to the DB Entities, as well as non-parties Banco Bilbao Vizcaya Argentaria ("BBVA") and J.P. Morgan Chase Bank N.A. ("J.P. Morgan"), and certain of their affiliates.

[3] The DB Entities respectfully submit that it is inherently inequitable that Plaintiffs' moving papers, including their moving brief ("Pl. Br."), present information to the Court that is redacted in the version served on the DB Entities. While appreciating that it was more convenient for Plaintiffs to file a single motion, such convenience does not excuse their presenting information to the Court that appears to be in support of their motion *against* the DB Entities but that the DB Entities are unable to review.  (*See, e.g.*, Pl. Br. 5, 7 11, 22).

The Motion and Cross-Motion relate to exceptionally broad Subpoenas, dated May 5, 2015, served by Plaintiffs on the DB Entities.  The Subpoenas primarily demand information related to the BONAR 2024 bonds offered by the Republic.  The DB Entities agreed to produce responsive material intended to address Plaintiffs' stated interest, as expressed in the Motion (Pl. Br. 3), in obtaining information relevant to whether the BONAR 2024 bonds constitute external indebtedness ("External Indebtedness") of the Republic under the 1994 Fiscal Agency Agreement without prejudice to Plaintiffs' ability to request additional information.  (Declaration of Marc Farris, sworn to on October 5, 2015 ("Farris Dec."), Ex. 36, 2-3).  Yet, rather than waiting for the DB Entities' production, Plaintiffs prematurely and unnecessarily filed the Motion.  Notwithstanding Plaintiffs' filing of the Motion, the DB Entities will be producing information in response to the Subpoenas and remain prepared to supplement that production. (*See id*.).

The DB Entities had **already** provided Plaintiffs with substantial information concerning the BONAR 2024 bonds **prior** to the issuance of the Subpoenas.  On February 25, 2015, the DB Entities (and J.P. Morgan) were directed to appear for an emergency hearing before Judge Griesa at which NML sought and obtained an order directing the DB Entities (and J.P. Morgan) to produce documents and a witness to be deposed the next day about a potential BONAR 2024 bond offering.  (Declaration of Philippe Zimmerman, sworn to on October 23, 2015 ("Zimmerman Dec."), ¶ 8).  (That offering ultimately did not occur.)  (*Id.*).  As directed by the Court, the DB Entities produced to NML and Aurelius several thousand pages of documents and a witness, who was deposed for 3 hours on February 26, 2015.  (*Id.*).  Both the documents and

testimony were designated "Confidential" under the Confidentiality Orders[4] in place in the matters in which the discovery was conducted.  (*Id*).

On April 22, 2015, Aurelius and NML again brought the DB Entities before the Court on an emergency basis seeking information concerning a potential BONAR 2024 bond offering.  As detailed in the DB Entities' pre-motion letter of July 6, 2015 (*see* 08-CV-6978, ECF No. 797),[5] Judge Griesa directed the DB Entities to provide NML and Aurelius with information concerning the offering.  The DB Entities' counsel then provided NML's and Aurelius' counsel with responsive information, which information was designated "Confidential" pursuant to the Confidentiality Orders in the matters in which the information was produced.  (*Id.*, at p. 3).

Despite the DB Entities' commitment to produce information relevant to Plaintiffs' stated rationale in seeking discovery (and to supplement that production, if necessary) and the Court's pre-motion letter requirement, Plaintiffs filed the instant Motion.  Plaintiffs support their motion with inaccurate statements.  DB AG – New York did not play a "central role" in the April 2015 auction of BONAR 2024 bonds.  (Pl. Br. 7, 22).  The DB Entities have <u>not</u> refused to produce documents from outside of New York.  (Pl. Br. 14, 21, 23).  In reality, the DB Entities have produced documents and information from DB AG London.  Moreover, some of the information that Plaintiffs admit the DB Entities offered to produce obviously comes from DB AG London Branch ("DB AG London").  (*See* Pl. Br., 13, 18).

---

[4] "Confidentiality Orders" refers to the Stipulations and Orders Governing Confidential Material entered in Docket Nos. 03-cv-8845, 05-cv-2434, 06-cv-6466, 07-cv-1910, 07-cv-2690, 07-cv-6563, 08-cv-2541, 08-cv-3302, 08-cv-6978, 09-cv-1707, 09-cv-1708, 07-cv-2715, 07-cv-11327, 07-cv-2693, 10-cv-4101, 10-cv-4782, 09-cv-8757,  09-cv-10620, 10-cv-1602, 10-cv-3507, 10-cv-3970 and 10-cv-8339.

[5]  The Court is respectfully referred to the letter for its contents, which are incorporated herein by reference. Notwithstanding the Court's order, dated July 14, 2015 (*see* 08-CV-6978, ECF No. 802), granting the DB Entities leave to file a motion, the DB Entities did not move (prior to this Cross-Motion) as discussions with Plaintiffs had resumed after the letter was filed and the DB Entities believed that a process was being put in place that would obviate the need to burden the Court.  Regrettably, Plaintiffs decided they could not wait for the process to proceed.

Plaintiffs also misrepresent the DB Entities' proposal. Plaintiffs ignore the specific categories of information being produced and the DB Entities' offer to supplement their production if Plaintiffs are not satisfied with the information produced. Plaintiffs inaccurately claim to have "repeatedly offered" to identify search parameters so as to "work cooperatively" with the DB Entities. (Pl. Br. 15). In fact, at no point during the meet and confer process did Plaintiffs agree to modify a single request or to prioritize among their requests. (Zimmerman Dec., ¶ 3).

There are two primary unresolved issues from the DB Entities' perspective. The DB Entities proposed producing documents with certain information redacted and/or producing certain documents designated "Attorneys' Eyes Only" because of two instances when information designated as "Confidential" appears to have been shared by certain of the Plaintiffs in violation of the Confidentiality Orders. (Pl. Br., 19-20). Plaintiffs have rejected this proposal.

Plaintiffs are demanding that the DB Entities produce documents possessed by Deutsche Bank S.A. ("DB SA") in Argentina. (Pl. Br. 21-24). However, (i) DB SA was not served with a subpoena, (ii) none of the DB Entities has possession, custody or control over documents in DB SA's possession, (iii) Deutsche Bank AG ("DB AG"), a German entity, is not subject to the Court's general jurisdiction (as opposed to DB AG – New York), and (iv) even if DB AG were subject to the Court's general jurisdiction, the requisite comity analysis strongly counsels this Court against seeking to compel DB AG to force DB SA to produce documents in response to the Subpoena in violation of Argentine law. Moreover, as a logical matter, if documents relevant to whether the bonds are External Indebtedness are in the possession of an entity affiliated with Deutsche Bank, they would be much more likely to exist outside of Argentina than in Argentina.

As established herein, Plaintiffs' Motion should be denied.  The DB Entities intend to produce information responsive to the Subpoenas.  The DB Entities are also willing to discuss a supplemental production if the initial production does not provide Plaintiffs with sufficient information regarding whether the bonds at issue are External Indebtedness.  Additionally, the Subpoenas should be quashed or limited to permit the protection of proprietary information to be produced by the DB Entities.

