UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
NML CAPITAL, LTD.,                              :
                                                :    08 Civ. 6978 (TPG)
                    Plaintiff,                  :    09 Civ. 1707 (TPG)
                                                :    09 Civ. 1708 (TPG)
            v.                                  :    14 Civ. 8601 (TPG)
                                                :    14 Civ. 8988 (TPG)
THE REPUBLIC OF ARGENTINA,                      :
                                                :
                    Defendant.                  :
-------------------------------------------------------- x
                                                :
AURELIUS CAPITAL MASTER, LTD. and               :
ACP MASTER, LTD.,                               :    09 Civ. 8757 (TPG)
                                                :    09 Civ. 10620 (TPG)
                    Plaintiffs,                 :
                                                :
            v.                                  :
                                                :
THE REPUBLIC OF ARGENTINA,                      :
                                                :
                    Defendant.                  :
                                                :
-------------------------------------------------------- x
                                                :
AURELIUS OPPORTUNITIES FUND II, LLC  :
and AURELIUS CAPITAL MASTER, LTD.,   :    10 Civ. 1602 (TPG)
                                                :    10 Civ. 3507 (TPG)
                    Plaintiffs,                 :
                                                :
            v.                                  :
                                                :
THE REPUBLIC OF ARGENTINA,                      :
                                                :
                    Defendant.                  :
                                                :    **(captions continued on next page)**
-------------------------------------------------------- x

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE REPUBLIC OF ARGENTINA'S MOTION TO VACATE THE INJUNCTIONS

```
------------------------------------------------------ x
AURELIUS CAPITAL MASTER, LTD. and    :        10 Civ. 3970 (TPG)
AURELIUS OPPORTUNITIES FUND II, LLC,  :        10 Civ. 8339 (TPG)
                                      :
                                      :
                    Plaintiffs,       :
                                      :
        v.                            :
                                      :
THE REPUBLIC OF ARGENTINA,            :
                                      :
                    Defendant.        :
------------------------------------------------------ x
BLUE ANGEL CAPITAL I LLC,             :
                                      :
                                      :
                    Plaintiff,        :        10 Civ. 4101 (TPG)
                                      :        10 Civ. 4782 (TPG)
        v.                            :        14 Civ. 8947 (TPG)
                                      :
THE REPUBLIC OF ARGENTINA,            :
                                      :
                    Defendant.        :
------------------------------------------------------ x
OLIFANT FUND, LTD.,                   :
                                      :
                    Plaintiff,        :        10 Civ. 9587 (TPG)
                                      :
        v.                            :
                                      :
THE REPUBLIC OF ARGENTINA,            :
                                      :
                    Defendant.        :
------------------------------------------------------ x
PABLO ALBERTO VARELA, et al.,         :
                                      :
                    Plaintiff,        :        10 Civ. 5338 (TPG)
                                      :
        v.                            :
                                      :
THE REPUBLIC OF ARGENTINA,            :
                                      :
                    Defendant.        :
------------------------------------------------------ x
```

2

```
------------------------------------------------------ x
AURELIUS CAPITAL PARTNERS, LP and        :
AURELIUS CAPITAL MASTER, LTD.            :
                                         :
                Plaintiffs,              :
                                         :
        v.                               :          14 Civ. 8946 (TPG)
                                         :
THE REPUBLIC OF ARGENTINA,               :
                                         :
                Defendant.               :
------------------------------------------------------ x
FFI FUND, LTD. and FYI LTD.,             :
                                         :
                Plaintiffs,              :
                                         :
        v.                               :
                                         :
THE REPUBLIC OF ARGENTINA,               :          14 Civ. 8630 (TPG)
                                         :
                Defendant.               :
------------------------------------------------------ x
```

**TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 6

    A.    Argentina Breaches The Pari Passu Clause By Issuing And Paying On
            Debt Superior To The FAA Bonds. ......................................................... 6

    B.    Lead Plaintiffs Seek Specific Enforcement Of Argentina's Equal
            Treatment Obligations. ........................................................................... 9

    C.    Argentina Defies And Attempts To Evade The Injunctions. ................... 10

    D.    Argentina's New Government Presents A Discriminatory, Take-It-Or-
            Leave-It Settlement Offer And Seeks To Lift The Injunctions. ............. 12

LEGAL STANDARD ....................................................................................................... 16

ARGUMENT .................................................................................................................... 17

I.     This Court Lacks Jurisdiction To Vacate The Injunctions. ............................... 17

II.    Argentina Cannot Demonstrate The Exceptional Changed Circumstances
       Required To Vacate Or Modify An Injunction. ................................................ 18

III.   The Injunctions Remain Justified And Essential To Protect Plaintiffs' Contractual
       Rights. .............................................................................................................. 23

    A.    Plaintiffs Still Have No Adequate Remedy At Law. ............................. 23

    B.    The Balance Of The Equities Favors The Injunctions. ......................... 24

    C.    Vacatur Would Contravene The Public Interest. ................................... 26

CONCLUSION ................................................................................................................. 27

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re A.T. Reynolds & Sons, Inc.,*
   452 B.R. 374 (S.D.N.Y. 2011)................................................................................................21

*Bank Midwest, N.A. v. Hypo Real Estate Capital Corp.,*
   No. 10-cv-232, 2010 WL 4449366 (S.D.N.Y. Oct. 13, 2010).................................................24

*Bldg. & Const. Trades Council of Phila. & Vicinity, AFL-CIO v. N.L.R.B.,*
   64 F.3d 880 (3d Cir. 1995)..................................................................................17, 18, 22, 23

*Campbell-Ewald Co. v. Gomez,*
   136 S. Ct. 663 (2016)...........................................................................................................21

*Graphic Commc'ns Union, Chi. Paper Handlers' & Electrotypers' Local No. 2 v.*
   *Chi. Tribune Co.,*
   779 F.2d 13 (7th Cir. 1985) .................................................................................................27

*Griggs v. Provident Consumer Disc. Co.,*
   459 U.S. 56 (1982)...............................................................................................................17

*King v. First Am. Investigations, Inc.,*
   287 F.3d 91 (2d Cir. 2002)...................................................................................................17

*Motorola Credit Corp. v. Uzan,*
   561 F.3d 123 (2d Cir. 2009)............................................................................................16, 18

*NML Capital, Ltd. v. Republic of Argentina,*
   699 F.3d 246 (2d Cir. 2012)..........................................................................................passim

*NML Capital, Ltd. v. Republic of Argentina,*
   727 F.3d 230 (2d Cir. 2013)..........................................................................................passim

*NML Capital, Ltd. v. Republic of Argentina,*
   No. 14-cv-8601 (TPG), 2015 WL 6656573 (S.D.N.Y. Oct. 30, 2015) ....................................25

*Safeco Ins. Co. of Am. v. Schwab,*
   739 F.2d 431 (9th Cir. 1984) ...............................................................................................24

*Sierra Club v. U.S. Army Corps of Eng'rs,*
   732 F.2d 253 (2d Cir. 1984)..........................................................................................passim

*Toliver v. Cnty. of Sullivan,*
   957 F.2d 47 (2d Cir. 1992) (per curiam)................................................................................17

**Other Authorities**

25 Williston on Contracts § 67:88 (4th ed.)..................................................................................24

Fed. R. Civ. P. 54.......................................................................................................................16

Fed. R. Civ. P. 60.................................................................................................................4, 16, 18

Fed. R. Civ. P. 62.1.............................................................................................................4, 17, 18

Int'l Fin., *Principles for Stable Capital Flows and Fair Debt Restructuring in Emerging Markets* (2005) ......................................................................................................7

Julie Wernau & Taos Turner, *Argentina Debt Deal Faces Hurdles Despite Bond Offer*, Wall St. J. (Feb. 7, 2016)..............................................................................................13

