# Exhibit A

*Execution Version*

REPUBLIC OF ARGENTINA

**U.S.\$1,562,000,000 6.250% Bonds due 2019**
**U.S.\$2,556,000,000 6.875% Bonds due 2021**
**U.S.\$3,692,000,000 7.500% Bonds due 2026**
**U.S.\$1,562,000,000 7.625% Bonds due 2046**

PURCHASE AGREEMENT

April 19, 2016

Deutsche Bank Securities Inc.
HSBC Securities (USA) Inc.
J.P. Morgan Securities LLC
Santander Investment Securities Inc.

As Representatives of the several Initial Purchasers listed
in Schedule 1 hereto

c/o Deutsche Bank Securities Inc.
60 Wall Street
New York, New York 10005

c/o HSBC Securities (USA) Inc.
452 Fifth Avenue
New York, New York 10018

c/o J.P. Morgan Securities LLC
383 Madison Avenue
New York, New York 10179

c/o Santander Investment Securities Inc.
45 East 53rd Street
New York, New York 10022

Ladies and Gentlemen:

THE REPUBLIC OF ARGENTINA (the "Republic") proposes to issue and sell (the "Offering") to the several initial purchasers listed in Schedule 1 hereto (the "Initial Purchasers"), for whom  you are acting as representatives (the "Representatives") and such Initial Purchasers severally agree to purchase from the Republic, (i) U.S.\$1,562,000,000 principal amount of its 6.250% Bonds due 2019 (the "Series A Securities"); (ii) U.S.\$2,556,000,000 principal amount of its 6.875% Bonds due 2021 (the "Series B Securities"), (iii) U.S.\$3,692,000,000 principal amount of its 7.500% Bonds due 2026 (the "Series C Securities"); (iv) U.S.\$1,562,000,000 principal amount of its 7.625% Bonds due 2046 (the "Series D Securities," and together with the

Series A Securities, Series B Securities, and the Series C Securities, the "Securities"). The Securities will have the benefit of a registration rights agreement (the "Registration Rights Agreement") to be dated as of the Closing Date (as defined below) between the Republic and the Representatives, pursuant to which the Republic will agree to register the Securities under the United States Securities Act of 1933, as amended (the "Securities Act"), and the rules and regulations promulgated by the Securities and Exchange Commission thereunder subject to the terms and conditions therein specified. The Securities will be issued pursuant to an Indenture to be dated as of April 22, 2016 (the "Indenture") between the Republic and The Bank of New York Mellon, as trustee (the "Trustee") and the Authorization (as defined in the Indenture) to be dated April 22, 2016. Except where the context otherwise requires, terms not otherwise defined in this purchase agreement (the "Agreement") shall have the meanings specified in the Indenture, Preliminary Offering Memorandum or in the Securities.

The Securities will be sold to the Initial Purchasers without being registered under the Securities Act, in reliance upon an exemption therefrom, and resold to qualified institutional buyers in compliance with the exemption from registration provided by Rule 144A under the Securities Act ("Rule 144A") and in offshore transaction in reliance on Regulation S under the Securities Act ("Regulation S").

The Republic has prepared a preliminary offering memorandum dated April 11, 2016 (the "Preliminary Offering Memorandum") and will prepare an offering memorandum dated the date hereof (the "Offering Memorandum") setting forth information describing the Republic, the terms of the offering and the terms of the Securities. Copies of the Preliminary Offering Memorandum have been, and copies of the Offering Memorandum will be, delivered by the Republic to the Initial Purchasers pursuant to the terms of this Agreement. The Republic hereby confirms that it has authorized the use of the Preliminary Offering Memorandum, the other Time of Sale Information (as defined below) and the Offering Memorandum in connection with the offering and resale of the Securities by the Initial Purchasers in the manner contemplated by this Agreement.

At or prior to 5:04 P.M., New York City time or such other time as agreed by the Republic and the Representatives (the "Time of Sale"), the following information shall have been prepared (collectively, the "Time of Sale Information"): the Preliminary Offering Memorandum, as supplemented and amended by the written communications listed on Annex A hereto, including the pricing term sheet, substantially in the form of Annex B hereto, setting forth the terms of the Securities (the "Pricing Term Sheet").

The Republic hereby confirms its agreement with the several Initial Purchasers concerning the purchase and resale of the Securities, as follows:

1.     Purchase and Resale of the Securities.

(a)     The Republic agrees to issue and sell the Securities to the several Initial Purchasers as provided in this Agreement, and each Initial Purchaser, on the basis of the representations, warranties and agreements set forth herein and subject to the terms and conditions set forth herein, agrees, severally and not jointly, to purchase from the Republic the

2

respective principal amount of Securities set forth opposite such Initial Purchaser's name on Schedule 1 hereto at a price equal to (i) 99.820% of the principal amount thereof plus accrued interest, if any, from (and including) April 22, 2016 to (and excluding) the Closing Date with respect to the Series A Securities; (ii) 99.820% of the principal amount thereof plus accrued interest, if any, from (and including) April 22, 2016 to (and excluding) the Closing Date with respect to the Series B Securities; (iii) 99.820% of the principal amount thereof plus accrued interest, if any, from (and including) April 22, 2016 to (and excluding) the Closing Date with respect to the Series C Securities; and (iv) 95.578% of the principal amount thereof plus accrued interest, if any, from (and including) April 22, 2016 to (and excluding) the Closing Date with respect to the Series D Securities.  The Republic will not be obligated to deliver any Securities except upon payment for all the Securities to be purchased as provided herein.

(b)     The Republic understands that the Initial Purchasers intend to offer the Securities for resale on the terms set forth in the Time of Sale Information.  Each Initial Purchaser, severally and not jointly, represents, warrants and agrees that:

(i)     it is a qualified institutional buyer (a "QIB") within the meaning of Rule 144A;

(ii)     it has not solicited offers for, or offered or sold, and will not solicit offers for, or offer or sell, the Securities by means of any form of general solicitation or general advertising within the meaning of Rule 502(c) of Regulation D or in any manner involving a public offering within the meaning of Section 4(a)(2) of the Securities Act; and

(iii)     it has not solicited offers for, or offered or sold, and will not solicit offers for, or offer or sell, the Securities as part of their initial offering except:

(A)     within the United States to persons whom it reasonably believes to be QIBs in transactions pursuant to Rule 144A and in connection with each such sale, it has taken or will take reasonable steps to ensure that the purchaser of the Securities is aware that such sale is being made in reliance on Rule 144A; or

(B)     outside the United States to persons other than U.S. persons, as defined in Regulation S, in reliance upon Regulation S and in accordance with the restrictions set forth in Annex C hereto;

that in each case, in purchasing the Securities are deemed to have represented and agreed as provided in the Offering Memorandum under the caption "Notice to Investors."

(c)     Each Initial Purchaser acknowledges and agrees that the Republic and, for purposes of the "no registration" opinions to be delivered to the Initial Purchasers pursuant to Sections 5(h) and 5(k), counsel for the Republic and counsel for the Initial Purchasers, respectively, may rely upon the accuracy of the representations and warranties of the Initial Purchasers, and compliance by the Initial Purchasers with their agreements, contained in

paragraph (c) above (including Annex C hereto), and each Initial Purchaser hereby consents to such reliance.

(d)    The Republic acknowledges and agrees that the Initial Purchasers may offer and sell Securities to or through any affiliate of an Initial Purchaser and that any such affiliate may offer and sell Securities purchased by it to or through any Initial Purchaser, and will be deemed to have made all of the representations and warranties of the Initial Purchasers set forth herein.

(e)    The Republic acknowledges and agrees that each Initial Purchaser is acting solely in the capacity of an arm's length contractual counterparty to the Republic with respect to the offering of Securities contemplated hereby (including in connection with determining the terms of the offering) and not as a financial advisor or a fiduciary to, or an agent of, the Republic or any other person. Additionally, the Initial Purchasers are not advising the Republic or any other person as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction. The Republic shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby, and no Initial Purchaser shall have any responsibility or liability to the Republic with respect thereto. Any review by any Initial Purchaser of the Republic and the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of the Initial Purchasers and shall not be on behalf of the Republic or any other person.

2.    <u>Delivery, Assignment and Payment</u>.

(a)    Delivery of the Securities will be made at the offices of Shearman & Sterling LLP at 10:00 A.M., New York City time, on April 22, 2016, or at such other time or place on the same date or such other date, that is a business day, as the Representatives and the Republic may agree upon in writing. The time and date of such delivery is referred to herein as the "<u>Closing Date</u>".

(b)    Payment for the Securities (as described in clause (c) below) shall be made against delivery through the facilities of The Depository Trust Company ("<u>DTC</u>"), for the account of the Initial Purchasers, of one or more global notes representing the Securities (collectively, the "<u>Global Note</u>"), with any transfer taxes payable in connection with the sale of the Securities duly paid by the Republic. A draft of the Global Note will be made available for inspection by the Representatives not later than 1:00 P.M., New York City time, on the day prior to the Closing Date.

(c)    The Republic hereby irrevocably:

(i)    transfers and assigns (and grants a first priority security interest in) the Republic's right to receive the payment under paragraph (b) above of the gross proceeds of the Offering, less the amounts payable under paragraph (d) below (the "<u>Net Proceeds</u>") to each of the entities identified in Column B of Schedule 2 hereto (each an "<u>Assignee</u>"), to the extent of the amount shown opposite the name of that Assignee in Column C of Schedule 2 hereto (for each Assignee, the "<u>Assigned Amount</u>");

(ii)    instructs Deutsche Bank Securities Inc., as billing and delivery bank (the "BDB"), to pay, out of the Net Proceeds of the Offering, by wire transfer in immediately available funds to each Assignee the Assigned Amount (in U.S. dollars or Euros) payable to that Assignee in the order set forth in Column A of Schedule 2; *provided* that the BDB shall not initiate wires to Assignees other than each of NML Capital, Ltd., Aurelius Capital Master, Ltd., ACP Master, Ltd., Aurelius Opportunities Fund II, LLC, Aurelius Capital Partners, LP, Blue Angel Capital I LLC, Olifant Fund, Ltd., FYI Ltd. and FFI Fund Ltd. (collectively the "Lead Plaintiffs"), unless the BDB has provided written notification (by electronic mail to the addresses set forth in Schedule III to Addendum A to the Agreement in Principle between the Republic and the Lead Plaintiffs, dated as of February 29, 2016 as modified via email exchange on February 28, 2016, attached as Annex D hereto (the "Agreement in Principle") to each of the Lead Plaintiffs of the time of initiation of the wire transfer made to such Lead Plaintiff, the federal reference numbers for such wire, the respective Assigned Amount so wired and such Lead Plaintiff's account to which it was wired, which account shall be as set forth in Schedule II to Addendum A to the Agreement in Principle (the "Wire Confirmation Information"); and *provided further* that after, and only after, the condition set forth in the preceding proviso is satisfied, the BDB shall initiate the wires to the Assignees other than the Lead Plaintiffs and shall provide such Assignees prompt written confirmation of the initiation of the wire transfers, including the time of initiation, the amounts of the wire transfers and the federal reference numbers;

(iii)    instructs the BDB not to initiate wires or other transfers of the Net Proceeds of the Offering, other than as provided in the preceding clause (ii), unless either (I) each of the Lead Plaintiffs has provided written notification to the BDB (by electronic mail to the address provided by the BDB to the Lead Plaintiffs in accordance with the provisions of Addendum A to the Agreement in Principle) that the financial institution at which its account is held has received payment in full of the amounts owed to such Lead Plaintiff pursuant to the Agreement in Principle by Fedwire for crediting to such Lead Plaintiff's account, or (II) none of the Lead Plaintiffs has provided written notification to the BDB (by electronic mail as aforesaid), within sixty (60) minutes of such Lead Plaintiff's receipt of the Wire Confirmation Information, that such Lead Plaintiff is unable to confirm receipt of such funds; and

(iv)    agrees to cooperate with each Assignee in any reasonable measures taken by that Assignee to perfect in any relevant jurisdiction the security interest granted hereby in the Assigned Amount payable to that Assignee.

(d)    On the Closing Date, the Republic agrees to pay or cause to be paid, through the BDB that is hereby authorized and instructed by the Republic to withhold the corresponding amounts from the proceeds of the Offering, to (i) the Initial Purchasers in same day funds a combined underwriting commission and selling concession of 0.18 % of the aggregate principal amount of the Securities (the "Fee"), in U.S. dollars to such U.S. dollar account as shall be designated by the Initial Purchasers to the Republic, of which each Representative shall receive 19% of the Fee, and each of the other Initial Purchasers shall receive 8% of the Fee and (ii) the parties listed on Schedule 3 hereto in such amounts opposite such parties' name. The Republic hereby transfers and assigns (and grants a first priority security interest in) to each of the Initial Purchasers, the Republic's rights to receive the proceeds of the offering to extent of the Fees and in respect of the expenses detailed on Schedule 3.

3.     <u>Representations and Warranties of the Republic</u>.  The Republic represents and warrants to each Initial Purchaser that:

(a)     *Preliminary Offering Memorandum, Time of Sale Information and Offering Memorandum.*  The Preliminary Offering Memorandum, as of its date, did not, the Time of Sale Information, at the Time of Sale, did not, and at the Closing Date, will not, and the Offering Memorandum, in the form first used by the Initial Purchasers to confirm sales of the Securities and as of the Closing Date, will not, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided*, that the Republic makes no representation or warranty with respect to any statements or omissions made in reliance upon and in conformity with information relating to any Initial Purchaser furnished to the Republic in writing by or on behalf of such Initial Purchaser through the Representatives expressly for use in the Preliminary Offering Memorandum, the Time of Sale Information or the Offering Memorandum, it being understood and agreed that the only such information consists of the information described as such in Section 7(b) hereof.

(b)     *Additional Written Communications.*  The Republic (including its agents and representatives, other than the Initial Purchasers in their capacity as such) has not prepared, made, used, authorized, approved or referred to and will not prepare, make, use, authorize, approve or refer to any written communication that constitutes an offer to sell or solicitation of an offer to buy the Securities (each such communication by the Republic or its agents and representatives (other than a communication referred to in clauses (i), and (ii)) an "<u>Issuer Written Communication</u>") other than (i) the Preliminary Offering Memorandum, (ii) the Offering Memorandum, (iii) the documents listed on Annex A hereto, the Pricing Term Sheet, substantially in the form of Annex B hereto, which constitute part of the Time of Sale Information, and (iv) any electronic road show or other written communications, in each case used in accordance with Section 4(c) hereof, and in the cases of (i) to (iv) any amendment or supplement thereto. Each such Issuer Written Communication, when taken together with the Time of Sale Information at the Time of Sale, did not, and at the Closing Date will not, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided*, that the Republic makes no representation or warranty with respect to any statements or omissions made in each such Issuer Written Communication in reliance upon and in conformity with information relating to any Initial Purchaser furnished to the Republic in writing by such Initial Purchaser through the Representatives expressly for use in any Issuer Written Communication, it being understood and agreed that the only such information furnished by or on behalf of the Initial Purchasers consists of the information described as such in Section 7(b) hereof.

(c)     *Power and Authority.* The Republic has full power and authority to execute and deliver each of this Agreement, the Indenture, the Registration Rights Agreement, the Process Agent Agreement (as defined herein), the Securities and all other documents and instruments to be executed and delivered by the Republic hereunder and thereunder (collectively, the "<u>Transaction Documents</u>") and to perform its obligations thereunder; and all action required to be taken for the due and proper authorization, execution and delivery of the Transaction

Documents (including execution and authorization, execution and delivery of the Authorization contemplated thereunder), and the consummation of the transactions contemplated hereby have been duly and validly taken.

(d)     *Transaction Documents.*  This Agreement has been duly executed and delivered by the Republic and constitutes a valid and legally binding agreement of the Republic enforceable against the Republic in accordance with their terms; each of the Indenture and the Authorization contemplated thereunder and the Registration Rights Agreement has been duly authorized by the Republic and on the Closing Date will be duly executed and delivered by the Republic and, when duly executed and delivered in accordance with its terms by each of the parties thereto on the Closing Date, will constitute a valid and legally binding agreement of the Republic enforceable against the Republic in accordance with its respective terms subject as to enforcement to general equity principles; the Securities have been duly authorized by the Republic and on the Closing Date will be duly executed and delivered by the Republic and, when duly executed and delivered in accordance with its terms by each of the parties thereto on the Closing Date and paid for as provided herein, will constitute valid and legally binding obligations of the Republic enforceable against the Republic in accordance with their terms, subject as to enforcement to general equity principles, and will be entitled to the benefits of the Indenture.

(e)     *Exchange Securities.*  On the Closing Date, the securities to be offered in exchange for the Securities pursuant to the Registration Rights Agreement (the "Exchange Securities") will have been duly and validly authorized for issuance by the Republic, and when issued and authenticated in accordance with the terms of the Indenture and the Registration Rights Agreement, will constitute valid and binding obligations of the Republic, enforceable against the Republic in accordance with their terms; and the Exchange Securities will conform to the descriptions thereof in the Time of Sale Information and Offering Memorandum.

(f)     *Descriptions of the Transaction Documents.*  Each of the Transaction Documents conform in all material respects to the description thereof contained in each of the Time of Sale Information and the Offering Memorandum.

(g)     *No Conflicts.*  The execution, delivery and performance by the Republic of each Transaction Document, the issuance, sale and delivery of the Securities  and compliance by the Republic with the terms thereof and the consummation of the transactions contemplated by the Transaction Documents will not (i) conflict with or result in a breach of any constitutional provision, any provision of any treaty, convention, statute, law, regulation, decree, judgment, order of any government, governmental body or court, domestic or foreign court order or similar authority binding on the Republic, (ii) conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, any fiscal agency agreement, indenture, trust deed, mortgage or other agreement to which the Republic is a party or by which any of the properties or assets of the Republic are bound, including the Agreement in Principle and including Addendum A thereto, or (iii) result in the creation of any lien or encumbrance upon such properties or assets, except, in cases of clauses (ii) and (iii), for those violations and defaults which individually and, in the aggregate, are not material to the Republic taken as a whole.

(h)     *No Consents Required.*  No consent, approval, authorization, permit, order, registration or qualification of or with any court, government or governmental agency or body or any third party is required to be taken, fulfilled, performed or obtained in the Republic or elsewhere (including without limitation, the obtaining of any consent, approval or license or the making of any filing or registration) for the execution and delivery of the Transaction Documents by the Republic, or for the issue, sale, delivery and performance of the Securities as contemplated herein and in the Preliminary Offering Memorandum, the Time of Sale Information, the Offering Memorandum, the consummation of the other transactions contemplated by the Transaction Documents, and the compliance by the Republic with the terms of the Transaction Documents, as the case may be, or for the validity or enforceability of the Transaction Documents against the Republic except, Law 27,249, Law 27,198 approving the Republic's budget for 2016, Decree 594/2016, Resolution 137/2016, Resolution 135/2016 of the Ministry of Treasury and Public Finance (*Ministerio de Hacienda y Finanzas Públicas*), which have been duly obtained and are in full force and effect on the date hereof and will be in full force and effect on the Closing Date and a resolution of the Ministry of Treasury and Public Finance (*Ministerio de Hacienda y Finanzas Públicas*) or the Secretary of Finance of the Ministry of Treasury and Public duly authorized approving the transactions contemplated herein; *provided, however*, that this resolution is not required for the effectiveness of this Agreement.