## STATEMENT OF FACTS

On or about May 5, 2015, Plaintiffs served the DB Entities with five identical Subpoenas.  (Farris Dec., Ex. 3).  The Subpoenas contain 16 requests (made in eight separately numbered requests, one of which contains nine sub-parts) effectively seeking all information in the DB Entities' possession, custody or control related to offerings or *potential* offerings of BONAR 2024 bonds and BODEN 2015 bonds.  (*See id.*).

The requests go well beyond simply seeking information related to Plaintiffs' stated rationale in serving the Subpoenas.  (*See id.*).  With respect to the BONAR 2024 bonds (the only bonds addressed in Plaintiffs' Motion), the Subpoenas seek, most egregiously, documents, communications and testimony related to, *inter alia*, the *contemplated* or actual offering, purchase or sale; all bids with identifying information; filings by the Republic with any governing agency, stock exchange or securities regulator in any jurisdiction; communications with Argentina, purchasers and/or third parties; and any fees, incentive payments, spreads, or other remuneration received by the DB Entities. (*Id.*).

The DB Entities served their objections to the Subpoenas on June 2, 2015.  (Zimmerman Dec., Ex. 1.)  Thereafter, Plaintiffs and the DB Entities engaged in several meet and confers and exchanged letters.  (Zimmerman Dec., ¶ 3.)  Throughout the meet and confers, Plaintiffs were unwilling to modify the Subpoenas in any manner.  (*Id.*).  Plaintiffs were also unwilling to

prioritize the information they requested.  (*Id*.).  In an effort to provide Plaintiffs with responsive

information while balancing the DB Entities' concerns, during a call on August 3, 2015, the DB

Entities proposed that they would:

1.   Identify the top 5 purchasers on whose behalf successful bids were made by DB SA on behalf of clients of DB AG - London in the April auction.  With respect to these purchasers, for whom the DB Entities would provide locations but not names, the DB Entities would attempt to locate communications, including emails and Bloomberg chats between the purchasers and salespeople/representatives of the DB entities.  In addition to providing the locations of the purchasers, the DB Entities would provide information concerning the amounts of bids.

2.   Provide examples of the information regarding the BONAR 2024 bond auction and offerings that were forwarded by salespeople for the DB Entities.

3.   Provide information reflecting the DB Entities' understanding of the flow of funds for the offerings/auctions that occurred.  Information concerning the DB Entities' understanding of the flow of funds related to the April 2015 auction was previously produced.  If Plaintiffs require anything further with respect to the April 2015 auction, the DB Entities requested that Plaintiffs specify what further information was needed.

4.   Provide information related to structuring of offerings/auctions that occurred.

5.   Provide documents reflecting governance of offerings/auctions including contracts, notes, decrees, Big Boy letters and any solicitation materials in the DB Entities possession.

6.   Provide information identifying the exchanges through which bonds are traded and the entities that play a role in clearing the bonds.

7.   Provide information concerning the method and/or process by which payments of principal or interest due on the BONAR 2024 bonds will be paid.

(*See* Farris Dec., Ex. 36, 2).

Without accepting or rejecting the above, Plaintiffs asked that the DB Entities also

provide the identity of custodians from whom information would be gathered, the location of all

the bidders in the April BONAR 2024 auction and purchasers of bonds in any other offerings,

and all communications with the Republic regarding the BONAR 2024 bonds. (*Id.,* 2-3).[6] The DB Entities agreed to produce the requested information as discussed below.

Not having heard back from Plaintiffs in nearly a month, on September 1, 2015, counsel for the DB Entities reached out to Plaintiffs' counsel by email seeking a response to the DB Entities' proposal. (Zimmerman Dec., Ex. 2).  Plaintiffs responded on September 2, 2015 with a letter that rejected the DB Entities' proposal.

Plaintiffs and the DB Entities resumed their discussions on September 10, 2015. (Zimmerman Dec., ¶ 5.)  During this call, the DB Entities expressed their intent to proceed with an initial production, as proposed in August, and to also provide Plaintiffs with additional information requested by Plaintiffs during the August 3 call.  (*Id.*).  On September 17, 2015, the DB Entities sent Plaintiffs a letter memorializing the DB Entities' intent to make an initial production of the following:

1. The seven categories of information identified by the DB Entities during the August 3, 2015 meet and confer, which are listed above;

2. The additional 3 categories of information identified by Plaintiffs during the August 3, 2015 meet and confer – that is: the identity of custodians from whom information was collected or requested, the location of all bidders in the April 2015 auction on whose behalf bids were placed by DB SA on behalf of customers of DB AG - London; and,

3. Information requested by NML, namely documents or other information identifying clients that were "solicited" or otherwise contacted regarding the April auction (which would be provided on an "Attorneys' Eyes Only" basis), and communications between Deutsche Bank AG and Deutsche Bank SA regarding auctions and offerings that occurred.

(Farris Dec., Ex. 36, 1-4).  The DB Entities also expressed their regret about the tone of Plaintiffs' letter, and corrected several misstatements in Plaintiffs' letter.  (*Id.*).

---

[6]  In addition to the meet and confers between counsel during July and August, executives representing the DB Entities and NML met separately in an effort to address issues between them.  (*See* Farris Dec., Ex. 36, p. 3).

Plaintiffs responded by filing the Motion.

## ARGUMENT

I.  ## PLAINTIFFS' MOTION SHOULD BE DISMISSED AS PREMATURE

Plaintiffs' Motion is unnecessary and, at the very least, premature.  The Federal Rules of Civil Procedure require parties to meet and confer prior to filing a discovery motion.  *See* Fed. R. Civ. P. 26(f), 37(a)(1).  Implicit in this requirement is the expectation that no discovery motion will be filed unless the parties reach an impasse.  Similarly, the Local Rules for the Southern District of New York and this Court's Individual Practice Rules require pre-motion letters prior to the filing of discovery motions.  *See* Local Rules of the U.S. Dist. Ct., S.D.N.Y. R. 37.2; Griesa, J. Individual Practices R. 2(A).[7]  The requirements to meet and confer and to file pre-motion letters derive from the same purpose – to avoid wasting limited judicial resources on unnecessary and premature discovery motions.  Unfortunately, Plaintiffs filed this Motion while Plaintiffs and the DB Entities were still discussing the Subpoenas (and the DB Entities had committed to commence a production) and without submitting a pre-motion letter, which would likely have permitted the Court to avoid being burdened with the instant Motion by guiding the parties to work together, as the DB Entities were attempting to do.

As detailed above, during Plaintiffs and the DB Entities' discussions, the DB Entities made a proposal that balanced providing Plaintiffs with information related to the stated rationale for issuing the Subpoenas and limiting the burden on the DB Entities. The DB Entities believe that their proposal was wholly consistent with the direction that this Court has repeatedly given

---

[7]  This Court's July 14, 2015 Order (*see* 08 cv 6978, ECF No. 802) in response to the DB Entities' July 6, 2015 pre-motion letter removed any doubt as to the applicability of Individual Practice Rule 2(A) and Local Civil Rule 37.2 to discovery disputes between Plaintiffs and the Non-Party Banks by stating, "[t]he court hereby waives the requirement for a pre-motion discovery conference."  Obviously, if the Rules were not applicable, the Court would not have needed to waive the required pre-motion discovery conference.

with respect to discovery between Plaintiffs and non-party financial institutions – that is, the parties should work with one another to develop a reasonable framework to provide responsive information. (*See*, *e.g.*, 08-CV-6978, ECF No. 797, Ex. B, at 22:16-23:11, 24:12-16).