Katia Porzecanski & Camila Russo, *Argentina Deposits $1 Billion for June 30 Bond Payments*..............................................................................................................................11

Katia Porzecanski et al., *Argentina Reaches Partial Deal on Debt, But Holdouts Remain* ..............................................................................................................................13

Ken Parks & Taos Turner, *Argentina Moves to Pay Exchange Bondholders in Argentina*, Wall St. J. (Aug. 20, 2014) ..............................................................................11

## INTRODUCTION

The Plaintiffs in these actions—referred to herein as the "Lead Plaintiffs"—oppose Argentina's motion to vacate the Injunctions. The Lead Plaintiffs are all of the Plaintiffs who obtained the original pari passu Injunctions in 2012. They hold approximately 65% of the pari passu claims that are the subject of the years-long effort to require Argentina to honor its contractual commitments and respect the judgments of the courts to which it voluntarily submitted.[1] This Court issued the Injunctions in these cases to remedy Argentina's longstanding breach of its contractual commitment to "rank" its "payment obligations" under Plaintiffs' bonds at least equally with its obligations on its Exchange Bonds. As this Court has explained, Plaintiffs "have their rights and nobody, under any circumstances [can] . . . take away their rights at all, in any degree." Ex. 42 at 29:22-24 (Sept. 28, 2011 Hr'g Tr.);[2] *see also NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230, 241 (2d Cir. 2013) ("*NML II*") ("[T]he district court's decision does no more than hold Argentina to its contractual obligation of equal treatment.").

But that is exactly what Argentina now asks this Court to do—to take away the Plaintiffs' repeatedly reaffirmed rights to equal treatment by eliminating the only judicial remedy capable of holding Argentina to its promise—this Court's Injunctions.

To support its request, Argentina does not proffer that it has discharged its equal treatment obligations to Plaintiffs. Nor does Argentina even represent that it will abide by its equal treatment obligations in the future. Instead, Argentina asserts that the Court should vacate its Injunctions merely because Argentina has (1) reached conditional settlement agreements with two creditors (the much larger of whom "settled" for 100% of its claim) who, together, account

---

[1]  We expect many more of the Plaintiff creditors will join this opposition as well. All told, the overwhelming majority of creditors involved in this litigation firmly oppose Argentina's requested relief.

[2]  "Ex." refers to the exhibits to the Declaration of Robert A. Cohen, filed concurrently with this Opposition.

for only 14% of claims held by Plaintiffs with pari passu Injunctions, and (2) made an ultimatum to the remaining Plaintiffs to settle their claims at sizeable discounts.

If this rings familiar—Argentina arguing that its take-it-or-leave-it restructuring offer is an adequate substitute for enforcement of Plaintiffs' contractual rights—it should. When Argentina appealed the Injunctions to the Second Circuit, it argued that because the vast majority of creditors had accepted Argentina's 2005 and 2010 offers to tender their bonds governed by the 1994 Fiscal Agency Agreement ("FAA" and "FAA Bonds") for Exchange Bonds, courts should decline to enforce Plaintiffs' contractual rights under the FAA and instead leave Plaintiffs with the option only to accept the restructuring terms Argentina had unilaterally dictated in 2005 and 2010. The Second Circuit flatly rejected this contention because it "ignored the outstanding bonds" held by Lead Plaintiffs. *NML II*, 727 F.3d at 238. Though Argentina's new government has just offered restructuring terms that are less confiscatory than those presented by the previous government, Argentina's new request to lift the Injunctions ignores the obligations of the FAA Bonds just the same. For that reason alone, Argentina's present request must be rejected.

None of this is to say that the efforts of Argentina's new government to resolve these long-pending cases are unwelcome. Quite to the contrary, Plaintiffs are encouraged by the engagement of Argentina's new leadership and by its stated desire to reach agreements to resolve these cases.

But those negotiations—which had been obdurately refused by Argentina for years—had only just begun when Argentina issued the February 5 ultimatum it now cites as justification for vacating the Injunctions. Representatives of President Macri's administration first discussed the terms of a potential settlement with the Lead Plaintiffs on February 1 for about two hours, and last met with that group, plus the Varela Plaintiffs, on February 4, for 20 minutes. On February

5, rather than continue negotiations, Argentina went public with an ambiguous tender offer for the defaulted bonds. Despite Argentina's unwillingness to engage directly with Lead Plaintiffs, and the diversion necessitated by the present Motion, Lead Plaintiffs have delivered term sheets to Argentina via the Special Master on February 4, February 7, and February 17, offering a succession of substantial haircuts. Only yesterday, after repeated requests by Lead Plaintiffs, did the Special Master agree to schedule another face-to-face meeting between Argentina and Lead Plaintiffs—a meeting that is taking place as this brief is being filed. And a substantial majority of the Plaintiffs in these cases have had no contact with Argentina at all. For them, Argentina's first and only communication was its vague February 5 tender offer.

Thus the factual premise for Argentina's present request—that Plaintiffs and Argentina have made substantial progress toward resolution of Plaintiffs' claims—is simply incorrect. For 86% of Plaintiffs, their claims remain unsettled and a meaningful settlement dialogue has yet to develop. It blinks reality to think that permitting Argentina to resume violating Plaintiffs' equal treatment rights would facilitate—rather than delay—the good-faith negotiations necessary to achieve ultimate resolution of these cases. It is only because this Court compelled Argentina to rank Plaintiffs' bonds equally that Argentina now, finally, is regarding those bonds as debts that must be resolved. Authorizing Argentina once again to violate Plaintiffs' contractual rights would upend the negotiations that only now are just beginning in earnest and would risk new and unwanted litigation.

Argentina's motion also is legally unfounded. As a threshold matter, this Court lacks jurisdiction to grant Argentina's requested relief because every Injunction at issue in this litigation is currently the subject of an appeal by Argentina. Argentina admits that this Court cannot vacate the Injunctions issued in October 2015, and accordingly asks only for an

"indicative ruling" under Rule 62.1 of the Federal Rules of Civil Procedure. But Argentina fails to acknowledge that the Injunctions this Court issued in 2012 *also* are the subject of an appeal pending before the Second Circuit. Indeed, in a mere six days the Second Circuit will hear oral argument in that appeal, in which Argentina contends that those Injunctions should be modified to exclude certain categories of Exchange Bonds. Jurisdiction thus is lacking in this Court with respect to all the Injunctions. This Court has discretion to decline to entertain, or simply defer considering, Argentina's request that this Court enter indicative rulings under Rule 62.1, and it should do so here. Doing so would materially advance the prospect of a comprehensive settlement, because it would make clear (particularly to Argentina) that resolution is to be found through good-faith negotiations, not by attempting to leverage settlements with a small fraction of creditors into relief from the Injunctions and a return to the disregard of Plaintiffs' contractual rights.

Should the Court decide to entertain Argentina's request for an indicative ruling, Argentina must satisfy the stringent standard of Rule 60(b) because the Injunctions are not "interlocutory," but rather permanent injunctions that the Second Circuit has twice affirmed. In the absence of a change in the governing law (and Argentina asserts none here), Argentina can satisfy that standard only by showing that the Injunctions have fulfilled their purpose such that the relief they provide is no longer necessary to Plaintiffs. Argentina suggests that, because it has *started* to negotiate with Plaintiffs, the Injunctions have provided Plaintiffs with their intended relief. That argument completely misapprehends the purpose of the Injunctions. The purpose of the Injunctions is not, as Argentina would have it, to compel Argentina to negotiate. Rather, as the Second Circuit held, the Injunctions are "intended to remedy Argentina's breach of the equal treatment obligation in the FAA." *NML II*, 727 F.3d at 237. It should go without

4

saying that Argentina's requested order to permit it to *resume violations* of the equal treatment obligation is contrary to the purposes of the Injunctions as found by the Second Circuit.