(i)     *Legal Proceedings.*  Except as described in each of the Time of Sale Information and the Offering Memorandum, there are no pending or, after due inquiry, threatened actions or proceedings (foreign or domestic) against or affecting the Republic or any National Governmental Agency which, if determined adversely to the Republic or any such National Governmental Agency, would individually or in the aggregate have a materially adverse effect on the financial condition or revenues and expenditures of the Republic or would materially adversely affect the ability of the Republic to perform its obligations under the Transaction Documents, or which are otherwise material in the context of the issue of the Securities.  As used herein, the term "National Governmental Agency" means any ministry, department, agency, statutory body or autonomous regulatory authority (including, without limitation, the Argentine Central Bank) of the Republic or any political subdivision thereof or therein (including, without limitation, relating to budget approvals and exchange controls).

(j)     *Taxes.*  There is no tax, duty, levy, impost, deduction, governmental charge or withholding imposed by the Republic or any political subdivision or taxing authority thereof or therein by virtue of the execution, delivery, performance or enforcement of the Transaction Documents (except for court fees and taxes incurred in connection with enforcement proceedings) or to ensure the legality, enforceability, validity or admissibility into evidence of the Transaction Documents or of any other document to be furnished thereunder, and it is not necessary that the Transaction Documents be submitted to, filed or recorded with any court or other authority in the Republic to ensure such legality, validity, enforceability or admissibility into evidence (except for court fees and taxes incurred in connection with enforcement proceedings, if any).

(k)     *Sanctions.*  The Republic will not, knowingly, use the Net Proceeds of the Offering contemplated hereby, or lend, contribute or otherwise make available such proceeds to any other person or entity (i) to fund any activities of or business with any person that, at the time of such

funding, is the subject of any sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department, the U.S. Department of Commerce, the U.S. Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury (collectively, "Sanctions"), or is in Crimea, Cuba, Iran, North Korea, Sudan, or Syria or (ii) in any other manner that will, in each case, result in a violation by any person (including any person participating in the transaction, whether as initial purchaser, advisor, investor or otherwise) of Sanctions.

(l)     *No Material Adverse Change.*  Subsequent to the respective dates as of which information is given in the Time of Sale Information and the Offering Memorandum, there has not been any material adverse change, or any event that could reasonably be expected to result in a prospective material adverse effect in (i) the financial or economic condition of the Republic or (ii) the ability of the Republic to perform its obligations under the Transaction Documents.

(m)     *Republic's Obligations.*  When duly issued and authenticated and paid for by the Initial Purchasers, the Securities will constitute direct, general, unconditional and unsubordinated obligations of the Republic for which the full faith and credit of the Republic will have been pledged; when issued, the Securities will rank without any preference among themselves and equally with all other unsubordinated public external indebtedness of the Republic. It is understood that this provision shall not be construed so as to require the Republic to make payments under the Securities ratably with payments being made under any other public external indebtedness of the Republic.

(n)     *No Immunity.*  Pursuant to the waiver of immunity in Section 15(g) hereof, neither the Republic nor any of its revenues, property or assets is entitled, in any jurisdiction to which it has submitted to jurisdiction under Section 15(d) hereof, to sovereign or other immunity from suit, jurisdiction of any court in such jurisdiction, set-off, attachment prior to judgment, attachment in aid of execution of judgment, execution of a judgment or from other legal process in such courts.  The waiver of immunity by the Republic contained or to be contained in the Transaction Documents, the appointment of the process agent in the Transaction Documents, the consent by the Republic to the jurisdiction of the courts specified in the Transaction Documents, and provisions stating that the laws of the State of New York govern the Transaction Documents, are irrevocably binding on the Republic to the fullest extent permitted by applicable law), *provided, however* that any judgment against the Republic by a court in Argentina is capable of being enforced in the courts of the Republic, subject to compliance with the provisions of Article 20 of Law No. 24,624, which provides that amounts due pursuant to any judicial action must be paid out of appropriations in the national budget and *provided, further, however* that such waiver shall not extend to and the Republic shall be immune in respect of and in relation to any suit, action or proceeding in, or the enforcement of any judgment issued by, any court to which the Republic has submitted to jurisdiction pursuant to Section 15(d) hereof against: (i) any reserves of the Central Bank of Argentina (Banco Central de la República Argentina); (ii) any property in the public domain located in the territory of Argentina that falls within the purview of Section 234 and 235 of the Civil and Commercial Code of Argentina; (iii) any property located in or outside the territory of Argentina that provides an essential public service; (iv) any property (whether in the form of cash, bank deposits, securities, third party obligations or any other methods of payment) of Argentina, its governmental agencies and other governmental entities relating to the performance of the budget, within the purview of Sections 165 through 170 of

Law No. 11,672, Complementaria Permanente de Presupuesto (t.o. 2014); (v) any property entitled to the privileges and immunities of the Vienna Convention on Diplomatic Relations of 1961 and the Vienna Convention on Consular Relations of 1963, including, but not limited to, property, premises and bank accounts used by the missions of Argentina; (vi) any property used by a diplomatic, governmental or consular mission of the Republic; (vii) taxes, duties, levies, assessments, royalties or any other governmental charges imposed by Argentina, including the right of Argentina to collect any such charges; (viii) any property of a military character or under the control of a military authority or defense agency of Argentina; (ix) any property forming part of the cultural heritage of Argentina; and (x) property protected by any applicable sovereign immunity law.  The waiver of immunity by the Republic contained in Section 15 hereof, Section 9.7 of the Indenture and Section 6(j) of the Registration Rights Agreement, and the indemnification and contribution provisions contained in Section 7 hereof do not conflict with Argentine law or public policy.

(o)    *IMF.*  The Republic is a member of, and is eligible to use the general resources of, the International Monetary Fund (the "IMF").  The IMF has not limited, pursuant to its articles of agreement or rules and regulations, the use of the Republic of the general resources of the IMF.

(p)    *Rule 144A Eligibility.*  On the Closing Date, the Securities will not be of the same class (within the meaning of Rule 144A(d)(3) under the Securities Act) as securities listed on a national securities exchange registered under Section 6 of the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act") or quoted in an automated inter-dealer quotation system.

(q)    *No General Solicitation or Directed Selling Efforts.*  Neither the Republic nor any other person acting on its behalf (other than the Initial Purchasers, as to which no representation is made) has (i) solicited offers for, or offered or sold, the Securities by means of any form of general solicitation or general advertising within the meaning of Rule 502(c) of Regulation D or in any manner involving a public offering within the meaning of Section 4(a)(2) of the Securities Act or (ii) engaged in any directed selling efforts within the meaning of Regulation S, and all such persons have complied with the offering restrictions requirement of Regulation S.

(r)    *Securities Law Exemptions.*  Assuming the accuracy of the representations and warranties of the Initial Purchasers contained in Section 1(b) (including Annex C hereto) and their compliance with their agreements set forth therein, it is not necessary, in connection with the issuance and sale of the Securities to the Initial Purchasers and the offer, resale and delivery of the Securities by the Initial Purchasers in the manner contemplated by this Agreement, the Time of Sale Information and the Offering Memorandum or to register the Securities under the Securities Act.

(s)    *Forward-Looking Statements.*  No forward-looking statement (within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act) included in any of the Time of Sale Information or the Offering Memorandum has been made without a reasonable basis or has been disclosed other than in good faith.

(t)    *Listing.*  The Republic has applied to admit the Securities for listing on the Official List of the Luxembourg Stock Exchange and the Mercado de Valores de Buenos Aires, S.A.

("Merval") and for trading on the Euro MTF Market and the Mercado Abierto Electrónico, S.A. ("MAE").

(u)     *No Taxes Payable by Initial Purchasers.*  There are no stamp or other issuance or transfer taxes or duties and no capital gains, income, assets tax, gross turnover tax, gift tax, tax on debits and credits in bank accounts, withholding or other similar fees or charges required to be paid by or on behalf of the Initial Purchasers to the Republic, or to any taxing authority thereof or therein, as the case may be, in connection with (i) the execution and delivery of the Transaction Documents and (ii) the holding of the securities by the Initial Purchasers and the offer or sale of the Securities by the Republic to the Initial Purchasers and by the Initial Purchasers to subsequent purchasers in accordance with the terms of this Agreement.

(v)     *Withholding Taxes.* With respect to any natural or legal person that resides outside of Argentina and is not otherwise an Argentine resident for Argentine tax purposes or an Argentine registered taxpayer, there is no tax, levy, deduction, charge or withholding imposed by the Republic or any political subdivision or taxing authority thereof or therein either (i) on or by virtue of the execution, delivery, enforcement of the Transaction Documents or (ii) any payment to be made by the Republic hereunder or any payment in respect of any of the Securities and sales or other transfers of the Securities effected outside Argentina by such persons are not subject to taxes, duties, deductions, withholdings or other charges of whatever nature in the Republic.

(w)     *Legal Form.* The Transaction Documents are or, upon due execution and delivery thereof, will be, as applicable, and the Securities, upon the due execution, authentication, issuance and delivery thereof, will be, in proper legal form under the laws of the Republic for the enforcement thereof in the Republic against the Republic; *provided*, that an official translation to Spanish of any Transaction Document to be enforced must be included in such enforcement action.

(x)     *Legal Requirements.* To ensure the legality, validity, enforceability or admissibility in evidence in Argentina of the Transaction Documents, it is not necessary that the Transaction Documents or any other document or instrument hereunder or thereunder be registered, recorded or filed with any court or other authority in Argentina or be notarized or that any documentary, stamp or similar tax, imposition or charge be paid on or in respect of the Transaction Documents, such Securities or any other document or instrument hereunder or thereunder, other than any court tax of such amount as may apply from time to time under applicable Argentine law in respect of the Transaction Documents or any other document or instrument hereunder or thereunder brought before the Argentine courts.

(y)     *No Restriction to Payments.* There is no law or regulation of the Republic that would restrict the Republic's ability to make payment to the Initial Purchasers in U.S. dollars outside Argentina.

(z)     *Enforcement of Foreign Judgments.* Except as described in the Offering Memorandum, any final judgment for a fixed or determined sum of money rendered by any U.S. federal or New York state court located in the State of New York having jurisdiction under its

11

own laws in respect of any suit, action or proceeding against the Republic based upon any of the Transaction Documents would be declared enforceable against the Republic by the courts of Argentina, without reconsideration or reexamination of the merits, subject to the following conditions: (i) the judgment of the relevant court to be enforced shall be final and conclusive; (ii) the jurisdiction of the courts has not been precluded by any law, order or treaty; (iii) service of process for any proceeding against the Republic has been lawfully effected on the Republic and was given an opportunity to defend against the foreign action; (iv) the judgment must be valid in the jurisdiction where rendered and its authenticity must be established in accordance with the requirements of Argentine law; (v) the judgment must not violate the principles of public policy of Argentine law; and (vi) the judgment shall not be contrary to a prior or simultaneous judgment of an Argentine court.

(aa)    *Licenses, Consents and Residence.*  It is not necessary under the laws of the Republic that the Initial Purchasers be licensed, qualified or entitled to carry on business in the Republic by reason of the execution, delivery, performance or enforcement of any of the Transaction Documents and the Initial Purchasers will not be deemed resident, domiciled, to be carrying on business or subject to taxation in the Republic solely by reason of the execution, delivery, performance outside the Republic or enforcement of the Transaction Documents.

(bb)    *Ratings.* The Republic has not been informed by either Moody's Investors Service, Inc. ("Moody's") or Standard & Poor's Ratings Service ("Standard & Poor's") that any of them intends or is contemplating any downgrading in any rating accorded to the Republic's debt securities to any rating category lower than B3 or B-.

(cc)    *Valid Choice of Law*.  The choice of laws of the State of New York as the governing law of the Transaction Documents is a valid choice of law under the laws of Argentina.

(dd)    *Submission to Jurisdiction.*  The Republic has the power to submit, and pursuant to Section 15(d) of this Agreement and Section 9.7 of the Indenture has legally, validly, effectively and irrevocably submitted, to the exclusive jurisdiction of any U.S. federal or New York state court located in The City of New York and the courts of the Republic; and has the power to designate, appoint and empower, and pursuant to Section 15(d) of this Agreement and Section 9.7 of the Indenture, has legally, validly and effectively designated, appointed and empowered an agent for service of process in any suit or proceeding based on or arising under this Agreement or the Indenture, as applicable, in any U.S. federal or New York state court located in The City of New York.

(ee)    *Indemnification and Contribution.*  The indemnification and contribution provisions set forth in Section 7 hereof do not contravene Argentine law or public policy.

(ff)    *Agreement in Principle.*  The Republic has provided to the Initial Purchasers a true and correct copy of the Agreement in Principle, including Addendum A thereto, and the amounts to be wired to each of the Lead Plaintiffs in accordance with Section 2(c) conform to the amounts set forth in Addendum A of the Agreement in Principle. Each of the Assignees is

either a Lead Plaintiff or the holder, or a trustee acting for the benefit of the holders, of Other Settled Claims, as such term is defined in Addendum A to the Agreement in Principle.

4.   Further Agreements of the Republic.  The Republic covenants and agrees with each Initial Purchaser that:

(a)   *Delivery of Copies.*  The Republic will deliver, without charge, to the Initial Purchasers as many copies of the Preliminary Offering Memorandum, any other Time of Sale Information, any Issuer Written Communication and the Offering Memorandum (including all amendments and supplements thereto) as the Representatives may reasonably request at any time prior to the Closing Date.

(b)   *Offering Memorandum, Amendments or Supplements.*  Before finalizing the Offering Memorandum or making or distributing any amendment or supplement to any of the Time of Sale Information or the Offering Memorandum, the Republic will furnish to the Representatives and counsel for the Initial Purchasers a copy of the proposed Offering Memorandum or such amendment or supplement for review, and will not distribute any such proposed Offering Memorandum, amendment or supplement to which the Representatives reasonably object.

(c)   *Additional Written Communications.*  Before using, authorizing, approving or referring to any Issuer Written Communication, the Republic will furnish to the Representatives and counsel for the Initial Purchasers a copy of such written communication for review and will not use, authorize, approve or refer to any such written communication to which the Representatives reasonably object.

(d)   *Notice to the Representatives.*  The Republic will advise the Representatives promptly, and confirm such advice in writing, (i) of the issuance by any governmental or regulatory authority of any order preventing or suspending the use of any of the Time of Sale Information, any Issuer Written Communication or the Offering Memorandum or the initiation or, to the knowledge of the Republic, the threatening of any proceeding for that purpose; (ii) of the occurrence of any event at any time prior to the completion of the initial offering of the Securities as a result of which any of the Time of Sale Information, any Issuer Written Communication or the Offering Memorandum as then amended or supplemented would include any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances existing when such Time of Sale Information, Issuer Written Communication or the Offering Memorandum is delivered to a purchaser, not misleading; and (iii) of the receipt by the Republic of any notice with respect to any suspension of the qualification of the Securities for offer and sale in any jurisdiction or, to the knowledge of the Republic, the initiation or threatening of any proceeding for such purpose; and the Republic will use its reasonable best efforts to prevent the issuance of any such order preventing or suspending the use of any of the Time of Sale Information, any Issuer Written Communication or the Offering Memorandum or suspending any such qualification of the Securities and, if any such order is issued, will use its best efforts to obtain as soon as possible the withdrawal thereof.

13

(e)     *Time of Sale Information.*  If at any time prior to the Closing Date (i) any event shall occur or condition shall exist as a result of which any of the Time of Sale Information as then amended or supplemented would include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading or (ii) it is necessary to amend or supplement the Time of Sale Information to comply with law, the Republic will immediately notify the Initial Purchasers thereof and forthwith prepare and, subject to paragraph (b) above, furnish to the Initial Purchasers such amendments or supplements to the Time of Sale Information as may be necessary so that the statements in any of the Time of Sale Information as so amended or supplemented will not, in the light of the circumstances under which they were made, be misleading or so that any of the Time of Sale Information will comply with law.

(f)     *Ongoing Compliance of the Offering Memorandum.*  If at any time prior to the completion of the initial offering of the Securities by the Initial Purchasers (i) any event shall occur or condition shall exist as a result of which the Offering Memorandum as then amended or supplemented would include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances existing when the Offering Memorandum is delivered to a purchaser, not misleading or (ii) it is necessary to amend or supplement the Offering Memorandum to comply with law, the Republic will immediately notify the Initial Purchasers thereof and forthwith prepare and, subject to paragraph (b) above, furnish to the Initial Purchasers such amendments or supplements to the Offering Memorandum as may be necessary so that the statements in the Offering Memorandum as so amended or supplemented will not, in the light of the circumstances existing when the Offering Memorandum is delivered to a purchaser, be misleading or so that the Offering Memorandum will comply with law.

(g)     *Blue Sky Compliance.*  The Republic will cooperate with the Initial Purchasers in arranging for the qualification of the Securities for offering and sale under the securities or "Blue Sky" laws of such jurisdictions as the Initial Purchasers may reasonably designate, the Republic will continue such qualifications in effect for as long as may be necessary to complete the resale of the Securities and the Republic will promptly advise the Initial Purchasers of the receipt by the Republic of any notification with respect to the suspension of the qualification of the Securities for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose; *provided* that the Republic shall not be required to file a general consent to service of process in any such jurisdiction, nor shall the Republic be required to take any action that would subject it to the service of process in proceedings, other than relating to the distribution of the Securities in any such jurisdiction where it is not now so subject.

(h)     *Use of Proceeds.*  The Net Proceeds from the sale of the Securities will be applied to settle claims with holders of certain outstanding bonds of the Republic.  The Republic will have no proprietary or reversionary interest in the Net Proceeds.  The Republic has transferred and assigned (and granted a first priority security interest in) the Republic's right to receive the payment of the Net Proceeds in favor of the settling claimants.  A portion of the Net Proceeds will be paid directly to those settling claimants who have obtained *pari passu* injunctions and entered into agreements in principle with the Republic on or before February 29, 2016, and such payments will be made in accordance with Section 2(c)(ii) hereof.  The balance of Net Proceeds

will be paid to a trustee, acting under a settlement trust agreement, for the benefit of certain other settling claimants. The payments will be made as described in each of the Time of Sale Information and the Offering Memorandum under the heading "Use of Proceeds".

(i)     *Clear Market.* During the period from the date hereof through and including the Closing Date, the Republic will not, without the prior written consent of the Representatives, offer, sell, contract to sell or otherwise dispose of any debt securities issued or guaranteed by the Republic substantially similar to the Securities.

(j)     *DTC, Euroclear and Clearstream.* The Republic will use its reasonable efforts to assist the Initial Purchasers in arranging for the Securities to be eligible for clearance and settlement through DTC, Euroclear and Clearstream.