Contrary to Plaintiffs' claims (Pl. Br. 17-18), the DB Entities' proposed initial production was not a unilateral decision by the DB Entities. Rather, it was a good faith effort to provide material relevant to Plaintiffs' stated rationale for issuing the Subpoenas and was even expanded to include information Plaintiffs' attorneys and NML expressly requested. (Farris Dec., Ex. 36, 5-8). Moreover, it was without prejudice to Plaintiffs requesting additional information. (*Id.*). Indeed, the information that the DB Entities still intend to produce addresses what Plaintiffs have identified as the key issues of "how, where and to whom" the BONAR 2024 bonds were "marketed" and sold, and "information about how the BONAR 2024 bond offerings were planned, prepared, conducted and executed," which information is allegedly relevant to whether the Bonds constitute External Indebtedness. (Pl. Br. 3, 10).

## II.     THE SUBPOENAS ARE UNDULY BURDENSOME, OVERLY BROAD AND UNLIKELY TO LEAD TO DISCOVERY OF RELEVANT INFORMATION

The Subpoenas must be quashed or modified as they are unduly burdensome in violation of Fed. R. Civ. P. 45. Pursuant to Fed. R. Civ. P. 45 (d)(3)(A)(iv), a court "must quash or modify a subpoena that … subjects a person to undue burden." Here, the Subpoenas are unduly burdensome because they are duplicative of discovery that was previously obtained by Plaintiffs from the DB Entities, demand information irrelevant to the purported rationale for the Subpoenas, and would subject the non-party DB Entities to an enormous amount of work at substantial unnecessary expense. Fed. R. Civ. P. 45 (d)(1); Fed. R. Civ. P. 45 Advisory Committee's Notes (1991) ("A non-party required to produce documents or materials is protected against significant expense resulting from involuntary assistance to the court."); *see,*

9

*e.g., AP Links, LLC v. Russ*, 299 F.R.D. 7, 14 (E.D.N.Y. 2014) (subpoena requests regarding invoices of non-party attorney were duplicative, and thus such subpoena requests would be quashed, since law firm already provided court with non-party attorney's un-redacted invoices pursuant to court order); *Asset Value Fund Ltd. P'ship v. Care Grp., Inc.*, No. 97 CIV. 1487 (DLC)(JCF), 1997 WL 706320, at *9 (S.D.N.Y. Nov. 12, 1997) ("A court may quash discovery requests that are unreasonably duplicative or cumulative.").

Plaintiffs incorrectly claim that the Subpoenas are "narrowly tailored."  (Pl. Br. 3, 14-15). Plaintiffs fail to acknowledge that the DB Entities have **already** provided thousands of pages of documents and information, as well as a witness for a 30(b)(6) deposition, in response to NML's and Aurelius' emergency applications to the Court for discovery regarding the BONAR 2024 bonds in February and April of this year.[8]  (Zimmerman Dec., ¶¶ 8, 10).  Plaintiffs' only response to the burden being imposed by their third bite at the apple of discovery related to the BONAR 2024 bonds is that the DB Entities should not only repeat their prior work but that they should do additional work to weed out previously produced material.  (Zimmerman Dec., ¶ 14).

As to the scope of the Subpoenas, as discussed above, Plaintiffs' Subpoenas demand, in the broadest of terms, documents, communications and testimony related to the *contemplated* or actual offering, purchase or sale of BONAR 2024 bonds.  (*See* Farris Dec., Ex. 3).  The Subpoenas go far beyond the scope of non-party discovery permitted by the courts.  *See JPMorgan Chase Bank v. Winnick*, No. 03 CIV 8535, 2006 WL 278192, at *3 (S.D.N.Y. Feb. 6,

---

[8] The DB Entities' prior production was made after nearly 15,000 pages of material was collected and reviewed on an expedited basis at substantial expense to the DB Entities.  (Zimmerman Dec., ¶ 9).  In addition, following the April hearing, counsel for the DB Entities provided NML's and Aurelius' counsel with detailed information concerning the bids DB AG London arranged to be placed on behalf of clients in the April 2015 auction of BONAR 2024 bonds and the flow of funds for bids that were accepted.  (*Id.*, ¶ 10).  Notably, prior to the issuance of the current Subpoenas, NML and Aurelius never indicated that the DB Entities' production was incomplete nor sought a meet and confer concerning the completeness of the DB Entities' production or testimony.  (*Id.*, ¶ 11).

2006) (holding that subpoena served on non-party Citibank was unduly burdensome where full compliance with subpoena would subject non-party to "tremendous expense" and the "relevance of the discovery sought" was "indirect", and where Citibank had previously produced documents responsive to plaintiffs' demands and agreed to produce a subset of the documents requested concerning the subpoena at issue); *Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 49 (S.D.N.Y. 1996) (finding subpoena served on non-party Merrill Lynch to be overbroad on its face where requests sought discovery of documents irrelevant to the claims at issue and the relationship between the subpoena's recipient and the defendant); *In re Biovail Corp. Sec. Litig.*, 247 F.R.D. 72, 74 (S.D.N.Y. 2007) (denying defendant's motion to compel and holding that where defendant was already in possession of relevant information to establish its claims "the virtually limitless financial and other information Biovail seeks is unnecessary and irrelevant, at least in this case, and the burden these demands place on the subpoenaed non-parties and diversion of their staff to provide it far outweighs any probative value of the information.").

Moreover, the Subpoenas go far beyond Plaintiffs' stated purpose of whether the BONAR 2024 Bonds are External Indebtedness.  (Pl. Br. 2-3, 15).  Plaintiffs fail to explain how information regarding how bond offerings that *never occurred* were contemplated to be structured, as well as information detailing the DB Entities' "role" in such offerings, will aid in determining whether the BONAR 2024 bonds are External Indebtedness.  (Pl. Br. 3, 10-11, 13, 18).

Similarly, information concerning efforts to structure offerings to avoid attachment will not aid in determining whether the bonds are External Indebtedness, particularly where the DB Entities have already produced information concerning the flow of funds for the April offering.  (See Farris Dec., Ex. 23).  Further, Plaintiffs insist that they require communications between the

11

DB Entities and the Republic, and make much of the fact that there were supposedly meetings between the DB Entities and the Republic related to a potential BONAR 2024 offering that never occurred. (Pl. Br. 6, 10, 14).[9]  Despite Plaintiffs' insistence that substantive documents or communications concerning any alleged meetings must exist, such information is simply not relevant to a determination of whether the bonds are External Indebtedness and Plaintiffs fail to explain how such a meeting would be relevant.

Without modification, the DB Entities expect that compliance with the Subpoenas would likely result in the collection and review of at least tens of thousands of pages of material, the vast majority of which would be irrelevant to whether the bonds are External Indebtedness. (Zimmerman Dec., ¶ 13).  Thus, as discussed above, the DB Entities proposed an initial production of information tailored to Plaintiffs' concerns and expressed a willingness to supplement that production if Plaintiffs required further information.

Plaintiffs have refused to work with the DB Entities to reduce the burden.  At no time during the meet and confer process did Plaintiffs offer to consider, let alone propose, search terms.  (Zimmerman Dec., ¶ 3).  Further, Plaintiffs refused to even prioritize their requests and answered the DB Entities' reasonable proposal for an initial production with this premature motion. (*Id.*).

Accordingly, the Subpoenas should be quashed or modified in the manner proposed by the DB Entities.