Indeed, every consideration that warranted the issuance of the Injunctions in the first instance continues to apply with equal force today. Plaintiffs remain without any adequate remedy at law for Argentina's breach of its equal-treatment obligations. And the equities the Second Circuit considered relevant continue to favor the Injunctions overwhelmingly. The Second Circuit rejected the argument that the Injunctions were inequitable because they permitted Plaintiffs to "thwart the implementation of an internationally supported restructuring plan," holding that while "Argentina has no right to force [Plaintiffs] to accept a restructuring," Argentina alone determines "whether it will repudiate that creditor's debt in a manner that violates [its] pari passu clause." *NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 263 n.15, 264 (2d Cir. 2012) ("*NML I*"). That remains true today. That Argentina reached settlements with a handful of Plaintiffs representing only 14% of Plaintiffs' claims is not a remotely adequate basis for disregarding the contractual rights of the remaining 86%.

To be clear, Lead Plaintiffs want to reach a fair settlement agreement with Argentina, and promptly. While Argentina claims that its motion will advance settlement discussions, it will, in fact, have the exact opposite effect. Indeed, it already has had a deleterious effect on negotiations, impeding communication and distracting parties from focusing on bridging their relatively few differences. Granting the relief Argentina seeks would simply delay resumption of negotiations by requiring Plaintiffs to return to the Second Circuit, or to take further measures necessary to protect their rights. Respectfully, the current facts do not support the order Argentina seeks, and the law does not permit this Court to enter an order that authorizes Argentina to violate Plaintiffs' contractual rights.

## BACKGROUND

### A.   Argentina Breaches The Pari Passu Clause By Issuing And Paying On Debt Superior To The FAA Bonds.

In 1994, Argentina issued bonds under the FAA. The FAA included several provisions to protect investors in the event that Argentina, which had a long history of debt default, defaulted again on its repayment obligations. One of these protections was the Pari Passu Clause, which promises:

> The Securities will constitute . . . direct, unconditional, unsecured and unsubordinated obligations of the Republic and shall at all times rank *pari passu* and without any preference among themselves. The payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness (as defined in this Agreement).

Ex. 1, (FAA ¶ 1(c)).

Concern over Argentina's potential default turned out to be well founded. In 2001, Argentina announced a moratorium on the payment of its outstanding public debt, including the FAA Bonds, and enacted Law 25,561, which granted expansive powers to Argentina's Executive Branch to restructure Argentina's outstanding public debt. Ex. 2 (Law 25,561). Argentina has extended this payment moratorium each year in its annual budgets and has refused to make payments on any bonds subject to the moratorium. *NML I*, 699 F.3d at 251; *see also* Ex. 2 (Law 25,561); Ex. 3 (Law 25,565 art. 6); Ex. 4 (Law 25,725 art. 7); Ex. 7 (Law 26,728 art. 48); Ex. 8 (Law 26,784 art. 39); Ex. 9 (Law 26,886 art. 4); Ex. 10 (Law 26,895 art. 56); Ex. 11 (Law 27,008 art. 44); Ex. 12 (Law 27,198 art. 41); Ex. 13 (*Claren Corp. c/ E.N.*, C. 462, XLVII (Mar. 6, 2014)); Ex. 14 (*Claren Corp. c/ Estadio Nacional*, CFed, sala X, 2010).

In 2005, Argentina sought to restructure its defaulted debt. Argentina initially promised its creditors that it would "engage in constructive negotiations" in accord with international

6

practice in sovereign-debt restructurings. Ex. 15 (Argentina—Letter of Intent and Addendum to the Technical Memorandum of Understanding, IMF (Mar. 10, 2004)); *see also* Ex. 16 at 11-14 (Inst. of Int'l Fin., *Principles for Stable Capital Flows and Fair Debt Restructuring in Emerging Markets* (2005)) (sovereign debt restructurings should include "regular dialogue," "creditor committee[s]," and "timely good faith negotiations").

Argentina broke that promise and instead transmitted to creditors a unilateral, take-it-or-leave-it offer (the "Exchange Offer") to exchange their defaulted FAA Bonds for newly issued bonds ("Exchange Bonds") worth a fraction as much. *NML I*, 699 F.3d at 252. To pressure bondholders to accept the Exchange Offer, Argentina enacted Law 26,017, the so-called "Lock Law," which prohibited Argentina's Executive Branch from reopening the Exchange Offer or accepting any type of settlement involving untendered securities that were eligible to participate in the 2005 Exchange Offer. *Id.* According to Argentine legislators, its legislative enactments placed the FAA Bonds "at the end of the line," Ex. 19 at 9 (Transcript, Meeting No. 37, First Special Session held on February 9, 2005 to discuss the System for Exchanging Bonds Issued by the Argentine Government), in a "peripheral garbage circuit," Ex. 18 at 28 (Transcript, 38th Meeting, 1st Extraordinary Session of the Argentine Republic Chamber of Senators of the Nation, held on February 3, 2005).

Argentina issued its first Exchange Bonds in 2005. Argentina provided that these new bonds were not subject to its payment moratorium, and it began to make regular payments on them. More than a quarter of Argentina's external creditors, however, refused to accept the highly unfavorable terms of the 2005 Exchange Offer.

Five years later, in 2010, Argentina again sought to restructure the remaining bonds that did not participate in the 2005 Exchange Offer. This 2010 Exchange Offer provided creditors

terms materially identical to the unilateral terms of the 2005 Exchange Offer. *NML I*, 699 F.3d at 252. Argentina facilitated the 2010 Exchange Offer by passing Law 26,547 (the "Lock Law Suspension"), which temporarily suspended the Lock Law, and which "prohibited [Argentina from] offer[ing] the holders of government bonds who may have initiated judicial . . . action, more favorable treatment than what is offered to those who have not done so." *Id.* at 252 n.3; Ex. 20 (Law 26,547 art. 1). In 2010, Argentina issued these new Exchange Bonds and then proceeded to make payments on those bonds, which also are not subject to Argentina's myriad legislation forbidding payments on its defaulted debt.

While it made regular payments on its Exchange Bonds, Argentina never resumed payments on the unexchanged FAA Bonds. Argentina confirmed in a filing with the U.S. Securities and Exchange Commission that Plaintiffs' FAA Bonds exist "as a separate category from its regular debt" and that Argentina "has not been in a legal position to pay" FAA Bondholders. *NML I*, 699 F.3d at 254 (punctuation omitted).

The Argentine courts have held that the Lock Law and "the moratoria on payments prevent them from recognizing New York judgments regarding the FAA Bonds." *NML I*, 699 F.3d at 254. In particular, these "courts" have enforced Argentina's laws "precluding its officials from paying defaulted bondholders and barring its courts from recognizing plaintiffs' judgments." *Id.* at 260. For example, Argentina's Supreme Court of Justice invoked the "budgetary laws" "deferring the servicing of the debt," such as "Law 25,561" and "Law 25,565," as well as the Lock Law Suspension, to deny recognition of this Court's judgments. Ex. 13 at 4 (*Claren Corp. c/ E.N.*, C. 462, XLVII (Mar. 6, 2014)). Argentine courts also have cited broader "public-policy principles of Argentine law"—reflected in the payment moratoria in "the budget laws" and the Lock Law Suspension—to refuse to "recognize" this Court's "judgment" holding

8

that Plaintiffs are entitled to the payments Argentina promised them.  Ex. 14 at 10-16 (*Claren Corp. c/ Estadio Nacional*, CFed, sala X, 2010).  Of course, these legal decisions and legislative enactments are merely manifestations of the Argentine government's refusal to pay Plaintiffs' claims, as Argentina's legislature has legislated to lift and re-impose the Lock Law whenever it was convenient for it to do so.  *See, e.g.*, Ex. 20 (Law 26,547 art. 1).