(k)     *No Resales by the Republic.* The Republic will not, and will use its reasonable best efforts to cause its Affiliates (as defined in Rule 144 under the Securities Act) not to, resell any of the Securities that have been acquired by any of them, except for Securities purchased by the Republic or any of its Affiliates and resold in a transaction registered under the Securities Act.

(l)     *No Integration.* Neither the Republic nor any of its Affiliates will, directly or through any agent, sell, offer for sale, solicit offers to buy or otherwise negotiate in respect of, any security (as defined in the Securities Act), that is or will be integrated with the sale of the Securities in a manner that would require registration of the Securities under the Securities Act.

(m)     *No General Solicitation or Directed Selling Efforts.* Neither the Republic nor any of its Affiliates or any other person acting on its or their behalf (other than the Initial Purchasers, as to which no covenant is given) will (i) solicit offers for, or offer or sell, the Securities by means of any form of general solicitation or general advertising within the meaning of Rule 502(c) of Regulation D or in any manner involving a public offering within the meaning of Section 4(a)(2) of the Securities Act or (ii) engage in any directed selling efforts within the meaning of Regulation S, and all such persons will comply with the offering restrictions requirement of Regulation S.

(n)     *No Stabilization.* The Republic will not take, directly or indirectly, any action designed to or that could reasonably be expected to cause or result, under the Exchange Act, in any stabilization or manipulation of the price of the Securities.

(o)     *Exchange Listing.* The Republic will use its reasonable efforts to have the Securities admitted for listing on the Official List of the Luxembourg Stock Exchange and the Merval and for trading on the Euro MTF Market, the alternative market of the Luxembourg Stock Exchange and MAE, promptly after the Closing Date.

(p)     *Tax Gross-Up.* The Republic agrees with each of the Initial Purchasers to make all payments to the Initial Purchasers under the Transaction Documents without withholding or deduction for or on account of any present or future taxes, duties or other governmental charges in the nature of a tax (including any interest, additions to tax or penalties) imposed by the Republic, or any political subdivision or taxing authority thereof or therein or any jurisdiction from or through which the Republic makes a payment under the Transaction Documents, each a

"Taxing Jurisdiction", unless the Republic is compelled by law to deduct or withhold such taxes, duties or charges. In that event, the Republic shall pay such additional amounts as may be necessary in order that the net amounts received after such withholding or deduction will equal the amounts that would have been received if no withholding or deduction has been made, except to the extent that such taxes, duties or charges (a) were imposed due to some connection of an Initial Purchaser with the Taxing Jurisdiction other than the mere entering into of this Agreement or receipt of payments hereunder or (b) would not have been imposed but for the failure of such Initial Purchaser to comply with any reasonable certification, information, documentation, identification or other reporting requirements concerning the nationality, residence, identity or connection with the Taxing Jurisdiction if such compliance is required or imposed by law or administrative practice as a precondition to an exemption from, or reduction in, such taxes, duties or other charges, *provided*, that (i) any such certification, information, documentation, identification, or other reporting requirements would not be materially more onerous, in form, procedure or substance, than comparable information or other reporting requirements imposed under U.S. tax law, regulation and administrative practice (such as IRS Forms W-8BEN, W-8BEN-E, W-8ECI and W-9) and (ii) the Republic has notified the Initial Purchasers in writing of such information or other reporting requirement at least 15 days before the applicable payment date. The Republic further agrees to indemnify and hold harmless the Initial Purchasers against any documentary, stamp, income, gift, gross turnover, debits and credits, capital, assets, sales, transaction or similar issue tax, duty or other governmental charge in the nature of a tax, either present or future, imposed by the Republic or any political subdivision or taxing authority thereof or therein, including any interest and penalties, on the creation, holding, issue and initial sale of the Securities, and on the execution, delivery, performance and enforcement of the Transaction Documents.

     5. Conditions of Initial Purchasers' Obligations. The performance of the obligation of each Initial Purchaser to purchase Securities on the Closing Date as provided herein is subject to the performance by the Republic of its covenants and other obligations hereunder and to the following additional conditions:

     (a)    *Representations and Warranties.* The representations and warranties of the Republic contained herein shall be true and correct on the date hereof and on and as of the Closing Date; and the statements of the Republic and its respective officers made in any certificates delivered pursuant to this Agreement shall be true and correct on and as of the Closing Date.

     (b)    *No Downgrade.* Subsequent to the earlier of (A) the Time of Sale and (B) the execution and delivery of this Agreement, no downgrading shall have occurred in the rating accorded to the Securities by Moody's or Standard and Poor's to a rating category lower than B3 or B-, respectively.

     (c)    *Rating.* The Republic shall use its best efforts to have the Securities rated by Moody's and Standard and Poor's as soon as practicable subsequent to the execution and delivery of this Agreement.

(d)     *Disruptive Measures*. No Disruptive Measure (as defined below) shall have occurred.

"Disruptive Measures" shall mean, subsequent to the earlier of (i) the Time of Sale and (ii) the execution and delivery of this Agreement (A) any order (including an attachment order), decision, judgment, precautionary measure, and/or temporary restraining/injunction order issued by any judicial, administrative or other regulatory authority that prevents the ability of the Initial Purchasers to subscribe for, pay, transfer and/or settle the Securities, including any such measure that would prevent the delivery of the Securities by the Initial Purchasers to the accounts of the purchasers of the Securities in the offering (including without limitation accounts in Clearstream or Euroclear), (B) any discovery order, or similar formal request, requiring the Initial Purchasers or their affiliates to make information relating to the Offering (including the documentation related thereto) available to any person, or (C) any order issued by the United States District Court ("District Court") for the Southern District of New York or the United States Court of Appeals for the Second Circuit reversing in whole or in part the order of the District Court dated March 2, 2016 in the matter NML Capital, Ltd. v Republic of Argentina (08-cv-6978) and 61 related actions.

For purposes of this Section 5(d), Disruptive Measure shall not include clause (B) of the above definition.

(e)     *Performing Public External Indebtedness*. No Performing Public External Indebtedness, as defined in the Offering Memorandum, has been accelerated in accordance with its terms in an amount that would have a material adverse effect on the financial, economic or fiscal condition of the Republic or its ability to perform its obligations under the Transaction Documents.

(f)     *No Material Adverse Change*.  Subsequent to the execution of this Agreement, no event or condition shall have occurred or shall exist that would or would reasonably be expected to have a material adverse effect on the revenues and expenditures or the condition (financial, economic, political or other) of the Republic, which event or condition is not described in each of the Time of Sale Information (excluding any amendment or supplement thereto) and the Offering Memorandum (excluding any amendment or supplement thereto) the effect of which in the reasonable judgment of the Representatives after consultation with the Republic would materially impair the Initial Purchasers' ability to market or distribute the Securities on the terms and in the manner contemplated by this Agreement, the Time of Sale Information and the Offering Memorandum.

(g)     *Certificate*.  The Initial Purchasers shall have received a certificate of the Republic, in English, executed by a duly qualified and authorized senior official of the Republic who has specific knowledge of the Republic's financial matters, dated the Closing Date, signed on behalf of the Republic, to the effect that such official, or another official in the Secretariat of Finance, has carefully examined the Preliminary Offering Memorandum, the Time of Sale Information, the Offering Memorandum, this Agreement and the Securities and that:

(i) the representations and warranties of the Republic contained in this Agreement are true and correct on and as of the date hereof and on the Closing Date, and the Republic has performed all covenants and agreements and satisfied all conditions on its part to be performed or satisfied hereunder at or prior to the Closing Date; and

(ii) at the Closing Date, since the date hereof or since the date as of which information is given in the Time of Sale Information and Offering Memorandum (exclusive of any amendment or supplement thereto after the date hereof), no event or development has occurred, and no information has become known, that, individually or in the aggregate, has or would be reasonably likely to have a material adverse effect on the revenues and expenditures or condition (financial, economic, political or other) of the Republic; and which event or condition is not described in each of the Time of Sale Information (excluding any amendment or supplement thereto) and the Offering Memorandum (excluding any amendment or supplement thereto).

(h)    *Confirmation by the Argentine Central Bank:* On or prior to the Closing Date, the Republic shall have furnished to the Representatives a copy of the confirmation by the Argentine Central Bank issued pursuant to Section 61 of Law 24,156 and implementing regulations.

(i)    *Internal Opinion of Solicitor General (Procurador del Tesoro de la Nación)*: On or prior to the Closing Date, the Republic shall have furnished to the Representatives a copy of the internal opinion of the Solicitor General (*Procurador del Tesoro de la Nación*).

(j)    *Resolution:* On or prior to the Closing Date, the Republic shall have furnished to the Representatives a copy of a resolution of the Ministry of Treasury and Public Finance (*Ministerio de Hacienda y Finanzas Públicas*) or of the Secretary of Finance of the Ministry of Treasury and Public Finance (*Secretario de Finanzas del Ministerio de Hacienda y Finanzas Públicas*) duly authorized approving the consummation of the transactions contemplated hereby in terms that are satisfactory to the Representatives at their own discretion.

(k)    *Authorization Certificate.* The Initial Purchasers shall have received a certificate of the Republic executed by a duly qualified senior official of the Republic substantially to the following effect:

(i) attaching certified copies of all laws, decrees, resolutions, approvals, authorizations, permits, consents, exemptions, licenses, opinions and other actions of or by, an notices to or for filings or registrations with the Republic (the "Applicable Authorizations"), necessary for the Republic to execute, deliver and perform the Transaction Documents or the validity or enforceability thereof;

(ii) certifying that none of such Applicable Authorizations has been amended and that each of such Applicable Authorizations is in full force and effect;

(iii) certifying that the conditions set forth in Section 2 of Law 27,249 have been met; and

(iv) attaching an incumbency certificate issued by the Secretary or Under-Secretary of Finance of the Republic, certifying as to the authority, incumbency and specimen signatures of the persons who have executed or will execute the Transaction Documents on behalf of the Republic.

(l)     *Opinion and Negative Assurance Letter of Counsel for the Republic.*  Cleary Gottlieb Steen & Hamilton LLP, counsel for the Republic, shall have furnished to the Representatives, at the request of the Republic, their written opinion and negative assurance letter, dated the Closing Date and addressed to the Initial Purchasers, in form and substance reasonably satisfactory to the Representatives, to the effect set forth in Annex E hereto.

(m)     *Opinion of Local Counsel.*  Bruchou, Fernández Madero & Lombardi, Argentine counsel for the Initial Purchasers, shall have furnished to the Representatives, its written opinion and negative assurance letter, dated the Closing Date and addressed to the Initial Purchasers, in form and substance reasonably satisfactory to the Representatives, with respect to such matters as the Representatives may reasonably request.

(n)     *Opinion of Solicitor General and Negative Assurance Letter (Procurador del Tesoro de la Nación).* Carlos Balbín, Solicitor General for the Republic, shall have furnished to the Representatives, at the request of the Republic, its written opinion, dated the Closing Date and addressed to the Initial Purchasers, in form and substance reasonably satisfactory to the Representatives.

(o)     *Opinion and Negative Assurance Letter of Counsel for the Initial Purchasers.* The Representatives shall have received on and as of the Closing Date an opinion and negative assurance letter, addressed to the Initial Purchasers, of Shearman & Sterling LLP, counsel for the Initial Purchasers, with respect to such matters as the Representatives may reasonably request, and such counsel shall have received such documents and information as they may reasonably request to enable them to pass upon such matters.

(p)     *No Legal Impediment to Issuance.*  The sale of the Securities shall not be enjoined (temporarily or permanently) on the Closing Date and no stop or similar order preventing or suspending the approval or use of the Offering Memorandum or preventing shall have been issued, and no proceeding for such purpose shall have been initiated.

(q)     *DTC, Euroclear and Clearstream.*  The Securities shall be eligible for clearance and settlement through DTC, Euroclear and Clearstream.

(r)     *Process Agent.* On the date hereof, the Initial Purchasers shall have received evidence of the agreement (the "Process Agent Agreement") of the person for the time being acting as, or discharging the function of, Banco de la Nación Argentina, to act as the process agent of the Republic, as described in Section 15(d) hereof.

(s)     *Listing.*  On or before the Closing Date, the Republic will have applied to admit the Securities for listing on the Official List of the Luxembourg Stock Exchange and the Merval, and for trading on its Euro MTF Market and the MAE.

(t)     *Indenture, Registration Rights Agreement and Securities.*  The Indenture shall have been duly executed and delivered by a duly authorized signatory of the Republic and the Trustee; the Registration Rights Agreement shall have been duly executed and delivered by a duly authorized signatory of the Republic and the Representatives; and the Securities shall have been duly executed and delivered by a duly authorized signatory of the Republic and duly authenticated by the Trustee.

(u)     *Additional Documents.*  On or prior to the Closing Date, the Republic shall have furnished to the Representatives such further certificates, opinions, letters, and documents as the Representatives may reasonably request.

(v)     *No Market Disruption.*  Subsequent to the date hereof (i) trading in securities generally on the New York Stock Exchange, or the Nasdaq Stock Market, the Merval or the MAE shall not have been suspended or materially limited or minimum prices shall not have been established on any such exchange or market; (ii) trading in any securities of the Republic on any market, exchange or in the over-the-counter market in the United States, the United Kingdom, Argentina or elsewhere shall not have been suspended or materially limited; (iii) a banking moratorium shall not have been declared either by Argentine, United States Federal or New York State authorities, (iv) a material disruption in commercial banking or securities settlement or clearance services in the United States or in Europe shall not have occurred or (v) there shall not have occurred any outbreak or escalation of major hostilities in which the United States or the Republic is involved, any declaration of war by the Congress of the United States or the Republic or any other substantial national or international calamity or emergency if, in the case of clauses (iv) and (v) hereof, in the Representatives' judgment, such event would make it impractical to proceed with the completion of the offer and closing in the manner contemplated in the Offering Memorandum.

(w)     *Validity of the Agreement in Principle.* On the Closing Date, the Agreement in Principle shall have not been terminated, and no communication or notice, public or otherwise, by any of the Lead Plaintiffs terminating the Agreement in Principle shall have been issued, or no proceeding for such purpose shall have been received by the Republic.

        If any of the conditions specified in this Section 5 shall not have been fulfilled when and as provided in this Agreement, or if any of the opinions and certificates mentioned above or elsewhere in this Agreement shall not be reasonably satisfactory (except where otherwise so qualified) in form and substance to the Representatives and counsel for the Initial Purchasers, this Agreement and all obligations of the Initial Purchasers hereunder may be terminated at, or at any time prior to, the Closing Date by the Representatives.  Notice of such termination shall be given to the Republic in writing or by telephone or facsimile confirmed in writing.

        The documents required to be delivered by this Section 5 will be delivered at the offices of counsel for the Initial Purchasers, at 599 Lexington Avenue, New York, New York 10022, on the Closing Date.

6.   Certain Agreements of the Initial Purchasers. Each Initial Purchaser hereby represents and agrees severally, and not jointly, that it has not and will not use, authorize use of, refer to, or participate in the planning for use of, any written communication that constitutes an offer to sell or the solicitation of an offer to buy the Securities other than (i) a written communication that contains no "issuer information" (as defined in Rule 433(h)(2) under the Securities Act) that was not included in the Preliminary Offering Memorandum or the Offering Memorandum, (ii) any written communication prepared by the Republic pursuant to Section 4(c) above, (iii) any written communication prepared by such Initial Purchaser and approved by the Republic in advance in writing or (iv) any written communication relating to or that contains the terms of the Securities that is substantially consistent with the Pricing Term Sheet and/or other information included in the Preliminary Offering Memorandum or the Offering Memorandum, including ordinary course communications via Bloomberg and other similar written communications used by the Initial Purchasers in connection with the marketing and distributing the transactions described in this Agreement, in each case subject to the provisions of Section 1 hereof. The Initial Purchasers represent, warrant and agree severally, and not jointly, that they and each of their affiliates (i) have complied with and will comply with the terms set out in Annex C hereof, (ii) will maintain the confidentiality of, and will not disclose, Schedule 2 except as necessary to implement the procedures for payment to the Assignees of the Assigned Amounts, and (iii) will provide prompt notice to the Lead Plaintiffs, to the extent permitted by applicable law, upon becoming aware of any attempt by any third party to place a lien upon, encumber or otherwise attach the proceeds of, or enjoin, the Offering.

7.   Indemnification and Contribution.

(a)   *Indemnification of the Initial Purchasers.* The Republic agrees to indemnify and hold harmless each Initial Purchaser, its affiliates, directors, officers, employees and agents and each person, if any, who controls such Initial Purchaser within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act, from and against any and all losses, claims, damages and liabilities (including, without limitation, legal fees and other expenses incurred in connection with any (i) Disruptive Measure, (ii) Settlement Failure, or (iii) any suit, action or proceeding or any claim asserted, as such fees and expenses are incurred), joint or several, that arise out of, or are based upon, any untrue statement or alleged untrue statement of a material fact contained in the Preliminary Offering Memorandum, any of the other Time of Sale Information, any Issuer Written Communication or the Offering Memorandum (or any amendment or supplement thereto) or any omission or alleged omission to state therein a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, in each case except insofar as such losses, claims, damages or liabilities arise out of, or are based upon, any untrue statement or omission or alleged untrue statement or omission made in reliance upon and in conformity with any information relating to any Initial Purchaser furnished to the Republic in writing by or on behalf of such Initial Purchaser through the Representatives expressly for use therein, it being understood and agreed that the only such information furnished by or on behalf of the Initial Purchasers consists of the information described as such in Section 7(b) hereof.

(b)   *Indemnification of the Republic.* Each Initial Purchaser agrees, severally and not jointly, to indemnify and hold harmless the Republic to the same extent as the indemnity set

forth in paragraph (a) above, but only with respect to any losses, claims, damages or liabilities that arise out of, or are based upon, any untrue statement or omission or alleged untrue statement or omission made in reliance upon and in conformity with any information relating to such Initial Purchaser furnished to the Republic in writing by or on behalf of such Initial Purchaser through the Representatives expressly for use in the Preliminary Offering Memorandum, any of the other Time of Sale Information, any Issuer Written Communication or the Offering Memorandum (or any amendment or supplement thereto), it being understood and agreed that the only such information consists of the following statements in the Preliminary Offering Memorandum and the Offering Memorandum: (i) the fourteenth paragraph under the caption "Plan of Distribution" in the Preliminary Offering Memorandum and in the Offering Memorandum about price stabilization and short positions, and (ii) the fifteenth paragraph under the caption "Plan of Distribution" in the Preliminary Offering Memorandum and in the Offering Memorandum about other relationships.