---

[9] Plaintiffs have no evidence to support their hypothesis that such meetings were held in New York.  (Pl. Br. 6).  In fact, the evidence Plaintiffs cite only refers to a scheduled meeting in London.  (*See* Farris Dec., Exs. 10-12).

III.   **THE DB ENTITIES SHOULD NOT BE COMPELLED TO PRODUCE, AND THE SUBPOENAS SHOULD BE QUASHED CONCERNING, THE IRRELEVANT, HIGHLY SENSITIVE INFORMATION DEMANDED BY PLAINTIFFS**

A.   **Plaintiffs Seek The Impermissible Disclosure Of Confidential Commercial Information**

Under the guise of seeking information relevant to whether the BONAR 2024 bonds constitute External Indebtedness, Plaintiffs contend that they are entitled to the "names and identifying information for the offerees and purchasers" of the BONAR 2024 bonds. (Pl. Br. 19). The Subpoenas should be quashed to the extent that they request such information.

A court may quash a subpoena where the subpoena requires disclosing confidential commercial information that would cause substantial economic harm to the competitive position of the producing party.  Fed. R. Civ. P. 45(d)(3)(B)(i); 9 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE §45.52 (3d ed.).  Here, Plaintiffs are competitors of many of the offerees and purchasers about whom they are requesting identifying information.  Production of the requested information would not only pose a serious threat to the DB Entities' reputation, but could give Plaintiffs an unfair commercial advantage in the marketplace in matters unrelated to these actions.

In order to protect its reputation and its customers' proprietary interests while giving Plaintiffs access to information they seek, the DB Entities have proposed providing Plaintiffs with information identifying the location of all bidders on whose behalf DB AG London arranged for DB SA to place a bid during the April 2015 BONAR 2024 bond auction and related communications for the top 5 purchasers of bonds on whose behalf DB AG London arranged for bids to be placed.  (Farris Dec., Ex. 36, 2).  Plaintiffs say that they have no way to test the accuracy or completeness of this jurisdiction information.  (Pl. Br. 20).  But this argument is, like their motion, premature.  If, after the information is produced, Plaintiffs require additional

13

information, Plaintiffs and the DB Entities are prepared to meet to discuss how to address Plaintiffs' concerns.

**B.    Should The Court Compel Disclosure, It Should Be On An Attorneys' Eyes Only Basis**

Should the Court compel disclosure of the names and identifying information, the applicable Confidentiality Orders should be modified to include an "Attorneys' Eyes Only" level of protection that can be utilized for this information.  *See, e.g., Asch/Grossbardt Inc. v. Asher Jewelry Co*., No. 02 Civ. 5914(SAS), 2003 WL 660833, at *3 (S.D.N.Y. Feb. 28, 2003) ("Ample precedent exists for limiting disclosure of highly sensitive, confidential or proprietary information to attorneys and experts, particularly when there is some risk that a party might use the information or disseminate it to others who might employ it to gain a competitive advantage over the producing party.") (citation omitted); *Vesta Corset Co. v. Carmen Founds., Inc*., No. 97 CIV. 5139 (WHP), 1999 WL 13257, at *3 (S.D.N.Y. Jan. 13, 1999) ("Protective orders that limit access to certain documents to counsel and experts are commonly entered in litigation involving trade secrets and other confidential research, development, or commercial information.") (citations omitted).  As discussed above, the names and identifying information of customers of DB AG London on whose behalf DB AG London arranged for bids to be placed and whose bids were accepted is highly proprietary information, the disclosure of which could give Plaintiffs, who are engaged in the business of purchasing bonds, an unfair competitive advantage.

Further, as the DB Entities previously advised the Court, it appears that certain Plaintiffs breached the Confidentiality Orders.  (*See* 08-CV-6978, ECF No. 797).  Thus, the DB Entities request that an "Attorneys' Eyes Only" designation be added to the Confidentiality Orders.  Fed. R. Civ. P. 26(c); *see In re NASDAQ Market-Makers Antitrust Litig.*, 164 F.R.D. 346, 355 (denying motion to unseal tapes produced by defendants and holding that internal calls between

14

defendants' trading desks and sales desks which "identif[ied] customers and transactions in specific securities at specific prices and in specific amounts and to disclose trading strategies for executing customer orders against the trading desks at other market-making firms. This is exactly the sort of confidential commercial information contemplated by Rule 26(c)."); *Vesta Corset Co., Inc. v. Carmen Founds., Inc.*, 97 Civ. 5139, 1999 WL 13257 (S.D.N.Y. 1999) (limiting disclosure of information where the parties were competitors).

First, NML, and perhaps Aurelius, has impermissibly shared information produced by the DB Entities with Olifant (and perhaps other interested parties).  Pursuant to the Confidentiality Orders, the DB Entities explicitly designated the information, including documents, that was produced in late February 2015 and the deposition testimony of their representative, Jeanmarie Genirs, on February 26, 2015 as "Confidential."  (*See* 08-CV-6978, ECF No. 797, 4).  Pursuant to the Confidentiality Orders, "Confidential" information was only permitted to be used for purposes of the action in which it was produced and could only be shared with specified groups of persons.[10]  Attorneys and parties in other actions against the Republic are not among the

---

[10] Section 7 of the Confidentiality Orders provides:

Confidential Discovery Material designated as "Confidential" or information derived therefrom may be disclosed or made available only to the following persons without written consent from the Producing Person:

(a)      outside litigation counsel that have appeared in the Actions [referring to the captioned actions] and attorneys, clerical, paralegal and secretarial staff employed by such counsel, provided that the signature on this Stipulation and Order of a member of a law firm acting as litigation counsel to a party shall constitute an agreement by all lawyers in, and regular and temporary employees of, that firm to be so bound;

(b)      experts or consultants retained in good faith to assist counsel in the Actions, provided that any such experts or consultants execute an undertaking to be bound by this Stipulation and Order in the form attached hereto prior to disclosure and a copy of such signed undertaking is retained by counsel for the party making disclosure to the expert or consultant, so that it may be shown to counsel for the Producing Person upon a showing of good cause;

(c)      the parties and inside counsel, officers, directors, partners, members, employees or former employees of the parties assisting in the prosecution or defense of the Actions, provided that counsel making such disclosure shall inform each such person that the matter is confidential and may not be disclosed or used except as provided in this Stipulation and Order;

individuals with whom information designated as "Confidential" is permitted to be shared.  (*See id*.).

Yet, on May 12, 2015, Olifant filed a Motion for Leave to Amend Complaint relying on "Confidential" documents produced by the DB Entities in February and "Confidential" testimony from the 30(b)(6) deposition of the DB Entities by Ms. Genirs.  (*See* 10 CV 9587, ECF No. 241).  Counsel for Olifant ultimately admitted that the "Confidential" information supporting Olifant's motion had been provided to him by NML.  (*See* 08-CV-6978, ECF No. 797, 4).  NML's sharing of the "Confidential" information with Olifant violated the Confidentiality Orders.