## B.  Lead Plaintiffs Seek Specific Enforcement Of Argentina's Equal Treatment Obligations.

In 2010, Lead Plaintiffs sued Argentina for breaching the Pari Passu Clause, which requires Argentina "at all times" to "rank" its "payment obligations" under the FAA Bonds "at least equally with all its other present and future unsecured and unsubordinated External Indebtedness" and to treat the FAA Bonds as "direct, unconditional, unsecured and unsubordinated obligations of the Republic."  Ex. 1 (FAA ¶ 1(c)).

This Court concluded that Argentina had breached the Clause by "relegating [Lead Plaintiffs'] bonds to a non-paying class by failing to pay the obligations currently due under [Lead Plaintiffs'] Bonds while at the same time making payments currently due to holders of other unsecured and unsubordinated External Indebtedness" and by "enact[ing]" the Lock Law and Lock Law Suspension.  D.E. 353 at 4-5.[3]  To remedy Argentina's breach, this Court issued the Injunctions ordering Argentina to make ratable payments to Lead Plaintiffs whenever it paid amounts due on the 2005 and 2010 Exchange Bonds.  D.E. 371 at 3-5; D.E. 425 at 4-5.  The Injunctions also expressly prohibited Argentina from taking action to evade the Court's jurisdiction.  D.E. 371 at 5; D.E. 425 at 7.

---

[3]  Unless otherwise indicated, "D.E." refers to docket entries in matter 08-Civ.-6978 (TPG) (S.D.N.Y.).

Argentina appealed the Injunctions, and on October 26, 2012, the Second Circuit affirmed this Court's rulings. *NML I*, 699 F.3d at 265. The Second Circuit reasoned that "Argentina effectively has ranked its payment obligations to the plaintiffs below those of the exchange bondholders" and that "the combination of Argentina's executive declarations and legislative enactments have ensured that plaintiffs' beneficial interests do *not* remain direct, unconditional, unsecured and unsubordinated obligations of the Republic." *Id.* at 259-60. Such "legislative enactments" included both the Lock Law and the Lock Law Suspension, as well as the numerous payment moratoria. *Id.* at 252 & n.3, 254-55, 257.

The Second Circuit also upheld the Injunctions as the appropriate remedy for Argentina's breach. *Id.* at 261-65. Following a limited remand, the Second Circuit affirmed the Injunctions in full, explaining that the Injunctions "affirm[] a proposition essential to the integrity of the capital markets: borrowers and lenders may, under New York law, negotiate mutually agreeable terms for their transactions, but they will be held to those terms." *NML II*, 727 F.3d at 248.

Argentina filed a petition for a writ of certiorari, which the Supreme Court denied on June 16, 2014. *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2819 (2014). The Injunctions then took effect. *NML Capital, Ltd v. Republic of Argentina*, No. 12-105(L), D.E. 1055 (2d Cir. June 18, 2014).

## C. Argentina Defies And Attempts To Evade The Injunctions.

Even before the Supreme Court had denied certiorari, Argentina had proclaimed its intention to disobey this Court's orders. During oral argument before the Second Circuit, Argentina's counsel advised the panel that Argentina "would not voluntarily obey the district court's injunctions, even if those injunctions were upheld by this Court." *NML II*, 727 F.3d at 238 (internal quotation marks omitted). True to this vow, Argentina attempted to evade the Injunctions immediately after the Second Circuit affirmed them in August 2013. Argentine

10

President Cristina Fernandez de Kirchner announced a plan that would allow the Exchange Bondholders to swap their Exchange Bonds for bonds payable in Argentina, where this Court's orders could more easily be ignored. Ex. 21 at 4-5 (Tr. of President Kirchner's August 26, 2013 Address). This Court responded by entering an order declaring that Argentina's scheme to move Argentina's payment mechanisms offshore would violate the Injunctions' anti-evasion provisions. D.E. 487 at 5-7.

This Court also appointed Mr. Daniel Pollack as Special Master to preside over settlement negotiations among Argentina and its creditors, with the hope of avoiding a default on the Exchange Bonds. D.E. 530. Argentina, however, refused to negotiate, opting instead for further default.

Days later in June 2014, Argentina violated the Injunctions again by transferring $832 million to various banks—including $539 million to Bank of New York Mellon ("BNY"), the trustee for some of the Exchange Bonds—for the purpose of making payments on the Exchange Bonds without making ratable payments to Lead Plaintiffs. Ex. 22 (Katia Porzecanski & Camila Russo, *Argentina Deposits $1 Billion for June 30 Bond Payments*, Bloomberg (June 26, 2014)). Again, this Court condemned Argentina's behavior, holding on August 6, 2014 that "the payment by Argentina to BNY . . . was illegal and a violation of the [Court's] Orders." D.E. 633 at 4.

When BNY refused to disburse Argentina's illegal payment, the Republic attempted to sidestep BNY. Argentina passed a law purporting to replace BNY with an entity it controls, Nación Fideicomisos, SA, so that this pliant institution would process Argentina's illegal payments. Ex. 23 art. 3 (Law 26,984); Ex. 24 (Ken Parks & Taos Turner, *Argentina Moves to Pay Exchange Bondholders in Argentina*, Wall St. J. (Aug. 20, 2014)); Ex. 25, (Charlie

Devereux et al., *Argentina's Bonds Decline on Plan to Offer Local-Law Swap*, Bloomberg (Aug. 20, 2014)).

In response to this litany of misconduct, this Court held Argentina in contempt. D.E. 687 at 3; D.E. 693 at 3. The Court provided that, to purge its contempt, "[t]he Republic of Argentina will need to reverse entirely the steps which it has taken constituting the contempt, including, but not limited to, re-affirming the role of The Bank of New York Mellon as the indenture trustee and withdrawing any purported authorization of Nación Fideicomisos, S.A. to act as the indenture trustee, and complying completely with the February 23, 2012 injunction." D.E. 693 at 3.

Even with a new government now in place, Argentina has not yet acted to purge its contempt.

**D.    Argentina's New Government Presents A Discriminatory, Take-It-Or-Leave-It Settlement Offer And Seeks To Lift The Injunctions.**

On November 22, 2015, Argentine voters elected a new President, Mauricio Macri. To his credit, days after his election, President Macri announced his intention to negotiate a resolution to these long-pending actions. Ex. 26 at 2 (Alexandra Stevenson, *Argentina's Next Finance Chief Meets Debt Dispute Mediator*, N.Y. Times (Dec. 9, 2015)). In December 2015, representatives from the Argentine government traveled to New York and met with the Special Master. *See id.* The Macri government seemed poised to break with the prior government's "unique[,] . . . unilateral and coercive approach to the debt restructuring" process. Ex. 27 at 1 (*Holdout Creditors Have Not Been an Obstacle to Sovereign Debt Restructurings*, Moody's (Apr. 10, 2013)).

On January 13, 2016, representatives from the Argentine government met with representatives of certain Plaintiffs for approximately an hour and a half. They discussed procedural issues. Declaration of Jay Newman ¶ 3 (February 16, 2016) ("Newman Decl.").

On February 1, 2016, Argentina met with six Plaintiffs—(i) the Lead Plaintiffs (minus the Varela Plaintiffs), which hold more than 65% of the pari passu claims, (ii) EM Ltd. ("EM"), which holds 9.5% of the pari passu claims, and (iii) Montreux Partners (and affiliated entities),[4] which holds about 4.8% of the pari passu claims. That meeting lasted for approximately two hours. Newman Decl. ¶ 4.

On February 3, 2016, Argentina reached side agreements in principle with EM and Montreux, though these settlements have not been (and may never be) consummated. Bausili Decl. ¶ 6. Argentina, EM, and Montreux initially declined to disclose the terms of their provisional settlements.