(c)     *Notice and Procedures.*  If any suit, action, proceeding (including any Disruptive Measure, Settlement Failure, or governmental or regulatory investigation), claim or demand shall be brought or asserted against any person in respect of which indemnification may be sought pursuant to either Section 7(a) or 7(b) above, such person (the "Indemnified Person") shall promptly notify the person against whom such indemnification may be sought (the "Indemnifying Person") in writing; *provided*, that the failure to notify the Indemnifying Person shall not relieve it from any liability that it may have under Section 7(a) or (b) above except to the extent that it has been materially prejudiced (through the forfeiture of substantive rights or defenses) by such failure; and *provided, further*, that the failure to notify the Indemnifying Person shall not relieve it from any liability that it may have to an Indemnified Person otherwise than under Section 7(a) or 7(b) above.  If any such proceeding shall be brought or asserted against an Indemnified Person and it shall have notified the Indemnifying Person thereof, the Indemnifying Person shall retain counsel reasonably satisfactory to the Indemnified Person (who shall not, without the consent of the Indemnified Person, be counsel to the Indemnifying Person, such consent not to be unreasonably withheld or delayed) to represent the Indemnified Person and any others entitled to indemnification pursuant to this Section 7 that the Indemnifying Person may designate in such proceeding and shall pay the fees and expenses of such proceeding and shall pay the fees and expenses of such counsel related to such proceeding.  In any such proceeding, any Indemnified Person shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such Indemnified Person unless (i) the Indemnifying Person and the Indemnified Person shall have mutually agreed to the contrary; (ii) the Indemnifying Person has failed within a reasonable time to retain counsel reasonably satisfactory to the Indemnified Person; (iii) the Indemnified Person shall have reasonably concluded that there may be legal defenses available to it that are different from or in addition to those available to the Indemnifying Person; or (iv) the named parties in any such proceeding (including any impleaded parties) include both the Indemnifying Person and the Indemnified Person and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them.  It is understood and agreed that the Indemnifying Person shall not, in connection with any proceeding or related proceeding in the same jurisdiction, be liable for the fees and expenses of more than one separate firm (in addition to any local counsel) for all Indemnified Persons, and that all such fees and expenses shall be reimbursed as they are incurred.  Any such separate firm for any Initial Purchaser, its affiliates, directors and officers

and any control persons of such Initial Purchaser shall be designated in writing by the Representatives and any such separate firm for the Republic or any party indemnified pursuant to Section 7(b) shall be designated in writing by the Republic.  The Indemnifying Person shall not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the Indemnifying Person agrees to indemnify each Indemnified Person from and against any loss or liability by reason of such settlement or judgment.  Notwithstanding the foregoing sentence, if at any time an Indemnified Person shall have requested that an Indemnifying Person reimburse the Indemnified Person for fees and expenses of counsel as contemplated by this paragraph, the Indemnifying Person shall be liable for any settlement of any proceeding effected without its written consent if (i) such settlement is entered into more than 30 days after receipt by the Indemnifying Person of such request and (ii) the Indemnifying Person shall not have reimbursed the Indemnified Person in accordance with such request prior to the date of such settlement.  No Indemnifying Person shall, without the written consent of the Indemnified Person, effect any settlement of any pending or threatened proceeding in respect of which any Indemnified Person is or could have been a party and indemnification could have been sought hereunder by such Indemnified Person, unless such settlement (x) includes an unconditional release of such Indemnified Person, in form and substance reasonably satisfactory to such Indemnified Person, from all liability on claims that are the subject matter of such proceeding and (y) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

(d)     *Contribution.*  If the indemnification provided for in Sections 7(a) or 7(b) above is unavailable to an Indemnified Person or insufficient in respect of any losses, claims, damages or liabilities referred to therein, then each Indemnifying Person under such paragraph, in lieu of indemnifying such Indemnified Person thereunder, shall contribute to the amount paid or payable by such Indemnified Person as a result of such losses, claims, damages or liabilities (i) in such proportion as is appropriate to reflect the relative benefits received by the Republic on the one hand and the Initial Purchasers on the other from the offering of the Securities or (ii) if the allocation provided by clause (i) is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) but also the relative fault of the Republic on the one hand and the Initial Purchasers on the other in connection with the statements or omissions that resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations.  The relative benefits received by the Republic on the one hand and the Initial Purchasers on the other shall be deemed to be in the same respective proportions as the Net Proceeds (before deducting expenses) received by the Republic from the sale of the Securities and the total discounts and commissions received by the Initial Purchasers in connection therewith, as provided in this Agreement, bear to the aggregate offering price of the Securities.  The relative fault of the Republic on the one hand and the Initial Purchasers on the other shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Republic or by the Initial Purchasers and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. For purposes of this Section 7(d), each director, officer, employee, affiliate and agent of an Initial Purchaser and each person, if any, who controls an Initial Purchaser within the meaning of the Securities Act and the Exchange Act shall have the same rights to contribution as such Initial Purchaser.

(e)     *Limitation on Liability.*  The Republic and the Initial Purchasers agree that it would not be just and equitable if contribution pursuant to this Section 7 were determined by <u>pro rata</u> allocation (even if the Initial Purchasers were treated as one entity for such purpose) or by any other method of allocation that does not take account of the equitable considerations referred to in Section 7(d) above.  The amount paid or payable by an Indemnified Person as a result of the losses, claims, damages and liabilities referred to in Section 7(d) above shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such Indemnified Person in connection with any such action or claim. Notwithstanding the provisions of this Section 7, in no event shall an Initial Purchaser be required to contribute any amount by which the total discounts and commissions received by such Initial Purchaser with respect to the offering of the Securities exceeds the amount of any damages that such Initial Purchaser has otherwise been required to pay by reason of untrue or alleged untrue statement or omission or alleged omission.  No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The Initial Purchasers' obligations to contribute pursuant to this Section 7 are several in proportion to their respective purchase obligations hereunder and not joint.

(f)     *Non-Exclusive Remedies.*  The remedies provided for in this Section 7 are not exclusive and shall not limit any rights or remedies that may otherwise be available to any Indemnified Person at law or in equity.

For purposes of this Section 7, "Settlement Failure" shall mean any loss suffered by an Indemnified Person in connection with carrying out the settlement payment mechanism in the Agreement in Principle.

8.     <u>Termination</u>.  This Agreement may be terminated by the Representatives if the conditions set forth in Section 5 are not met and have not been waived or, in the sole discretion of the Representatives, by notice to the Republic, if after the execution and delivery of this Agreement and on or prior to the Closing Date (i) trading in securities generally on the New York Stock Exchange or the Nasdaq Stock Market, the Merval or the MAE shall have been suspended or materially limited or minimum prices shall not have been established on any such exchange or market; (ii) trading in any securities of the Republic on any market, exchange or in the over-the-counter market in the United States, the United Kingdom, Argentina or elsewhere shall not have been suspended or materially limited; (iii) a banking moratorium shall not have been declared either by Argentine, United States Federal or New York State authorities, (iv) a material disruption in commercial banking or securities settlement or clearance services in the United States or in Europe shall not have occurred or (v) there shall not have occurred any outbreak or escalation of major hostilities in which the United States or the Republic is involved, any declaration of war by the Congress of the United States, or the Republic or any other substantial national or international calamity or emergency if, in the case of clauses (iv) and (v) hereof, in the Representatives' judgment, such event would make it impractical to proceed with the completion of the offer and closing in the manner contemplated in the Offering Memorandum.

9.     <u>Defaulting Initial Purchaser</u>.

(a)     If, on the Closing Date, any Initial Purchaser defaults on its obligation to purchase the Securities that it has agreed to purchase hereunder, the non-defaulting Initial Purchasers may in their discretion arrange for the purchase of such Securities by other persons satisfactory to the Republic on the terms contained in this Agreement.  If, within 36 hours after any such default by any Initial Purchaser, the non-defaulting Initial Purchasers do not arrange for the purchase of such Securities, then the Republic shall be entitled to a further period of 36 hours within which to procure other persons satisfactory to the non-defaulting Initial Purchasers to purchase such Securities on such terms.  If other persons become obligated or agree to purchase the Securities of a defaulting Initial Purchaser, either the non-defaulting Initial Purchasers or the Republic may postpone the Closing Date for up to five full business days in order to effect any changes that in the opinion of counsel for the Republic or counsel for the Initial Purchasers may be necessary in the Time of Sale Information, the Offering Memorandum or in any other document or arrangement, and the Republic agrees to promptly prepare any amendment or supplement to the Time of Sale Information or the Offering Memorandum that effects any such changes.  As used in this Agreement, the term "Initial Purchaser" includes, for all purposes of this Agreement unless the context otherwise requires, any person not listed in Schedule 1 hereto that, pursuant to this Section 9, purchases Securities that a defaulting Initial Purchaser agreed but failed to purchase.

(b)     Notwithstanding the procedures described in Section 10(a) above, in the event that, following a default by any Initial Purchaser on its obligations to purchase the Securities, the aggregate principal amount of unpurchased Securities does not exceed one-tenth of the aggregate principal amount of all the Securities, then the Republic shall have the right on the Closing Date to require each non-defaulting Initial Purchaser to purchase the principal amount of Securities that such Initial Purchaser agreed to purchase hereunder plus such Initial Purchaser's pro rata share (based on the principal amount of Securities that such Initial Purchaser agreed to purchase hereunder) of the Securities of such defaulting Initial Purchaser or Initial Purchasers for which such arrangements have not been made.

(c)     If, after giving effect to any arrangements for the purchase of the Securities of a defaulting Initial Purchaser or Initial Purchasers by the non-defaulting Initial Purchasers and the Republic as provided in Section 9(a) above, the aggregate principal amount of such Securities that remains unpurchased exceeds one-tenth of the aggregate principal amount of all the Securities, or if the Republic shall not exercise the right described in Section 9(b) above, then this Agreement shall terminate without liability on the part of the non-defaulting Initial Purchasers.  Any termination of this Agreement pursuant to this Section 9 shall be without liability on the part of the Republic, except that the provisions of Section 7 hereof shall not terminate and shall remain in effect in respect of the non-defaulting Initial Purchasers.

(d)     Nothing contained herein shall relieve a defaulting Initial Purchaser of any liability it may have to the Republic or any non-defaulting Initial Purchaser for damages caused by its default.

10.     Payment of Expenses.

(a)     If the transactions contemplated by this Agreement are consummated, the Republic agrees to pay or cause to be paid all costs and expenses incident to the performance of its respective obligations hereunder, including without limitation, (i) the costs incident to the

25

authorization, issuance, sale, preparation and delivery of the Securities and the Exchange Securities and any taxes payable in that connection; (ii) the costs incident to the preparation and printing of the Preliminary Offering Memorandum, any other Time of Sale Information, any Issuer Written Communication and the Offering Memorandum (including any amendment or supplement thereto) and the distribution thereof; (iii) the costs of reproducing and distributing each of the Transaction Documents; (iv) the fees and expenses of the respective counsels (including local and international counsel) and any other experts or advisers retained for the Republic and the Initial Purchasers (subject to the limit set forth in Schedule 3 hereto); (v) the reasonable fees and expenses incurred in connection with the registration or qualification and determination of eligibility for investment of the Securities and the Exchange Securities under the laws of such jurisdictions as the Representatives may designate and the preparation, printing and distribution of a Blue Sky Memorandum (including the related fees and expenses of counsel for the Initial Purchasers) (subject to the limits set forth in Schedule 3 hereto); (vi) any fees charged by rating agencies for rating the Securities and the Exchange Securities; (vii) the fees and expenses of the Trustee and any paying agent (including related fees and expenses of any counsel to such parties); (viii) all expenses and application fees incurred in connection with the approval of the Securities and the Exchange Securities for book-entry transfer by DTC; (ix) all expenses incurred exclusively by the Republic in connection with any "road show" presentation to potential investors; and (x) all expenses and application fees related to the listing of the Securities and the Exchange Securities and the Merval on the Euro MTF Market of the Luxembourg Stock Exchange and for trading on the MAE.

(b)     If the Republic for any reason fails to tender the Securities for delivery to the Initial Purchasers the Republic agrees to reimburse the Initial Purchasers for all out-of-pocket costs and expenses (including the fees and expenses of their counsel up to such amount as set forth in Schedule 3 hereto) reasonably incurred and documented by the Initial Purchasers in connection with this Agreement and the offering contemplated hereby.

11.     Persons Entitled to Benefit of Agreement.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and the officers and directors and any controlling persons referred to herein, and the affiliates of each Initial Purchaser referred to in Section 7 hereof.  Nothing in this Agreement is intended or shall be construed to give any other person any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein.  No purchaser of Securities from any Initial Purchaser shall be deemed to be a successor merely by reason of such purchase.

12.     Survival.  The respective indemnities and rights of contribution set forth in Section 7 and representations and warranties and obligations of the Republic under Sections 3 and 10 hereof of the Republic and of the Initial Purchasers contained in this Agreement or made by or on behalf of the Republic or the Initial Purchasers pursuant to this Agreement or any certificate delivered pursuant hereto shall survive the delivery of and payment for the Securities and shall remain in full force and effect, regardless of any termination of this Agreement or any investigation made by or on behalf of the Republic or the Initial Purchasers.

13.     Certain Defined Terms.  For purposes of this Agreement, (a) except where otherwise expressly provided, the term "affiliate" has the meaning set forth in Rule 405 under the Securities Act; (b) the term "business day" means any day other than a day on which banks are

permitted or required to be closed in New York City; and (c) the term "written communication" has the meaning set forth in Rule 405 under the Securities Act.

14.    Compliance with USA Patriot Act.  In accordance with the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), the Initial Purchasers are required to obtain, verify and record information that identifies their respective clients, including the Republic, which information may include the name and address of their respective clients, as well as other information that will allow the Initial Purchasers to properly identify their respective clients.

15.    Miscellaneous.

(a)    *Authority of the Representatives.*  Any action by the Initial Purchasers hereunder may be taken by Deutsche Bank Securities Inc., HSBC Securities (USA) Inc., J.P. Morgan Securities LLC and Santander Investment Securities Inc. on behalf of the Initial Purchasers, and any such action taken by Deutsche Bank Securities Inc., HSBC Securities (USA) Inc., J.P. Morgan Securities LLC and Santander Investment Securities Inc. shall be binding upon the Initial Purchasers.

(b)    *Notices.*  All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given if mailed or transmitted and confirmed by any standard form of telecommunication.  Notices to the Initial Purchasers shall be given to the Representatives c/o Deutsche Bank Securities Inc., 60 Wall Street, New York, New York 10005; Attention Latin America Debt Capital Markets, with a copy at the same address to attention of the General Counsel, 36th Floor (fax: 212-797-4561), c/o HSBC Securities (USA) Inc., 452 Fifth Avenue, New York, New York 10018; Attention: DCM Transaction Management Group, Tel: (212)525-3652 (fax: 212 525-0238), J.P. Morgan Securities LLC, 383 Madison Avenue, New York, New York 10179 (fax: 212-834-6326); Attention: Latin American Debt Capital Markets, and c/o Santander Investment Securities Inc., 45 East 53 street, New York, New York 10022; Attention: Debt Capital Markets (fax: 212-407-0430).  Notices to the Republic shall be given to it at: Republic of Argentina, Ministry of the Treasury and Public Finance, Hipólito Yrigoyen 250, Piso 10, Oficina 1029, 1310 Buenos Aires, Argentina; Attention Santiago Bausili, Under-Secretary of Finance, with a copy (which shall not constitute notice) to Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006 (fax: (212) 225-3999) Attention: Andrés de la Cruz.

(c)    *Governing Law.*  This Agreement and any claim, controversy or dispute arising under or related to this Agreement shall be governed by and construed in accordance with the laws of the State of New York.

(d)    *Submission to Jurisdiction.*  To the fullest extent permitted by applicable law, the Republic hereby irrevocably submits to the exclusive jurisdiction of the U.S. federal and New York state courts in the Borough of Manhattan in The City of New York and the courts of the Republic (each, a "Specified Court") in any suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby (a "Related Proceeding").  The Republic irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any

objection which it may now or hereafter have to Related Proceedings brought in a Specified Court (excluding, for the avoidance of doubt, such actions, suits or proceedings relating to securities laws of the United States or any state thereof), whether on the grounds of venue, residence or domicile or on the ground that the Related Proceedings have been brought in an inconvenient forum. The Republic agrees that final judgment in any such suit, action or proceeding brought in such court shall be conclusive and binding upon the Republic, as applicable, and may be enforced in any court to the jurisdiction of which the Republic, as applicable, is subject by a suit upon such judgment. The Republic irrevocably appoints Banco de la Nación Argentina, at its office located at 225 Park Avenue, New York, New York, 10169, and, if such person is not maintained by the Republic as its agent for such purpose, the Republic will appoint CT Corporation System, as its authorized agent in the Borough of Manhattan in The City of New York upon which process may be served in any such suit or proceeding, and agrees that service of process upon such authorized agent, and written notice of such service to the Republic, as the case may be, by the person serving the same to the address provided in this Section 15, shall be deemed in every respect effective service of process upon the Republic in any such suit or proceeding. The Republic hereby represents and warrants that such authorized agent has accepted such appointment and has agreed to act as such authorized agent for service of process. The Republic further agrees to take any and all action as may be necessary to maintain such designation and appointment of such authorized agent in full force and effect for a period of five years from the date of this Agreement. For the avoidance of doubt, this Section 15(d) shall survive the delivery of and payment for the Securities and shall remain in full force and effect, regardless of any termination of this Agreement or any investigation made by or on behalf of the Republic or the Initial Purchasers.

Notwithstanding anything contained herein to the contrary, neither such appointment of an authorized agent nor the waiver of immunity set forth in paragraph (g) below shall be interpreted to include suits, actions or proceedings brought under the U.S. federal securities laws or state securities laws.

(e)     *Waiver of Jury Trial.* Each of the parties hereto hereby waives any right to trial by jury in any suit or proceeding arising out of or relating to this Agreement.

(f)     *Judgment Currency.* To the fullest extent permitted by law, the obligation of the Republic in respect of any amount due under this Agreement shall, notwithstanding any payment in any currency other than U.S. dollars (whether pursuant to a judgment or otherwise), be discharged only to the extent of the amount in the relevant currency that the party entitled to receive such payment may, in accordance with its normal procedures, purchase with the sum paid in such other currency (after any premium and costs of exchange) on the business day immediately following the day on which such party receives such payment. If the amount in the relevant currency that may be so purchased for any reason falls short of the amount originally due, Argentina shall pay such additional amounts, in the relevant currency, as may be necessary to compensate for the shortfall. Any obligation of the Republic not discharged by such payment shall, to the fullest extent permitted by applicable law, be due as a separate and independent obligation and, until discharged as provided herein, shall continue in full force and effect. The Republic agrees to indemnify each Initial Purchaser, its directors, officers, affiliates and each person, if any, who controls such Initial Purchaser within the meaning of Section 15 of the

Securities Act or Section 20 of the Exchange Act, against any loss incurred as a result of any judgment or order being given or made for any amount due in connection with this Agreement and any such judgment or order being expressed and paid in a currency (the "Judgment Currency") other than U.S. dollars and as a result of any variation as between (i) the rate of exchange at which the U.S. dollar amount is converted into the Judgment Currency for the purpose of such judgment or order, and (ii) the rate of exchange at which such indemnified person is able to purchase U.S. dollars with the amount of the Judgment Currency actually received by the indemnified person. The foregoing indemnity shall constitute a separate and independent obligation of the Republic and shall continue in full force and effect notwithstanding any such judgment or order as aforesaid. The term "rate of exchange" shall include any premiums and costs of exchange payable in connection with the purchase of, or conversion into, the relevant currency.