There is also substantial circumstantial evidence that either NML or Aurelius breached the Confidentiality Orders regarding information designated as "Confidential" that was provided by the DB Entities in April.  Shortly after the emergency hearing in April where the DB Entities were directed by the Court to produce information on an expedited basis, counsel for the DB Entities advised NML's and Aurelius' counsel that DB AG London had arranged for a $834 million bid to be made on behalf of a client in April in the 2024 BONAR bond auction. (*See* 08-

---

(d)        the Court, pursuant to Paragraph 10 of this Stipulation and Order;

(e)        employees of outside copy services used to make copies of Discovery Materials;

(f)        witnesses deposed in the Actions or who appear at any hearing or trial in the Actions, but only to the extent disclosure occurs in preparation for and/or during such deposition, hearing or trial, provided that counsel making such disclosure shall inform each such person that the material is confidential and may not be disclosed or used except as provided in this Stipulation and Order;

(g)        court reporters who record testimony taken in the course of the Actions.

(03-cv-8845 (ECF No. 173); 05-cv-2434 (ECF No. 177); 06-cv-6466 (ECF No. 132); 07-cv-1910 (ECF No. 111); 07-cv-2690 (ECF No. 110); 07-cv-6563 (ECF No. 102); 08-cv-2541 (ECF No. 126); 08-cv-3302 (ECF No. 122); 08-cv-6978 (ECF No. 108); 09-cv-1707 (ECF No. 442); 09-cv-1708 (ECF No. 445); 07-cv-2715 (ECF No. 157); 07-cv-11327 (ECF No. 151); 07-cv-2693 (ECF No. 118); 10-cv-4101 (ECF No. 6); 10-cv-4782 (ECF No. 8); 09-cv-8757 (ECF No. 8); 09-cv-10620 (ECF No. 62); 10-cv-1602 (ECF No. 12); 10-cv-3507 (ECF No. 12); 10-cv-3970 (ECF No. 9); 10-cv-8339 (ECF No. 28)).

CV-6978, ECF No. 797, 3).[11]  After that imprecise information was shared, Argentine media reported alleged bids of $830 million and $840 million on behalf of a single bidder.  (*Id*.)  The only credible explanation for the inclusion of this inaccurate information in the articles in the Argentine press is that NML and/or Aurelius shared the information designated by the DB Entities as "Confidential" in violation of the Confidentiality Orders.

## IV.   THE DB ENTITIES SHOULD NOT BE COMPELLED TO PRODUCE DOCUMENTS FROM DB SA

### A.   This Court Does Not Have Personal Jurisdiction Over DB SA

On or about May 5, 2015, Plaintiffs served the Subpoenas on DB AG – New York, DBAHC, DBSI, DBTCA and Taunus.  (Farris Dec., Ex. 3).  Plaintiffs did not serve the Subpoena on DB SA.  (*See id*.).  Nonetheless, Plaintiffs seek to compel the production of documents from DB SA in violation of United States and Argentine law.  (Pl. Br. 21-24).

Unable to claim that it served the Subpoenas on DB SA, Plaintiffs erroneously argue that this Court has general jurisdiction over "Deutsche Bank" based on Deutsche Bank – New York's registration with the New York Department of Financial Services ("NYDFS").  (Pl. Br. 21-22).  As discussed in detail in BBVA's Memorandum of Law In Opposition To Plaintiffs' Motion To Compel And In Support Of BBVA's Cross-Motion To Quash And For A Protective Order ("BBVA Brief"), the assertion of general jurisdiction over DB SA fails in light of the Second Circuit's holding in *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122 (2d Cir. 2014) and the Supreme Court's holding in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014).  For the same reasons articulated in the BBVA Brief, DB SA is not "at home" in this forum.  (BBVA Brief, §  II(A)).  Further, Plaintiffs' argument that "Deutsche Bank" or DB AG has consented to general

---

[11] The information provided by the DB Entities' counsel was imprecise as the specified amount was the aggregate of several bids made at the same price not a single bid.  (*See* 08-CV-6978, ECF No. 797, 3).

jurisdiction is a misreading of Banking Law § 200(3) that is unsupported by customary aids to statutory construction and that would render the statute unconstitutional.  (BBVA Brief, §  II(B)).  The arguments included in Sections II(A) and (B) of BBVA's brief are incorporated herein by reference.

Moreover, even assuming, *arguendo*, that DB AG – New York's registration with the NYDFS subjects DB AG generally to jurisdiction in New York, DB AG (and DB AG – New York) should not be directed to produce documents in the possession, custody and control of DB SA, which is a separate legal entity.  DB SA is not registered as a foreign branch with the NYDFS,[12] and is not a branch of DB AG or any of the DB Entities.  As discussed in the Iriberri Dec., DB SA is a financial entity, a securities broker-dealer and a joint stock company incorporated under Argentine law, which is registered and domiciled in Argentina.  (Iriberri Dec., § 1.1).  The capital stock of DB SA is held by two companies: DB AG (the majority shareholder) and Suddeutshe Vermogensverwaltung GmbH.  (*Id*., § 1.2).  Both of these companies are incorporated in the Federal Republic of Germany and are subject to German law and jurisdiction.  (*Id*.).

Under Argentine law, as a subsidiary of a foreign corporation, DB SA is a distinct legal entity and its property is owned exclusively by the company.  (*Id*.).  As a shareholder, DB AG does not own any of the assets of DB SA, either legally or beneficially.  (*Id*.).  Further, DB AG does not have the right under Argentine law to review or control DB SA's books and records.  (*Id*., § 1.3).

---

[12] See N.Y. Dep't of Fin. Servs., Foreign Branches As of October 6, 2015, http://www.dfs.ny.gov/about/whowesupervise/sifbranc.htm (last accessed October 23, 2015).

The authority cited by Plaintiffs discussing a parent's obligation to produce documents in the possession of its affiliate is inapposite.  This case is readily distinguishable from *Vera v. Republic of Cuba*, No. 12 Civ. 1596, 2015 WL 1244050, at * 8 (S.D.N.Y. Mar. 17, 2015) (Pl. Br. 21), where there was no discussion of the subpoenaed entity being a New York branch of a foreign headquartered bank with a separate foreign legal entity in possession of the subpoenaed information.  Similarly, this case is distinguishable from this Court's May 29, 2009 decision requiring Citibank to produce information from Argentina, where the Court recognized that "[s]ince plaintiffs have served a subpoena on Citibank N.A., *a New York-based institution*, Citibank N.A. is required to produce information within its control, regardless of where the information is physically located." *Aurelius Capital Partners, LP, et al. v. The Republic of Argentina*, 07 Civ. 2715 (TPG), (May 29, 2009 Order) [ECF No. 198] (Pl. Br. 23) (emphasis added).  Here, of course, DB AG is based in Germany, not New York.

Plaintiffs' argument as to specific personal jurisdiction similarly fails.  Plaintiffs cannot show that the separate legal entity DB SA had any contacts with New York related to the bond offerings at issue.  Thus, *Gucci Am., Inc. v. Weixing Li*, No. 10 Civ. 4974 (RJS), 2015 WL 5707135 (S.D.N.Y. Sept. 29, 2015) (Pl. Br. 22) is distinguishable where Bank of China was both the entity with a branch in New York served with a subpoena and the foreign entity from which plaintiff sought information.  In addition, the holding in *Application to Enforce Admin. Subponeas Duces Tecum of the S.E.C. v. Knowles*, 87 F.3d 413 (10th Cir. 1996) (Pl. Br. 23) is wholly irrelevant because that case dealt with jurisdiction over an individual.