On February 4, the Lead Plaintiffs, this time including the Varela Plaintiffs, met with Argentina in an in-person meeting, where the institutional Lead Plaintiffs presented a term sheet for a settlement of their claims, which included a material discount on value of their claims. Newman Decl. ¶ 5. After approximately 20 minutes, Argentina's representatives walked out, announcing that they would fly back to Buenos Aires that evening. Newman Decl. ¶ 5.

On February 5, 2016, without responding directly to the term sheet it had been presented, Argentina made a public tender offer for Plaintiffs' bonds and associated claims. Ex. 28 (Julie Wernau & Taos Turner, *Argentina Debt Deal Faces Hurdles Despite Bond Offer*, Wall St. J. (Feb. 7, 2016)); *see also* Ex. 29 (Katia Porzecanski et al., *Argentina Reaches Partial Deal on*

---

[4]  For ease of reference, the following group of entities affiliated with Montreux Partners is referred to collectively herein as "Montreux": Montreux Partners, L.P., Los Angeles Capital, Cordoba Capital, and Wilton Capital, Ltd.

*Debt, But Holdouts Remain*, Bloomberg (Feb. 5, 2016)). The tender offer included what Argentina refers to as the "Standard Offer" and the "Pari Passu Offer." The so-called "Standard Offer" is available to any FAA Bondholder, including those with bonds covered by this Court's Injunctions. It provides for Argentina to pay 150% of the "original principal amount" of the Plaintiffs' bonds. Mem. of L. in Support of the Republic of Argentina's Mot., By Order to Show Cause, to Vacate the Injunctions ("Mot.") at 9; Declaration of Michael Paskin Ex. J at 1 (Feb. 11, 2016), D.E. 864-1. Argentina has acknowledged that the Standard Offer can result in payments to some plaintiffs of 100% of their total claim against Argentina, including pre-judgment and post-judgment interest.[5] Indeed, as explained below, that is exactly what EM will receive. *See infra* p. 20.

Alternatively, holders of bonds covered by this Court's Injunctions may accept the "Pari Passu Offer." *Id.* at 9-10; Paskin Decl. Ex. J. That offer has two parts: For post-judgment claims, Argentina would pay 70% of the judgment. Paskin Decl. Ex. J at 1 (Feb. 11, 2016), D.E. 864-1. For pre-judgment claims, Argentina would pay 70% of the "accrued value of the claim." *Id.* In either case, Argentina would pay a creditor 72.5% of the applicable claim if that creditor accepts the offer by tomorrow, February 19, 2016. *Id.*

Argentina did not specify in the Pari Passu Offer it announced on February 5 whether it would recognize applicable statutory post-judgment interest on post-judgment claims or statutory pre-judgment interest on pre-judgment claims. On February 11, Argentina's Memorandum of Law indicated that both forms of such statutory interest would be disregarded. *See* Mot. 10

---

[5]   This was not clear from Argentina's brief or the February 5 offer attached to the brief. It was only on February 17, 2016 that Argentina clarified in a subsequent release that payments to settling plaintiffs would be capped at the value of their judgments, plus applicable post-judgment interest. Ex. 51. Indeed, until Argentina made this clarification, the Standard Offer appeared to permit plaintiffs to settle for *more than* the total value of their claims.

(referring to claims "accrued at their contractual rate," without reference to statutory rate). Yesterday, however, Argentina announced for the first time that it would recognize statutory post-judgment interest, Ex. 51, but said nothing about statutory pre-judgment interest. Later that day, Argentina's counsel confirmed to Lead Plaintiffs that Argentina also would recognize statutory interest on missed interest payments.

Even after these eleventh-hour clarifications, Argentina's offer plainly advantages some bondholders over others. Argentina proposes to pay some creditors (including EM) 100% of what Argentina owes to them, while it proposes to impose a 30% or 27.5% haircut on other creditors. Commentators have thus aptly observed that Argentina's offer was designed to "divide" its creditors into competing groups. *See* Ex. 30 (Carlos Burgueño, *The vultures will try to get Judge Griesa to lift the injunction today*, Ambito Financiero (Feb. 8, 2016)); *accord* Bausili Decl. ¶ 6.

Less than a week after announcing its tender offer, Argentina proceeded by ex parte order to show cause to bring the instant motion for an order vacating the Injunctions once (1) the Argentine legislature repeals the Lock Law and "Law 26,984 (the 'Sovereign Payment Law')"; and (2) Argentina transmits payment to Plaintiffs that reached a settlement agreement with Argentina "on or before February 29, 2016." Mot. at 3.

The motion was predicated upon settlements Argentina had already reached with some Plaintiffs. Yet, conspicuously absent from the motion was any disclosure of the terms of those settlements. On February 12, 2016, Lead Plaintiffs issued subpoenas to EM and Montreux and document requests to Argentina requesting the documents governing those settlements. Exs. 34-40 (document requests and subpoenas); Ex. 41 (EM's Responses and Objections to Subpoena); Cohen Decl. ¶¶ 7-8, 10. On February 16, 2016—hours after the original due date that this Court

established for Plaintiffs' opposition briefs—Argentina informed Lead Plaintiffs that it would not produce its agreements with EM and Montreux unless Lead Plaintiffs agreed that "neither the documents nor their substance would be disclosed publicly or used for any purpose outside the context of these litigations." Ex. 49. This secrecy contrasted sharply with Argentina's previously stated desire to conduct these negotiations "in public to guarantee the transparency of the process." Ex. 50 (Mercopress, *All Negotiations with Holdout Funds Will Be Made Public, Announced Argentina* (Jan. 18, 2016)).

The next day, February 17, 2016—less than 24 hours before this filing was due to be filed—Argentina filed a supplemental declaration attaching the agreements with EM and Montreux. *See* Supp. Decl. of Michael A. Paskin, Exs. A, B (Feb. 17, 2016), D.E. 872. Argentina provided no explanation for why it had changed its view regarding the confidentiality of the two agreements, but, whatever the reason, its delay in providing Lead Plaintiffs significant information relating to this motion had compromised Lead Plaintiffs' ability to respond and had kept the recipients of Argentina's tender offer in the dark. The agreements and other documents belatedly produced disclosed that Montreux accepted the Pari Passu Offer with respect to judgment creditors, with Argentina promising to pay 72.5% of Montreux's judgments, an amount estimated to be "$298,644,000." *Id.* Ex. A. And EM accepted the Standard Offer, with Argentina agreeing to pay "$849,201,747.38," 100% of EM's judgment, plus post-judgment interest. *Id.* Ex. B at 2.

## LEGAL STANDARD

To justify its request to dissolve the Injunctions, Argentina must satisfy the requirements of Federal Rule of Civil Procedure 60(b)(5) for vacating a final order and demonstrate that "applying [the Injunction] prospectively is no longer equitable." Fed. R. Civ. Proc. 60(b)(5); *see*

also *Sierra Club v. U.S. Army Corps of Eng'rs*, 732 F.2d 253, 256 (2d Cir. 1984) (motion to modify permanent injunction subject to Fed. R. Civ. Proc. 60(b)(5)). Rule 60(b)(5) requires movants to "demonstrate[] exceptional circumstances," *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 126 (2d Cir. 2009) (citation and quotation marks omitted), showing "a significant change in the law or facts," *Sierra Club*, 732 F.2d at 256.[6] A permanent injunction "may not be changed in the interest of the defendants if the purposes of the litigation as incorporated in the decree have not been fully achieved." *Sierra Club*, 732 F.2d at 256. Vacatur is inappropriate where "conduct . . . sought to be prevented will recur absent the injunction," *Bldg. & Const. Trades Council of Phila. & Vicinity, AFL-CIO v. N.L.R.B.*, 64 F.3d 880, 888 (3d Cir. 1995).