The Republic agrees that Section 765 of the Argentine Civil and Commercial Code is not applicable to this Agreement and any of the Transaction Documents.

(g)     *Waiver of Immunity*.  (i) To the extent that the Republic or any of its revenues, assets or properties shall be entitled, in any jurisdiction in which any Specified Court is located, in which any Related Proceeding may at any time be brought against it or any of its revenues, assets or properties, or in any jurisdiction in which any Specified Court is located in which any suit, action or proceeding may at any time be brought for the purpose of enforcing or executing any final non-appealable judgment in any Related Proceeding (a "Related Judgment"), to any immunity from suit, from jurisdiction of any such court, from set-off, from attachment prior to judgment, from attachment in aid of execution of judgment, from execution of a judgment or from any other legal or judicial process or remedy, and to the extent that in any such jurisdiction there shall be attributed such an immunity, the Republic hereby irrevocably waives such immunity, to the fullest extent permitted by the laws of such jurisdiction, including the Federal Sovereign Immunities Act of 1976, in respect of its obligations under this Agreement, the Indenture and the Registration Rights Agreement except for actions arising out of or based on the U.S. federal securities laws or any state securities laws for which the Republic reserves the right to plead sovereign immunity under the Federal Sovereign Immunities Act of 1976; *provided, however,* that the above exception shall not in any way limit the ability of the Initial Purchasers to exercise the rights of indemnification and contribution from the Republic set forth in Section 6 hereof; and *provided, further,* that such waiver of immunity shall not extend to, and the Republic shall be immune in respect of and in relation to any suit, action or proceeding or enforcement of any Related Judgment against: (i) any reserves of the Central Bank of Argentina (*Banco Central de la República Argentina*); (ii) any property in the public domain located in the territory of Argentina that falls within the purview of Section 234 and 235 of the Civil and Commercial Code of Argentina; (iii) any property located in or outside the territory of Argentina that provides an essential public service; (iv) any property (whether in the form of cash, bank deposits, securities, third party obligations or any other methods of payment) of Argentina, its governmental agencies and other governmental entities relating to the performance of the budget, within the purview of Sections 165 through 170 of Law No. 11,672, *Complementaria Permanente de Presupuesto* (t.o. 2014); (v) any property entitled to the privileges and immunities of the Vienna Convention on Diplomatic Relations of 1961 and the Vienna Convention on Consular Relations of 1963, including, but not limited to, property, premises and

bank accounts used by the missions of Argentina; (vi) any property used by a diplomatic, governmental or consular mission of the Republic; (vii) taxes, duties, levies, assessments, royalties or any other governmental charges imposed by Argentina, including the right of Argentina to collect any such charges; (viii) any property of a military character or under the control of a military authority or defense agency of Argentina; (ix) any property forming part of the cultural heritage of Argentina; and (x) property protected by any applicable sovereign immunity law.

(ii)   The Republic hereby irrevocably waives, to the fullest extent permitted by law, any requirement or other provision of law, rule, regulation or practice which requires or otherwise establishes as a condition to the institution, prosecution or completion of any action or proceeding (including appeals) arising out of or relating to this Agreement, the Securities, the Indenture, the Registration Rights Agreement, the Offering Memorandum, the Time of Sale Information and the Offering Memorandum, the posting of any bond or the furnishing, directly or indirectly, of any other security.

(h)   *Counterparts.*  This Agreement may be signed in counterparts (which may include counterparts delivered by any standard form of telecommunication), each of which shall be an original and all of which together shall constitute one and the same instrument.

(i)   *Amendments or Waivers.*  No amendment or waiver of any provision of this Agreement, nor any consent or approval to any departure therefrom, shall in any event be effective unless the same shall be in writing and signed by the parties hereto.

(j)   *Severability.*  In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

*Headings.*  The headings herein are included for convenience of reference only and are not intended to be part of, or to affect the meaning or interpretation of, this Agreement.

If the foregoing is in accordance with your understanding, please indicate your acceptance of this Agreement by signing in the space provided below.

Very truly yours,

THE REPUBLIC OF ARGENTINA

By_____

Name:

Title:

[Signature Page – Purchase Agreement - Settlement]

DEUTSCHE BANK SECURITIES INC.

For itself and on behalf of the
several Initial Purchasers listed
in Schedule 1 hereto.

By _____
Name: André Silva
Title: Managing Director

By _____
Name: Matthew Dukes
Title: Director

[Signature Page – Purchase Agreement - Settlement]

HSBC SECURITIES (USA) INC.

For itself and on behalf of the
several Initial Purchasers listed
in Schedule 1 hereto.

By

Name:
Title:        **Diane Kenna**
              **Managing Director**

[Signature Page – Purchase Agreement - Settlement]

J.P. MORGAN SECURITIES LLC

For itself and on behalf of the
several Initial Purchasers listed
in Schedule 1 hereto.

By _____

Name:       Lisandro Miguens
Title:       Managing Director

[Signature Page – Purchase Agreement - Settlement]

SANTANDER INVESTMENT SECURITIES INC.

For itself and on behalf of the
several Initial Purchasers listed
in Schedule 1 hereto.

By _____
Name:   Richard N. Zobkiw, Jr.
Title:   Senior Vice President

By _____
Name: Dan  Vallimarco C
Title:  MD

[Signature Page – Purchase Agreement - Settlement]

Schedule 1

**Series A**

| Initial Purchasers | Principal Amount of the Series A Securities |
|---|---|
| Deutsche Bank Securities Inc. ........................................... | US$296,780,000 |
| HSBC Securities (USA) Inc. ........................................... | $296,780,000 |
| J.P. Morgan Securities LLC........................................... | $296,780,000 |
| Santander Investment Securities Inc........................................... | $296,780,000 |
| BBVA Securities Inc. ........................................... | $124,960,000 |
| Citigroup Global Markets Inc. ........................................... | $124,960,000 |
| UBS Securities LLC ........................................... | $124,960,000 |
| **Total** ........................................... | **US$1,562,000,000** |

**Series B**

| Initial Purchasers | Principal Amount of the Series B Securities |
|---|---|
| Deutsche Bank Securities Inc. ................................................... | US$485,640,000 |
| HSBC Securities (USA) Inc. ..................................................... | $485,640,000 |
| J.P. Morgan Securities LLC....................................................... | $485,640,000 |
| Santander Investment Securities Inc........................................... | $485,640,000 |
| BBVA Securities Inc. ................................................................ | $204,480,000 |
| Citigroup Global Markets Inc. ................................................... | $204,480,000 |
| UBS Securities LLC ................................................................. | $204,480,000 |
| **Total** ................................................................................. | **US$2,556,000,000** |

**Series C**

| Initial Purchasers | Principal Amount of the Series C Securities |
|---|---|
| Deutsche Bank Securities Inc. ............................................................... | US$701,480,000 |
| HSBC Securities (USA) Inc. ................................................................. | $701,480,000 |
| J.P. Morgan Securities LLC................................................................... | $701,480,000 |
| Santander Investment Securities Inc. .................................................. | $701,480,000 |
| BBVA Securities Inc. .......................................................................... | $295,360,000 |
| Citigroup Global Markets Inc. .............................................................. | $295,360,000 |
| UBS Securities LLC ............................................................................ | $295,360,000 |
| **Total** ............................................................................................ | **$3,692,000,000** |

**Series D**

| Initial Purchasers | Principal Amount of the Series D Securities |
|---|---|
| Deutsche Bank Securities Inc. ........................................................ | US$296,780,00 |
| HSBC Securities (USA) Inc. .......................................................... | $296,780,000 |
| J.P. Morgan Securities LLC........................................................... | $296,780,000 |
| Santander Investment Securities Inc............................................... | $296,780,000 |
| BBVA Securities Inc. ................................................................... | $124,960,000 |
| Citigroup Global Markets Inc. ....................................................... | $124,960,000 |
| UBS Securities LLC ..................................................................... | $124,960,000 |
| **Total** ....................................................................... | **$1,562,000,000** |

Schedule 2

| A | B | C | D | E |
|---|---|---|---|---|
| Number | Name of Assignee | Assigned Amount (USD or Euros) | Account Name | Institution Receiving Payment |
| 1 | NML Capital, Ltd | U.S.$2,426,610,458.00 | Redacted | |
| 2 | Aurelius Capital Master, Ltd | U.S.$434,476,042.00 | | |
| 3 | ACP Master, Ltd. | U.S.$108,711,975.00 | | |
| 4 | Aurelius Opportunities Fund II, LLC | U.S.$134,225,451.00 | | |
| 5 | Aurelius Capital Partners, LP | U.S.$169,141,371.00 | | |
| 6 | Blue Angel Capital I LLC | U.S.$411,425,409.00 | | |
| 7 | Olifant Fund, Ltd. | U.S.$70,990,501.00 | | |

| A | B | C | D | E |
|---|---|---|---|---|
| Number | Name of Assignee | Assigned Amount (USD or Euros) | Account Name | Institution Receiving Payment |
| | | | Redacted | |
| 8 | FYI Ltd. | U.S.$366,407,062.00 | | |
| 9 | FFI Fund Ltd. | U.S.$550,603,782.00 | | |
| 10 | EM Limited | U.S.$849,201,747.00 | | |
| 11 | Procella Holdings, L.P. | U.S.$37,866,814.00 | | |
| 12 | VR Global Partners, L.P. | U.S.$35,508,705.00 | | |
| 13 | Montreux Partners, LP | U.S.$308,560,843.00 | | |
| 14 | Capital Ventures International | U.S.$221,833,952.53 | | |
| 15 | Lorin Capital Master Fund LP | U.S.$739,265.26 | | |

| A | B | C | D | E |
|---|---|---|---|---|
| Number | Name of Assignee | Assigned Amount (USD or Euros) | Account Name | Institution Receiving Payment |
| | | | Redacted | |
| 16 | Clarex Limited | U.S.$110,468,850.45 | | |
| 17 | Lightwater Corporation Limited | U.S.$9,634,370.00 | | |
| 18 | Old Castle Holdings, Ltd. | U.S.$963,437.00 | | |
| 19 | Paolo Ercolani | U.S.$1,008,964.48 | | |
| 20 | Rafael Leopoldo Settin Lando | U.S.$3,235,439.00 | | |
| 21 | The Bank of New York Mellon, in its capacity as Settlement Trustee under that certain Settlement Trust Agreement dated as of April 22, 2016 | U.S.$975,496,855.30 €1,829,623,670.00 | | |

**Schedule 3**

**<u>Expenses</u>**

Roadshow......................................................................    To be invoiced

Counsel fees and expenses..........................................    To be invoiced

Printing and reproduction ...........................................    To be invoiced

Rating Agencies ...........................................................    To be invoiced

Trustee fees and expenses ...........................................    To be invoiced

Listings.........................................................................    To be invoiced

DTC fees and expenses................................................    To be invoiced

ANNEX A

**a.     Additional Time of Sale Information**

1.     Pricing Term Sheet

**ANNEX B**

**Pricing Term Sheet, dated April 19, 2016**
**to Preliminary Offering Memorandum dated April 11, 2016**
**Strictly Confidential**

# THE REPUBLIC OF ARGENTINA

**U.S.$ 1,562,000,000 6.250% Bonds Due 2019**
**U.S.$ 2,556,000,000 6.875% Bonds Due 2021**
**U.S.$ 3,692,000,000 7.500% Bonds Due 2026**
**U.S.$ 1,562,000,000 7.625% Bonds Due 2046**

Pricing Term Sheet

April 19, 2016

| | |
|---|---|
| **Issuer** | The Republic of Argentina |
| **Format** | 144A / Reg S with the benefit of a Registration Rights Agreement |
| **Settlement Date** | April 22, 2016 |
| **Pricing Date** | April 19, 2016 |
| **Minimum Denominations** | U.S.$150,000 and integral multiples of U.S.$1,000 in excess thereof. |
| **Expected Listing / Trading** | Luxembourg - Euro MTF / Merval / MAE |
| **Expected Ratings**[1] | B3 by Moody's and B- by Standard & Poor's |
| **Governing Law** | State of New York |
| **Global Coordinators and Joint Bookrunners** | Deutsche Bank Securities Inc. HSBC Securities (USA) Inc. J.P. Morgan Securities LLC Santander Investment Securities Inc. |
| **Joint Bookrunners** | BBVA Securities Inc. Citigroup Global Markets Inc. UBS Securities LLC |
| **Clearing** | DTC/Euroclear/Clearstream |
| **Use of Proceeds** | Net proceeds from the offering will be applied to settle claims of holders of Untendered Debt of the Republic in compliance with the Debt Authorization Law. |
| **Recent Developments** | On April 13, 2016, the United States Court of Appeals for the Second Circuit (the "Second Circuit") ruled from the bench affirming the March 2, 2016 order of the United States District Court for the Southern District of New York (the "District Court") vacating the so called "*pari-passu*" |

1

injunctions upon the District Court's verification that the conditions precedent set forth in the March 2, 2016 order have been met.  On April 14, 2016, the Second Circuit issued an order affirming its bench ruling, and on April 15, 2016 it issued a further summary order providing the reasoning for its ruling and also issued the mandate returning the case to the District Court.

## Series A

| | |
|---|---|
| **Title of Securities** | 6.250% Bonds Due 2019 |
| **Principal Amount** | U.S.$ 1,562,000,000 |
| **Maturity Date** | April 22, 2019 |
| **Coupon Rate** | 6.250% per annum |
| **Price to Public** | 100.000%, plus accrued interest, if any, from April 22, 2016 |
| **Yield to Maturity** | 6.250% |
| **Spread to Benchmark Treasury** | +532.7bps |
| **Benchmark Treasury** | UST 0.875% due April 15, 2019 |
| **Benchmark Treasury Spot and Yield** | 99-27+ | 0.923% |
| **Gross Proceeds to the Issuer** | U.S.$ 1,562,000,000 |
| **Interest Payment Dates** | Payable semi-annually in arrears on April 22 and October 22 of each year. |
| **First Interest Payment Date** | October 22, 2016 |
| **ISIN/CUSIP** | Reg S ISIN USP04808AG92<br>Reg S CUSIP P04808 AG9<br>Rule 144A ISIN US040114GZ77<br>Rule 144A CUSIP 040114 GZ7 |

## Series B

| | |
|---|---|
| **Title of Securities** | 6.875% Bonds Due 2021 |
| **Principal Amount** | U.S.$ 2,556,000,000 |

| | |
|---|---|
| **Maturity Date** | April 22, 2021 |
| **Coupon Rate** | 6.875% per annum |
| **Price to Public** | 100.000%, plus accrued interest, if any, from April 22, 2016 |
| **Yield to Maturity** | 6.875% |
| **Spread to Benchmark Treasury** | +562.0bps |
| **Benchmark Treasury** | UST 1.250% due March 31, 2021 |
| **Benchmark Treasury Spot and Yield** | 99-31 1/4 | 1.255% |
| **Gross Proceeds to the Issuer** | U.S.$ 2,556,000,000 |
| **Interest Payment Dates** | Payable semi-annually in arrears on April 22 and October 22 of each year. |
| **First Interest Payment Date** | October 22, 2016 |
| **ISIN/CUSIP** | Reg S ISIN USP04808AA23<br>Reg S CUSIP P04808 AA2<br>Rule 144A ISIN US040114GQ78<br>Rule 144A CUSIP 040114 GQ7 |

## Series C

| | |
|---|---|
| **Title of Securities** | 7.500% Bonds Due 2026 |
| **Principal Amount** | U.S.$ 3,692,000,000 |
| **Maturity Date** | April 22, 2026 |
| **Coupon Rate** | 7.500% per annum |
| **Price to Public** | 100.000%, plus accrued interest, if any, from April 22, 2016 |
| **Yield to Maturity** | 7.500% |
| **Spread to Benchmark Treasury** | +571.1bps |
| **Benchmark Treasury** | UST 1.625% due February 15, 2026 |
| **Benchmark Treasury Spot and Yield** | 98-17 | 1.789% |
| **Gross Proceeds to the Issuer** | U.S.$ 3,692,000,000 |

| | |
|---|---|
| **Interest Payment Dates** | Payable semi-annually in arrears on April 22 and October 22 of each year. |
| **First Interest Payment Date** | October 22, 2016 |
| **ISIN/CUSIP** | Reg S ISIN USP04808AC88<br>Reg S CUSIP P04808 AC8<br>Rule 144A ISIN US040114GS35<br>Rule 144A CUSIP 040114 GS3 |

## Series D

| | |
|---|---|
| **Title of Securities** | 7.625% Bonds Due 2046 |
| **Principal Amount** | U.S.$ 1,562,000,000 |
| **Maturity Date** | April 22, 2046 |
| **Coupon Rate** | 7.625% per annum |
| **Price to Public** | 95.758%, plus accrued interest, if any, from April 22, 2016 |
| **Yield to Maturity** | 8.000% |
| **Spread to Benchmark Treasury** | +541.3bps |
| **Benchmark Treasury** | UST 3.000% due November 15, 2045 |
| **Benchmark Treasury Spot and Yield** | 108-16 | 2.587% |
| **Gross Proceeds to the Issuer** | U.S.$ 1,495,739,960 |
| **Interest Payment Dates** | Payable semi-annually in arrears on April 22 and October 22 of each year. |
| **First Interest Payment Date** | October 22, 2016 |
| **ISIN/CUSIP** | Reg S ISIN USP04808AE45<br>Reg S CUSIP P04808 AE4<br>Rule 144A ISIN US040114GU80<br>Rule 144A CUSIP 040114 GU8 |

[1] A securities rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time.

The information in this pricing term sheet supplements the Issuer's preliminary offering memorandum, dated April 11, 2016 (the "Preliminary Offering Memorandum") and supersedes the information in the Preliminary Offering Memorandum to the extent inconsistent with the information in the Preliminary

Offering Memorandum. This pricing term sheet is qualified in its entirety by reference to the Preliminary Offering Memorandum. Terms used herein but not defined herein shall have the respective meanings as set forth in the Preliminary Offering Memorandum.

---

This communication is intended for the sole use of the person to whom it is provided by the sender. This notice shall not constitute an offer to sell or a solicitation of an offer to buy, nor shall there be any sale of the securities in any state or jurisdiction in which such offer, solicitation or sale would be unlawful. The securities have not been registered under the Securities Act of 1933, as amended (the "Securities Act"). The securities may not be offered or sold within the United States or to U.S. persons except to qualified institutional buyers in reliance on the exemption from registration provided by Rule 144A and to certain non U.S. persons in offshore transactions in reliance on Regulation S under the Securities Act. You are hereby notified that sellers of the securities may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A. Before you invest, you should read the Preliminary Offering Memorandum as supplemented by this pricing term sheet.