Even if DB SA were not a separate legal entity, Plaintiffs' purported bases for claiming specific jurisdiction over the DB Entities (Pl. Br. 22-23) are false.  DB AG – New York was not central to the BONAR 2024 offerings and there is no evidence that DB AG – New York

employees worked with the Republic to arrange the April offering, solicit investors or place

bonds.  Indeed, here, as Plaintiffs were previously informed, the few customers who expressed

an interest in the April auction were advised that DB AG – New York was not taking orders and

invited to contact individuals at DB AG London if they wanted more information or were

interested in bidding.  (Farris Dec., Ex. 23).  Plaintiffs only cite one document to support this

claim, but that document is simply a press release issued by the Republic regarding an upcoming

bond offering.  (Farris Dec., Ex. 20).

### B.    The DB Entities Do Not Have Control Over DB SA's Documents

Plaintiffs' argument that the DB Entities have control over documents from DB SA is

baseless.  First, as a legal matter, the control analysis is no longer applicable in light of the

holdings in *Daimler* and *Gucci Am., Inc.,* which restrict the exercise of general jurisdiction over

foreign entities.  Thus, the pre-*Daimler* and pre-*Gucci* authority cited by Plaintiffs is irrelevant.

Second, as explained in the Iriberri Dec., neither DB AG nor any of the DB Entities have

the right to control documents in DB SA's possession under Argentine law.  "Control is defined

not only as possession, but as the legal right to obtain the documents requested upon demand."

*Linde v. Arab Bank, PLC*, 262 F.R.D. 136, 141 (E.D.N.Y. 2009) (citing *Searock v. Stripling*, 736

F.2d 650, 653 (11th Cir. 1984)).  DB SA is not a branch of DB AG.  In Argentina, branches and

subsidiaries of foreign corporations are subject to different laws.  In contrast with a branch, a

subsidiary of a foreign corporation, such as DB SA, is a distinct legal entity and its property is

owned exclusively by the company itself.  (Iriberri Dec., § 1.2).  The shareholders of an

Argentine "SA" do not own any of the assets of the company, either legally or beneficially.

(*Id.*).  Further, the shareholders have a limited right of information concerning the day-to-day

operations of the company.  (*Id.*, § 1.3.).  They do not have direct access to the SA's books and

records.  (*Id.*).  Thus, under Argentine law, DB AG, DB AG – New York and the other DB
Entities do not have the legal right to obtain DB SA's documents.

Third, Plaintiffs cannot meet their burden, under pre-*Gucci* and pre-*Daimler* case law, of
establishing that the DB Entities have control over DB SA's documents.  "The party seeking the
production bears the burden of establishing control."  *Zenith Elecs. LLC v. Vizio, Inc*., Misc. No.
M8-85, 2009 WL 3094889, at * 2 (S.D.N.Y. Sept. 25, 2009) (citation omitted).  *See also In re
Vivendi Universal , SA Sec. Litig.,* No. 02 Civ. 5571, 2009 WL 8588405, at *3 (S.D.N.Y. July
10, 2009) ("The burden of demonstrating that the party from whom discovery is sought has the
practical ability to obtain the documents in issue lies with the party seeking discovery.")
(citation omitted); *Linde*, 262 F.R.D. at 141 ("The party seeking to compel a subsidiary to
produce the documents of its foreign parent has the burden of showing that the documents are
within the local subsidiary's control.") (citation omitted).[13]

**C.**     **Principles Of International Comity Warrant Denial Of Plaintiffs' Motion And The
Granting of the DB Entities' Cross-Motion**

Plaintiffs' Motion ignores international comity.  Comity weighs heavily in favor of the
denial of Plaintiffs' Motion and the granting of the DB Entities' Cross-Motion because, as

---

[13] Instead of providing the court with facts concerning the DB Entities' control over DB SA, Plaintiffs make the
following contradictory and conclusory statements:

• "Deutsche Bank and BBVA both assert that the Subpoenas cover only documents located at their New York
offices even though *neither dispute that they can obtain responsive documents from their non-New York offices*"
(Pl. Br. 21) (emphasis added); and

• "Deutsche bank erroneously *contends that its New York branch cannot obtain documents outside of New
York*." (Pl. Br. 23, n. 12) (emphasis added).

While Plaintiffs appear to simultaneously claim that the DB Entities both dispute and do not dispute that they can
obtain documents from non-New York offices, neither statement is accurate.  The DB Entities have not asserted that
the Subpoena covers only documents located in New York and have in fact produced documents from DB AG
London.  (Zimmerman Dec., ¶¶ 6, 12).  In addition, while the DB Entities do not dispute that DB AG – New York
can obtain (and has produced) documents from DB AG London, as discussed herein, DB AG – New York does not
have possession, custody or control of or the practical ability to obtain documents from DB SA in Argentina.

discussed in detail below, all seven factors of the comity analysis indicate that this Court should give due regard to Argentina's laws and the rights of Argentina's citizens or other persons under the protection of those laws.

> International comity is "neither a matter of absolute obligation … nor a mere courtesy and good will," but is the "recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws."

*CE Int'l Res. Holdings, LLC v. SA Minerals Ltd. P'ship,* No. 12-CV-08087(CM)(SN), 2013 WL 2661037, at * 8 (S.D.N.Y. June 12, 2013 (citing *In re Maxwell Commc'n Corp.*, 93 F.3d 1036, 1046-48 (2d Cir. 1996)).[14]  "It calls for a particularized analysis of the respective interests of the foreign nation and the requesting nation."  *Id.* (citation omitted).

Numerous federal courts have relied on principles of comity to refrain from exercising the full scope of their subpoena power.  *See, e.g., Ings v. Ferguson*, 282 F.2d 149, 152 (2d Cir. 1960) ("[I]t seems highly undesirable that the courts of the United States should countenance service of a subpoena upon a New York agency of a foreign bank which is not a party to the litigation and whose country has provided procedures for securing information, the production of which is consistent with its laws"); *CE Int'l Res. Holdings, LLC*, 2013 WL 2661037, at * 8-16 (denying motion to compel production of documents held in Singapore branch and directing use of Hague Convention); *Tiffany (NJ) LLC v Qi Andrew*, 276 F.R.D. 143, 151-61 (S.D.N.Y. 2011), *aff'd sub nom. Tiffany (NJ) LLC v. Andrew*, No. 10 CIV. 9471 WHP, 2011 WL 11562419 (S.D.N.Y. Nov. 14, 2011) ("*Qi Andrew*") (denying motion to compel production of documents

---

[14] In *CE Int'l Res. Holdings, LLC*, 2013 WL 2661037, at * 8-16, the court engaged in the comity analysis and required plaintiff to use the Hague Convention to obtain documents from DB AG Singapore Branch.  That case is *a fortiori* support for requiring the use of the Hague Convention in the instant case where here, unlike in *CE Int'l Res. Holdings, LLC*, DB SA is not a branch of DB AG but a separate legal entity.

located in China and directing plaintiff to use Hague Convention); *Linde*, 262 F.R.D. at 149-52

(denying motion to compel production of documents located in branch in Israel based on

considerations of international comity); *Nissan Fire & Marine Ins. Co. v. Fortress Re, Inc*., No.