## ARGUMENT

### I.   This Court Lacks Jurisdiction To Vacate The Injunctions.

Argentina cannot seek to vacate the Injunctions because they currently are on appeal in the Second Circuit. *See* 2d Cir. Nos. 15-1060(L), 15-3675(L). The filing of a notice of appeal "divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982). Although this Court "can entertain and *deny* the [R]ule 60(b) motion" filed during the pendency of an appeal without disturbing the jurisdiction of the Court of Appeals, it "lack[s] jurisdiction to grant" Argentina's motion. *Toliver v. Cnty. of Sullivan*, 957 F.2d 47, 49 (2d Cir. 1992) (per curiam); *accord King v. First Am. Investigations, Inc.*, 287 F.3d 91, 94 (2d Cir. 2002).

---

[6]   Argentina erroneously suggests that Rule 54(b)—which observes that interlocutory orders may be revised prior to judgment—governs. The Injunctions, however, are "final . . . order[s]" issued to remedy Argentina's breach of the Pari Passu Clause. *See* Fed. R. Civ. P. 60(b). They are not preliminary injunctions subject to a final determination of Plaintiffs' rights. Indeed, when Argentina petitioned for Supreme Court review, it repeatedly characterized the Injunctions as "final." *See, e.g.,* Argentina Cert. Pet. at vii (labelling the Injunctions "Amended February 23, 2012 Order granting final permanent injunction" and the opinion "Opinion accompanying order granting permanent injunction."); *id.* at 3 ("The decisions below are final."); *id.* at 15 ("On remand, the district court issued final permanent injunctions.").

Argentina recognizes this insurmountable jurisdictional hurdle—at least as to the so-called "me too" actions at issue in appeal No. 15-3675(L). Mot. at 16-17. Accordingly, Argentina seeks only an indicative ruling pursuant to Federal Rule of Civil Procedure 62.1 in those cases. *Id.*

Argentina fails to acknowledge, however, that the same jurisdictional defect precludes litigation in this Court concerning the thirteen original pari passu actions. Appeals in those actions, too, are currently pending, as No. 15-1060(L). In those cases—scheduled to be argued on February 24, 2016—Argentina is challenging the scope of the Injunction. Until the Second Circuit returns the mandate, this Court has no jurisdiction to entertain any further challenge to the Injunction.

In the meantime, this Court should decline to entertain Argentina's request for an indicative ruling. Rule 62.1 expressly authorizes district courts to "defer considering the motion" or to "deny the motion" while the matter is on appeal. Fed. R. Civ. P. 62.1(a)(1), (2). Either outcome would be an appropriate exercise of this Court's discretion. Settlement negotiations have only just begun, and Argentina's motion is predicated on its mistaken view that its initial February 5 offer is an end rather than a beginning to settlement negotiations. Providing the parties this additional time to negotiate likely will enhance the prospect of a settlement.

## II.    Argentina Cannot Demonstrate The Exceptional Changed Circumstances Required To Vacate Or Modify An Injunction.

Because Argentina asks this Court to vacate the Injunctions, Argentina must show "a significant change in the law or facts" under Rule 60(b)(5). *Sierra Club*, 732 F.2d at 256. That change must be "exceptional," *Uzan*, 561 F.3d at 126, demonstrating that "the purposes of the litigation as incorporated in the decree have . . . been fully achieved," *Sierra Club*, 732 F.2d at

256; and the Injunctions cannot be vacated if Plaintiffs' harm will "recur absent the
[I]njunction[s]," *Bldg. & Const. Trades Council*, 64 F.3d at 888.

      Argentina presents no new circumstance that would justify vacating the Injunctions.
There certainly are no new legal developments that undermine the Injunctions' foundation.
Argentina suggests that repealing the Lock Law would be a change in circumstances sufficient to
warrant lifting of the Injunctions. Mot. at 13-14; *see also* EM Br. at 12-13. But such legislation
would not itself restore the FAA Bonds to the same rank as the Exchange Bonds. Argentina's
courts have refused to recognize claims under Plaintiffs' bonds based not only on the Lock Law,
but also on Argentina's "public policy" against paying those bonds. *See* Exs. 13-14. Argentina's
motion confirms its commitment to this public policy, as it seeks vacatur of the Injunctions
precisely so that Argentina may make payments on the Exchange Bonds without making
payments on the defaulted FAA Bonds, which it prefers to keep in a restructuring dictated by its
unilateral offer. That could not remotely sustain Argentina's burden of demonstrating it no
longer is breaching the Pari Passu Clause.

      The only new facts that Argentina identifies are that (1) it reached agreements in
principle with two plaintiffs, accounting for just 14% of the claims at issue in these cases (paying
two-thirds of those claims at 100%), and (2) it announced a tender offer to the Plaintiffs
accounting for the remaining 86% of the claims in these cases. Mot. at 13.

      This is precious little progress to warrant a wholesale undoing of this Court's orders. At
this point, there have been a total of two meetings in which the parties have discussed terms of a
potential deal, the most recent of which occurred nearly two weeks ago and lasted only 20
minutes; a third meeting is getting underway as this brief is being filed. Many Plaintiffs have
had no dialogue with Argentina at all. Meanwhile, Argentina's tender offer appears to be

evolving by the minute, with material revisions and clarifications of the offer coming in as Plaintiffs finalize this brief.

While the Special Master has lauded Argentina's first offer in a decade as a "historic breakthrough," that might be so only as compared to the epic intransigence of the prior regime. In fact, all is not entirely as Argentina represents in its motion. Argentina repeatedly touts "enormous progress" it has made in resolving Plaintiffs' claims, but the reality is that, among the Plaintiffs with pari passu Injunctions, Argentina has reached settlements only with EM and Montreux, accounting for less than one-seventh of the claims at issue in this Court and, even under the terms of Argentina's settlement offer, EM "settled" for 100% of its claim. Paskin Supp. Decl. Ex. B.[7] By contrast, if EM had accepted the "Pari Passu Offer," it would receive just $594 million (70% of EM's $849 million claim), some $255 million less than under the "Standard Offer." Thus, EM would receive 43% more under the Standard Offer than it would under the Pari Passu Offer. Convincing EM to accept 100 cents on the dollar is hardly a major accomplishment (though quite a coup for EM).[8]

Argentina's nascent effort to coerce a settlement cannot justify the relief sought, because the Second Circuit already has rejected Argentina's argument that a unilateral settlement demand ever could warrant lifting these Injunctions. The judicial power does not exist to impose "'pressure tactics' designed to coerce a settlement." *In re A.T. Reynolds & Sons, Inc.*, 452 B.R.

---

[7]  Press reports suggest that Argentina also has reached an agreement for an undisclosed amount with one of the class-action plaintiffs. *See* Ex. 54 (Nate Raymond, *Argentina Reaches Settlement in U.S. Debt Class Action: Mediator*, Reuters (Feb. 16, 2016)). At most, these claims amount to less than 1% of Argentina's total defaulted debt. *See id.*

[8]  Argentina also oversteps when it states that its discriminatory offer "has received the support of the United States Government." Mot. at 10. Treasury Secretary Lew's statement that he "commended Argentina's good faith efforts to resolve this longstanding dispute," Paskin Decl., Ex. K, cannot fairly be construed as an expression of "support" for Argentina's offer. To the contrary, what Secretary Lew, and the United States Government, expressed support for was Argentina's decision to engage in negotiations—the very process Argentina's motion now seeks to pretermit.

374, 382 (S.D.N.Y. 2011) (quoting *Kothe v. Smith*, 771 F.2d 667, 669 (2d Cir. 1985)). Adhering to that black-letter law, the Second Circuit already has ruled in the pari passu cases that Plaintiffs are "completely within [their] rights to reject" Argentina's take-it-or-leave-it restructuring offers and that such rejection does not constitute a basis for denying Plaintiffs equitable relief. *NML I*, 699 F.3d at 263 n.15; *see also Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 670 (2016) ("An unaccepted settlement offer—like any unaccepted contract offer—is a legal nullity, with no operative effect.").