**ANY DISCLAIMERS OR OTHER NOTICES THAT MAY APPEAR BELOW ARE NOT APPLICABLE TO THIS COMMUNICATION AND SHOULD BE DISREGARDED. SUCH DISCLAIMERS OR OTHER NOTICES WERE AUTOMATICALLY GENERATED AS A RESULT OF THIS COMMUNICATION BEING SENT VIA BLOOMBERG OR ANOTHER EMAIL SYSTEM.**

**ANNEX C**

<u>Restrictions on Offers and Sales Outside the United States</u>

In connection with offers and sales of Securities outside the United States:

(a)     Each Initial Purchaser acknowledges that the Securities have not been registered under the Securities Act and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except pursuant to an exemption from, or in transactions not subject to, the registration requirements of the Securities Act.

(b)     Each Initial Purchaser, severally and not jointly, represents, warrants and agrees that:

(i)     Such Initial Purchaser has offered and sold the Securities, and will offer and sell the Securities, (A) as part of their distribution at any time and (B) otherwise until 40 days after the later of the commencement of the offering of the Securities and the Closing Date, only in accordance with Regulation S under the Securities Act ("<u>Regulation S</u>") or Rule 144A or any other available exemption from registration under the Securities Act.

(ii)     None of such Initial Purchaser or any of its affiliates or any other person acting on its or their behalf has engaged or will engage in any directed selling efforts with respect to the Securities, and all such persons have complied and will comply with the offering restrictions requirement of Regulation S.

(iii)     Such Initial Purchaser has not and will not enter into any contractual arrangement with any distributor with respect to the distribution of the Securities, except with its affiliates or with the prior written consent of the Republic.

Terms used in paragraph (a) and this paragraph (b) and not otherwise defined in this Agreement have the meanings given to them by Regulation S.

(c)     Each Initial Purchaser acknowledges that no action has been or will be taken by the Republic that would permit a public offering of the Securities, or possession or distribution of any of the Time of Sale Information, the Offering Memorandum, any Issuer Written Communication or any other offering or publicity material relating to the Securities, in any country or jurisdiction where action for that purpose is required.

**ANNEX D**

Agreement in Principle

[The Agreement in Principle begins on the next page.]

**FRIEDMAN KAPLAN** FRIEDMAN KAPLAN SEILER & ADELMAN LLP

**EDWARD A. FRIEDMAN**
efriedman@fklaw.com
212.833.1102

March 3, 2016

<u>BY ECF</u>

Honorable Thomas P. Griesa
United States District Judge
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, NY 10007-1312

Re: *NML Capital, Ltd. v. The Republic of Argentina*
Nos. 08 Civ. 6978, 09 Civ. 1707, 09 Civ. 1708, 14 Civ. 8601,
14 Civ. 8988
*Aurelius Capital Master, Ltd. v. The Republic of Argentina*
Nos. 09 Civ. 8757, 09 Civ. 10620, 10 Civ. 3970, 10 Civ. 8339
*Aurelius Opportunities Fund II, LLC v. The Republic of Argentina*
Nos. 10 Civ. 1602, 10 Civ. 3507
*Aurelius Capital Partners, LP v. The Republic of Argentina*
No. 14 Civ. 8946
*Blue Angel Capital I LLC v. The Republic of Argentina*
Nos. 10 Civ. 4101, 10 Civ. 4782, 14 Civ. 8947
*Olifant Fund, Ltd. v. The Republic of Argentina*
No. 10 Civ. 9587
*FFI Fund, Ltd. v. The Republic of Argentina*
No. 14 Civ. 8630

Dear Judge Griesa:

We represent plaintiffs Aurelius Capital Master, Ltd., Aurelius Opportunities
Fund II, LLC, ACP Master, Ltd., Aurelius Capital Partners, LP, and Blue Angel Capital I
LLC, and write on behalf of all the plaintiffs in the above-captioned actions to provide the
Court with a copy of the Agreement in Principle referenced in my letter of yesterday
afternoon. Certain pages with information not relevant to the matters before the Court have
been redacted. The relevance of this agreement was set forth in the letter, and we
respectfully submit that its inclusion on this Court's docket will facilitate prompt access by
the Court of Appeals.

Respectfully submitted,

*Edward A. Friedman*

Edward A. Friedman

Honorable Thomas P. Griesa               - 2 -                         March 3, 2016

Enclosure

cc:    All Parties by ECF

AGREEMENT IN PRINCIPLE

The Plaintiffs in the actions listed on the Plaintiffs' signature pages hereto agree in principle, severally and not jointly, with the Republic of Argentina, as of February 29, 2016, as follows:

1. Subject to the condition set forth in paragraph 5 below, the Republic of Argentina will pay, and the Plaintiffs will accept, 75% of the amount of their claims of $5,891,000,000 asserted in the U.S. District Court for the Southern District of New York on defaulted Argentine bonds, inclusive of all legal and statutory interest applicable to each such claim through February 29, 2016, which payment therefore shall be equal to $4,418,250,000. The Republic of Argentina shall also pay interest on the claims of $5,891,000,000 which shall accrue at the rate of 2% per annum from March 1, 2016 to the date of payment if payment is made on or before April 14, 2016. If payment is not made by that date, interest will resume running from and after that date on the full claims at the legal and statutory interest rate applicable to each such claim.

2. Subject to the condition set forth in paragraph 5 below, the Republic of Argentina will make an additional payment to the Plaintiffs, and Plaintiffs will accept the additional payment, such payment being in an amount equal to $235 million, to (a) settle all claims asserted *outside* the U.S. District Court for the Southern District of New York, world-wide, and (b) reimburse the Plaintiffs for legal fees wherever incurred, whether in the U.S. District Court for the Southern District of New York or in any other jurisdiction, world-wide.

3. The parties thus agree that through February 29, 2016, the claims amount would be $5,891,000,000 and the total payment due (inclusive of amounts due under paragraphs 1 and 2 above), if paid on such date, would be $4,653,250,000. The parties further agree that interest shall accrue from March 1 through the earlier of payment in full of all amounts due hereunder or April 14 in the per diem amount of $322,795. All payments to be made by the Republic of Argentina pursuant to paragraphs 1 and 2 above shall be paid in accordance with paragraph 7 below.

4. The sums set forth in paragraphs 1 and 2 above, when paid, will be in full and final settlement of all claims of any nature or kind by the Plaintiffs against the Republic of Argentina, arising or existing world-wide in connection with the securities that are the subject of the actions listed on each such Plaintiff's signature page hereto or any judgments entered in such actions through the date of such payment, other than claims that arise under this Agreement in Principle, and,

following such payment in full, each Plaintiff will provide the Republic of Argentina with Stipulations of Dismissal with Prejudice of all of the actions listed on such Plaintiff's signature page hereto in the U.S. District Court for the Southern District of New York and the equivalent in any related actions pending in any other jurisdiction, world-wide.

Upon the receipt by the Plaintiffs of payments in full of the sums set forth in paragraphs 1 and 2 above, the Plaintiffs will promptly release all attachments and pending attachments and executions, world-wide, and return to Argentina all property levied upon or seized by the Plaintiffs, world-wide, all as listed on Schedule 1.

Upon the receipt by the Plaintiffs of payments in full of the sums set forth in paragraphs 1 and 2 above, as of the date of such receipt of payment, each Plaintiff, on the one hand, and the Republic of Argentina, on the other hand, hereby unqualifiedly releases and discharges each other, and their respective ministers, government and other officials, officers, directors, equityholders, managers, affiliates, employees, agents, attorneys, successors and assigns, from any and all claims, causes of action, damages or liabilities (including attorneys' fees), of any kind, whether at law or in equity, known or unknown, asserted or unasserted, fixed or contingent, arising or existing world-wide in connection with the securities that are the subject of the actions listed on each such Plaintiff's signature page hereto or any judgments entered in such actions through the date of such payment, other than claims that arise under this Agreement in Principle.

5. The condition to the Plaintiffs receiving the payments set forth above is that legislation by the Congress of the Republic of Argentina that lifts, abridges or repeals Law 26,017 (known as the Lock Law) and Law 26,984 (known as the Sovereign Payment Law) (or a functionally equivalent action) has become effective and unconditionally permits the immediate payment in full of the amounts set forth in paragraphs 1 and 2 above. Effective immediately upon the receipt of the final payment in full of the sums set forth in paragraphs 1 and 2 above, the Plaintiffs' Injunctions will be automatically vacated. If and to the extent that the Court requires any additional documentation to effect the lifting of the Plaintiffs' Injunctions as set forth in the prior sentence, the Plaintiffs agree to provide such documentation, in form and substance reasonably satisfactory to the Republic of Argentina, and the Court, promptly upon request. Until the Plaintiffs are paid in full pursuant to paragraphs 1 and 2 above or this Agreement in Principle is terminated in accordance with its terms, the Republic of Argentina agrees that it will not request the Court to vacate or modify the Injunctions in the Plaintiffs'

2

cases or support the request by any third party to vacate or modify such Injunctions, other than automatically upon payment in full to the Plaintiffs of the amounts set forth in paragraphs 1 and 2 above.

6. The parties agree to cooperate with each other and with the Special Master, Daniel A. Pollack, Esq., to effectuate the purposes and terms of this Agreement in Principle, including but not limited to executing and delivering any and all documents reasonably required to effectuate the purposes and terms of this Agreement in Principle, in form reasonably satisfactory to the Republic of Argentina and the Plaintiffs.   Notwithstanding any other provision in this agreement, nothing herein will prevent or limit the Plaintiffs' ability to litigate to safeguard their legal position, including the position that, until the Plaintiffs are paid in full, their Injunctions cannot be lifted.

7. The parties contemplate that to fund the payments to the Plaintiffs under paragraphs 1 and 2 above (other than interest accruing after February 29, 2016 as set forth below), the Republic of Argentina, after certifying to the Plaintiffs in writing that the condition set forth in the first sentence of paragraph 5 above has been satisfied, will undertake one or more capital-raises, likely in the form of a bond offering.

The Republic of Argentina agrees that, other than as set forth in the next succeeding sub-paragraph, until the Republic of Argentina provides the certification referred to in the preceding sentence, or this Agreement in Principle is terminated, the Republic of Argentina will not undertake any capital-raises. Following such certification, the Republic of Argentina agrees that the first monies raised by it through capital-raises, up to the full amount to be paid to the Plaintiffs under paragraphs 1 (other than interest accruing after February 29, 2016) and 2 above will immediately and directly be paid by the underwriters or other entities selected to manage or provide the capital-raises into Accounts maintained with one or more money center financial institutions in the State of New York and each of such institutions shall be determined by the Plaintiffs and reasonably acceptable to the Republic of Argentina, and which Accounts shall be in the name of and for the sole benefit of the applicable Plaintiff. The Republic of Argentina shall require the underwriters or other entities selected to manage or provide any capital-raises to pay all proceeds thereof directly into the Accounts (allocated among such Accounts as provided by the court order contemplated below by this paragraph 7), unless the underwriters or such other entities shall have been notified in writing by the Plaintiffs that all amounts due and payable to the Plaintiffs under paragraphs 1

3

(other than interest accruing after February 29, 2016) and 2 above have been paid in full in accordance with the terms hereof.

None of the requirements set forth in this paragraph 7 shall apply to a capital-raise which (a) occurs in the ordinary course of the operation and administration of the affairs of the government of the Republic of Argentina, (b) is (i) entirely denominated in Argentine pesos, which capital-raises can be unlimited in amount, or (ii) other currencies, provided that such capital-raises do not exceed, in the aggregate, $2,000,000,000 U.S. dollars (calculated for each such capital-raise at the exchange rates in effect on the date of the closing of such capital raise), and (c) is marketed and offered solely within the Republic of Argentina.

Each Plaintiff agrees that as long as this Agreement in Principle is in effect as to that Plaintiff and as long as the Republic of Argentina is in compliance with the terms of this Agreement in Principle, it shall not attach, or attempt to attach, or enjoin, in whole or in part, a capital-raise that is made by the Republic of Argentina.

The parties will negotiate in good faith to agree as promptly as practicable following the date hereof to an Addendum A to this Agreement in Principle, and shall cooperate to obtain promptly thereafter an order of the Court approving such Addendum A, which order shall be binding upon the Plaintiffs, the Republic of Argentina and any underwriters or other entities selected to manage or provide any capital-raises, as provided in this paragraph 7. Such Addendum A shall contain provisions for the implementation of this paragraph 7, including, without limitation, the following:

(i)     that the first monies raised through capital-raises up to the full amount to be paid to the Plaintiffs under paragraphs 1 (other than interest accruing after February 29, 2016) and 2 above shall immediately and directly be paid by the underwriters or other entities selected to manage or provide the capital-raises into the Accounts, as provided above;

(ii)    that all funds paid into the Accounts shall be immediately paid over to the Plaintiffs, subject to any notice or instructions from the Plaintiffs required by the financial institution(s) at which the Accounts are maintained;

(iii)   that, in the event of the termination of this Agreement in Principle, all funds at the time held in the Accounts shall be retained by the Plaintiffs, as aforesaid;

4

(iv)   that all funds paid into the Accounts will be in cash, in U.S. dollars in immediately available funds, via wire transfer; and

(v)   that the allocation of the payments in full as contemplated by paragraphs 1 and 2 above among the Plaintiffs shall be in accordance with a schedule to be incorporated into such order, as such schedule may be further modified with the consent of each of the Plaintiffs.

Notwithstanding the foregoing, the Plaintiffs may choose an alternative payment mechanism which will be reflected in Addendum A and the court order contemplated by this paragraph 7, which alternative payment mechanism shall be reasonably acceptable to the Republic of Argentina.

The parties contemplate that the payments to the Plaintiffs of interest accruing after February 29, 2016 as provided in paragraph 1 above will be made directly to the Plaintiffs by the Republic of Argentina, in cash, in U.S. dollars, in immediately available funds, by wire transfer. Notwithstanding that such interest shall be separately payable to the Plaintiffs as provided in this sub-paragraph, for all purposes of this Agreement in Principle, the Plaintiffs shall not be deemed to have been paid in full unless and until all interest as provided in paragraph 1 above is also paid in full.

8.  The parties agree that announcement of the Agreement in Principle will be made by the Special Master, Daniel A. Pollack, Esq. upon the signing of the Agreement in Principle, and that, thereafter, the parties will issue public statements of their own supportive of the Agreement in Principle.

9.  This Agreement in Principle is governed by the laws of the State of New York. The parties agree that any dispute arising under, out of or relating to this Agreement in Principle shall be submitted to the Special Master for mediation. If the Special Master is unable to effect a resolution within 2 business days of the submission of such dispute, such dispute may be submitted to the U.S. District Court for the Southern District of New York before the Hon. Thomas P. Griesa on an expedited basis for resolution. Notwithstanding the foregoing, in the event that any party requires urgent resolution of dispute in order to avoid irreparable harm to its rights under this Agreement in Principle, such party may apply directly to the Court for dispute resolution without first submitting the dispute to the Special Master for mediation. Each party waives trial by jury. For the purpose of the resolution of disputes under this Agreement in Principle, the Republic of Argentina

5

waives sovereign and other immunities (and consents to New York jurisdiction and service of process) otherwise available to it to the fullest extent provided in the documentation governing the Plaintiffs' claims.   The parties hereto agree that in connection with any such dispute (i) no party hereto shall be entitled to monetary damages as a result of another party's breach of the terms of this Agreement in Principle and (ii) each party shall be entitled to specific performance and to injunctive or other equitable relief as the sole remedies for any breach of this Agreement in Principle.

10. This Agreement in Principle is binding and enforceable upon all the parties. Each party represents that the person signing this Agreement in Principle on its behalf is duly authorized to do so and to bind such party in accordance with the terms of this Agreement in Principle.  Each Plaintiff will have the right to terminate this Agreement in Principle as to itself if (1) by March 3, 2016, the order contemplated by paragraph 7 above has not been entered by the U.S. District Court for the Southern District of New York or (2) the payment in full of all amounts to be made to the Plaintiffs as contemplated by this Agreement in Principle is not made in accordance with the terms hereof by 12:00 noon EST, Thursday, April 14, 2016.  In the event that this Agreement in Principle is terminated as to any or all Plaintiffs pursuant to this paragraph 10, the terminating Plaintiffs and the Republic of Argentina (with respect to the terminating Plaintiffs only) shall thereupon be restored to their respective prior positions as if there had been no Agreement in Principle.  The parties agree that this Agreement in Principle qualifies as an agreement in principle with the Republic of Argentina entered into on or before February 29, 2016 as contemplated by the Court's indicative order dated February 19, 2016.

[SIGNATURE PAGES FOLLOW]

6

_____

Luis Caputo
Secretary of Finance
Republic of Argentina

New York, New York
February 26, 2016

## PLAINTIFFS

NML CAPITAL, LTD.

By: _____
Name: PAUL SINGER
Title: PRESIDENT

Actions referenced in the preamble: Case Nos. 03 Civ. 8845 (TPG) (S.D.N.Y.), 05 Civ. 2434 (TPG) (S.D.N.Y), 06 Civ. 6466 (TPG) (S.D.N.Y.), 07 Civ. 2690 (TPG) (S.D.N.Y.), 08 Civ. 3302 (TPG) (S.D.N.Y.), 07 Civ. 1910 (TPG) (S.D.N.Y.), 07 Civ. 6563 (TPG) (S.D.N.Y.), 08 Civ. 2541 (TPG) (S.D.N.Y.), 08 Civ. 6978 (TPG) (S.D.N.Y.), 09 Civ. 1707 (TPG) (S.D.N.Y.), 09 Civ. 1708 (TPG) (S.D.N.Y.), 14 Civ. 8988 (TPG) (S.D.N.Y.), 14 Civ. 8601 (TPG) (S.D.N.Y.)

8

AURELIUS CAPITAL MASTER, LTD.
    By Aurelius Capital Management, LP,
    solely as investment manager and not in its
    individual capacity

By: _____
    Name:  Luc M. Dowling
    Title:   Managing Director

ACP MASTER, LTD.
    By Aurelius Capital Management, LP,
    solely as investment manager and not in its
    individual capacity

By: _____
    Name:  Luc M. Dowling
    Title:   Managing Director

AURELIUS OPPORTUNITIES FUND II, LLC
    By Aurelius Capital Management, LP,
    solely as manager and not it its individual
    capacity

By: _____
    Name:  Luc M. Dowling
    Title:   Managing Director

AURELIUS CAPITAL PARTNERS, LP
    By Aurelius Capital Management, LP,
    solely as investment manager and not in its
    individual capacity

By: _____
    Name:  Luc M. Dowling
    Title:   Managing Director

9

OLIFANT FUND, LTD.

By: _____

Name: _John N Spinney Jr_

Title: _Authorized Signatory_

Actions referenced in the preamble: 10 Civ. 9587 (TPG) (S.D.N.Y.)

FYI LTD.

By: _____
Name: John N Spinney Jr
Title: Authorized Signatory

FFI FUND LTD.

By: _____
Name: John N Spinney Jr
Title: Authorized Signatory

Actions referenced in the preamble: Case Nos. 05 Civ. 3328 (TPG) (S.D.N.Y.), 14 Civ. 8630 (TPG) (S.D.N.Y)

BLUE ANGEL CAPITAL I LLC

By: _____

      Name: _Avram Friedman_

      Title: _Manager_

Actions referenced in the preamble: Case Nos. 07 Civ. 2693 (TPG) (S.D.N.Y.), 10 Civ. 4101 (TPG) (S.D.N.Y.), 10 Civ. 4782 (TPG) (S.D.N.Y.), 14 Civ. 8947 (TPG) (S.D.N.Y.)