M8-85 (GEL), 2002 WL 1870084, at *6 (S.D.N.Y. Aug. 14, 2002) (quashing subpoena, based on

"prudential, international comity-based consideration," without prejudice to an application for a

letter rogatory to take deposition in Japan); *Minpeco, SA v. Conticommodity Servs., Inc*., 116

F.R.D. 517, 522-30 (S.D.N.Y. 1987) (denying motion to compel production of documents

located in Switzerland, based on international comity); *Laker Airways Ltd., v. Pan Am. World

Airways*, 607 F. Supp. 324, 326-27 (S.D.N.Y. 1985) (refusing to enforce subpoena served in

New York where documents were located in London and Hague Convention provided procedure

for obtaining evidence in foreign country).

The comity analysis requires the Court to consider seven factors, including: (1) the

importance to the litigation of the documents or other information requested; (2) the degree of

specificity of the request; (3) whether the information originated in the United States; (4) the

availability of alternative means to securing the information; (5) the balance of national interests;

(6) the hardship of compliance on the party or witness from whom discovery is sought; and (7)

the good faith of the party resisting discovery.[15]

### 1.    The Importance Of The Information To The Litigation

As discussed above, Plaintiffs have not demonstrated and cannot demonstrate that the

information sought from DB SA will lead to information relevant to whether the BONAR 2024

Bonds constitute External Indebtedness.  Indeed, as a logical matter, if documents relevant to

---

[15] Factors (1)-(5) derive from Section 442 of the Restatement (Third) of Foreign Relations Law of the United States.
Factors (6)-(7) derive from Circuit case law.  *Minpeco, SA*, 116 F.R.D. at 523.

whether the bonds are External Indebtedness are in the possession of an entity affiliated with Deutsche Bank, they would be much more likely to exist outside of Argentina than in Argentina. As such, there is no reason to believe that directing the DB Entities to produce information in the possession of DB SA in Argentina will lead to the discovery of documents relevant to the issue of External Indebtedness, particularly as the DB Entities are producing information relevant to that issue from outside of Argentina.  Thus, this factor weighs against compelling the production of documents from DB SA.

        2.      The Degree Of Specificity Of The Request

As discussed in detail in Point II *infra*, the Subpoenas are overly broad and unduly burdensome in violation of Fed. R. Civ. P. 45.  Despite the DB Entities' prior productions of information related to the BONAR 2024 bonds, the fact that the DB Entities have been subjected to a Fed. R. Civ. P. 30(b)(6) deposition related to the BONAR 2024 bonds, and the DB Entities' proposal to produce information tailored to Plaintiffs' interests in response to the Subpoenas, Plaintiffs will not agree to the reasonable process proposed by the DB Entities or to any meaningful limitations of the Subpoenas.  Thus, this factor supports not compelling the production of documents from DB SA.

        3.      Whether The Information Originated In The United States

As discussed above, the DB Entities have agreed to produce and are in the process of producing certain information within the possession, custody and control of the DB AG New York and London Branches.  Any responsive documents or communications in the sole possession of DB SA would have originated outside of the United States.  Indeed, as the Iriberri Dec. makes clear, DB SA's documents and records, and the information concerning its day-to-

day business activity in Argentina are neither possessed by nor within the control of its

shareholders, which include DB AG.  (Iriberri Dec., §§ 1.2 – 1.3).

Accordingly, this factor weighs in favor of the DB Entities.  *See CE Int'l Res. Holdings,*

*LLC,* 2013 WL 2661037, at * 10 ("The overseas location of this information weighs in favor of

non-enforcement of the subpoena."); *Linde*, 262 F.R.D. at 150 (refusing to compel production of

documents from non-party bank that "originated in or are located in Israel, not the United

States."); *Gucci Am., Inc. v. Curveal Fashion*, No. 09 CIV. 8458 RJS/THK, 2010 WL 808639, at

*3 (S.D.N.Y. Mar. 8, 2010) ("Plaintiffs do not suggest that the documents may be retrieved in

the United States, … [a]ccordingly, the Court concludes that the third factor weighs in favor of

UOB NY.").

  4. <u>The Availability Of Alternative Means To Securing The Information</u>

"[I]f the information sought can be easily obtained elsewhere, there is little or no reason

to require a party to violate foreign law."  *CE Int'l Res. Holdings, LLC*, 2013 WL 2661037, at

*10 (citation omitted); *Linde*, 262 F.R.D. at 150 (refusing to compel production of documents

from non-party bank when the requesting party had "alternative means of obtaining some of the

account and transactional evidence" from non-party bank).

First, documents related to communications between DB SA and the Republic can be

obtained from the Republic, which is a party to these matters.  At a minimum, in the first

instance, Plaintiffs should seek the information related to the BONAR 2024 bonds from the

Republic.  If they are unable to obtain the information from the Republic, only then should the

Court even consider Plaintiffs' application for the Court to compel the DB Entities to produce

documents in the possession of DB SA.  *See, e.g., Robinson Steel Co. v. Caterpillar, Inc.*, No.

2:10-CV-438-JTM-PRC, 2012 WL 5903769, at *3 (N.D. Ind. Nov. 21, 2012) (quashing

subpoena as unduly burdensome where it "appear[ed] to the Court that much of the information [plaintiff] is seeking . . . could have been obtained through party discovery . . . and that [plaintiff] did not attempt to obtain the information by discovery in the action before issuing the subpoenas."); *Soto v. Castlerock Farming & Transport, Inc*., No. 1:09-cv-00701 AWI, 2011 WL 2680839, at *9 (E.D. Cal. July 8, 2011) ("In general, there is a preference for parties to obtain discovery from one another before burdening non-parties with discovery requests. . . . Consequently, where plaintiffs have not shown they attempted to obtain documents from the defendant in an action prior to seeking the documents from a non-party, a subpoena duces tecum places an undue burden on a non-party.").

Further, New York federal and state courts have routinely required litigants to make use of the Hague Convention when seeking information located in the foreign country that is a signatory, such as Argentina. *See In re Vivendi Universal, SA Sec. Litig*., No. 02 Civ. 5571 RJH, 2004 WL 3019766, at *1 (S.D.N.Y. Dec. 30, 2004); *Hudson v. Hermann Pfauter GmbH & Co*., 117 F.R.D. 33, 38-39 (N.D.N.Y. 1987) ("To assume that the 'American' rules are superior to those procedures agreed upon by the signatories of the Hague Convention without first seeing how effective Convention procedures will be in practice would reflect the same parochial biases that the Convention was designed to overcome."); *Orlich v. Helm Bros*., 160 A.D.2d 135, 144, 560 N.Y.S.2d 10, 15 (1st Dep't 1990) (holding that nonparty disclosure must proceed through Hague Convention); *Intercont'l Credit Corp. v. Roth*, 154 Misc.2d 639, 641, 595 N.Y.S.2d 602, 603 (Sup. Ct. N.Y. Cty. 1991) ("application of the Hague Convention… which encompasses principles of international comity, is virtually compulsory").

Here, the Iriberri Dec. makes clear that not only is the issuance of Letters of Request under the Hague Convention an alternative means of securing the subpoenaed information, but a

26

mandatory recourse for the production of documents in Argentina.  (Iriberri Dec., §§ II.1 – II.2).

Any failure of DB SA to observe the terms of the Hague Convention exposes DB SA to penalties

under both Argentine Criminal and Civil law.  (Iriberri Dec., § V).  Further, the DB Entities are

willing to cooperate with Plaintiffs to prepare a Letter of Request under the Hague Convention.