Indeed, when Argentina appealed the original pari passu Injunctions, the Second Circuit ordered Argentina to state what payment terms it would offer. *NML Capital, Ltd. v. Republic of Argentina*, No. 12-105(L), D.E. 903 (2d Cir. Mar. 1, 2013). Argentina responded by offering to resolve Lead Plaintiffs' claims under the terms of the 2005 Exchange Offer. *NML Capital, Ltd. v. Republic of Argentina*, No. 12-105(L), D.E. 950 (2d Cir. Mar. 29, 2013). That was insufficient, the Second Circuit ruled, because it "ignored the outstanding bonds" held by Lead Plaintiffs. *NML II*, 727 F.3d at 238. Argentina's new settlement offer may be better than its 2013 offer, but Argentina's position as to its existing contractual obligations is unchanged: It wants the Court to ignore them and to authorize it to resume the breaches of Plaintiffs' contractual rights the Injunctions were designed to restrain. Indeed, we know—because Argentina, through the instant motion, has told us—that Argentina's discriminatory treatment of Plaintiffs' FAA Bonds "will recur absent the injunction." *Bldg. & Const. Trades Council of Phila.*, 64 F.3d at 888. In these circumstances, the Injunctions "may not be changed in the interest of the defendant[]." *Sierra Club*, 732 F.2d at 256.

Argentina tries to fit its request within the Second Circuit's precedents by recasting the purpose of the Injunctions as "to provide a strong incentive to Argentina to negotiate in good

faith" and to provide Plaintiffs "a club in negotiations." Mot. at 2, 16. That is wrong, as the Injunctions themselves and the Second Circuit's opinions affirming them confirm. *NML II*, 727 F.3d at 241 ("[T]he district court's decision does no more than hold Argentina to its contractual obligation of equal treatment."); *NML I*, 699 F.3d at 262 (The Injunctions "direct Argentina to comply with its contractual obligations not to alter the rank of its payment obligations.").

But even on its own terms, Argentina's argument fails because the record of the last two weeks amply demonstrates that Argentina is much less interested in negotiating in good faith than "providing [the remaining 86% of holdouts] with an incentive to reach a resolution rather than continue to hold out." Mot. at 16. The Second Circuit already has confirmed in no uncertain terms that "Argentina has no right to force [Plaintiffs] to accept a restructuring," *NML I*, 699 F.3d at 263 n.15, which, by eliminating Plaintiffs' only effective relief, is what Argentina's proposed order would do. That "any party can press its claims in court," Mot. at 16, is little comfort when no meaningful relief is available.

In this case, there can be no doubt that vacating the Injunctions would "thwart[]" rather than "effectuate[]" "the purpose behind the injunction," *Sierra Club*, 732 F.2d at 257, and the irreparable harm that the Injunctions sought to remedy certainly would recur if they are vacated, *Bldg. & Const. Trades Council*, 64 F.3d at 888. The "purpose" of these Injunctions is to compel Argentina to comply with its contractual equal treatment obligations.[9] There is simply no

---

[9]  Ex. 42 (Sept. 28, 2011 Hr'g Tr.) 29:21-24 ("These people have their rights and nobody, under any circumstance - the exchange offers did not take away their rights at all, in any degree."); Ex. 43 (Feb. 23, 2012 Hr'g Tr.) 31:5-8 (Argentina's actions "leave[] these plaintiffs who have judgments, who have debts, either they give up, which they don't have to do."); Ex. 44 (June 18, 2014 Hr'g Tr.) 10:1-6 ("You can talk about negotiating. Negotiation is fine. But, as a judge, what I want is a legal mechanism to prevent another situation where the Republic can simply laugh off a judgment."); Ex. 45 (Sept. 29, 2014 Hr'g Tr.) 26:19-22 ("But what has happened is the Republic in various ways has sought to avoid to not attend to, almost to ignore this basic part of its financial obligations; that is, obligations to the people who did not exchange."); Ex. 46 (May 29, 2015 Hr'g Tr.) 23:24-24:1 ("Unless the republic wants to pay 100 percent of the judgments, which the republic doesn't indicate that it will do, then there has to be a settlement."); Ex. 47 (Aug. 12, 2015 Hr'g Tr.) 33:19-22 ("I would like to remind

conceivable way to view vacatur of the Injunctions as "effectuat[ing]" that purpose. *Id.* Quite
the contrary: vacatur of the Injunctions would render those equal treatment obligations a nullity.
Under Second Circuit precedent, Argentina's motion thus must be denied.

## III. The Injunctions Remain Justified And Essential To Protect Plaintiffs' Contractual Rights.

It is not enough for Argentina to show that circumstances have changed. Those changes
must "have so changed as to make [the requested modification] equitable." *Sierra Club*, 732
F.2d at 256. Here, there is no justification for changing the Injunctions. Specific performance is
available "where no adequate monetary remedy is available and that relief is favored by the
balance of equities, which may include the public interest." *NML I*, 699 F.3d at 261. Each of
these factors favors the Injunctions as strongly today as it did when the Injunctions were first
issued and when they were repeatedly affirmed.

### A. Plaintiffs Still Have No Adequate Remedy At Law.

This Court and the Second Circuit have found that Plaintiffs would suffer irreparable
harm in the absence of the Injunctions. Argentina's promise not to subordinate its obligations to
Plaintiffs beneath its obligations to others is an allocation of priority among creditors, which
courts regularly enforce by specific performance because it constitutes an agreement to allocate
"bargained-for risk," and the loss of that bargained-for position constitutes irreparable harm.
*Bank Midwest, N.A. v. Hypo Real Estate Capital Corp.*, No. 10-cv-232, 2010 WL 4449366, at *6
(S.D.N.Y. Oct. 13, 2010); *see also, e.g., Safeco Ins. Co. of Am. v. Schwab*, 739 F.2d 431, 433

---

*(Cont'd from previous page)*

you and everybody here that the reason we are in this courtroom in 2015 is that the Republic of Argentina has
failed to honor its obligations to pay indebtedness that date back 12 years or so ago."); Ex. 48 (Oct. 28, 2015
Hr'g Tr.) 28:10-17 ("[The FAA] is a contract entered into by the Republic of Argentina and other parties who
have functions under the contract. That is what this case has always been about and always will be about.
Contracts have certain terms. They have certain requirements. Those requirements are not generally labeled as
coercion. They are contractual terms, and that's all we have here. That is the beginning and the end of it.").

(9th Cir. 1984); 25 Williston on Contracts § 67:88 (4th ed.). The Pari Passu Clause ensures that Argentina cannot undermine bargained-for equality among payment obligations by giving priority to newly issued obligations. Without the Injunctions specifically enforcing that Clause, Plaintiffs will suffer irreparable harm since Argentina's payment obligations under their bonds will "remain debased of their contractually-guaranteed status." D.E. 425 ¶ 1(a).

Vacating the Injunctions at this time will leave Plaintiffs in the same exact place that they occupied before the Court issued the Injunctions: holding scraps of paper that Argentina remains free to ignore. *See NML I*, 699 F.3d at 262 (holding that "monetary damages are an ineffective remedy" because "Argentina will simply refuse to pay any judgments"). Vacating the Injunctions thus would only give Argentina license to disregard its payment obligations under Plaintiffs' bonds simply because Plaintiffs chose not to accept yet another take-it-or-leave-it offer.