**Schedule 1**

# Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

**Taylor, Jeffrey**

| | |
|---|---|
| **From:** | Eckstein, Kenneth H. |
| **Sent:** | Sunday, February 28, 2016 5:02 PM |
| **To:** | Argentina Settlement Group |
| **Subject:** | FW: AIP |
| **Attachments:** | Modified Document AIP  (003).doc |

As sent. Will wait for his reply.

**From:** Eckstein, Kenneth H.
**Sent:** Sunday, February 28, 2016 5:00 PM
**To:** Pollack, Daniel
**Subject:** FW: AIP

Dear Dan,

As you know, I represent all of the Plaintiffs that intend to be parties to the Agreement in Principle with the Republic of Argentina to be dated February 29, 2016 (a copy of which is attached and referred to as the "AIP").  I have been authorized by the Plaintiffs to agree to the modification to the AIP set forth below on their behalf.  Kindly send this email to Mr. Caputo and ask him to confirm today, on behalf of the Republic, by return email, that the following language shall be deemed substituted for the language in the third full (unnumbered) paragraph of paragraph 7 of the AIP.

"None of the requirements set forth in this paragraph 7 shall apply to a capital-raise which (a) occurs in the ordinary course of the operation and administration of the affairs of the government of the Republic of Argentina (for the purposes of this Agreement in Principle only, "ordinary course" shall not include paying in whole or in part, while this Agreement in Principle is in effect, any claims relating to defaulted Argentine bonds brought in the United States District Court for the Southern District of New York), (b) is (i) entirely denominated in Argentine pesos, which capital raises can be unlimited in amount, or (ii) other currencies, provided that such capital raises do not exceed, in the aggregate, $2,000,000,000 U.S. dollars (calculated for each such capital raise at the exchange rates in effect on the date of the closing of such capital raise) and (c) is marketed and offered solely within the Republic of Argentina."

Once Mr. Caputo has so confirmed, I am authorized to exchange signature pages with the Republic of Argentina and execute the AIP in the form attached hereto with the modification set forth above.

Best regards,

Kenneth H. Eckstein

**Kenneth H. Eckstein**
Partner

**KRAMER LEVIN**
**NAFTALIS & FRANKEL** LLP
1177 Avenue of the Americas
New York, New York 10036

1

**Pollack, Daniel**

| | |
|---|---|
| **From:** | Luis Andres Caputo <lcaputo@mecon.gob.ar> |
| **Sent:** | Sunday, February 28, 2016 5:35 PM |
| **To:** | Pollack, Daniel |
| **Subject:** | AIP |

Dear Dan:

I confirm the acceptability of the addition to para 7 as stated in Mr. Eckstein's e-mail to you of this afternoon.

Best regards,
Luis

ADDENDUM A
TO
AGREEMENT IN PRINCIPLE DATED AS OF FEBRUARY 29, 2016,
AS MODIFIED VIA EMAIL EXCHANGE ON FEBRUARY 28, 2016

In accordance with the Agreement in Principle, dated as of February 29, 2016, among the Republic of Argentina and each of the Plaintiffs named therein, as modified via email exchange on February 28, 2016 (as so modified, and as it may be amended from time to time hereafter, the "Agreement in Principle") the following procedures shall govern the process of funding payments to the Plaintiffs under the provisions of paragraph 7 of the Agreement in Principle.

A.      In accordance with the terms of the Agreement in Principle, the first monies raised through any capital-raises (except for capital-raises excluded pursuant to the third subparagraph within paragraph 7 of the Agreement in Principle, referred to herein as "Exempted Capital Raises") by the Republic of Argentina up to the full amount to be paid to the Plaintiffs under the Agreement in Principle (other than interest accruing after February 29, 2016) (any such capital-raise, a "Capital-Raise") will be paid by the financial institutions or other entities which fund, manage, syndicate or otherwise coordinate such Capital-Raise (such financial institutions referred to herein as "Facilitating Institutions"; where the Republic of Argentina is directly engaged in a Capital-Raise, the term Facilitating Institution refers to the Republic of Argentina itself) to the Plaintiffs in accordance with the procedures set forth in this Addendum A.  The term "Capital-Raises" is to be interpreted broadly to include all raising of capital, whether domestically or internationally, whether taking the form of debt, equity or other securities, loans, repo transactions, derivative instruments, or some other form, whether public or private, and whether offered broadly or not but, in each case, shall not include Exempted Capital Raises.

B.      The Republic of Argentina shall keep the Plaintiffs reasonably apprised on a current basis and in reasonable detail concerning the status of any and all Capital-Raises and, in furtherance of the foregoing, will (i) notify the Plaintiffs in writing of the identity of the Facilitating Institutions (including the contact information thereof, which shall include email addresses) upon the formal mandate thereof but, in any event, reasonably in advance of launch of marketing or syndication in respect of any Capital-Raise, the expected size of such Capital-Raise and the anticipated date of consummation of such Capital-Raise, in each case, reasonably in advance of the consummation thereof, and will notify Plaintiffs in writing in the event of and following any change in the Facilitating Institutions, such expected size or such anticipated date and (ii) provide to the Plaintiffs, on the basis that the Plaintiffs agree to maintain their confidentiality through the date the Capital-Raise is consummated or abandoned, draft underwriting agreement, offering memorandum or other material documentation with respect to any such Capital-Raise reasonably in advance of the execution thereof and, promptly upon execution of such documentation, executed copies thereof, in each case, in order to ensure compliance with this Addendum A.  In the event that the Republic of Argentina determines to undertake an Exempted Capital Raise denominated in a currency other than the Argentine peso, the Republic of Argentina will notify the Plaintiffs in writing of such determination reasonably in advance of the consummation thereof (which notice shall set forth the amount of such Exempted Capital Raise in the applicable currency) and in the event of the consummation of such Exempted Capital Raise, the Republic of Argentina will promptly notify the Plaintiffs in writing of such consummation (which notice shall set forth the final amount of such Exempted Capital Raise in the applicable currency).

C.      The Republic of Argentina will provide the Facilitating Institutions in respect of any Capital-Raise with a copy of this Addendum A and the Agreement in Principle, and will ensure that the definitive underwriting or other documentation relating thereto complies or is consistent with the provisions of this Addendum A.

D.      Plaintiffs shall promptly prepare Schedule IA to this Addendum A, which shall set forth the allocation of the aggregate amount payable to the Plaintiffs as of February 29, 2016 under the Agreement in Principle among the individual Plaintiffs and promptly provide the Republic of Argentina with such Schedule IA.  Schedule IA shall be signed by each of the Plaintiffs and, upon such signature, shall be incorporated herein by reference.

a)   If at any time payment of the amount, or remaining amount, due to the Plaintiffs (other than interest accruing after February 29, 2016, the payment of which is separately provided for in (Q) below) is made only in part, the Plaintiffs will promptly revise Schedule IA to reflect the payment in part.

b)   Nothing in this Addendum precludes payment to the Plaintiffs by the Republic of Argentina in any other manner which is in accordance with Schedule IA and which also provides for a cash payment by wire transfer of immediately available funds in U.S. dollars, but if payment is made in another manner in part, the Plaintiffs will appropriately modify Schedule IA.

c)   The Plaintiffs will promptly provide the Republic of Argentina with written notice of any changes to Schedule IA; provided that during the one business day period immediately preceding the consummation of a Capital Raise, a Plaintiff may not change the amount, or remaining amount, due to such Plaintiff with respect to the proceeds of any Capital Raise.

E.      The Plaintiffs will promptly prepare Schedule II to this Addendum A which will set forth the identification of the accounts of each of the Plaintiffs maintained with one or more money center financial institutions located in the State of New York or elsewhere in the United States and reasonably acceptable to the Republic of Argentina[1] (the "Accounts"), and wiring instructions for payment into each of the Accounts and promptly provide the Republic of Argentina with such Schedule II, which shall be incorporated herein by reference.  For operational convenience, a Plaintiff may designate on Schedule II the Account of an affiliate to receive payment on its behalf, provided it makes an indication to that effect on Schedule II.  The Plaintiffs agree to provide promptly to the Facilitating Institutions all "know your customer" or other similar information reasonably requested by the Facilitating Institutions to allow such Facilitating Institutions to comply with applicable law and regulations.

a)   If at any time a Plaintiff changes its Account or wiring instructions, it will promptly revise Schedule II to reflect the change and will promptly notify the other Plaintiffs and the Republic of Argentina of such change; provided that during the one business day period immediately preceding the consummation of a Capital Raise, a Plaintiff may not change its Account or wiring instructions with respect to the proceeds of any Capital-Raise.

b)   The Republic of Argentina will maintain the confidentiality of Schedule II, and will not disclose Schedule II except as necessary to implement the procedures of this Addendum A, to persons who will agree to maintain the confidentiality of Schedule II.

F.      All notices and other communications under this Addendum shall be in writing and shall be deemed given when actually received if (a) delivered personally by hand or via courier or (b) sent by e-mail, in each case, at the physical or email addresses—

---

[1]      The following institutions shall be deemed to be reasonably satisfactory to the Republic of Argentina: The Bank of New York Mellon, Wells Fargo, State Street Bank & Trust Co, State Street Bank & Trust Co, Boston, Goldman, Sachs & Co., JP Morgan Chase, TD Bank, N.A., The Bank of Nova Scotia, HSBC Private Bank, and Citibank NA.

a) If to the Plaintiffs, as set forth in Schedule III (which shall set forth both physical addresses and email addresses for each Plaintiff), which such Schedule III the Plaintiffs will promptly prepare and deliver to the Republic of Argentina and which Schedule III shall be incorporated herein by reference. Notice shall not be effective with respect to any Plaintiff unless delivered to each address or e-mail address, as the case may be, listed on Schedule III with respect to such Plaintiff, <u>provided</u> that delivery to physical addresses of any notice pursuant to (L) shall not be effective. If at any time a Plaintiff changes its notice instructions, it will promptly revise Schedule III to reflect the change and will promptly notify the other Plaintiffs and the Republic of Argentina of such change; <u>provided</u> that during the one business day period immediately preceding the consummation of a Capital Raise, a Plaintiff may not change its notice instructions with respect to any Capital-Raise;

b) If to the Republic of Argentina, as set forth in Schedule IV (which shall set forth both physical address and email addresses for the Republic of Argentina), which such Schedule IV the Republic of Argentina will promptly prepare and deliver to the Plaintiffs, and which Schedule IV shall be incorporated herein by reference. Notice shall not be effective with respect to the Republic of Argentina unless delivered to each address or e-mail address, as the case may be, listed on Schedule IV, <u>provided</u> that delivery to physical addresses of any notice pursuant to (L) shall not be effective. If at any time the Republic of Argentina changes its notice instructions, it will promptly revise Schedule IV to reflect the change and will promptly notify the Plaintiffs of such change; and

c) If to the Facilitating Institutions, as provided to the Plaintiffs in accordance with (B) above.

G.     No later than two business days after the Republic of Argentina provides notice to the Plaintiffs of the identity of the Facilitating Institutions as provided in (B) above, the Plaintiffs will provide written notice to the Facilitating Institutions for the Capital-Raise, with a copy to the Republic of Argentina, of Schedule IA, Schedule II and Schedule III as then in effect, and instruct the Facilitating Institutions to wire funds on the closing date in the amounts as provided in Schedule IA in accordance with wiring instructions as provided in Schedule II.

a) The Plaintiffs will promptly provide the Facilitating Institutions with written notice of any changes to Schedule IA, Schedule II or Schedule III made prior to consummation of any Capital-Raise, it being understood that no changes to any schedule hereto with respect to such Capital-Raise may be made during the periods set forth (D)(c), (E)(a) and (F) above.

b) The Facilitating Institutions will maintain the confidentiality of Schedule II, and will not disclose Schedule II except as necessary to implement the procedures of this Addendum A, to persons who will agree to maintain the confidentiality of Schedule II.

H.     The Republic of Argentina will (a) provide written notice to the Plaintiffs within 24 hours of becoming aware of any attempt by any creditor of the Republic of Argentina to place a lien upon, encumber or otherwise attach the proceeds of any Capital-Raise or to enjoin such Capital-Raise and (b) use its reasonable best efforts to cause the Facilitating Institutions to agree in any material documentation with respect to any Capital-Raise to provide prompt notice to the Plaintiffs upon becoming aware of any attempt by any creditor of the Republic of Argentina to place a lien upon, encumber or otherwise attach the proceeds of any Capital-Raise or to enjoin such Capital-Raise.

I.     The Plaintiffs will provide any notices or instructions to the financial institutions at which their respective Accounts are maintained, to the extent that such may be required by those institutions.

3

J.      On the closing date of any Capital-Raise, without further instruction, the Facilitating Institutions will cause to be wired to each of the Plaintiffs to their respective Accounts in accordance with Schedule II, cash in immediately available funds, in United States dollars in an amount sufficient to pay the amounts owed to each of the Plaintiffs, as set forth in Schedule IA.  The wire transfers will be initiated as promptly as operationally practicable on the closing date.  The Facilitating Institutions will provide prompt written confirmation to the Plaintiffs of the initiation of the wire transfers, including the time of initiation, the amounts of the wire transfers and the federal reference numbers.

K.      If the proceeds of a Capital-Raise are insufficient to pay the full amounts payable to the Plaintiffs as set forth in Schedule IA, the Facilitating Institutions will cause to be made a partial payment to each of the Plaintiffs pro rata in accordance with Schedule IA.

L.      If the proceeds of a Capital Raise are in excess of the amount required to pay the Plaintiffs in full, as set forth in Schedule IA, the excess may be applied by the Facilitating Institutions as the Republic of Argentina directs, but only after first monies raised through such Capital-Raise have been wired to the Plaintiffs as contemplated by (J) above and the Facilitating Institutions have provided in writing to each of the Plaintiffs federal reference numbers for each wire made to each such Plaintiff's Account, together with the amount so wired and the Plaintiff's Account to which it was wired (such federal reference numbers and wire information, collectively, the "Wire Confirmation Information") and the other applicable requirements of this (L) have been met.  After each Plaintiff has received Wire Confirmation Information, the Facilitating Institutions may initiate wires to pay other claims relating to the defaulted Argentine bonds pursuant to settlement agreements or agreements in principle in settlement of such claims ("Other Settled Claims").

The Facilitating Institutions may initiate wires or other transfers of Capital Raise proceeds (other than wires to the Plaintiffs as contemplated herein and in respect of the Other Settled Claims) only after each Plaintiff has confirmed in writing to the Facilitating Institutions and the Republic of Argentina that the receiving money-center financial institution at which its Account is held has received the payment in full of the amounts owed pursuant to the Agreement in Principle by Fedwire for crediting to such Plaintiff's Account.  Each Plaintiff shall use its reasonable best efforts to confirm as expeditiously as possible that such Plaintiff's payments have been received.  A Plaintiff shall be deemed to have made such confirmation unless such Plaintiff shall have notified the Facilitating Institutions in writing within sixty (60) minutes from that Plaintiff's receipt of Wire Confirmation Information that such Plaintiff is unable to confirm such receipt of funds.  All notices pursuant to this (L) shall be given by email in accordance with (F).

For the avoidance of doubt and notwithstanding anything contained in this Addendum A to the contrary, no Plaintiff will be deemed to have been paid in full under the terms of the Agreement in Principle unless and until the full amount of the monies owed to such Plaintiff shall have been received by such Plaintiff via deposit into such Plaintiff's Account in U.S. dollars in immediately available funds.

M.      Any payment made to the Accounts will be final and irrevocable, notwithstanding (in the case of any partial payment) any subsequent termination of the Agreement in Principle.  Any amounts so paid shall be credited on a dollar for dollar basis against the receiving Plaintiff's claims which are subject to the Agreement in Principle.  No such credit shall amend or otherwise modify any provision of the Agreement in Principle, including, but not limited to, paragraph 10 thereof which provides that in the event of a termination of the Agreement in Principle, the terminating Plaintiffs and the Republic of Argentina (with respect to the terminating Plaintiffs only) shall thereupon be restored to their respective prior positions as if there had been no Agreement in Principle.  Notwithstanding the crediting of any partial payment, all uncredited claims shall remain in full force and effect.

4

N.      The Facilitating Institutions and all other financial institutions participating in a Capital-Raise will be fully protected in relying on Schedule IA delivered to the Facilitating Institutions in accordance with (G) above, and any dispute of the Republic of Argentina regarding Schedule IA may be had solely with the Plaintiffs and will be resolved in accordance with paragraph 9 of the Agreement in Principle.

O.      No disclosure made by the Republic of Argentina in any offering document with regard to the use of proceeds of a Capital-Raise will be inconsistent with these procedures.

P.      The Plaintiffs and the Republic of Argentina will reasonably cooperate with the Facilitating Institutions to accommodate legal, logistical or other reasonable concerns of the Facilitating Institutions in connection with the implementation of this Addendum A.

Q.      The following procedures will apply to the payment of interest accruing after February 29, 2016 by the Republic of Argentina to the Plaintiffs in accordance with paragraph 7 of the Agreement in Principle.

a)  Payments of interest accruing after February 29, 2016 will be made by the Republic of Argentina on the same business day that the corresponding payment to the Plaintiffs of the amounts due the Plaintiffs under the Agreement in Principle (other than such interest) is made.  If such payment is made only in part, the amount of the interest accruing after February 29, 2016 will be payable in corresponding part to each of the Plaintiffs pro rata in accordance with Schedule IA.

b)  The Republic of Argentina will provide notice to the Plaintiffs of the payments of interest accruing after February 29, 2016 to each of the Plaintiffs no later than the time such payment is made.  The notice will state the amount paid and the basis upon which the amount paid was calculated.

c)  All payments of interest accruing after February 29, 2016 by the Republic of Argentina will be made in cash, in United States dollars, in immediately available funds by wire transfer to the Accounts in accordance with the instructions set forth in Schedule II as then in effect.

d)  Plaintiffs shall promptly prepare Schedule IB to this Addendum A which shall set forth the amount of interest accruing after February 29, 2016, payable to each of the Plaintiffs on a daily basis for payments made from March 2, 2016 to April 14, 2016, assuming the full amount payable to the Plaintiffs under the Agreement in Principle exclusive of such interest is paid in full on one of those days and promptly provide the Republic of Argentina with such Schedule IB.  Schedule IB shall be signed by each of the Plaintiffs and, upon such signature, shall be incorporated herein by reference.

e)  If at any time payment of the amount, or remaining amount, due to the Plaintiffs (other than interest accruing after February 29, 2016) is made only in part, the Plaintiffs will promptly revise Schedule IB to reflect the payment in part.

f)  The Plaintiffs will promptly provide the Republic of Argentina with written notice of any changes to Schedule IB.

g)  Schedule IB is provided for convenience only, and the amount of interest accruing after February 29, 2016 payable to the Plaintiffs will be governed by paragraph 1 of the Agreement in Principle, including with respect to interest accruing after April 14, 2016.