(Zimmerman Dec., ¶ 15).  *See CE Int'l Res. Holdings, LLC*, 2013 WL 2661037, at *12 (denying

motion to compel where DB AG offered to cooperate with application under Hague

Convention); *Qi Andrew*, 276 F.R.D. at 160 (denying motion to compel where Bank of China

offered to help draft Hague Convention request).  Accordingly, this factor weighs in favor of the

DB Entities.

> 5.    The Balance Of National Interests

"The fifth factor… requires the Court to engage in the precarious task of balancing the

interests of the United States against the interests of a foreign nation." *CE Int'l, Res. Holdings,

LLC*, 2013 WL 2661037, at *13 (citation omitted).  "[W]here the interest [of the United States] is

a generalized interest in 'fully and fairly adjudicating matters before its courts,' courts allocate

relatively less weight to the United States in this analysis." *Id.* at *14 (citations omitted).  *See

also Minpeco*, 116 F.R.D. at 523 ("It is of some significance that the cases involved here are

private civil actions rather than criminal or civil enforcement proceedings in which the United

States government is the party moving to compel.").

Relative to the United States, Argentina has an interest in enforcement of its laws related

to protection of personal data, banking secrecy and security dealing secrecy.  As an expression of

this interest, as discussed in the Iriberri Dec., Argentina's Congress passed Law No. 25,326, the

Personal Data Protection Act ("PDPA"), which establishes rules that are aimed at ensuring the

right to privacy and other constitutional rights of both individuals and legal entities.  (Iriberri

Dec., § III).  Article 10 of the PDPA provides, in pertinent part:

> 1.  Those responsible for keeping personal data and the persons who may intervene in any phase of the processing of personal data are bound by professional secrecy with respect to the data.  Such obligation shall survive even after the relationship with the owner of the data is finished.

> 2.  The obligated party may be relieved of his duty of secrecy by judicial decision and when there are sufficient reasons concerning public security, the national defense or public health.

(*Id.*, § III.3).  To strengthen this duty, when the PDPA was enacted, the Argentine Penal Code

was amended in order to incorporate a specific criminal sanction against anyone legally bound to

maintain professional secrecy who may unlawfully disclose data under his/its control.  (*Id.*, § V).

Article 157 of the Penal Code provides, in pertinent part:

> A prison sentence for a term of between one month and two years shall be impose on whoever:

> […]

> 2.  Unlawfully furnishes or reveals to someone an information that is recorded in an archive or in personal data banks whose secrecy the indicted person is obliged to preserve by a statutory provision.

(*Id.*).

Further, the Argentine government agency charged with implementing the PDPA, the

Direccion Nacional de Proteccion de Datos Personales, can impose administrative penalties for

violations, including warnings, suspension of the use of the data for up to a year, closure of the

applicable database and/or fines of ARS 80,001 to ARS 100,000.  (*Id.*).[16]  In addition, data

---

[16] In addition, in 2012, the Argentine Congress passed Law No. 26,831 (the Capital Markets Act or "CMA"), which imposes a duty of secrecy on DBSA as a "Negotiation Agent" and a "Settlement Compensation Agent," with regard to transactions on behalf of third parties.  (Iriberri Dec., § III.6).   Violation of the CMA could subject DBSA to additional administrative penalties.  (*Id.*, § V).

owners can bring a lawsuit for damages against the entity who unlawfully disclosed the data. (*Id.*).   Moreover, DBSA and its officers could be subject to administrative and regulatory proceedings and sanctions by the Central Bank or the Superintendent of Financial and Currency Exchange Entities for violations of the law.  (*Id.*).

Accordingly, Argentina's interest in professional secrecy outweighs the United States' generalized interest in the enforcement of U.S. judgments, particularly in light of the fact that the DB Entities are non-parties and the information Plaintiffs seek, to the extent that it exists, is more likely to be in possession of the DB Entities outside of Argentina than in the possession of DB SA in Argentina.  *See CE Int'l Res. Holdings, LLC*, 2013 WL 2661037, at *14 ("notwithstanding the United States' generalized interest in the enforcement of U.S. judgments, the Court finds that Singapore's specific interest in bank customer secrecy favors non-enforcement of the subpoena, especially in light of Deutsche Bank's non-party status."); *Qi Andrew*, 276 F.R.D. at 158 ("While the United States certainly has an interest in enforcing its orders and protecting trademark rights, the Chinese interest in protecting its account holders' confidentiality appears more significant in this case. The regulations at issue have few exceptions and appear to provide harsh consequences for violations. The fact that the Banks are non-parties further pushes this factor in favor of the Banks.").  Thus, this factor weighs against compelling production from DB SA.

     6.    <u>The Hardship Of Compliance</u>

"The hardship prong of the international comity analysis considers two related factors: possibility of sanctions and the status of the entity in the underlying action."  *CE Int'l, Res. Holdings, LLC*, 2013 WL 2661037, at *14.  As discussed above, the disclosure of information possessed by DB SA, a non-party, would violate Argentina's professional secrecy laws and

subject DB SA or its officers to civil and criminal liability.  (Iriberri Dec., § V).   Accordingly, this factor weighs against compelling disclosure.

### 7.   The Good Faith Of The Resisting Person

Finally, the good faith of the DB Entities is demonstrated by their offer to make an initial production of information relevant to what the DB Entities believe to be the areas of particular interest to Plaintiffs, subject to Plaintiff requesting additional information.[17]   (Farris Dec., Ex. 36, 1-4).  *See Qi Andrew*, 276 F.R.D. at 160 (finding no bad faith where the banks contacted plaintiffs after receiving the preliminary injunction and subpoenas, relayed the information found in their New York branches, and offered to help draft a Hague Convention request); *Minpeco, SA*, 116 F.R.D. at 522-23 (suggesting no bad faith where entity did not "deliberately court[ ] legal impediments to production").  Contrary to Plaintiffs' contentions (Pl. Br. 14), the initial production proposed by the DB Entities includes the production of certain information from outside of the United States, including that in the possession of DB AG London.[18]  (Zimmerman Dec., ¶ 6).  Further, the DB Entities are prepared to cooperate with Plaintiffs in making a Letter of Request under the Hague Convention.  (Zimmerman Dec., ¶ 15).  Moreover, any purported bad faith in not producing documents from DB SA is negated by the fact that production would violate Argentine law.  (*See* Iriberri Dec., §§ II - V).  *See CE Int'l Res. Holdings, LLC*, 2013 WL 2661037, at *16 (finding that Deutsche Bank AG's opposition to subpoena was not in bad faith where Singapore possessed applicable banking secrecy laws).  Thus, the comity analysis weighs against compelling production from DB SA.

---

[17] This was in addition to the DB Entities' prior production of almost 3,000 pages of information, telephone calls and emails between counsel for NML/Aurelius and the DB Entities, and a 30(b)(6) deposition of the DB Entities related to the BONAR 2024 bonds.  (Zimmerman Dec., ¶¶ 8, 10).

[18] Moreover, documents previously produced by the DB Entities include documents from DB AG London. (Zimmerman Dec., ¶ 12).

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' Motion should be denied and the DB Entities'

Cross-Motion should be granted.

Dated: New York, New York
October 23, 2015

MOSES & SINGER LLP

By: ____/s/Philippe Zimmerman_____
Philippe Zimmerman
Shari A. Alexander
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
(212) 554-7800
pzimmerman@mosessinger.com
salexander@mosessinger.com

*Attorneys for the DB Entities*