## B. The Balance Of The Equities Favors The Injunctions.

The balance of the equities still favors maintaining the Injunctions in favor of those creditors who have not accepted Argentina's recently announced tender offer. Nowhere in Argentina's submission does it suggest that, absent the Injunctions, it would honor "its legal obligations" under Plaintiffs' bonds. *See NML I*, 699 F.3d at 263. And Argentina surely has the financial wherewithal to honor Plaintiffs' obligations. Argentina says those obligations amount to "approximately \$9 billion." Bausili Decl. ¶ 7. But Argentina has already agreed to pay \$6.5 billion in connection with this settlement; surely Argentina can afford the additional amount short of that \$2.5 billion difference that would likely lead to a consensual settlement. Such a payment would be a small fraction of Argentina's \$29.7 billion *cash on hand. See* Ex. 31 (@BancoCentral_AR, Twitter (Feb. 5, 2016, 1:43 PM), https://twitter.com/BancoCentral_ AR/status/695724536730427397). Indeed, Argentina recently added \$5 billion to its vault,

despite the Injunctions. *See* Ex. 32 (@BancoCentral_AR, Twitter (Feb. 11, 2016, 1:40 PM),
https://twitter.com/BancoCentral_AR/status/697898144600875009). With this trove of foreign
currency reserves, it is little surprise that "the Republic has repeatedly shown it can pay its debts
when it chooses to do so—such as its October 2015 payment of nearly $6 billion to creditors; its
February 2014 settlement with Repsol S.A. for $5 billion; and its May 2014 settlement with the
Paris Club nations for $9.7 billion." *NML Capital, Ltd. v. Republic of Argentina*, No. 14-cv-
8601 (TPG), 2015 WL 6656573, at \*5 n.3 (S.D.N.Y. Oct. 30, 2015). Argentina's recent
agreement to make substantial settlement payments to Montreux and EM—and, indeed, to pay
EM in full—further suggests that Argentina can pay Plaintiffs if it chooses to do so.

Argentina responds that the Injunctions are no longer equitable because, in its view, its
February 5 tender offer constituted "'an historic breakthrough,'" Mot. at 1, demonstrating that
Argentina's government under President Macri is no longer "a 'uniquely recalcitrant debtor,'"
Mot. at 13. Even if Argentina had been negotiating directly with Plaintiffs for months, rather
than merely a matter of hours, this argument still would be a *non sequitur*. Argentina's supposed
openness to settlement simply is not a substitute for its faithful adherence to its contractual
obligations—particularly where it proposes to pay some creditors, such as EM, in full as the
Injunctions currently contemplate—and accordingly cannot justify an order permitting Argentina
to resume violating Plaintiffs' equal treatment rights.[10]

Finally, while there is a new government now in place, that does not erase the decade-
long pattern of defiance of judgments and court orders that caused this Court to enter the
Injunctions. Indeed, the substance of the relief Argentina seeks is permission to resume
violations of the equal treatment rights of those plaintiffs that refuse its terms. That hardly is a

---

[10]    Indeed, the equities could hardly favor Argentina, as its new government still has not purged its contempt of
court.

departure from the past; it is history repeating itself. Plaintiffs "have their rights," this Court observed, and they cannot be taken away simply because Argentina has conducted preliminary negotiations and reached agreements with a handful of parties.

The equities thus still favor the Injunctions.

## C.    Vacatur Would Contravene The Public Interest.

Vacating the Injunctions would undermine the public interest of requiring debtors to comply with their contractual obligations. As the Second Circuit recognized, this interest is "essential to the integrity of the capital markets." *NML II*, 727 F.3d at 248. Indeed, "New York's status as one of the foremost commercial centers" relies on the premise that "borrowers and lenders may, under New York law, negotiate mutually agreeable terms for their transactions, but they will be held to those terms." *Id.* Vacating the Injunctions disserves that public interest: This Court entered the Injunctions to promote the rule of law, but vacating them would only encourage further lawlessness.

Argentina and EM are wrong when they assert that vacating the Injunctions would serve the public interest favoring settlement. Mot. at 14-15; EM Br. at 15. First, any asserted difficulty of reaching a settlement due to challenges imposed by an injunction does not excuse litigants from its command. "Otherwise every order [binding a party] would be deemed to create irreparable harm, and it would be easy to get such orders stayed." *Graphic Commc'ns Union, Chi. Paper Handlers' & Electrotypers' Local No. 2 v. Chi. Tribune Co.*, 779 F.2d 13, 15 (7th Cir. 1985) (Posner, J.). Moreover, the rushed schedule contemplated by Argentina's proposed order actually impedes good-faith negotiations and fair settlements. The proposed order's arbitrary deadline of February 29 effectively precludes any meaningful negotiations between Argentina and the great many Plaintiffs who have heard from Argentina only through its publicly announced tender offer, and thus the proposed order tacitly endorses Argentina's "take-it-or-

leave-it" bargaining tactics. Indeed, Argentina's own actions confirm the folly of a hurried approach, as its initial February 5 offer included several ambiguous terms that certainly would have been clarified prior to publication had Argentina engaged directly with Lead Plaintiffs.

Allowing Argentina to proceed in such a coercive and rushed fashion would be unfair to Plaintiffs, who have struggled for years—and at enormous cost—to promote the settlement dialogue that (for some) has only just begun or (for many) has yet to begin. It is particularly prejudicial to individual bondholders, such as the Varela Plaintiffs, who now are being prodded to accept Argentina's unfair offer hastily or risk being left with no settlement and no means of enforcing their contractual rights to equal treatment. That is not an equitable result.

Finally, Argentina contends that the Injunctions are "obstacles" to settlement "because they make it difficult for Argentina to access the global capital markets to raise funds." Mot. at 15. This is an odd contention coming, as it does, on the heels of the BCRA's recent $5 billion bond issue. *See* Ex. 33 (Carolina Millan & Katia Porzecanski, *Argentina Agrees to Borrow $5 Billion from Wall Street Banks*, Bloomberg (Jan. 29, 2016)). But in any event, this "obstacle" is surmounted easily enough by negotiating with Plaintiffs to release their Injunctions. Argentina seems to assume that it would be impossible for it to negotiate settlements with all of the Plaintiffs, but it has hardly made an effort to do so.

## CONCLUSION

Due to the Court's orders enforcing Argentina's contractual obligations and to the recent engagement of Argentina's new leadership, there is, at last, a reasonable prospect of reaching an equitable resolution to an unprecedented, global dispute. But negotiations only started this month and are ongoing. It is hardly surprising that the parties have not yet reached a resolution for a multi-billion-dollar transaction in 18 days. Equity cannot be expected to be achieved if

Argentina is permitted to withdraw from good-faith negotiations and leave in their place a divisive, "take-it-or-leave-it" offer. This Court should deny outright Argentina's motion to vacate the Injunctions at this critical moment in the history of this litigation so that the parties can continue in their nascent, but sincere, efforts to reach a prompt and just settlement.

Dated:   New York, New York
February 18, 2016

Respectfully submitted,

Theodore B. Olson
Matthew D. McGill
Jason J. Mendro
Christopher B. Leach
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

Robert A. Cohen
Dennis H. Hranitzky
DECHERT LLP
1095 Avenue of the Americas
New York, N.Y. 10036
(212) 698-3500

*Attorneys for Plaintiff NML Capital, Ltd.*

Edward A. Friedman
Daniel B. Rapport
Marc G. Farris
FRIEDMAN KAPLAN SEILER
& ADELMAN LLP
7 Times Square
New York, N.Y. 10036
(212) 833-1100

Roy T. Englert, Jr.
Mark T. Stancil
ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER &
SAUBER LLP
1801 K Street, N.W.
Washington, D.C. 20006
(202) 775-4500

*Attorneys for Plaintiffs Aurelius Capital Master, Ltd., Aurelius Opportunities Fund II, LLC, ACP Master, Ltd., and Blue Angel Capital I LLC*

Robert D. Carroll
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

*Attorney for Plaintiffs Olifant Fund, Ltd.,
FFI Fund Ltd., and FYI Ltd.*

Michael C. Spencer
MILBERG LLP
One Pennsylvania Plaza
New York, N.Y. 10119
(212) 594-5300

*Attorney for Plaintiffs Pablo Alberto Varela, et
al.*

29