R.        Upon the payment in full to the Plaintiffs of all amounts due under the Agreement in Principle, the Plaintiffs shall, at the election of the Republic of Argentina, either (i) deliver or irrevocably instruct to be delivered the defaulted Republic of Argentina bonds that are the subject of the Agreement in Principle to the Republic of Argentina or (ii) irrevocably instruct the cancellation of such bonds.

S.        Notwithstanding anything to the contrary herein, all computations of amounts hereunder shall be in accordance with the Agreement in Principle and the aggregate amount of payments hereunder shall not exceed the amounts set forth in or contemplated by the Agreement in Principle, so long as the Agreement in Principle is in effect.  As to the allocation of any such amounts, the Republic of Argentina and the Facilitating Institutions shall be entitled to rely on the Schedules hereto or other written instructions of all of the Plaintiffs.

T.        No taxes shall be withheld by the Facilitating Institutions or the Republic of Argentina from any payments payable to the Plaintiffs in accordance with this Addendum A.

ANNEX E

Form of Opinion and Negative Assurance Letter of
Cleary Gottlieb Steen & Hamilton LLP, New York Counsel to the Republic of Argentina

April 22, 2016

Deutsche Bank Securities Inc.
HSBC Securities (USA) Inc.
J.P. Morgan Securities LLC
Santander Investment Securities Inc.
 as Representatives of the several Initial Purchasers

c/o Deutsche Bank Securities Inc.
60 Wall Street
New York, New York 10005

c/o HSBC Securities (USA) Inc.
452 Fifth Avenue
New York, New York 10018

c/o J.P. Morgan Securities LLC
383 Madison Avenue
New York, New York 10179

c/o Santander Investment Securities Inc.
45 East 53rd Street
New York, New York 10022

Ladies and Gentlemen:

　　　　We have acted as special United States counsel to the Republic of Argentina (the
"Republic"), in connection with the Republic's offering of U.S.$1,562,000,000 aggregate
principal amount of 6.250% Notes due 2019, U.S.$2,556,000,000 aggregate principal amount of
6.875% Notes due 2021, U.S.$3,692,000,000 aggregate principal amount of 7.500% Notes due
2026, and U.S.$1,562,000,000 aggregate principal amount of 7.625% Notes due 2046
(collectively, the "Notes"), pursuant to the terms of the purchase agreement dated April 19, 2016
(the "Purchase Agreement") among the Republic, Deutsche Bank Securities Inc., HSBC
Securities (USA) Inc., J.P. Morgan Securities LLC and Santander Investment Securities Inc., as
representatives to the several initial purchasers named in Schedule 1 thereto (the "Initial
Purchasers").  The Notes will be issued under an indenture dated as of April 22, 2016 (the
"Indenture") between the Republic and The Bank of New York Mellon, as trustee (the
"Trustee").  The preliminary offering memorandum dated April 11, 2016, relating to the Notes is
herein called the "Preliminary Offering Memorandum," and the final offering memorandum
dated April 19, 2016, relating to the Notes is herein called the "Final Offering Memorandum."
This opinion letter is furnished pursuant to Section 5(l) of the Purchase Agreement.

In arriving at the opinions expressed below, we have reviewed the following documents:

(a)   a facsimile copy of the executed Purchase Agreement;

(b)   the Preliminary Offering Memorandum;

(c)   the Final Offering Memorandum;

(d)   facsimile copies of each of the Rule 144A Global Securities and Regulation S Global Securities (each as defined in the Indenture) representing the Notes as executed by the Republic and authenticated by the Trustee;

(e)   a facsimile copy of the executed registration rights agreement dated April 19, 2016 (the "Registration Rights Agreement") between the Republic and the Initial Purchasers;

(f)   a facsimile copy of the executed Indenture; and

(g)   the documents delivered to you by the Republic at the closing pursuant to the Purchase Agreement.

In addition, we have reviewed the originals or copies certified or otherwise identified to our satisfaction of such instruments and other certificates of public officials, officers and representatives of the Republic and such other documents, and we have made such investigations of law, as we have deemed appropriate as a basis for the opinions expressed below.

In rendering the opinions expressed below, we have assumed the authenticity of all documents submitted to us as originals and the conformity to the originals of all documents submitted to us as copies.  In addition, we have assumed and have not verified (i) the accuracy as to factual matters of each document we have reviewed (including, without limitation, the accuracy of the representations and warranties of the Republic in the Purchase Agreement) and (ii) that the Notes have been duly authenticated in accordance with the terms of the Indenture.

Based on the foregoing, and subject to the further assumptions and qualifications set forth below, it is our opinion that:

1.   The Indenture has been duly executed and delivered by the Republic under the law of the State of New York and is a valid, binding and enforceable agreement of the Republic.

2.   The Purchase Agreement has been duly executed and delivered by the Republic under the law of the State of New York.

3.   The Registration Rights Agreement has been duly executed and delivered by the Republic under the law of the State of New York and is a valid, binding and enforceable agreement of the Republic (except that we express no opinion with respect to Section 5 of the Registration Rights Agreement for indemnification and contribution).

4.    The Notes have been duly executed and delivered by the Republic under the law of the State of New York and, assuming due authentication and delivery of the Notes by the Trustee, the Notes are valid, binding and enforceable obligations of the Republic, entitled to the benefits of the Indenture.

5.    The issuance and sale of the Notes to the Initial Purchasers pursuant to the Purchase Agreement do not, and the performance by the Republic of its obligations in the Purchase Agreement, the Registration Rights Agreement, the Indenture and the Notes will not, (a) require any consent, approval, authorization, registration or qualification of or with any governmental authority of the United States of America or the State of New York that in our experience normally would be applicable in relation to transactions of the type contemplated by the Purchase Agreement, the Registration Rights Agreement and the Indenture (but we express no opinion relating to the United States federal securities laws or any state securities or Blue Sky laws, except as set forth in paragraph 7 below) or (b) result in a violation of any United States federal or New York State law or published rule or regulation that in our experience normally would be applicable in relation to transactions of the type contemplated by the Purchase Agreement, the Registration Rights Agreement and the Indenture (but we express no opinion relating to the United States federal securities laws or any state securities or Blue Sky laws, except as set forth in paragraph 7 below).

6.    The statements set forth under the heading "Description of the Bonds" in the Preliminary Offering Memorandum, considered together with the pricing information set forth in Annex A to the Purchase Agreement, and under the heading "Description of the Bonds" in the Final Offering Memorandum, insofar as such statements purport to summarize certain provisions of the Notes and the Indenture, provide a fair summary of such provisions, the statements set forth under the heading "Exchange Offer; Registration Rights" in the Preliminary Offering Memorandum and under the heading "Exchange Offer; Registration Rights" in the Final Offering Memorandum, insofar as such statements purport to summarize certain provisions of the Registration Rights Agreement, provide a fair summary of such provisions, and the statements set forth under the heading "Taxation—U.S. Federal Income Tax Consequences" in the Preliminary Offering Memorandum and under the heading "Taxation—U.S. Federal Income Tax Consequences" in the Final Offering Memorandum, insofar as such statements purport to summarize certain federal income tax laws of the United States, constitute a fair summary of the principal U.S. federal income tax consequences of an investment in the Notes.

7.    No registration of the Notes under the U.S. Securities Act of 1933, as amended, and no qualification of an indenture under the U.S. Trust Indenture Act of 1939, as amended, are required for the offer and sale of the Notes by the Republic to the Initial Purchasers pursuant to and in the manner contemplated by the Purchase Agreement, or by the Initial Purchasers as contemplated by the Purchase Agreement, the Preliminary Offering Memorandum and the Final Offering Memorandum.

8.    Assuming validity under the laws of the Republic, then under the laws of the State of New York relating to submission to jurisdiction, the Republic, pursuant to Section 15 of the Purchase Agreement, Section 6 of the Registration Rights Agreement, Section 9.7 of the Indenture and Paragraph 16 of the Notes, respectively, has (i) validly and irrevocably submitted to the personal jurisdiction of any New York State or U.S. federal court in the Borough of

Manhattan, The City of New York in any action arising out of or related to the Indenture or the Notes, (ii) to the fullest extent permitted by applicable law, validly and irrevocably waived any objection to the venue of a proceeding in any such court, and (iii) validly appointed the person from time to time discharging the function of Banco de la Nación Argentina as its initial authorized agent for the purpose described in Section 15 of the Purchase Agreement, Section 6 of the Registration Rights Agreement, Section 9.7 of the Indenture and Paragraph 16 of the Notes; and service of process effected in the manner set forth in Section 15 of the Purchase Agreement, Section 6 of the Registration Rights Agreement, Section 9.7 of the Indenture and Paragraph 16 of the Notes will be effective to confer valid personal jurisdiction over the Republic in any such action.

Insofar as the foregoing opinions relate to the validity, binding effect or enforceability of any agreement or obligation of the Republic, (a) we have assumed that the Republic and each other party to such agreement or obligation has satisfied those legal requirements that are applicable to it to the extent necessary to make such agreement or obligation enforceable against it (except that no such assumption is made as to the Republic regarding matters of the federal law of the United States of America or the law of the State of New York that in our experience normally would be applicable with respect to such agreement or obligation), (b) such opinions are subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and to general principles of equity and (c) such opinions are subject to the effect of judicial application of foreign laws or foreign governmental actions affecting creditors' rights.

In rendering the opinion expressed in numbered paragraph 6 above, we have assumed the accuracy of, and compliance with, the representations, warranties and covenants of the Republic and the Initial Purchasers contained in the Purchase Agreement, and compliance with the procedures contained in the Preliminary Offering Memorandum and the Final Offering Memorandum relating to the offer and sale of the Notes.

The enforceability in the United States of the waiver by the Republic of its immunities, as set forth in Section 15 of the Purchase Agreement, Section 6 of the Registration Rights Agreement, Section 9.7 of the Indenture and Paragraph 16 of the Notes is subject to the limitations imposed by the Foreign Sovereign Immunities Act of 1976. We express no opinion as to the enforceability of any such waiver of immunity to the extent that it purports to apply to any immunity to which the Republic may become entitled after the date hereof.

We also note that the designation in Section 15 of the Purchase Agreement, Section 6 of the Registration Rights Agreement, Section 9.7 of the Indenture and Paragraph 16 of the Notes of the U.S. federal courts sitting in the Borough of Manhattan, The City of New York as the venue for actions or proceedings relating to the Purchase Agreement, Indenture and the Notes is (notwithstanding the waiver in Section 15 of the Purchase Agreement, Section 6 of the Registration Rights Agreement, Section 9.7 of the Indenture and Paragraph 16 of the Notes) subject to the power of such courts to transfer actions pursuant to 28 U.S.C. §1404(a) or to dismiss such actions or proceedings on the grounds that such a federal court is an inconvenient forum for such an action or proceeding.

We express no opinion as to the enforceability of Section 6(k) of the Registration Rights Agreement and Paragraph 17 of the Notes relating to currency indemnity.

The foregoing opinions are limited to the federal law of the United States of America and the law of the State of New York.

We are furnishing this opinion letter to you, as the Initial Purchasers, solely for your benefit in your capacity as such in connection with the offering of the Notes. This opinion letter is not to be relied on by or furnished to any other person or used, circulated, quoted or otherwise referred to for any other purpose. We assume no obligation to advise you or any other person, or to make any investigations, as to any legal developments or factual matters arising subsequent to the date hereof that might affect the opinions expressed herein.

Very truly yours,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: _____

, a Partner

April 22, 2016

Deutsche Bank Securities Inc.
HSBC Securities (USA) Inc.
J.P. Morgan Securities LLC
Santander Investment Securities Inc.
  as Representatives of the several Initial Purchasers

c/o Deutsche Bank Securities Inc.
60 Wall Street
New York, New York 10005

c/o HSBC Securities (USA) Inc.
452 Fifth Avenue
New York, New York 10018

c/o J.P. Morgan Securities LLC
383 Madison Avenue
New York, New York 10179

c/o Santander Investment Securities Inc.
45 East 53rd Street
New York, New York 10022

Ladies and Gentlemen:

       We have acted as special United States counsel to the Republic of Argentina (the "Republic"), in connection with the Republic's offering of U.S.$1,562,000,000 aggregate principal amount of 6.250% Notes due 2019, U.S.$2,256,000,000 aggregate principal amount of 6.875% Notes due 2021, U.S.$3,692,000,000 aggregate principal amount of 7.500% Notes due 2026, and U.S.$1,562,000,000 aggregate principal amount of 7.625% Notes due 2046 (collectively, the "Notes"), pursuant to the terms of the purchase agreement dated April 19, 2016 (the "Purchase Agreement") among the Republic and Deutsche Bank Securities Inc., HSBC Securities (USA) Inc., J.P. Morgan Securities LLC and Santander Investment Securities Inc., as representatives to the several initial purchasers named in Schedule 1 thereto (the "Initial Purchasers"). The preliminary offering memorandum dated April 11, 2016, relating to the Notes is herein called the "Preliminary Offering Memorandum," and the final offering memorandum dated April 11, 2016, relating to the Notes is herein called the "Final Offering Memorandum." This letter is furnished to you pursuant to Section 5(l) of the Purchase Agreement.

       Because the primary purpose of our professional engagement was not to establish or confirm factual matters or financial or statistical information, and because many determinations involved in the preparation of the Preliminary Offering Memorandum, the Final Offering Memorandum and the pricing information set forth in Annex A to the Purchase Agreement are of a wholly or partially non-legal character or relate to legal matters outside the scope of our opinion letter to you of even date herewith, we are not passing upon and do not

assume any responsibility for the accuracy, completeness or fairness of the statements contained in the Preliminary Offering Memorandum, the Final Offering Memorandum or the pricing information set forth in Annex A to the Purchase Agreement (except to the extent expressly set forth in numbered paragraph 6 of our opinion letter to you of even date herewith), and we make no representation that we have independently verified the accuracy, completeness or fairness of such statements (except as aforesaid). We note that certain portions of the Preliminary Offering Memorandum, the Final Offering Memorandum and the pricing information set forth in Annex A to the Purchase Agreement have been included therein on the authority of officials of the Republic, and that we are not experts (within the meaning of the U.S. Securities Act of 1933, as amended) with respect to any portion of the Preliminary Offering Memorandum, the Final Offering Memorandum or the pricing information set forth in Annex A to the Purchase Agreement, including, without limitation, the financial or statistical data included therein. We are also not passing upon and do not assume any responsibility for ascertaining whether or when any of the Preliminary Offering Memorandum, the Final Offering Memorandum or the pricing information set forth in Annex A to the Purchase Agreement were conveyed to any person.

However, in the course of our acting as special United States counsel to the Republic in connection with its preparation of the Preliminary Offering Memorandum, the Final Offering Memorandum and the pricing information set forth in Annex A to the Purchase Agreement, we participated in conferences and telephone conversations with officials and representatives of the Republic, your representatives and representatives of your counsel, during which conferences and conversations the contents of the Preliminary Offering Memorandum, the Final Offering Memorandum and the pricing information set forth in Annex A to the Purchase Agreement and related matters were discussed, and we reviewed certain records and documents furnished to us by the Republic.

Based on our participation in such conferences and conversations and our review of such records and documents as described above, our understanding of the U.S. federal securities laws and the experience we have gained in our practice thereunder, we advise you that:

(a)     No information has come to our attention that causes us to believe that the Preliminary Offering Memorandum (except the financial data included therein and the statistical data included in the sourcebook prepared in connection therewith, as to which we express no view), considered together with the pricing information set forth in Annex A to the Purchase Agreement, at 5:04 p.m.] (New York time) on April 19, 2016, contained an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(b)     No information has come to our attention that causes us to believe that the Final Offering Memorandum (except the financial data included therein and the statistical data included in the sourcebook prepared in connection therewith, as to which we express no view), as of the date thereof or hereof, contained or contains an untrue statement of a material fact or omitted or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

We are furnishing this letter to you, as the Initial Purchasers, solely for your benefit in your capacity as such in connection with the offering of the Notes. This letter is not to

be relied on by or furnished to any other person or used, circulated, quoted or otherwise referred to for any other purpose.  We assume no obligation to advise you, or to make any investigations, as to any legal developments or factual matters arising subsequent to the date hereof that might affect the views expressed herein.

Very truly yours,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:   _____
                     , a Partner

# Exhibit B

# EXHIBIT B
## AMOUNTS PAID TO FEBRUARY 29 SETTLING PARTIES

| # | Feb 29 Settling Party | Amount Paid (USD) | Fedwire Reference Number |
|---|---|---|---|
| 1 | NML Capital, Ltd. | U.S.$2,426,610,458.00 | F1S1604228065800 |
| 2 | Aurelius Capital Master, Ltd | U.S.$434,476,042.00 | 20160422B1Q8152C000876 |
| 3 | ACP Master, Ltd. | U.S.$108,711,975.00 | 20160422B1Q8152C000875 |
| 4 | Aurelius Opportunities Fund II, LLC | U.S.$134,225,451.00 | 20160422B1Q8154C000873 |
| 5 | Aurelius Capital Partners, LP | U.S.$169,141,371.00 | 20160422B1Q8154C000880 |
| 6 | Blue Angel Capital I LLC | U.S.$411,425,409.00 | 20160422B1Q8153C000856 |
| 7 | Olifant Fund, Ltd. | U.S.$70,990,501.00 | 20160422B1Q8153C000871 |
| 8 | FYI Ltd. | U.S.$366,407,062.00 | 20160422B1Q8151C000836 |
| 9 | FFI Fund Ltd. | U.S.$550,603,782.00 | 20160422B1Q8153C000855 |
| 10 | EM Limited | U.S.$849,201,747.00 | 20160422B1Q8151C001533 |
| 11 | Procella Holdings, L.P. | U.S.$37,866,814.00 | F1S1604228168900 |
| 12 | VR Global Partners, L.P. | U.S.$35,508,705.00 | F1S1604228167100 |
| 13 | Montreux Partners, LP | U.S.$308,560,843.00 | 20160422B1Q8151C001532 |
| 14 | Capital Ventures International | U.S.$221,833,952.53 | 20160422B1Q8151C001534 |
| 15 | Lorin Capital Master Fund, LP (formerly Tortus Capital Master Fund, LP) | U.S.$739,265.26 | F1S1604228158400 |

| # | Feb 29 Settling Party | Amount Paid (USD) | Fedwire Reference Number |
|---|---|---|---|
| 16 | Clarex Limited | U.S.$110,468,850.45 | 20160422B1Q8151C001541 |
| 17 | Lightwater Corporation Limited | U.S.$9,634,370.00 | 20160422B1Q8152C001553 |
| 18 | Old Castle Holdings, Ltd. | U.S.$963,437.00 | 20160422B1Q8154C001614 |
| 19 | Paolo Ercolani | U.S.$1,008,964.48 | 20160422B1Q8154C001846 |
| 20 | Rafael Leopoldo Settin Lando | U.S.$3,235,439.00 | 20160422B1Q8154C001612 |